**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE CITIGROUP INC. BOND LITIGATION | Master File No. 08 Civ. 9522 (SHS) <br><br> **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** <br><br> **ECF CASE** |

I.    INTRODUCTION .................................................................................. 2

II.   JURISDICTION AND VENUE ............................................................. 9

III.  PARTIES ............................................................................................... 9

      A.    Plaintiffs ..................................................................................... 9

      B.    Defendants ................................................................................ 12

            1.    Citigroup, Citigroup Funding, and the Citigroup Trusts.......... 12

            2.    Individual Defendants............................................................. 14

            3.    Underwriter Defendants.......................................................... 20

IV.   SUBSTANTIVE ALLEGATIONS ....................................................... 34

      A.    The Public Offering Materials Misstated and Omitted Material Facts
            Regarding Citigroup's Exposure to as Much as $66 Billion of CDOs Backed
            by Subprime Mortgages ........................................................... 36

            1.    Overview of Citigroup's CDO Business................................. 36

            2.    Beginning in 2006, the Housing Market Plummets,   Exposing
                  the Holders of Citigroup's CDO Securities to   Large Losses................. 38

            3.    Citigroup Shocks the Market by Disclosing Its Exposure to
                  Subprime-Backed CDOs.......................................................... 43

            4.    Citigroup Continues to Fundamentally Misstate the Value
                  of Its CDO Securities and Their Effect on Its  Financial
                  Condition Throughout 2008...................................................... 48

      B.    The Public Offering Materials Misrepresent Citigroup's Exposure
            to $100 Billion of SIVs, Fail to Consolidate the SIVs in Violation
            of GAAP, and Fail to Properly Value the SIVs' Assets ...................... 50

            1.    Citigroup's Misstatements about Its SIV Operations ............... 51

            2.    Citigroup Belatedly Admits Its Obligation to   Consolidate SIVs............ 55

            3.    The Company Misstates the Value of the Belatedly   Consolidated
                  SIV Assets in the 2008 Offering Materials................................ 56

      C.    The Public Offering Materials Report Materially Understated Reserves
            for Citigroup's Residential Mortgage Loan Portfolio........................... 58

            1.    Citigroup's Subprime, Second Lien, and Alt-A   Mortgages
                  Were Likely to Suffer Widespread Defaults.............................. 59

            2.    The Public Offering Materials Reported Materially Understated
                  Loss Reserves......................................................................... 61

D.     Misstatements Relating to Auction Rate Securities in the Public Offering Materials ......................................................................... 65

     1.     Citigroup's ARS Business ....................................................... 65

     2.     As Demand for ARS Plummets in 2007, the Public    Offering Materials Fail to Disclose that Citigroup    Accumulated $11 Billion of Illiquid and Impaired ARS ....................................................... 66

     3.     Citigroup Reveals Its Exposure to $11 Billion of Illiquid ARS and Incurs a $1.5 Billion Write-Down and Other Losses on Those Securities ....................................................... 67

E.     Citigroup Finally Reveals that Its CDOs, Mortgage Portfolio, SIV Assets, and ARS Exposures Left the Company Dangerously Undercapitalized, Necessitating the Government's $326 Billion Bailout ........... 68

V.     DEFENDANTS VIOLATED GENERALLY ACCEPTED ACCOUNTING PRINCIPLES AND OTHER REPORTING REGULATIONS ...................................... 74

A.     GAAP Background and Overview of GAAP Violations ...................................... 74

B.     Citigroup's Accounting for Its CDOs, SIVs and Other Subprime Exposures Violated GAAP and SEC Disclosure Requirements ......................... 75

     1.     Citigroup's Failure To Properly Disclose Its Direct Subprime Exposure Violated GAAP ...................................................... 75

C.     Citigroup Recorded Materially Understated Loan Loss Reserves In Violation Of GAAP ................................................................. 77

D.     Citigroup Violated GAAP by Failing to Consolidate Its Commercial Paper CDOs and SIVs onto its Balance Sheet Pursuant to FIN 46(R). ............... 77

     1.     FIN 46(R) Required Citigroup to Consolidate Its Commercial Paper CDOs ...................................................... 77

     2.     FIN 46(R) Required Citigroup to Consolidate Its SIVs.......................... 79

E.     Citigroup Misstated the Fair Value of its Subprime Related CDOs and Its Subprime-Linked SIV Assets ................................................... 82

     1.     Citigroup Misstated The Fair Value of its CDOs ................................... 82

     2.     Citigroup Misstated the Fair Value of its SIVs........................................ 86

VI.     SUMMARY OF CITIGROUP'S FALSE AND MISLEADING SECURITIES OFFERINGS ............................................................................. 87

VII.     ADDITIONAL FALSE AND MISLEADING STATEMENTS IN THE PUBLIC OFFERING MATERIALS .................................................... 95

VIII.     CLASS ACTION ALLEGATIONS ........................................................ 95

IX.     THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE.......................................................... 107

X.     CAUSES OF ACTION.....................................................................107

Plaintiffs Minneapolis Firefighters' Relief Association ("Minneapolis Firefighters"), Louisiana Municipal Police Employees' Retirement System ("LMPERS"), Louisiana Sheriffs' Pension and Relief Fund ("Louisiana Sheriffs"), City of Tallahassee Retirement System ("City of Tallahassee"), Miami Beach Employees' Retirement Plan ("MBERP"), Southeastern Pennsylvania Transit Authority ("SEPTA"), City of Philadelphia Board of Pensions and Retirement ("City of Philadelphia"), and American European Insurance, Company ("AEIC") (collectively, "Plaintiffs"), bring this action individually and on behalf of all persons and entities, except Defendants and their affiliates, who purchased or otherwise acquired the debt securities (including certain medium term notes), series of preferred stock and certain series of depository shares representing interests in preferred stock (collectively, "Bond Class Securities") in or traceable to offerings between May 2006 and August 2008 (the "Offerings Period"), as set forth on the Appendix attached hereto (the "Offerings"), and were damaged thereby.

Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief is based on, *inter alia,* the investigation of Court-appointed Bond Counsel, Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz"), Court-appointed Lead Counsel, Kirby McInerney LLP, and other counsel working at their direction, including Barroway Topaz Kessler Meltzer & Check, LLP ("Barroway Topaz") and Pomerantz Haudek Block Grossman and Gross LLP ("Pomerantz Haudek"). This investigation included, but was not limited to, interviews and consultations with former employees of Citigroup and its subsidiaries, as well as a review of: (1) public filings with the Securities and Exchange Commission ("SEC"); (2) research reports by securities and financial analysts; (3) transcripts of Citigroup investor conference calls; (4) publicly available Company presentations; (5) press releases and media

reports; (6) economic analyses of securities movement and pricing data; (7) publicly available legal actions involving Citigroup; (8) media and economic reports regarding the housing market and mortgage industry; and (9) consultation with various relevant experts.

Plaintiffs' investigation into the factual allegations contained herein is continuing, and many of the facts related to Plaintiffs' allegations are known only by Citigroup and the Defendants named herein, or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. The Securities Act claims asserted herein do not sound in or arise from allegations of fraud.

## I.    <u>INTRODUCTION</u>

1.    Between May 2006 and August 2008, Citigroup raised over $71 billion dollars from investors in the Offerings, while misrepresenting its exposure to several hundred billion dollars worth of toxic securities linked to residential mortgages. Investors in the Offerings did not learn the truth about Citigroup's toxic mortgage-linked exposures until November 2008, when the Bond Class Securities plummeted in value following a series of admissions that revealed Citigroup's disastrous financial condition. Indeed, the Company's situation was so dire that the United States Government was forced to engineer an unprecedented $326 billion bailout to protect Citigroup – once the world's largest bank – from a forced breakup or liquidation.

2.    The principal driver of growth in Citigroup's business since 2005 was extending and securitizing mortgages and other loans. Citigroup operated its business with an extremely high degree of leverage. At the end of 2007, the Company's Tier 1 capital ratio—which measured Citigroup's capital as a percentage of its assets at risk of default—reflected that Citigroup possessed just $7 of capital for every $100 of risky assets that it held. Thus, it was critical that Citigroup accurately disclose and account for its riskiest exposures, because losses in

even a small portion of those exposures would be more than enough to deplete the Company's capital and render it insolvent.

3. During the time that Citigroup conducted the Offerings, the U.S. housing market plummeted, as home prices collapsed and millions of borrowers defaulted on their mortgages. Consequently, the Company's riskiest exposures during this time period included: (1) as much as $66 billion of collateralized debt obligations ("CDOs") backed by subprime mortgage assets; (2) $100 billion of assets in off-balance sheet structured investment vehicles ("SIVs") that purchased a wide variety of subprime mortgage-related securities; and (3) $213 billion of subprime and similarly risky mortgages that Citigroup directly owned. Citigroup made untrue statements and material omissions in the Public Offering Materials[1] regarding its exposure to each of these asset classes.

4. For example, for most of the Offerings Period, Citigroup's SEC filings, which were incorporated into the Public Offering Materials, represented that Citigroup had virtually no direct exposure to subprime mortgaged-backed CDOs on the Company's balance sheet. Indeed, it was not until November 4, 2007, that Citigroup suddenly disclosed that it had more than $55 billion of direct exposure to subprime mortgage-backed CDO securities. Research analysts and the financial press immediately expressed their dismay over Citigroup's failure to previously disclose this CDO exposure. As noted by multiple analysts, investors had been "misled" about "the extent of the company's CDO exposure," which "has never been disclosed before, not even in [Citigroup's] 3Q call, which is very surprising."

5. The Public Offering Materials also misrepresented Citigroup's exposure to SIVs. SIVs were off-balance sheet entities, created and managed by Citigroup, which raised money by

---

[1] The "Public Offering Materials" for each Offering include the Shelf Registration Statement, the prospectus and pricing supplement, and all SEC filings incorporated therein, as further described in Section VI and reflected on the Appendix attached hereto.

issuing commercial paper that Citigroup marketed and sold to its institutional clients. The SIVs used these funds to purchase, among other things, mortgage-backed and other securities directly from Citigroup, and then used the income generated by those assets to pay the holders of their commercial paper. Citigroup was the largest sponsor and manager of SIVs in the world, having created about 25% of the $400 billion market for these entities. Because the SIVs removed unwanted assets from the Company's balance sheet and provided the Company with new capital that it used to extend fresh loans, the SIVs' financial condition was critical to Citigroup's ability to continue its mortgage lending and securitization business.

6.     During 2006 and the first three quarters of 2007, Citigroup repeatedly represented in its Public Offering Materials that it would not suffer losses in connection with the SIVs it sponsored, had no responsibility for any such losses, and would not consolidate the SIVs onto its own balance sheet. Indeed, the Public Offering Materials stated that, because Citigroup had only "limited continuing involvement" in its off-balance sheet SIVs, any losses the Company might suffer were "not expected to be material." Even as late as November 2007, when the value of the SIVs' assets had substantially declined and the SIVs could no longer issue commercial paper to fund their operations, Citigroup still insisted that it had no obligation to, and would not, consolidate the SIVs onto its balance sheet, and was not responsible for any losses incurred by the SIVs.

7.     Citigroup's statements about its SIV exposure were untrue and omitted material facts. In reality, and as Citigroup was ultimately forced to acknowledge, the Company was obligated to consolidate its SIVs in its financial statements and absorb the SIVs' losses. Indeed, on December 13, 2007—only one month after it again publicly assured investors that it was not responsible for losses incurred by its SIVs—Citigroup announced that it was consolidating the

SIV assets onto its balance sheet, thereby exposing the Company to billions of dollars of failing subprime mortgage related securities. As the *Financial Times* noted, "This is the second time unwanted assets have suddenly appeared on the Citigroup balance sheet. The bank's knack for landing in the blackest spots of the market is starting to look hard to match."

8.     The Public Offering Materials also materially understated loss reserves for the Company's $213 billion portfolio of residential mortgage loans. Many of these mortgages carried a high risk of default because they were made to borrowers who did not document their income or who possessed especially low credit scores, or because the loans were drawn against the equity value of a property at a time when housing prices were declining precipitously. While accounting rules required Citigroup to take reserves based on losses that were "likely" to occur, the Company allowed its reserves to track—and at times to be less than—the amount of loans that had already defaulted. Further, despite the Company's rapidly expanding portfolio of particularly risky loans, coupled with the collapse of the housing market, Citigroup reduced its allowance for loan losses as a percentage of total loans in 2006 and 2007. Indeed, Citigroup's reserves as a percentage of total loans by year end 2006 was barely half the Company's reserve percentage in 2003, when the Company's exposures were far less risky and the housing markets were far healthier.

9.     Even after the Company belatedly disclosed some of its subprime-related exposures at the end of 2007, it continued to fundamentally misrepresent the value of those assets. For example, on April 28, 2008, the Company conducted a public offering pursuant to which it sold $6 billion worth of bonds. In the Public Offering Materials for those bonds, Citigroup assured investors that its subprime mortgage-backed CDO securities had a "fair value" of $39.8 billion, and that this figure was reliable because Citigroup's valuation methodology had

been "refined . . . to reflect ongoing unfavorable market developments" in the housing sector. Similarly, the Public Offering Materials represented that the Company's recently consolidated SIVs possessed "high quality" assets and therefore their consolidation "resulted in an increase of assets of $59 billion." Further, the Company assured investors that it possessed ample capital to fund any potential losses on these or any other assets. Indeed, the Public Offering Materials reported that the Company was not only "well capitalized" under federal regulations, but that Citigroup's readily available capital was so plentiful that it was "sufficient to absorb unexpected market, credit, or operational losses."

10. Those statements were materially untrue. In reality, Citigroup's toxic CDOs, subprime-linked SIV assets and mortgage loans were deteriorating rapidly in value and worth drastically less than the values that Citigroup represented, and the Company did not have the capital it needed to absorb losses on those holdings. On November 17, 2008, Citigroup held a "Town Hall" meeting for its employees. At this meeting, the Company announced that, even after recording more than $32 billion of write-downs on the assets described above, it would no longer mark-to-market another $80 billion of mortgage-related assets. Two days later, on November 19, 2008, Citigroup announced that it would dismantle its SIVs and purchase their remaining $17.4 billion of assets in order to pay off the holders of SIV-issued commercial paper, further indicating the toxic nature of the SIVs' purportedly "high quality" assets.

11. As a result of these disclosures, investors and analysts finally realized the truth about Citigroup's financial condition. Specifically, by refusing to disclose the true market value of these mortgage-linked assets by marking them to market, and by dismantling the SIVs and directly assuming their assets, Citigroup essentially admitted that these exposures were either worthless or worth so much less than reported that the Company could not withstand the losses it

would have to take if it reported their true value. *The Wall Street Journal* noted that "[t]he back-to-back moves, coupled with existing fears about Citigroup's massive off-balance-sheet holdings, stoked investor fears that Citigroup could be swamped by toxic assets flooding back onto its books." On November 20, 2008, an analyst wrote that it "received numerous calls today asking [] if Citigroup is about to fail."

12. Purchasers of the Bond Class Securities suffered a collapse in the value of their investments, with debt and preferred securities issued in the Offerings collapsing as much as 56% between November 17 and November 21, 2008 as the market realized that Citigroup's mortgage-linked exposures were worth tens of billions of dollars less than was previously represented.

13. Faced with these developments, and recognizing that a Citigroup failure would destabilize global financial markets, the U.S. government was forced to take action that was unprecedented in scope and scale. On November 23, 2008, only six days after the Town Hall meeting, the Government was forced to guarantee over $300 billion of "loans and securities backed by residential real estate and commercial real estate" in order to rescue Citigroup from the losses caused by the Company's hundreds of billions of dollars of toxic mortgage-linked securities – many of which remained undisclosed until after the Company began incurring losses on those exposures. The Government also injected the Company with $20 billion of cash to stabilize its dwindling capital base – an amount that was in addition to the $25 billion the Government had given to Citigroup in October 2008 in connection with the Troubled Asset Relief Program ("TARP").

14. Although the Public Offering Materials had repeatedly reassured investors that the Company's mortgage-related "assets" were worth hundreds of billions of dollars and that the

Company could absorb even "unexpected" losses on those exposures, the bailout revealed that the opposite was true. As one analyst wrote, "the deal is essentially pricing in the expectation that Citi's toxic assets are worth much less than Citi has valued them at," and that as a result of the bailout, "the Federal Reserve (a/k/a the taxpayer…) is on the hook for hundreds of billions of dollars."

15.     In fact, the Company's mortgage-related assets were so impaired, and the losses on them so severe, that even the staggering $326 billion bailout was not enough to rescue Citigroup. On January 12, 2008, *The Wall Street Journal* reported that Citigroup was expected to record a loss of approximately $10 billion for the fourth quarter of 2008, and had agreed to sell its lucrative brokerage business in order to raise billions of dollars to fund its continuing losses, despite the Government guarantee.

16.     Further, on January 13, 2008, *The Wall Street Journal* reported that the Company could no longer survive as presently constituted and would need to be dismantled in order to raise capital. According to the article, Citigroup would fund its continuing losses through "a drastic plan to shed a host of businesses and shrink itself by one-third," thus ending its existence as the country's largest bank. The Company's mortgage-related assets were so impaired, the article reported, that Citigroup was seeking to form a separate entity – a so-called "bad bank" – in which it could quarantine those assets permanently.

17.     Accordingly, Plaintiffs seek relief under the Securities Act of 1933, on behalf of themselves and a Class of investors similarly situated for their damages resulting from purchases or acquisitions of Bond Class Securities made pursuant to or traceable to the Registration Statements issued in connection with the Public Offering Materials.

## II.   JURISDICTION AND VENUE

18.   This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331.  The claims alleged herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o.

19.   Venue is proper in this district pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b), (c), and (d).  Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this district. At all times relevant to this Complaint, the headquarters and principal offices of Citigroup were located within this district at 399 Park Avenue, New York, New York 10043.

20.   In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of national securities exchanges.

## III.   PARTIES

### A.   Plaintiffs

21.   Plaintiff Minneapolis Firefighters is a public pension system that operates for the benefit of current and former firefighters of the City of Minneapolis, Minnesota and their dependents.  Minneapolis Firefighters purchased certain Bond Class Securities pursuant to the Shelf Registration Statements and related Public Offering Materials as set forth on its certification attached hereto as Exhibit A.  The Public Offering Materials contained material misstatements and omissions of fact.  Minneapolis Firefighters and its investment personnel were

misled by the false and misleading statements set forth herein and suffered damages pursuant to Section 11, 12 and/or 15 of the Securities Act.

22.    Plaintiff Louisiana Sheriffs is a defined-benefit pension fund for sheriffs in the State of Louisiana. Louisiana Sheriffs purchased certain Bond Class Securities pursuant to the Shelf Registration Statements and related Public Offering Materials as set forth on its certification attached hereto as Exhibit B. The Public Offering Materials contained material misstatements and omissions of fact. Louisiana Sheriffs and its investment personnel were misled by the false and misleading statements set forth herein and suffered damages pursuant to Section 11, 12 and/or 15 of the Securities Act.

23.    Plaintiff Louisiana Municipal Police Employees' Retirement System ("Louisiana Police") is a defined-benefit pension fund for police officers in the State of Louisiana. Louisiana Police purchased certain Bond Class Securities pursuant to the Shelf Registration Statements and related Public Offering Materials as set forth on its certification attached hereto as Exhibit C. The Public Offering Materials contained material misstatements and omissions of fact. Louisiana Police and its investment personnel were misled by the false and misleading statements set forth herein and suffered damages pursuant to Section 11, 12 and/or 15 of the Securities Act.

24.    Plaintiff the City of Tallahassee Retirement System ("City of Tallahassee") is a public pension plan for the benefit of current and former employees of the City of Tallahassee, Florida. The City of Tallahassee purchased certain of the Bond Class Securities pursuant to or traceable to the Shelf Registration Statements and related Public Offering Materials as set forth on its certification attached hereto as Exhibit D. The Public Offering Materials contained material misstatements and omissions of fact. The City of Tallahassee and its investment

personnel were misled by the false and misleading statements set forth herein and suffered damages pursuant to Section 11, 12 and/or 15 of the Securities Act.

25.     Plaintiff the City of Philadelphia Board of Pensions and Retirement ("City of Philadelphia") is a public pension system that operates for the benefit of active and retired police, fire and municipal workers of Philadelphia, Pennsylvania.  The City of Philadelphia purchased certain of the Bond Class Securities pursuant to or traceable to the Shelf Registration Statements and related Public Offering Materials as set forth on its certification attached hereto as Exhibit E.  The Public Offering Materials contained material misstatements and omissions of fact.  The City of Philadelphia and its investment personnel were misled by the false and misleading statements set forth herein and suffered damages pursuant to Section 11, 12 and/or 15 of the Securities Act.

26.     Plaintiff the Miami Beach Employees' Retirement Plan ("MBERP") is a public pension system that operates for the benefit of current and former employees of the City of Miami Beach, Florida.  The MBERP purchased certain of the Bond Class Securities pursuant to or traceable to the Shelf Registration Statements and related Public Offering Materials as set forth on its certification attached hereto as Exhibit F.  The Public Offering Materials contained material misstatements and omissions of fact.  The MBERP and its investment personnel were misled by the false and misleading statements set forth herein and suffered damages pursuant to Section 11, 12 and/or 15 of the Securities Act.

27.     Plaintiff Southeastern Pennsylvania Transit Authority ("SEPTA") is the nation's fifth largest public transportation system and maintains a pension fund operating for the benefit of current and former employees of SEPTA.  SEPTA purchased certain of the Bond Class Securities pursuant to or traceable to the Shelf Registration Statements and related Public Offering Materials as set forth on its certification attached hereto as Exhibit G.  The Public

Offering Materials contained material misstatements and omissions of fact. SEPTA and its investment personnel were misled by the false and misleading statements set forth herein and suffered damages pursuant to Section 11, 12 and/or 15 of the Securities Act.

28. Plaintiff, American European Insurance, Company ("AEIC") is a property/casualty insurer, based in Cherry Hill, New Jersey. AEIC purchased certain of the Bond Class Securities pursuant to or traceable to the Shelf Registration Statements and related Public Offering Materials, as set forth on its certification attached hereto as Exhibit H. The Public Offering Materials contained material misstatements and omissions of fact. AEIC and its investment personnel were misled by the false and misleading statements set forth herein and suffered damages pursuant to Section 11, 12 and/or 15 of the Securities Act.

**B.** **Defendants**

**1.** **Citigroup, Citigroup Funding, and the Citigroup Trusts**

29. Defendant Citigroup, incorporated in 1988 under the laws of Delaware, is traded on the NYSE under the symbol "C." Citigroup's principal executive offices are located at 399 Park Avenue, New York, New York. The Company is a multibank holding company providing various financial services to customers in the United States and internationally. Citigroup is an issuer of securities at issue in this action, as set forth herein.

30. Defendant Citigroup Funding, Inc. ("Citigroup Funding") is a wholly-owned subsidiary of Citigroup whose business activities consist primarily of providing funds to Citigroup and its subsidiaries. Citigroup Funding's principal executive offices are located at 399 Park Avenue, New York, New York. Citigroup Funding is an issuer of securities at issue in this action, as set forth herein.

31. Defendant Citigroup Capital XIV is a Delaware statutory trust located at 399 Park Avenue, New York, New York. The sole assets of Citigroup Capital XIV are securities issued by

Citigroup. Citigroup Capital XIV is an issuer of securities at issue in this action, as set forth herein.

32.     Defendant Citigroup Capital XV is a Delaware statutory trust located at 399 Park Avenue, New York, New York. The sole assets of Citigroup Capital XV are securities issued by Citigroup. Citigroup Capital XV is an issuer of securities at issue in this action, as set forth herein.

33.     Defendant Citigroup Capital XVI is a Delaware statutory trust located at 399 Park Avenue, New York, New York. The sole assets of Citigroup Capital XVI are securities issued by Citigroup. Citigroup Capital XVI is an issuer of securities at issue in this action, as set forth herein.

34.     Defendant Citigroup Capital XVII is a Delaware statutory trust located at 399 Park Avenue, New York, New York. The sole assets of Citigroup Capital XVII are securities issued by Citigroup. Citigroup Capital XVII is an issuer of securities at issue in this action, as set forth herein.

35.     Defendant Citigroup Capital XVIII is a Delaware statutory trust located at 399 Park Avenue, New York, New York. The sole assets of Citigroup Capital XIII are securities issued by Citigroup. Citigroup Capital XVIII is an issuer of securities at issue in this action, as set forth herein.

36.     Defendant Citigroup Capital XIX is a Delaware statutory trust located at 399 Park Avenue, New York, New York. The sole assets of Citigroup Capital XIX are securities issued by Citigroup. Citigroup Capital XIX is an issuer of securities at issue in this action, as set forth herein.

37.     Defendant Citigroup Capital XX is a Delaware statutory trust located at 399 Park Avenue, New York, New York.  The sole assets of Citigroup Capital XX are securities issued by Citigroup.  Citigroup Capital XX is an issuer of securities at issue in this action, as set forth herein.

38.     Defendant Citigroup Capital XXI is a Delaware statutory trust located at 399 Park Avenue, New York, New York.  The sole assets of Citigroup Capital XXI are securities issued by Citigroup.  Citigroup Capital XXI is an issuer of securities at issue in this action, as set forth herein.

39.     The Defendants listed in ¶¶31-38 are referred to collectively herein as the "Citigroup Trusts."

40.     The Defendants listed in ¶¶29-38 are referred to collectively herein as the "Citigroup Defendants."

### 2.     Individual Defendants

41.     Defendant C. Michael Armstrong ("Armstrong") has been a member of the Board of Directors of Citigroup since 1989.  Armstrong is liable for the Offerings pursuant to the shelf registration statements dated March 2, 2006, March 10, 2006 and June 20, 2006, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Citigroup director.

42.     Defendant Alan J.P. Belda ("Belda") has been a member of the Board of Directors of Citigroup since 1997.  Belda is liable for the Offerings pursuant to the shelf registration statements dated March 2, 2006 and March 10, 2006 and June 20, 2006, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Citigroup director.

43.     Defendant Sir Winfried Bischoff ("Bischoff") has been a member of the Board of Directors of Citigroup since 2007.  Bischoff is liable for all Offerings completed during his tenure as a Citigroup director.

44.     Defendant Michael Conway ("Conway"), at times relevant hereto, was a Vice President and Controller of Citigroup Funding.  Conway is liable for the Offerings pursuant to the shelf registration statement dated March 10, 2006, filed with the SEC on Form S-3, which he signed.

45.     Defendant Gary Crittenden ("Crittenden") was, at times relevant hereto, the Chief Financial Officer of Citigroup.  Crittenden signed Citigroup's annual report on Form 10-K, which was incorporated by reference into all Public Offering Materials applicable to Offerings occurring after February 22, 2008 (the date on which the relevant Form 10-K was filed with the SEC).

46.     Defendant George David ("David') was a member of the Board of Directors of Citigroup from 2002 to April 22, 2008.  David is liable for the Offerings pursuant to the shelf registration statements dated March 2, 2006, March 10, 2006 and June 20, 2006, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Citigroup director.

47.     Defendant Kenneth T. Derr ("Derr") has been a member of the Board of Directors of Citigroup since 1987.  Derr is liable for the Offerings pursuant to the shelf registration statements dated March 2, 2006, March 10, 2006, and June 20, 2006, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Citigroup director.

48.     Defendant John M. Deutch ("Deutch") has been a member of the Board of Directors of Citigroup since 1996.  Deutch is liable for the Offerings pursuant to the shelf

registration statements dated March 2, 2006, March 10, 2006 and June 20, 2006, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Citigroup director.

49.     Defendant Scott Freidenrich ("Freidenrich"), at times relevant hereto, was a Director of Citigroup Funding.  Freidenrich is liable for the Offerings pursuant to the shelf registration statement dated March 10, 2006, filed with the SEC on Form S-3, which he signed.

50.     Defendant James Garnett ("Garnett"), at times relevant hereto, was a Director of Citigroup Funding.  Garnett is liable for the Offerings pursuant to the shelf registration statement dated March 10, 2006, filed with the SEC on Form S-3, which he signed.

51.     Defendant John C. Gerspach ("Gerspach") was, at times relevant hereto, Controller and Chief Accounting Officer of Citigroup, a Director of Citigroup Funding, and a trustee of Citigroup Trusts.  Gerspach is liable for the Offerings pursuant to the shelf registration statements dated March 2, 2006, March 10, 2006 and June 20, 2006, filed with the SEC on Form S-3, which he signed.

52.     Defendant Ann Dibble Jordan ("Jordan") was a member of the Board of Directors of Citigroup from 1989 to April 17, 2007.  Jordan is liable for the Offerings pursuant to the shelf registration statements dated March 2, 2006, March 10, 2006 and June 20, 2006, filed with the SEC on Form S-3, which she signed, and for all Offerings completed during her tenure as a Citigroup director.

53.     Defendant Klaus Kleinfeld ("Kleinfeld") was a member of the Board of Directors of Citigroup from 2005 to August 15, 2007.  Kleinfeld is liable for the Offerings pursuant to the shelf registration statements dated March 2, 2006, March 10, 2006 and June 20, 2006, filed with

the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Citigroup director.

54.     Defendant Sallie L. Krawcheck ("Krawcheck") was, at times relevant hereto, the Chief Financial Officer of Citigroup, as well as a trustee of Citigroup Trusts.   Krawcheck is liable for the Offerings pursuant to the shelf registration statements dated March 2, 2006, March 10, 2006 and June 20, 2006, filed with the SEC on Form S-3, which she signed.

55.     Defendant Andrew N. Liveris ("Liveris") has been a member of the Board of Directors of Citigroup since 2005.   Liveris is liable for the Offerings pursuant to the shelf registration statements dated March 2, 2006, March 10, 2006 and June 20, 2006, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Citigroup director.

56.     Defendant Dudley C. Mecum ("Mecum") was a member of the Board of Directors of Citigroup from 1986 to April 17, 2007.   Mecum is liable for the Offerings pursuant to the shelf registration statements dated March 2, 2006, March 10, 2006 and June 20, 2006, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Citigroup director.

57.     Defendant Ann M. Mulcahy ("Mulcahy") has been a member of the Board of Directors of Citigroup since 2004.   Mulcahy is liable for the shelf registration statements dated March 2, 2006, March 10, 2006 and June 20, 2006, filed with the SEC on Form S-3, which she signed, and for all Offerings completed during her tenure as a Citigroup director.

58.     Defendant Vikram Pandit ("Pandit") has been a member of the Board of Directors of Citigroup since December 2007.   Pandit is liable for all Offerings completed during his tenure as a Citigroup director.   Pandit signed Citigroup's annual report on Form 10-K, which was

incorporated by reference into all Public Offering Materials applicable to Offerings occurring after February 22, 2008 (the date on which the relevant Form 10-K was filed with the SEC).

59.     Defendant Richard D. Parsons ("Parsons") has been a member of the Board of Directors of Citigroup since 1996.  Parsons is liable for the Offerings pursuant to the shelf registration statements dated March 2, 2006, March 10, 2006 and June 20, 2006, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Citigroup director.

60.     Defendant Charles Prince ("Prince") was a member of the Board of Directors from 2003 to November 5, 2007.  Prince is liable for the Offerings pursuant to the shelf registration statements dated March 2, 2006, March 10, 2006 and June 20, 2006, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Citigroup director.

61.     Defendant Roberto Hernandez Ramirez ("Ramirez") has been a member of the Board of Directors of Citigroup since 2001.  Ramirez is liable for the Offerings pursuant to the shelf registration statements dated March 2, 2006, March 10, 2006 and June 20, 2006, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Citigroup director.

62.     Defendant Judith Rodin ("Rodin") has been a member of the Board of Directors of Citigroup since 2004.  Rodin is liable for the Offerings pursuant to the shelf registration statements dated March 2, 2006, March 10, 2006 and June 20, 2006, filed with the SEC on Form S-3, which she signed, and for all Offerings completed during her tenure as a Citigroup director.

63.     Defendant Saul Rosen ("Rosen"), at times relevant hereto, was a Director of Citigroup Funding, as well as a Trustee of Citigroup Trusts.  Rosen is liable for the Offerings

pursuant to the shelf registration statements dated March 2, 2006, March 10, 2006 and June 20, 2006, filed with the SEC on Form S-3, which he signed.

64.    Defendant Robert E. Rubin ("Rubin") has been a member of the Board of Directors of Citigroup since 1999.  Rubin is liable for the Offerings pursuant to the shelf registration statements dated March 2, 2006, March 10, 2006 and June 20, 2006, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Citigroup director.

65.    Defendant Robert L. Ryan ("Ryan") has been a member of the Board of Directors of Citigroup since 2007.  Ryan is liable for all Offerings completed during his tenure as a Citigroup director.

66.    Defendant Franklin A. Thomas ("Thomas") has been a member of the Board of Directors of Citigroup since 1970.  Thomas is liable for the Offerings pursuant to the shelf registration statements dated March 2, 2006, March 10, 2006 and June 20, 2006, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Citigroup director.

67.    Defendant Eric L. Wentzel ("Wentzel"), at times relevant hereto, was Executive Vice President and Treasurer of Citigroup Funding, as well as a Trustee of Citigroup Trusts. Wentzel is liable for the Offerings pursuant to the shelf registration statement dated March 10, 2006, filed with the SEC on Form S-3, which he signed.

68.    Defendant David Winkler ("Winkler"), at times relevant hereto, was Executive Vice President and Chief Financial Officer of Citigroup Funding.  Winkler is liable for the Offerings pursuant to the shelf registration statement dated March 10, 2006, filed with the SEC on Form S-3, which he signed.

69.     The individuals listed in ¶¶41-68 are referred to collectively herein as the "Individual Defendants."

### 3.     Underwriter Defendants

70.     Defendant A.G. Edwards & Sons, Inc. ("A.G. Edwards") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, A.G. Edwards was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

71.     Defendant ABN AMRO Inc. ("ABN") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, ABN was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

72.     Defendant Apex Pryor Securities ("Apex"), a division of Rice Financial Products Company, was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, Apex was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

73.     Defendant B.C. Ziegler and Company (n/k/a Ziegler Capital Management) ("B.C. Ziegler") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, B.C. Ziegler was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

74.     Defendant Banc of America Securities LLC ("BOA") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, BOA was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

75. Defendant Barclays Bank PLC ("BBP") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, BBP was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

76. Defendant Barclays Capital Inc. ("Barclays") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, Barclays was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

77. Defendant BB&T Capital Markets, a division of Scott & Stringfellow, Inc. ("BB&T") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, BB&T was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

78. Defendant Blaylock Robert Van, LLC ("Blaylock Robert Van") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, Blaylock was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

79. Defendant BNP Paribas Securities Corp. ("BNP") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, BNP was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

80. Defendant C.L. King & Associates, Inc. ("C.L. King") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, C.L.

King was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

81.     Defendant Cabrera Capital Markets, LLC ("Cabrera") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, Cabrera was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

82.     Defendant CastleOak Securities, L.P. ("CastleOak") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, CastleOak was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

83.     Defendant Charles Schwab & Co. ("Charles Schwab") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, Charles Schwab was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

84.     Defendant Citigroup Global Markets Inc. ("Citigroup Global Markets" or "CGMI") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, Citigroup Global Markets was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

85.     Defendant Citigroup Global Markets Limited ("CGML") was an underwriter of an Offering as specified in the Appendix attached hereto.  As an underwriter of an Offering, CGML was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

86.     Defendant Comerica Securities Inc. ("Comerica") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, Comerica was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

87.     Defendant Credit Suisse Securities (Europe) Limited ("CS Europe") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, CS Europe was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

88.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, Credit Suisse was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

89.     Defendant Crowell, Weedon & Co. ("Crowell") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, Crowell was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

90.     Defendant D.A. Davidson & Co. ("D.A. Davidson") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, D.A. Davidson was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

91.     Defendant Danske Bank A/S ("Danske") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, Danske was

responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

92. Defendant Davenport & Company LLC ("Davenport") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, Davenport was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

93. Defendant Deutsche Bank Securities Inc. ("DB AG") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, DB AG was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

94. Defendant Deutsche Bank Securities Inc. ("Deutsche") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, Deutsche was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

95. Defendant Doley Securities, LLC ("Doley") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, Doley was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

96. Defendant Ferris, Baker, Watts, Inc. ("Ferris") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, Ferris was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

97. Defendant Fidelity Capital Markets, a division of National Financial Services LLC ("Fidelity Capital") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, Fidelity Capital was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

98. Defendant Advisors Asset Management, Inc. (n/k/a Fixed Income Securities, LP) ("Fixed Income") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, Fixed Income was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

99. Defendant Fortis Bank NV-SA ("Fortis") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, Fortis was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

100. Defendant Goldman, Sachs & Co. ("Goldman Sachs") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, Goldman Sachs was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

101. Defendant Greenwich Capital Markets Inc. ("Greenwich") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, Greenwich was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

102.     Defendant Guzman & Co. ("Guzman") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, Guzman was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

103.     Defendant H&R Block Financial Advisers Inc. ("H&R Block") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, H&R Block was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

104.     Defendant HSBC Securities (USA) Inc. ("HSBC") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, HSBC was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

105.     Defendant ING Belgium, SA ("ING Belgium") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, ING Belgium was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

106.     Defendant J.J.B. Hilliard, W.L. Lyons, Inc. ("J.J.B. Hilliard") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, J.J.B Hilliard was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

107.     Defendant J.P. Morgan Securities Inc. ("JPMSI") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, JPMSI was

responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

108. Defendant Jackson Securities LLC ("Jackson") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, Jackson was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

109. Defendant Janney Montgomery Scott LLC ("Janney") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, Janney was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

110. Defendant Jeffries & Company, Inc. ("Jeffries") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, Jeffries was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

111. Defendant JPMorgan Chase & Co., ("JPMorgan Chase") is a successor in liability to Bear, Stearns & Co. ("Bear Stearns"). Bear Stearns was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, Bear Stearns was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

112. Defendant Keefe, Bruyette & Woods, Inc. ("Keefe, Bruyette") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, Keefe, Bruyette was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

113.     Defendant KeyBanc Capital Markets, a division of McDonald Investments Inc. ("KeyBanc") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, KeyBanc was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

114.     Defendant Loop Capital Markets LLC ("Loop") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, Loop was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

115.     Defendant Melvin Securities, L.L.C. ("Melvin") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, Melvin was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

116.     Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, Merrill Lynch was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

117.     Defendant Mesirow Financial, Inc. ("Mesirow") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, Mesirow was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

118.     Defendant Morgan Keegan & Company, Inc. ("Morgan Keegan") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of

Offerings, Morgan Keegan was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

119. Defendant Morgan Stanley & Co. Inc. ("Morgan Stanley") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, Morgan Stanley was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

120. Defendant Muriel Siebert & Co. ("Muriel Siebert") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, Muriel Siebert was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

121. Defendant nabCapital Securities, LLC ("nabCapital") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, nabCapital was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

122. Defendant Oppenheimer & Co. Inc. ("Oppenheimer") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, Oppenheimer was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

123. Defendant Pershing LLC ("Pershing") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, Pershing was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

124.     Defendant Piper Jaffray & Co. ("Piper Jaffray") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, Piper Jaffray was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

125.     Defendant Raymond James & Associates, Inc. ("Raymond James") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, Raymond James was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

126.     Defendant RBC Capital Markets Corporation ("RBC Capital") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, RBC Capital was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

127.     Defendant RBC Dain Rauscher Inc. ("RBC") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, RBC was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

128.     Defendant Robert W. Baird & Co. Inc. ("Baird") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, Baird was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

129.     Defendant Ryan Beck & Co., Inc. ("Ryan Beck") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, Ryan Beck was

responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

130.    Defendant Samuel A. Ramirez & Co., Inc. ("Ramirez & Co.") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, Ramirez & Co. was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

131.    Defendant Sandler, O'Neill & Partners, L.P. ("Sandler, O'Neill") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, Sandler O'Neill was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

132.    Defendant SBK-Brooks Investment Corp. ("SBK") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, SBK was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

133.    Defendant Stifel, Nicolaus & Company, Inc. ("Stifel, Nicolaus") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, Stifel, Nicolaus was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

134.    Defendant Stone & Youngberg LLC ("Stone") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, Stone was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

135.    Defendant SunTrust Capital Markets, Inc. (n/k/a SunTrust Robinson Humphrey, Inc.) ("SunTrust") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, SunTrust was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

136.    Defendant TD Ameritrade, Inc. ("TD Ameritrade") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, TD Ameritrade was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

137.    Defendant TD Securities (USA) LLC ("TD Securities") was an underwriter of Offerings as specified herein. As an underwriter of Offerings, TD Securities (USA) was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

138.    Defendant The Royal Bank of Scotland plc ("The Royal Bank") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, The Royal Bank was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

139.    Defendant The Williams Capital Group, L.P. ("Williams") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings, Williams was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

140.    Defendant Toussaint Capital Markets, LLC ("Toussaint") was an underwriter of Offerings as specified in the Appendix attached hereto. As an underwriter of Offerings,

Toussaint was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

141.    Defendant UBS Securities LLC ("UBS") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, UBS was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

142.    Defendant UBS Limited ("UBSL") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, UBSL was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

143.    Defendant Utendahl Capital Partners, L.P. ("Utendahl") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, Utendahl was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

144.    Defendant Wachovia Capital Securities, LLC ("Wachovia") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, Wachovia was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

145.    Defendant Wedbush Morgan Securities Inc. ("Wedbush") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, Wedbush was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

146.    Defendant Wells Fargo Investments, LLC ("Wells Fargo") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, Wells Fargo was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

147.    Defendant William Blair & Company L.L.C. ("William Blair") was an underwriter of Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, William Blair was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Public Offering Materials.

148.    The defendants listed in ¶¶70-147 are referred to collectively herein as the "Underwriter Defendants."

## IV.    **SUBSTANTIVE ALLEGATIONS**

149.    Between May 2006 and August 2008, Citigroup conducted 48 public Offerings of the Bond Class Securities that are at issue in this Complaint.  The Company conducted these Offerings pursuant to certain Public Offering Materials, the dates of which are set forth in the table at ¶309.

150.    The Public Offering Materials associated with each Offering contained untrue statements of material fact and/or omitted to disclose material facts regarding: (1) Citigroup's direct exposure to as much as $66 billion of CDOs containing subprime residential mortgage-backed securities ("RMBS"); (2) Citigroup's exposure to approximately $100 billion of securities held by its SIVs; (3) Citigroup's approximately $213 billion portfolio of residential mortgage loans; (4) Citigroup's exposure to approximately $11 billion of impaired, illiquid auction rate securities ("ARS"); (5) the value of Citigroup's assets; (6) the Company's "well capitalized" status; (7) Citigroup's net income; and (8) various other metrics related to Citigroup's financial results during the Offerings Period.

151.    Each of these untrue statements of fact and/or omissions was highly material to investors because the undisclosed exposures noted above, as well as Citigroup's multi-hundred billion dollar residential mortgage portfolio, posed a substantial risk to the Company's solvency and capital adequacy – the basic measure of financial viability for a financial institution like Citigroup.  The fundamental metric of Citigroup's capital adequacy was its Tier 1 capital ratio, which measured the Company's readily available capital as a percentage of assets that were potentially at risk of default (known as its "Risk-Adjusted Assets").  In order to be considered "well capitalized," federal regulations required the Company to maintain a Tier 1 capital ratio of at least 6% (*i.e.*, capital equal to at least 6% of its risk adjusted assets).  Maintaining its well-capitalized status was critical to Citigroup's financial condition.  If the Company accumulated large amounts of risky exposures that depleted its Tier 1 capital, investors would conclude that the Company lacked the capital to fund its potential losses and would lose faith in its viability.  Accordingly, in each of its SEC filings issued during the Offerings Period, Citigroup represented that it "maintained a 'well capitalized' position."

152.    Citigroup operated with a very high degree of leverage, holding a small amount of capital against a massive asset base.  As its assets declined in value, Citigroup's leverage ratio increased to dangerous levels.  For example, in 2007, the Company reported over $1.25 trillion of risk-adjusted assets (itself an incorrect number because Citigroup was not reporting the true market risk of its deteriorating subprime-related assets) and only $89 billion of Tier 1 capital.  Thus, the Company had a razor-thin margin for error, as losses in even a small portion of its risk-adjusted assets could destroy much or even all of its Tier 1 capital, rendering the Company under-capitalized and causing investor flight.  Indeed, a November 1, 2007 analyst report concluded that losses of $16 billion – or just 4.2% of the Company's undisclosed exposures to

CDOs, SIVs, residential mortgages, and ARS – would deprive Citigroup of its purported well-capitalized status.

153. Consequently, it was critical for the Company to adequately disclose to investors in the Offerings the extent and risks of its exposures to CDOs, SIVs, residential mortgages, and ARS. As set forth below, Citigroup misrepresented or failed to fully inform investors about those risks and their impact on its overall financial health.

154. A series of post-Offering disclosures concerning these subjects revealed the Company's true financial condition and demonstrated that the Public Offering Materials contained untrue statements and omitted material facts. Additional specific untrue statements and material omissions contained in the Public Offering Materials are identified in Section VII below.

A. **The Public Offering Materials Misstated and Omitted Material Facts Regarding Citigroup's Exposure to as Much as $66 Billion of CDOs Backed by Subprime Mortgages**

155. Throughout the Offerings Period, Citigroup consistently informed investors that it was one of the country's largest originators and sellers of CDO securities. As explained below, however, Citigroup failed to disclose that the Company had retained direct exposure to as much as $66 billion of CDO securities backed by subprime mortgages. This exposure—which was more than 3.3 times the capital cushion the Company maintained to preserve its well capitalized status, and more than four times the total amount of subprime mortgage exposure that the Company had disclosed to investors in previous Offerings—was sufficient by itself to leave the Company's ability to operate its business in question because of a lack of available capital.

1. **Overview of Citigroup's CDO Business**

156. A CDO is a type of structured finance security that pays the holder of a CDO certificate a fixed amount of principal and interest, which comes from a pool of underlying, cash-

generating assets. The securities that Citigroup issued in connection with each CDO were divided into "super senior" and "junior" tranches. The super senior securities were paid first from the cash flow generated by the CDO's underlying assets. The junior tranches were paid only after the super senior obligations had been satisfied. The assets supporting the CDOs relevant to this case consisted principally of Residential Mortgage Backed Securities ("RMBS").

157. Citigroup created RMBS by originating and purchasing hundreds of thousands of residential mortgages, pooling them together, and then issuing securities that entitled the purchaser to a specified payout of the cash generated when borrowers made payments on the underlying mortgages. RMBS were also broken into "tranches" similar to the CDO organization described in the prior paragraph.

158. The RMBS that collateralized Citigroup's CDOs included substantial amounts of "subprime" mortgages. Subprime mortgages carry a higher risk of default than conventional mortgages because they are loans made to riskier borrowers. When a CDO was collateralized primarily by RMBS, the quality and performance of the underlying mortgages were ultimately the key factors in determining whether CDO investors would be repaid their principal and receive interest.

159. Citigroup created two kinds of CDOs before and during the Offerings Period: so-called "high-grade" CDOs and "mezzanine" CDOs. A high-grade CDO is based on collateral (such as RMBS) with a credit rating of A or better from an independent credit rating agency. A mezzanine CDO is based on collateral that is rated BBB or less, *i.e.*, usually the mezzanine tranches of RMBS, and therefore carries a higher risk of default (and typically provides for higher interest coupons for the underlying tranches).

160. The early 2000s were marked by rapid and historic home price appreciation. By 2004, however, mortgage originators, including Citigroup and other lenders from which Citigroup purchased mortgages, had relaxed their lending standards by, among other things, issuing: (i) low documentation or "Liar Loans" in which a borrower provided little or no documentation of income or assets; and (ii) first and second mortgage loans with high loan to property value ratios ("LTV"), *i.e.*, where the loan amount was for greater than 90% of the property's value, in which the borrower had little or no equity in the property, and was likely to default if home prices did not continue to rise. In addition, Citigroup and others extended these loans to borrowers with below-average credit scores. As these risky loans proliferated between 2005 and 2007, Citigroup increasingly packaged them into its own CDOs – thus creating CDO securities whose underlying cash flow was increasingly unstable and sensitive to home price declines or other credit stress.

2. **Beginning in 2006, the Housing Market Plummets,**
**Exposing the Holders of Citigroup's CDO Securities to**
**Large Losses**

161. Beginning no later than early 2006, the housing market began to collapse. As illustrated in the chart below, U.S. home prices, which had been increasing at an unprecedented pace in the mid-2000s, slowed their growth and then fell precipitously throughout 2006 and 2007:



162. The root cause of this collapse was the fact that millions of mortgage loans had been made to subprime borrowers who were defaulting in record numbers – the same kind of loans that were collateralizing the CDOs the Company had underwritten. As a direct result of the slowdown and subsequent collapse of U.S. home prices, the market for CDO securities backed by subprime mortgages began to show signs of serious impairment as early as the first quarter of 2006.

163. By the end of 2005, as the housing market began its decline, investors had become increasingly concerned about whether the Company had any exposure to subprime-backed CDOs. Indeed, in November 2005, *The Wall Street Journal* reported that the "much less demanding" mortgage underwriting standards of the prior years were "putting everyone . . . at risk," including the "bond investors" who purchased mortgage-backed securities. Similarly, in February 2006, *Barron's* published an article titled, "Coming Home to Roost," in which it

reported that investors were experiencing "much anxiety" over "mortgage-backed securities" given the "easy lending practices" that prevailed in recent years. The article reported that "[v]arious doomsday scenarios are being posited" regarding CDOs backed by subprime mortgages, and quoted institutional investors predicting that, "These CDOs . . . could get completely wiped."

164. These problems continued – and grew worse – in 2006, as borrowers continued to default in record numbers. Thus, an S&P report for the third quarter of 2006 noted that mortgage lenders were experiencing rising delinquencies and early payment defaults. Similarly, in the first quarter of 2007, Moody's noted that "loans securitized in the first, second and third quarters of 2006 have experienced increasingly higher rates of early default than loans securitized in previous quarters."

165. As investor concern grew over subprime mortgage-backed CDOs during 2006 and 2007, Citigroup conducted many of the Offerings giving rise to this action. In the Public Offering Materials for the Offerings, Citigroup consistently reassured investors that it had no direct exposure to subprime-backed CDOs because it was principally a seller, rather than a purchaser, of CDOs. For example, the Company's Form 10-K for 2006 stated that Citigroup acted as a market maker for *C*DOs by creating and selling CDOs to outside investors through off-balance sheet entities called Variable Interest Entities ("VIEs"). According to the 2006 Form 10-K, Citigroup's role in the CDO market was to "create new security offerings . . . for institutional clients and retail customers" through its VIEs and that it had only "limited continuing involvement" in the VIEs, was "not the primary beneficiary," and thus, Citigroup did not reflect the assets of the VIEs on its balance sheet. Similarly, the 2006 Form 10-K stated that the "Company's mortgage loan securitizations are primarily non-recourse, thereby <u>effectively</u>

transferring the risk of future credit losses to the purchasers of securities issued by the trust."
(Emphasis added).

166.     Despite the market's focus on the risks of subprime-backed CDOs, the Company did not disclose that it had retained <u>any</u> direct subprime CDO exposure at all until July 20, 2007, and, even then, the Company understated its direct exposure by tens of billions of dollars. Specifically, on a July 20, 2007 conference call, Defendant Crittenden, the Company's CFO, stated that the Company's total on-balance sheet subprime exposure in its Securities and Banking division was $13 billion as of the second quarter of 2007, which had been materially <u>reduced</u> from $24 billion at the end of 2006 (a figure never before disclosed). Defendant Crittenden also announced that the Company would mark down its subprime-backed securities by approximately $1.3 billion. According to Crittenden, "Think about this as the CDOs, the CLOs, and the secured assets that we hold on our balance sheet. I think our risk team did a nice job of anticipating that this was going to be a difficult environment, and so set about in a pretty concentrated effort to reduce our exposure over the last six months."

167.     Based upon these disclosures, analysts concluded that Citigroup's subprime CDO exposure was both "small" and "manageable." For example, after the Company's second quarter 2007 earnings release and conference call, a July 23, 2007 Buckingham report stated that "the impact of subprime on" Citigroup's "balance sheet" was "small" because "broker balance sheets are not static, with turnover of subprime assets related to securitizations rapid." Due to the ostensibly "small" amount of the Company's subprime exposures, the Buckingham report reiterated a "Strong Buy" recommendation. Similarly, a July 23, 2007 Bear Stearns report noted that the Company's statements regarding its subprime exposure "suggested that the bank's risks are both relatively small and manageable."

168.     In a conference call to discuss the Company's third quarter financial results on October 15, 2007, Defendant Crittenden reported that Citigroup had again <u>reduced</u> its direct exposure to subprime-backed securities from the $13 billion he reported previously. The same information led analysts to conclude that concerns of Citigroup's capital adequacy were overdone and Citigroup's exposure to subprime and CDO assets was well below the exposure of its peer investment banks.

169.     In reality, by the middle of 2007, the Company held direct exposure to approximately $66 billion of subprime-backed CDO securities.

170.     The Company accumulated this exposure in two ways. First, Citigroup had retained the risk of loss with respect to $25 billion of subprime mortgage-backed CDO securities issued between 2003 and the end of 2005, by selling those securities to investors but specifically attaching a guarantee to them known as a "liquidity put." Citigroup wrote the liquidity puts on its so-called "commercial paper" CDOs. The Company's commercial paper CDOs functioned just like a typical CDO, except that, in addition to drawing income from the underlying RMBS, the CDO also created income by issuing short-term commercial paper.

171.     Under the terms of the liquidity puts that Citigroup used to sell its CDO securities to outside investors, if the CDO could not issue commercial paper at a specified interest rate in order to fund its obligations profitably, <u>then Citigroup itself was obligated to directly satisfy the obligations on the CDO's outstanding securities</u>. Citigroup's guarantee that it would fund the CDO securities if the CDO trust could not issue commercial paper at a profitable rate directly contradicted the "non-recourse" risk transfer that the Company described in the Public Offering Materials. Citigroup did not disclose the existence of these liquidity puts until November 2007

and thus, the Public Offering Materials issued in connection with Offerings conducted prior to this date were materially false and misleading for this reason alone.

172. In addition, between 2004 and 2007, Citigroup had created approximately $28.4 billion of subprime mortgage-backed CDO securities that it was unable to sell, which the Company retained on its own balance sheet. Further, more than $8 billion of the $28.4 billion in subprime-backed CDO paper that Citigroup could not sell to third parties consisted of especially risky mezzanine CDO securities, which were most vulnerable to default in the collapsing housing market. The Public Offering Materials for Offerings which preceded November 2007 failed to disclose the existence of the Company's exposure to $28.4 billion of these retained, subprime mortgage-backed CDO securities.

173. Accordingly, by the third quarter of 2007, Citigroup's exposure to subprime mortgage-backed CDOs amounted to approximately $66 billion, and not the $13 billion that had been disclosed with the second quarter 2007 earnings. This undisclosed exposure was highly material to investors in the Offerings because it equaled approximately 60% of Citigroup's Tier 1 capital at the end of 2007, and thus posed a substantial risk to the Company's capital adequacy.

### 3. Citigroup Shocks the Market by Disclosing Its Exposure to Subprime-Backed CDOs

174. As noted above, on October 15, 2007, during the Company's conference call to discuss its third quarter results, Defendant Crittenden stated that the Company had reduced its direct exposure to subprime securities from $13 billion as of the second quarter. Just three weeks later, investors learned that Citigroup's CDO exposure was multiples higher.

175. On November 1, 2007, Citigroup fired two of its senior-most CDO executives: Michael Raynes, Citigroup's head of structured credit, and Nestor Dominguez, Citigroup's co-head of CDOs. On November 2, 2007, it was reported that: (1) the SEC was investigating

Citigroup's accounting; (2) Citigroup's Board of Directors would hold an "emergency" meeting during the November 3-4, 2007 weekend; and (3) Defendant Prince would resign. On November 3, *The Wall Street Journal* reported that Citigroup was on the verge of reporting losses much greater than previously disclosed.

176.    Finally, on Sunday, November 4, 2007, Citigroup issued a press release disclosing that, in contrast to its prior representations, the Company possessed approximately $55 billion of exposure to CDOs backed by subprime RMBS – or approximately $43 billion more than had been disclosed. (As set forth below, the Company had an additional $10.5 billion of exposure, which it finally disclosed in January 2008.) The $43 billion of exposure first disclosed to investors on November 4, 2007 consisted of (a) $25 billion of commercial paper purchased pursuant to the liquidity puts, which was "principally secured" by subprime mortgage-backed CDOs; (b) approximately $10 billion of so-called "high grade" subprime mortgage-backed CDO securities; and (c) $8 billion of lower quality "mezzanine" subprime mortgage-backed CDO securities. The Company further announced that these CDOs were already impaired by between $8 billion and $11 billion.

177.    Also on November 4, 2007, the Company issued a second press release in which it announced that, because of the losses it had suffered on its CDO portfolio, Defendant Prince (the Company's Chairman and CEO) would "retire," effective immediately. Prince stated that his "retirement" was "the only honorable course for me to take."

178.    On a November 5, 2007 conference call, Defendant Crittenden acknowledged that the Company had not previously disclosed its exposure to $43 billion of subprime-backed CDO securities, stating that, "The $43 billion <u>that we disclosed yesterday</u> falls into this super senior

category." He also noted that at least $8 billion of the Company's write-down of its total subprime-backed assets was attributable to this newly-disclosed exposure.

179. Defendant Crittenden further admitted that the $25 billion of CDO-issued commercial paper was indistinguishable from more typical CDO securities, stating that "once it's back on our books, for all intents and purposes, it operates and looks like a super senior CDO position" and that it "has all the characteristics of a super senior CDO." Crittenden also acknowledged that the Company had written the "liquidity puts," pursuant to which it purchased the $25 billion of commercial paper, "up until I believe the end of 2005," *i.e.*, before the start of the Offerings Period, and that Citigroup had repurchased the commercial paper under those liquidity puts "during the course of the summer" of 2007 – at the very time that the Company raised billions of dollars from investors without disclosing this exposure in the Public Offering Materials.

180. Numerous securities analysts immediately expressed surprise and dismay at the Company's failure to previously disclose its exposure to $43 billion of subprime-mortgage backed CDOs, and stated that this large exposure materially altered the Company's risk profile. For example, on November 4, 2007, JP Morgan issued a report stating that the Company's write-down of between $8 billion and $11 billion was "much larger than expected" and that, "The majority of the exposure against which Citi is taking a charge has never been disclosed before, not even in its 3Q earnings call [which occurred on October 15, 2007], which is very surprising." Deutsche Bank issued a November 4 report stating that "the new write-down is unsettling and comes only 3 weeks after the company released [third quarter] earnings." Similarly, on November 5, 2007, Buckingham issued a report stating that the write-down "is materially higher than our expectation, and reflects previously undisclosed subprime CDO exposures of $43

billion for a total of $55 billion – much higher than the prior disclosed $13 billion. . . . [W]e are disappointed with the lack of previous disclosure surrounding the extent of the company's CDO exposure." (Emphasis added.)

181.     The Buckingham report further noted that the Company's prior CDO disclosures not only omitted this $43 billion exposure, but also misrepresented the Company as a "careful" "market maker," or seller, of subprime CDO securities, rather than a holder of that risk:

> In prior conference calls, management had noted that it had reduced its subprime and CDO exposure in its "secured lending" book from $24 billion at 4Q06 to $13 billion at the end of 2Q07 and "slightly less" than $13 billion in 3Q07 (which has now been disclosed at $11.7 billion). The only other disclosures in previous conference calls were the fact that Citigroup was also an "active market maker" in the subprime asset class and that it managed its market making exposures carefully. However, it is now being disclosed that Citigroup has $43 billion of subprime-backed CDO exposures within its investment bank – on top of the $11.7 billion previously mentioned. Despite the fact that all of the $43 billion is in "super senior" AAA tranches, ongoing weakness in subprime default rates has prompted rating agency downgrades of even these super senior exposures, prompting a significant revaluation of the securities.
>
> The further decline in value of subprime CDOs is not surprising given the worsening mortgage market in October. However, what is surprising is the additional level of exposures. In fact, we find management's previous disclosures surrounding subprime exposure as deceptive at best. Specifically, while management appears to have accurately portrayed its secured lending exposure of less than $13 billion on the 3Q07 conference call, by leaving out the additional (and much more substantial) $43 billion in subprime CDO exposure within other areas of the business, we feel misled. [Emphasis added.]

182.     Likewise, on November 5, 2007, Credit Suisse issued a report noting that the newly-disclosed exposure was "surprisingly large and at risk for sizeable write-downs." Credit Suisse further noted that the Company's disclosure revealed that its exposure to subprime-backed CDO securities – once thought to be no more than $13 billion at most – in truth was "much larger" than that of its peer investment banks.

183.     Also on November 5, 2007, Fitch Ratings downgraded Citigroup's Long-term Issuer Default Rating (IDR) to "AA" from "AA+", along with Citi's other long-term ratings, and the Company's rating outlook was listed as negative.

184.     In response to Citigroup's early November disclosures concerning CDOs and SIVs, from October 31 through November 7, 2007, the price of the Bond Class Securities declined substantially.

185.     On January 15, 2008, the Company announced that its CDO exposure was actually materially higher than had been disclosed in November 2007.  On that day, Citigroup issued a press release announcing its results for the fourth quarter of 2007, which were among the worst in the Company's history, disclosing that the Company possessed an additional $10.5 billion in exposure to subprime-backed CDOs.  Because the Company had purchased insurance on this $10.5 billion of CDO securities, the Company described them as "hedged exposures." These exposures were important to investors because, even though they were purportedly "hedged," the financial insurance companies guaranteeing this exposure, principally Ambac and MBIA, were facing the threat of downgrades by the rating agencies amidst their own financial distress, thus calling into question their ability to pay for any defaults on these insured securities. The insurers' problems exposed the Company to additional losses on another $10.5 billion of exposure.  Indeed, over the next three reporting periods, the Company wrote down the value of its "hedged" exposures by $1.1 billion.

186.     Even after Citigroup belatedly admitted the amount of its direct exposure to tranches of subprime-backed CDOs, it failed to disclose the magnitude of other direct exposures to risky mortgage securitizations.  For example, on April 15, 2008, Citigroup issued its first quarter 2008 results, in which it disclosed $1 billion of write-downs "net of hedges, on Alt-A

mortgages," which are mortgages that can qualify as prime or subprime, but are typically based on limited documentation of ability to repay. During its conference call that day, Citigroup disclosed that this write-down was on trading portfolios of Alt-A RMBS, and that it had held $22 billion of exposure to Alt-A RMBS as of December 31, 2007, and $18.3 billion as of March 31, 2008. A Credit Suisse analyst report that day promptly identified the Alt-A RMBS exposure as "newly disclosed."

187. Once again, however, Citigroup remained silent about how this massive exposure to Alt-A RMBS was incurred until October 15, 2008, when Citigroup first disclosed in a slide presentation that almost 75% of these securities were originated in 2006 or later – a time in which "Alt-A" loans were widely recognized to have been made with poor mortgage underwriting standards. Citigroup reported another $1.15 billion write-down in the third quarter of 2008, and the Government bailout includes mortgage-linked assets like Citigroup's failing Alt-A RMBS portfolio.

4. **Citigroup Continues to Fundamentally Misstate the Value of Its CDO Securities and Their Effect on Its Financial Condition Throughout 2008**

188. Throughout 2008, the Company conducted a series of Offerings in which it raised more than $30 billion in capital. In the Public Offering Materials pursuant to which the Company conducted these Offerings, Citigroup misrepresented the value of the severely deteriorating CDO securities that it held on its balance sheet and the manner in which these securities impacted its financial condition.

189. For example, in its 2007 Form 10-K, incorporated by reference into the Public Offering Materials for the Offerings conducted after February 22, 2008, Citigroup stated that the "reasonable" and "fair value" of its previously-disclosed CDO exposures, after write-downs, was $39.8 billion. Significantly, to assure investors that this valuation was appropriate, the Company

stated that it had "refined" its valuation methodology "to reflect ongoing unfavorable market developments."

190. These statements, including the write-downs referenced in the preceding paragraph, were materially false and misleading when made. In truth, the Company's CDO securities were supported by subprime mortgages with rapidly increasing delinquency rates, and thus were virtually unsellable. Indeed, the fact that the Company could not sell these securities to any outside investors strongly indicated that their value was minimal, at best, as did the fact that the leading market indices for RMBS-linked securities had declined by two-thirds by late 2007 and had lost virtually all of their value by early 2008. Thus, rather than reporting these securities in its 2007 Form 10-K as assets with a value of almost $40 billion, Citigroup should have marked them down to reflect their true value, and taken a corresponding charge to income, which it failed to do, in violation of GAAP.

191. In addition, throughout 2008 – including just days before the U.S. Government guarantee – the Company repeatedly assured investors that it was well capitalized and therefore possessed ample funds to withstand any losses. For example, in the 2007 Form 10-K, the Company noted that "[d]uring December 2007 and January 2008 we raised over $30 billion to strengthen our capital base." Consequently, the Company stated, it "maintained its 'well-capitalized' position with a Tier 1 capital ratio of 7.12% at December 31, 2007." Similarly, Defendant Pandit repeatedly informed investors throughout 2008 that Citigroup had "made sure" that its subprime-backed assets were "well capitalized," and the Company had achieved "the capital strength that will allow us to refocus on earnings and earnings growth."

192. Beginning in mid-November 2008, the Company went into a death spiral culminating in its stunning admission that it no longer possessed the capital to write–down the

mortgage-related assets to their true value. Specifically, as set forth more fully below in Section IV-E, on November 17, 2008, the Company suddenly announced that it would no longer measure the fair value of $80 billion of its assets, including its CDOs. This announcement revealed that those assets were grossly overvalued and that the Company lacked the capital to absorb the charges to its income that would occur if Citigroup properly marked those assets to their fair value. With this revelation, investors immediately abandoned the Company, causing the price of its stock and the Bond Class Securities to plummet and spurring calls for a Government-forced break-up, merger or bailout. On November 23, 2008, the U.S. Government was forced to agree to guarantee $326 billion of the Company's riskiest assets (including its CDOs and a wide-range of other mortgage-linked assets) against default to prevent Citigroup from being liquidated.

### B. The Public Offering Materials Misrepresented Citigroup's Exposure to $100 Billion of SIVs, Failed to Consolidate the SIVs in Violation of GAAP, and Failed to Properly Value the SIVs' Assets

193. Throughout the Offerings Period, Citigroup sponsored and managed seven Structured Investment Vehicles ("SIVs") that it kept off its balance sheet and that, by the second quarter of 2007, collectively held over $100 billion of assets. These assets included large amounts of CDOs and RMBS collateralized by subprime and low-quality mortgages, as well as a wide range of other risky exposures that dramatically lost value as the housing market downturn became a credit crisis.

194. In the Public Offering Materials, Citigroup repeatedly stated that it was not required to absorb losses on its SIVs, that it was not required to consolidate the SIVs' assets on its balance sheet, and that it would not take any steps requiring it to absorb any losses. In reality, however, the Company was required to absorb losses on its SIVs and consolidate them in its financial statements—as Citigroup conceded on December 13, 2007, when it consolidated $50 billion of toxic SIV assets.

195.    Even after belatedly consolidating its SIVs, as further explained below, Citigroup continued to misstate the value of the assets (which Citigroup claimed were worth almost $50 billion) in subsequent Public Offering Materials.  In fact, those assets, much like Citigroup's directly held CDOs, were severely impaired.  By misrepresenting the nature of the SIV exposure and overstating the value of their assets, Citigroup materially overstated its capital position, assets, shareholder equity and, ultimately, its ability to maintain its solvency.

### 1.    Citigroup's Misstatements about Its SIV Operations

196.    The Company's SIVs were off-balance sheet entities, created and managed by Citigroup, which raised money by issuing commercial paper that Citigroup marketed and sold to its institutional clients.  The SIVs then used these funds to purchase mortgage-backed and other securities directly from Citigroup and third parties, and used the income generated by those assets to pay the holders of their commercial paper.  The SIVs were crucial to Citigroup's ability to continue its mortgage lending and securitization business because the SIVs removed unwanted assets from the Company's balance sheet and provided the Company with new capital that it used to extend fresh loans.  Citigroup was, by far, the single largest sponsor of SIVs in the banking industry.  Its SIVs held assets valued at $100 billion in March 2007, which represented 25% of the entire SIV market.

197.    Citigroup repeatedly represented in the Public Offering Materials that the SIVs were off-balance sheet entities that were responsible for their own funding, and that Citigroup was not responsible for their liabilities.  For example, Citigroup's 2006 Form 10-K reported that the Company had only "limited continuing involvement" with its SIVs, and thus had no obligation to consolidate them.

198.    Citigroup also disclosed a combined "maximum exposure" to all of its VIEs, including its SIVs, but told investors to disregard these figures by representing in the Public

Offering Materials that, given the Company's purportedly "limited" involvement with these entities, "[a]ctual losses are not expected to be material."

199. These statements were materially false when made. In truth, Citigroup was obligated to absorb any losses that the SIVs, or the purchasers of their commercial paper, might suffer, and therefore should have consolidated the SIVs on its balance sheet. While no express contract required the Company to absorb these losses, Citigroup was implicitly required to do so because allowing the SIVs to fail would cause Citigroup's mortgage lending and securitization business to collapse. Indeed, allowing the SIVs to fail would cause investors in those vehicles—Citigroup's coveted institutional and private wealth clients—to suffer massive losses and stop purchasing the securities issued by those vehicles, which would substantially harm the Company's business. Further, allowing the SIVs to fail by defaulting on the commercial paper debt they issued would cause the commercial paper market to collapse, leading to widespread dislocations in the debt market.

200. By failing to consolidate the SIVs on its balance sheet, Citigroup understated its assets and liabilities, overstated shareholder equity and its capital position, and prevented its own investors from understanding how the declining value of the SIVs' assets (which included large amounts of mortgage-backed securities) would actually impair the Company's capital adequacy. The Company's violations of GAAP arising from its financial reporting of its SIVs are set forth more fully below in Section V.

201. As noted above, as the housing market collapsed in 2006 and 2007, SIV assets deteriorated in value, which exposed the SIVs to large losses and prevented them from issuing new commercial paper to fund those potential losses. Although the Company consistently maintained in the Public Offering Materials that it was not required to absorb these losses, in

mid-October 2007, Citigroup took action to shield itself from the severe impairments in its SIVs' assets by seeking to transfer those assets to an even more remote entity. Specifically, on October 14, 2007, news reports disclosed that Citigroup, Bank of America, and JP Morgan were assessing a plan to create a so-called "super SIV," which was yet another off-balance sheet entity, funded collectively by all the banks, that would assume as much as $100 billion of Citigroup's SIV assets and liabilities. Notably, neither Bank of America nor JP Morgan sponsored SIVs of their own. Rather, their reason for pursuing the "super SIV" was to avoid a widespread failure of the commercial paper markets that would result if Citigroup's SIVs failed.

202. News of the "super SIV" raised questions about Citigroup's financial condition and accounting. For example, an October 14, 2007 article in *The Wall Street Journal's* "Deal Book" site titled "A Bailout for Citigroup?" explained that "it's clear that Citigroup has the most to gain from this operation. And it's clearly bad if the balance sheet of the country's largest bank were frozen for months on end as it poured money into contractual unwindings of SIV positions." Similarly, the *Financial Times* reported on October 15, 2007 that the Company was advocating for the creation of this "super SIV" as a way to try to avoid losses on its large SIV exposure, even though it insisted that those exposures were "healthy:" "Citi has created more SIVs than almost any other bank in recent years and, though its executives insist these vehicles are relatively healthy, it has come under particular scrutiny."

203. In order to calm investor concern about its SIV exposure, the Company inaccurately insisted that there was no reason to consolidate the SIVs. On October 19, 2007, the Company issued a one-page fact sheet about its seven SIVs, stating that it "has no contractual obligation to provide liquidity facilities or guarantees to any of the Citi-advised SIVs." Citigroup's assertion that it would not guarantee the SIVs against losses helped calm the

concerns of certain investors and analysts. For example, JP Morgan issued an October 25, 2007 report noting that investors' "SIV concerns [were] overdone" because "Citi would have no interest in consolidating SIV assets," and therefore the Company's SIVs "should not have a significant impact as feared."

204. At the same time, however, certain other market observers were not convinced, and continued to raise questions about Citigroup's accounting for its SIVs, and in particular its failure to consolidate those SIVs. For example, on October 24, 2007, *Bloomberg* published an article titled "Citigroup SIV Accounting Looks Tough to Defend," which noted that Citigroup was obligated to support its SIVs because the Company had "creat[ed] expectations it would stand behind the funds," and therefore should have consolidated them all along:

> The more Citigroup, Inc. says about its structured investment vehicles, or SIVs, the more questionable the bank's accounting for them is beginning to look. . . . Okay, so it has no explicit obligation [to support the SIVs]. That begs the question: Does Citigroup have any implicit obligation to protect SIV investors from losses? Citigroup isn't saying. It's a crucial question. If Citigroup is implicitly obligated to absorb most of the SIVs' losses, then the SIVs already should be on Citigroup's balance sheet, under accounting rules.

> The Company has its reputation on the line . . . . Citigroup organized, pitched, and manages the SIVs it sponsors, creating expectations it would stand behind the funds and protect their investors. . . . In a September 5 report, Henry Tabe, managing director of Moody's Corp.'s SIV-ratings team, said the "blow to a bank's reputation that may be occasioned by a failure of an SIV may be more than the bank can tolerate." [Emphasis added.]

205. That *Bloomberg* article further criticized the proposed plan to create a "super SIV" as follows: "So, the proposed cure for Citigroup's off-balance sheet SIVs is more off-balance-sheet accounting. There's no surer sign that Citigroup is worried about its potential SIV losses."

206. Despite investor focus on the SIVs, Citigroup expressly reiterated that it was not required to and would not consolidate the SIVs in the Company's Form 10-Q for the third quarter

of 2007, which was filed on November 5, 2007, and was subsequently incorporated by reference into certain Public Offering Materials. Specifically, the Company noted that its SIVs' assets totaled approximately $80 billion and represented that the Company "will not take actions that will require the Company to consolidate the SIVs."

## 2. Citigroup Belatedly Admits Its Obligation to Consolidate SIVs

207. Barely six weeks after flatly denying that it had to consolidate the SIVs, on December 13, 2007, Citigroup did just that, announcing that it would "support" its SIVs and therefore would "consolidate the SIVs assets and liabilities on its balance sheet under applicable accounting rules." In essence, Citigroup's act was an admission that, contrary to its prior representations, it was required to absorb losses suffered by its SIVs. Consolidating the SIVs severely stressed Citigroup's capital position, as it brought billions of CDOs, RMBS, and other mortgage-related debt onto the Company's balance sheet and materially increased the Company's direct exposure to risky securities by another $50 billion.

208. The financial press immediately recognized that the Company's SIV consolidation flatly contradicted its prior disclosures on the subject, and marked the second time in roughly six weeks that the Company had shocked investors by admitting its true exposure to tens of billions of dollars worth of impaired assets. For example, on December 14, 2007, the *Financial Times* wrote that:

> This is the second time unwanted assets have suddenly appeared on the Citigroup balance sheet. The bank's knack for landing in the blackest spots of the market is starting to look hard to match. First, investors were shocked to discover its exposure to collateralised debt obligations had ballooned . . . . And now, $49bn worth of assets in off-balance sheet vehicles will be brought on to the balance sheet as well. <u>Investors will feel particularly aggrieved at this latest move, given how clearly Citi had said it would not do anything to consolidate these assets.</u> Such a statement suggested rather more control over events than is possible in these markets. [Emphasis added.]

209.    Analysts also recognized that the SIV consolidation constrained the Company's capital adequacy.  For example, on December 14, 2007, CIBC World Markets issued a report stating that the consolidation "will further imperil [the Company's] fragile capital ratios going into the fourth quarter and surely pressure the company to continue to raise capital, sell assets, and cut its dividend."  That report further noted that the Company's capital ratio was "precariously low," and that, "[a]t a minimum, we expect the rating agencies to continue to seriously reassess their ratings on C" – an especially negative development for holders of the Company's Bond Class Securities.  Indeed, on December 13 and 14, 2007, the value of Citigroup's Bond Class Securities declined significantly.

### 3.    The Company Misstates the Value of the Belatedly Consolidated SIV Assets in the 2008 Offering Materials

210.    Even after it belatedly consolidated its SIVs, throughout 2008 Citigroup continued to raise tens of billions of dollars through Public Offering Materials that made untrue statements of material fact, and/or omitted material facts, regarding the effect of the SIV assets on the Company's financial position.  Specifically, the Company brought the $49 billion of SIV assets onto its balance sheet and represented that the assets were not impaired, when in fact they were severely impaired, and these impairments only deepened throughout 2008.

211.    Significantly, in its December 13, 2007 press release, the Company maintained that one of the "key" reasons why it consolidated its SIVs was because "[g]iven the high credit quality of the SIV assets, Citi's credit exposure under its commitment is substantially limited." The Company further assured investors that it expected to suffer "little or no" loss due to its SIV consolidation, and expected to "return to its targeted capital ratios by the end of the second quarter of 2008."

212.     Over the following two quarters, the Company continued to represent that the assets contained in its SIVs were performing well and were not threatening the Company's capital adequacy.  For example, on April 15, 2008, Citigroup announced a nominal $212 million write-down on the $49 billion in SIV assets.  Then, in August 2008, Citigroup's second quarter 2008 Form 10-Q actually reported an $11 million <u>increase</u> in the value of the Company's SIV assets, indicating that the balance sheet stress that had worried investors in December 2007 was subsiding and the Company's financial position was strengthening.

213.     The Company's statements in the Public Offering Materials following December 13, 2007 about the value of its SIV assets (as well as its capital position, balance sheet strength and shareholder equity, among other things) were untrue because the SIV assets were, in fact, significantly impaired and worth dramatically less than Citigroup had reported.  Investors in the Offerings did not learn the truth about the Company's impaired SIV assets until November 19, 2008, when the Company announced that it was reclassifying the remaining SIV assets in such a way that future earnings would be immune from further write-down of the SIVs' assets.

214.     Indeed, as revealed at that time, the Company had been desperately trying to sell its toxic SIV assets, but could not find a buyer willing to take them.  Thus, on November 19, 2008, Citigroup announced that it had paid its own SIVs $17 billion to unwind and compensate the holders of the SIVs' commercial paper, which meant that Citigroup would now directly assume the liabilities of the SIVs, pushing the Company closer to insolvency.  Citigroup's decision further revealed that those assets were worth far less than Citigroup had reported, and that Citigroup could not survive the charges it would be required to take if it properly marked those assets to their fair value.

215.    On November 19, 2008, *Dow Jones* reported that investors had begun to "question the survival prospects of the U.S. banking giant."  *The Wall Street Journal* noted that the Company's announcements of November 17 and 19 "stoked investor fears that Citigroup could be swamped by toxic assets flooding back onto its books."  On November 20, 2008, Ladenburg Thalman issued a report stating that it "received numerous calls today asking [] if Citigroup is about to fail."  Additional reports began to emerge that Citigroup was in desperate talks with the U.S. Government regarding a forced break-up, a forced merger, or a massive bailout package.

216.    The value of the Company's Bond Class Securities fell on the news that the Company was directly assuming its SIVs' deeply impaired assets.  For example, the price of the bonds issued in the April 18, 2008 Offering declined more than 40%.

217.    Indeed, the Company's direct exposure to its SIVs' severely impaired assets had pushed it to the precipice of insolvency.  Just four days after Citigroup assumed its SIVs' assets, on November 23, 2008, the Company's financial condition was so imperiled that the U.S. government was forced to agree to a $326 billion bailout package.  As part of that bailout, the Government agreed to absorb substantial losses on the mortgage-linked and other assets formerly contained in Citigroup's SIVs, as Citigroup lacked the capital to do so itself.

**C.    The Public Offering Materials Reported Materially Understated Reserves for Citigroup's Residential Mortgage Loan Portfolio**

218.    Before and during the Offerings Period, Citigroup accumulated approximately $213 billion of residential mortgage loans that were of such poor quality that they would, and did, predictably default in large numbers.  Despite the likelihood of widespread defaults in the Company's mortgage loan portfolio, the Public Offerings Materials reported understated

allowances for loan losses, which materially overstated the Company's net income at each reporting period and inflated its capital ratios.

1.    **Citigroup's Subprime, Second Lien, and Alt-A
      Mortgages Were Likely to Suffer Widespread Defaults**

219.    Citigroup acquired mortgage loans in two ways. First, it originated them directly through its lending unit, CitiMortgage. Second, the Company purchased loans from third-party mortgage originators, or "correspondent" lenders. After acquiring these loans, the Company often used them to collateralize its RMBS and CDOs, which in many instances were then sold to its SIVs. Thus, the Company's subprime mortgage business produced the assets that supported its structured finance business.

220.    In order to generate enough mortgages so that the Company could continually issue new RMBS and CDOs, Citigroup aggressively expanded its subprime mortgage originations beginning in 2005. According to a December 2006 *Mortgage Banking Magazine* article, by 2006, Citigroup was the fourth largest overall mortgage originator, with $132.9 billion of originations in the first nine months of the year. Indeed, Citigroup's first mortgage portfolio increased from $88.4 billion in 2002 to $150 billion at the end of 2007. During this time, its second mortgage portfolio rose even more dramatically—1,000%— from $6.3 billion to $63 billion.

221.    As part of this overall expansion, Citigroup materially increased its exposure to several kinds of particularly risky loans. For example, the Company acquired tens of billions of dollars worth of mortgages to borrowers with subprime credit scores, known in the mortgage industry as a Fair Isaac Corporation ("FICO") score of 620 or below. Mortgage loans issued to consumers with such low credit scores were especially risky because, at the time the Company extended the loan, the borrower already had demonstrated an inability to repay debts, as

evidenced by the low FICO score. Moreover, these borrowers had demonstrated their inability to repay their debts even in normal market conditions, meaning that as the housing market deteriorated, the likelihood of default increased substantially. By the end of 2007, the Company had direct exposure to at least $23 billion of subprime first mortgages, and billions more in exposure to subprime second mortgages.

222. Further, the Company acquired tens of billions of dollars of loans with loan-to-value ratios ("LTV") of over 90%. These loans posed special risks to Citigroup because the borrower had virtually no personal equity in the property. Accordingly, the borrower had much less motivation to repay the loan in times of stress, as occurred throughout 2006 forward. Moreover, these loans were risky because they provided almost no cushion to absorb losses through foreclosures in the event of declining housing prices. As housing prices declined in 2006 and 2007, it became exceedingly difficult for high LTV borrowers to repay their loans through sales or further refinancings, and the risk of default therefore materially increased. By the end of 2007, the Company possessed approximately $51 billion of mortgages with LTVs above 90%.

223. The Company also dramatically increased its portfolio of home equity lines of credit, or "HELOCs." A HELOC is a second mortgage loan drawn against the equity in a home (*i.e.*, drawn against the difference between the value of the remaining first mortgage and the present market value of the home). HELOCs posed significant risks because payment was directly related to the borrower's ability to pay the underlying first mortgage. Because the HELOCs and other second-liens were the last loans to be repaid, as housing prices decreased, the risk and magnitude of losses on HELOCs became far more severe than on first-liens. Citigroup aggressively assumed this risk, with HELOC originations growing at a staggering pace, from

$800 million in 1999 to about $48 billion in 2006.  By the end of 2007, the Company held $62 billion worth of HELOCs.

224.     In addition, the Company expanded its portfolio of so-called "Alt-A" loans.  An Alt-A loan does not require proof of the borrower's income.  Because the mortgage lender had not verified that the borrower can afford to repay the loan, Alt-A loans posed an extremely high risk of default.  For this reason, Alt-A loans are commonly referred to as "liar's loans."  By year-end 2007, Citigroup had accumulated $58 billion in Alt-A loans.

225.     Citigroup compounded the danger of risky underwriting by frequently issuing mortgages that had multiple risk-increasing characteristics, such as a HELOC with greater than 90% LTV, made to a borrower with low a FICO score.

226.     Finally, the Company purchased a growing volume of loans from correspondent subprime lenders who originated similarly risky subprime, Alt-A, HELOC, and high LTV loans without adequately ensuring that the borrower could repay the loan.   The Company's correspondent loan originators included some of the country's most reckless lenders, such as Accredited Home Lenders and New Century.   Their underwriting was so deficient that CitiMortgage eventually brought lawsuits against more than 20 of its correspondent lenders, alleging that the mortgages they produced failed to comply with CitiMortgage's own purchasing requirements.  Nevertheless, the Company's correspondent channel loan volume increased from $69 billion at 2005 to $89 billion at 2006, and stood at more than $94 billion by year-end 2007.

2.     **The Public Offering Materials Reported Materially Understated Loss Reserves**

227.     Each quarter, the Company was required under GAAP to establish a loan loss reserve sufficient to cover probable losses in its mortgage portfolio.  Accordingly, the level of the Company's loss reserve was an especially important piece of information to investors because it

reflected the losses that the Company was likely to incur on its $213 billion mortgage portfolio. At each reporting period, the Public Offering Materials materially understated the Company's loss reserves.

228. The purpose of loan loss reserves is to provide a current reserve against <u>likely</u> credit losses inherent in a company's portfolio. Under SFAS 5, Citigroup was supposed to set a reserve when (a) "it is <u>probable</u> that an asset had been impaired . . . at the date of the financial statements," and (b) "the amount of the loss can be reasonably estimated." (Emphasis added.) Moreover, SFAS 5 required detailed disclosures, including estimates of losses, even when losses on mortgage exposures were only "reasonably possible." Thus, GAAP required the Company to establish a reserve that reflected not merely the amount of loans that already had defaulted and been charged-off at each reporting period, but also reflected the additional amount of loans that were <u>likely</u> to default but had not yet done so.

229. Rather than comply with this requirement – which would have signaled to investors that the Company's mortgage portfolio was deteriorating and would suffer large losses – the Company's loan loss reserves (which it referred to as an "Allowance for Loan Losses") reflected only the loans that had already defaulted and been charged off in that reporting period, in violation of GAAP.

230. Indeed, as set forth in the chart below, which was reported in the third quarter of 2008, the Company's reserve levels on its North American loan portfolio tracked the actual charge-offs, called net credit losses or "NCL" ratio, of that portfolio. Moreover, as revealed by this chart, from the third quarter of 2006 through the third quarter of 2007, the Company's reserves for this portfolio <u>were substantially below</u> the actual losses for that portfolio. In other words, even as the Company dramatically expanded its volume of risky mortgage loans,

Citigroup reported "likely" losses at a level even lower than its "actual" losses. This was a violation of SFAS 5, which, as noted above, required the Company to establish a reserve not just for its actual charge-offs, but also for those additional loans that were likely to default because of the dramatically increased risks in the Company's mortgage portfolio, but had not yet done so.

## Consumer [1] Credit Trends



231.    Moreover, moving beyond the North American consumer portfolio, as Citigroup dramatically increased its volume of risky loans from 2005 through 2007, it substantially decreased its reserves as a percentage of total loans. The following chart reflects this stark discrepancy:

| Period Ending | Reserve (millions) | Total Loans - Net (millions) | Reserves as % of Total Loans |
|---|---|---|---|
| 12-31-2002 | $11,101 | $447,805 | 2.48% |
| 12-31-2003 | $12,643 | $478,006 | 2.64% |
| 12-31-2004 | $11,269 | $548,829 | 2.05% |
| 12-31-2005 | $9,782 | $583,503 | 1.68% |
| 3-31-2006 | $9,505 | $605,307 | 1.57% |
| 6-30-2006 | $9,144 | $637,085 | 1.44% |
| 9-30-2006 | $8,979 | $655,382 | 1.37% |
| 12-31-2006 | $8,940 | $679,192 | 1.32% |
| 3-31-2007 | $9,510 | $693,344 | 1.37% |
| 6-30-2007 | $10,381 | $742,924 | 1.40% |
| 9-30-2007 | $12,728 | $773,969 | 1.64% |
| 12-31-2007 | $16,117 | $777,993 | 2.07% |

232.     In light of the Company's massive increase in high-risk loans, coupled with the collapse of the housing market since year-end 2005, Citigroup should have increased its reserves substantially throughout 2006 and 2007.  Yet, in violation of GAAP, by the first quarter of 2006, Citigroup had materially reduced its reserves as a percentage of its net loan balance and continued to further reduce that reserve through 2006 and 2007, as reflected in the chart above. Indeed, by year-end 2006, the Company maintained a reserve of only 1.32% of its total net loan balance—just <u>half</u> of the 2.64% it maintained in 2003, when the Company's loans were much less risky, and before the housing market began to plummet.

233.     At a bare minimum, the Company should have maintained its allowance for losses at the 2% level to which it adhered before significantly increasing its portfolio of risky loans in 2005.  Measured against this 2% benchmark—which still was far too low given the increased size and risk of the mortgage portfolio and the housing market collapse—Citigroup understated its loan loss reserves by $2.6 billion as of the 2006 first quarter, $3.6 billion as of the 2006 second quarter, more than $4.1 billion as of the 2006 third quarter, more than $4.6 billion as of year-end 2006, $4.4 billion as of the 2007 first quarter, $4.5 billion as of the 2007 second quarter, and $2.8 billion as of the 2007 third quarter.  Measured against a higher loan loss reserve percentage, which was appropriate in light of the Company's massive volume of risky loans and the severely deteriorating housing market, the Company's understatements are even greater.

234.     Indeed, Citigroup's loan loss reserves remained substantially understated in the fourth quarter of 2007 and in 2008.  By year end 2007, it was widely accepted that the housing market had collapsed long ago.  Yet, Citigroup only increased reserves to barely above the 2% level—2.07% as of year-end 2007 and 2.31% as of the 2008 first quarter.  And, as of the 2008 second quarter, it increased reserves only to a level marginally higher than in 2003—2.78%.

235.     These levels failed to reflect losses that were both probable and estimable given the housing market collapse.  At even a 3% reserve level —which was still not adequate to reflect the risky nature of the Company's portfolio and the housing market collapse—the Company's loss reserves were understated by $7.2 billion at year-end 2007, $4.3 billion at the first quarter of 2008 and $1.6 billion at the second quarter of 2008.  Indeed, in the third quarter of 2008, after Citigroup had completed the last of the Offerings at issue in this case, it increased its reserves by more than <u>$3.2 billion</u> – or 20% of the Company's total reserves as of year-end 2007.

**D.**     **<u>Misstatements Relating to Auction Rate Securities in the Public Offering Materials</u>**

236.     Beginning in the third quarter of 2007, Citigroup's Public Offering Materials misstated and failed to disclose the existence of Citigroup's $11 billion portfolio of impaired and illiquid Auction Rate Securities ("ARS"), and failed to properly account for that exposure.

**1.**     **<u>Citigroup's ARS Business</u>**

237.     An ARS is a long-term debt instrument with an interest rate that is regularly reset through a Dutch auction process, which typically occurs every 7, 28, or 35 days.

238.     Citigroup was among the country's largest underwriters of ARS.  In addition, through its broker-dealer arm, Smith Barney, the Company sold ARS to its private brokerage clients and oversaw the auctions through which the interest rates on ARS were re-set and the securities were re-sold.

239.     Citigroup marketed ARS to its customers as highly liquid cash equivalents that provided a higher interest rate than other cash equivalents, such as money-market funds, which purportedly provided investors with the same ability to quickly liquidate the investment and withdraw the cash funds.

240. Unknown to investors, however, in order to provide the liquidity that the Company had promised its clients, Citigroup (and other ARS brokers) routinely supported ARS auctions during the Offerings Period by buying ARS when there were not enough independent buyers to purchase the supply of ARS at the auction. Indeed, as explained in an August 15, 2008 letter to the SEC from the Regional Bond Dealers Association, which is quoted below, only market-makers themselves, such as Citigroup, knew that they were supporting ARS auctions by acquiring and holding large amounts of ARS securities:

> Lead managers in an ARS transaction exercise an almost complete degree of control over information associated with auctions. Lead managers are the only dealers associated with an ARS that know, for example, the number of bidders at an action, the individual and aggregate dollar amount of bids, the range of bid prices, whether there are sufficient bids by investors for the auction to succeed, and the clearing rates in successful auctions. The lead manager is also the only party (other than perhaps the auction agent, who is not a principal in the transaction) who knows whether the lead manager itself bid at an auction for its own account and whether that bid was necessary for the auction's success.

### 2. As Demand for ARS Plummets in 2007, the Public Offering Materials Fail to Disclose that Citigroup Accumulated $11 Billion of Illiquid and Impaired ARS

241. Beginning in August 2007, the demand for ARS fell precipitously because the financial insurance companies that insured these securities (a key factor in their attractiveness to investors) were facing the threat of downgrades by the credit rating agencies, which would impair the value of insured ARS. Investor demand for ARS also declined as investors maintained more of their portfolios in cash.

242. In response, the Company began supporting ARS auctions by purchasing increasingly large amounts of surplus ARS for which there was no other buyer. Consequently, beginning in approximately August 2007, the Company began accumulating billions of dollars worth of ARS on its balance sheet. By February 2008, unknown to investors, Citigroup had accumulated as much as $11 billion in ARS on its balance sheet. Moreover, because there few

other buyers willing to purchase these ARS, the securities were almost entirely illiquid and their value was severely impaired at the time that Citigroup acquired them.

243.    By February 2008, Citigroup could no longer afford to bloat its balance sheet with illiquid ARS because of its escalating mortgage-related liabilities, as noted above.  At that point, Citigroup and other ARS market-makers stopped supporting the ARS auctions, and instead began try to sell the ARS securities they had accumulated in order to reduce the ARS on their own balance sheets.  As a direct result, while Citigroup was initially able to sell a portion of its ARS, the $300 billion ARS market became completely illiquid shortly thereafter.  Indeed, because thousands of ARS investors could no longer liquidate their ARS, the SEC, the New York Attorney General, and various state authorities promptly commenced investigations into Citigroup's sale of ARS to its brokerage clients, who also instituted a wide range of their own actions against Citigroup.

244.    Despite the Company's massive exposure to ARS, Citigroup's Form 10-Q for the third quarter of 2007 and its Form 10-K for 2007, both of which were incorporated by reference into certain Public Offering Materials as indicated on the Appendix attached hereto, failed to disclose that the Company had accumulated billions of dollars in ARS during the third and fourth quarters of 2007, amounting to $11 billion by February 2008, or that these ARS were illiquid and severely impaired.

**3.    Citigroup Reveals Its Exposure to $11 Billion of Illiquid ARS and Incurs a $1.5 Billion Write-Down and Other Losses on Those Securities**

245.    On April 18, 2008, Citigroup shocked the market by disclosing in its earnings release for the first quarter of 2008 that it possessed $11 billion of illiquid ARS as of mid-February 2008, and held a current inventory of $8 billion.

246.     At the same time that the Company first disclosed its exposure to ARS, it further stunned investors by disclosing that its ARS portfolio was already impaired by $1.5 billion (an 18.75% impairment), and thus, the Company had written down its ARS portfolio to $6.5 billion and taken a corresponding $1.5 billion charge to its income.  Analysts noted that the Company had never before disclosed its ARS exposure.  For example, on April 18, 2008 Credit Suisse issued a report stating that the Company's "newly disclosed . . . $6.5B auction rate securities exposure[]" was "[w]orthy of note."  (Emphasis added.)

247.     Even after disclosing its ARS exposure, the Company continued to materially misstate the value of those securities and their impact on its capital adequacy.  Indeed, in the second quarter of 2008, Citigroup recorded a $197 million gain on its ARS portfolio.  However, in August 2008 Citigroup reached a settlement with the New York State Attorney General pursuant to which it agreed to repurchase $7.3 billion of ARS from its clients precisely because the ARS market was completely illiquid and there were no other buyers for those securities.

**E.**     **Citigroup Finally Reveals that Its CDOs, Mortgage Portfolio, SIV Assets, and ARS Exposures Left the Company Dangerously Undercapitalized, Necessitating the Government's $326 Billion Bailout**

248.     By the end of 2007, the Company's exposure to hundreds of billions of dollars of severely impaired CDOs, mortgages, SIV assets, and ARS left Citigroup's long-term viability in serious question, since the Company could not absorb the necessary write-downs and losses from all of these deteriorating assets without putting its solvency in doubt.  Indeed, from the second quarter of 2007 through the time of the last Offering in August 2008, the Company recorded a series of write-downs on these exposures: (a) a $28 billion write-down on its subprime-backed CDO exposures; (b) a $1.3 billion write-down of its Alt-A RMBS; (c) a $1.5 billion write-down of its ARS portfolio; and (d) a $200 million write-down of its SIVs.

249.    Although totaling approximately $31 billion, these write-downs failed to reflect the true value of the Company's remaining assets or reveal the actual impact of these "assets" on the Company's financial condition.  In fact, because the write-downs actually decreased in size throughout the Offerings Period—and the Company even reported gains on certain of these assets—this signaled to investors that the quality of these assets was improving, and any adverse impact on the Citigroup's financial condition was subsiding.  For example, the Company's CDO write-downs dramatically decreased from $16.5 billion in the fourth quarter of 2007 to $5.9 billion in the first quarter of 2008 and $3.4 billion in the second quarter of 2008.  Similarly, the Company reported a relatively modest $212 write-down on its SIVs in the first quarter of 2008, and then recorded a gain of $11 million the next quarter.

250.    While the write-downs were decreasing in size, the Company continued to assure investors that its liabilities were similarly decreasing, and therefore that the Company's capital position was improving.  For example, in the Company's July 18, 2008 earnings release, incorporated by reference into certain Public Offering Materials, Defendant Pandit underscored that "write-downs in our Securities and Banking business [which included the Company's CDOs and SIVs] decreased by 42%" and that Citigroup had "reduced legacy assets substantially."  The earnings release further assured investors that the Company's "Tier 1 Capital ratio increased to 8.7%," substantially above the 6% benchmark for "well-capitalized" status.

251.    In truth, however, the Company's capital adequacy was in serious jeopardy.  On October 14, 2008, Citigroup received a $25 billion capital infusion from the U.S. Government through TARP, which was the maximum amount that the Company could have received under TARP's terms.

252.    After receiving that $25 billion, the Company continued to misrepresent its exposure to the severely impaired assets described herein and their impact on its capital adequacy.  Indeed, as late as November 2008, Citigroup continued to insist that its financial position was strong and that it had ample capital to withstand any mortgage-related losses.  On November 17, 2008, Citigroup held a "Town Hall" meeting for its employees.  At that meeting – and despite the fact that Citigroup was just six days away from requiring a $326 billion bailout to prevent its collapse – the Company repeatedly assured investors that its capital position was strong.  Specifically, Defendant Pandit stated that Citigroup had "significantly reduced our risky assets while putting the company in a very strong capital position," and was "very well positioned from a capital standpoint to weather future potential challenges."

253.    At this same meeting, however, Citigroup made another announcement that signaled to investors that the Company's CDOs, mortgage portfolio, SIV assets, and ARS were materially impaired – so impaired, in fact, that Citigroup had effectively given up attempting to attribute any value to them.  Specifically, the Company announced that it would cease valuing $80 billion of assets at their market price each reporting period by removing these assets from the Company's trading portfolio and reclassify them as "held to maturity," "held for sale," or "held for investment."  By doing so, Citigroup hoped that this re-categorization of $80 billion in assets would allow the Company to avoid taking large write-downs on those exposures at each quarter, like the write-downs noted above.

254.    Although the Company did not disclose the precise composition of these re-categorized assets, analysts concluded that the "risky" assets included within the $80 billion consisted of Citigroup's CDOs, SIV assets, RMBS, and ARS.  For example, Buckingham issued a November 17, 2008 report noting that the Company's exposure to "risky assets" included

CDOs, other "mortgage assets," and SIV assets. Similarly, *The Wall Street Journal's* Deal Journal site reported that the $80 billion included CDOs, RMBS, and ARS.

255. The Company's decision to avoid additional write-downs on this $80 billion of impaired assets shocked the market because it was an admission that these assets had either no value, or such little value Citigroup could not afford to absorb the write-downs it would have to take if it properly valued its assets. Indeed, in response to the Company's November 17 disclosure, investors immediately began to realize that the Company was essentially insolvent. For example, on November 18, 2008 Ladenburg Thalmann issued a report noting that investors "do not trust the company's balance sheet," and that there existed a "belief that the bank's securities holdings are overstated." On November 19, 2008, *Dow Jones* reported that investors had begun to "question the survival prospects of the U.S. banking giant." Likewise, on November 20, 2008, *The Wall Street Journal* reported that "[t]he market is losing confidence in Citigroup" because of the "balance sheet maneuver" of reclassifying the $80 billion in troubled assets:

> The market is losing confidence in Citigroup.  In the wake of some planned balance-sheet maneuvers, it isn't tough to see why.  . . .  Largely overlooked in the presentation materials release to investors was a disclosure that this quarter the firm would reclassify about $80 billion in assets.  Those assets wouldn't have to be marked to market prices.  Or they could be held in a way that keeps such losses from hitting earnings.  That has unnerved investors, since such holdings include risky holdings such as collateralized debt obligations – structured securities that have already led to billions in write-downs.  [Emphasis added.]

256. Immediately following the Company's disclosures at the Town Hall meeting, reports began to emerge that Citigroup executives were considering breaking the Company apart and selling its various business units, or merging with a competitor. However, distrust of the Company's solvency prevented any deal, according to a November 21, 2008 article by *Dow Jones*. That article reported that Citigroup could not find a merger partner because "of wariness

about what toxic assets remain on Citi's books. Nor would other banks be willing to trust Citi's claims about the strength of its balance sheet."

257.     With Citigroup on the brink of collapse, additional reports began emerging that the U.S. Government would have to provide the Company with huge amounts of capital just to prevent its liquidation. On November 22, 2008, *The New York Times* reported that analysts had concluded that the Company had "two remaining options: a federally forced merger or nationalization." That same day, *The Wall Street Journal* reported that "Citigroup officials have been talking in recent days to Treasury Department and Federal Reserve officials, and those discussions are expected to continue through the weekend." In a separate article, *The New York Times* further reported that Citigroup required "a new financial lifeline" from the Government.

258.     As investors realized that Citigroup was close to insolvent, the price of the Bond Class Securities collapsed. Between November 17 and 21, several of the preferred securities lost more than 50% of their value.

259.     On November 23, 2008, investors' worst fears about the Company's true financial condition were confirmed. On that day, the Company announced that it had reached an agreement with the U.S. Government to rescue Citigroup from imminent liquidation with a $326 billion bailout package—the largest in history. Pursuant to the terms of that agreement, the Government agreed to guarantee $306 billion of the Company's mortgage-related assets. Although Citigroup agreed to absorb the first $29 billion of losses, with the Government agreeing to absorb 90% of the remaining losses, the Company lacked even the capital to fund its portion of the agreement. Indeed, pursuant to the agreement, the Government infused Citigroup with $20 billion of new capital that it immediately required to survive. The Company's financial position was so dire that the Government arranged the bailout over a weekend, and announced it

on a Sunday—indicating that without immediate guarantees and cash infusions totaling $326 billion, the Company would have been liquidated as early as Monday, November 24.

260.    According to the Term Sheet that generally described the Government bailout, the $306 billion of assets consisted principally of the Company's "loans and securities backed by residential real estate," such as its CDOs, RMBS, residential mortgage loans, and the mortgage-related assets that formerly were contained within its SIVs.  Indeed, a November 24, 2008 report by Fox-Pitt noted that the Government bailout "appear[ed] to include" $305 billion in "real estate-related 'problem assets,'" and excluded "non-residential consumer" assets and the Company's "corporate loan portfolio."  Further, a November 24, 2008 report by Oppenheimer stated that, although it was "unclear" which assets were included in the $306 billion guarantee, the Company's "risky exposures" included its CDOs, RMBS, SIV assets, and ARS.

261.    As *The Wall Street Journal* reported on November 24, 2008, the Company's claims of capital adequacy—which were made as late as November 17—flatly contradicted the reality of the Company's insolvency due to its exposure to the toxic assets described above:

> The federal government agreed Sunday night to rescue Citigroup Inc. by helping to absorb potentially hundreds of billions of dollars in losses on toxic assets on its balance sheet and injecting fresh capital into the troubled financial giant.  . . . Even as they assured employees and investors last week that the company was on sound financial footing, Citigroup executives and directors knew they needed to do something fast to stabilize their company.  [Emphasis added.]

262.    Despite the Company's disclosures made between November 17 and 23, significant uncertainty remains about Citigroup's financial condition.  Indeed, the Company's exposure to impaired mortgage-related assets remains so large that, according to *The Wall Street Journal* article, "it's not clear whether [the bailout] will be enough to stabilize Citigroup."  Recent reports further indicate that Citigroup's toxic exposures are so large that the Government bailout, despite its staggering size, is insufficient to stabilize the Company.  On January 12 and

13, 2009, *The Wall Street Journal* reported that Citigroup would likely report a loss of "at least $10 billion" for the fourth quarter of 2008. In order to fund these continuing losses, *The Wall Street Journal* reported, Citigroup had embarked on a "drastic plan to shed a host of businesses" and sell them off, thereby dismantling the world's largest bank. Moreover, Citigroup's mortgage-related assets were so severely impaired that the Company was seeking to form an entirely separate entity – the so-called "bad bank" – to assume those toxic assets and liabilities, so that they could no longer damage Citigroup.

## V.  DEFENDANTS VIOLATED GENERALLY ACCEPTED ACCOUNTING PRINCIPLES AND OTHER REPORTING REGULATIONS

### A.  GAAP Background and Overview of GAAP Violations

263.    Citigroup's financial statements issued during the Offerings Period also failed to comply with Generally Accepted Accounting Principles ("GAAP").[2]  Regulation S-X requires that interim financial statements, such as those filed in Citigroup's Form 10-Qs, must also comply with GAAP, with the exception that interim financial statements need not include disclosures which would be duplicative of disclosures accompanying annual financial statements.

264.    Citigroup's publicly-filed quarterly and annual financial statements between the first quarter of 2006 and the second quarter of 2008, which were included or incorporated in the Public Offering Materials, failed to comply with numerous provisions of GAAP. Among other things, the Company's financial statements during the Offerings Period failed to: (1) disclose the existence of the Company's exposures to subprime-linked CDOs, SIVs that contained billions of dollars in mortgage-linked assets and other mortgage-related exposures; (2) report proper

_____

[2] GAAP is promulgated in part by the American Institute of Certified Public Accountants ("AICPA") and consists of a hierarchy of authoritative literature established by the AICPA. The highest level in the hierarchy includes Financial Accounting Standards Board Statements of Financial Accounting Standards (SFAS), Financial Accounting Standards Board Interpretations (FIN), Accounting Principles Board Opinions (APB) and AICPA Accounting Research Bulletins (ARB).

reserves in connection with Citigroup's subprime mortgage portfolio for the first quarter of 2006 through the first two quarters of 2008; (3) properly disclose the risks arising from its SIVs and from CDOs for which it issued liquidity puts; and (4) report timely write-downs and impairments on the value of the Company's CDOs backed by subprime mortgages as well as the SIV assets it belatedly consolidated. These violations of GAAP and other disclosure requirements resulted in material misstatements in Citigroup's financial statements from the first quarter of 2006 through the second quarter of 2008.

265. Defendants also failed to provide the comprehensive disclosures required by SEC regulations. Specifically, Item 303 of Regulation S-K requires a registrant to "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." As explained below, Citigroup failed to disclose material events and negative trends as required.

### B. Citigroup's Accounting for Its CDOs, SIVs and Other Subprime Exposures Violated GAAP and SEC Disclosure Requirements

#### 1. Citigroup's Failure To Properly Disclose Its Direct Subprime Exposure Violated GAAP

266. Citigroup's financial statements violated GAAP because they failed to properly disclose material concentrations of risk and exposures to risk arising from subprime backed CDOs and failed to disclose risks related to Citigroup's continuing involvement with the SIVs it sponsored.

267. Paragraph 15A of SFAS 107, Disclosures about Fair Value of Financial Instruments, required Citigroup to disclose "all significant concentrations of credit risk from all financial instruments, whether from an individual counterparty or groups of counterparties." Group concentrations of credit risk exist if a number of counterparties have similar economic characteristics that would cause their ability to meet contractual obligations to be similarly

affected by changes in economic or other conditions. Further, if a significant concentration of risk represents a material contingency, the risk must be disclosed in the Company's interim financial statements in accordance with APB No. 28, Interim Financial Reporting.

268. Similarly, SOP No. 94-6, Disclosure of Certain Risks and Uncertainties ("SOP 94-6"), requires disclosures to be made in financial statements regarding any vulnerabilities arising due to the fact that the business is exposed to certain risks and uncertainties that might have a "severe impact" on its future operations. SOP 94-6 defines a "severe impact" as a "significant financially disruptive effect on the normal functioning of the entity."

269. For Citigroup, subprime mortgage borrowers and subprime mortgage-linked securities were a group concentration of risk. Thus, Citigroup was required to disclose the concentration, the maximum amount of loss, and any mitigation strategies to reduce the risk of loss. As described above, Citigroup's failure to disclose as much as $66 billion of CDO tranches linked to subprime mortgages, coupled with its inadequately disclosed SIV and other mortgage-linked securities, violated SFAS 107, SOP 94-6 and APB No. 28.

270. Citigroup held over $50 billion in undisclosed CDO "direct subprime exposure" on its balance sheet. It also had billions of dollars of mortgage-related exposure in the SIVs, which Citigroup failed to consolidate on its balance sheet (as set forth below) until December 2007. This concentration of risk threatened to, and ultimately did, severely impact the Company's financial position. During the fourth quarter of 2007 alone, Citigroup's CDO assets resulted in write downs of $18.1 billion, and led to pre-tax and net losses of $17.0 billion and $9.8 billion, respectively, for the quarter. These same assets ultimately became the subject of the U.S. Government's $326 billion bailout in November 2008. Under the circumstances, SOP 94-6

plainly required Citigroup to disclose in the Public Offering Materials these vulnerabilities and the severe impact they could and did have on Citigroup's financial condition.

**C.** **Citigroup Recorded Materially Understated Loan Loss Reserves In Violation Of GAAP**

271.     As noted above in ¶¶218-35, Citigroup's loan loss reserves from the first quarter of 2006 through the first two quarters of 2008 were materially inadequate and did not reflect the high risk of loss inherent in its mortgage loan portfolio, which included subprime, Alt-A, HELOC, high LTV, and low-quality correspondent loans. The company's reserves therefore violated GAAP, including in particular SFAS 5. Further, the Company's understated reserves resulted in overstatements of net income, retained earnings, total assets, and total shareholders equity, as set forth on Citigroup's consolidated balance sheets. Because those overstated balance sheet items were components of the Company's Tier 1 capital ratio, those capital ratios were also overstated from the first quarter of 2006 through the first two quarters of 2008 for this reason alone, and others described herein.

**D.** **Citigroup Violated GAAP by Failing to Consolidate Its Commercial Paper CDOs and SIVs onto its Balance Sheet Pursuant to FIN 46(R).**

272.     Citigroup's commercial paper CDOs, against which Citigroup wrote liquidity puts as set forth in ¶¶169-79, as well as its SIVs, were variable interest entities ("VIEs") subject to the consolidation rule set forth in FIN 46(R), Consolidation of Variable Interest Entities. In violation of GAAP, Citigroup failed to consolidate its Commercial Paper CDOs and SIVs.

**1.** **FIN 46(R) Required Citigroup to Consolidate Its Commercial Paper CDOs**

273.     FIN 46(R), ¶14 states that "an enterprise shall consolidate a variable interest entity if that enterprise has a variable interest ... that will absorb the majority of the entity's

expected losses ….." Guarantees or similar obligations, such as puts, implicate consolidation under FIN 46(R) ¶B10:

> Guarantees of the value of the assets or liabilities of a variable interest entity, written put options on the assets of the entity, or similar obligations such as some liquidity commitments or agreements (explicit or implicit) to replace impaired assets held by the entity are variable interests if they protect holders of other interests from suffering losses. To the extent the counterparties of guarantees, written put options, or similar arrangements will be called on to perform in the event expected losses occur, those arrangements are variable interests, including fees or premiums to be paid to those counterparties.

274. On November 5, 2007, Citigroup disclosed for the first time that it had written a put option or "liquidity put" on $25 billion of commercial paper CDOs. As is now known, these "liquidity puts" obligated Citigroup to buy back commercial paper at full price and at low yields if commercial paper rates rose above a predetermined level. In its 2007 Form 10-K, Citigroup further disclosed that it: (a) underwrote Commercial Paper CDOs between 2003-2006; (b) wrote liquidity put options on the CDOs with a total notional amount of $25 billion to benefit the commercial paper investors; (c) purchased the outstanding commercial paper beginning in July 2007 in order to forestall the formal exercise of the liquidity puts; and (d) did not consolidate the CDOs in accordance with FIN 46(R).

275. As a result of the obligations pursuant to the liquidity put options, Citigroup was required to absorb a majority of losses of the commercial paper CDOs. Specifically, if the assets in the $25 billion of CDOs associated with the liquidity puts deteriorated in value, the CDOs' inability to refinance their commercial paper on favorable terms was essentially a foregone conclusion, Citigroup's obligations pursuant to the liquidity puts would be triggered and Citigroup would incur the losses on those CDOs. Accordingly, Citigroup was required by FIN 46(R) to consolidate the $25 billion of commercial paper CDOs supported by liquidity puts in its yearly and quarterly financial statements issued during the Offering Period. However, these

CDO exposures were not disclosed to investors, much less consolidated, until the fourth quarter of 2007, in violation of GAAP. Further, the lack of consolidation of the commercial paper CDOs in Citigroup's financial statements caused its Tier 1 capital ratios to be materially overstated during this same portion of the Offerings Period.

276. Had the commercial paper CDOs been consolidated from the beginning of 2006, the underlying subprime assets would have required timely write-downs in accordance with SFASs No. 115 and 157, resulting in significant acceleration of the eventual write-downs recorded by the Company. Specifically, had it consolidated the commercial paper CDOs as required, Citigroup would have reported write-downs to their value at year-end 2006 and for each quarter in 2007. Citigroup's failure to take these write-downs further rendered its financial statements for those periods to be in violation of GAAP.

## 2. FIN 46(R) Required Citigroup to Consolidate Its SIVs

277. Under FIN 46(R), Citigroup was also required to consolidate its SIVs because it maintained an implicit obligation to backstop these entities.

278. FIN 46(R) requires that a company consolidate a VIE if the company is a "primary beneficiary" of the VIE, meaning that the company's variable interests can result in the company absorbing more than half of the VIE's expected losses or receive more than half of the VIE's expected residual returns. Even where the company is not considered the "primary beneficiary," FIN 46(R) still provides that a company holding a "significant variable interest" in a VIE must disclose the "nature of its involvement with the variable interest entity and when that involvement began"; the "nature, purpose, size, and activities of the variable interest entity"; and the "enterprise's maximum exposure to loss as a result of its involvement with the variable interest entity."

279.     In March 2005, FASB issued FSP FIN 46(R)-5, *Implicit Variable Interests under FASB Interpretation No. 46*.  FSP FIN 46(R)-5 states that an implicit variable interest is an implied pecuniary interest in an entity that changes with changes in the fair value of the entity's net assets exclusive of variable interests.  The example of an implicit variable interest provided by FSP FIN 46(R)-5 is "an implicit agreement to replace impaired assets held by a variable interest entity that protects holders of other interests in the entity from suffering losses."

280.     FSP FIN 46(R)-5 also states that the determination as to whether an implicit variable interest exists because a company is effectively guaranteeing all or a portion of the investment or would be expected to make funds available depends on all the relevant facts and circumstances.  Those facts and circumstances include, but are not limited to, whether there is an economic incentive for a company to act as a guarantor or to make funds available.

281.     In an October 24, 2007 article by *Bloomberg* financial reporter Jonathan Weil, entitled, "*Citigroup SIV Accounting Looks Tough to Defend*," FASB Chairman Robert Herz was quoted as saying of FIN 46(R): "if there's a party at risk for a majority of the expected losses, then that party has to consolidate."  According to FASB member Tom Linsmeier, who was also quoted in the *Bloomberg* article, implicit guarantees "must be taken into consideration both at the inception of the VIE and at specific reconsideration events – like the rollover of commercial paper in an SIV."

282.     In sponsoring the SIVs and selling their commercial paper to Citigroup clients, the Company provided an implicit guarantee to absorb losses from the SIVs in the event their assets declined in value and the SIVs were not able to fund themselves by retiring or refinancing their commercial paper.  Since Citigroup at all relevant times was the party "at risk for a majority of the expected losses" of the SIVs, it should have consolidated the SIVs onto its balance sheet

from inception. Further, Citigroup should have reported the increased likelihood of losses or actual losses once the SIVs were unable to roll over their commercial paper.

283. Prior to the third quarter of 2007, Citigroup did not consolidate any of its SIVs onto its balance sheet in any capacity. In light of the fact that the term "structured investment vehicle" did not appear even once in any Form 10-Q or 10-K filed by Citigroup throughout 2006 and the first ten months of 2007, Citigroup violated, at a minimum, the disclosure provisions of FIN 46(R) set forth above. Indeed, at the least, Citigroup was obliged to disclose to investors in the Offerings the risk that it would consolidate the SIVs, including the risk that the SIVs' assets would lose significant value, and Citigroup would absorb the losses in the event the SIVs could not fund their business.

284. Citigroup was required to consolidate the SIVs in accordance with FIN 46(R) and FSP FIN 46(R)-5 because Citigroup maintained an implicit obligation to backstop these entities and absorb the majority of losses in the SIVs. Although Citigroup asserted in its third quarter 2007 Form 10-Q, for example, that it was not <u>contractually obligated</u> to support the sponsored SIVs, this statement failed to take into account Citigroup's undisclosed implicit guarantee.

285. Citigroup's failure to consolidate the SIVs onto its balance sheet for the 2006 quarterly and annual financial statements and on its March 31, 2007, June 30, 2007 and September 30, 2007 quarterly financial statements caused the Company to understate its assets and liabilities by up to $100 billion, overstate its capital ratios, overstate the value of its SIV assets and overstate earnings during this portion of the Offerings Period.

286. In December 2007, when Citigroup finally acknowledged that it should have consolidated the SIVs on its balance sheet, Citigroup's Tier 1 capital ratio was projected to decline 16 basis points. Also, as a direct result of: (a) the consolidation, (b) the anticipated write-

down in the carrying values of the assets, and (c) the erosion of Citigroup's capital ratios, Moody's cut its ratings on Citigroup's debt from Aa2 to Aa3, citing doubts that Citigroup could rebuild its capital at the levels and in the time period needed under the circumstances. The rating downgrade would require Citigroup to raise and carry even more capital.

E. **Citigroup Misstated the Fair Value of its Subprime Related CDOs and Its Subprime-Linked SIV Assets**

1. **Citigroup Misstated The Fair Value of its CDOs**

287.     As noted above, Citigroup failed to disclose its exposure to as much as $66 billion of subprime backed CDOs until November 2007. As explained herein, both before admitting this exposure and after belatedly putting these securities on its balance sheet, the Company violated GAAP by failing to report the true and severely depressed value of these CDO securities.

288.     Citigroup classified its CDOs and CDO-related exposures as "trading securities," which are securities that are bought and held principally for the purpose of being sold in the near term.   Under FAS No. 115, *Accounting for Investments in Certain Debt Securities,* these securities are to be measured at fair value in the statement of financial position, with any changes to "fair value" to be charged against earnings.

289.     For its financial statements beginning January 1, 2007, Citigroup also applied Statements of Financial Accounting Standards No. 157, *Fair Value Measurements*" ("SFAS No. 157"). SFAS No. 157 defines fair value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants." SFAS 157 emphasizes that fair value is "not an entity specific measurement," and "should be determined based on the assumptions that market participants would use in pricing the asset or liability." (emphasis added).

290.    SFAS No. 157 establishes a hierarchy for inputs used in measuring "fair value," that range from Level 1 through Level 3.  Level 1 inputs are the observed market prices of a particular asset, while Level 2 inputs are derived principally from or corroborated by observable market data by correlation or other means (market-corroborated inputs)." Level 3 inputs are non-observable, internal model-driven inputs.

291.    According to SFAS 157, "valuation techniques used to measure fair value shall maximize the use of observable inputs and minimize the use of unobservable inputs (SFAS No. 157, ¶ 21)."  Accordingly, Level 3 inputs are the least desirable, as they use assumptions developed by the reporting company to determine fair value.

292.    As described below, Citigroup's financial statements significantly overstated the fair value of its CDO assets in its Form 10-K for 2006 and in its financial statements thereafter. These misstatements resulted in corresponding overstatements of pre-tax income, financial instruments owned, total assets, retained earnings, and total shareholders equity within Citigroup's consolidated financial statements.  The effect of these misstatements was also to inflate Citigroup's Tier 1 capital ratios.

293.    In valuing its CDO securities, Citigroup violated GAAP in several ways.  First, until, September 30, 2007 (when Citigroup took a $500 million write-down on its super senior CDO exposures and a further $1 billion write-down on its other CDO-related exposures), the Company maintained these positions on its books at original cost.  However, at the very same time, Citigroup was simply unable to sell these securities to any outside investor.  Therefore, Citigroup's valuation ignored a directly observable "Level 1" input – that is, Citigroup's inability to sell the CDOs at par – which established that these securities were not worth their par value.

294.    Indeed, Citigroup was unable to sell more than $28 billion of the "high grade" and "mezzanine" CDOs that it originated between 2004 and 2007.  Moreover, by 2006, Citigroup was recycling unsold more junior tranches of its prior CDOs into new CDO securitizations, in which Citigroup also held the "super senior' exposures.  All this occurred at a time when the mortgage finance industry began to collapse, housing prices began to decline, and CDOs - including those securitized by Citigroup – were collateralized by RMBS backed by poorly underwritten subprime loans.  These observable facts further indicated that the value of the Company's CDO positions was substantially below their carrying value beginning in the fourth quarter of 2006.

295.    Second, Citigroup carried its CDO assets at values that bore no relationship to the most directly applicable market index.  In February 2007, a consortium of banks – including Citigroup – launched the TABX index, which attempts to replicate the market value of a basket of RMBS, similar in structure to the CDOs that Citigroup held.  Like CDOs, which include senior and junior tranches, the TABX index accounts for high levels of subordination and therefore provides a benchmark for the value of senior CDO positions such as those owned by Citigroup.  The most senior index is the TABX.HE 07-1 06-2 40-100 (the "40-100 TABX") because it is tied to underlying RMBS collateral assuming a subordination of 40%.  This is substantially higher than the subordination of Citigroup's owned "super senior" exposures, and therefore provides a conservative benchmark against which to measure the decline in value of the Company's CDOs.

296.    From inception in February 2007 until June 30, 2008, the 40-100 TABX simply collapsed, falling to less than 6% of par by June 2008:

| Date | Value (100 = 100% of par) |
|---|---|
| 2/16/2007 | 96.70 |

| | |
|---|---|
| 3/30/2007 | 83.80 |
| 6/29/2007 | 69.08 |
| 9/28/2007 | 34.25 |
| 12/31/2007 | 17.25 |
| 3/31/2008 | 9.22 |
| 6/30/2008 | 5.75 |

297.    As shown in the above table, the relevant TABX indices plunged in February/March 2007 and, by March 31, 2008, fell to less than ten percent of par.  Nevertheless, at September 30, 2007, Citigroup valued its non-insured CDO securities at $ 42.9 billion (after a $500 million write-down), while the TABX showed that these securities were more properly valued at $14.86 billion – or $28 billion less than at what Citigroup carried those securities.[3] Even at June 30, 2008, after a series of further write-downs, Citigroup valued these CDO assets at $16.3 billion, yet the TABX index showed that these assets were worth only $2.5 billion, or almost $14 billion less than Citigroup's own valuations. Given these large discrepancies, Citigroup carried these assets at substantially more than their fair value throughout the Offerings Period.

298.    Third, besides disregarding the most directly applicable observable market inputs shown by the TABX index and its own marketing experience, Citigroup's methodology to value its CDO holdings was fundamentally flawed in other respects.  Prior to the first quarter of 2008, Citigroup applied a model that used a discount rate for cash flows based on Collateralized Loan Obligations ("CLOs").   CLOs are backed by pooled assets of <u>corporate</u> loans and have no exposure to residential mortgages whatsoever.   As a result, while the housing market deteriorated, the discount rate that Citigroup applied did not reflect the further risk that existed in

---

[3] Citigroup also improperly valued the $10.5 billion of "hedged" CDO tranches.  For these exposures, Citigroup carried the CDO tranches at par and took write-downs on the fair value of the hedges.  However, even though the majority of the hedges were with financial insurance companies that were distressed and would be unable to honor their commitments if their customers' CDOs (which were highly correlated) defaulted, Citigroup took no write-down on the value of the hedges at September 30, 2007 and only a $900 million write-down at December 31, 2007.

subprime-backed exposures.  Indeed, a February 15, 2006 Citigroup publication titled, *A General Review of CDO Valuation Methods*, warned against the very technique that Citigroup used, stating that "one must take care to make sure that only <u>appropriate</u> comparisons are made" and that "<u>it would not be fair to compare the prices of ABS CDO triple-B bonds to CLO triple-B bonds.</u>" (Emphasis added).

299.     Citigroup's models also relied heavily on rating agencies – at the very time that Citigroup's own CDO prospectuses were warning CDO investors that credit ratings were not to be relied upon, because credit ratings do not speak to market valuation and are often untimely or outdated.     Finally, Defendant Crittenden admitted on October 25, 2007, that Citigroup's CDO valuations had been determined by Citigroup's market risk team, which focused on changes in interest rates, rather than its credit risk team, which focused on credit risks.  Each of these facts further establishes that Citigroup dramatically overstated the value of its CDO holdings by using inapplicable benchmarks.

### 2.     Citigroup Misstated the Fair Value of its SIVs

300.     Citigroup also overstated the value of its SIV assets.  At December 31, 2007, Citigroup's SIVs had a 40% exposure to structured finance (amounting to $23.4 billion), including more than $4 billion of RMBS.  For the reasons set forth above, the SIVs' mortgage-related exposure required Citigroup to recognize severe impairments in its SIVs beginning in the fourth quarter of 2006.

301.     Moreover, other aspects of the SIVs strongly indicated that the SIVs were severely impaired before the Company recorded any write-downs.  As noted above, by the third quarter of 2007, the market for SIV assets was illiquid due to concerns about SIV asset quality, requiring Citigroup to fund the SIVs itself.  Indeed, the SIV assets were so toxic that, in the third

quarter of 2007, the Company tried to shift their assets into a so-called "super SIV" even farther from its own balance sheet.

302.    Yet Citigroup took virtually no write-downs on these assets until late 2008 – only $200 million at March 31, 2008, $2 billion at September 30, 2008 and another $1.1 billion when it announced the liquidation of the SIVs on November 19, 2008.  These were belated write-downs which should have been taken on these assets no later than the fourth quarter of 2007, if not earlier, when Citigroup acted upon its obligation to absorb SIV losses.  Had the write-downs occurred in the fourth quarter of 2007, Citigroup's 2007 pre-tax earnings of $1.7 billion would have been reduced to zero.  Earnings would have been reduced in earlier periods as well, if Citigroup had consolidated SIVs in compliance with GAAP and had recorded the appropriate asset impairments in the periods in which they arose.

303.    Ultimately, on November 19, 2008, Citigroup announced that it would record the remaining SIV assets which it had purchased as "available for sale" – an accounting category in which future fair value write-downs will have no impact on earnings.  Therefore, even after belatedly consolidating the SIVs and reporting incremental write-downs to their underlying assets, the SIV assets remained so overvalued that Citigroup was forced once again to limit the transparency regarding the value of the SIVs' assets in order to immunize its income statement from further write-downs.

## VI.    SUMMARY OF CITIGROUP'S FALSE AND MISLEADING SECURITIES OFFERINGS

304.    The Securities Act claims are brought on behalf of investors who purchased Citigroup securities in or traceable to the Offerings set forth in the Appendix, each of which was conducted pursuant to a Shelf Registration Statement and Prospectus, filed with the SEC on Form S-3 on either (i) March 2, 2006, (ii) March 10, 2006, or (iii) June 20, 2006, (as amended

through subsequent post-effective amendments filed with the SEC) (collectively, the "Shelf Registration Statements"). The "effective date" of each of the Shelf Registration Statements, as that term is defined under the Securities Act, is the date of the relevant Offering, not the earlier date on which the Shelf Registration Statement itself was filed. *See* 17 C.F.R. § 230.415 and 17 C.F.R. § 229.512(a)(2).

305. The Form S-3 "shelf registration" permits an issuer to register numerous different securities for later issuance in a single SEC filing. Once this "shelf" is established, the issuer may later "take down" securities from the shelf by issuing them to the public pursuant to a later-filed prospectus, prospectus supplement, and/or pricing supplement that refers investors to the underlying Form S-3. Accordingly, each of the Offerings was also conducted pursuant to its own prospectus, prospectus supplement, and/or pricing supplement.

306. The Shelf Registration Statements also expressly incorporate by reference certain of Citigroup's Forms 10-K, 10-Q, and 8-K filed with the SEC prior to the date of each of the Offerings. Additionally, each of the Shelf Registration Statements contain the following or materially similar language:

> The SEC allows Citigroup to "incorporate by reference" the information it files with the SEC, which means that it can disclose important information to you by referring you to those documents. The information incorporated by reference is considered to be part of this prospectus….
>
> . . .
>
> All documents Citigroup files pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act after the date of this prospectus and before the later of (1) the completion of the offering of the securities described in this prospectus and (2) the date the broker-dealer subsidiaries of Citigroup stop offering securities pursuant to this prospectus shall be incorporated by reference in this prospectus from the date of filing of such documents.

307. Additionally, the prospectus and/or the prospectus supplement for each of the Offerings also expressly incorporate by reference certain SEC filings, including certain Forms

10-K, 10-Q, and 8-K. As set forth herein, Citigroup's Forms 10-K, 10-Q and 8-K made materially untrue statements of act and omitted to disclose material facts.

308. For each Offering, the Shelf Registration Statement, the prospectus or pricing supplement for that Offering, and all SEC filings incorporated therein are referred to collectively as the "Public Offering Materials." The particular SEC filings incorporated into the Public Offering Materials for each Offering are set forth below in the Appendix attached hereto.

309. The Offerings are set forth below, organized by Shelf Registration Statement, date of the particular Offering, description of the security (with the "Cusip" number, which is a standard way investors identify particular securities), the dollar value of the particular Offering, and the issuer of the particular Bond Class Security:

| OFFERINGS PURSUANT TO THE MARCH 2, 2006 SHELF REGISTRATION STATEMENT | | | |
|---|---|---|---|
| **DATE OF OFFERING** | **CITIGROUP ISSUER DEFENDANT** | **SECURITY DESCRIPTION (CUSIP NUMBER)** | **VALUE OF SECURITIES SOLD TO INVESTING PUBLIC** |
| May 18, 2006 (the "May 18, 2006 Offering") | Citigroup, Inc. | Floating Rate Notes due 2011 (172967DL2) | $1.5 billion |
| June 9, 2006 (the "June 9, 2006 Offering") | Citigroup, Inc. | Floating Rate Subordinated Notes due 2016 (172967DM0) | $600 million |
| June 28, 2006 (the "June 28, 2006 Offering") | Citigroup, Inc. | 5.850% Notes due 2013 (172967DP3) | $1 billion |
| June 30, 2006 (the "June 30, 2006 Offering") | Citigroup, Inc. | Floating Rate Notes due 2011 (172967DL2) | $250 million |

| | | | |
|---|---|---|---|
| August 2, 2006 (the "August 2, 2006 Offering") | Citigroup, Inc. | 5.85% Notes due 2016 (172967DQ1) | $1 billion |
| August 25, 2006 (the "August 25, 2006 6.125% Subordinated Offering") | Citigroup, Inc. | 6.125% Subordinated Notes due 2036 (172967DR9) | $1.5 billion |
| August 25, 2006 (the "August 25, 2006 Floating Subordinated Offering") | Citigroup, Inc. | Floating Rate Subordinated Notes due 2036 (172967DS7) | $250 million |
| September 29, 2006 (the "September 29, 2006 Offering") | Citigroup, Inc. | 5.10% Notes due 2011 (172967DU2) | $1 billion |
| November 7, 2006 (the "November 7, 2006 5.85% Notes Offering") | Citigroup, Inc. | 5.85% Notes due 2016 (172967DQ1) | $150 million |
| November 7, 2006 (the "November 7, 2006 5.10% Notes Offering") | Citigroup, Inc. | 5.10% Notes due 2011 (172967DU2) | $100 million |
| December 7, 2006 (the "December 7, 2006 Offering") | Citigroup, Inc. | Floating Rate Subordinated Notes due 2036 (172967DS7) | $175 million |
| December 28, 2006 (the "December 28, 2006 Offering") | Citigroup, Inc. | Floating Rate Notes due 2009 (172967DW8) | $2 billion |
| January 16, 2007 (the "January 16, 2007 Offering") | Citigroup, Inc. | 6.125% Subordinated Notes due 2036 (172967DR9) | $500 million |
| February 12, 2007 (the "February 12, 2007 Offering") | Citigroup, Inc. | 5.5% Subordinated Notes due 2017 (172967DY4) | $1.25 billion |

| February 16, 2007 (the "February 16, 2007 Offering") | Citigroup, Inc. | Floating Rate Subordinated Notes due 2016 (172967DM0) | $750 million |
|---|---|---|---|
| February 27, 2007 (the "February 27, 2007 Offering") | Citigroup, Inc. | 5.250% Notes due 2012 (172967DZ1) | $1 billion |
| March 7, 2007 (the "March 7, 2007 Offering") | Citigroup, Inc. | Floating Rate Notes due 2014 (172967EA5) | $650 million |
| May 29, 2007 (the "May 29, 2007 Offering") | Citigroup, Inc. | 5.875% Notes due 2037 (172967EC1) | $1 billion |
| May 31, 2007 (the "May 31, 2007 Offering") | Citigroup, Inc. | Floating Rate Subordinated Notes due 2036 (172967DS7) | $100 million |
| August 13, 2007 (the "August 13, 2007 Offering") | Citigroup, Inc. | Floating Rate Notes due 2010 (172967EG2) | $3 billion |
| August 15, 2007 (the "August 15, 2007 Offering") | Citigroup, Inc. | 6.00% Notes due 2017 (172967EH0) | $1.5 billion |
| August 27, 2007 (the "August 27, 2007 Offering") | Citigroup, Inc. | 5.500% Notes due 2012 (172967EJ6) | $1 billion |
| September 14, 2007 (the "September 14, 2007 5.250% Notes Offering") | Citigroup, Inc. | 5.250% Notes due 2012 (172967DZ1) | $300 million |
| September 14, 2007 (the "September 14, 2007 6.00% Notes Offering") | Citigroup, Inc. | 6.00% Notes due 2017 (172967EH0) | $500 million |

| October 17, 2007 (the "October 17, 2007 Offering") | Citigroup, Inc. | 5.300% Notes due 2012 (172967EL1) | $3 billion |
|---|---|---|---|
| November 21, 2007 (the "November 21, 2007 Offering") | Citigroup, Inc. | 6.125% Notes due 2017 (172967EM9) | $4 billion |
| January 23, 2008 (the "January 23, 2008 Offering") | Citigroup, Inc. | Depositary Shares Each Representing A 1/1,000th Interest in a Share of 6.5% Non-Cumulative Convertible Preferred Stock, Series T (172967598) | $3,168,650,000 (63,373,000 depositary shares at $50 per share) |
| January 25, 2008 (the "January 25, 2008 Offering") | Citigroup, Inc. | Depositary Shares Each Representing a 1/1,000th Interest in a Share of 8.125% Non-Cumulative Preferred Stock, Series AA (172967572) | $3,715,000,000 (148,600,000 depositary shares at $25 per share) |
| March 5, 2008 (the "March 5, 2008 Offering") | Citigroup, Inc. | 6.875% Notes due 2038 (172967EP2) | $2.5 billion |
| April 11, 2008 (the "April 11, 2008 Offering") | Citigroup, Inc. | 5.500% Notes due 2013 (172967EQ0) | $4.75 billion |
| April 28, 2008 (the "April 28, 2008 Offering") | Citigroup, Inc. | Depositary Shares Each Representing a 1/25th Interest in a Share of 8.40% fixed Rate/Floating Rate Non-Cumulative Preferred Stock Series E (172967ER8) | $6 billion (6 million depositary shares at $1,000 per share) |
| May 12, 2008 (the "May 12, 2008 Offering") | Citigroup, Inc. | 6.125% Notes due 2018 (172967ES6) | $3 billion |

| May 13, 2008 (the "May 13, 2008 Offering") | Citigroup, Inc. | Floating Rate Notes due 2018 (172967ET4) | $550 million |
|---|---|---|---|
| May 13, 2008 (the "May 13, 2008 Depositary Share Offering") | Citigroup, Inc. | Depositary Shares Each Representing a 1/1,000th Interest in a Share of 8.50% Non-Cumulative Preferred Stock, Series F (172967556) | $2,040,000,000 (81,600,000 depositary shares at $25 per share) |
| August 19, 2008 (the "August 19, 2008 Offering") | Citigroup, Inc. | 6.500% Notes due 2013 (172967EU1) | $3 billion |

| OFFERINGS PURSUANT TO THE MARCH 10, 2006 SHELF REGISTRATION STATEMENT | | | |
|---|---|---|---|
| DATE OF OFFERING | CITIGROUP ISSUER DEFENDANT | SECURITY DESCRIPTION (CUSIP) | VALUE OF SECURITIES SOLD TO INVESTING PUBLIC |
| May 25, 2007 (the "May 25, 2007 Offering") | Citigroup Funding, Inc. | Medium Term Notes, Series D, maturing on May 25, 2022 (1730T0CR8) | $70 million |
| October 22, 2007 (the "October 22, 2007 Offering") | Citigroup Funding, Inc. | Medium Term Notes, Series D, maturing on October 22, 2009 (1730T0EK1) | $1.8 billion |
| May 7, 2008 (the "May 7, 2008 Offering") | Citigroup Funding, Inc. | Medium Term Notes, Series D, maturing on May 7, 2010 (1730T0FV6) | $2.25 billion |
| May 28, 2008 (the "May 28, 2008 Offering") | Citigroup Funding, Inc. | Medium Term Notes, Series D, maturing on May 28, 2013 (1730T0EP0) | $70 million |
| June 26, 2008 (the "June 26, 2008 Offering") | Citigroup Funding, Inc. | Medium Term Notes, Series D, maturing on June 26, 2013 | $35 million |

| | | (1730T0GB9) | |
|---|---|---|---|

<table>
<tr><td colspan="4" align="center"><b>OFFERINGS PURSUANT TO THE<br>JUNE 20, 2006 SHELF REGISTRATION STATEMENT</b></td></tr>
<tr><td><b>DATE OF OFFERING</b></td><td><b>CITIGROUP ISSUER DEFENDANT</b></td><td><b>SECURITY DESCRIPTION (CUSIP)</b></td><td><b>VALUE OF SECURITIES SOLD TO INVESTING PUBLIC</b></td></tr>
<tr><td>June 30, 2006 (The "June 30, 2006 Offering")</td><td>Citigroup Capital XIV</td><td>Citigroup Capital XIV 6.875% Enhanced Trust Preferred Securities<br><br>(17309E200)</td><td>$565 million</td></tr>
<tr><td>September 15, 2006 (the September 15, 2006 Offering")</td><td>Citigroup Capital XV</td><td>Citigroup Capital XV 6.50% Enhanced Trust Preferred Securities<br><br>(17310G202)</td><td>$1.185 billion</td></tr>
<tr><td>November 22, 2006 (the "November 22, 2006 Offering")</td><td>Citigroup Capital XVI</td><td>Citigroup Capital XVI 6.45% Enhanced Trust Preferred Securities<br><br>(17310l201)</td><td>$1.6 billion</td></tr>
<tr><td>March 6, 2007 (the "March 6, 2007 Offering")</td><td>Citigroup Capital XVII</td><td>Citigroup Capital XVII 6.35% Enhanced Trust Preferred Securities<br><br>(17311H209)</td><td>$1.1 billion</td></tr>
<tr><td>June 28, 2007 (the "June 28, 2007 Offering")</td><td>Citigroup Capital XVIII</td><td>Citigroup Capital XVIII 6.829% Fixed Rate/ Floating Rate Enhanced Trust Preferred Securities<br><br>(EG5909395)</td><td>£500 million</td></tr>
<tr><td>August 15, 2007 (the "August 15, 2007 Offering")</td><td>Citigroup Capital XIX</td><td>Citigroup Capital XIX 7.250% Enhanced Trust Preferred Securities<br><br>(17311U200)</td><td>$1.225 billion</td></tr>
</table>

| November 27, 2007 (the "November 27, 2007 Offering") | Citigroup Capital XX | Citigroup Capital XX 7.875% Enhanced Trust Preferred Securities (173085200) | $787.5 million |
|---|---|---|---|
| December 21, 2007 (the "December 21, 2007 Offering") | Citigroup Capital XXI | Citigroup Capital XXI 8.300% Enhanced Trust Preferred Securities (173094AA1) | $3.5 billion |

## VII.   ADDITIONAL FALSE AND MISLEADING STATEMENTS IN THE PUBLIC OFFERING MATERIALS

310.    As further detailed on the Appendix attached hereto, the Public Offering Materials pursuant to which Citigroup conducted the above Offerings incorporated certain of the Company's SEC filings, which in turn set forth materially untrue statements, and failed to disclose material facts, beginning with the Company's Form 10-Q for the first quarter of 2006.

311.    Before filing each of the Forms 10-K and 10-Q described below, Citigroup issued press releases announcing its financial results for the relevant period.  Indeed, throughout 2006 and the first half of 2007, Citigroup's earnings announcements regularly highlighted the Company's "record" revenues and earnings, and the "positive trends" and "strong momentum" the Company was seeing in its U.S. consumer business, which included the Company's mortgage business.  Thus, for example, on January 19, 2007, the Company announced "record" revenues and earnings for the year 2006 of $89.6 billion and $21.2 billion, respectively, which Defendant Prince attributed to the "positive trends" Citigroup was seeing in its businesses.

312.    Similarly, on April 16, 2007, the Company reported "record" revenues of $25.5 billion and income of $5 billion for the first quarter of 2007, and Defendant Prince stated that the Company had "generated strong momentum this quarter, with revenues increasing 15% to a record, driven by growing customer business volumes."  And on July 20, 2007, Citigroup again

reported "record" revenues and income for the second quarter of 2007, with revenue increasing 20% and income increasing 18% from the same period of the prior year, and Defendant Prince again spoke extremely positively about the Company's business:

> We have very clear priorities to drive growth and we are executing on all of them. We generated record revenues, up 20%, and record earnings from continuing operations, up 18%, both driven by our record international results.

313. These financial results were filed with the SEC pursuant to Forms 8-K. For the same reasons set forth below explaining why Citigroup's Forms 10-K and 10-Q contained untrue statements of material fact or made material omissions, the Forms 8-K announcing the financial results for the same periods, which were incorporated into the Public Offering Materials as indicated in the Appendix attached hereto, also contained untrue statements of material fact or made material omissions.

**A.**     **False Statements in Public Offering Materials Prior to November 4, 2007**

314. Citigroup's Forms 10-Q for the first quarter of 2006 (the "May 5, 2006 Form 10-Q"), the second quarter of 2006 (the "August 4, 2006 Form 10-Q"), and the third quarter of 2006 (the "November 3, 2006 Form 10-Q"), Citigroup's Form 10-K for 2006 (the "2006 Form 10-K"), and Citigroup's Forms 10-Q for the first quarter of 2007 (the "May 4, 2007 Form 10-Q") and the second quarter of 2007 (the "August 3, 2007 Form 10-Q") (collectively, the "Pre-November 4, 2007 Filings") were each materially false and misleading for substantially the same reasons, which are summarized below. As noted above, the Appendix identifies the Public Offering Materials that incorporate each of the Pre-November 4, 2007 Filings.

315. First, as further detailed at ¶¶165-81 above, each of the Pre-November 4, 2007 Filings stated that the Company's various "mortgage securitizations," such as its CDOs, "are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchasers of the securities issued by the trust." This statement was materially untrue because, in

reality, the Company retained the risk of loss on as much as $66 billion of undisclosed, direct exposure to subprime-backed CDOs, which those SEC filings failed to disclose. Besides failing to disclose this exposure, Citigroup also failed to report appropriate write-downs of these CDO tranches, beginning no later than the fourth quarter of 2006.

316. Second, with respect to the Company's SIVs, each of the Pre-November 4, 2007 Filings provided that Citigroup maintained only "limited continuing involvement and, as a result, we do not consolidate their assets and liabilities in our financial statements." As further detailed at ¶¶193-217 above, that statement was materially untrue because, rather than maintaining only "limited" involvement," the Company was obligated to guarantee its SIVs against losses, and therefore was required to consolidate them under GAAP and report timely and accurate write-downs, which it failed to do.

317. Third, as further detailed at ¶¶218-35 above, each of the Pre-November 4, 2007 Filings reported materially understated loss reserves. Because the Company's reserves were understated, the Company failed to take the required charges against income. Consequently, the Pre-November 4, 2007 Filings also reported materially overstated amounts of net income.

318. Fourth, as further detailed at ¶¶161-217 above, the Pre-November 4, 2007 Filings also stated that "actual losses are not expected to be material" on the Company's Variable Interest Entities ("VIEs"), which was a broad category of off-balance sheet entities that included its CDOs and SIVs. This statement was materially untrue because, as the housing market began to decline and then collapsed in 2006 and 2007, the Company held direct exposure to as much as $66 billion of subprime-backed CDOs and was obligated to absorb losses on its SIVs, which contained as much as $100 billion of troubled assets, including billions of dollars of additional mortgage backed securities. Given these massive exposures to mortgage-backed securities, as

the housing market began to decline and then collapsed in 2006 and 2007, the Company faced a material risk of losses arising from its VIEs.

319.   Fifth, each of the Pre-November 4, 2007 Filings reported that the Company was "well-capitalized" because it had maintained a Tier 1 capital ratio substantially above 6%. Similarly, each of those SEC filings reported the Company's "risk capital," which Citigroup stated was "the amount of capital required to absorb potential unexpected economic losses resulting from extremely severe events over a one-year time period."  Likewise, each of the Pre-November 4, 2007 Filings reported the Company's "value at risk," which Citigroup stated was the amount of the "potential decline" of the Company's trading securities—such as its CDO securities—over a one-day holding period, calculated to a "99% confidence level."  Each of Citigroup's reported Tier 1 capital ratio, its risk capital and its value at risk was materially misstated because the Company failed to disclose and properly account for its various mortgage-related assets and liabilities, as set forth more fully above at ¶¶161-235, 263-303.

320.   In addition, the SEC filings noted above stated that the Company's financial statements complied with GAAP.  As explained in Section V, this statement was untrue.

321.   Further, the Pre-November 4, 2007 Filings included certifications under the Sarbanes-Oxley Act (the "Sarbanes-Oxley Certifications") signed by Defendant Prince and either Defendant Krawcheck or Defendant Crittenden, certifying that the signatory had reviewed the relevant SEC filing and that such filing did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."  These certifications were untrue because the Company's SEC filings contained the untrue statements and material omissions described above.

## B. False Statements in Public Offering Materials After November 4, 2007

322. As noted above, on July 20, 2007, Defendant Crittenden stated that the Company had only $13 billion of direct exposure to subprime assets, and that the Company had materially reduced this exposure from $24 billion at the end of 2006. During an October 1, 2007 conference call, Defendant Crittenden reiterated that the Company had reduced its direct subprime exposure to just $13 billion. A transcript of this conference call was attached to a Form 8-K and filed with the SEC on October 1, 2007 (the "October 1, 2007 Form 8-K"), and thereby incorporated into the Public Offering Materials for subsequent Offerings.

323. On October 15, 2007, Citigroup announced its results for the third quarter of 2007. While the Company reported positive net income of more than $2 billion, it acknowledged that the results were "disappointing" and below expectations. The Company attributed the results to declines in the fixed income business but it did not further detail the aspects of that business that were deteriorating. Moreover, in that press release, Defendant Prince assured investors that the Company was healthy and that any problems in the fixed income business were being addressed.

324. Three weeks later, on November 4, 2007, Citigroup disclosed for the first time that the Company actually possessed an additional $43 billion of exposure to subprime-backed CDOs, bringing its total disclosed exposure to approximately $55 billion. That same day, Defendant Prince abruptly "resigned" from his position with the Company, saying that resigning "is the only honorable course for me to take."

325. On November 5, 2007 Citigroup filed its Form 10-Q for the quarter ending September 30, 2007 (the "November 5, 2007 Form 10-Q"). The November 5, 2007 Form 10-Q reported net income for the third quarter of 2007 of $2.21 billion, quarter-end balance sheet assets of $2.358 trillion, and an allowance for loan losses of $12.73 billion. The November 5,

2007 Form 10-Q reported that "Citigroup maintained its 'well-capitalized' position with a Tier 1 Capital Ratio of 7.32% at September 30, 2007." The November 5, 2007 Form 10-Q further reported that Citigroup's risk capital was $78.4 billion at September 30, 2007, and that its value at risk was $111 million.

326. Citigroup's reported earnings, assets, loss reserves, Tier 1 capital ratio, and risk capital were each materially untrue because the November 5, 2007 Form 10-Q failed to disclose and properly account for: (a) the severe impairments in the Company's exposure to $43 billion of subprime-backed CDOs, as described above at ¶¶287-99; (b) the Company's undisclosed exposure to another $10.5 billion of subprime-backed CDOs, as noted above at ¶185; (c) the Company's obligation to provide funding to or absorb losses on its SIVs, which contained $80 billion of assets as of September 31, 2007, including billions of dollars of mortgage-related securities, as noted above at ¶¶193-217, 272-86; (d) the Company's undisclosed exposure to billions of dollars of impaired ARS, as described above at ¶¶236-47; and (e) that Citigroup faced a concentration of risk tied to the plummeting housing market that jeopardized its capital adequacy due to the Company's large and growing exposure to CDOs, SIVs, RMBS, and hundreds of billions of dollars of subprime, Alt-A, HELOC, high LTV, and correspondent loans, as further detailed above at ¶¶155-235.

327. Regarding the Company's SIVs, the November 5, 2007 Form 10-Q further stated that "Citigroup has no contractual obligation to provide liquidity facilities or guarantees to any of the Citi-advised SIVs . . . ." The Form 10-Q also stated that "Citigroup will not take actions that will require the Company to consolidate the SIVs." These statements were materially untrue and omitted to state material facts because, in reality, the Company made an implicit guarantee to protect its SIVs against losses, and therefore was required to consolidate them under GAAP and

record write-downs as the SIVs' assets deteriorated in value, as set forth more fully above at ¶¶277-86, 300-03.

328.   In addition, Citigroup's allowance for loan losses was materially deficient, as explained above at ¶¶218-35.  The Company understated its loan reserves by at least $4.13 billion, and thus overstated its net income by at least the same amount.

329.   The November 5, 2007 Form 10-Q stated that Company's financial statements complied with GAAP.  As set forth in Section V, this statement was untrue.  The November 5, 2007 Form 10-Q also included Sarbanes Oxley Certifications signed by Defendants Prince and Crittenden, which made virtually identical representations as set forth in ¶321 above.  These statements were false for all the reasons set forth above.

330.   On December 13, 2007, the Company issued a press release, later filed with the SEC on Form 8-K (the "December 14, 2007 Form 8-K"), in which it admitted its obligation to consolidate its SIVs.  Even so, the December 14, 2007 Form 8-K contained untrue statements of material fact about the quality of the SIVs' assets and their impact on the Company's financial condition.  Specifically, December 14, 2007 Form 8-K stated that the SIVs' assets had a "high credit quality" and therefore "Citi's credit exposure under its commitment is substantially limited."  Those statements were materially untrue because the SIV assets were not of "high quality," but included similarly toxic RMBS securities and other assets that infected Citigroup's balance sheet and which were experiencing substantially greater losses than Citigroup reported.  Further, the December 14, 2007 Form 8-K stated that the SIVs' assets were worth more than $49 billion.  In fact, those assets were substantially impaired.

331.   On January 15, 2008, Citigroup announced its results for 2007.  The Company reported a loss for the fourth quarter of $9.8 billion, which included $18 billion in write-downs

on sub-prime related directed exposures that had only been first disclosed two months earlier. Significantly, however, the Company still reported a profit for the year of $3.6 billion, and Defendant Pandit represented that the Company was "keeping a tight control over our business risks" and taking steps "to strengthen our capital base." In reality, even these results failed to reflect the true impairments in the Company's mortgage-related exposures.

332. On February 22, 2008, Citigroup filed its Form 10-K for the year ended December 31, 2007 (the "2007 Form 10-K"), which reported $9.83 billion in net losses for the fourth quarter of 2007, $3.62 billion of net income for the year, year-end balance sheet assets of $2.187 trillion, and an allowance for loan losses of $16.117 billion. The 2007 Form 10-K also reported that "Citigroup maintained its 'well-capitalized' position with a Tier 1 Capital Ratio of 7.12% at December 31, 2007," and that its value at risk was just $163 million, only $13 million of which was attributable to the Company's SIVs. Further, the Company asserted that consolidating the SIVs increased the value of Citigroup's asset base by $59 billion.

333. Citigroup's reported earnings, assets, loss reserves, Tier 1 capital ratio, and value at risk were each materially untrue because the 2007 Form 10-K failed to disclose and account for: (a) the severe impairments to the Company's direct exposure to as much as $66 billion of subprime-backed CDOs, as explained above at ¶¶287-99; (b) the severe impairments to the Company's now-consolidated SIV assets, as explained above at ¶¶300-03; (c) Citigroup's accumulation of approximately $11 billion in impaired, illiquid ARS on its balance sheet, as noted above at ¶¶236-47; and (d) Citigroup's exposure to a concentration of risk tied to the plummeting housing market that jeopardized its capital adequacy due to the Company's large and growing exposure to CDOs, SIVs, RMBS, and hundreds of billions of dollars of subprime, Alt-

A, HELOC, high LTV, and correspondent loans as further detailed at ¶¶155-235. Further, Citigroup's allowance for loan losses was materially deficient, as set forth above at ¶¶218-35.

334. The 2007 Form 10-K also stated that the Company's financial statements complied with GAAP. As set forth above in Section V, this statement was untrue. The 2007 Form 10-K also included Sarbanes-Oxley Certifications signed by Defendants Pandit and Crittenden. That statement was false for all the reasons set forth above.

335. On April 18, 2008, the Company reported a net loss of $5.1 billion for the first quarter of 2008, and revealed that write-downs of $1.5 billion on auction rate securities inventory contributed heavily to that loss. This was the first time the Company ever disclosed that it had billions of dollars worth of ARS on its balance sheet, let alone that these assets were also materially impaired. Further, Defendant Pandit assured investors that the Company's capital position was strong, noting that the Company had "taken decisive and significant actions to strengthen our balance sheet." On May 2, 2008, the Company filed its first quarter Form 10-Q (the "May 2, 2008 Form 10-Q"), which reiterated those first quarter results and stated that the Company had maintained its "well-capitalized" status. These statements were materially false. As set forth above, the mortgage-related and other toxic assets held by the Company were so impaired that the Company was precariously close to insolvency.

336. On July 18, 2008, Citigroup reported a net loss for the 2008 second quarter of $2.5 billion, or half of the loss that had been reported in the first quarter. Citigroup touted that these "results improved substantially versus first quarter 2008 due to lower write-downs," which declined 42%. Defendant Pandit assured investors that Citigroup was "demonstrat[ing] strength in our core franchise. We cut our second quarter losses in half compared to the first quarter." On August

1, 2008, Citigroup filed its Form 10-Q for the second quarter of 2008, which reiterated these financial results and again stated that the Company had maintained its "well-capitalized" status.

337. The statements relating to the second quarter of 2008 were materially false. As set forth herein, only four months later, Citigroup required the largest government bailout in history precisely because its mortgage related assets were so deeply impaired that they had effectively rendered the Company insolvent.

338. As further detailed above, in the fall of 2008, Citigroup was teetering on the verge of insolvency due to the impairments in its mortgage-related assets and ARS. Desperate for capital, the Company sought help from the U.S. government. On October 14, 2008, it was announced that the U.S. Department of the Treasury would purchase from Citigroup $25 billion of preferred stock and warrants pursuant to the Troubled Assets Relief Program ("TARP").

339. However, as described above, it was not until November that investors realized that the Company was teetering on insolvency. Specifically, on November 17, 2008, Citigroup announced that, even after recording more than $32 billion of write-downs on the assets described above during 2007 and 2008, it would no longer mark-to-market $80 billion of mortgage-related assets. Investors and analysts immediately understood that Citigroup's decision to stop marking these assets to market was an admission that these assets were worth dramatically less than reported, and that Citigroup lacked the capital to absorb the losses that would occur if it properly valued these assets.

340. Two days later, on November 19, 2008, Citigroup announced that it would dismantle its SIVs and purchase their remaining $17.4 billion of assets in order to pay the holders of SIV-issued commercial paper, which further indicated to investors that the SIVs

purportedly "high quality" assets were either virtually worthless or that their true value was dramatically less than the Company had reported.

341. In response to these announcements, the prices of the Company's debt and preferred securities issued in the Offerings collapsed, falling as much as 56% between November 17 and November 21.

342. On Sunday, November 23, 2008, with Citigroup potentially facing a liquidation that would wreak havoc on the country's financial markets, the U.S. Government was forced to rescue Citigroup from the losses caused by its hundreds of billions of dollars of toxic mortgage-linked securities. In the largest bailout in history, the Government was forced to guarantee $306 billion of Citigroup's mortgage-related assets and provide the Company with $20 billion of cash.

## VIII. CLASS ACTION ALLEGATIONS

343. Bond Class Plaintiffs bring this action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure individually and on behalf of all persons and entities, except Defendants and their affiliates, who purchased or otherwise acquired the debt securities (including certain medium term notes), series of preferred stock and certain series of depository shares representing interests in preferred stock (collectively, "Bond Class Securities") in or traceable to Offerings between May 2006 and August 2008, as set forth on the Appendix attached hereto, and were damaged thereby. Excluded from the Class are Defendants, their respective officers and directors (current and former), members of their immediate families and their legal representatives, heirs, successors or assigns, trustees of the Citigroup Trusts, and any entity in which any Defendant has or had a controlling interest.

344. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is presently unknown to Plaintiffs and can only be ascertained through appropriate discovery, Plaintiffs reasonably believe that there are

thousands of members in the Class. Record owners and other members of the Class may be identified by records maintained by Defendants and their transfer agents, and may be notified of the pendency of the action by mail, the internet or publication using the form of notice similar to that customarily used in securities class actions.

345. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' violations of the Securities Act of 1933.

346. Plaintiffs will fairly and adequately represent the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

347. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. These common questions of law and fact include:

a. whether Defendants violated the Securities Act of 1933 as alleged herein;

b. whether the Shelf Registration Statements and the Public Offering Materials contained materially untrue statements or omitted statements of material fact; and

c. the extent of damages suffered by the Class, and the proper measure of damages.

348. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to obtain individual redress. There will be no difficulty in the management of this action as a class action.

## IX. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

349. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.

350. First, none of the statements complained of herein was a forward-looking statement. Rather they were historical statements or statements of purportedly current facts and conditions at the time the statements were made. Second, the statutory safe harbor does not apply to statements included in financial statements which purport to have been prepared in accordance with GAAP.

351. To the extent any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding the Company's business and financial condition and its purported compliance with GAAP.

## X. CAUSES OF ACTION

### COUNT I

### For Violations Of Section 11 Of The Securities Act Against The Citigroup Defendants

352. Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

353. This Count is asserted against the Citigroup Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of members of the Class who purchased or otherwise acquired the Bond Class Securities pursuant to or traceable to the materially false and misleading Shelf Registration Statements and Public Offering Materials incorporated by

reference in those Registration Statements, and were damaged thereby. The chart located at ¶309 above identifies the particular Citigroup Defendant issuer for each Offering.

354. Each of the Shelf Registration Statements, including the Public Offering Materials incorporated by reference therein at the time of each Offering, contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading.

355. Each Citigroup Defendant, for each offering of its Bond Class Securities, is strictly liable under Section 11 for the materially untrue statements and omissions in the Shelf Registration Statements and incorporated Public Offering Materials for that Offering.

356. Plaintiffs and members of the Class purchased Bond Class Securities issued under or traceable to the Shelf Registration Statements.

357. Plaintiff and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the Shelf Registration Statements and incorporated Public Offering Materials when they purchased or acquired their Bond Class Securities.

358. The value of the Bond Class Securities has declined substantially subsequent to the consummation of the Offerings and Plaintiffs and the other members of the Class have sustained damages.

359. Less than one year elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the time that the first complaint was filed asserting claims arising out of the falsity of each of the Shelf Registration Statements. Less than three years elapsed between the time that the securities at issue in this complaint were bona fide offered to the public and the time that the first complaint was filed asserting claims arising out of the falsity of each of the Shelf Registration Statements.

360. This claim does not sound in fraud. For purposes of asserting this claim under the 1933 Act, Plaintiffs do not allege that any Defendant acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

361. By reason of the foregoing, the Citigroup Defendants are liable for violations of Section 11 of the Securities Act to Plaintiffs and the other members of the Class who purchased or otherwise acquired Bond Class Securities pursuant to the Shelf Registration Statements.

## COUNT II

### For Violations Of Section 11 Of The Securities
### Act Against The Individual Defendants Other Than Crittenden and Krawcheck

362. Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

363. This Count is asserted against the Individual Defendants other than Crittenden and Krawcheck for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of members of the Class who purchased or otherwise acquired the Bond Class Securities pursuant to or traceable to the materially false and misleading Shelf Registration Statements and Public Offering Materials incorporated by reference in those Registration Statements, and were damaged thereby.

364. Each Defendant named in this Count is liable in connection with those Offerings: (a) made at a time when the Defendant was a director of the issuer, or (b) made pursuant to a Shelf Registration Statement that the Defendant signed. The descriptions of each Individual Defendant at ¶¶41-68 above identify the Offerings for which such Individual Defendant is liable pursuant to this Count.

365. Each of the Shelf Registration Statements, including the Public Offering Materials incorporated by reference therein at the time of each Offering, contained untrue statements of

material fact and omitted other facts necessary to make the statements made therein not misleading.

366.     Each of the Defendants named in this Count is unable to establish an affirmative defense based on a reasonable and diligent investigation of the statements contained in the Registration Statements and incorporated Public Offering Materials.  The Defendants named in this Count did not make a reasonable investigation or possess reasonable grounds to believe that those statements were true and that there were no omissions of any material fact.  Accordingly, the Defendants named in this Count acted negligently and are therefore liable to Plaintiffs and the other members of the Class who purchased Bond Class Securities.

367.     Plaintiffs and members of the Class purchased Bond Class Securities issued under or traceable to the Shelf Registration Statements.

368.     Plaintiff and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the Shelf Registration Statements and incorporated Public Offering Materials when they purchased or acquired their Bond Class Securities.

369.     The value of the Bond Class Securities has declined substantially subsequent to the consummation of the Offerings and Plaintiffs and the other members of the Class have sustained damages.

370.     Less than one year elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the time that the first complaint was filed asserting claims arising out of the falsity of each of the Shelf Registration Statements.  Less than three years elapsed between the time that the securities at

issue in this complaint were bona fide offered to the public and the time that the first complaint was filed asserting claims arising out of the falsity of each of the Shelf Registration Statements.

371. This claim does not sound in fraud. For purposes of asserting this claim under the 1933 Act, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

372. By reason of the foregoing, the Individual Defendants, other than Defendants Crittenden and Krawcheck, are liable for violations of Section 11 of the Securities Act to Plaintiffs and the other members of the Class who purchased or otherwise acquired Bond Class Securities pursuant to the Shelf Registration Statements.

## COUNT III

### For Violations Of Section 11 Of The Securities Act Against The Underwriter Defendants

373. Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

374. This Count is asserted against the Underwriter Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of members of the Class who purchased or otherwise acquired the Bond Class Securities pursuant to or traceable to the materially false and misleading Shelf Registration Statements and Public Offering Materials incorporated by reference in those Registration Statements, and were damaged thereby.

375. Each of the Underwriter Defendants was an underwriter of certain of the Bond Class Securities, as set forth on the Appendix.

376. Each of the Shelf Registration Statements, including the Public Offering Materials incorporated by reference therein at the time of each Offering, contained untrue statements of material fact and omitted other facts necessary to make the statements made therein not misleading.

377. Each of the Defendants named in this Count is unable to establish an affirmative defense based on a reasonable and diligent investigation of the statements contained in the Registration Statements and incorporated Public Offering Materials. The Defendants named in this Count did not make a reasonable investigation or possess reasonable grounds to believe that those statements were true and that there were no omissions of any material fact. Accordingly, the Defendants named in this Count acted negligently and are therefore liable to Plaintiffs and the other members of the Class who purchased Bond Class Securities.

378. Plaintiffs and members of the Class purchased Bond Class Securities issued under or traceable to the Shelf Registration Statements.

379. Plaintiff and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the Shelf Registration Statements and incorporated Public Offering Materials when they purchased or acquired their Bond Class Securities.

380. The value of the Bond Class Securities has declined substantially subsequent to the consummation of the Offerings and Plaintiffs and the other members of the Class have sustained damages.

381. Less than one year elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the time that the first complaint was filed asserting claims arising out of the falsity of each of the Shelf Registration Statements. Less than three years elapsed between the time that the securities at issue in this complaint were bona fide offered to the public and the time that the first complaint was filed asserting claims arising out of the falsity of each of the Shelf Registration Statements.

382.     This claim does not sound in fraud.  For purposes of asserting this claim under the 1933 Act, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

383.     By reason of the foregoing, the Underwriter Defendants are liable for violations of Section 11 of the Securities Act to Plaintiffs and the other members of the Class who purchased or otherwise acquired Bond Class Securities pursuant to the Shelf Registration Statements.

## COUNT IV

### For Violations Of Section 12(a)(2) Of The Securities Act Against The Citigroup Defendants

384.     Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

385.     This Count is asserted against the Citigroup Defendants for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all members of the Class who purchased or otherwise acquired Bond Class Securities in the Offerings and were damaged thereby.

386.     The Citigroup Defendants were sellers, offerors, and/or solicitors of sales of the Bond Class Securities issued in the Offerings pursuant to the Shelf Registration Statements and Public Offering Materials.  These materials contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth herein.

387.     The Citigroup Defendants directly solicited the purchase of Bond Class Securities by Plaintiffs and other members of the Class by means of the Shelf Registration Statements and related Prospectuses, motivated at least in part by the desire to serve their own financial interests.

388.     The Citigroup Defendants used means and instrumentalities of interstate commerce and the U.S. mails.

389.     Plaintiffs and other members of the Class purchased or otherwise acquired Bond Class Securities in the Offerings pursuant to the materially untrue and misleading Shelf Registration Statements and incorporated Public Offering Materials and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained therein.

390.     The value of the Bond Class Securities has declined substantially subsequent to the consummation of the Offerings and Plaintiffs and the other members of the Class have sustained damages.

391.     Less than one year elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the time that the first complaint was filed asserting claims arising out of the falsity of each of the Shelf Registration Statements.  Less than three years elapsed between the time that the securities at issue in this complaint were bona fide offered to the public and the time that the first complaint was filed asserting claims arising out of the falsity of each of the Shelf Registration Statements.

392.     This claim does not sound in fraud.  For purposes of asserting this claim under the 1933 Act, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

393.     By virtue of the conduct alleged herein, the Citigroup Defendants violated Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiffs and other members of the Class who purchased in Offerings pursuant to the Shelf Registration Statements and incorporated Public Offering Materials and have retained their securities, have the right to rescind and recover the

consideration paid for their securities, and hereby elect to rescind and tender their securities to the Citigroup Defendants. In addition, Plaintiffs and the members of the Class who have sold their securities that they originally purchased through the Offerings are entitled to rescissory damages.

## COUNT V

### For Violations Of Section 12(a)(2) Of The Securities Act Against The Underwriter Defendants

394.    Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

395.    This Count is asserted against the Underwriter Defendants for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all members of the Class who purchased or otherwise acquired Bond Class Securities in the Offerings and were damaged thereby.

396.    The Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the Bond Class Securities issued in the Offerings pursuant to the Shelf Registration Statements and Public Offering Materials. These materials contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth herein.

397.    The Underwriter Defendants: (a) transferred title to Plaintiffs and other members of the Class who purchased Bond Class Securities; (b) transferred title of Bond Class Securities to other underwriters and/or broker-dealers that sold those securities as agents for the Underwriter Defendants; and (c) solicited the purchase of Bond Class Securities by Plaintiffs and other members of the Class by means of the Shelf Registration Statements and related Prospectuses, motivated at least in part by the desire to serve the Underwriter Defendants' own financial interest and the interests of the Citigroup Defendants, including but not limited to

commissions on their own sales of Bond Class Securities and separate commissions on the sale of those securities by non-underwriter broker-dealers.

398.    The Underwriter Defendants used means and instrumentalities of interstate commerce and the U.S. mails.

399.    Plaintiffs and other members of the Class purchased or otherwise acquired Bond Class Securities in the Offerings pursuant to the materially untrue and misleading Shelf Registration Statements and incorporated Public Offering Materials and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained therein.

400.    The value of the Bond Offering Securities has declined substantially subsequent to the consummation of the Offerings and Plaintiffs and the other members of the Class have sustained damages.

401.    Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the time that the first complaint was filed asserting claims arising out of the falsity of each of the Shelf Registration Statements.  Less than three years elapsed from the time that the securities upon which this Count is brought were bona fide offered to the public and the time that the first complaint was filed asserting claims arising out of the falsity of each of the Shelf Registration Statements.

402.    This claim does not sound in fraud.  For purposes of asserting this claim under the 1933 Act, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

403.    By virtue of the conduct alleged herein, the Underwriter Defendants violated Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiffs and other members of the Class

who purchased in Offerings pursuant to the Shelf Registration Statements and incorporated Public Offering Materials have the right to rescind and recover the consideration paid for their securities, and hereby elect to rescind and tender their securities to the Underwriter Defendants and the Underwriter Defendants. In addition, Plaintiffs and the members of the Class who have sold their securities that they originally purchased through the Offerings are entitled to rescissory damages.

## COUNT VI

### For Violations Of Section 15 Of The Securities Act
### Against Citigroup

404. Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

405. This Count is asserted against Citigroup for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiffs and the other members of the Class who have asserted claims pursuant to Sections 11 or 12(a)(2) of the Securities Act, as set forth above.

406. At all times relevant hereto, Citigroup was a controlling person of the Citigroup Defendants (other than Citigroup) and Defendants CGMI and CGML within the meaning of Section 15 of the Securities Act. Because of its position of control and authority over these Defendants, Citigroup was able to, and did, control (a) the contents of the Shelf Registration Statements and incorporated Public Offering Materials for Offerings of Bond Class Securities issued by the other Citigroup Defendants; and (b) the actions of Defendants CGMI and CGML as underwriters of Bond Class Securities.

407. By virtue of Citigroup's control over the other Citigroup Defendants, CGMI, and CGML, Citigroup is named herein as a Defendant under Section 15 of the Securities Act with respect to the Bond Class Securities issued by the other Citigroup Defendants or underwritten by CGMI or CGML.

408. This claim does not sound in fraud. For purposes of asserting this claim under the 1933 Act, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

409. By reason of the aforementioned conduct, each of the Defendants named in this Count is liable under Section 15 of the Securities Act to Plaintiffs and the other members of the Class who have asserted claims pursuant to Sections 11 or 12(a)(2) of the Securities Act, as set forth above. As a direct and proximate result of the conduct of Defendant Citigroup, Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of Bond Class Securities.

## COUNT VII

### For Violations Of Section 15 Of The Securities Act
### Against The Individual Defendants

410. Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

411. This Count is asserted against the Individual Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiffs and the other members of the Class who have asserted claims pursuant to Sections 11 or 12(a)(2) of the Securities Act, as set forth above.

412. During their times as Directors and/or Officers of Citigroup, the Individual Defendants were controlling persons of Citigroup, the other Citigroup Defendants, CGMI, and CGML within the meaning of Section 15 of the Securities Act.

413. Each Individual Defendant, at the times they were a Director or Officer of Citigroup, participated in the operation and management of Citigroup and the other Citigroup Defendants, and conducted and participated, directly and indirectly, in the conduct of the business affairs of Citigroup, the other Citigroup Defendants, CGMI, and CGML. Because of

their positions of control and authority as Officers and/or Directors of Citigroup, the Individual Defendants were able to, and did, control (a) the contents of the Shelf Registration Statements and the incorporated Public Offering Materials, which contained materially untrue financial and other information, and (b) the activities of CGMI and CGML as underwriters of Bond Class Securities.

414. This claim does not sound in fraud. For purposes of asserting this claim under the 1933 Act, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

415. By virtue of the Individual Defendants' control over Citigroup and the Citigroup Defendants, and by virtue of Citigroup's control over the other Citigroup Defendants, CGMI, and CGML, the Individual Defendants are named herein as Defendants under Section 15 of the Securities Act with respect to the Bond Class Securities issued by any of the Citigroup Defendants or underwritten by CGMI or CGML.

416. By reason of the aforementioned conduct, each of the Defendants named in this Count is liable under Section 15 of the Securities Act to Plaintiffs and the other members of the Class who have asserted claims pursuant to Sections 11 or 12(a)(2) of the Securities Act, as set forth above. As a direct and proximate result of the conduct of the Individual Defendants, Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of Bond Class Securities.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

a. Determining that this action is a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b.    Awarding all damages and other remedies set forth in the Securities Act in favor of Plaintiff and all members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.    Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial.

Dated: January 15, 2009
     New York, New York

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

By: _____
Steven B. Singer
Mark Lebovitch
Kurt Hunciker
John Rizio-Hamilton
1285 Avenue of the Americas
New York, New York 10019
Tel: (212) 554-1400
Fax: (212) 554-1444

*Attorneys for Bond Plaintiffs, and*
*Court-Appointed Bond Counsel*

Ira M. Press
Peter S. Linden
**KIRBY McINERNEY LLP**
825 Third Avenue, 16th Floor
New York, NY 10022
Tel: (212) 371-6600
Fax: (212) 751-2540

Robert D. Klausner
**KLAUSNER & KAUFFMAN, P.A.**
10059 Northwest 1st Court
Plantation, FL 33324
Tel: (954) 916-1202
Fax: (954) 916-1232

*Interim Lead Counsel for Interim Lead
Plaintiffs The ATD Group*

*Additional Counsel for Minneapolis
Firefighters' Relief Association and
Louisiana Sheriffs' Pension and Relief Fund*

Brian F. Rice
**RICE, MICHAELS & WALTHER LLP**
206 East Bridge – Riverplace
10 Second Street, Northwest
Minneapolis, MN 55413
Tel:  (612) 676-2303
Fax:  (612) 676-2319

*Additional Counsel for Minneapolis
Firefighters' Relief Association*

David Kessler
Sharan Nirmul
Benjamin Sweet
**BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA  19087
Tel: (610) 667-7706
Fax: (610) 667-7056

*Additional Counsel for City of Tallahassee
Retirement System, Miami Beach
Employees' Retirement Plan, Southeastern
Pennsylvania Transit Authority and City of
Philadelphia Board of Pensions and
Retirement*

Marc I. Gross
Joshua B. Silverman
**POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS LLP**
100 Park Avenue
New York, NY 10017
Tel- 212-661-1100
Fax-212-661-8665

*Additional Counsel for American European
Insurance, Company*