UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE CITIGROUP INC. BOND LITIGATION | MASTER FILE<br>08 Civ. 9522 (SHS)<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF CITIGROUP DEFENDANTS'
AND INDIVIDUAL DEFENDANTS' MOTION TO DISMISS
THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

PAUL, WEISS, RIFKIND, WHARTON &
  GARRISON LLP
Brad S. Karp
Richard A. Rosen
Susanna M. Buergel
Karen R. King

1285 Avenue of the Americas
New York, New York 10019-6064
Tel.  (212) 373-3000

*Attorneys for Defendants Citigroup Inc.,
Citigroup Funding Inc., Citigroup Capital
XIV, Citigroup Capital XV, Citigroup
Capital XVI, Citigroup Capital XVII,
Citigroup Capital XVIII, Citigroup Capital
XIX, Citigroup Capital XX, Citigroup
Capital XXI, C. Michael Armstrong, Alain
J.P. Belda, Sir Winfried Bischoff, Michael
Conway, Gary Crittenden, George David,
Kenneth T. Derr, John M. Deutch, Scott
Freidenrich, James Garnett, John C.
Gerspach, Ann Dibble Jordan, Klaus
Kleinfeld, Sallie L. Krawcheck, Andrew N.
Liveris, Dudley C. Mecum, Ann Mulcahy,
Vikram Pandit, Richard D. Parsons, Charles
Prince, Roberto Hernández Ramírez, Judith
Rodin, Saul Rosen, Robert E. Rubin, Robert
L. Ryan, Franklin A. Thomas, Eric L.
Wentzel and David Winkle*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................. 1

FACTUAL ALLEGATIONS ...................................................................... 3

     A.    The Citigroup Defendants ...................................................... 3

     B.    The Financial Crisis of Late 2007 to Present ........................ 5

     C.    Procedural History ................................................................. 7

     D.    The Complaint ....................................................................... 7

ARGUMENT ............................................................................................ 9

     A.    The Complaint's Allegations Are Deficiently
           Pleaded Under Rule 8(a) ....................................................... 9

     B.    The Complaint's Allegations Are Deficiently
           Pleaded Under Rule 9(b) ..................................................... 10

I.     ALLEGATIONS OF MISMANAGEMENT ARE NOT
     ACTIONABLE UNDER THE SECURITIES LAWS ................................... 15

II.    PLAINTIFFS FAIL TO ALLEGE AN ACTIONABLE
     MISSTATEMENT OR OMISSION ................................................. 18

     A.    Plaintiffs Fail to Allege an Actionable Misstatement
           or Omission Regarding Citigroup's CDO Holdings ........................... 20

           1.    CDOs ..................................................................... 20

           2.    Citigroup's Disclosures about CDO Exposure ........................ 21

           3.    Citigroup's Subprime-Related Write-Downs ........................... 23

           4.    Plaintiffs Fail to Allege A Duty to Disclose Additional
                 Details about the Company's CDO Holdings ........................... 23

           5.    Plaintiffs' Allegations of GAAP Violations Fail to
                 Plead An Actionable Misstatement or Omission ..................... 26

                 i)    Plaintiffs Fail to Plead Non-Compliance
                     with FIN 46-R ............................................... 28

ii) Plaintiffs Fail to Plead Overstatement of the
Fair Value of Subprime Backed CDOs........................................30

6. Plaintiffs' Remaining Disagreements with Citigroup's CDO
Disclosures Do Not Give Rise to a Securities Act Claim.........................32

B. The Complaint Fails to Allege an Actionable
Misstatement or Omission Regarding SIVs.......................................34

1. SIVs.........................................................................35

2. Citigroup's Disclosures Regarding SIVs.................................35

3. Citigroup Was Not Obligated to Consolidate
Its SIV Holdings.........................................................36

4. Plaintiffs Fail to Plead a Misstatement About
the Quality of SIV Assets .................................................37

C. The Complaint Fails to Allege an Actionable
Misstatement or Omission Regarding Citigroup's
Mortgage Loan Portfolio ....................................................38

D. The Complaint Fails to Allege an Actionable Misstatement
or Omission Regarding Auction Rate Securities.................................38

1. Auction Rate Securities ...............................................39

2. Plaintiffs Fail to Allege Any Actionable
Omissions Regarding ARS ..............................................40

3. Plaintiffs Fail to Allege Any Actionable
Misstatements Regarding ARS .........................................42

E. Subsequent Market Events Cannot Render
Prior Disclosures Inaccurate.................................................43

III. PLAINTIFFS FAIL TO PLEAD FRAUD WITH PARTICULARITY..................................47

A. Plaintiffs Fail to Plead with Particularity the
Falsity of Specific Statements ...............................................48

B. Plaintiffs Fail to Plead a Strong Inference
of Fraudulent Intent .......................................................48

1. Market Information in 2006 and Early 2007 Does
Not  Support a Strong Inference of Fraudulent Intent..............................49

        2.      Plaintiffs May Not Plead Fraudulent
                Intent by Hindsight................................................................51

        3.      "Group Pleading" Does Not Satisfy the
                Requirements of Rule 9(b)....................................................52

IV.    PLAINTIFFS LACK STANDING TO SUE UNDER
       SECTION 12(A)(2) OR TO ASSERT SECTION 11
       CLAIMS WITH RESPECT TO MANY OF THE OFFERINGS...................................53

V.     PLAINTIFFS ARE NOT ENTITLED TO RECOVERY
       FOR CERTAIN OFFERINGS BECAUSE THEY HAVE
       NOT PLEADED ANY DAMAGE ...............................................................53

VI.    THE CITIGROUP DEFENDANTS ARE NOT
       STATUTORY SELLERS UNDER SECTION 12(a)(2)................................53

VII.   PLAINTIFFS FAIL TO STATE A CLAIM
       UNDER SECTION 15............................................................................55

VIII.  CERTAIN CLAIMS ARE TIME BARRED ..............................................56

IX.    PLAINTIFFS IMPROPERLY ASSERT SECTION 11
       CLAIMS AGAINST CERTAIN INDIVIDUAL DEFENDANTS..................................57

     A.     Individual Defendants Jordan, Kleinfeld, Mecum, and Prince ...........................57

     B.     Individual Defendants Bischoff, Pandit, and Ryan .............................59

X.     CONCLUSION ...................................................................................60

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Acceptance Ins. Cos. Sec. Litig.*,
  423 F.3d 899 (8th Cir. 2005) ............................................... 27

*In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*,
  No. 03-1529, 2007 WL 2615928 (S.D.N.Y. Sept. 10, 2007) ............................. 57

*In re Alliance Pharm. Corp. Sec. Litig.*,
  279 F. Supp. 2d 171 (S.D.N.Y. 2003) ............................................ 27, 37

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ...................................................... 9

*Bell Atlantic Corp. v. Twombly*,
  127 S. Ct. 1955 (2007) ........................................................ 9, 10

*Benzon v. Morgan Stanley Distribs., Inc.*,
  420 F.3d 598 (6th Cir. 2005) .................................................... 18

*Capri v. Murphy*,
  856 F.2d 473 (2d Cir. 1988) ................................................... 53, 54

*Charas v. Sand Tech. Sys. Int'l, Inc.*,
  No. 90 Civ. 5639, 1992 WL 296406 (S.D.N.Y. Oct. 7, 1992) ............................. 16

*Ciresi v. Citigroup*,
  782 F. Supp. 819 (S.D.N.Y. 1991) ............................................. 16, 17

*In re CIT Group, Inc. Sec. Litig.*,
  349 F. Supp. 2d 685 (S.D.N.Y. 2004) ........................................... 13, 17

*In re Citigroup Inc. Sec. Litig.*,
  No. 08-9901 (S.D.N.Y.) ......................................................... 7, 14

*In re Citigroup Inc. S'holder Derivative Litig.*,
  No. 3338, 2009 WL 481906 (Del. Ch. Feb. 24, 2009) ........................... 17, 47, 51

*In re Convergent Techs. Sec. Litig.*,
  948 F.2d 507 (9th Cir. 1991) .................................................... 25

*In re Corning Sec. Litig.*,
  No. 01-6580, 2004 WL 1056063 (W.D.N.Y. Apr. 9, 2004) ............................. 12

*Coronel* v. *Quanta Capital Holdings, Ltd.*,
   No. 07-1405, 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009)............................................*passim*

*Cortec Indus., Inc.* v. *Sum Holding L.P.*,
   949 F.2d 42 (2d Cir. 1991) ........................................................................................3

*Cozzarelli* v. *Inspire Pharm. Inc.*,
   549 F.3d 618 (4th Cir. 2008) ..................................................................................14

*Craftmatic Sec. Litig.* v. *Kraftsow*,
   890 F.2d 628, 638 n.14 (3d Cir. 1989)....................................................................15

*Credit Suisse First Boston Corp.* v. *Arm Fin. Group, Inc.*,
   No. 99 CIV 12046 WHP, 2001 WL 300733 (S.D.N.Y. Mar. 28, 2001).................54

*In re Deutsche Telekom AG Securities Litig.*,
   No. 00 CIV 9475 SHS, 2002 WL 244597 (S.D.N.Y. Feb. 20, 2002)..............54, 56

*Dorchester Investors* v. *Peak Int'l Ltd.*,
   134 F. Supp. 2d 569 (S.D.N.Y. 2001) .....................................................................57

*Ellison* v. *Am. Image Motor Co., Inc.*,
   36 F. Supp. 2d 628 (S.D.N.Y. 1999) .......................................................................56

*Field* v. *Trump*,
   850 F.2d 938 (2d Cir. 1988) ....................................................................................16

*In re Flag Telecom Holdings. Ltd. Sec. Litig.*,
   352 F. Supp. 2d 429 (S.D.N.Y. 2005)...............................................................27, 56

*Food & Allied Serv. Trades Dep't, AFL-CIO* v. *Millfeld Trading Co., Inc.*,
   841 F. Supp. 1386 (S.D.N.Y. 1994)........................................................................55

*Ganino* v. *Citizens Util. Co.*,
   228 F.3d 154 (2d Cir. 2000) ....................................................................................26

*Gant* v. *Wallingford Bd. of Educ.*,
   69 F.3d 669 (2d Cir. 1995) ........................................................................................3

*Garber* v. *Legg Mason, Inc. et al*,
   537 F. Supp. 2d 597 (S.D.N.Y. 2008)...........................................................9, 10, 34

*Geiger* v. *Solomon-Page Group, Ltd.*,
   933 F. Supp. 1180 (S.D.N.Y. 1996)........................................................................20

*Glidepath Holding B.V.* v. *Spherion Corp.*,
   590 F. Supp. 2d 435 (S.D.N.Y. 2007).....................................................................49

*Harrison* v. *Rubenstein*,
  No. 02-9356, 2007 WL 582955 (S.D.N.Y. Feb. 26, 2007) ................................................... 16

*Hinerfeld* v. *United Auto Group*,
  No. 97-3553, 1998 WL 397852 (S.D.N.Y. July 15, 1998) ................................................... 17

*In re Huntington BancShares, Inc. ERISA Litig.*,
  2009 WL 330308 (S.D. Ohio Feb. 9, 2009) ............................................................. 19, 47, 50

*In re Initial Pub. Offering Sec. Litig.*,
  358 F. Supp. 2d 189 (S.D.N.Y. 2004) ................................................................................... 27

*In re Int'l Bus. Mach. Corporate Sec. Litig.*,
  163 F.3d 102 (2d Cir. 1998) .................................................................................................. 27

*In re Integrated Res. Real Estate Ltd. P'ships Sec. Litig.*,
  815 F. Supp. 620 (S.D.N.Y. 1993) ........................................................................................ 28

*Johnson* v. *NYFIX, Inc.*,
  399 F. Supp. 2d 105 (D. Conn. 2005) ................................................................................... 48

*In re JP Morgan Chase*,
  363 F. Supp. 2d 595 (S.D.N.Y. 2005) .............................................................. 11, 13, 48, 51

*Kalin* v. *Xanboo, Inc.*,
  526 F. Supp. 2d 392 (S.D.N.Y. 2007) ................................................................................... 52

*Kramer* v. *Time Warner Inc.*,
  937 F.2d 767 (2d Cir. 1991) .................................................................................................... 3

*Ladmen Partners, Inc.* v. *Globalstar , Inc.*,
  No. 07 Civ. 0976 (LAP), 2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008) ....................... 12, 13

*Lerner* v. *FNB Rochester Corp.*,
  841 F. Supp. 97 (W.D.N.Y. 1993) ........................................................................... 16, 28, 43

*Luce* v. *Edelstein*,
  802 F.2d 49 (2d Cir. 1986) .................................................................................................... 11

*LXR Biotech., Inc.* v. *Intelligent Surgical Lasers*,
  928 F. Supp. 1301 (S.D.N.Y. 1996) ...................................................................................... 56

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
  272 F. Supp. 2d 243 (S.D.N.Y. 2003) ................................................................................... 19

*In re Merrill Lynch & Co. Sec., Derivative & ERISA Litigation*,
  No. 07-9633 (S.D.N.Y. Feb. 27, 2009) ................................................................................. 11

*In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*,
    434 F. Supp. 2d 233 (S.D.N.Y. 2006) ................................................................. 19

*Mills* v. *Polar Molecular Corp.*,
    12 F.3d 1170 (2d Cir. 1993) ..................................................................... 11, 48

*In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*,
    No. 03 Civ. 8208 (RO), 2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006) ................................ 19

*In re Morgan Stanley Tech. Fund Sec. Litig.*,
    Nos. 02-6153, 02-8579, 2009 WL 256005 (S.D.N.Y. Feb. 2, 2009) ................................... 19

*In re N.Y. Cmty. Bancorp, Inc. Sec. Litig.*,
    448 F. Supp. 2d 466 (E.D.N.Y. 2006) ............................................................. 9, 25

*Olkey* v. *Hyperion 1999 Term Trust, Inc.*,
    98 F.3d 2 (2d Cir. 1996) ............................................................................. 16

*Oran* v. *Stafford*,
    226 F.3d 275 (3rd Cir. 2000) ........................................................................ 33

*Oxford Asset Mgmt., Ltd.* v. *Jaharis*,
    297 F.3d 1182 (11th Cir. 2002) ...................................................................... 18

*Panther Partners, Inc.* v. *Ikanos Commc'ns, Inc.*,
    538 F. Supp. 2d 662 (S.D.N.Y. 2008) ...................................................... 10, 27, 34, 37

*Pinter* v. *Dahl*,
    486 U.S. 622 (1988) .............................................................................. 53, 54

*Pittleman* v. *Impac Mortgage Holdings, Inc.*,
    No. 8:07-cv-00970-AG-MLG (C.D. Cal. Mar. 9, 2009) ................................................ 47

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007) ............................................................ 10, 55

*In re Refco, Inc. Sec. Litig.*,
    No. 05 Civ. 8626, 2008 WL 3843343 (S.D.N.Y. Aug. 14, 2008) ...................................... 57

*Resnik* v. *Swartz*,
    303 F.3d 147 (2d Cir. 2002) ......................................................................... 18

*Rombach* v. *Chang*,
    355 F.3d 164 (2d Cir. 2004) ..................................................................... 10, 14

*Roth* v. *Jennings*,
    489 F.3d 499 (2d Cir. 2007) .......................................................................... 3

*Rubke* v. *Capital Bancorp Ltd.*,
    551 F.3d 1156 (9th Cir. 2009) ........................................................................ 14

*In re Salomon Analyst AT&T Litig.*,
    350 F. Supp. 2d 455 (S.D.N.Y. 2004) ............................................................. 48

*San Leandro Emergency Med. Group Profit Sharing Plan* v. *Philip Morris Co, Inc.*,
    75 F.3d 801 (2d Cir. 1996) ............................................................................. 25

*Scibelli* v. *Roth*,
    No. 98 Civ. 7228, 2000 WL 122193 (S.D.N.Y. Jan. 31, 2000)....................... 37

*SEC* v. *First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996) ......................................................................... 55

*Shalala* v. *Guernsey Mem'l Hosp.*,
    514 U.S. 87 (1995) ......................................................................................... 26

*Shields* v. *Citytrust Bancorp.*,
    25 F.3d 1124 (2d Cir. 1994) ..................................................................... 48, 52

*Sloan Overseas Fund, Ltd.* v. *Sapiens Int'l Corp.*,
    941 F. Supp. 1369 (S.D.N.Y. 1996)................................................................ 56

*Steed Fin. LDC* v. *Nomura Sec. Int'l, Inc.*,
    No. 00 CIV. 8058 (NRB), 2001 WL 1111508 (S.D.N.Y. Sept. 20, 2001) ...................... 54, 55

*Tellabs Inc.* v. *Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (2007) ................................................................................... 49

*Thor Power Tool Co.* v. *Comm'r.*,
    439 U.S. 522 (1979)........................................................................................ 26

*In re Time Warner Inc. Sec. Litig.*,
    9 F.3d 259 (2d Cir. 1993) ............................................................................... 41

*In re Turkcell Illetisim Hizmetler, A.S. Sec. Litig.*,
    202 F. Supp. 2d 8 (S.D.N.Y. 2001)................................................................. 34

*In re Ultrafem Inc. Sec. Litig.*,
    91 F. Supp. 2d 678 (S.D.N.Y. 2000)............................................................... 19

*Wallace* v. *Buttar*,
    239 F. Supp. 2d 388 (S.D.N.Y. 2003),
    *rev'd on other grounds*, 378 F.3d 182 (2d Cir. 2004)................................ 55, 56

*In re WorldCom, Inc. Sec. Litig.*,
    No. 02-3288, 2004 WL 1097786 (S.D.N.Y. May 18, 2004)............................. 56

*Xerion Partners I LLC* v. *Resurgence Asset Mgmt. LLC*,
   474 F. Supp. 2d 505 (S.D.N.Y. 2007)..................................................................28

*Xia* v. *Gonzales*,
   247 Fed. App'x 241 (2d Cir. 2007)......................................................................3

*In re Xinhua Finance Media, Ltd. Sec. Litig.*,
   No. 07-3994 (LTS), 2009 WL 464934 (S.D.N.Y. Feb. 25, 2009).......................18

*Zirkin* v. *Quants Capital Holding Ltd.*,
   07 Civ. 851 (RPP), 2009 WL 185940 (S.D.N.Y. Jan. 23, 2009)........................11

STATUTES AND RULES

Fed. R. Civ. P. 8(a) ...................................................................................... 9, 10, 48

Fed. R. Civ. P. Rule 9(b) ....................................................................................... *passim*

Fed. R. Civ. P. 12(b)(6)................................................................................... 1, 3, 9

Fed. R. Evid. 201(b)(2) ...............................................................................................3

SEC Rule 10b-5, 17 C.F.R. § 240.10B-5 (2008)................................................ 10, 14

SEC Rule 412, 17 C.F.R. § 230.412 (2008)............................................................ 58

Securities Act of 1933 § 11, 15 U.S.C. § 77k(a) ................................................ *passim*

Securities Act of 1933 § 12(a)(2), 15 U.S.C. § 77 l(a)(2)................................... *passim*

Securities Act of 1933 § 15, 15 U.S.C. § 77o .............................................. 8, 10, 55

OTHER AUTHORITIES

Accounting Principles Board Opinion No. 28...................................................... 24, 36

Accounting Standards Executive Committee, Statement of Position No. 94 ................. 24, 36, 41

Ben S. Bernanke, Chairman, Fed. Reserve, Address at the Fed. Reserve Bank of
   Chicago's 43rd Annual Conference on Bank Structure and Compeition 6
   (May 17, 2007) ...................................................................................................43

*Credit Markets and the Economic Crisis: Hearing before the S. Comm. on Banking,
   Housing and Urban Affairs*, 110th Cong. 2 (Oct. 16, 2008) (statement of Eric Stein) .........44

Financial Accounting Standards Board, Interpretation No. 46-R ............................25, 28, 29, 36

Financial Accounting Standards Board,
   Staff Position, Statement of Position 46-R-5........................................................36

Financial Accounting Standards Board,
  Statement of Financial Accounting Standards No. 107 ........................................... 24, 36, 41

Financial Accounting Standards Board,
  Statement of Financial Accounting Standards No. 115 ....................................................24

Financial Accounting Standards Board,
  Statement of Financial Accounting Standards No. 157 ....................................................30

*The Financial Crisis and the Role of Federal Regulators: Hearing before the H.R.*
  *Comm. on Oversight and Government Reform*, 110th Cong. 22 (Oct. 23, 2008)
  (statement of Christopher Cox, Chairman, SEC)....................................................................6

*The Financial Crisis and the Role of Federal Regulators: Hearing before the H.R.*
  *Comm. On Oversight and Government Reform*, 110th Cong. 15 (Oct. 23, 2008)
  (testimony of Alan Greenspan, Former Chairman, Fed. Reserve) ...................................5, 44

*Hearing before the H. Comm. on Fin. Servs.*, 110th Cong. 2 (July 18, 2007)
  (testimony of Ben S. Bernanke, Chairman, Fed. Reserve)....................................................44

*Hearing before the H. Fin. Servs. Comm.*, 110th Cong. 2 (Nov. 18, 2008)
  (statement of Henry M. Paulson) ...........................................................................................44

*Hearing before the J. Economic Comm.*, 110th Cong. 1–2 (Mar. 28, 2007)
  (testimony of Ben S. Bernanke, Chairman, Fed. Reserve)....................................................43

*Hearing before the United States S. Comm. on Banking, Housing, and Urban Affairs*,
  110th Cong. 1 (Mar. 22, 2007) (testimony of Roger T. Cole, Director,
  Div. of Banking Supervision and Regulation, Board of Governors of
  Federal Reserve System) ........................................................................................................43

*Turmoil in the Financial Markets: Hearing before the Comm. on H. Oversight and*
  *Government Reform*, 110th Cong. 4 (Nov. 13, 2008)
  (statement of David S. Ruder) ..........................................................................................6, 45

Defendants Citigroup Inc. ("Citigroup" or the "Company"), Citigroup Funding Inc., Citigroup Capital XIV, Citigroup Capital XV, Citigroup Capital XVI, Citigroup Capital XVII, Citigroup Capital XVIII, Citigroup Capital XIX, Citigroup Capital XX, and Citigroup Capital XXI, (collectively, "Citigroup Defendants"), together with Defendants C. Michael Armstrong, Alain J.P. Belda, Sir Winfried Bischoff, Michael Conway, Gary Crittenden, George David, Kenneth T. Derr, John M. Deutch, Scott Freidenrich, James Garnett, John C. Gerspach, Ann Dibble Jordan, Klaus Kleinfeld, Sallie L. Krawcheck, Andrew N. Liveris, Dudley C. Mecum, Ann Mulcahy, Vikram Pandit, Richard D. Parsons, Charles Prince, Roberto Hernández Ramírez, Judith Rodin, Saul Rosen, Robert E. Rubin, Robert L. Ryan, Franklin A. Thomas, Eric L. Wentzel and David Winkler (collectively the "Individual Defendants"), respectfully submit this memorandum of law in support of their motion to dismiss the Consolidated Amended Class Action Complaint (the "complaint") in its entirety and with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

The United States is in the midst of an unprecedented market meltdown that continues to wreak havoc on the world economy and cause monumental financial losses in all sectors across the country. Plaintiffs, purported purchasers of Citigroup debt securities, preferred stock or interests in preferred stock (collectively, "Bond Class Securities") in public offerings between May 2006 and August 2008, seek to recover losses attributable to the decline in the value of those securities in late 2007 and 2008.

Plaintiffs assert that the public offering materials contained material misrepresentations or omissions with respect to four types of assets: (i) collateralized debt obligations ("CDOs"); (ii) structured investment vehicles ("SIVs"); (iii) residential mortgage loans; and, (iv) auction rate securities ("ARS"). But, most of the core allegations in the

complaint are simply claims of mismanagement—that Citigroup acquired too many risky assets, had inadequate loan loss reserves, and failed to anticipate the economic downturn—which are not actionable under the Securities Act.  The complaint also is flawed because Citigroup had no duty to disclose the level of detail alleged in the complaint about each of the four types of assets on which plaintiffs focus.

Finally, the claims here are built on a demonstrably false premise:  that write-downs taken by Citigroup after the worldwide financial crisis unfolded proves that the Company's *prior* disclosures were inaccurate.  Plaintiffs do not—and cannot—allege that these disclosures were inaccurate ***at the time that they were made***.  The complaint is utterly devoid of allegations showing that Citigroup had reason to know that a market crisis would begin to unfold in late 2007 and lead to substantial write-downs of certain assets.

Indeed, plaintiffs ignore the fact that, until late 2007, market regulators and participants viewed the likely impact of the subprime mortgage market's decline as limited.  The failure of the financial community to predict the extent of the economic downturn is reflected in the fact that Citigroup's peers in the financial industry have suffered losses on a similar or even greater scale.

# FACTUAL ALLEGATIONS[1]

## A.  The Citigroup Defendants

Citigroup is a publicly traded financial services institution that provides, through its subsidiaries and divisions, commercial and investment banking and brokerage services. (¶ 29.)[2]  Citigroup Funding Inc. is a wholly owned subsidiary of Citigroup that provides funding to Citigroup and its subsidiaries by issuing debt securities.  (*See* ¶ 30.)  Citigroup Capital XIV, Citigroup Capital XV, Citigroup Capital XVI, Citigroup Capital XVII, Citigroup Capital XVIII, Citigroup Capital XIX, Citigroup Capital XX and Citigroup Capital XXI (collectively, the "Citigroup Trusts") are Delaware statutory trusts whose sole assets are securities issued by Citigroup.  (¶¶ 31–38.)

As a financial services company, Citigroup is in the business of taking calculated risks.  The public offering materials at issue contained disclosures about the market risks inherent to its business, including the very risks that materialized in late 2007.  For example, Citigroup's 10-Ks, which were incorporated in each offering, specifically stated that:

> "Citigroup's financial results are closely tied to the external economic environment.  Movements in interest rates and foreign exchange rates present both opportunities and risks for the Company.  ***Weakness in the global economy, credit deterioration, inflation, and geopolitical uncertainty are examples of risks***

---

[1]   Solely for purposes of this motion, we accept as true the non-conclusory factual allegations of the complaint.  *See Gant* v. *Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995).  When considering a motion to dismiss under Rule 12(b)(6), a court need only accept as true the non-conclusory factual allegations of the complaint.  *See id.*  In ruling on a motion to dismiss, the Court also may refer to documents referenced in the complaint, matters of public record and authentic documents upon which plaintiffs' claims are based.  *See, e.g., Roth* v. *Jennings*, 489 F.3d 499, 509 (2d Cir. 2007); *Cortec Indus., Inc.* v. *Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir. 1991).  Here, plaintiffs state that their allegations are based on, among other things, "public filings with the [SEC]," "research reports by securities and financial analysts," "publicly available Company presentations," "press releases and media reports," "economic analyses of securities movement and pricing data," and "media and economic reports regarding the housing market and mortgage industry."  (Compl. at 1–2.)  Additionally, the Court may take judicial notice of facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  FED. R. EVID. 201(b)(2); *see also, e.g., Xia* v. *Gonzales*, 247 Fed. App'x 241, 243 n.1 (2d Cir. 2007) (taking judicial notice of federal government agency report); *Kramer* v. *Time Warner Inc.*, 937 F.2d 767, 773–74 (2d Cir. 1991).

[2]   Citations in the form of "¶ __" refer to paragraphs in the complaint.  Citations in the form of "Ex. __" refer to exhibits attached to the Declaration of Richard A. Rosen, dated March 12, 2009.

*that could adversely impact our earnings*."  (Ex. 7 at 6 (emphasis added); Ex. 10 at 6.)

* * *

"The profitability of Citigroup's businesses *may be affected by global and local economic conditions, such as the liquidity of the global financial markets*, the level and volatility of interest rates and equity prices, investor sentiment, inflation, and the availability and cost of credit."  (Ex. 7 at 56 (emphasis added); Ex. 10 at 58; *see also* Ex. 20 at 38.)

* * *

"[T]he Company's earnings *may be impacted through its market risk and credit risk positions and by changes in economic conditions.*  In addition, Citigroup's earnings are dependent upon the extent to which management can successfully manage its positions within the global markets.  *In particular environments, the Company may not be able to mitigate its risk exposures as effectively as desired,* and may have unwanted exposures to certain risk factors."  (Ex. 7 at 56 (emphasis added); Ex. 10 at 58; Ex. 20 at 38.)

* * *

"The Company's earnings are also dependent upon its ability to properly value financial instruments. *In certain illiquid markets, judgmental estimates of value may be required.*  The Company's earnings are also dependent upon how effectively it assesses the cost of credit and manages its portfolio of risk concentrations."  (Ex. 7 at 56 (emphasis added); Ex. 10 at 58; Ex. 20 at 38.)

* * *

"The Company generally maintains large trading portfolios in the fixed income, currency, commodity and equity markets and has significant investment positions, including investments held by its private equity business.  *The revenues derived from these portfolios are directly affected by economic conditions*.  *The credit quality of Citigroup's on-balance sheet assets and off-balance sheet exposures is also affected by economic conditions, as more loan delinquencies would likely result in a higher level of charge-offs and increased provisions for credit losses, adversely affecting the Company's earnings.*"  (Ex. 7 at 56 (emphasis added); Ex. 10 at 58; *see also* Ex. 20 at 38.)

These risk disclosures were supplemented in the numerous prospectuses issued

for each of the offerings at issue in this litigation.  For example:

"The *risks associated with a particular indexed note* generally depend on factors over which Citigroup Funding has no control and which *cannot readily be foreseen. These risks include:  economic events*; political events; and  *the supply of, and demand for, the underlying assets*.   In recent years, currency exchange rates and prices for various underlying assets have been highly volatile. *Such volatility may be expected in the future.*  Fluctuations in rates or prices that have

4

occurred in the past are not necessarily indicative, however, of fluctuations that may occur during the term of any indexed note." (Ex. 8 at S-5 (emphasis added).)

* * *

"The impact on Citigroup's financial results for the fourth quarter from changes in the fair value of these [sub-prime related] exposures will **depend on future market developments and could differ materially** from the range above." (Ex. 17 at 14; Ex. 18 at 14–15; Ex. 19 at 17 (emphasis added).)

* * *

"The market price of Citigroup common stock **may also be affected by market conditions affecting the stock markets in general**, including price and trading fluctuations on the NYSE." (Ex. 22 at S-9 (emphasis added).)

**B.      The Financial Crisis of Late 2007 to Present**

In mid-August 2007, an unprecedented credit crisis suddenly struck the worldwide economy. Credit markets froze, liquidity dried up, the commercial paper market collapsed, and interbank lending rates rose dramatically. This crisis, which has been described by former Chairman of the Federal Reserve Alan Greenspan as "a once in a century credit tsunami," continues to wreak havoc on the financial sector as it deepens and evolves. *The Financial Crisis and the Role of Federal Regulators: Hearing before the H.R. Comm. on Oversight and Government Reform*, 110th Cong. 15 (Oct. 23, 2008).

The severity and unprecedented nature of this crisis is demonstrated by the dramatic events that unfolded in September 2008:

- the bankruptcy of Lehman Brothers in September 2008;

- the takeover of Merrill Lynch by Bank of America;

- the largest bank failure in U.S. history in the seizure of Washington Mutual by the FDIC;

- the transformation of Morgan Stanley and Goldman Sachs into bank holding companies;

- the provision of an $85 billion secured credit facility to American International Group ("AIG") by the Federal Reserve Bank of New York.

This profound financial crisis continues to take both market participants and federal regulators by surprise.  Although housing prices and the subprime market had declined in 2006 and the start of 2007 (¶ 161), until late 2007 the extent and impact of this deterioration was regarded as limited.  In July 2007, before the onset of the crisis, Treasury Secretary Henry Paulson stated: "I think we're at or near the bottom there.  I don't deny there's a problem with subprime mortgages but I really do believe its [*sic*] containable, it's quite containable."  *US's Paulson: Subprime "At, Near Bottom"; Need Vigilance*, Market News Service, at 1 (July 24, 2007).  In October 2008, following the dramatic events described above, SEC Chairman Christopher Cox acknowledged:  "I think that every regulator wishes that he or she had been able to predict the unprecedented meltdown of the entire U.S. mortgage market which was the fundamental cause of this crisis."  *The Financial Crisis and the Role of Federal Regulators: Hearing before the H.R. Comm. on Oversight and Government Reform*, 110th Cong. 22 (Oct. 23, 2008).  In November 2008, Former Chairman of the SEC David Ruder said that "[o]ne key aspect of the credit crisis was the failure of both market participants and regulators to predict the collapse of the home loan mortgage market."  *Turmoil in the Financial Markets*:  *Hearing before the Comm. on H. Oversight and Government Reform*, 110th Cong. 4 (Nov. 13, 2008) (Statement of David S. Ruder).

As a result of this severe, unanticipated crisis and the sudden decline in the value of mortgage-backed securities, Citigroup—like almost every other bank on Wall Street—reported disappointing results, including multi-billion dollar write-downs on exposures to subprime mortgages, in the second half of 2007 (¶¶ 174–79, 207) and in 2008 (¶¶ 185–87, 212–13, 245–46).

## C.     Procedural History

On September 30 and October 28, 2008, respectively, two putative class actions asserting claims under the Securities Act of 1933 were filed in New York State Supreme Court, New York County. *Louisiana Sheriffs' Pension & Relief Fund, et al.* v. *Citigroup Inc., et al.*, Index No. 08602830 (N.Y. Sup. Ct.); *Minneapolis Firefighters' Relief Association, et al.* v. *Citigroup Inc., et al.*, Index No. 08650414 (N.Y. Sup. Ct.).  Defendants removed both actions to the United States District Court for the Southern District of New York, and the cases were assigned to this Court as related to *In re Citigroup Inc. Securities Litigation*, No. 08-9901 (S.D.N.Y.).

On December 10, 2008, this Court consolidated the two actions under the caption *In re Citigroup Inc. Bond Litigation* and ordered coordination with *In re Citigroup Inc. Securities Litigation*.  On January 15, 2009, plaintiffs filed the consolidated amended complaint.

## D.     The Complaint

The complaint asserts claims for violations of Section 11 of the Securities Act against the Citigroup Defendants (Count I ¶¶ 352–61), the Individual Defendants (Count II ¶¶ 362–72)[3] (other than Gary Crittenden and Sallie Krawcheck), and the Underwriter Defendants[4] (Count III ¶¶ 373–83); violations of Section 12(a)(2) of the Securities Act against the Citigroup Defendants (Count IV ¶¶ 384–93) and the Underwriter Defendants (Count V

---

[3]    The Individual Defendants are current or former executives and directors of Citigroup or its subsidiaries. (¶¶ 41–68.)

[4]    The Underwriter Defendants are Banc of America Securities LLC (¶ 74), Barclays Capital Inc. (¶ 76), Citigroup Global Markets Inc. (¶ 84), Citigroup Global Markets Limited (¶ 85), Credit Suisse Securities (USA) LLC (¶ 88), Deutsche Bank Securities Inc. (¶¶ 93–94), Goldman, Sachs & Co. (¶ 100), Greenwich Capital Markets Inc. (¶ 101), JP Morgan Chase & Co. as successor to Bear Stearns (¶ 111), Merrill Lynch, Pierce, Fenner & Smith Inc. (¶ 116), Morgan Stanley & Co, Inc. (¶ 119), UBS Securities LLC (¶ 141), and Wachovia Capital Securities, LLC (¶ 144).

¶¶ 394–403); and violations of Section 15 of the Securities Act against Citigroup (Count VI ¶¶ 404–09) and the Individual Defendants (Count VII ¶¶ 410–16).

The gravamen of the complaint is that Citigroup's public disclosures from 2006 through 2008—which were part of the public offering materials for the Bond Class Securities— contained misstatements or omissions of material fact regarding Citigroup's holdings in, and exposure to, CDOs, SIVs, residential mortgages and ARS.

Not surprisingly, Citigroup is only one of dozens of financial service companies and related entities that recently have been named in investor class action lawsuits asserting claims parallel to those asserted in the complaint.[5]  To date:  (i) approximately 46 lawsuits asserting violations of the Securities Act have been filed against financial institutions, including Merrill Lynch, Bank of America and Deutsche Bank, in connection with their exposure to subprime mortgage-backed securities ("MBS"); (ii) approximately 40 lawsuits have been filed against financial institutions and mortgage companies, including J.P. Morgan Chase and Credit Suisse, alleging misleading statements or omissions in connection with direct lending practices and the valuations of subprime mortgages and related assets; and, (iii) approximately 7 lawsuits have been filed against financial institutions, including Wachovia, Washington Mutual, and

---

[5]    *See* Kevin LaCroix, The D&O Diary:  Subprime and Credit Crisis-Related Securities Class Action Lawsuits (2009), http://69.177.1.186/clients/blog/subprimelawsuitslist.doc.  Examples include:  *In re Ambac Fin. Group, Inc. Sec. Litig.*, No. 08-00411 (S.D.N.Y. filed Jan. 15, 2008) (Ambac); *Carroll* v. *American Int'l Group, Inc.*, No. 08-08659 (S.D.N.Y. filed Oct. 9, 2008) (AIG); *Sklar* v. *Bank of America Corp.* No. 09-580 (S.D.N.Y. filed Jan. 21, 2009) (Bank of America); *N.J. Carpenters Health Fund* v. *Home Equity Mortgage Trust*, No. 08-5653 (S.D.N.Y. filed June 23, 2008) (Credit Suisse); *Powell* v. *ING Group NV*, No. 09-1410 (S.D.N.Y. filed Feb. 17, 2009) (ING); *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust* v. *J.P. Morgan Acceptance Corp.*, No. 08-1713 (E.D.N.Y. filed Mar. 26, 2008) (JP Morgan Chase); *Fogel Capital Mgmt., Inc.* v. *Fuld*, No. 08-822 (S.D.N.Y. filed Sept. 24, 2008) (Lehman Brothers); *In re Merrill Lynch & Co. Sec., Derivative & ERISA Litig.*, No. 07-9633 (S.D.N.Y. filed Sept. 23, 2008) (Merrill Lynch); *Public Employee's Ret .Sys. of Miss.* v. *Morgan Stanley*, No.  30-2008-226005 (Cal. Super. Ct. filed Dec. 2, 2008) (Morgan Stanley); *Miller* v. *Wachovia Corp.*, No. 08-879 (E.D.N.Y. filed Jan. 3, 2008) (Wachovia); *Koesterer* v. *Washington Mut.*, No. 08-387 (W.D. Wash. filed Oct. 21, 2008) (Washington Mutual); *Boilermaker-Blacksmith Nat'l Pension Trust* v. *Wells Fargo Mortgage-Backed Securities 2006 AR1Trust*, No. 09-833 (S.D.N.Y. filed Feb. 2, 2009) (Wells Fargo).

Wells Fargo, alleging misleading statements or omissions in connection with their exposure to Alt-A related mortgages and MBS.

In short, virtually every significant private sector participant in the financial, mortgage, and housing sectors of the economy is being accused of taking excessive risks and failing properly to disclose and value assets.  But, of course, the very fact that all of the financial institutions who collectively comprise the markets in question engaged in the same practices and risk assessments as Citigroup did, and sustained similar losses, is strong confirmation that the disclosures at issue accurately reflected the best information available at the time they were made.

## ARGUMENT

### A.     The Complaint's Allegations Are Deficiently Pleaded Under Rule 8(a)

In evaluating a motion to dismiss under Rule 12(b)(6), a court must accept well-pleaded factual allegations in the complaint as true.  *See Bell Atlantic Corp.* v. *Twombly*, 127 S. Ct. 1955, 1965 (2007); *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 93 (2d Cir. 2007).  However, a court need not accept as true conclusions unsupported by the facts alleged, legal conclusions, bald assertions or unwarranted inferences.  *See Twombly*, 127 S. Ct. at 1965 (citing *Papasan* v. *Allain*, 478 U.S. 265, 286 (1986)).  Dismissal is appropriate where Plaintiff fails "to raise a right to relief above the speculative level."  *ATSI Commc'ns*, 493 F.3d at 98 (quoting *Twombly*, 127 S. Ct. at 1965).[6]

---

[6]   To establish a claim under Section 11, a plaintiff must show that:  (i) defendant is a signer of a registration statement, director of the issuer, or underwriter for the offering; (ii) plaintiff purchased the registered securities; and, (iii) part of the registration statement for the offering contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.  *See* 15 U.S.C. § 77k(a); *Garber* v. *Legg Mason, Inc.*, *et al*, 537 F. Supp. 2d 597, 610 (S.D.N.Y. 2008); *In re N.Y. Cmty. Bancorp, Inc. Sec. Litig.*, 448 F. Supp. 2d 466, 477 (E.D.N.Y. 2006).

To establish a claim under Section 12(a)(2), a plaintiff must show that:  (i) defendants sold or offered a security; (ii) by means of a prospectus; (iii) that included an untrue statement of material fact or omitted a material fact

As recently explained by the Supreme Court in *Bell Atlantic Corp.* v. *Twombly*, to survive a motion to dismiss under Rule 8(a), a plaintiff must plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." 127 S.Ct. at 1965 (2007). Instead, a complaint must plead "[f]actual allegations . . . to raise a right to relief above the speculative level." *Id.* "Craftily drafted" allegations implying "that what only became clear due to subsequent events was somehow known . . . far earlier," such as those asserted here, do not meet this pleading standard. *Panther Partners, Inc.* v. *Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 669–70 (S.D.N.Y. 2008.) As we show below, this complaint does not meet the *Twombly* test.

**B.      The Complaint's Allegations Are Deficiently Pleaded Under Rule 9(b)**

In some instances, claims asserted under the Securities Act need not satisfy the heightened pleading requirements of Rule 9(b). However, plaintiffs have not asserted a garden variety Securities Act complaint exempt from the stringent requirements of Rule 9(b). Although plaintiffs purportedly (and self-servingly state that they) do not assert a cause of action under Section 10(b) and Rule 10b-5 of the Exchange Act, the complaint "sound[s] in fraud" and therefore must satisfy the heightened pleading requirements of Rule 9(b). *Rombach* v. *Chang*, 355 F.3d 164, 171 (2d Cir. 2004).[7]

Under Rule 9(b), claims that sound in fraud must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the

---

necessary to make such statements not misleading. *See* 15 U.S.C. § 77l(a)(2); *Garber*, 537 F. Supp. 2d at 610; *Panther Partners, Inc.* v. *Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008).

To establish a claim under Section 15 for control-person liability, a plaintiff must show:  (i) "a primary violation by a controlled person"; and, (ii) "control by the defendant of the primary violator." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 637 (S.D.N.Y. 2007) (internal quotation marks omitted); *see also* 15 U.S.C. § 77o.

[7]      Rule 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).

statements were made, and (4) explain why the statements were fraudulent." *Mills* v. *Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993). Allegations that "fail to specify the time, place, speaker, and sometimes even the content of the alleged misrepresentations, lack the 'particulars' required by Rule 9(b)." *Luce* v. *Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986)

       As this Court has held, the applicable test for determining whether a Securities Act claim "sounds in fraud" is whether the complaint includes "'wording and imputations . . . classically associated with fraud,'" such as allegations that a registration statement or prospectus "'contained untrue statements of material facts and that materially false and misleading statements were issued.'" *In re JP Morgan Chase*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005) (quoting *Rombach*, 355 F.3d at 172); *see also Zirkin* v. *Quants Capital Holding Ltd.*, 07-851, 2009 WL 185940, at *12 (S.D.N.Y. Jan. 23, 2009) (finding that defendants' 1933 Act claim "evinces an intent to defraud, and is therefore subject to the heightened pleading requirements of Rule 9(b)"). Similarly, in his recent decision in *In re Merrill Lynch & Co. Securities, Derivative & ERISA Litigation*, Judge Rakoff concluded that the complaint in that action, which alleged claims under Sections 11, 12, and 15 of the Securities Act, was subject to Rule 9(b) because, while "fraud is not a prerequisite to the legal claims asserted in the Complaint," "on any fair reading," the allegations were "classically associated with fraud." No. 07-9633, at *1 (S.D.N.Y. Feb. 27, 2009) (quoting *Rombach*, 355 F.3d at 172).

       Here, the complaint bristles with allegations of statements that were "materially false and misleading" and "contain[] untrue statements of material fact." *Id.* For example, plaintiffs contend that "investors [were] 'misled'" (¶ 4); "Citigroup's statements about its SIV exposure were untrue and omitted material facts" (¶ 7); statements in the "Public Offering Materials" were "materially untrue" (¶ 10); the "Public Offering Materials contained material

misstatements and omissions" (¶ 21); and the "Public Offering Materials associated with each Offering contained untrue statements of material fact and/or omitted to disclose material facts" (¶150).[8]

Moreover, plaintiffs not only employ "'wording and imputations . . . classically associated with fraud,'" the very nature of their claims imply a charge of fraud.  Where a plaintiff alleges that a company concealed an "enormous" liability, *Coronel* v. *Quanta Capital Holdings, Ltd.*, No. 07-1405, 2009 WL 174656, at *15 (S.D.N.Y. Jan. 26, 2009), or that a defendant had contrary knowledge when "reviewing and/or disseminating [allegedly] misleading statements and information," *Ladmen Partners, Inc.* v. *Globalstar, Inc.*, No. 07-0976, 2008 WL 4449280, *12 (S.D.N.Y. Sept. 30, 2008) (Preska, J.), such claims "sound in fraud" *see id.*; *see also In re Corning Sec. Litig.*, No. 01-6580, 2004 WL 1056063, at *9 (W.D.N.Y. Apr. 9, 2004) (holding that Rule 9(b) applied to Section 11 claim alleging that registration statement "concealed and failed adequately to disclose material facts").

Here, plaintiffs assert that "the Company did not disclose that it had retained <u>any</u> direct subprime CDO exposure at all until July 20, 2007, and, even then, the Company understated its direct exposure by *tens of billions of dollars*" (¶ 166 (second emphasis added)); "[e]ven after Citigroup *belatedly admitted* the amount of its direct exposure to tranches of subprime-backed CDOs, it *failed to disclose* the magnitude of other direct exposures to risky mortgage securitizations (¶ 186 (emphasis added)); "Citigroup remained silent about how this *massive* exposure to Alt-A RMBS was incurred until October 15, 2008" (¶ 187 (emphasis added)); "[b]eginning in mid-November 2008, the Company went into a death spiral culminating in its *stunning admission* that it no longer possessed the capital to write-down the mortgage-

---

[8]    (*See also* ¶¶ 22–28, 151, 154, 190, 199, 210, 376, 396.)

related assets to their true value" (¶ 192 (emphasis added)); "[i]n order to calm investor concern about its SIV exposure, the Company *inaccurately insisted* that there was no reason to consolidate the SIVs" (¶ 203 (emphasis added)); Citigroup "failed to disclose that [it] had accumulated *billions of dollars* in ARS during the third and fourth quarters of 2007, amounting to $11 billion by February 2008, or that these ARS were illiquid and severely impaired" (¶ 244 (emphasis added)); and "[a]fter receiving that $25 billion, the Company continued to misrepresent its exposure to the severely impaired assets" (¶ 252 ).[9]  Such allegations necessarily sound in fraud and each must be plead with the specificity required under Rule 9(b).

Similarly, a claim that defendants undervalued liabilities or overvalued complex assets necessarily implies that contemporaneous adverse information existed and was available to the defendants and therefore "unquestionably sounds in fraud."  *In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690 n.4 (S.D.N.Y. 2004) ("[A]n allegation that defendants reported that loan loss reserves were adequate despite 'already knowing at the time of filing . . . that the Company did not have adequate reserves,' unquestionably sounds in fraud." (second alteration in original) (citation omitted)); *Coronel*, 2009 WL 174656, at *15 (allegations implying the issuer had access to contrary facts "infer an intent to defraud, and are therefore subject to the heightened pleading requirements of Rule 9(b)").  Thus, plaintiffs' allegations that Citigroup understated its exposure to subprime and CDO assets (*see, e.g.*, ¶¶ 166, 168–69, 211) amount to charges of fraud and must meet the strict pleading burdens imposed by Rule 9(b).[10]

---

[9]   (*See also* ¶¶ 5, 207, 218, 229, 247, 303, 324.)

[10]   A plaintiff cannot avoid the heightened pleading requirements of Rule 9(b) merely by inserting boilerplate language into the complaint stating that its Securities Act claims "do[] not sound in fraud."  *In re Axis Capital Holdings Ltd.*, 456 F. Supp. 2d at 598; *see also In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d at 635 ("Plaintiffs cannot evade the Rule 9(b) strictures by summarily disclaiming any reliance on a theory of fraud or recklessness.").  Thus, plaintiffs' disclaimer that its Securities Act claims do "not sound in fraud " (¶ 382) is legally ineffective.  *See JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d at 635; *see also Ladmen Partners*, 2008 WL 4449280, at *11 n.10 ("It is well established that . . . a 'boilerplate disclaimer is not enough to make out a claim for negligence.'" (citation omitted)).

Furthermore, the factual allegations in this complaint mirror the allegations in the complaint filed in *In re Citigroup Inc. Sec. Litig*, No. 08-9901 (S.D.N.Y.) (the "Exchange Act Complaint") (*Compare* ¶ 1 (alleging that Citigroup "misrepresent[ed] its exposure to several hundred billion dollars worth of toxic securities linked to residential mortgages"), *with* Exchange Act Complaint ¶ 1 (alleging that "Citigroup responded to the widely-known financial crisis by concealing both the extent of its ownership of toxic assets—most prominently, CDOs backed by nonprime mortgages—and the risks associated with them" and "Defendants omitted to disclose the existence or acknowledge the market value of or risks associated with tens of billions of dollars of financial instruments").)[11]  Where, as here, plaintiffs employ the exact same factual allegations to assert violations of the Securities Act that are employed in the parallel Exchange Act Complaint, the Securities Act claims "sound in fraud."  *See, e.g.*, *Rubke* v. *Capital Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) ("Where …. a complaint employs the exact same factual allegations to allege violations of section 11 as it uses to allege fraudulent conduct under Section 10(b) of the Exchange Act, we can assume that it sounds in fraud."); *Cozzarelli* v. *Inspire Pharm. Inc.*, 549 F.3d 618, 629 (4th Cir. 2008) (holding that Securities Act claims "sounded in fraud" where both Securities Act and Exchange claims relied on the same factual allegations); *Rombach*, 355 F.3d at 171 (holding that when "same course of conduct that would support Rule 10b-5 claim" is offered in support of Section 11 or Section 12(a)(2) claim, such claims are subject to Rule 9(b)'s heightened pleading standard).[12]

---

[11]  *Compare also, e.g.*, ¶ 324, *with* Exchange Act Compl. ¶¶ 184–85 (CDOs); ¶ 199, *with* Exchange Act Compl. ¶¶ 1081–83 (SIVs); ¶¶ 186–87, *with* Exchange Act Compl. ¶¶ 958–61 (Alt-A RMBS); ¶ 244, *with* Exchange Act Compl. ¶ 920 (ARS); *and* ¶ 252, *with* Exchange Act Compl. ¶ 992 (solvency).

[12]  The fact that the Securities Act and Exchange Act claims are set forth in two separate complaints is of no practical consequence.  The Bond Action is subject to the supervision and authority of Lead Plaintiffs and Lead Counsel, and the Bond Action is to be coordinated with the Consolidated Action for all pre-trial purposes. (December 10, 2008 Order at ¶ 1.)

# I.
# ALLEGATIONS OF MISMANAGEMENT
# <u>ARE NOT ACTIONABLE UNDER THE SECURITIES LAWS</u>

Many of the core allegations of the complaint do not concern purported

misstatements and omissions actionable under the Securities Act of 1933, but instead are nothing

more than hindsight critiques of alleged poor business decisions and failed risk management

practices leading up to and responding to the subprime market crisis of late 2007 and 2008.  For

example, plaintiffs assert that:

- Citigroup took on too many risky assets—underwrote too many CDOs, sponsored too many SIVs, issued too many leveraged loans, originated too many subprime mortgages.  (¶¶ 3, 151, 155, 160, 162–65, 169–73, 193, 207, 221–25, 231, 233, 248, 254, 260, 270–71, 282.)

- Citigroup "purchased a growing volume of loans from correspondent" channel lenders, "includ[ing] some of the country's most reckless lenders."  (¶ 226.)

- Citigroup's allowances for loan losses in 2006–08 were inadequate and "should have" been "maintained" or "increased . . . substantially."  (¶¶ 8, 218, 227, 229–34, 271.)

- Citigroup underwrote and supported ARS auctions, "accumulating billions of dollars worth of ARS on its balance sheet."  (¶¶ 238, 240, 242.)

- Citigroup was insufficiently capitalized, "operat[ing] its business with an extremely high degree of leverage," and with insufficient capital to support assets that were "at risk of default."  (¶¶ 2, 9–10, 151–52, 155, 191–92, 209, 217, 251–52, 261.)

- Citigroup's valuation methods did not adequately calculate "value" and "risk" and relied on inaccurate assumptions.  (¶¶ 6, 9–10, 14, 150, 178–82, 186, 189–90, 192, 195, 198–200, 285, 293–301.)

These allegations amount to nothing more than criticism of management's

judgment and business strategies and, as a matter of law, such claims are not actionable under the

securities laws.  As the court explained in *Craftmatic Sec. Litig.* v. *Kraftsow*, liability under the

Securities Act "flows from material misrepresentations or omissions."  890 F.2d 628, 638 n.14

(3d Cir. 1989).  As a result, no matter what "artful legal draftsmanship" plaintiffs deploy,

"claims essentially grounded in corporate mismanagement" cannot give rise to liability under the

Securities Act. *Id.* at 638–39. *See also Ciresi* v. *Citigroup*, 782 F. Supp. 819, 821 (S.D.N.Y. 1991), *aff'd*, 956 F.2d 1161 (2d Cir. 1992) (dismissing with prejudice Section 11, 12(2) and 15 claims where plaintiffs "allege[d] that defendants improperly managed [the company], primarily by failing to establish adequate reserves for loan losses while at the same time making . . . loans of a high-risk nature"); *Olkey* v. *Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 7–9, (2d Cir. 1996) (affirming dismissal of plaintiffs' Securities Act claim based on defendants' alleged failure to disclose assumptions behind their ultimately unprofitable investment decisions, and emphasizing that "[n]ot every bad investment is the product of misrepresentation."); *Harrison* v. *Rubenstein*, No. 02-9356, 2007 WL 582955, at *13 (S.D.N.Y. Feb. 26, 2007) (dismissing plaintiff's Securities Act claim where the complaint alleged that defendants' business decisions turned out to be poor and led to losses); *Lerner* v. *FNB Rochester Corp.*, 841 F. Supp. 97, 102 (W.D.N.Y. 1993) (dismissing plaintiff's Securities Act claims where core allegations in the complaint were "complaints of mismanagement rather than misrepresentations").[13]

In particular, allegations that Citigroup "increased its exposure to several kinds of particularly risky loans" (¶ 221), "relaxed [its] lending standards" (¶ 160), "acquired . . . loans with loan-to-value ratios ("LTV") of over 90%" (¶ 222), "expanded its portfolio of so-called 'Alt-A' loans" (¶ 224), "purchased a growing volume of loans from correspondent subprime lenders" (¶ 226), "dramatically increased its portfolio of home equity lines of credit" (¶ 223), "created . . . subprime mortgage-backed CDO securities that it was unable to sell" (¶ 172), and "support[ed] ARS auctions by purchasing . . . surplus ARS" (¶ 242) allege nothing more than that Citigroup engaged in certain allegedly risky transactions and investments. Similarly,

---

[13]     *See also Field* v. *Trump*, 850 F.2d 938 (2d Cir. 1988) ("[A]llegations of garden-variety mismanagement" do not support "a claim under the federal securities laws"); *Charas* v. *Sand Tech. Sys. Int'l, Inc.*, No. 90 Civ. 5639, 1992 WL 296406, at *5 (S.D.N.Y. Oct. 7, 1992) ("[W]here the central thrust of . . . a series of claims arises

allegations that Citigroup failed to establish adequate loan loss reserves (*see* ¶¶ 8, 218, 227, 229–34, 271) and maintained insufficient capital ratios (*see* ¶¶ 2, 9–10, 151–52, 155, 191–92, 209, 217, 251–52, 261) merely question management's assessment of risks.  These are classic claims of mismanagement and are insufficient to allege violations of the Securities Act.  *See Ciresi*, 782 F. Supp. at 821 ("[T]hat defendants did not plan their loan reserves properly is essentially a claim that defendants mismanaged the company."); *see also In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d at 689 (Plaintiffs' claims under the Securities Act that loan loss reserves were inadequate dismissed as "nothing more than an assertion that [defendants were] incorrect or unskillful in determining exactly what amount of reserves would be adequate."); *Hinerfeld* v. *United Auto Group*, No. 97-3553, 1998 WL 397852, at *7 (S.D.N.Y. July 15, 1998)  (dismissing Securities Act claims on the grounds that "[t]he failure to anticipate the extent of necessary reserves, even if it amounts to mismanagement, is not actionable under federal securities laws.")

As Chancellor Chandler recently stated in his decision granting virtually all of defendants' motion to dismiss in *In re Citigroup Inc. Shareholder Derivative Litigation*, No. 3338, 2009 WL 481906 (Del. Ch. Feb. 24, 2009):

> The essence of the business judgment of managers and directors is deciding how the company will evaluate the trade-off between risk and return.  Businesses—and particularly financial institutions—make returns by taking on risk; a company or investor that is willing to take on more risk can earn a higher return.  Thus, in almost any business transaction, the parties go into the deal with the knowledge that, even if they have evaluated the situation correctly, the return could be different than they expected.  It is almost impossible for a court, in hindsight, to determine whether the directors of a company properly evaluated risk and thus made the 'right' business decision.

*Id.* at *12.  These observations are particularly applicable to the allegations asserted in the complaint pending before this Court.  Because allegations of mismanagement are not actionable

---

from acts of corporate mismanagement, the claims are not cognizable under federal law.") (citation and

under the securities laws, plaintiffs' hindsight criticisms of business decisions made by defendants during the Class period fail to state a claim.

## II.
## PLAINTIFFS FAIL TO ALLEGE AN
## ACTIONABLE MISSTATEMENT OR OMISSION

In the absence of a statutory or other duty, or unless plaintiffs can fairly allege that a failure to disclose would render a prior statement inaccurate, plaintiffs fail adequately to plead claims under Sections 11 and 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77k(a); 15 U.S.C. § 77 l(a)(2).  Courts in this Circuit and others routinely dismiss cases under the Securities Act in the absence of a duty to disclose the information in question.  *See, e.g.*, *Benzon* v. *Morgan Stanley Distribs., Inc.*, 420 F.3d 598, 612 (6th Cir. 2005) (dismissing action where court found that SEC regulations did not create duty to disclose regarding performance of certain investments); *Resnik* v. *Swartz*, 303 F.3d 147, 154 (2d Cir. 2002) ("Disclosure of an item of information is not required . . . simply because it may be relevant or of interest to a reasonable investor.  For an omission to be actionable, the securities laws must impose a duty to disclose the omitted information." (citing *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993))); *Oxford Asset Mgmt., Ltd.* v. *Jaharis*, 297 F.3d 1182, 1189 (11th Cir. 2002) (dismissing Section 11 and 12(a)(2) action on grounds that "[t]o hold that section 11(a) imposes liability unless the prospectus includes all material facts is simply to wholly ignore and render superfluous that section's qualifying language 'required to be stated therein or necessary to make the statements therein not misleading'"); *In re Xinhua Fin. Media, Ltd. Sec. Litig.*, No. 07-3994 (LTS), 2009 WL 464934, *6 (S.D.N.Y. Feb. 25, 2009) (dismissing after finding no duty to

---

quotation omitted).

disclose all "material, non-public, adverse information" (quoting *J & R Marketing, SEP* v. *Gen. Motors Corp.*, 519 F.3d 552, 561 (6th Cir. 2008))).[14]

Plaintiffs' theory suffers from an additional inherent flaw—it starts from the assumption that, just because certain assets of the company declined in value during the class period, the initial valuations and accounting judgments made about those assets must have been wrong from the start. But this is not the law. Such after the fact reasoning is especially fallacious in the context of the market meltdown continuing to unfold across the U.S. and global economies. It is plain that Citigroup's (and its competitors') stock price has suffered as a result of the ongoing credit crisis that started in late 2007; not, as plaintiffs claim, from alleged false and misleading disclosures made as early as 2006 under completely different market conditions. *See, e.g.*, *In re Huntington BancShares, Inc. ERISA Litig.*, 08 Civ. 0175, 2009 WL 330308, at *8 (S.D. Ohio Feb. 9, 2009) (dismissing "stock drop case" where company's financial difficulties were part of the "economic climate in general, which of course includes the subprime lending crisis" and the company's "stock price [had] essentially moved in tandem" with its peer companies). As described in more detail below, plaintiffs' allegations of omissions or material misrepresentations in the offering materials with respect to CDOs, SIVs, residential mortgage loans and ARS all are without merit.

---

[14]   *See also In re Morgan Stanley Tech. Fund Sec. Litig.*, Nos. 02-6153, 02-8579, 2009 WL 256005, at *7–13 (S.D.N.Y. Feb. 2, 2009) (dismissing claims under Sections 11, 12(a)(2) and 15 where SEC regulations did not impose duty to disclose nor was disclosure necessary to correct previous misleading statement); *In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*, 434 F. Supp. 2d 233, 238 (S.D.N.Y. 2006) (dismissing claims under Section 12(a)(2) where "current law and SEC regulations impose no duty on the defendants" to disclose more than defendants did in the funds' offering prospectuses); *In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, No. 03 Civ. 8208 (RO), 2006 WL 1008138, at *8 (S.D.N.Y. Apr. 18, 2006) (dismissing action under the Securities Act where "[d]efendants did not have a duty to disclose that brokers received greater compensation for the sales of [defendants] mutual funds than for the sales of funds offered by other companies"); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 248–53 (S.D.N.Y. 2003) (dismissing after finding SEC regulations did not impose duty to disclose information at issue); *In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 699 (S.D.N.Y. 2000) (dismissing Sections 11 and 12(a)(2) claims where "defendants were not under an obligation to disclose that [product's] prospects for mass acceptance posed an extreme risk");

A.    **Plaintiffs Fail to Allege an Actionable Misstatement
       or Omission Regarding Citigroup's CDO Holdings**

      Plaintiffs allege that the offering materials for Citigroup securities contained material misstatements and omissions because they (i) failed to disclose the scope of Citigroup's exposure to CDOs backed by subprime mortgages and (ii) misstated the value of Citigroup's CDO holdings because the Company did not follow GAAP and therefore failed to consolidate certain CDOs onto its balance sheet.  Neither of these allegations is sufficiently plead.

    1.    **CDOs**

      CDOs—a name that refers both to the entity that issues the securities and the securities themselves—are asset-backed securities that are structured from a portfolio of fixed income assets such as residential mortgage-backed securities ("RMBS").  (¶ 156.)  The rights to the cash flow from the assets are divided into a number of classes, or "tranches," whereby the senior tranches receive payment before the mezzanine and junior tranches.  (*Id.*)

      Each CDO tranche is rated by independent ratings firms according to the perceived credit risks.  (*Id.*)  The senior tranche is typically rated AAA and, above the senior tranche, CDOs often have a "super-senior" tranche.  (*Id.*)  Because the super-senior tranche has priority even over the senior tranche, it is regarded as having a better-than-AAA rating.  *See* Douglas J. Lucas, Laurie S. Goodman & Frank J. Fabozzi, *Collateralized Debt Obligations: Structures and Analysis* 236 (2d ed. 2006) ("The super senior AAA tranche is senior to a tranche that is also rated AAA, so the super senior's credit risk can be considered to be even better than AAA.").

---

*Geiger* v. *Solomon-Page Group, Ltd.*, 933 F. Supp. 1180, 1187–88 (S.D.N.Y. 1996) (dismissing Sections 11 and 12(a)(2) claims because defendants not required to disclose allegedly omitted information).

Citigroup was a leading CDO arranger and ranked either first or second in CDO underwriting (by volume of assets securitized) in 2005, 2006 and 2007.  (*See* ¶ 155.)[15]  In recent years, CDOs originated across the industry were backed by increasing concentrations of subprime RMBS.  (*See, e.g.*, ¶ 158.)

### 2.      Citigroup's Disclosures about CDO Exposure

Despite plaintiffs' repeated assertions that "[f]or most of the Offering Period, Citigroup's SEC filings . . . represented that [it] had virtually no direct exposure to subprime mortgage-backed CDOs on the Company's balance sheet" (¶ 4; *see, e.g.*, ¶¶ 155, 315) and Citigroup "did not disclose that it had retained <u>any</u> direct subprime CDO exposure at all until July 20, 2007" (¶ 166), plaintiffs fail to cite or quote a single statement by Citigroup representing that it "had no direct exposure to subprime-backed CDOs." (¶ 165.)  In fact, there are no such representations.

The reality is that, in each of its quarterly and annual filings throughout the class period, Citigroup disclosed the nature of its involvement with CDOs and its exposure to CDOs (and other similar off-balance sheet entities).  (*See, e.g.*, Ex. 7 at 90; Ex. 10 at 147; Ex. 15 at 72.) For example, each of Citigroup's 10Ks and 10Qs during the Class Period stated:

> The Company packages and securitizes assets purchased in the financial markets to create new security offerings, including arbitrage collateralized debt obligations (CDOs) and synthetic CDOs for institutional clients and retail customers, which match the clients' investment needs and preferences.

---

[15]   Several different types of CDOs are discussed in the complaint, including High Grade CDOs, Mezzanine CDOs, and commercial paper CDOs (also referred to as Liquidity Puts).  "High grade" CDOs are CDO in which the underlying assets are typically the more senior tranches (A or AA) of asset-backed securities. (¶ 159.)  "Mezzanine" CDOs are CDOs in which the underlying assets are the mezzanine tranches of asset-backed securities.  (*Id.*)  Commercial paper CDOs issue commercial paper backed by super-senior tranches for which Citigroup provided backstop financing (also referred to as liquidity puts) in the event of the occurrence of certain events.  (¶¶ 170–71.)

(*See, e.g.*, Ex. 7 at 90; *see also* Ex. 10 at 147; Ex. 15 at 72.)  Citi explicitly disclosed that it had

involvement with CDO-type structures and that the amount of assets in those CDO structures

increased over time—from $10 billion in the first quarter of 2004 to $74.7 billion in the second

quarter of 2007.  (Ex. 8 at 75; Ex. 12 at 67.)

As plaintiffs acknowledge, CDOs are one type of Variable Interest Entity ("VIE")

(¶¶ 272, 318).  Citigroup stated throughout the class period that:

> The Company may [] provide other financial services and/or
> products to the VIEs for market-rate fees.  These may include:  the
> provision of liquidity or contingent liquidity facilities; interest rate
> or foreign exchange hedges and credit derivative instruments; and
> the purchasing and warehousing of securities until they are sold to
> the SPE.

(Ex. 7 at 90; Ex. 10 at 93.)  Citigroup further explained that "the Company may, along with other

financial institutions, provide liquidity facilities, such as commercial paper backstop lines of

credit to the VIEs."  (Ex. 7 at 133; Ex. 10 at 147.)  Additionally, Citigroup disclosed that it "may

also have an ownership interest in certain VIEs."  (Ex. 7 at 133; Ex. 10 at 147.)

Most importantly, plaintiffs concede that, throughout the Offering Period,

Citigroup disclosed its exposure as a result of its involvement with VIEs, including CDO-type

structures.  (¶ 198 ("Citigroup also disclosed a combined 'maximum exposure' to all of its

VIEs.").)  For instance, Citigroup disclosed that "[a]lthough actual losses are not expected to be

material, the ***Company's maximum exposure to loss*** as a result of its involvement with VIEs that

are not consolidated was ***$117 billion*** and $109 billion at June 30, 2007 and December 31,

2006."  (Ex. 12 at 67 (emphasis added).)  This maximum exposure figure consisted of the

"notional amounts of credit lines, guarantees, other credit support, and liquidity facilities, the

notional amounts of credit default swaps and certain total return swaps, and the amount invested

where Citigroup has an ownership interest in the VIEs."  (*Id.*)

22

### 3.    Citigroup's Subprime-Related Write-Downs

As the economy began to deteriorate in late 2007, Citigroup's disclosures about its CDO holdings were updated to reflect developing market conditions.  On October 1, 2007, for example, Citigroup "pre-announced" its expectation that third quarter results would be adversely impacted by the dislocations in the mortgage-backed securities and credit markets, including anticipated write-downs of $1.3 billion on subprime RMBS warehoused for future CDO securitization, CDO positions, and leveraged loans warehoused for future CLO securitization. (Ex. 13.)  On October 15, 2007, this figure was revised to $1.56 billion on subprime-related assets in Citigroup's structured credit products business, including CDOs.  (Ex. 14.)

On November 4, 2007, following unprecedented rating agency downgrades in mid- and late-October on significant numbers of subprime RMBS, which in turn were expected to cause significant deterioration in the value of CDOs, Citigroup announced anticipated fourth quarter subprime-related write-downs of $8 billion to $11 billion, which resulted largely from write-downs on Citigroup's holdings of $43 billion of super-senior tranches of CDOs and $2.7 billion in CDO warehouse inventory and unsold tranches of ABS CDOs.  (¶ 176; Ex. 1.)  As the credit crisis deepened, Citigroup announced additional write-downs on its CDO exposure in the fourth quarter of 2007 and in each quarter of 2008.  (*See* Ex. 21 at 11–12; Ex. 23 at 22; Ex. 24 at 30; Ex. 26 at 34; Ex. 27 at 7.)

### 4.    Plaintiffs Fail to Allege A Duty to Disclose Additional Details about the Company's CDO Holdings

Plaintiffs' allegation that the Company failed to ***separately quantify*** the extent to which its CDOs were backed by subprime mortgages (¶¶ 3–4, 150, 166, 172, 264, 266) does not state a claim under Sections 11 or 12(a)(2) because the securities laws and regulations do not

impose an obligation upon companies to disaggregate financial statements to disclose individual line item exposures.

Plaintiffs' suggestion that Financial Accounting Standards Board, Statement of Accounting Standards ("SFAS") No. 107 ¶ 15A required the Company to make distinct and separate disclosure of its subprime CDO exposure throughout the Offering Period (¶¶ 267, 269) is wrong. SFAS No. 107 ¶ 15A concerns the disclosure of significant *credit risk to a counterparty*. SFAS No. ¶ 15A does not apply to CDO holdings, which are not subject to credit risk to a counterparty. Instead, CDO holdings were subject to a *market risk* associated with the mortgage market. SFAS 107 No. ¶ 15C specifically provides that "[a]n entity is encouraged, *but not required, to disclose quantitative information about the market risks of financial instruments*."[16] To the extent plaintiffs criticize management's assessment of the market risk posed by the Company's CDO holdings, this is nothing more than an allegation of mismanagement, which is not actionable under the securities laws. *See supra* Section I.

Far from requiring a company to disaggregate its assets in financial disclosures, the accounting rules specifically permit and contemplate that companies will disclose classes of assets, liabilities, and total-balance-sheet risk, rather than specific holdings. *See* SFAS No. 115 ¶ 19 (requiring disclosure of "aggregate fair value" of financial instruments for "major security

---

[16] Plaintiffs also allege that Statement of Position ("SOP") No. 94-6 and Accounting Principles Board Opinion ("APB") No. 28 require that Citigroup "disclose the concentration, the maximum amount of loss, and any mitigation strategies to reduce the risk of loss" from its CDOs' exposure to sub-prime mortgages. (¶¶ 267–69.) Neither rule requires a company to disaggregate its financial disclosures. APB No. 28 requires that interim financial statements employ the "accounting principles and practices used by an enterprise in the preparation of its latest annual financial statements." (APB No. 28 ¶ 10.) It does not require any more detailed disclosures than are mandated by SFAS 107 ¶ 15A. SOP No. 94-6 does not even apply to "financial instruments," (SOP No. 94-6 ¶ 23), but in any event, requires disclosures that are "sufficient to inform users of the general nature of the associated risk," and does not demand the explicit disclosures regarding Citigroup's CDO holdings which plaintiffs allege were required. (SOP No. 94-6 ¶ 24).

types").[17]  With respect to VIEs specifically, Financial Accounting Standards Board

Interpretation No. 46-R ("FIN 46-R") requires only that a company disclose the aggregate assets

of VIEs with which it has involvement, not each type of VIE, and not the specific exposure to

each type of VIE.  FIN 46-R.[18]

> In any event, the magnitude of Citigroup's CDO holdings was determinable from

public information.  As plaintiffs acknowledge, "Citigroup consistently informed investors that it

was one of the country's largest originators and sellers of CDO securities" (¶ 155) and it made

available, in every financial statement during the Offering Period, the scope of its exposure to

unconsolidated VIEs, which include CDOs.  (*See e.g.* Ex. 10 at 147.); *see also In re N.Y. Cmty.*

*Bancorp*, 448 F. Supp. 2d at 479 (holding additional disclosure is not required under the

Securities Act or the Securities Exchange Act where "it is apparent from the quarterly reports

disclosed to the public that the company was heavily involved in investing in mortgage-backed

securities").  It was known throughout the industry that underwriters typically retain substantial

portions of the "super senior" tranches of the CDOs they underwrite and distribute.  Frank J.

Fabozzi, *Introduction to Structured Finance* 143 (2006).[19]  Thus, investors who were interested

in understanding Citigroup's holdings in super-senior CDO positions prior to the market collapse

in late 2007 had the ability to evaluate the magnitude of those holdings based on publicly

---

[17]   Moreover, the type of line item disclosure suggested by plaintiffs would not only be overly burdensome and
time consuming to prepare, but the resulting disclosure would be too granular to be meaningful.  *In re
Convergent Techs. Sec. Litig.*, 948 F.2d 507, 516 (9th Cir. 1991) (Neither the Securities Act nor the Securities
Exchange Act requires management "'to bury the shareholders in an avalanche of trivial information – a result
that is hardly conducive to informed decision making'") (*quoting TSC Indus., Inc.* v. *Northway, Inc.*, 426 U.S.
438, 488-49 (1976)); *San Leandro Emergency Med. Group Profit Sharing Plan* v. *Philip Morris Co, Inc.*, 75
F.3d 801, 810 (2d Cir. 1996) (same holding with respect to the Securities Exchange Act).

[18]   Under FIN 46-R, a company that has "significant variable interest" in a VIE "shall disclose (a) the nature of its
involvement with the variable interest entity and when that involvement began; (b) the nature, purpose, size and
activities of the variable interest entity, and (c) the enterprise's maximum exposure to loss as a result of its
involvement with the variable interest entity."  (FIN 46-R ¶ 24.)

[19]   The same is true of Citigroup's commercial paper CDO exposure.  (Ex. 29 at 13.)

available information.  It is notable, in this regard, that the plaintiffs in the companion Exchange

Act Complaint appear to have performed this calculation in drafting that complaint.  (*See*

Exchange Act Complaint ¶ 121 ("The record of Citigroup's CDO underwriting thus establishes

exactly which super senior tranches Citigroup was holding at any given time, as well as

Citigroup's aggregate super senior exposure at any given time.").)

> **5.     Plaintiffs' Allegations of GAAP Violations Fail to
> Plead an Actionable Misstatement or Omission**

In addition to purported omissions about the details of Citigroup's CDO holdings,

plaintiffs also allege that Citigroup's financial disclosures "from the first quarter of 2006 through

the second quarter of 2008" contained material misstatements as a result of GAAP violations in

the accounting of the CDOs.  (¶ 264.)  According to plaintiffs, these GAAP violations caused

Citigroup to:  (i) fail to consolidate its commercial paper CDOs on its balance sheet (*see* ¶¶ 264,

272); and, (ii) misstate the fair value of its CDOs (*see* ¶¶ 264, 287–99).

Despite devoting a significant portion of the complaint to allegations that

Citigroup's financial disclosures violated GAAP, plaintiffs nevertheless fail to plead a single

GAAP violation.  "[F]ar from being a canonical set of rules," GAAP serves as a guideline with

enough flexibility to offer more than one correct answer to specific problems and "tolerate[s] a

range of 'reasonable' treatments, leaving the choice among alternatives to management."  *Thor

Power Tool Co.* v. *Comm'r*, 439 U.S. 522, 544 (1979); *see also Shalala* v. *Guernsey Mem'l

Hosp.*, 514 U.S. 87, 101 (1995) ("GAAP changes and, even at any one point, is often

indeterminate."); *Ganino* v. *Citizens Util. Co.*, 228 F.3d 154, 160 n.4 (2d Cir. 2000) ("GAAP

does not prescribe a fixed set of rules, but rather represent[s] the range of reasonable alternatives

that management can use." (internal citation omitted)).

Plaintiffs offer only their subjective view of how Citigroup's CDOs should have been accounted for, based on a hindsight assessment of the severity of market risks unknown at the time the Company allegedly should have made different disclosures. *See In re Acceptance Ins. Cos. Sec. Litig.*, 423 F.3d 899, 903 (8th Cir. 2005) ("[R]etrospective analysis of awareness cannot be the basis for a claim" under the Securities Act.); *Coronel*, 2009 WL 174656, at *13 (dismissing plaintiffs' claims under the Securities Act because "the relevant inquiry under the Securities Act is . . . whether the facts alleged in the Complaint evince that the Company knew or had reason to believe, at the time the Prospectus and Registration Statement were filed, that the statement was untrue."); *Panther Partners, Inc.*, 538 F. Supp. 2d at 669–70 (dismissing complaint where plaintiffs "reverse-engineered" their allegations, which were "craftily drafted to imply that what only became clear due to subsequent events was somehow known to [defendants] far earlier in time"); *In re Flag Telecom Holdings. Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 447 (S.D.N.Y. 2005) (stating that under the Securities Act, "[t]he truth of a statement … is adjudged by the facts as they existed when the registration statement became effective"); *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 205 (S.D.N.Y. 2004) (same); *In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 183 (S.D.N.Y. 2003) ("Section 11 by its terms applies to material misstatements and omissions in the registration statement 'when such part became effective.'… Accordingly, when subsequent events make an effective registration statement misleading, section 11 does not apply." (quoting Thomas Lee Hazen, *The Law of Securities Regulation* 597 (4th ed. 2002))); *see also In re Int'l Bus. Mach. Corporate Sec. Litig.*, 163 F.3d 102, 110 (2d Cir. 1998) (noting that there is no duty to update or correct a disclosure under the Securities Act or the Securities Exchange Act "when the original statement was not forward looking and does not contain some factual representation that remains 'alive' in the

27

minds of investors as a continuing representation" (citing *In re Burlington Coat Factory*, 114 F.3D 1410, 1432 (3d Cir. 1997))).

   In fact, plaintiffs' version of market events and public knowledge in 2006 and 2007 is inconsistent with the public record.  *See infra* Section III.B.1.  Courts repeatedly have rejected efforts by plaintiffs to cherry pick, with the benefit of hindsight, particular judgment calls on the accounting treatment of particular assets, which is an inherently forward looking function.  *Xerion Partners I LLC* v. *Resurgence Asset Mgmt. LLC*, 474 F. Supp. 2d 505, 517 (S.D.N.Y. 2007) (noting that "'[t]he Second Circuit . . . does not recognize 'fraud by hindsight'" pleading and therefore dismissing Securities Act and Securities Exchange Act claims that defendants improperly calculated leasehold and goodwill valuations); *In re Integrated Res. Real Estate Ltd. P'ships Sec. Litig.*, 815 F. Supp. 620, 674 (S.D.N.Y. 1993) (dismissing Securities Act claims on the basis that "label[ing] a projection which does not pan out 'fraud' merely because it turned out not to be true is 'fraud by hindsight.'"); *Lerner*, 841 F. Supp. at 101 (dismissing complaint based on the Securities Act and the Securities Exchange Act because "plaintiff is more accurately expressing his displeasure with the judgment calls made by management, which turned out to have been poorly made, and with management's failure to anticipate that its portfolio would be particularly vulnerable in an economic slump").

    **i)**   **Plaintiffs Fail to Plead Non-Compliance with FIN 46-R**

   As required by FIN 46-R, Citigroup disclosed in each of its periodic Form 10-Q and 10-K filings up to and including the second fiscal quarter of 2007:  (i) its exposure to unconsolidated VIEs, including CDOs; (ii) the nature of its involvement with these financial instruments included providing liquidity support, such as commercial paper backstop lines of credit; (iii) that it may also have an ownership interest in certain VIEs; and, (iv) that "[t]he Company is not the primary beneficiary of these VIEs under FIN 46-R due to its limited

continuing involvement and, as a result, does not consolidate their assets and liabilities in its financial statements." (Ex. 7 at 90; Ex. 10 at 147, Ex. 12 at 67.)

Plaintiffs nonetheless allege that because of its liquidity support to certain VIEs, "Citigroup [also] was required by FIN 46-R to consolidate the $25 billion of commercial paper CDOs supported by liquidity puts in its yearly and quarterly financial statements issued during the Offering Period." (¶ 275). Plaintiffs' claim is without merit. The accounting rules make clear that whether a company has significant involvement in a VIE, even in the form of providing it liquidity facility support, is not determinative of its obligation to consolidate that VIE. *See* FIN 46-R ¶ 24.[20] Under FIN 46-R, a company need only consolidate a VIE if the company anticipates absorbing a majority of the expected losses associated with the VIE. *See* FIN 46-R ¶¶ 14, 15. Plaintiffs allege no facts establishing that Citigroup anticipated that it would absorb the majority of the expected losses associated with the commercial paper CDOs prior to the unprecedented mortgage downgrades in the fourth quarter of 2007.

After the "rating agency downgrades of the CDO collateral in the fourth quarter [of 2007]," and ***after*** it purchased outstanding commercial paper from certain CDOs, Citigroup had cause to re-evaluate the question of whether to consolidate the VIEs. (Ex. 20 at 91.) At that point, pursuant to FIN 46-R, Citigroup concluded that it would absorb the majority of the losses associated with these CDOs and consolidated them onto its balance sheet. (*Id.*) The mere fact that Citigroup consolidated commercial paper CDOs in late 2007 does not establish that the company had an obligation to consolidate these instruments earlier than it did.

---

[20]   As evidenced by its disclosures throughout the Offering Period, Citigroup considered its liquidity support for certain unconsolidated VIEs to be a "significant variable interest" in the VIE. (*See e.g.*, Ex. 20 at 86 ("The Company generally considers the following types of involvement to be significant: …Writing a 'liquidity put' or other liquidity facility to support the issuance of short-term notes.").)

      **ii)**    **Plaintiffs Fail to Plead Overstatement of the**
                     **Fair Value of Subprime Backed CDOs**

Plaintiffs also allege that Citigroup "significantly overstated the fair value of its CDO assets in its Form 10-K for 2006 and in its financial statements thereafter." (¶ 292.) However, although plaintiffs repeatedly cite GAAP rules requiring that assets be carried at "fair value" (*see, e.g.*, ¶¶ 288–89), the complaint is devoid of any factual allegation showing that Citigroup did not calculate properly the "fair value" of its CDO assets at the time of the challenged disclosures.

First, plaintiffs point to SFAS No. 157, *Fair Value Measurements*, which requires the consideration of "observable" market data, if available, in valuation.  Market data can include price quotes for the same or similar assets, or "[i]nputs other than quoted prices that are observable for the asset or liability (for example, interest rates and yield curves observable at commonly quoted intervals, volatilities, prepayment speeds, loss severities, credit risks, and default rates. )"  SFAS No. 157 ¶ 28.  However, plaintiffs do not allege that Citigroup failed to use market data prior to late 2007.  Not do they allege that market data was available after the market crisis unfolded in late 2007.  Indeed, SFAS No. 157 explicitly contemplates the circumstance where no observable market data is available, and permits companies to make estimates about the market based on the best information available.  SFAS No. 157.

Plaintiffs allege that Citigroup's "inability to sell the CDOs at par," or "sell more than $28 billion of the 'high grade' and 'mezzanine' CDOs that it originated between 2004 and 2007" shows that it must have known at the time that these securities were not worth their par value.  (¶¶ 293–94; *see also* ¶ 190.)  This allegation fails because plaintiffs do not allege anything relating to the actual market prices of these instruments or that Citigroup failed to follow such market prices.  Moreover, as plaintiffs concede, Citigroup purchased protection on

some of its super-senior CDO holdings from AMBAC and other financial insurance companies, transactions that provided for price discovery.  (¶ 185.)  Critically, plaintiffs fail to allege that Citigroup failed to value its super-senior CDO holdings consistent with those available market transactions.

Plaintiffs' allegation that Citigroup should have used the TABX index to value Citigroup's CDO portfolio is baseless.  (¶¶ 295–97.)  Plaintiffs cite no legal authority for the proposition that Citigroup was required to use the TABX index to value its CDO assets.  In any event, the alternative valuation methodology proposed by plaintiffs is seriously flawed.  The TABX index relied on by plaintiffs tracks BBB rated tranches of RMBS (the lowest-rated tranches) with mortgage vintages from 2006 and 2007,[21] whereas the vast majority of Citigroup's super-senior CDO positions were backed by RMBS rated higher than single-A and included mortgage vintages from before 2006.[22]  (¶¶ 107, 140.)

Indeed, the TABX was never intended to serve as a valuation tool for RMBS or CDOs writ large.  Markit, the creator and administrator of the index, has stated explicitly that the ABX (on which the TABX is based) was "not designed to be uncritically extrapolated to the broader ABS market, and it was certainly not designed as a valuation tool for individual securities."  (Ex. 30.)  The TABX, which is very thinly traded, is an even more ill-suited valuation tool.  Goodman et al., *Subprime Mortgage Credit Derivatives*, at 160 ("[T]here is no way to use TABX pricing as the benchmark for CDO pricing.").  Moreover, the TABX index is

---

[21]  There is no TABX index that tracks mortgage vintages prior to 2006. *See* Markit TABX.HE Indices, http://www.markit.com/information/products/category/indices/tabx.html (last visited Mar. 13, 2009).

[22]  Plaintiffs have not alleged a coherent basis to believe that Citigroup's CDO portfolio was correlated to the TABX index.  Indeed, CDOs often include credit enhancements, or additional securities (often non-MBS) in the underlying portfolio of securities, while the TABX only tracks a portfolio of exclusively subprime MBS holdings.  Laurie S. Goodman, et al., *Subprime Mortgage Credit Derivatives* 145–49, 156–60 (Wiley & Sons 2008).  Thus, the TABX portfolio is "less diversified" than a typical CDO and is therefore ill-suited as a measure of CDO performance.  *Derivative Fitch: Customized Approach Needed to Analyze TABX.HE*, Business Wire, Apr. 19, 2007, at 1.

systematically distorted towards lower valuation because it is too illiquid to "take the weight of short-selling heaped on [it]." *Don't Mark to Markit*, Economist, Mar. 6, 2008, at 1.  Thus, the TABX represented anything but "a benchmark for the value of senior CDO positions such as those owned by Citigroup."  (¶ 295.)

Finally, plaintiffs allege that "Citigroup applied a model that used a discount rate for cash flows based on Collateralized Loan Obligations ("CLOs")" (¶ 298), and "relied heavily on rating agencies," (¶ 299) and that these alleged practices also masked the fair value of the CDOs.  At best, plaintiffs merely allege that they would have valued the CDOs differently. Plaintiffs' Monday morning quarterbacking does not plead any impropriety with respect to Citigroup's choice in valuation methodology at the time of the relevant disclosures.  Indeed, plaintiffs ignore the fact that, prior to mid-October 2007, there were virtually no downgrades of AAA CDO tranches.

Ultimately, the choice in valuation methodology is a management decision and plaintiffs' allegations of mismanagement are not actionable under the securities laws.  *See supra* Section I.

### 6. Plaintiffs' Remaining Disagreements with Citigroup's CDO Disclosures Do Not Give Rise to a Securities Act Claim

Plaintiffs' remaining claims with respect to Citigroup's disclosures about CDOs also fail to plead a material misstatement or omission.

*First*, plaintiffs suggest that Citigroup's statement that it had "limited continuing involvement" in VIEs was misleading in light of the exposure its CDOs had to subprime mortgages.  (¶ 165.)  As addressed above, plaintiffs improperly equate *exposure to* CDOs with continuing *involvement* in the CDO.  (*See* ¶ 198.)  Because Citigroup had neither operational

control nor equity interest in the CDOs it structured, the statement that it had "limited continuing involvement" in VIEs is accurate.[23]

*Second*, plaintiffs allege that Citigroup's statements prior to November 4, 2007 that the "Company's mortgage loan securitizations are primarily non-recourse" effectively transferred the risk of future credit losses to the purchasers of securities and were misleading because Citigroup retained the risk of loss on as much as $66 billion of subprime-backed CDOs. (¶¶ 165, 315.) Plaintiffs ignore the fact that Citigroup's mortgage securitization activities, and therefore its disclosures about those activities, were separate and distinct from its CDO-related activity and disclosures. (*See, e.g.*, Ex. 20 at 147.) Both activities were in fact disclosed accurately, and plaintiffs do not plead facts sufficient to support an allegation that the two disclosures somehow should have been included.

*Lastly*, plaintiffs allege that Citigroup had a duty to disclose "known trends" that it "reasonably expects will have a material favorable or unfavorable impact on net sales or revenues" under Regulation S-K, Item 303. (¶ 265.) As a threshold matter, there is no private right of action under Item 303. *See Oran* v. *Stafford*, 226 F.3d 275, 287–88 (3rd Cir. 2000) (citing *In re Canandaigua Sec. Litig.*, 944 F. Supp. 1202, 1209 n.4 (S.D.N.Y. 1996)). In order for a violation of Item 303 to create liability under the 1933 Act, plaintiffs must "plead facts

---

[23]   Plaintiffs also allege that, with respect to the Company's CDO holdings, Citigroup misled the market by disclosing in July and October that "the Company's total on-balance sheet subprime exposure in its Securities and Banking division was $13 billion" prior to November 2007. (¶¶ 166–73; 322–24.) These allegations—which sound in fraud—fail to satisfy the heightened pleading requirements of Rule 9(b) and should be dismissed. *See supra* pp. 10–14. In addition, these alleged misstatements are not actionable because, with the exception of the October 1 statement, plaintiffs do not allege that these purported misstatements were incorporated into the public offering materials at issue in this lawsuit and therefore cannot form the basis for a claim under Sections 11 or 12 (a)(2) of the Securities Act. The October 1 statement by its express terms does not purport to disclose all of Citigroup's subprime exposure in its securities and banking division, as plaintiffs suggest, but only its "secured subprime exposure in [its] lending and structuring business." (Ex. 13 at Ex. 99.2 p. 3.) As a result, plaintiffs have not adequately alleged that the October 1 statement was misleading; nor do plaintiffs remotely satisfy the requirement that they plead facts supporting a strong inference of scienter, given that the complaint fails to allege facts indicating that the Company—whose views mirrored those of its peer

33

indicating that the alleged known trends existed at the time of the purported misleading statements or omissions." *Garber*, 537 F. Supp. 2d at 611 (citing *In re Turkcell Illetisim Hizmetler, A.S. Sec. Litig.*, 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001)).  Plaintiffs fail to meet this requirement in two key respects.  First, they fail to allege which specific SEC filings allegedly violate Item 303.  Rather, they summarily allege that Citigroup "failed to provide the comprehensive disclosures required by SEC regulations."  (¶ 265.)  Second, the complaint "fails to allege that there [were] 'trends' or that they were 'known' as of the date the [unidentified] Prospectus became effective."  *In re Turkcell*, 202 F. Supp. 2d at 13.

Plaintiffs cannot employ "20/20 hindsight" to impose a duty to disclose trends or uncertainties that were unknown to Citigroup at the time the earlier financial documents were prepared.  *See Panther Partners, Inc.*, 538 F. Supp. 2d at 669 (dismissing Securities Act claims based on Item 303 where "a close inspection of the pleadings … reveals that the allegations have been craftily drafted to imply that what only became clear due to subsequent events was somehow known to [the defendant] far earlier in time, well before the confirming event occurred or other evidence came to light").

## B.   The Complaint Fails to Allege an Actionable Misstatement or Omission Regarding SIVs

Plaintiffs allege that Citigroup made material omissions or misstatements about its involvement with SIVs by (i) falsely stating that it would not, and was not obligated to, consolidate the SIVs onto its balance sheet (¶¶ 194, 197, 203, 206, 284–85, 300) and (ii) improperly characterizing its SIV assets as having "high credit quality" (¶¶ 9–10, 330, 340).  Neither argument has merit.

---

financial institutions—did not reasonably believe at the time that there was a material risk of loss to its super-senior portfolio.

1.      **SIVs**

Citigroup, during the relevant time period, was the investment manager for seven SIVs, which are operating companies that issue tranched securities and invest in a portfolio of assets. (¶ 196.)  The bulk of the securities issued by SIVs are in the form of short-term debt, such as commercial paper, which allows the SIVs to borrow money cheaply—to pay low interest rates to senior debt investor—and then to use that money to invest in higher-yielding assets.  (*Id.*) Though Citigroup advised the SIVs, it had no contractual obligation to consolidate the SIVs onto its balance sheet.  (¶ 199.)

On December 13, 2007, in response to announcements by ratings agencies regarding possible downgrades to the SIVs due to liquidity issues, Citigroup announced that, pursuant to applicable accounting rules, and though it was not required to do so, the company would consolidate the SIVs' assets and liabilities onto its balance sheet.  (¶ 207)  As a result of the spiraling financial crisis, and the accompanying credit freeze, Citigroup was unable to find a purchaser for its SIVs and, on November 19, 2008, was required to pay $17 billion to unwind its SIVs and compensate the holders of the SIVs' commercial paper.  (¶ 214.)

2.      **Citigroup's Disclosures Regarding SIVs**

Citigroup plainly disclosed the extent and nature of its involvement with SIVs in each of its annual SEC filings during the relevant Offerings Period.  Plaintiffs' claim that "the term 'structured investment vehicle' did not appear once in any Form 10-Q or 10-K filed by Citigroup throughout 2006 and the first ten months of 2007" (¶ 283) is demonstrably false.  Each of Citigroup's annual filings during the Class Period clearly disclosed the amount of assets in the SIVs and its exposure to SIVs (along with other VIEs).  For example, Citigroup's 10-K for 2006 clearly states that Citigroup had involvement with "structured investment vehicles" with assets of $79.847 billion.  (Ex. 10 at 146.)  Moreover, as plaintiffs concede, Citigroup disclosed the

amount of its "'maximum exposure' to all of its VIEs, including its SIVs." (¶ 198.)  Citigroup's

disclosures showed that its maximum exposure to loss from VIEs increased during the Class

Period from $89 billion on June 30, 2006 (Ex. 9 at 108), to $117 billion on June 30, 2007 (Ex. 12

at 67).[24]  Plaintiffs have pleaded no basis to impose an affirmative duty on Citigroup to disclose

additional details about its SIVs.

### 3.      Citigroup Was Not Obligated to Consolidate Its SIV Holdings

Plaintiffs' assertion that Citigroup was obligated, under FIN 46-R and Financial

Accounting Standards Board, Staff Statement of Position ("FSP") FIN 46-R-5, to consolidate the

SIVs onto its books, and absorb any loss, because it had an "implicit" obligation to provide

liquidity to the SIVs is based on a faulty assumption.  (¶¶ 277–86.)  Although Citigroup stated

that it would, *at its discretion*, provide liquidity to the SIVs, it also consistently made clear that it

had "*no contractual obligation* to provide liquidity facilities or guarantees to any of the Citi-

advised SIVs."  (¶ 203 (emphasis added); *see also* ¶¶ 194, 199, 203, 206–07, 327; Ex. 16.)

Plaintiffs fail to cite a single law, regulation, or judicial decision supporting its

novel theory of "implicit" obligations.  Instead, plaintiffs rely on news reports from mid-October

2007 stating that Citigroup and other financial institutions were "assessing a plan to create a so-

called 'super-SIV'" (¶ 201), and the fact that Citigroup ultimately did provide liquidity support

to the SIVs.  (¶ 207.)

In any event, even if there had been an "implicit guarantee," FIN 46-R(5) ¶ 6

requires a judgment of whether a guarantor actually will absorb a majority of losses, and

plaintiffs have failed to plead any facts impugning the appropriateness of Citigroup's judgment

that it would not absorb the majority of the SIVs' losses through the third quarter of 2007;

---

[24]   Notably, although Citigroup did disclose its specific involvement with and exposure to SIVs, it had no legal
obligation to do so.  As discussed *supra* Section II.A.4, SFAS 107 ¶ 15A, SOP No. 94-6, and APB No. 28,

certainly, plaintiffs cannot simply point to the fact that in the fourth quarter of 2007—in response to sharply deteriorating market conditions—Citigroup did consolidate the SIVs onto its balance sheet as evidence that it should have done so earlier.

### 4.      Plaintiffs Fail to Plead a Misstatement About the Quality of SIV Assets

Plaintiffs also allege that Citigroup misrepresented the value of its SIV assets in Offering Materials in late 2007 through mid-2008 by representing that the assets contained in its SIVs were performing well and not threatening the Company's capital adequacy.  (¶¶ 210–13.) However, plaintiffs fail to identify anything inaccurate about the statements made during this period.

That Citigroup decided—over a year later in vastly different market conditions— to reclassify its SIV assets does not establish that the assets were "worth far less than Citigroup had reported" in October 2007, at the time of the allegedly misleading disclosure.  (¶ 214); *see Scibelli* v. *Roth*, No. 98 Civ. 7228, 2000 WL 122193, at *3 (S.D.N.Y. Jan. 31, 2000) (plaintiffs' suggestion that the fact that defendants announced certain information in September must have meant that defendants were in possession of this information the previous July was "not a reasonable inference").  Plaintiffs' argument that Citigroup's reclassification of its SIV assets in November 2008 is evidence that the value of these assets was misrepresented in October 2007 simply ignores the monumental deterioration in the credit markets in the interim.  Plaintiffs' strategy of "reverse-engineering" allegations does not plead a claim under Sections 11 or 12(a)(2).  *See, e.g.*, *Coronel*, 2009 WL 174656, at *13; *Panther Partners, Inc.*, 538 F. Supp. 2d at 669–70; *In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d at 183.

---

relied on by plaintiffs, do not require a company to disclose by line-item its holdings in specific assets.

C.   **The Complaint Fails to Allege an Actionable Misstatement
or Omission Regarding Citigroup's Mortgage Loan Portfolio**

Citigroup's real estate lending business involved the origination and funding of residential and commercial mortgage loans, and was conducted primarily through its subsidiary, CitiMortgage.  (¶ 219.)  In addition to lending directly to borrowers through its retail channel, CitiMortgage also funded loans through its "correspondent" channel by purchasing loans underwritten by other mortgage originators.  (*Id*.)  Citigroup either held these mortgages in its first and second mortgage portfolios, sold them to third parties, or securitized them into RMBS that were then held in its warehouse, structured into CDOs, or sold to third parties.  (*See* ¶ 160, 219–20.)

Plaintiffs allege that Citigroup's financial disclosures contained material misstatements because defendants failed to reserve adequately for loan losses, in violation of GAAP.  (¶¶ 218–35.)  As discussed above, claims of GAAP violations do not suffice to plead a violation of the Securities Act of 1933.  *See supra* Section II.A.5.  Moreover, allegations of inadequate loan loss reserves are fundamentally allegations of mismanagement, which are not actionable under the securities laws.  *See supra* Section I.  In any event, plaintiffs have not plead with particularity facts establishing that Citigroup should have known at the time that it needed larger loan loss reserves.

D.   **The Complaint Fails to Allege an Actionable Misstatement
or Omission Regarding Auction Rate Securities**

The complaint alleges that Citigroup both failed to disclose material information about its ARS practices and holdings, and "materially misstate[d] the value of those securities and their impact on [the company's] capital adequacy."  (¶¶ 240, 242, 244, 247.)  However,

plaintiffs fail to identify the additional material information Citigroup had a duty to disclose, or any actual misstatements in the disclosures Citigroup made in 2008.[25]

### 1.    Auction Rate Securities

"Auction rate securities" are debt instruments (such as corporate bonds, municipal bonds, or preferred stock) with long-term maturities for which the interest rates or dividend yields are periodically reset (usually every 7, 14, 28 or 35 days) through a "Dutch auction" for each security.  (¶ 237.)  In a "Dutch auction" process, bids are submitted to an auction agent by a designated broker-dealer on behalf of current and prospective investors in a particular ARS. Based on the submitted bids, the auction agent will set the interest rate for the next time period by determining the lowest bid rate at which all the shares can be sold at par.  If there are not enough orders to purchase all the ARS being sold at the auction, the auction fails and the interest rate paid to the ARS holders until the next auction is set at a maximum rate pre-defined by the issuer in the prospectus.

The specific terms for each ARS are set forth in the prospectus for that security. Smith Barney, a division of Citigroup's subsidiary Citigroup Global Markets Inc., is one of the many broker-dealers that underwrite ARS and manage the auctions for certain ARS.  (¶ 238.) Like other broker-dealer firms, Citigroup had the option to place bids in ARS auctions, either to purchase securities for its own account, or to prevent an auction from failing.  (¶¶ 240, 242.) This practice was known to the public and disclosed to customers.  *See* Auction Rate Securities Practices and Procedures of Citigroup Global Markets Inc. ("CGMI ARS Practices"), *available at* https://www.smithbarney.com/products_services/fixed_income/auction_rate_securities; *In re*

---

[25]    Plaintiffs' ARS allegations begin with Citigroup's Form 10-Q for the third quarter 2007 (¶ 244) and, therefore, are inapplicable to prior offerings.

*Bear Stearns & Co. Inc., et al.*, File No. 3-12310 (Securities and Exchange Commission May 31, 2006), *available at* http://sec.gov/litigation/admin/2006/33-8684.pdf.

   In February 2008, due to, among other things, a steep decline in demand for ARS as a result of the overall credit crisis, Citigroup stopped placing cover bids in certain ARS auctions. (¶¶ 241, 243.) As a result, those auctions began to fail. (¶ 243.) On April 18, 2008, Citigroup announced that it had written down $1.5 billion on its ARS inventory due to failed auctions and deterioration in the credit market. (¶¶ 245–46.)

   Following auction failures across the industry in February 2008, state and federal regulators commenced investigations of the major broker-dealer firms, including Citigroup, regarding the events and decisions leading up to the auction failures. (¶ 243.) On August 7, 2008, a settlement-in-principle was announced between Citigroup and the regulators, under which Citigroup agreed, without admitting any wrongdoing, to offer to purchase at par ARS that are not auctioning from all Citigroup individual investors, small institutions, and charities that purchased ARS from Citigroup prior to February 11, 2008. (¶ 247; Ex. 25.) Citigroup also agreed to provide non-recourse loans to retail investors that need interim liquidity up to the par amount of their ARS holdings. (Ex. 25.) The settlement led to a $612 million write-down on ARS for third quarter of 2008. (*Id.*)

### 2.  Plaintiffs Fail to Allege Any Actionable Omissions Regarding ARS

   Plaintiffs allege that Citigroup failed to disclose that (i) the company routinely bid in ARS auctions to prevent the auctions from failing, and (ii) it had accumulated billions of dollars in "illiquid and severely impaired" ARS during the third and fourth quarters of 2007. (¶¶ 240–44.) Neither allegation is adequately pleaded.

*First*, Citigroup's bidding practices in ARS auctions have been explicitly described on Citigroup's public website since 2006.  *See* CGMI ARS Practices, *supra*.  The website stated clearly that:

- Citigroup is permitted, but not obligated, to submit orders in auctions for its own account either as a bidder or a seller, ***and routinely does so in the auction rate securities market in its sole discretion***.  *Id.* (emphasis added).

- Citigroup may ***routinely*** place one or more bids in an auction for its own account to acquire ARS for its inventory.  *Id.* (emphasis added).

- There may not always be enough bidders to prevent an auction from failing in the absence of Citigroup bidding in the auction for its own account.  Therefore, failed auctions are possible, especially if the issuer's credit were to deteriorate, if a market disruption were to occur or if, for any reason, Citigroup were unable or unwilling to bid.  *Id.*

- Citigroup is not obligated to make a market in the ARS, and may discontinue trading in the ARS without notice for any reason at any time.  *Id.*

*Second*, plaintiffs fail to plead a legal duty to disclose the amount of Citigroup's ARS holdings.  Disclosure is not required simply because the information may be of interest to an investor.  *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993).  Plaintiffs' reliance on SFAS No. 107 and Statement of Position ("SOP") No. 94-6 as sources for a duty to disclose is misplaced.  (¶¶ 267–69.)  As discussed above, neither SFAS No. 107 nor SOP No. 94-6 require companies to disaggregate their financial statements and disclose individual line-item exposures.  *See supra* Section II.A.4.  In any event, plaintiffs fail to allege that any risk associated with Citigroup's ARS holdings was material during the time period in question.

Plaintiffs' allegation that Citigroup was required to disclose that its ARS holdings were "illiquid and severely impaired" is particularly flawed because, during the time in question, the securities were neither illiquid nor severely impaired.  As plaintiffs concede, the ARS market

did not begin losing liquidity until February of 2008.  (¶ 243.)[26]  At the time that Citigroup

issued its third quarter 2007 Form 10-Q on November 5, 2007 (Ex. 15), not a single auction

conducted by Citigroup had ever failed—and plaintiffs do not allege otherwise.  Moreover, on

February 22, 2008, when the 2007 Form 10-K was filed (Ex. 20), it had only been a matter of

weeks since auctions had begun to fail, so labeling assets "severely impaired" would have been

premature.  Even so, Citigroup drew investors' attention to potential problems with the ARS

market, acknowledging that the downturn in the market at large "negatively affect[s] a wide

range of products, including auction rate securities."  (*Id.*)

### 3.      Plaintiffs Fail to Allege Any Actionable Misstatements Regarding ARS

Plaintiffs fail to identify *any* misstatement about ARS in Citigroup's disclosures,

much less a material misstatement.  Plaintiffs simply argue that after disclosing its ARS

holdings, "the Company continued to materially misstate the value of those securities."  (¶ 247.)

As evidence, plaintiffs note that in the Form 10-Q for the second quarter of 2008, Citigroup

announced a $197 million gain in its ARS portfolio (*id.*), while in the third quarter, the company

reached a $7.3 billion dollar settlement with the New York State Attorney General regarding its

role in the ARS market's downturn (*id.*).  Plaintiffs provide no explanation as to why the

settlement renders the prior statement inaccurate.

The two statements that plaintiffs point to are not inconsistent with one another.

The fact that Citigroup entered into a settlement in principle with regulators in August 2008

bears no relationship to the value of the company's own ARS portfolio, or whether or not the

ARS held by Citigroup continued to earn interest prior to the settlement.

---

[26]     Even afterwards, the ARS market retained sufficient liquidity for the company to report a $197 million gain on
its ARS inventory in the second quarter of that year.  (Ex. 24 at 17.)

**E.      Subsequent Market Events Cannot Render Prior Disclosures Inaccurate**

As shown above with respect to each of the four asset classes, the relevant accounting rules clearly contemplated that Citigroup would make business judgments about the market in valuation decisions.  Case law recognizes that the mere fact that adverse events occur later does not establish that the judgments made at the time of the valuations were inaccurate.  *See Coronel*, No. 07 Civ. 1405, 2009 WL 174656, at *13; *Lerner* v. *FNB Rochester Corp.*, 841 F. Supp. 97, 102 (W.D.N.Y. 1993).  The hindsight nature of plaintiffs' attack on these judgments, and the lack of any factual predicate for the proposition that Citigroup was obligated to make additional disclosures, is underscored by the unpredictable nature and pervasiveness of the market crisis.  Until late 2007, market regulators and participants viewed the impact of the subprime mortgage market's decline as limited:

- In March 2007, Federal Reserve Director of Banking Supervision and Regulation Roger T. Cole stated that "***at this time, we are not observing spillover effects from the problems in the subprime market to traditional mortgage portfolios or, more generally, to the safety and soundness of the banking system***."  *Hearing before the United States S. Comm. on Banking, Housing, and Urban Affairs*, 110th Cong. 1 (Mar. 22, 2007) (testimony of Roger T. Cole, Director, Division of Banking Supervision and Regulation, Board of Governors of the Federal Reserve System) (emphasis added).

- In March 2007, Federal Reserve Chairman Ben Bernanke stated that "***the impact on the broader economy and financial markets of the problems in the subprime market seem likely to be contained***."  *Hearing before the J. Economic Comm.*, 110th Cong. 1–2 (Mar. 28, 2007) (testimony of Ben S. Bernanke, Chairman, Fed. Reserve) (emphasis added).

- In May 2007, Federal Reserve Chairman Ben Bernanke stated that "***the effect of the troubles in the subprime sector on the broader housing market will likely be limited***, and we do not expect significant spillovers from the subprime market to the rest of the economy or the financial system."  Ben S. Bernanke, Chairman, Fed. Reserve, Address at the Federal Reserve Bank of Chicago's 43rd Annual Conference on Bank Structure and Competition 6 (May 17, 2007) (emphasis added).

- In July 2007, Treasury Secretary Henry Paulson stated that he believed that ***the housing market correction was "at or near the bottom***" and that ***the***

43

*financial markets remained generally healthy*.  Emily Kaiser, *Paulson Sees U.S. Housing Downturn Near End*, Reuters, July 2, 2007, at 1 (emphasis added).[27]

- In July 2007, Federal Reserve Chairman Ben Bernanke stated that "[o]verall, *the U.S. economy appears likely to expand at a moderate pace over the second half of 2007*, with growth then strengthening a bit in 2008 to a rate close to the economy's underlying trend."  *Hearing before the H. Comm. on Financial Services*, 110th Cong. 2 (July 18, 2007) (testimony of Ben S. Bernanke, Chairman, Fed. Reserve) (emphasis added).

Public documents also make clear that most market participants—including market regulators—did not anticipate the contagion effect of the subprime mortgage dislocations on the broader economy or the ultimate extent of what we now know, in hindsight, to be the beginning of a cataclysmic market collapse.  For example:

- In March 2008, Federal Reserve Vice Chairman Donald Kohn stated:  "I don't know that we fully appreciated all the risks out there. . . .  *I'm not sure anybody did*, to be perfectly honest."  Damian Paletta, *Fed Admits Missteps on Banks*, Wall St. J., Mar. 5, 2008, at A11 (emphasis added).

- In October 2008, Former Chairman of the Federal Reserve Alan Greenspan stated that "*[w]e are in the midst of a once in a century credit tsunami*. . . . The crisis . . . has turned out to be much broader than anything I could have imagined." *The Financial Crisis and the Role of Federal Regulators: Hearing before the H.R. Comm. on Oversight and Government Reform*, 110th Cong. 15 (Oct. 23, 2008) (emphasis added).  "[I]f you go back and ask yourself how in the early years anybody could realistically make judgments as to what was ultimately going to happen to subprime, *I think you are asking more than anybody is capable of judging*."  *Id.* at 101–02 (emphasis added).

- In October 2008, Senior Vice President of the Center for Responsible Lending Eric Stein stated: "[*T*]*he current financial crisis . . . is much broader in scope and more severe than we had foreseen*."  *Credit Markets and the Economic Crisis*: *Hearing before the S. Comm., on Banking, Housing and Urban Affairs*, 110th Cong. 2 (Oct. 16, 2008) (statement of Eric Stein) (emphasis added).

- In November 2008, Treasury Secretary Henry Paulson stated:  "*We have not in our lifetime dealt with a financial crisis of this severity and unpredictability*."  *Hearing before the H. Financial Services Comm.*, 110th Cong. 2 (Nov. 18, 2008) (statement of Henry M. Paulson) (emphasis added).

---

[27]  *See also* Board of Governors of the Federal Reserve System, *Monetary Policy Report to the Congress* (July 18, 2007) ("[Subprime] pressures have been contained"), *available at* http://www.federalreserve.gov/boarddocs /hh/2007/july/fullreport.pdf.

- In November 2008, Former Chairman of the SEC David Ruder stated that "*[o]ne key aspect of the credit crisis was the failure of both market participants and regulators to predict the collapse* of the home loan mortgage market. None of the primary market participants predicted the collapse. The risk management systems of most banks, investment banks, ratings agencies, and credit default swap insurers did not predict the collapse. *Regulators, including the Federal Reserve Board, the Federal Deposit Insurance Corporation, the Department of Treasury, the SEC, and the Commodity Futures Trading Commission did not predict the collapse.*" *Turmoil in the Financial Markets*: *Hearing before the Comm. on H. Oversight and Government Reform*, 110th Cong. 4 (Nov. 13, 2008) (statement of David S. Ruder) (emphasis added).

In particular, the severity and speed of the market downturn and its impact on

super-senior tranches of CDOs, was a surprise to market participants and financial

commentators:

- "The fall in the super senior tranches has been so extreme that '*no stress model in the world would ever have had it*'" (quoting Morgan Stanley's former CFO), which drop "implies defaults in the range of 40–50% on mortgages written in 2005 and 2006, *levels never seen before*." David Wighton, *Morgan Stanley Peers through Looking Glass*, Fin. Times, Nov. 8, 2008 (emphasis added).

- "[U]ntil recently, the *super-senior pieces were thought to be shielded* from the volatility that shook riskier CDOs." Valerie Bauerlein & Carrick Mollenkamp, *Wachovia Write-Downs Deepen–Value of Securities Falls By $1.1 Billion; Feeling Burned*, Wall St. J., Nov. 10, 2007, at A3 (emphasis added).

- "Th[ere] has *never in financial history* been a AAA rated bond that fell so far, so fast." UBS Business Update Call (Dec.11, 2007) (emphasis added).

Citigroup is only one of many financial service companies that reported

unfavorable results in late 2007 and into 2008. Citigroup's peers in the financial industry

suffered losses on a similar or even greater scale:

| WRITE-DOWNS AS OF FOURTH QUARTER 2008[28] | | | |
|---|---|---|---|
| Company | Total Write-Downs (since 1/1/07) ($bn) | Market Cap (as of 1/1/07) ($bn) | Total Write-Downs/ Market Cap (%) |
| Wachovia | 97.9 | 90.0 | 109% |
| Washington Mutual | 45.6 | 42.9 | 106% |
| Merrill Lynch | 55.9 | 820 | 68% |
| UBS | 48.6 | 127.7 | 38% |
| **Citigroup** | **85.4** | **273.7** | **31%** |
| Morgan Stanley | 21.5 | 85.4 | 25% |
| JP Morgan Chase | 29.5 | 167.5 | 18% |
| Bank of America | 40.2 | 239.8 | 17% |
| Credit Suisse | 13.6 | 84.8 | 16% |

Indeed, several financial firms have collapsed under the weight of the market crisis which began in late 2007 and developed into a full-blown economic catastrophe in the late summer of 2008:

- On May 31, 2008, Bear Stearns was acquired by JPMorgan Chase for $10 a share, although its stock traded above $170 a share in 2007.

- On September 15, 2008, after its stock plummeted to less than $1 per share, Lehman Brothers filed for Chapter 11 bankruptcy protection.

- Also on September 15, 2008, after seeing the price of its stock decline from $97.53 per share at the beginning of 2007, Merrill Lynch agreed to be acquired by Bank of America in a $50 billion all-stock transaction.

- On September 25, 2008, Washington Mutual became the largest bank in U.S. history to fail when it was seized by the FDIC; its banking assets were sold to JPMorgan Chase for $1.9 billion.

- In September 2008, Morgan Stanley and Goldman Sachs both transformed themselves into bank holding companies in order to shore up liquidity and long-term capital.

- In September 2008, the Federal Reserve Bank of New York provided American International Group ("AIG") with an $85 billion secured credit facility to ensure it could meet its capital needs and avoid bankruptcy. In November, the Federal Government, through the Troubled Assets Relief Program, purchased $40 billion of newly issued AIG preferred shares so that AIG could pay down that facility.

---

[28]   Sources:  Rodney Yap & Dave Pierson, *Banks' Subprime Market-Related Losses, Top $815 Billion: Table*, Bloomberg.com, Feb. 9, 2009, at 1–2, http://www.bloomberg.com/apps/news?pid=newsarchive &sid=aQBNVIONOiAc; Financial Times Global 500 December 2006, http://media.ft.com/cms/ff835864-a646-11db-937f-0000779e2340,dwp_uuid=95d63dfa-257b-11dc-b338-000b5df10621.pdf.

- In October 2008, Wachovia agreed to merge into Wells Fargo for $15 billion.

- In November 2008, Moody's Investor Service downgraded the credit ratings of leading bond insurers and former AAA-rated companies Ambac Financial Group and MBIA Insurance Corp. to non-investment grade status as a result of their losses from exposure to mortgage risks.

In short, it is plain that Citigroup's (and its competitors') stock price has suffered as a result of the ongoing credit crisis that started in late 2007; not, as plaintiffs claim, from alleged false and misleading disclosures made as early as 2006 under completely different market conditions.  *See, e.g.*, *In re PXRE Group, Ltd., Sec. Litig.*, 06 Civ. 3410 (RJS), 2009 WL 539864, at *31 (S.D.N.Y. Mar. 4, 2009) ("Taken collectively, Plaintiff's factual allegations suggest an industry, and a company, shocked by a unique and devastating catastrophe."); *In re Huntington BancShares, Inc. ERISA Litig.*, 2009 WL 330308, at *8–9 (dismissing "stock drop case[]" where company's financial difficulties were part of the "economic climate in general, which of course includes the subprime lending crisis" and the company's "stock price [had] essentially moved in tandem" with its peer companies); *In re Citigroup Inc. S'holder Derivative Litig.*, 2009 WL 481906, at *23 (dismissing derivative claim where plaintiffs' allegations showed only that defendant's loses "as a result of the recent problems in the United States economy, particularly those in the subprime mortgage market").[29]

## III.
## PLAINTIFFS FAIL TO PLEAD FRAUD WITH PARTICULARITY

Because plaintiffs' claims under Sections 11 and 12(a)(2) sound in fraud, they must be pleaded with particularity under Rule 9(b).  Rule 9(b) requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were

---

[29]   *See also Pittleman* v. *Impac Mortgage Holdings, Inc.*, No. 8:07-cv-00970-AG-MLG, slip op. at 6 (C.D. Cal. Mar. 9, 2009) ("This case is about a company involved in a volatile industry at the onset of a long, destructive economic downturn.").

fraudulent." *Mills* v. *Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993).  In addition, Rule 9(b) "requires plaintiffs to allege facts that give rise to a strong inference of fraudulent intent" "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields* v. *Citytrust Bancorp.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

## A.    Plaintiffs Fail to Plead with Particularity the Falsity of Specific Statements

In order to plead the falsity of specific statements, a plaintiff must allege with particularity "provable facts" to demonstrate that the statement is "both objectively and subjectively false." *In re Salomon Analyst AT&T Litig.*, 350 F. Supp. 2d 455, 465–66 (S.D.N.Y. 2004) (quoting *Bond Opportunity Fund* v. *Unilab Corp.*, 99 Civ. 11074 (JSM), 2003 WL 21058251, at *5 (S.D.N.Y. May 9, 2003)).  "It is not sufficient . . . to allege that an opinion was unreasonable, irrational, excessively optimistic, not borne out by subsequent events, or any other characterization that relies on hindsight or falls short of an identifiable gap between the opinion publicly expressed and the opinion truly held."  350 F. Supp. at 466.

As discussed above, plaintiffs fail to plead facts establishing the falsity of specific statements in the offering materials regarding Citigroup's holdings in CDOs, SIVs, mortgages or auction rate securities. *See supra* Section II.  Having failed to meet the pleading standard of Rule 8(a), the complaint certainly fails to meet the heightened pleading requirements of Rule 9(b).

## B.    Plaintiffs Fail to Plead a Strong Inference of Fraudulent Intent

The complaint also should be dismissed for failure to plead facts that give rise to a strong inference of fraudulent intent. *See In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d at 635 (dismissing Section 11 claims that sounded in fraud for failure to plead fraudulent intent); *Johnson* v. *NYFIX*, *Inc.*, 399 F. Supp. 2d 105, 122 (D. Conn. 2005) (dismissing claims under

48

Section 11 for failure to adequately allege "that defendants knew or were reckless in not knowing that the statements included in the registration statement were false or misleading"). The Supreme Court has held that in determining whether the requirement to plead a strong inference of scienter (for a securities fraud claim under the Exchange Act) has been met, the reviewing court must ask: "when the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs Inc.* v. *Makor Issues & Rights*, *Ltd.*, 127 S. Ct. 2499, 2502–03 (2007). The relative weight of competing inferences also is applicable to Rule 9(b) cases. *See Glidepath Holding B.V.* v. *Spherion Corp.*, 590 F. Supp. 2d 435, 451 n.5 (S.D.N.Y. 2007) (although *Tellabs* involved the "strong inference" requirement of the PSLRA, courts in Rule 9(b) cases can be "guided by the Supreme Court's explanation [in *Tellabs*] of how competing inferences should be weighed in determining whether a particular inference should be considered 'strong'").

Here, plaintiffs fail to allege that defendants had either motive or opportunity to commit fraud, and the complaint includes only a handful of scattered allegations of purported conscious misbehavior or recklessness. These isolated and cursory allegations do not create an inference of fraudulent intent that is as strong as any opposing inference and do not meet the requirements of Rule 9(b). (*See generally* Defs.' Mem. of Law in Supp. of Their Mot. to Dismiss the Am. Consolidated Class Action Compl. at 42–43.)

## 1. Market Information in 2006 and Early 2007 Does Not Support a Strong Inference of Fraudulent Intent

Plaintiffs first attempt to argue that the subprime crisis was widely foreseen in 2006 and early 2007, implicitly suggesting that defendants knew that their subprime assets would collapse in value. (¶¶ 163–65.) But until late 2007, both market participants and regulators believed that the decline in subprime values would be limited. The isolated expressions of

concern from certain articles in the financial press (¶ 163) about the subprime market that plaintiffs cite do not establish that Defendant knew or should have known that a subprime crisis was looming.  *See*, *e.g.*, *In re Huntington BancShares*, *Inc. ERISA Litig.*, 2009 WL 330308, at *8 (rejecting allegations that defendant knew or should have known of "extreme risk[s]" of the subprime market based on publicity in the "financial and popular press" because defendant "cannot be held to a standard that would require [it] to predict the future of the financial markets.").  Citigroup's confidence in the subprime market was in fact widely shared by other financial institutions and federal regulators and the suggestion that the market consensus is evidence of defendants' fraudulent intent should be rejected.

Plaintiffs also allege that Citigroup's "inability to sell the CDOs at par," or "sell more than $28 billion of the 'high grade' and 'mezzanine' CDOs that it originated between 2004 and 2007" shows that it must have known at the time that these securities were not worth their par value.  (¶¶ 190, 293–94.)  However, this allegation fails because Citigroup's decision to retain billions of dollars worth of super-senior tranches of CDOs directly counters the notion that the Company thought those positions were risky.

### 2.     Plaintiffs May Not Plead Fraudulent Intent by Hindsight

Plaintiffs also repeatedly claim that Citigroup's statements were shown to be false, and—by implication—deliberately false, by subsequent events.  Plaintiffs argue, for example, that Citigroup's consolidation of $50 billion of SIV assets on December 13, 2007 was an "admission" that its prior statements that it did not have to consolidate these assets were false. (¶¶ 194, 207–08.).  Plaintiffs argue that Citigroup's plans to create a "super SIV" with other banks shows that Citigroup was planning in advance to consolidate the SIVs.  (¶¶ 201–02, 301.) Plaintiffs also argue that the ARS settlement Citigroup reached with the New York Attorney General in August 2008 was evidence that Citigroup had "materially misstate[d]" the value of its ARS assets earlier that year.  (¶ 247.)  But, for the very reason that subsequent events are not evidence that a statement was false at the time it was made, they also cannot establish that that the speaker knew at the time that the statement was false.

The courts do not permit plaintiffs to plead fraudulent intent by hindsight.  In *In re Citigroup Shareholder Derivative Litigation*, based on the same facts as the present case, the court recently held that failure to prevent losses does not establish that defendants "must have consciously ignored these warning signs."  2009 WL 481906, at *13;[30] *see also In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d at 624, 635 (holding that when pleading fraud under the Securities Exchange Act, "[p]laintiffs need not allege 'the exact date and time' when defendants became aware of information contrary to their statements, but plaintiffs must 'supply some factual basis for the allegation that the defendants knew or should have known that the statements were false at some point during the time period alleged'" and holding that this

---

[30]   While the procedural context of Chancellor Chandler's ruling concerned the defendant director's motion to dismiss for failure to plead demand futility, Chancellor Chandler specifically noted that he was determining whether the plaintiffs had "plead[ed] particularized facts that demonstrate that the directors acted with scienter, *i.e.*, that they had actual or constructive knowledge that their conduct was legally improper."  *Id.* at 28.

reasoning applied equally to claims sounding in fraud under the Securities Act (quoting *Rothman*

v. *Gregor*, 220 F.3d 81, 91 (2d Cir. 2000))); *Shields*, 25 F.3d at 1129 (rejecting claim that bank

executives knew loan portfolio was "precarious" and understated reserves before commercial

real estate market collapsed during late 1980s and holding that "record[ing] statements by

defendants predicting a prosperous future and hold[ing] them up against the backdrop of what

actually transpired" was insufficient to plead "conscious fraudulent behavior or recklessness"

under Rule 9(b).).

### 3.      "Group Pleading" Does Not Satisfy the Requirements of Rule 9(b)

Finally, plaintiffs treat all defendants as a group and make no attempt to plead

facts supporting a strong inference of fraudulent intent with respect to each individual defendant.

This kind of "group pleading" does not satisfy a plaintiff's burden to plead fraudulent intent.  *See*

*Kalin* v. *Xanboo, Inc.*, 526 F. Supp. 2d 392, 400 (S.D.N.Y. 2007) ("[W]hen multiple defendants

are named in an action for fraud or mistake, 'Rule 9(b) requires that plaintiffs specifically state

what each particular defendants did or said, by what means, when, to whom and with what

intent.'" (quoting *Homburger* v. *Venture Minerals, Inc.*, No. 80-7159, 1985 WL 549, at *2

(S.D.N.Y. Apr. 24, 1985))).  Plaintiffs fail to identify specific conduct or knowledge of any of

the twenty seven Individual Defendants to support a claim of conscious misbehavior or

recklessness.  The Individual Defendants held a wide array of jobs within Citigroup; some were

in senior management, some were directors, and some were executives and directors of Citigroup

subsidiaries.  (¶¶ 41–68.)  Yet plaintiffs make no attempt to distinguish among the various

Individual Defendants.

## IV.
## PLAINTIFFS LACK STANDING TO SUE UNDER SECTION 12(A)(2) OR TO ASSERT SECTION 11 CLAIMS WITH RESPECT TO MANY OF THE OFFERINGS.

For the reasons set forth in the Underwriter Defendants' memorandum of law in support of their motion to dismiss the Amended Complaint, which the Citigroup Defendants and the Individual Defendants hereby adopt and incorporate, plaintiffs lack standing to sue under Section 12(a)(2) and lack standing under Section 11 with respect to most of the bond offerings.

## V.
## PLAINTIFFS ARE NOT ENTITLED TO RECOVERY FOR CERTAIN OFFERINGS BECAUSE THEY HAVE NOT PLEADED ANY DAMAGE

For the reasons set forth in the Underwriter Defendants' memorandum of law in support of their motion to dismiss the Amended Complaint, which the Citigroup Defendants and the Individual Defendants hereby adopt and incorporate, plaintiffs are not entitled to recovery for certain offerings because they have not pleaded any damages.

## VI.
## THE CITIGROUP DEFENDANTS ARE NOT STATUTORY SELLERS UNDER SECTION 12(a)(2)

Plaintiffs' Section 12(a)(2) claim also fails because the Citigroup Defendants do not qualify as "statutory sellers" for the purposes of Section 12(a)(2).  In *Pinter* v. *Dahl*, 486 U.S. 622 (1988), the Supreme Court defined "seller" for the purposes of Section 12(a)(1) to be a person who (i) passes title to the plaintiff, or (ii) "successfully solicits the purchase [of securities], motivated at least in part by a desire to serve his own financial interests or those of the securities owner."  *Id.* at 642, 647.  The Second Circuit has applied *Pinter*'s definition of "seller" to claims arising under Section 12(a)(2).  *Capri* v. *Murphy*, 856 F.2d 473, 478 (2d Cir. 1988) (holding that "the language of sections 12(1) and 12(2) is identical in meaning" and concluding that defendants, who had prepared and circulated the relevant prospectus to investors, qualified as "sellers" within the meaning of 12(a)).

With respect to the first prong of *Pinter*, Section 12(a)(2) "imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers." *Pinter*, 486 U.S. at 644 n.21. Here, the complaint does not allege that the Citigroup Defendants sold any securities directly to plaintiffs.

Likewise, with respect to the second prong of *Pinter*, the complaint does not adequately allege that any of the Citigroup Defendants solicited purchases from plaintiffs. *See Steed Fin. LDC* v. *Nomura Sec. Int'l, Inc.*, No. 00-8058, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001) (Buchwald, J.) (holding that plaintiff failed to satisfy the second prong of *Pinter* because it did not allege that defendant directly solicited it to purchase the security in question) (citing *Pinter*, 486 U.S. at 651 n.27, and *Capri*, 856 F.2d at 478–79). Plaintiffs merely resort to blanket assertions that the Citigroup Defendants "were sellers, offerors, and/or solicitors" of the securities at issue, who "directly solicited the purchase of Bond Class Securities by Plaintiffs" and were "motivated at least in part by the desire to serve their own financial interests." (¶¶ 386–87.) Courts routinely have rejected such bald allegations of solicitation. *See Credit Suisse First Boston Corp.* v. *Arm Fin. Group, Inc.*, No. 99-12046, 2001 WL 300733, at *10 (S.D.N.Y. Mar. 28, 2001) (Pauley, J.) (holding that plaintiffs' allegation that defendants "solicited the sale of ARM's preferred stock" was a "bald allegation of solicitation" that, "standing alone, does not suffice for pleading purposes" (internal citations omitted)); *In re Deutsche Telekom AG Sec. Litig.*, 00 Civ. 9475, 2002 WL 244597, at *4–5 (S.D.N.Y. Feb. 20, 2002) (Stein, J.) (dismissing Section 12(a)(2) claim where, *inter alia*, defendant did not sign the registration statement and the complaint contained no factual allegations that defendant "actively solicited" the purchase of securities).

In any event, plaintiffs do not allege that they purchased the securities in question as a *direct result* of solicitation by the Citigroup Defendants.  *See Steed Fin. LDC*, 2001 WL 1111508, at *7 (dismissing Section 12 claim where the complaint failed to allege that "plaintiff purchased the securities as a result of [defendant's] solicitation").

## VII.
## PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 15

Plaintiffs also assert claims against Citigroup and the Individual Defendants under Section 15 of the Securities Act on the ground that Citigroup controlled the Citigroup Defendants, Citigroup Global Markets Inc. ("CGMI") and Citigroup Global Markets Limited ("CGML"), and that the Individual Defendants controlled Citigroup, the other Citigroup Defendants, CGMI and CGML.  (¶¶ 406, 412.)

Because plaintiffs have not properly pleaded a primary violation of the securities laws, the control person claims under Section 15 should be dismissed.  *SEC* v. *First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996) ("In order to establish a prima facie case of controlling-person liability, a plaintiff must show a primary violation by the controlled person.").

Even if there were an underlying violation of the Securities Act, dismissal would be appropriate because plaintiffs have failed to allege adequately that Citigroup and the Individual Defendants had actual control of the purported primary violators.  *See In re Refco*, 503 F. Supp. 2d at 637 ("To prevail on a § 15 claim, a plaintiff is required to prove actual control, not merely control person status." (internal citation omitted)).  The complaint is devoid of any allegation that Citigroup or the Individual Defendants in fact had the power to direct or influence the allegedly controlled persons, or how that control was exercised.  *See Wallace* v. *Buttar*, 239 F. Supp. 2d 388, 396 (S.D.N.Y. 2003), *rev'd on other grounds*, 378 F.3d 182 (2d Cir. 2004) ("[T]he rule [is] that an alleged control person must actually possess, in fact rather than

theory, the ability to direct the actions of the controlled person."); *Ellison* v. *Am. Image Motor Co.*, *Inc.*, 36 F. Supp. 2d 628, 642 (S.D.N.Y. 1999); *Sloan Overseas Fund*, *Ltd.* v. *Sapiens Int'l Corp.*, 941 F. Supp. 1369, 1378 (S.D.N.Y. 1996).

   In particular, the mere existence of a parent/subsidiary relationship does not support the allegation that defendants had the power to "direct or cause the direction of the management or policies of the defendant subsidiaries." *In re WorldCom*, *Inc. Sec. Litig.*, No. 02-3288, 2004 WL 1097786, at *3 (S.D.N.Y. May 18, 2004); *see In re Deutsche Telekom AG Sec. Litig.*, 2002 WL 244597, at *5–6. Similarly, it is well settled in this district that "status as an officer, director, or shareholder, absent more, is not enough to trigger control person liability." *LXR Biotech.*, *Inc.* v. *Intelligent Surgical Lasers*, 928 F. Supp. 1301, 1315 (S.D.N.Y. 1996) (internal citation omitted); *see also Wallace*, 239 F. Supp. 2d at 396 ("[T]he power to direct the management and policies of a person must be a real, *de facto* power and not just *de jure*: Officer or director status alone does not constitute control." (internal citation omitted)); *Food & Allied Serv. Trades Dep't*, *AFL-CIO* v. *Millfeld Trading Co.*, *Inc.*, 841 F. Supp. 1386, 1391 (S.D.N.Y. 1994) ("While courts in this circuit have not always agreed on just how much beyond status as a director must be alleged to plead a Section 20(a) claim … they have agreed that a bare allegation of director status, without more, is insufficient.").

## VIII.
## CERTAIN CLAIMS ARE TIME BARRED

   For the reasons set forth in the Underwriter Defendants' memorandum of law in support of their motion to dismiss the Amended Complaint, which the Citigroup Defendants and the Individual Defendants hereby adopt and incorporate, certain of plaintiffs' Securities Act claims are time barred under the one-year statute of limitations and should be dismissed.

## IX.
## PLAINTIFFS IMPROPERLY ASSERT SECTION 11
## CLAIMS AGAINST CERTAIN INDIVIDUAL DEFENDANTS

Only certain persons can be held liable under Section 11. 15 U.S.C. § 77k.

Under Section 11(a)(1) of the Securities Act, "every person who signed [a] registration

statement" can be sued for misrepresentations or material omissions in the statement. 15 U.S.C.

§ 77k(a)(1). Under Section 11(a)(2), any director of an issuer can be sued for material

misstatements or omissions contained in a part of a registration statement "when such part

became effective." 15 U.S.C. § 77k(a)(2).

Dismissal is appropriate for Section 11 claims brought against defendants who do

not fit the statutory definition. *See In re Refco, Inc. Sec. Litig.*, No. 05 Civ. 8626, 2008 WL

3843343, at *2-5 (S.D.N.Y. Aug. 14, 2008) (dismissing Section 11 claim against defendant

banks where plaintiffs failed to allege facts showing that defendants were within the statutory

definition); *In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*, No. 03-1529, 2007 WL

2615928, at *8–9, *12 (S.D.N.Y. Sept. 10, 2007) (same); *In re Flag Telecom Holdings*, 352 F.

Supp. 2d at 447 (same); *Dorchester Investors* v. *Peak Int'l Ltd.*, 134 F. Supp. 2d 569, 574–76

(S.D.N.Y. 2001) (same).

While plaintiffs concede that not all of the Citigroup Defendants and the

Individual Defendants face liability with respect to each offering (¶¶ 309, 355, 364, *see also*

¶¶ 41–68), their claims remain overly broad with respect to certain Individual Defendants.

### A.      Individual Defendants Jordan, Kleinfeld, Mecum, and Prince

Individual Defendants Jordan, Kleinfeld, Mecum, and Prince ceased to be

Citigroup directors in 2007. (¶¶ 52–53, 56, 60.) They therefore cannot be held liable under

Section 11(a)(2) for any offerings issued after the dates that they resigned, and the only basis for

their liability after these dates is Section 11(a)(1). Moreover, even though Jordan, Kleinfeld,

Mecum, and Prince signed the March 2, 2006, March 10, 2006, and June 20, 2006 Shelf

Registration Statements, they are not liable under Section 11(a)(1) for all the offerings issued

pursuant to these statements.

      In the case of Shelf Registration Statements, certain parts of the registration

statement are incorporated by reference from annual Form 10-Ks, filed by the registrant after the

registration statement is initially declared effective.  As a result and in accordance with Rule 412

under the Securities Act, each time an issuer files a new Form 10-K the registration statement is

deemed to be updated and the old Form 10-K is superseded by the more recent incorporated

report.  17 C.F.R. § 230.412; *see also* Securities Act Release No. 33-6335 (acknowledging that

"the effective date" of a document incorporated by reference into a registration statement is the

date of such document's filing).  "Information in such documents cannot be evaluated, for

purposes of Section 11(a), as of a time earlier than their initial filing."  (*Id.*)

      Therefore, a director who resigns from an issuer with an effective Shelf

Registration Statement cannot be subject to liability under Section 11(a)(1) for parts of a Shelf

Registration Statement that have been updated by Form 10-Ks filed after the date of his or her

resignation.  This approach is consistent with the undertakings that an issuer is required to

include in a Shelf Registration Statement pursuant to Item 512 of Regulation S-K.  Item 512

requires an issuer to acknowledge that  each filing of an issuer's Form 10-K that is incorporated

by reference into a registration statement is be deemed to be a new registration statement for

purposes of determining liability under the Securities Act and commencement of the statute of

limitations period for Securities Act liability.

      Citigroup's 2007 10-K was filed on February 22, 2008, and lists all of the

directors as of that time.  (Ex. 20 at 205.)  Because it is clear from the 10-K that Jordan,

Kleinfeld, Mecum, and Prince were not Citigroup directors at this time, the underlying registration statement was effectively amended to exclude them, at least as to all of the offerings in the complaint that postdate February 22, 2008.  Therefore, despite plaintiffs' assertions in the complaint, these defendants cannot be held liable under Section 11(a)(1) for any offering made after February 22, 2008 pursuant to the March 2, 2006, March 10, 2006, and June 20, 2006 Shelf Registration Statements.  Given that Jordan, Kleinfeld, Mecum, and Prince are not liable under Section 11(a)(2) for any offerings issued later than the dates that they resigned from the Citigroup board, they are not liable for any offerings made after February 22, 2008.

**B.      Individual Defendants Bischoff, Pandit, and Ryan**

As noted above, proper defendants under Section 11 include those who signed a registration statement and those who were directors of the issuer at the time that it was filed.  As plaintiffs do not allege that Individual Defendants Bischoff, Pandit, and Ryan signed the March 2, 2006, March 10, 2006 or June 20, 2006  Shelf Registration Statements, they cannot be held liable under Section 11(a)(1) in relation to any of the offerings in the complaint.  The only basis for holding Pandit, Bischoff or Ryan liable under Section 11 is pursuant to Section 11(a)(2), which creates liability for "every person who was a director of … the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted." Plaintiffs allege that Bischoff, Pandit, and Ryan have all been Citigroup Board Members since 2007, midway through the class period.  Although plaintiffs note that these defendants cannot be held liable for offerings issued before they became Citigroup directors (¶¶ 43, 58, 65), Bischoff, Pandit, and Ryan cannot be held liable with respect to any offering in the complaint issued after they became Citigroup directors because they are not alleged to be directors of Citigroup Funding or trustees of any of the Citigroup Trusts.  (¶¶ 43, 58, 65.)  Section 11(a)(2) provides for

59

liability only for directors *of the issuer*, and by plaintiffs' own admission Citigroup Funding and

the Citigroup Trusts served as the sole issuer of a number of offerings.  (¶ 309.)

**X.**

**CONCLUSION**

For the reasons set forth above, the Citigroup Defendants and the Individual

Defendants respectfully request that the Court dismiss the complaint in its entirety and with

prejudice.

Dated: New York, New York
      March 13, 2009

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON &
 GARRISON LLP

            /s/  Richard A. Rosen
Brad S. Karp  (bkarp@paulweiss.com)
Richard A. Rosen  (rrosen@paulweiss.com)
Susanna M. Buergel  (sbuergel@paulweiss.com)
Karen R. King  (kking@paulweiss.com)

1285 Avenue of the Americas
New York, New York  10019-6064
Tel.  (212) 373-3000

*Attorneys for Defendants Citigroup Inc., Citigroup
Funding Inc., Citigroup Capital XIV, Citigroup Capital
XV, Citigroup Capital XVI, Citigroup Capital XVII,
Citigroup Capital XVIII, Citigroup Capital XIX,
Citigroup Capital XX, Citigroup Capital XXI, C.
Michael Armstrong, Alain J.P. Belda, Sir Winfried
Bischoff, Michael Conway, Gary Crittenden, George
David, Kenneth T. Derr, John M. Deutch, Scott
Freidenrich, James Garnett, John C. Gerspach, Ann
Dibble Jordan, Klaus Kleinfeld, Sallie L. Krawcheck,
Andrew N. Liveris, Dudley C. Mecum, Ann Mulcahy,
Vikram Pandit, Richard D. Parsons, Charles Prince,
Roberto Hernández Ramírez, Judith Rodin, Saul Rosen,
Robert E. Rubin, Robert L. Ryan, Franklin A. Thomas,
Eric L. Wentzel and David Winkler*

60
