**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: CITIGROUP INC. BOND LITIGATION | Master File No. 08 Civ. 9522 (SHS) |
| | ECF Case |

**BOND PLAINTIFFS' OPPOSITION TO**
**DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT**

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
Steven B. Singer
Mark Lebovitch
Kurt Hunciker
John Rizio-Hamilton
1285 Avenue of the Americas
New York, New York 10019
Tel: (212) 554-1400
Fax: (212) 554-1444

*Attorneys for Bond Plaintiffs and*
*Court-Appointed Bond Counsel*

Additional counsel listed on signature
block

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

I.      PRELIMINARY STATEMENT ................................................................. 1

II.     FACTS ......................................................................................................... 8

      A.   Citigroup Failed To Disclose And Accurately Account For Over $66 Billion Of
           Subprime Mortgage-Backed CDOs ................................................................. 8

           1.   Overview of Citigroup's CDO Business and Early Signs of the Housing Crisis ... 8

           2.   The Public Offering Materials Failed to Disclose Citigroup's CDO Exposure .... 10

           3.   Throughout 2008, Citigroup Misstated the Value of Its CDO Securities
               and Their Impact on Its Financial Condition ......................................... 13

      B.   Citigroup Failed To Accurately Disclose And Account For Its Exposure To $100
           Billion Of SIVs ................................................................................................. 14

           1.   Overview of Citigroup's SIV Operations and Citigroup's Failure to Report the
               Nature of Its SIV Exposures ................................................................... 14

           2.   Citigroup Stuns Investors by Belatedly Admitting Its Obligation to Consolidate
               Its SIVs and Absorb Their Losses ......................................................... 16

           3.   Throughout 2008, Citigroup Misstated the Value of Its SIV Assets .................... 17

      C.   Citigroup's Loss Reserves Were Materially Understated In The Public Offering
           Materials ............................................................................................................. 19

      D.   Citigroup Failed To Disclose And Accurately Account For $11 Billion Of ARS ....... 21

      E.   Citigroup Reveals That Its Mortgage-Linked Assets Were So Impaired That The
           Company Required An Unprecedented $326 Billion Bailout ...................................... 23

III.    ARGUMENT ............................................................................................... 25

      A.   Standards Applicable To The Motions To Dismiss ..................................... 25

           1.   Rule 8(a) Governs Bond Plaintiffs' Claims ............................................. 26

           2.   The "Sounds in Fraud" Doctrine Does Not Graft a Scienter Requirement Onto
               Sections 11 and 12(a)(2) ......................................................................... 32

           3.   Even If Rule 9(b) Applies, the Complaint Satisfies It .......................................... 33

B.  The Downturn In The Economy Does Not Insulate Defendants From Liability As A Matter Of Law .................................................................................... 35

C.  The Complaint Pleads Untrue Statements And Omissions Regarding Citigroup's Direct Exposure To Subprime-Backed CDOs .................................................. 39

    1.  The Public Offering Materials Failed to Disclose Citigroup's CDO Exposure .... 39

    2.  Citigroup Failed to Properly Account for Its CDO Exposure ............................... 47

    3.  The Complaint Adequately Alleges that Citigroup Violated FIN 46(R) by Failing to Consolidate Its Commercial Paper CDOs ....................................... 50

D.  The Public Offering Materials Contained Actionable Misstatements And Omissions Regarding Citigroup's SIVs ................................................................. 51

E.  Citigroup Misstated Its Loss Reserves ...................................................... 55

F.  The Complaint Alleges Materially False Statements And Omissions Regarding ARS .......................................................................................... 57

G.  The Complaint Pleads Specific False Statements And Omissions Rather Than General Mismanagement ............................................................................. 59

H.  Citigroup's Boilerplate Risk Disclosures Do Not Render Its Misstatements And Omissions Immaterial ................................................................................... 61

I.  The Challenges To Bond Plaintiffs' Standing Are Meritless And Premature ............. 63

J.  Claims Based On The May 25, 2007 And June 28, 2007 Offerings Are Timely ........ 65

K.  The Citigroup Defendants Are Statutory "Sellers" For Purposes Of Section 12(a)(2) ........................................................................................... 67

L.  Section 11 Claims Are Properly Alleged Against The Seven Objecting Directors ..... 69

M.  The Complaint Adequately Alleges Claims for Control Person Liability Under Section 15 ......................................................................................... 70

IV.  CONCLUSION ...................................................................................... 73

# TABLE OF AUTHORITIES

Page(s)

CASES

*In re Adams Golf, Inc. Sec. Litig.,*
381 F.3d 267 (3d Cir. 2004).................................................26

*Alpern v. UtiliCorp United, Inc.,*
84 F.3d 1525 (8th Cir. 1996) ................................................66

*In re Am. Bank Note Holographics Secs. Litig.,*
93 F. Supp. 2d 424 (S.D.N.Y. 2000).............................................68

*In re APAC Teleservices, Inc. Sec. Litig.,*
No. 97-9145, 1999 U.S. Dist. LEXIS 17908 (S.D.N.Y. 1999)................................68

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,*
324 F. Supp. 2d 474 (S.D.N.Y. 2004)...................................28, 31, 60

*Atlas v. Accredited Home Lenders Holding Co.,*
556 F. Supp. 2d 1142 (S.D. Cal. 2008)........................................ *passim*

*ATSI Commc'n., Inc. v. Shaar Fund, Ltd.,*
493 F.3d 87 (2d Cir. 2007)..............................................25, 26

*In re AXIS Capital Holdings Ltd. Sec. Litig.,*
456 F. Supp. 2d 576 (S.D.N.Y. 2006)........................................30, 52

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)....................................................26

*In re BellSouth Corp. Sec. Litig.,*
355 F. Supp. 2d 1350 (N.D. Ga. 2005) .........................................33

*Boykin v. Keycorp,*
521 F.3d 202 (2d Cir. 2008)...............................................26

*In re Burlington Coat Factory,*
114 F.3d 1410 (3d Cir. 1997)..............................................49

*Burstyn v. Worldwide Xceed Group, Inc.,*
No. 01-1125, 2002 WL 31191741 (S.D.N.Y. Sep. 30, 2002)................................37

*Caiola v. Citibank, N.A.,*
295 F.3d 312 (2d Cir. 2002).........................................7, 43, 52, 58

*Ciresi v. Citicorp,*
782 F. Supp. 2d 819 (S.D.N.Y. 1991).........................................57

*In re CIT Group, Inc.*,
    349 F. Supp. 2d 685 (S.D.N.Y. 2004)............................................................32, 57

*In re Citigroup Inc. S'holder Deriv. Litig.*,
    964 A.2d 106 (2009).............................................................................................60

*In re Corning Sec. Litig.*,
    No. 01-6580, 2004 WL 1056063 (W.D.N.Y. Apr. 9, 2004)...............................30

*Coronel v. Quanta Capital Holdings, Ltd.*,
    No. 07-1405, 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) .........................30, 32, 39

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ..............................................5, 37, 62, 63

*Cozzarelli v. Inspire Pharms. Inc.*,
    549 F.3d 618 (4th Cir. 2008) ..............................................................................30

*Craftmatic Sec. Litig. v. Kraftsow*,
    890 F.2d 628 (3d Cir. 1989)................................................................................61

*Credit Suisse First Boston Corp. v. Arm Fin. Group*,
    No. 99-12046, 2001 U.S. Dist. LEXIS 3332 (S.D.N.Y. Mar. 28, 2001)................69

*In re DDi Corp. Sec. Litig.*,
    No. 03-7063, 2005 WL 3090882 (C.D. Cal. 2005) .............................................63

*Degulis v. LXR Biotechnology*,
    No. 95-4204, 1997 U.S. Dist. LEXIS 381 (S.D.N.Y. Jan. 21, 1997) ....................66

*Degulis v. LXR Biotechnology*,
    928 F. Supp. 2d 1301 (S.D.N.Y. 1996).............................................................72

*DeMarco v. Lehman Bros., Inc.*,
    309 F. Supp. 2d 631 (S.D.N.Y. 2004).................................................................40

*DeMarco v. Robertson Stephens Inc.*,
    318 F. Supp. 2d 110 (S.D.N.Y. 2004).................................................................40

*DeMaria v. Andersen*,
    318 F.3d 170 (2d Cir. 2003)...................................................................... *passim*

*In re Deutsche Telekom AG Sec. Litig.*,
    No. 00-9475, 2002 WL 244597 (S.D.N.Y. Feb. 20, 2002)...............................69, 72

*Dietrich v. Bauer*,
    76 F. Supp. 2d 312 (S.D.N.Y. 1999)...................................................................71

*Dorchester Investors v. Peak Trends Trust*,
No. 99-4696, 2003 U.S. Dist. LEXIS 1446 (S.D.N.Y. Feb. 3, 2003)......................................68

*In re DoubleClick Privacy Litig.*,
154 F. Supp. 2d 497 (S.D.N.Y. 2001)....................................................................................26

*In re Dreyfus Aggressive Growth Mutual Fund Litig.*,
No. 98-4318, 2000 WL 1357509 (S.D.N.Y. Sept. 20, 2000) ............................................7, 63

*In re Dynergy, Inc.*,
339 F. Supp. 2d 804 (S.D. Tex. 2004) ...................................................................................66

*In re Dynex Inc. Sec. Litig.*,
No. 05-1897, 2006 WL 314524, *vacated in part on other grounds*,
531 F.3d 190 (2d Cir. 2008)...........................................................................................55, 56

*In re Friedman's, Inc. Sec. Litig.*,
385 F. Supp. 2d 1345 (N.D. Ga. 2005) ..................................................................................63

*Food & Allied Servs. Trades Dep't v. Millfeld Trading Co.*,
841 F. Supp. 1386 (S.D.N.Y. 1993)......................................................................................72

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000)................................................................................... *passim*

*Garber v. Legg Mason, Inc.*,
537 F. Supp. 2d 597 (S.D.N.Y. 2008) ...................................................................................29

*In re Global Crossing, Ltd. Secs. Litig.*,
322 F. Supp. 2d 319 (S.D.N.Y. 2004)..............................................................................49, 54

*In re Globalstar Sec. Litig.*,
No. 01-1748, 2003 WL 22953163 (S.D.N.Y. Dec. 15, 2003) ....................................... *passim*

*Hall v. Children's Place Retail Stores, Inc.*,
580 F. Supp. 2d 212 (S.D.N.Y. 2008)....................................................................................40

*Hall v. The Children's Place Retail Stores, Inc.*,
No. 07-8252, 2008 WL 2791526 (S.D.N.Y. July 18, 2008)....................................................43

*Harrison v. Rubenstein*,
No. 02-9356, 2007 WL 582955 (S.D.N.Y. Feb. 26, 2007)....................................................61

*Heller v. Goldin Restructuring Fund, L.P.*,
590 F. Supp. 2d 603 (S.D.N.Y. 2008)....................................................................................62

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983)..............................................................................................4, 26, 36

*Hicks v. Morgan Stanley & Co.*,
   No. 01-10071, 2003 U.S. Dist. LEXIS 11972 (S.D.N.Y. July 16, 2003) .............................64

*Hinerfeld v. United Auto Group*,
   No. 97-3533, 1998 WL 397852 (S.D.N.Y. July 15, 1998).....................................................57

*Holmes v. Baker*,
   166 F. Supp. 2d 1362 (S.D. Fla. 2001) ................................................................................48

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*,
   159 F.3d 723 (2d Cir. 1998)................................................................................................61

*In re Huntington BancShares, Inc. ERISA Litig.*,
   No. 08-0165, 2009 WL 330308 (S.D. Ohio Feb. 9, 2009) ....................................................39

*In re Indep. Energy Holdings PLC Sec. Litig.*,
   154 F. Supp. 2d 741 (S.D.N.Y. 2001)............................................................................36, 60

*In re Initial Pub. Offering Sec. Litig.*,
   358 F. Supp. 2d 189 (S.D.N.Y. 2004)...................................................................................46

*In re Initial Pub. Offering Sec. Litig.*,
   544 F. Supp. 2d 277 (S.D.N.Y. 2008) .............................................................................29, 56

*In re Initial Pub. Offering Sec. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003)...............................................................................32, 35

*In re JDS Uniphase Corp. Sec. Litig.*,
   No. 02-1486, 2005 U.S. Dist. LEXIS 20831 (N.D. Cal. Jan. 6, 2005)...................................48

*In re JPMorgan Chase Sec. Litig.*,
   363 F. Supp. 2d 595 (S.D.N.Y. 2005).......................................................................26, 29, 32

*In re Juniper Networks, Inc. Sec. Litig.*,
   542 F. Supp. 2d 1037 (N.D. Cal. 2008) .........................................................................62, 63

*Kramer v. Time Warner, Inc.*,
   937 F.2d 767 (2d Cir. 1991)...............................................................................................36

*Ladmen Partners, Inc. v. Globalstar, Inc.*,
   No. 07-0976, 2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008) .................................................30

*Lapin v. Goldman Sachs Group, Inc.*,
   506 F. Supp. 2d 221 (S.D.N.Y. 2006)......................................................................40, 42, 51

*LC Capital Partners, LP v. Frontier Ins. Group, Inc.*,
   318 F.3d 148 (2d Cir. 2003)...............................................................................................65

*Lentell v. Merrill Lynch & Co.*, Inc.,
    396 F.3d 161 (2d Cir. 2005)..................................................................65

*Lerner v. FNB Rochester Corp.*,
    841 F. Supp. 97, 102 (W.D.N.Y. 1993) ............................................39, 61

*Levine v. AtriCure, Inc.*,
    508 F. Supp. 2d 268 (S.D.N.Y. 2007).................................................63

*Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*,
    238 F.3d 363 (5th Cir. 2001) .............................................................66

*Louisiana Municipal Police Employees' Retirement Sys. v. Merrill Lynch & Co.*,
    No. 08-9063, (S.D.N.Y. Feb. 19, 2009)..........................................29, 32

*Maywalt v. Parker & Parsley Petroleum Co.*,
    147 F.R.D. 51 (S.D.N.Y. 1993) ..........................................................63

*In re Merck & Co., Inc. Sec. Derivative & ERISA Litig.*,
    543 F.3d 150 (3d Cir. 2008)................................................................65

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    289 F. Supp. 2d 416 (S.D.N.Y. 2003).................................................36

*In re Merrill Lynch & Co. Sec., Deriv., & ERISA Litig*,
    No. 07-9633 (S.D.N.Y. Mar. 3, 2009) ................................................29

*Miller v. Lazard, Ltd.*,
    473 F. Supp. 2d 571 (S.D.N.Y. 2007)..................................................58

*Nanopierce Techs., Inc. v. Southridge Capital Mgmt.*,
    No. 02-0767, 2008 WL 250553 (S.D.N.Y. Jan. 29, 2008) ..........................43, 53, 58

*Nappier v. Pricewaterhouse Coopers, LLP*,
    227 F. Supp. 2d 263 (D.N.J. 2002) .....................................................50

*In re Nat'l Golf Properties Inc. Sec. Litig.*,
    No. 02-1383, 2003 WL 23018761 (C.D. Cal. Mar. 19, 2003)...............................33

*In re New Century*,
    588 F. Supp. 2d 1206 (C.D. Cal.. 2008) ............................................. *passim*

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)..........................................................33, 48

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
    98 F.3d 2 (2d Cir. 1996).....................................................................61

*In re OPUS360 Corp. Sec. Litig.*,
   No. 01-2938, 2002 U.S. Dist. LEXIS 18558 (S.D.N.Y. Sept. 30, 2002)...............................68

*Panther Partners, Inc. v. Ikanos Commc'n, Inc.*,
   538 F. Supp. 2d 662 (S.D.N.Y. 2008).........................................................................47

*Pittleman v. Impac Mortgage Holdings, Inc.*,
   No. 07-0970, 2009 WL 648983 (C.D. Cal. Mar. 9, 2009)......................................39

*In re PMA Capital Corp. Sec. Litig.*,
   No. 03-6121, 2005 WL 1806503 (E.D. Pa. July 27, 2005) ....................................63

*In re Prestige Brands Holding, Inc.*,
   No. 05-06924, 2006 U.S. Dist. LEXIS 46667 (S.D.N.Y. July 10, 2006) .............29

*In re PXRE Group, Ltd., Sec. Litig.*,
   No. 06-3410, 2009 WL 539864 (S.D.N.Y Mar. 4, 2009) ......................................39

*In re RAIT Fin. Trust Sec. Litig.*,
   No. 07-03148, 2008 WL 5378164 (E.D. Pa. Dec. 22, 2008)........................... *passim*

*In re Refco, Inc. Sec. Litig,* 503 F. Supp. 2d 611 (S.D.N.Y. 2007)...................... *passim*

*In re Reliance Sec. Litig.*,
   91 F. Supp. 2d 706 (D. Del. 2000).............................................................................55

*Rinehart v. Lehman Bros. Holdings, Inc.*,
   No. 08-5598 (S.D.N.Y. Jan. 8, 2009) ........................................................................28

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004).............................................................................. *passim*

*Rubke v. Capitol Bancorp Ltd.*,
   551 F.3d 1156 (9th Cir. 2009) ....................................................................................30

*Schnall v. Annuity and Life Re (Holdings), Ltd.*,
   No. 02-2133, 2004 WL 367644 (D. Conn Feb. 22, 2004).................................37, 56

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001).........................................................................................35

*In re Scottish Re. Group Sec. Litig.*,
   524 F. Supp. 2d 370 (S.D.N.Y. 2007)................................................................ *passim*

*SEC v. Caserta*,
   75 F. Supp. 2d 79 (E.D.N.Y. 1999) ...........................................................................56

*SEC v. Keating*,
   No. 91-6785, 1992 WL 207918 (C.D. Cal. July 23, 1992)........................................61

*SEC v. Simpson Capital Mgmt, Inc.*,
    586 F. Supp. 2d 196 (S.D.N.Y. 2008).................................................................................25

*Shaw v. Digital Equip. Corp.*,
    82 F.3d 1194 (1st Cir. 1996).................................................................................31, 53, 57

*Staehr v. Hartford Fin. Servs. Group Inc.*,
    547 F.3d 406 (2d Cir. 2008).................................................................................25, 36

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*,
    No. 00-8058, 2001 U.S. Dist. LEXIS 14761 (Sept. 20, 2001) .............................................69

*In re StockerYale Sec. Litig.*,
    453 F. Supp. 2d 345 (D.N.H. 2006).................................................................................37

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006).................................................................................31, 33

*In re SureBeam Corp. Sec. Litig.*,
    No. 03-1721, 2005 WL 5036360 (S.D. Cal. Jan. 3, 2005) ....................................................60

*Tedesco v. Mishkin*,
    689 F. Supp. 1327 (S.D.N.Y. 1988).................................................................................63

*In Re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*,
    202 F. Supp. 2d 8 (S.D.N.Y. 2001).................................................................................47

*In re U.S.A. Classic Sec. Litig.*,
    No. 93-6667, 1995 U.S. Dist. LEXIS 8327 (S.D.N.Y. June 16, 1995) ...................................68

*In re VEECO Instr., Inc. Sec. Litig.*,
    235 F.R.D. 220 (S.D.N.Y. 2006) .................................................................................62

*In re Vivendi Universal, S.A. Sec. Litig.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003).......................................................................... *passim*

*Wallace v. Buttar*,
    239 F. Supp. 2d 388 (S.D.N.Y. 2003), *rev'd on other grounds*,
    378 F.3d 192 (2d Cir. 2004).................................................................................72

*White v. Heartland High-Yield Mun. Bond Fund*,
    237 F. Supp. 2d 982 (E.D. Wis. 2002).................................................................................48

*Wolf v. Frank*,
    477 F.2d 467 (5th Cir. 1973) .................................................................................61

*In re World Access, Inc. Sec. Litig.*,
    119 F. Supp. 2d 1348 (N.D. Ga. 2000).................................................................................61

*In re WorldCom, Inc. Sec. Litig.*,
   294 F. Supp. 2d 392 (S.D.N.Y. 2003)......................................................................62

*In re WorldCom, Inc. Sec. Litig.*,
   352 F. Supp. 2d 472 (S.D.N.Y. 2005).............................................................. *passim*

*In re WorldCom, Inc. Sec. Litig.*,
   No. 02-3288, 2004 WL 1435356 (S.D.N.Y. June 28, 2004) ...................................26

*In re WorldCom, Inc. Sec. Litig.*,
   No. 02-3288, 2004 WL 1097786 (S.D.N.Y. May 18, 2004) ...................................72

*In re WorldCom, Inc. Sec. Litig.*,
   No. 02-3288, 2005 U.S. Dist. LEXIS 4193 (S.D.N.Y. Mar. 21, 2005) ...................70

*In re Worldspace Sec. Litig.*,
   No. 07-2252, 2008 U.S. Dist. LEXIS 56224 (S.D.N.Y. July 21, 2008) ...................29

*In re WRT Energy Sec. Litig.*,
   No. 96-3610, 2005 U.S. Dist. LEXIS 1894 (S.D.N.Y. Feb. 9, 2005)................27, 31

## STATUTES AND RULES

15 U.S.C. § 77k (2009) ................................................................................. *passim*

15 U.S.C. § 77m (2009) .............................................................................................64

15 U.S.C. § 78u-4 (2009) ...........................................................................................32

FED. R. CIV. P. 8(a) (2009)........................................................................... *passim*

FED. R. CIV. P. 9(b) (2009) .......................................................................... *passim*

FED. R. CIV. P. 15(c) (2009).......................................................................................66

## OTHER AUTHORITIES

17 C.F.R. § 210.4-01 (2009) .......................................................................................56

17 C.F.R. § 230.159A (2009) ......................................................................................67

17 C.F.R. § 230.412 (2009).........................................................................................70

# I.    PRELIMINARY STATEMENT

Between May 2006 and August 2008 (the "Offerings Period"), Citigroup (the "Company" or the "Bank") reported purportedly "record" revenues and earnings, driven principally by its surging U.S. mortgage business.  ¶¶311-13.[1]  To fuel this growth, Citigroup conducted no fewer than 49 public Offerings of debt and preferred securities, raising over $71 billion from investors.  ¶1.  Until the end of 2007, the Public Offering Materials issued in connection with these Offerings represented that Citigroup had no direct exposure to, and strictly "limited" involvement with, securities linked to subprime mortgages.  ¶9.  In reality, unbeknownst to investors, Citigroup was exposed to hundreds of billions of dollars worth of toxic mortgage-linked securities.  ¶¶161-73, 193-296.

For example, until November 2007, the Public Offering Materials failed to disclose that Citigroup held $66 billion of direct exposure to collateralized debt obligations ("CDOs") backed by subprime mortgages.  ¶¶165-73, 322.  Significantly, when Citigroup belatedly disclosed this massive liability, Fitch immediately downgraded Citigroup, and securities analysts reacted with astonishment, stating that this exposure "has never been disclosed before;" was "surprisingly large and at risk for sizeable write-downs;" and that they had been "misled" by the Company's prior disclosures.  ¶¶180-83.  Similarly, until December 2007, the Public Offering Materials failed to disclose Citigroup's direct exposure to $100 billion of structured investment vehicles ("SIVs") containing assets backed by highly risky subprime mortgages.  Specifically, the Public Offering Materials represented that Citigroup had only "limited" involvement with its SIVs, and was not required to absorb their losses or consolidate them on its balance sheet.  ¶¶194-206.  In

---

[1] All citations to "¶" are to the Consolidated Amended Class Action Complaint (the "Complaint").  Unless otherwise noted, all capitalized terms have the same meaning as in the Complaint, and all emphases have been added.  References to "Citi Br." are to the Memorandum of Law in Support of Citigroup Defendants' and Individual Defendants' Motion to Dismiss.   References to "UW Br." are to the Memorandum of Law in Support of the Underwriter Defendants' Motion to Dismiss.

reality, however, Citigroup <u>was</u> obligated to absorb the losses of its SIVs and consolidate their toxic assets – facts to which Citigroup ultimately admitted on December 13, 2007.  ¶¶199-205. Once again, financial commentators and analysts reacted with surprise, noting that the disclosure was the "second time unwanted assets have <u>suddenly appeared</u> on the Citigroup balance sheet," and that the consolidation would "further imperil [Citigroup's] fragile capital ratios," and cause the rating agencies "to seriously reassess their ratings" on Citigroup.  ¶¶208-09.

Moreover, the Public Offering Materials materially misstated Citigroup's loss reserves for its $213 billion portfolio of subprime and similarly risky mortgages.  ¶¶218-35.  The Company's loss reserve was important to investors in Citigroup debt and preferred stock because this metric was supposed to reflect the risk of loss in Citigroup's massive mortgage portfolio, and because Citigroup was required to charge any increase in its reserves against its income.  ¶227. Accounting rules required Citigroup to reserve for loans that had defaulted <u>and</u> those whose existing credit risk created a probability of default.  However, in violation of GAAP, Citigroup reported reserves that were <u>lower</u> than the amount of its <u>already-incurred</u> defaults.  ¶¶228-32. Consequently, Citigroup misstated its loss reserves, and overstated its income, by between $1.6 and $7.2 billion each quarter during the Offerings Period.  ¶¶233-35.

Even after Citigroup disclosed certain of its exposures to mortgage-linked securities and consolidated the SIVs on its balance sheet at the end of 2007, the Company misrepresented the value of those "assets" and their impact on its capital adequacy in the Public Offering Materials provided to investors in connection with later Offerings.  For example, on April 28, 2008, Citigroup conducted a $6 billion offering of preferred stock, and represented in those Public Offering Materials that the "fair value" of Citigroup's CDOs was $40 billion.  Those Public Offering Materials also reported that the consolidation of the SIVs had actually "resulted in an

2

increase of assets of $59 billion," and that Citigroup would suffer "little or no" loss due to the SIVs' purportedly "high credit quality."  ¶¶9, 210-11.  Moreover, the Public Offering Materials assured investors that Citigroup was not only "well capitalized," *i.e.*, that it held ample funds to absorb any losses, but that it also possessed capital "sufficient to absorb unexpected market, credit, or operational losses."  ¶9.

These statements were materially false.  On November 17, 2008, Citigroup's CEO, Defendant Vikram Pandit, informed his employees at a Town Hall meeting in New York that Citigroup would stop attempting to value approximately $80 billion worth of assets backed by subprime mortgages.  ¶¶253-54.  Investors in Citigroup debt and preferred stock interpreted this remark for what it was – an admission that if Citigroup reported these assets at their true value, the Bank would not be able to withstand the losses it would be forced to incur and would, in fact, be rendered insolvent.  ¶255.  Two days later, on November 19, 2008, Citigroup confirmed these views, announcing that its SIVs were so impaired that the Bank was not able to find any buyer for these worthless assets, and would have to unwind them at a cost of $17 billion.  ¶¶213-15.

Following these announcements, Citigroup went into a death spiral, as the market realized that Citigroup's mortgage-backed assets were close to worthless and that the Bank was insolvent.  ¶¶255-58.  With Citigroup on the brink of liquidation, on November 23, 2008, the United States Government was forced to agree to the largest corporate bailout in history, guaranteeing more than $300 billion of Citigroup's toxic mortgage-related assets, and injecting the Company with another $20 billion in cash.  ¶259.  As investors in Citigroup debt and preferred stock realized the truth about Citigroup's disastrous financial condition, the price of the Bond Class Securities collapsed, falling more than 50% between November 17 and 21, 2008. ¶¶12, 258.

These allegations unquestionably establish a claim for violations of the Securities Act of 1933 (the "Securities Act").  As the Supreme Court has stated, "a plaintiff … need only show a material misstatement or omission to establish his prima facie case."  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 (1983); *see* 15 U.S.C. § 77k(a).  Thus, a claim is properly stated if, in compliance with the minimal pleading requirements of Rule 8(a), the Complaint alleges a material misstatement or omission.  Scienter is not required.  Indeed, once a complaint pleads the existence of a material misstatement or omission, as the Complaint repeatedly does, "[l]iability against the issuer of a security is <u>virtually absolute, even for innocent misstatements</u>."  *Herman*, 459 U.S. at 381 (emphasis added).

In response to these allegations, Defendants make a series of arguments which ignore the Complaint, cite to materials that the Court cannot consider on this motion, misstate the law, and raise disputed issues of fact that cannot be resolved at this stage.  For example, Defendants contend that the Complaint "sounds in fraud" and is therefore subject to Rule 9(b) rather than Rule 8(a), because it alleges that Citigroup's statements were both "misleading" and highly material, and because there exists a separate complaint, in a separate case, that alleges fraud against Citigroup.  *See* Citi Br. at 10-15.  Indeed, Defendants go so far as to argue that Bond Plaintiffs are required to plead each Defendant's scienter, even though this Complaint asserts only Securities Act claims and scienter is not an element of a Securities Act claim.

These arguments flatly contradict the plain language of Securities Act and the holdings of numerous courts.  The Complaint's allegations of "misleading" statements and omissions mirror the language of the Securities Act itself, and thus, by definition, cannot automatically render the Complaint subject to Rule 9(b).  *See* 15 U.S.C. § 77k (providing liability for a "false" or "misleading" registration statement).  Similarly, since the Securities Act <u>requires</u> that a

misstatement or omission be "material," the fact that Citigroup's omissions were highly material does not automatically trigger the application of Rule 9(b).  Moreover, Defendants' argument that the Complaint sounds in fraud because there exists a separate fraud complaint, in a separate case, is unprecedented.  To Bond Plaintiffs' knowledge, no court has ever held that another plaintiff's fraud allegations, in another case, replace the non-fraud allegations in a separate complaint.

Defendants also ask the Court to conclude, at the pleading stage, that Citigroup was the victim of an economic "Act of God" because it was struck by an "unforeseeable" credit "tsunami," which similarly impacted financial institutions such as AIG, Washington Mutual, and Lehman Brothers.  *See* Citi Br. at 43-47.  These fact-based arguments, which the Court cannot accept at this stage, are irrelevant.  Significantly, Citigroup's ability or inability to foresee the collapse of the housing market is not at issue in this litigation because Bond Plaintiffs are only required to plead the existence of a false statement or misleading omission, which they have done.  Moreover, Defendants' argument contradicts the Complaint's allegations that the risk of subprime-backed CDOs was apparent before the Offerings Period began (¶¶160-65), and invites the Court to make a series of sweeping factual findings about the causes and foreseeability of the housing market's collapse, and its impact on numerous other companies not even mentioned in the Complaint.  Recognizing the impropriety of making such factual findings at this stage, courts have consistently rejected Defendants' argument in denying motions to dismiss subprime-related securities complaints.  *See, e.g.*, *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1173-74 (C.D. Cal. 2008) (holding that "[i]t is not the Court's role to speculate on the causes of the current economic situation," and rejecting defendants' argument that mortgage lender and securitizer suffered losses due to "an 'unprecedented' external 'liquidity crisis'" and "other

macroeconomic arguments").

Defendants also make a series of highly fact-intensive arguments that ignore the allegations of the Complaint and can be swiftly rejected. For example, Defendants claim that the Complaint merely pleads mismanagement. *See* Citi Br. at 1-2, 15-18. However, the Complaint does not allege that Citigroup is liable because it engaged in a failed business strategy that led to enormous exposure to subprime mortgages, but because Defendants failed to properly disclose and account for that exposure. *See, e.g.*, ¶¶310-42, 354-57. Similarly, Defendants' arguments that they purportedly disclosed Citigroup's CDO and SIV exposure ignores the facts that (i) the truth on the market defense is "intensely fact-specific" and not appropriate for resolution on a motion to dismiss, *see Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000); and (ii) the market's reaction to these disclosures unquestionably establishes at this stage that such information had not been previously disclosed, *see In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 181-82 (S.D.N.Y. 2003) (rejecting truth-on-market defense where debt ratings dropped on company's disclosures). And while Defendants also argue – paradoxically – that they had no duty to disclose the Bank's exposure to hundreds of billions of dollars worth of subprime-backed securities, it is black-letter law that "'[a] prospectus will violate federal securities laws if it does not disclose material objective factual matters or buries those matters beneath other information.'" *In re Globalstar Sec. Litig.*, No. 01 Civ. 1748(SHS), 2003 WL 22953163, at *10 (S.D.N.Y. Dec. 15, 2003) (Stein, J.) (quoting *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003)). Contrary to what Defendants contend, their obligation to disclose the Bank's exposure to these toxic securities did not begin to arise only when they began to report up to $11 billion of losses on them. Moreover, Defendants themselves made a series of statements in the Public Offering Materials creating the impression that Citigroup had only "limited"

exposure to these securities, and the law is clear that, having chosen to discuss the subject, Citigroup "had a duty to be both accurate and complete." *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002).

Defendants also argue that Citigroup had no obligation to consolidate its SIVs because no express contract required it to absorb their losses. *See* Citi Br. at 36-37. This again contradicts the Complaint's well-pled allegations that Citigroup had an implicit obligation to absorb its SIVs' losses, and that GAAP requires consolidation when such an "implicit agreement" exists – facts to which Citigroup admitted when it consolidated its SIVs in December 2007, after months of denying that it had an obligation to do so. ¶¶199-200, 204, 279-81. Defendants' argument that Citigroup decided to absorb nearly $50 billion of losses on these assets not because it had any obligation to do so, but out of the "goodness of its heart," defies belief and cannot be credited at this stage.

Defendants' remaining arguments have been widely rejected by courts. For example, while Defendants contend that Citigroup's reserve misstatements are categorically inactionable because they reflect judgments (*see* Citi Br. at 38), courts routinely hold that reserve misstatements give rise to liability under the Securities Act where, as here, the Complaint pleads facts which contradicted those "judgments" at the time they were made. *See, e.g.*, *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1150-52, 1154, 1159 (S.D. Cal. 2008) (sustaining Section 11 claim against subprime lender based on reserve misstatements). Similarly, although Defendants maintain that Bond Plaintiffs lack standing to assert claims in connection with securities they did not personally purchase (UW Br. at 9-12), "[c]ourts have repeatedly held that … class representatives need not have invested in each security" in order to assert claims on behalf of the Class. *In re Dreyfus Aggressive Growth Mutual Fund Litig.*, No.

7

98 Civ. 4318(HB), 2000 WL 1357509, at *2-3 (S.D.N.Y. Sept. 20, 2000).

Accordingly, the Court should entirely deny Defendants' motions to dismiss the Complaint.

## II.    FACTS

The basic measure of Citigroup's financial viability is its capital adequacy as measured by its Tier 1 capital ratio.  ¶151.  Citigroup's Tier 1 capital ratio measured the Company's readily available capital as a percentage of assets that were potentially at risk of default.  *Id.*  To assure investors in Citigroup debt and preferred stock of the Bank's financial health, Citigroup repeatedly stated in the Public Offering Materials that it "maintained a 'well capitalized' position."  *Id.*  However, Citigroup's purported well-capitalized status was extremely vulnerable because the Company operated with a very high degree of leverage.  For example, at the end of 2007, Citigroup held just $7 of capital for every $100 of risky assets on its balance sheet.  ¶2.  Given this highly-leveraged business model, Citigroup's disclosures regarding its riskiest exposures were highly material to investors in its debt and preferred stock, as losses in even a small portion of those exposures were sufficient to deplete Citigroup's capital and render the Company insolvent.  ¶¶2, 151-54.

**A.    Citigroup Failed To Disclose And Accurately Account For Over $66 Billion Of Subprime Mortgage-Backed CDOs**

1.    Overview of Citigroup's CDO Business and Early Signs of the Housing Crisis

A CDO is a structured finance security that pays its holder a fixed amount of principal and interest generated by a pool of underlying, cash-producing residential mortgage-backed securities ("RMBS"), which collateralize the CDO.  ¶156.  The underlying RMBS are backed by hundreds of thousands of residential mortgages, which generate cash flow for the CDO as borrowers make their mortgage payments.  ¶157.  The cash flows supporting Citigroup's CDOs

were highly sensitive to home price declines or other credit stress because the underlying mortgages consisted of several kinds of risky loans, such as subprime loans, Alt-A or "liar loans," mortgages for greater than 90% of the property's value, and second mortgages drawn only against the equity value of the home, which were known as HELOCs.  ¶¶158-60, 219-26.

Before and during the Offerings Period, Citigroup accumulated huge amounts of direct exposure to CDOs backed by these mortgages, which ultimately totaled $66 billion. Specifically, Citigroup retained the risk of loss on $25 billion of subprime mortgage-backed CDO securities pursuant to a guarantee known as a "liquidity put," which Citigroup attached to its so-called "commercial paper" CDOs issued between 2003 and 2005.  ¶170.  The effect of the "put" was to bind Citigroup to provide liquidity when the CDO's asset values declined and the CDO could not refinance its maturing debt.  Thus, Citigroup was required to absorb the CDO's losses by purchasing its commercial paper.  ¶171.  Although this obligation had existed since at least 2005, the Public Offering Materials failed to disclose this direct exposure until November 2007, as set forth more fully below.

In addition to this $25 billion of exposure, between 2004 and 2007, Citigroup had created approximately $41 billion of subprime mortgage-backed CDO securities that it was unable to sell and therefore directly retained.  ¶172.  The Public Offering Materials also failed to disclose the Company's exposure to this additional $41 billion of CDO securities.  *Id.*

By early 2006, millions of borrowers began to default on the underlying loans, causing the housing market to collapse and home prices to fall precipitously.  ¶¶161-62.  Contrary to Defendants' arguments that this housing crisis, and its effect on CDOs, was an entirely unforeseeable event that materialized "out of the blue" at the end of 2007, the market for subprime-backed CDOs showed signs of serious impairment as early as the first quarter of 2006.

¶163.   Indeed, in November 2005, *The Wall Street Journal* reported that the "much less demanding" mortgage underwriting standards of the prior years were "putting everyone … at risk," including the "bond investors" who purchased mortgage-backed securities.  *Id.*  Similarly, in February 2006, *Barron's* published an article titled, "Coming Home to Roost," in which it reported that "[v]arious doomsday scenarios are being posited" regarding subprime-backed CDOs, and quoted institutional investors predicting that, "These CDOs … could get completely wiped."  *Id.*  As these problems intensified, *Standard & Poor's* reported that, as of the third quarter of 2006, mortgage lenders were experiencing rising delinquencies and early payment defaults.  ¶164.  Similarly, in the first quarter of 2007, *Moody's* reported that "loans securitized in the first, second and third quarters of 2006 have experienced increasingly higher rates of early default than loans securitized in previous quarters."  *Id.*

2.   The Public Offering Materials Failed to Disclose Citigroup's CDO Exposure

As reported in the Public Offering Materials, Citigroup had little or no direct exposure to subprime-backed CDOs because it was a seller, rather than a purchaser or holder, of CDOs.  ¶165.  For example, the Company's Form 10-K for 2006 stated that Citigroup acted as a market-maker for CDOs by "creat[ing] new security offerings … for institutional clients and retail customers," and selling them to outside investors.  *Id.*  Consistent with this role, Citigroup stated that it retained only "limited continuing involvement" with these securities (*id.*), and that its "mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchasers of securities issued by the trust."  ¶165.  As a result, the "doomsday scenarios" regarding CDOs referred to above had no impact on the value of the Bond Class Securities, because the market was unaware of Citigroup's exposure to these assets.

Citigroup did not disclose that it had any direct exposure to sub-prime backed CDOs until nearly eighteen months after the start of the Offerings Period – and even then, Defendants

materially understated by tens of billions of dollars Citigroup's exposure to these highly risky securities.  Specifically, on July 20, 2007, Defendant Crittenden, the Company's CFO, stated on a conference call that Citigroup's total subprime exposure was $13 billion – an amount which analysts concluded was both "small" and "manageable."  ¶¶166-68.

Then, beginning on November 1, 2007, Citigroup fired two of its most senior CDO executives: the head of structured credit and the co-head of CDOs.   ¶175.   Immediately thereafter, a report surfaced stating that (i) the SEC was examining Citigroup's accounting; (ii) Citigroup's Board of Directors would hold an "emergency" meeting during the November 3-4 weekend; and (iii) Citigroup was about to report losses much greater than expected.  *Id.*

On November 4, Citigroup admitted that, in contrast to its prior representations, in reality it possessed approximately $55 billion of subprime CDO exposure, consisting of (i) $25 billion of securities guaranteed by the liquidity puts;[2] and (ii) approximately $30 billion of securities that Citigroup had been unable to sell.  ¶¶169-76.  Significantly, the Company further announced that these CDOs <u>were already impaired by between $8 billion and $11 billion</u>, and that Defendant Prince, its Chairman and CEO, would "retire" immediately, because falling on the proverbial sword was "the only honorable course for me to take."  ¶¶176-77.

On a November 5, 2007 conference call scheduled specifically to discuss these new disclosures, Defendant Crittenden acknowledged that the Company had not previously disclosed its exposure to $43 billion of subprime-backed CDO securities, stating that, "The $43 billion <u>that we disclosed yesterday</u> falls into this super senior category."  ¶178.  Defendant Crittenden further acknowledged that, in the summer of 2007, Citigroup's commercial paper CDOs had begun to

---

[2] Moreover, Citigroup violated GAAP by failing to consolidate its $25 billion of commercial paper CDOs on its balance sheet before November 2007.  ¶¶273-76.  Indeed, FIN 46(R) required consolidation when an "enterprise … will absorb the majority of [another] entity's expected losses," as the liquidity puts required Citigroup to do.  ¶273. *See* Section III.C.3, *infra*.

fail, requiring Citigroup to fund their losses at the very time that Citigroup raised billions of dollars from investors in debt and preferred stock without disclosing this impaired exposure. ¶¶179, 309.

Numerous securities analysts immediately reported that Citigroup had not previously disclosed this exposure, and that it materially altered the Company's risk profile.  For example, on November 4, 2007, JPMorgan reported that the Company's $8-$11 billion write-down was "much larger than expected" and "[t]he majority of the exposure against which Citi is taking a charge has never been disclosed before, not even in its 3Q earnings call [held on October 15, 2007], which is very surprising."  ¶180.  Similarly, on November 5, 2007 Buckingham reported that the write-down "is materially higher than our expectation, and reflects previously undisclosed subprime CDO exposures of $43 billion for a total of $55 billion – much higher than the prior disclosed $13 billion. … [W]e are disappointed with the lack of previous disclosure surrounding the extent of the company's CDO exposure."  *Id.*  The Buckingham report also noted that Citigroup's prior statements misrepresented the Bank as a "careful" "market maker," or seller, of subprime CDO securities, rather than a holder of that risk, and added that:

> In fact, we find management's previous disclosures surrounding subprime exposure as deceptive at best. Specifically, while management appears to have accurately portrayed its secured lending exposure of less than $13 billion on the 3Q07 conference call, by leaving out the additional (and much more substantial) $43 billion in subprime CDO exposure within other areas of the business, we feel misled.

¶181. Likewise, on November 5, 2007, Credit Suisse reported that the newly-disclosed exposure was "surprisingly large and at risk for sizeable write-downs," and revealed that Citigroup's subprime-backed CDO exposure – once thought to be no more than $13 billion – was actually "much larger" than that of its peer investment banks.  ¶182.

On January 15, 2008, the Company announced that its CDO exposure was actually

materially higher than had been disclosed in November 2007.  On that day, Citigroup issued a press release announcing its results for the fourth quarter of 2007, in which it disclosed that it possessed an additional $10.5 billion in exposure to subprime-backed CDOs, bringing its total CDO exposure to approximately $66 billion.[3]  ¶185.

      3.      <u>Throughout 2008, Citigroup Misstated the Value of Its CDO Securities and Their Impact on Its Financial Condition</u>

Even after Citigroup disclosed its CDO exposure, Defendants continued to inaccurately report the remaining value of the Bank's CDO securities and their impact on its purported "well-capitalized" status.  ¶¶188-91.  For example, in its 2007 Form 10-K, which was incorporated by reference into the Public Offering Materials for Offerings conducted after February 28, 2008, Citigroup stated that the "fair value" of its CDO securities was $39.8 billion.  ¶189.  Importantly, the Company stated that it had "refined" its valuation methodology "to reflect ongoing unfavorable market conditions," and that it possessed capital "sufficient to absorb unexpected market, credit, or operational losses."  ¶¶9, 189.

Those statements were untrue when made because, in reality, the Company's CDO securities were worth far less than reported.  Although Defendants claim that no existing facts demonstrated that the Company's CDOs holdings were worth less that reported (Citi Br. at 19, 27), numerous contemporaneous facts indicated precisely that, including that (i) Citigroup could not find a buyer for its CDOs (¶¶190, 293-94); (ii) the leading market index for valuing RMBS, known as the "TABX" – which Citigroup helped to create – reflected that the Company's CDO securities were worth a fraction of their reported value (¶¶295-97); and (iii) as Citigroup has

---

[3] Because Citigroup had purchased insurance on this $10.5 billion of CDO securities, Citigroup described them as "hedged exposures."  Nevertheless, these exposures were important to investors because the financial insurance companies guaranteeing this exposure were facing the threat of downgrades by the rating agencies amidst their own financial distress, thus calling into question their ability to pay for any defaults.  Indeed, over the next three reporting periods, the Company wrote down the value of its "hedged" exposures by $1.1 billion.  ¶185.

admitted, its valuation methodology improperly relied on valuations of corporate bonds (which were far less risky than mortgage-backed bonds) and credit ratings (which were irrelevant to market valuation) (¶¶298-99).  As set forth below in Section II.E, the Company's unreported losses on its CDO securities were so severe that they brought Citigroup to the brink of insolvency, and ultimately required the largest Government bailout in history to prevent Citigroup from being liquidated.

**B.**    **Citigroup Failed To Accurately Disclose And Account For Its Exposure To $100 Billion Of SIVs**

      1.    Overview of Citigroup's SIV Operations and Citigroup's Failure to Report the Nature of Its SIV Exposures

Citigroup's SIVs were off-balance sheet entities which raised money by issuing commercial paper that Citigroup sold to its institutional clients, which the SIVs then used to purchase mortgage-backed assets from Citigroup.  ¶196.  The SIVs were crucial to Citigroup's ability to continue its mortgage lending and securitization business – which was the Company's principal driver of growth during the Offerings Period – because the SIVs removed unwanted assets from Citigroup's balance sheet and provided it with new capital that it used to extend new loans.  *Id.*  Citigroup's SIVs held assets valued at more than $100 billion in March 2007.  *Id.*

As the housing market collapsed in 2006 and 2007, the SIVs' assets deteriorated in value and their cash flows were jeopardized, exposing them to large losses and preventing them from issuing, or "rolling over," new commercial paper to fund those potential losses.  ¶¶193, 201.  The Public Offering Materials represented that the SIVs were strictly off-balance sheet entities that were responsible for their own funding, and that Citigroup was not responsible for their liabilities.  ¶¶197-98.  For example, the Public Offering Materials stated that Citigroup had only "limited continuing involvement" with the SIVs, no obligation to absorb their losses, and thus no reason to consolidate them.  ¶197.

14

These statements were untrue when made.  In reality, Citigroup was obligated to absorb any losses that the SIVs, or the purchasers of their commercial paper, might suffer, and therefore should have disclosed this obligation and consolidated the SIVs on its balance sheet pursuant to FIN 46(R).  ¶¶199, 277-86.  In fact, allowing the SIVs to fail would cause (i) Citigroup's mortgage lending and securitization business to collapse; (ii) investors in the SIVs – Citigroup's coveted institutional and private wealth clients – to suffer massive losses; and (iii) the commercial paper market to freeze.[4]  Thus, as a practical matter, if Citigroup's SIVs lost value and could not fund their obligations, Citigroup was required to absorb the losses.

The truth about Citigroup's SIV obligations began to emerge in late 2007.  On October 14, 2007, news reports disclosed that Citigroup, Bank of America, and JPMorgan were planning to create a so-called "super SIV," which was yet another off-balance sheet entity, funded collectively by all the banks, which would assume as much as $100 billion of Citigroup's SIV assets and liabilities.  ¶201.  News of the "super SIV" raised questions about Citigroup's financial condition and accounting, and underscored how critical Citigroup's SIV exposure was to its financial health.  For example, on October 14, 2007, *The Wall Street Journal* published an article titled, "A Bailout for Citigroup?" and explained that "it's clear that Citigroup has the most to gain from this operation.  And it's clearly bad if the balance sheet of the country's largest bank were frozen for months on end as it poured money into contractual unwindings of SIV positions."  ¶202.  Similarly, the *Financial Times* reported on October 15, 2007 that the Company was advocating for the creation of this "super SIV" as a way to try to avoid losses on its large SIV exposure, even though it insisted that those exposures were "healthy."  *Id.*

---

[4] Recognizing these realities, the plain language of FIN 46(R) states that consolidation should occur if the obligation to absorb losses is either "explicit or implicit."  ¶273.  Moreover, in explaining the obligation to consolidate, both the Chairman of the Financial Accounting Standards Board ("FASB") and another FASB member have stated that, where, as here, "the rollover of commercial paper" issued by a SIV exposes a party to the "risk [of] the majority of expected losses," then "that party has to consolidate."  ¶281.

The Bank repeatedly stated that it did not need to, and would not, consolidate the SIVs. For example, on October 19, 2007, Citigroup issued a one-page fact sheet stating that it "has no contractual obligation to provide liquidity facilities or guarantees to any of the Citi-advised SIVs."  ¶203.  Although this assertion satisfied certain investors and analysts (*id.*), certain other market observers continued to raise questions about Citigroup's failure to consolidate its SIVs. For example, on October 24, 2007, *Bloomberg* published an article titled "Citigroup SIV Accounting Looks Tough to Defend."  Consistent with FIN 46(R)'s reference to "implicit" obligations, *Bloomberg* reported that accounting rules required Citigroup to consolidate its SIVs because the Company had "creat[ed] expectations it would stand behind the funds:"

> The more Citigroup, Inc. says about its structured investment vehicles, or SIVs, the more questionable the bank's accounting for them is beginning to look.  …  Okay, so it has no explicit obligation [to support the SIVs].  That begs the question: Does Citigroup have any implicit obligation to protect SIV investors from losses?  <u>Citigroup isn't saying</u>.  It's a crucial question.  <u>If Citigroup is implicitly obligated to absorb most of the SIVs' losses, then the SIVs already should be on Citigroup's balance sheet, under accounting rules.</u>

¶204.  That article further criticized the proposed plan to create a "super SIV" as follows: "So, the proposed cure for Citigroup's off-balance sheet SIVs is more off-balance-sheet accounting. There's no surer sign that Citigroup is worried about its potential SIV losses."  ¶205.

Nevertheless, in its Form 10-Q for the third quarter of 2007 (which was filed on November 5, 2007 and incorporated into the Public Offering Materials for Offerings after that date), Citigroup flatly stated that it "<u>will not</u> take actions that will require the Company to consolidate the SIVs."  ¶206.  As set forth below, Citigroup was in fact required to consolidate the SIVs long before this statement was made.

> 2.   <u>Citigroup Stuns Investors by Belatedly Admitting Its Obligation to Consolidate Its SIVs and Absorb Their Losses</u>

On December 13, 2007 – only six weeks after denying that it had to consolidate the SIVs

– Citigroup announced that it would, in fact, "support" its SIVs and "consolidate the [remaining $49 billion of] SIVs assets and liabilities on its balance sheet under applicable accounting rules." ¶207. The financial press immediately recognized that the Company's SIV consolidation flatly contradicted its prior statements on the subject. For example, on December 14, 2007, the *Financial Times* wrote that:

> This is the second time unwanted assets have suddenly appeared on the Citigroup balance sheet. The bank's knack for landing in the blackest spots of the market is starting to look hard to match. First, investors were shocked to discover its exposure to collateralised debt obligations had ballooned…. And now, $49bn worth of assets in off-balance sheet vehicles will be brought on to the balance sheet as well. <u>Investors will feel particularly aggrieved at this latest move, given how clearly Citi had said it would not do anything to consolidate these assets.</u>

(¶208). Analysts also recognized that the SIV consolidation jeopardized the Company's capital adequacy. On December 14, 2007, CIBC World Markets reported that the consolidation "will further imperil [the Company's] fragile capital ratios going into the fourth quarter and surely pressure the company to continue to raise capital, sell assets, and cut its dividend." ¶209. In response to this news, on December 13 and 14, 2007, the value of Citigroup's Bond Class Securities declined significantly. *Id.*

   3. <u>Throughout 2008, Citigroup Misstated the Value of Its SIV Assets</u>

During 2008, Citigroup continued to raise tens of billions of dollars through Public Offering Materials that inaccurately reported the value of the SIV assets and their effect on the Company's "well capitalized" status. ¶210. For example, Citigroup's December 13, 2007 press release – which was incorporated by reference into the Public Offering Materials issued after that date – stated that one of the "key" reasons the Company consolidated its SIVs was because, "[g]iven the high credit quality of the SIV assets, Citi's credit exposure under its commitment is substantially limited." ¶211. Consistent with these claims as to the purported "high credit quality" of the SIV assets, Citigroup's 2007 Form 10-K represented that the $49 billion of SIV

17

assets were not impaired as of December 31, 2007.  ¶210.  Over the next two quarters, Citigroup reported a nominal write-down of these assets, followed by an <u>increase</u> in their value.  ¶212.

In reality, the SIV assets were worth dramatically less than Citigroup had reported, as established by the following contemporaneous facts, for which Citigroup failed to properly account: (i) since early 2006, the mortgage loans supporting the SIV assets had suffered sharply rising defaults, which impaired the underlying cash flows (¶¶160-64); (ii) by the third quarter of 2007, the SIV commercial paper market was severely illiquid and Citigroup could find no buyer for its SIV assets at their recorded value (¶301); and (iii) since at least the fourth quarter of 2006, the relevant market index showed that the SIVs' mortgage-backed assets had severely deteriorated in value (¶¶296-97, 300-03).

Investors in the Bond Class Securities did not learn the truth about Citigroup's impaired SIV assets and their impact on the Company's capital adequacy until November 19, 2008.  On that date, Citigroup announced that it could not find any buyer for its SIV assets, and, accordingly, it was unwinding the SIVs and purchasing those assets itself at a cost of $17 billion, which meant that it would assume the SIVs' assets directly.  In addition, Citigroup stated that it was reclassifying these assets so that, under accounting rules, the Company would not have to mark them to their market value and take the corresponding charges against its income.  ¶¶213-14.

Investors in the Bond Class Securities immediately recognized that this was an admission that the SIVs' assets were virtually worthless, and that Citigroup could not survive the charges it would be required to take if it accurately marked those assets to their fair value.  ¶¶213-15. Indeed, Citigroup's financial condition was so imperiled that, just four days later, the U.S. Government was forced to enter into a $326 billion bailout package in which it agreed to absorb

losses on the former SIV assets, as Citigroup lacked the capital to do so itself.  ¶217.

**C.**      **Citigroup's Loss Reserves Were Materially Understated In The Public Offering Materials**

Before and during the Offerings Period, Citigroup aggressively expanded its mortgage portfolio, increasing it from $94.7 billion in 2002 to $213 billion by 2007.  ¶¶218, 220.  The loans fueling this expansion carried a high risk of default at the time of origination and became even more likely to default as the housing market collapsed.  Specifically, Citigroup's portfolio included (i) at least $23 billion of subprime mortgages, whose borrowers had demonstrated an inability to repay their debts even under normal market conditions (¶221); (ii) $51 billion of mortgages with loan-to-value ratios of over 90%, in which the borrower had virtually no equity in the property and thus little incentive to repay the loan in times of stress, and which provided no cushion to absorb losses through foreclosures as home prices collapsed (¶222); (iii) $62 billion of HELOCs (*i.e.*, second mortgages drawn only against the equity value of the property), which were risky because they were the last mortgages to be repaid, and their collateral evaporated as home prices plummeted (¶223); and (iv) $58 billion of Alt-A or "liar loans," for which the borrower provided no proof of income or ability to repay the debt (¶224).  Citigroup also compounded these risks by frequently issuing mortgages that had multiple risk-increasing characteristics, such as a HELOC with a loan-to-value ratio above 90% made to a borrower with a subprime credit score.  ¶¶225-26.  Finally, Citigroup purchased $94 billion of loans from some of the country's most reckless lenders, including New Century and Accredited Home Lenders, who extended loans similar to those described above.  ¶226.  The underwriting of these loans was so deficient that the Company eventually brought 20 lawsuits against the third-party lenders, alleging that their loans failed to comply with Citigroup's purchasing requirements.  *Id.*

Each quarter, GAAP required Citigroup to establish a reserve against this portfolio, and

to charge any increase in this reserve against its income.  This reserve was particularly important to investors because it informed them of the losses that Citigroup would incur, and the corresponding reduction in the Company's profit that would result.  ¶227.

Importantly, the express purpose of a loss reserve is to provide a reserve against <u>all probable losses</u> that are <u>inherent</u> in a company's portfolio.  Specifically, SFAS 5 required Citigroup to set a reserve when "it is <u>probable</u> that an asset has been impaired … at the date of the financial statements."  ¶228.  Thus, GAAP required Citigroup to establish a reserve that reflected (i) all loans that had already defaulted and been charged-off at each quarter, <u>and</u> (ii) the additional amount of loans whose existing credit risk established a probability of default, but which had not yet defaulted.  *Id.*

In violation of the plain language of these requirements, the Company's loss reserves for its North American loan portfolio included <u>only</u> the loans that had <u>already defaulted</u> and been charged off, with no provision for the additional loans that posed a probability of default.  ¶¶229-30.  Further, from the third quarter of 2006 through the third quarter of 2007, the Company's reserves for its North American portfolio <u>were substantially below</u> the actual losses for that portfolio.  ¶231.  Thus, Citigroup reported "probable" losses as equal to or lower than its "actual" losses – which violated SFAS 5 <u>by definition</u>.  ¶230.

Moreover, moving beyond the North American portfolio, as Citigroup dramatically increased its volume of risky loans from 2005 through 2007, it significantly decreased its reserves as a percentage of total loans.  ¶231.  Given the dramatic increase in the risk profile of the Company's mortgage portfolio, coupled with the housing market's collapse, GAAP required Citigroup to <u>increase</u> its reserves.  ¶232.  Yet, in violation of SFAS 5, Citigroup did precisely the opposite, <u>reducing</u> its reserves as a percentage of total loan balance beginning in the first quarter

of 2006 and continuing throughout 2007.  Indeed, by year-end 2006, Citigroup set its reserves at only 1.32% of its loans – merely <u>half</u> of what it maintained in 2003, when its loans were much less risky and the housing market had not yet collapsed.  ¶¶231-32.

At a bare minimum during the Offerings Period, Citigroup should have maintained its reserves at the 2% level which it adhered to before 2005, when the Company significantly increased its portfolio of high-risk loans.  Measured against Citigroup's own 2% benchmark (which still was too low given the factors described above), Citigroup understated its reserves, and overstated its income, by between $2.6 billion and $4.6 billion from the first quarter of 2006 through the third quarter of 2007.  ¶233.

Citigroup's loss reserves remained materially misstated in the fourth quarter of 2007 and in 2008.  By year-end 2007, when it was clear that the housing market had collapsed, Citigroup only increased its reserves marginally above the 2% level it employed when the market was healthy and its portfolio was far less risky.  Applying a 3% reserve level – which still was not adequate to reflect its high-risk portfolio and the market collapse – Citigroup misstated its loss reserves by between $1.6 billion and $7.2 billion at each quarter from year-end 2007 through the second quarter of 2008.  In the third quarter of 2008, after all the Offerings were completed, Citigroup suddenly increased its reserves by more than $3.2 billion – a 20% increase over the Company's total reserves as of year-end 2007.  ¶235.

**D.      Citigroup Failed To Disclose And Accurately Account For $11 Billion Of ARS**

Auction Rate Securities ("ARS") are long-term debt instruments with an interest rate that is regularly reset through a Dutch auction process.  ¶237.  Citigroup sold ARS to its private brokerage clients, marketing them as highly liquid cash equivalents with attractive interest rates, and oversaw the auctions through which the interest rates were reset and the securities were re-sold.  ¶238.  In order to provide the liquidity that the Company had promised its clients,

Citigroup routinely supported ARS auctions during the Offerings Period by buying the securities when there were not enough buyers at the auctions.  ¶240.  The Public Offering Materials did not disclose this practice.  *Id.*  Indeed, as explained in an August 15, 2008 letter to the SEC from the Regional Bond Dealers Association, market-makers themselves, such as Citigroup, were the "only dealers … that know … whether the lead manager itself bid at an auction for its own account and whether that bid was necessary for the auction's success."  *Id.*

Beginning in August 2007, demand for ARS fell precipitously because the financial insurance companies that insured these securities were facing downgrades by the credit rating agencies, which would impair the value of insured ARS, and because investors were maintaining more of their portfolios in cash.  ¶241.  In response to this illiquid market, Citigroup began supporting auctions by purchasing surplus ARS.  ¶242.  Thus, beginning in August 2007, the Company accumulated billions of dollars of ARS on its balance sheet, an exposure that grew to as much as $11 billion by February 2008.  *Id.*

By then, Citigroup could no longer afford to purchase illiquid ARS because of its escalating mortgage-related liabilities.  ¶ 243.  It therefore stopped supporting the auctions and began trying to sell the ARS securities it had accumulated.  *Id.*  However, because the market was illiquid, Citigroup could divest only a small portion of its ARS holdings.  *Id.*

Despite the Company's massive exposure to these illiquid securities as of August 2007, its Form 10-Q for the third quarter of 2007 and its Form 10-K for 2007, both of which were incorporated by reference into certain Public Offering Materials, failed to disclose the existence of this exposure.  ¶244.

Instead, on April 18, 2008, Citigroup announced in its earnings release for the first quarter of 2008 that it had possessed $11 billion of illiquid ARS as of mid-February 2008, and

held a current inventory of $8 billion.  ¶245.  Citigroup further disclosed that its ARS portfolio was <u>already impaired by $1.5 billion</u>.  ¶246.  Contrary to Defendants' claim that investors knew about Citigroup's ARS exposure (Citi Br. at 39-40), Credit Suisse reported on April 18 that Citigroup's "<u>newly disclosed</u> … $6.5B auction rate securities exposure[]" was "[w]orthy of note."  *Id.*

**E.**     **<u>Citigroup Reveals That Its Mortgage-Linked Assets Were So Impaired That The Company Required An Unprecedented $326 Billion Bailout</u>**

By the end of 2007, the write-downs that Citigroup had recorded on the assets described above did not reflect their true value.  ¶¶248-49.  Indeed, Citigroup's write-downs substantially <u>decreased</u> from mid-2007 through mid-2008, signaling to investors that the quality of these assets was improving, and that the risk of any adverse impact on Citigroup's financial condition was subsiding.  *Id.*  Citigroup affirmatively stated as much in its July 18, 2008 earnings release (incorporated by reference into certain Public Offering Materials), which provided that the Company's write-downs had "decreased by 42%" and that its available capital had "increased" so that it remained "well-capitalized."  ¶250.

In reality, Citigroup's capital adequacy was in serious jeopardy.  On October 14, 2008, Citigroup received a $25 billion capital infusion from the U.S. Government through the Troubled Asset Relief Program.  ¶251.  Citigroup then continued to inaccurately represent the impact of its mortgage-linked assets on its capital adequacy.  For example, on November 17, 2008, Citigroup held a "Town Hall" meeting for its employees.  At that meeting, Defendant Pandit stated that Citigroup was "very well positioned from a capital standpoint to weather future potential challenges."  ¶252.  However, at that meeting, Citigroup made a disclosure which revealed that, in reality, the Company was effectively insolvent.  Specifically, Citigroup announced that it would cease valuing $80 billion of assets (including its CDOs, SIV assets, and ARS) at their

market price each reporting period – and thus would avoid further write-downs – by removing them from the Company's trading portfolio and reclassifying them as "held to maturity."  ¶253.

This announcement stunned the market, because it signaled that these assets had either no value, or such little worth that Citigroup could not absorb the write-downs it would have to take if it properly valued them.  ¶255.  For example, on November 18, 2008 Ladenburg Thalmann reported that investors "do not trust the company's balance sheet" and "belie[ved] that the bank's securities holdings are overstated."  *Id.*  Two days later, on November 19, Citigroup further signaled its insolvency by announcing that it had been unable to find a buyer for its SIV assets, and therefore was forced to unwind the SIVs and purchase their assets itself at a cost of $17 billion.  Further, Citigroup announced that, after directly assuming these SIV assets, it would reclassify them so that it would no longer have to mark them to market.  This announcement confirmed that Citigroup's SIV assets were essentially worthless, and that the Company lacked the capital to absorb the charges against income that it would have to take if it marked them to their market value.  ¶¶213-15.   Indeed, on November 20, *The Wall Street Journal* reported that "[t]he market is losing confidence in Citigroup," and that "[i]n the wake of some planned balance-sheet maneuvers, it isn't tough to see why."  *Id.*; *see also* ¶¶11, 255.

While Citigroup executives were considering a merger with a competitor, *Dow Jones* reported that no bank was willing to merge with Citigroup because "of wariness about what toxic assets remain on Citi's books.  Nor would other banks be willing to trust Citi's claims about the strength of its balance sheet."  ¶256.  With Citigroup on the brink of collapse and unable to find a private company willing to absorb it, *The New York Times* and *The Wall Street Journal* reported that the U.S. Government would have to provide Citigroup with huge amounts of capital just to prevent its liquidation.  ¶257.  As investors realized that Citigroup was close to insolvent, the

price of the Bond Class Securities collapsed, losing <u>more than 50%</u> of their value between November 17 and 21.  ¶258.

Confronted with this situation, the U.S. Government was forced to take unprecedented action to rescue Citigroup from imminent bankruptcy and liquidation.   Accordingly, on November 23, 2008, the U.S. Government provided Citigroup with a <u>$326 billion bailout package</u> – the largest in history.  ¶259.  Pursuant to the terms of the bailout, the U.S. Government agreed to guarantee losses on $306 billion of the Company's mortgage-related assets and infuse Citigroup with $20 billion of new capital that it immediately required to survive.  *Id.*  Analysts specifically reported that "the deal is essentially pricing in the expectation that <u>Citi's toxic assets are worth much less than Citi has valued them at</u>" in the Public Offering Materials.  ¶14.

### III.   ARGUMENT

#### A.   Standards Applicable To The Motions To Dismiss

In assessing Defendants' motions, the Court must accept the Complaint's factual allegations as true and draw all inferences in the plaintiff's favor.  *See ATSI Communs., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  The Court's function is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient."  *SEC v. Simpson Capital Mgmt., Inc.*, 586 F. Supp. 2d 196, 199 (S.D.N.Y. 2008) (internal quotation marks omitted).  Absent a valid request for judicial notice – of which none has been made – matters extraneous to the Complaint cannot be considered for their truth. *See, e.g.*, *Staehr v. Hartford Fin. Servs. Group*, 547 F.3d 406, 424, 425 (2d Cir. 2008) (court must "accept[] as true all factual allegations in the complaint and construe[] all reasonable inferences in the non-movant's favor," and thus may not judicially notice extraneous materials for "the truth of their contents").

1.      Rule 8(a) Governs Bond Plaintiffs' Claims

Under Section 11 of the Securities Act, "a plaintiff … need only show a material misstatement or omission to establish his prima facie case.  Liability against the issuer of a security is <u>virtually absolute, even for innocent misstatements</u>."  *Herman*, 459 U.S. at 381 (emphasis added); *see* 15 U.S.C. § 77k(a); *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (because "fraud is not an element or a requisite to a claim under Sections 11 and 12(a)(2)," a plaintiff "need allege no more than negligence to proceed").[5]  Accordingly, Bond Plaintiffs' Securities Act claims "are governed by the pleading standard set forth in Rule 8(a)."  *In re WorldCom, Inc. Sec. Litig.*, No. 02-CV-3288(DLC), 2004 WL 1435356, at *3 (S.D.N.Y. June 28, 2004).[6]

Defendants contend that the Complaint's allegations "sound in fraud" and therefore are subject to the heightened pleading standards of Rule 9(b).  *See* Citi Br. at 10-14.  Defendants maintain that, under *Rombach* and this Court's decision in *In re JPMorgan Chase Sec. Litig.*, "the applicable test" for determining whether Rule 9(b) applies is whether the Complaint alleges that the Public Offering Materials made "materially false and misleading" statements and "contained untrue statements of fact."  Citi Br. at 11-12.  This argument is incorrect, and ignores the fact that the language that Defendants cite to mirrors the statutory language of Section 11, which by definition cannot trigger the application of Rule 9(b).  *See* 15 U.S.C. § 77k (providing

---

[5] Others subject to Section 11 liability, including directors and underwriters, may have an affirmative defense of due diligence, but that defense is not suitable for adjudication at the motion to dismiss stage.  *See, e.g.*, *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004); *In re DoubleClick Privacy Litig.*, 154 F. Supp. 2d 497, 507 (S.D.N.Y. 2001).

[6] Contrary to Defendants' assertion, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), does not impose "a universal standard of heightened fact pleading."  *Boykin v. Keycorp*, 521 F.3d 202, 213 (2d Cir. 2008) (citation omitted).  In *Boykin*, the Second Circuit recognized that *Twombly* only sets forth "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible."  *Id.*  Thus, a plaintiff need only provide factual allegations sufficient "to raise a right to relief above the speculative level."  *ATSI*, 493 F.3d  at 98 (citing *Twombly*, 550 U.S. at 555).

liability "on account of a <u>false</u> registration statement" which contains "an <u>untrue</u> statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not <u>misleading</u>") (emphasis added); *In re WRT Energy Sec. Litig.*, No. 96 Civ. 3610, 2005 U.S. Dist. LEXIS 1894, at *17 (S.D.N.Y. Feb. 9, 2005) ("The phrases 'materially incorrect,' 'untrue statements' … merely allude to language in … the [Securities] Act.").

Moreover, *Rombach* does not stand for a judicially-created exception that overrides both the Securities Act and Rule 8(a).  In *Rombach*, the plaintiffs brought fraud claims under Section 10(b) of the Securities Exchange Act (the "Exchange Act") and non-fraud claims under Section 11 of the Securities Act, but <u>did not even plead negligence as a basis for the Section 11 claims, leaving fraud as the only basis for the complaint</u>.  *See Rombach*, 355 F.3d at 172.  By contrast, this Complaint does not assert any fraud claim, and expressly pleads strict liability and negligence as the basis for its pure Securities Act claims, using language drawn from the Securities Act itself and disavowing any fraud allegation whatsoever.  *See, e.g.*, ¶¶355, 366. Bond Plaintiffs allege, for example, that Citigroup "<u>failed to disclose</u>" its CDO exposure (¶155); "<u>inaccurately</u>" stated that it was not required to absorb its SIVs' losses, and failed consolidate them (¶203); "reported materially understated loss reserves" (¶317); "failed to disclose … and properly account for" its ARS exposure (¶236); and "<u>failed to disclose and properly account for</u> its various mortgage-related assets and liabilities (¶319)" (emphasis added).[7]

Further, although *Rombach* applied Rule 9(b) as to the issuer (against which Section 10(b) fraud claims had been brought), it held that the Section 11 and 12(a)(2) claims against the underwriter defendants <u>were subject to Rule 8(a)'s notice pleading requirements</u> because those

---

[7] *See also* ¶¶360, 371, 382, 392, 402, 408, 414 (expressly disclaiming allegations of fraud).

claims "sound[ed] in negligence."  *Id.* at 178.[8]  Thus, the mere use of words found in the statute itself does not support imposing Rule 9(b) to Section 11 claims.  Rather, the Court only applies the heightened pleading standard if the "gravamen" of the charges against a particular defendant necessarily rest on a finding of fraud.

Recognizing this, courts have consistently rejected the categorical argument that Defendants advance, and have applied a negligence standard for Section 11 and 12 claims unless those claims "plainly" plead fraud.  For example, Judge Lynch in *In re Refco, Inc. Sec. Litig.* recognized that, rather than requiring the universal application of Rule 9(b) to Securities Act claims, *Rombach* requires a case-by-case analysis of plaintiffs' Securities Act allegations:

> [T]he court's conclusion that the particular language in *Rombach* was indicative of fraud should be read in the context of the pleadings at issue in that case, in which the plaintiffs "[did] not assert any claim of negligence on the part of the Individual Defendants, nor [did] they specify any basis for such a claim." *Rombach* necessarily requires a case-by-case analysis of particular pleadings to determine whether "the gravamen of the complaint is plainly fraud."  In this case, the gravamen of the § 11 claims is plainly not fraud.

503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007) (emphasis added).[9]  Consistent with this approach, Judge Kaplan also has ruled that a claim sounds in fraud only if it alleges that "the proponent" of a false and misleading statement "knew it at the time or acted in reckless disregard of its truth. That's where the line is between 9(b) and not 9(b)."  *Rinehart v. Lehman Bros. Holdings, Inc.*, No. 08-5598(LAK), Tr. at 24:22-25:3 (S.D.N.Y. Jan. 8, 2009), Ex. 1 to the Declaration of Steven B. Singer (the "Singer Decl.").  The overwhelming weight of authority in this Circuit is in

---

[8]  Indeed, the Underwriter Defendants concede that the Complaint "is utterly devoid of any alleged facts demonstrating fraudulent intent on the part of the Underwriter Defendants." UW Br. at 14-15.

[9]  Significantly, *Refco* was case in which, unlike here, the complaint alleged that defendants had "engaged in a massive fraud," and alleged parallel claims under Section 10(b) of the Exchange Act in connection with that fraud. 503 F. Supp. 2d at 632 (emphasis added).  Nevertheless, Judge Lynch held that, "This fact, however, does not take away plaintiffs' right to plead in the alternative that defendants violated provisions requiring only negligence." *Id.*

accord.[10]

This Court's decision in *JPMorgan* comports with this approach.  There, plaintiffs alleged that JPMorgan knowingly helped Enron Corporation accomplish what was arguably the largest securities fraud in history by arranging certain fraudulent transactions that JPMorgan <u>knew</u> were bogus trades, and then misrepresenting them as *bona fide* trades in its own disclosures.  *See* 363 F. Supp. 2d 595, 605-06, 636 (S.D.N.Y. 2005).  This Court recognized that "plaintiffs have alleged more than mere negligence – <u>the entire complaint sounds in fraud</u>."  *Id.* at 635 (emphasis added).  *JPMorgan* therefore does not support the categorical rule that Defendants advance.[11]

Defendants next argue that "the very nature of [Bond Plaintiffs'] claims imply a charge of fraud" because the Complaint alleges that the Public Offering Materials "understated Citigroup's direct exposure by tens of billions of dollars."  Citi Br. at 12.  In essence, Defendants claim that there is no such thing as large-scale negligence and that, if a misstatement is highly material in amount or repeated numerous times, it evokes fraud irrespective of the liability standards of the

---

[10] *See e.g.*, *In re Worldspace Sec. Litig.*, No. 07-2252, 2008 U.S. Dist. LEXIS 56224 (S.D.N.Y. July 21, 2008) (Berman, J.) (applying Rule 8(a) to claims that "are carefully couched in the language of negligence"); *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 612 (S.D.N.Y. 2008) (Chin, J.) ("Because plaintiffs have specifically disclaimed any component of fraud in their Sections 11 and 12(a)(2) claims, there are no 'averments of fraud'" and Rule 8(a) applies); *In re Initial Public Offering Sec. Litig.*, 544 F. Supp. 2d 277, 299 (S.D.N.Y. 2008) (Scheindlin, J.) ("Section 11 claims against the Issuer Defendants sound in negligence and are thus subject only to Rule 8(a)"); *In re Prestige Brands Holding, Inc.*, No. 05-06924, 2006 U.S. Dist. LEXIS 46667, at *24-25 (S.D.N.Y. July 10, 2006) (Brieant, J.) ("If conduct may be either fraudulent or negligent, the latter is presumed in absence of evidence to the contrary.  These claims clearly are not subject to the heightened pleading requirements of Rule 9(b), because they sound in negligence."); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 502 (S.D.N.Y. 2004) (Conner, J.) ("Rule 9(b) does not apply to plaintiffs' § 11 claims against [the underwriter] because that claim does not sound in fraud. The Complaint contains no allegations of fraudulent conduct on the part of [the underwriter], and plaintiffs have not asserted any Exchange Act claims against the underwriter.").

[11] *In re Merrill Lynch & Co. Sec., Deriv., & ERISA Litig.*, No. 07-9633 (S.D.N.Y. Mar. 3, 2009) also does not support Defendants' expansive interpretation.  In that case, Judge Rakoff acknowledged that *Rombach* does <u>not</u> hold that any Section 11 complaint alleging false and misleading statements sounds in fraud.  Instead, he held that the issue is whether the "import of the pleadings … smack of fraud or not."  *See Louisiana Muni. Police Empl. Retirement Sys.*, Tr. at 11:12-15, Ex. 2 to the Singer Decl.  Further, in holding that that particular complaint did sound in fraud, Judge Rakoff seized on two factual allegations: that "the Federal Bureau of Investigation had launched a 'mortgage fraud task force,' Complaint, ¶197, and the 'Massachusetts state authorities had accused Merrill of fraud....'"  Memorandum Order at 2, Ex. 31 to the Rosen Decl.  There are no such allegations here.

Securities Act and the complaint's theory.  This argument fails because the Securities Act requires that a misstatement be material, and its strict liability standard does not change merely because that element is easily satisfied.  Indeed, it would be a perverse result if it were more difficult to obtain relief under the Securities Act for highly material misstatements than for less material ones.  If a complaint including only Securities Act claims sounds in fraud on this basis even in the absence of any allegation of intentional conduct, then a judicially-created exception has swallowed the legislative rule applying Rule 8(a) to Section 11 and 12(a)(2) claims.[12]

Defendants also argue that the Complaint sounds in fraud because it purportedly "mirror[s]" the allegations in the Section 10(b) complaint asserted by different plaintiffs in a separate case before Your Honor styled In re Citigroup Inc. Sec. Litig., No. 07 Civ. 9901 (the "Securities Fraud Litigation").  Citi Br. at 14.  This is nonsense, both factually and legally. Factually, the claims in the Securities Fraud Litigation necessarily rely on extensive allegations of intentional or reckless misconduct which are wholly absent from the case at bar.  Legally, Defendants cite no case applying Rule 9(b) because a different complaint, in a different case, alleges a parallel Section 10(b) claim.  Moreover, this argument contravenes the holdings of numerous courts that Section 11 claims do not sound in fraud merely because there is a parallel

---

[12] The cases upon which Defendants rely are inapposite because they concerned (i) clear instances of alleged fraudulent conduct and (ii) often involved complaints which alleged Section 10(b) fraud claims together with Section 11 claims.  See Coronel v. Quanta Capital Holdings, Ltd., No. 07-1405, 2009 WL 174656, *15, 19 (S.D.N.Y. Jan. 26, 2009) (complaint, alleging both Section 10(b) and Section 11 claims, asserted that "Quanta systematically underestimated the Company's loss reserves" for the intentional purpose of "maintain[ing] an A.M. Best 'excellent' rating'"); Ladmen Partners, Inc. v. Globalstar, Inc., No. 07-0976, 2008 WL 4449280, *16, *32 (S.D.N.Y. Sept. 30, 2008) (complaint alleged that defendants deliberately withheld … information from investors because it needed money … to finance a new generation of satellites"); In re AXIS Capital Holdings Ltd. Sec. Litig., 456 F. Supp. 2d 576, 586-87 (S.D.N.Y. 2006) (where complaint asserted both Section 10(b) and Section 11 claims, failure to disclose "contingent commissions" sounded in fraud because plaintiffs claimed that commissions were anticompetitive acts); In re Corning Sec. Litig., No. 01-6580, 2004 WL 1056063, at *9, *14, *20-21 (W.D.N.Y. Apr. 9, 2004) (where complaint asserted both Section 10(b) and Section 11 claims, Section 11 claims were dismissed for failure to even plead the falsity of purely forward-looking statements); see also Rubke v. Capitol Bancorp Ltd., 551 F.3d 1156, 1161 (9th Cir. 2009) (plaintiffs' Securities Act and Section 10(b) claims rested on the "same exact" factual allegations); Cozzarelli v. Inspire Pharms. Inc., 549 F.3d 618, 629 (4th Cir. 2008) (where complaint asserted both Section 10(b) and Section 11 claims, "complaint treat[ed] the allegedly false statements in Inspire's prospectuses as part of a single, coordinated scheme to defraud investors").

Section 10(b) fraud claim, even when that parallel fraud claim is asserted in the <u>same</u> complaint. *See, e.g.*, *Refco*, 503 F. Supp.2d at 632 (rejecting sounds in fraud defense even though, in connection with parallel Section 10(b) claim, plaintiff had alleged a "massive fraud"); *WRT Energy*, 2005 U.S. Dist. LEXIS 1894, at *18; *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 502 (S.D.N.Y. 2004).[13]

Finally, Defendants argue that misstatements of the values of "complex assets" inherently sound in fraud because they "necessarily impl[y] that contemporaneous adverse information existed and was available to the defendants."  Citi Br. at 13.  The mere "existence" or "availability" of contemporaneous adverse information does not necessarily mean that Defendants <u>intentionally</u> concealed or even knew about such information.  Recognizing this fact, numerous courts that have held that a plaintiff may plead negligence-based Securities Act claims for the misstatement of asset valuations, loss reserves, and other GAAP violations.  *See, e.g.*, *In re RAIT Fin. Trust Sec. Litig.*, No. 07-03148, 2008 WL 5378164, at *7 (E.D. Pa. Dec. 22, 2008) (sustaining Section 11 claims based on failure to properly value assets collateralizing CDOs and record loan loss reserves); *In re New Century*, 588 F. Supp. 2d 1206, 1214, 1226, 1239 (C.D. Cal. 2008) (sustaining Section 11 claims based on failure to properly value RMBS securities and record reserves); *Accredited Home Lenders*, 556 F. Supp. 2d at 1151, 1154, 1159; *Vivendi*, 381 F. Supp. 2d at 175 (sustaining Securities Act claim based on alleged failure to timely write-down goodwill); *Refco*, 503 F. Supp. 2d at 633 (sustaining Section 11 claims based in part on GAAP

---

[13] *See also In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 272 (3d Cir. 2006) (even though "a core theory of fraud permeates the action," Rule 8 applies where the "plaintiffs have expressly pled negligence in connection with their Section 11 and 12(a)(2) claims. We regard this difference in pleading as dispositive."); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1223 (1st Cir. 1996) ("the Wilensky complaint avoids grounding its Section 11 and 12(2) claims on any allegations of fraud. Although the complaint does assert that defendants actually possessed the information that they failed to disclose, those allegations cannot be thought to constitute 'averments of fraud,' absent any claim of scienter and reliance.  Otherwise, any allegation of nondisclosure of material information would be transformed into a claim of fraud for purposes of Rule 9(b).").

violations).[14]

Accordingly, the Complaint is subject to the notice pleading requirements of Rule 8(a).

2.   The "Sounds in Fraud" Doctrine Does Not Graft a Scienter Requirement Onto
     Sections 11 and 12(a)(2)

Even if the Court were to apply Rule 9(b), Bond Plaintiffs would not be required to plead facts giving rise to a strong inference of scienter.  In the context of Section 11 or Section 12(a)(2) claims, Rule 9(b) requires only that Bond Plaintiffs plead "the who, what, when, where, and how" of the alleged misrepresentations.  There is nothing in *Rombach* suggesting that a Section 11 plaintiff must plead scienter with particularity – nor could there be, because scienter is not an element of a Securities Act claim.  In recognition of the different elements of claims under the Securities Act and those under Section 10(b) of the Exchange Act, the Private Securities Litigation Reform Act's ("PSLRA") pleading provisions regarding fraud apply only to Exchange Act claims.  *See* 15 U.S.C. § 78u-4(a)(1)-(b); *see also In re Initial Pub. Offering Sec. Litig.* ("*IPO*"), 241 F. Supp. 2d 281, 338 (S.D.N.Y. 2003) ("[T]he PSLRA pleading requirements have no application to claims that arise under Section 11 or other provisions of the Securities Act.").[15]

Judge Rakoff recognized this distinction in *Louisiana Municipal Police Employees' Retirement Sys. v. Merrill Lynch & Co.*  Oral argument concluded with the following exchange between Court and counsel:

MR. BERGER:  I'm assuming that whatever your Honor's decision, we're not

---

[14] Defendants' cited authorities are inapposite.  The challenged statements in *In re CIT Group, Inc.*, 349 F. Supp. 2d 685, 687 (S.D.N.Y. 2004), were that "[w]e believe that our loan loss reserves … are adequate" – a statement of belief which could be false only if "the defendants knew the statement was untrue.  *See also Coronel*, 2009 WL 174656 (allegations sounded in fraud where plaintiffs alleged insurance reserves were deliberately understated to maintain ratings).

[15] In *JPMorgan*, this Court stated that, "[i]n contravention of Fed. R. Civ. P. 9(b) and the PSLRA, plaintiffs have failed to plead with particularity a strong inference of scienter in connection with a material misrepresentation or omission" in their Section 11 claims.  363 F. Supp. 2d at 635.  Notably, however, *JPMorgan* concerned Section 10(b) fraud claims asserted against all defendants.  In this case, where the Complaint pleads only Securities Act claims, the PSLRA's pleading provisions cannot apply, as noted above.

going to be required to plead intent ….

THE COURT:  No.

BERGER:  If your Honor is going to get –

COURT:  <u>Rombach</u> makes that clear, too.  When they are saying you have to plead fraud with particularity, it doesn't mean you have to plead with particularity an element that is not an element of the complaint.  It just means, for example, the misrepresentations would have to be spelled out in 9(b) detail as opposed to the more general detail that rule 8 would require.

No. 08-9063(JSR) (S.D.N.Y. Feb. 19, 2009), Tr. at 63:19-64:5, Ex. 2 to the Singer Decl. Numerous other authorities are in accord.[16]  Therefore, even if Rule 9(b) applied to Bond Plaintiffs' claims, it applies only to the specific elements required to establish Bond Plaintiffs' claims under the Securities Act – which do not include scienter.

       3.       <u>Even If Rule 9(b) Applies, the Complaint Satisfies It</u>

Even if Rule 9(b) applied to Bond Plaintiffs' claims, the Complaint easily satisfies its particularity requirements.  Rule 9(b) requires only that the Complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000); *Suprema*, 372 F.3d at 277. The Complaint satisfies this standard with respect to each type of alleged material omission and misstatement.

For example, as to Citigroup's CDO exposure, the Complaint identifies and explains the false statements and omissions in (i) the pre-November 4, 2007 Public Offering Materials, which omitted to disclose approximately $66 billion of direct exposure, falsely stated that Citigroup's

---

[16] *See In re Scottish Re. Group Sec. Litig.*, 524 F. Supp. 2d 370, 393, 398 (S.D.N.Y. 2007) (holding that the complaint's Securities Act claims sounded in fraud but only applying scienter analysis to Section 10(b) claims); *In re BellSouth Corp. Sec. Litig.*, 355 F. Supp. 2d 1350, 1362 n.9, 1365 n.11 (N.D. Ga. 2005) (applying Rule 9(b) to Section 11 claims and stating that "Under the Securities Act, if one or more of the statements are determined to be material, the claim survives the Defendants' motions.  Those statements under an Exchange Act analysis also have to be evaluated under the scienter element of the claim."); *In re Nat'l Golf Properties Inc. Sec. Litig.*, No. 02-1383, 2003 WL 23018761 (C.D. Cal. Mar. 19, 2003) (applying Rule 9(b) to Section 11 claims and holding that so long as plaintiff explains why the misstatements are false and misleading, the allegations state a claim).

involvement with these securities was "limited," and failed to consolidate $25 billion of commercial paper CDOs in violation of GAAP (¶¶165-85, 315, 322-24); and (ii) the post-November 4, 2007, Public Offering Materials, which misstated the value of the Company's CDOs by particularized amounts, and misrepresented that Citigroup maintained its "well-capitalized" status despite its undisclosed losses on its CDO exposures (¶¶188-91, 248-62, 287-99, 322-42).

Similarly, with regard to Citigroup's SIV exposure, the Complaint identifies and explains the falsity of (i) the pre-December 13, 2007 Public Offering Materials, which failed to consolidate as much as $100 billion of SIV assets and liabilities in violation of GAAP, failed to disclose Citigroup's obligation to absorb losses, and falsely represented that Citigroup will not do so (¶¶193-209, 266-70, 272, 277-86, 316-18); and (ii) the post-December 13, 2007 Public Offering Materials, which falsely reported that the SIVs' "high credit quality" posed no threat to Citigroup's capital adequacy, misstated the value of the SIV assets, and misrepresented Citigroup's "well-capitalized" status despite the fact that its SIV assets were virtually worthless (¶¶210-17, 248-62, 300-03, 330-42).

Likewise, regarding the Company's loss reserves, the Complaint identifies and quantifies the misstatements in the Public Offering Materials throughout the Offerings Period, explains why they were overstated, and how these misstatements violated GAAP. ¶¶218-35, 317, 325-42. Moreover, with respect to Citigroup's ARS exposure, the Complaint alleges that Citigroup failed to disclose that, beginning in August 2007, it had acquired $11 billion of illiquid securities, and after disclosing this exposure in April 2008, it carried these illiquid "assets" on its balance sheet at misstated values. ¶¶236-47, 325-26, 331-33.

The Complaint also identifies where and when each of these misstatements and omissions

appeared by specifying each of the Company's SEC filings that contained them (¶¶314, 322, 325-26, 331-33, 335-36), and which of these SEC filings were incorporated into each set of Public Offering Materials for each Offering (*see* Appendix to Complaint).

Further, the Complaint identifies the speaker of each of these statements (*i.e.*, those who may be held liable for them) by specifying (i) the issuer for each Offering (¶309); (ii) the underwriters for each Offering and the particular amount that each underwriter underwrote (*see* Appendix); (iii) the date of the Registration Statement for each Offering (¶309) and which Defendants signed each Registration Statement (¶¶41-68); and, (iv) where applicable, the times during which each Defendant served as a director of Citigroup (*id.*).

Nothing more is required to satisfy the particularity requirements of Rule 9(b).  *See, e.g.*, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69-74 (2d Cir. 2001) (finding Rule 9(b) satisfied in Section 10(b) fraud case and noting that "[e]ven with the heightened pleading standard under Rule 9(b) and the Securities Reform Act we do not require the pleading of detailed evidentiary matter in securities litigation"); *IPO*, 241 F. Supp. 2d at 327 (Rule 9(b) can be satisfied in "one sentence").

**B.**     **The Downturn In The Economy Does Not Insulate Defendants From Liability As A Matter Of Law**

Beginning in early 2006, the housing market began to collapse due to defaults on the exact kinds of mortgages that Citigroup originated and securitized, causing investors to become acutely concerned that subprime-backed securities would greatly diminish in value.  ¶¶160-64. Nevertheless, until the end of 2007 Defendants failed to disclose Citigroup's exposure to hundreds of billions of dollars worth of subprime-backed assets, and even then Defendants failed to properly account for the declining value of those assets and their severe impact on Citigroup's capital adequacy.

In response, Defendants attempt to rewrite these allegations, claiming in essence that the downturn in the housing market was an unforeseeable "Act of God," and that Citigroup could not have violated the federal securities laws because other financial institutions (such as Merrill Lynch and Washington Mutual) also suffered material losses on their subprime holdings. *See* Citi Br. at 5-6, 8-9, 19, 43-47, 28, 51-52.  As a result, Defendants posit that all of Citigroup's statements were true when made, and that all of the Class's losses were caused by macroeconomic events alone. *Id.* at 9, 47.  Such arguments should be rejected.

First, Defendants' argument that the collapse of the housing market was not foreseeable is a red herring because Citigroup's subjective state of mind is not at issue in this case.  Plaintiffs here have alleged that Defendants made a series of statements which created the erroneous impression that Citigroup had minimal exposure to subprime-backed securities, and that such statements were false because they failed to disclose that, in reality, the Company had hundreds of billions of dollars of direct exposure to these securities.  That is all that is required to state a claim for liability under the Securities Act, where liability is "virtually absolute" for even "innocent" misstatements and omissions. *Herman*, 459 U.S. at 382.

Second, Defendants' argument that the collapse of the housing market was unforeseeable ignores the allegations of the Complaint (¶¶160-64), and asks the Court to do what it cannot at this stage: namely, decide as a matter of law that the collapse was both unforeseeable and

impacted every financial institution in the country the same way.[17]   Indeed, recognizing the impropriety of embarking on such a fact-finding mission at this stage of the litigation, numerous courts have rejected Defendants' exact argument, even in the context of evaluating fraud claims brought under the Exchange Act.  *See Countrywide*, 588 F. Supp. 2d at 1173-74 (holding that "[i]t is not the Court's role to speculate on the causes of the current economic situation," and rejecting defendants' argument that mortgage lender and securitizer suffered losses due to "an 'unprecedented' external 'liquidity crisis'" and "other macroeconomic arguments"); *New Century*, 588 F. Supp. 2d at 1230 (rejecting claim that mortgage lender and securitizer was "taken by surprise when the [housing] market took an unexpected turn for the worse"); *RAIT*, 2008 WL 5378164, at *7 (rejecting "fraud by hindsight" defense to allegations that company failed to disclose its subprime exposure, properly value the assets collateralizing its CDOs, and account for loss reserves); *Accredited Home Lenders*, 556 F. Supp. 2d 1161 n.7 (refusing to even consider defense counsel's summary of "non-prime lending industry events" as defense to liability).[18]

---

[17] *See, e.g., Staehr*, 547 F.3d at 424-25 (court must "accept[] as true all factual allegations in the complaint and construe[] all reasonable inferences in the non-movant's favor," and thus may not judicially notice extraneous materials for "the truth of their contents"); *see also In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 747 (S.D.N.Y. 2001) ("[M]otions to dismiss in securities cases have become all too common where the procedural posture of the case renders most of the defendants' arguments futile.  Many motions to dismiss ask the court to engage in judgment calls which are better made by the trier of fact.").

While Defendants vaguely argue in footnotes that the Court can accept their substitute allegations for the truth of the matter asserted (*see* Citi Br. at 3, n.1; UW Br. at 5, n.3), the cases that they cite state otherwise.  *See, e.g., Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991) (noting that the district court did not rely on "[t]he alleged market collapse" for the truth of the matter asserted, and thus did "not run afoul of the rule that a district court must confine itself to the four corners of the complaint"); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 421 n.6 (S.D.N.Y. 2003) (noticing the mere fact of a market crash, but not noticing its causes or foreseeability).

[18] *See also In re StockerYale Sec. Litig.*, 453 F. Supp. 2d 345, 359 (D.N.H. 2006) ("Defendants' reference to a wide range of economic and other factors that may have caused or contributed to the decline in price of StockerYale shares raises issues that will be addressed at later stages of this litigation, but those possibilities do not warrant dismissal…."); *Schnall v. Annuity and Life Re (Holdings), Ltd.*, No. 3:02 CV 2133(GLG), 2004 WL 367644, at *9 (D. Conn Feb. 22, 2004) ("While a trier of fact might blame market forces rather than accounting violations for that decline, the allegations in the Complaint are sufficient to withstand [this] motion to dismiss."); *Burstyn v. Worldwide Xceed Group, Inc.*, No. 01-1125, 2002 WL 31191741, at *6 (S.D.N.Y. Sep. 30, 2002) (same).

Third, even assuming the Court could, on this motion, consider and accept as true the extraneous remarks that Defendants parrot about the downturn – almost all of which are remarks from government officials and others trying to explain their own alleged regulatory failures – such statements are irrelevant.  Tellingly, none of these statements mentions, let alone defends or excuses Citigroup or the Public Offering Materials, and thus they have nothing to do with whether Citigroup made actionable false statements and omissions.[19]

Fourth, Defendants' attempt to analogize Citigroup's losses to those of other companies similarly misses the mark.  The Court obviously cannot accept the "everyone else did it too" defense at the pleading stage, and this argument again fails to address the salient question of whether Citigroup made untrue statements and omissions in the Public Offering Materials.[20]

Finally, even if the Court were inclined to entertain factual arguments outside the pleadings, Defendants' substitute allegations are wrong.  It defies credulity to suggest that Citigroup's losses were relatively modest when compared to the losses of other banks.  *See* Citi Br. at 46.  The fact that only Citigroup required the largest bailout in history establishes that the

---

[19] Also irrelevant is Defendants' assertion that, as late as August 2007, the housing collapse was perceived to be limited to the subprime sector.  *See* Citi Br. at 43.  Since the Complaint pleads that all of Citigroup's exposures included subprime-backed assets, the risk of which materialized long before August 2007 (¶163), the exact point at which other kinds of loans began to default is of no moment.

[20] To the extent that the Court wishes to engage in this comparison, it does not exculpate Citigroup in the slightest.  For example, Washington Mutual is the subject of an ongoing criminal grand jury investigation headed by the United States Attorney's Office (and involving the FBI, the SEC, and the IRS), which is examining whether that bank's collapse was "the result of obvious criminal wrongdoing," according to the U.S. Attorney leading the case. *See* "Top Feds Scouring WaMu Files for Evidence of Fraud," Ex. 3 to the Singer Decl.  Similarly, AIG is the subject of a criminal probe involving the U.S. Attorney, the Department of Justice, and the SEC for "overstat[ing] the value of contracts connected to subprime mortgages."  *See* "SEC, Justice Scrutinize AIG on Swaps Accounting," Ex. 4 to the Singer Decl.  Further, Lehman Brothers is the subject of ongoing criminal grand jury investigations concerning whether it lied about its deteriorating financial health.  *See* "U.S. to Ask Analysts if Lehman Misled," Ex. 5 to the Singer Decl.

Company had a uniquely high level of exposure to, and losses from, these toxic assets.[21]  At a bare minimum, this fact precludes any conclusion as a matter of law that Citigroup's losses were on par with its peers.

In sum, Defendants' argument that they face no liability as a matter of law because all banks were equally impacted by an unforeseeable housing crisis is factually wrong, cannot be decided on the pleadings, and, unsurprisingly, has been consistently rejected by the courts.[22]

## C.   The Complaint Pleads Untrue Statements And Omissions Regarding Citigroup's Direct Exposure To Subprime-Backed CDOs

### 1.   The Public Offering Materials Failed to Disclose Citigroup's CDO Exposure

The Complaint alleges in detail that Citigroup failed to disclose its exposure to as much as $66 billion of subprime-backed CDO securities until the end of 2007, when Citigroup

---

[21] In an effort to shrink Citigroup's massive losses, Defendants set forth a chart that purports to compare Citigroup's write-downs with those of other banks, measured as a percentage of market capitalization. *See* Citi Br. at 46.  First, market capitalization is a concept that is solely rooted in common stock value and thus has no application to the Bond Class Securities.  Second, it is unclear whether the "Total Write-Downs" figures include write-downs unrelated to mortgage-backed assets.  Third, the purported metric of "Total Write-Downs/Market Cap (%)" is concocted, as there is no necessary relationship between write-downs and market capitalization.  Fourth, because Citigroup once had by far the largest market capitalization of any bank, this metric merely dilutes Citigroup's losses and makes them appear smaller than they actually are.  Fifth, even if Citigroup's market capitalization were relevant to its losses, its market capitalization as of January 1, 2007 (approximately $274 billion) is an inappropriate denominator.  The better denominator is Citigroup's market capitalization as of November 23, 2008, when its stock price finally reflected its true financial condition.  At that time, the Company had a market capitalization of only $21 billion – meaning that its "total write-downs" amounted to 407% of its market capitalization, not the 31% that Defendants claim.  Sixth, conspicuously absent from this chart is Goldman Sachs, which emerged from the housing downturn virtually unscathed.  Thus, this manipulated data raises many more factual questions than it could ever resolve, and utterly fails to establish anything as a matter of law.

[22] The cases that Defendants cite in support of their "falsity by hindsight" argument are misplaced.  *See* Citi Br. at 43, 47.  For example, in *Pittleman v. Impac Mortgage Holdings, Inc.*, the court dismissed the complaint for failure to plead scienter – which is not an element of a Securities Act claim.  *See* No. 07-cv-00970-AG-MLG, slip op. at 4 (C.D. Cal. Mar. 9, 2009).  Both *In re PXRE Group, Ltd., Sec. Litig.* and *Coronel* concerned highly-qualified loss estimates issued by insurance companies in the immediate aftermath of Hurricanes Rita and Katrina – facts that have no bearing here.  *See* No. 06 Civ. 3410 (RJS), 2009 WL 539864, at *31 (S.D.N.Y. Mar. 4, 2009); 2009 WL 174656, at *14.  *In re Huntington BancShares, Inc. ERISA Litig.* concerned ERISA claims, which are not at issue here, and involved a defendant which had "unequivocally disclosed" its subprime exposure, which Citigroup did not.  *See* 08 Civ. 0175, 2009 WL 330308, at *10 (S.D. Ohio Feb. 9, 2009).  Finally, the complaint in *Lerner v. FNB Rochester Corp.* alleged only that the registration statement "falsely portrayed the Company as [a] strong and stable institution," with no supporting, contemporaneous facts.  *See* 841 F. Supp. 97, 102 (W.D.N.Y. 1993).  By contrast, this Complaint pleads particular facts explaining why Citigroup's highly specific statements were untrue at the time they were made.  Further, the cases that Defendants cite in support of their "fraud by hindsight" argument (*see* Citi Br. at 28, 51-52) are inapposite because scienter is not element of Bond Plaintiffs' claims.  *See* Section II.A, *supra*.

acknowledged that these assets were already impaired by as much as $11 billion.  ¶¶155-79.  The Complaint also pleads that when Citigroup belatedly disclosed this exposure on November 4, 2007, numerous analysts stated that this information had "never been disclosed before;" materially altered the Company's risk profile; and that they had been "misled" by Citigroup's "previous disclosures" as to its subprime exposure.  ¶¶180-82.  Consistent with these allegations, on November 5, 2007, Fitch downgraded the Company precisely because of this massive exposure.  ¶183.

Despite these facts, Defendants argue paradoxically that (i) Citigroup had previously disclosed its exposure to subprime-backed CDOs; and (ii) Citigroup had no duty to disclose its exposure to subprime-backed CDOs until it had already suffered between $8 and $11 billion of losses on those securities.  Both of these arguments are without merit.

First, Citigroup's "truth-on-the-market" defense fails for numerous reasons.  As the Second Circuit has held, this defense is "intensely fact-specific" and "rarely an appropriate basis for" dismissal <u>even on summary judgment</u>, let alone on a motion to dismiss.  *Ganino*, 228 F.3d at 167.  This is because the defense requires Defendants to establish both (i) that the allegedly "corrective information" was communicated to investors, <u>and</u> (ii) as "the Second Circuit has stressed," that this information was "conveyed to the public <u>with a degree of intensity and credibility</u> sufficient to counter-balance effectively any misleading information created by the alleged statements."  *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 238 (S.D.N.Y. 2006) (quoting *Ganino*, 228 F.3d at 167) (emphasis added).  Moreover, to satisfy this demanding standard, Defendants' disclosures must have been so obvious, clear, and forceful that "<u>no reasonable investor</u> could have been misled."  *Id.*  Given the fact-intensive nature of this inquiry,

courts in this District routinely deny motions to dismiss based on the truth-on-the-market defense.[23]

Further, numerous facts alleged in the Complaint preclude any finding that Citigroup disclosed its exposure as a matter of law.  For example, Defendant Crittenden <u>admitted</u> that Citigroup had not disclosed $43 billion of its CDO exposure until November 4, 2007.  ¶178.  Moreover, analysts specifically stated that Citigroup had <u>not</u> previously disclosed its exposure, and Fitch immediately downgraded Citigroup after its corrective disclosure on November 4.  ¶¶180-83.  At minimum, these allegations raise an issue of fact as to whether the Company disclosed its CDO exposure.  *See, e.g.*, *Vivendi*, 381 F. Supp. 2d at 181-82 (rejecting truth-on-market defense where debt ratings dropped on company's disclosures); *see also* cases cited in footnote 23, *supra*.

In addition, Defendants have failed to cite a single statement by Citigroup disclosing its substantial exposure to CDOs before November 4, 2007.  The best that Defendants can do is cite to generalized disclosures, including "disclosures" that Citigroup "packages and securitizes assets" into CDOs; that Citigroup "<u>may</u>" also have an ownership interest in certain VIEs (off-balance sheet vehicles which included numerous securities that were completely unrelated to real estate);[24] and that Citigroup had a <u>theoretical</u> "maximum exposure to loss" to its hundreds of unconsolidated VIEs, which it expressly told investors to disregard (¶198).  These statements were vague and highly-qualified, and failed to disclose – either literally or in substance – the

---

[23] *See, e.g.*, *Ganino*, 228 F.3d at 167; *Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 212, 229 (S.D.N.Y. 2008) (whether facts "were adequately disclosed to the market is a fact-intensive query that cannot be disposed of on a motion to dismiss"); *Lapin*, 506 F. Supp. 2d at 238; *DeMarco v. Lehman Bros., Inc.*, 309 F. Supp. 2d 631, 634 (S.D.N.Y. 2004) ("At the very least, it is a question for the jury."); *DeMarco v. Robertson Stephens Inc.*, 318 F. Supp. 2d 110, 121 (S.D.N.Y. 2004) (whether defendants' disclosures "meet the 'intensity and credibility' standard is a question of fact").

[24] VIEs included "CDO-type transactions," "Investment-related transactions," "Trust preferred securities," "Mortgage-related transactions" and "Structured finance and other."  *See* Citigroup's Form 10-Q for the quarter ended June 30, 2007 at 67, Ex. 6 to the Singer Decl.

Company's exposure to $66 billion of highly risky subprime-backed CDOs.  *See Ganino*, 228 F.3d at 167 ("intensity and credibility" of alleged corrective disclosures must unquestionably override untrue statements); *In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 491 (S.D.N.Y. 2005) ("It is worth reiterating that any inquiry into alleged material misstatements within a registration statement must focus not on whether 'particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the securities.'" (quoting *DeMaria*, 318 F.3d at 180)).

Finally, Defendants' own arguments implicitly concede that the Public Offering Materials did not disclose this highly material information.  Indeed, rather than citing to any of the Public Offering Materials, Defendants resort to citing an academic treatise for the general proposition that the market knew that investment banks retained CDO exposure.  *See* Citi Br. at 21-22.[25]  Presumably, of course, this treatise did not state that Citigroup possessed $66 billion of direct exposure to subprime backed CDOs, and it certainly cannot support the conclusion that the Public Offering Materials disclosed this information.  *See, e.g.*, *Lapin*, 506 F. Supp. 2d at 235-38 (rejecting truth on the market defense despite numerous news reports and a lawsuit concerning the salient facts).

Apparently recognizing that this information was not disclosed before November 4, 2007, Defendants also claim that they had no duty to disclose it before that date.  *See* Citi Br. at 23.  In essence, Defendants are contending that they did not have a duty to disclose Citigroup's CDO

---

[25] Relying largely on Lead Plaintiffs' determination of Citigroup's ownership of specific CDO tranches, which is set forth in the separate Securities Fraud Litigation against Citigroup before this Court, Citigroup also argues that investors "had the ability to evaluate the magnitude of those [CDO] holdings based on publicly available information."  Citi Br. 24.  This ignores that Lead Plaintiffs were able to do so only because, after November 4, 2007, Citigroup disclosed its ownership of CDO tranches and the amounts of each type of tranche owned.  This information was not available to investors before that date, as confirmed by the stunned reactions of analysts who closely followed the Bank's disclosures.

exposure until the Company already had incurred between $8 and $11 billion of losses on that exposure.  Contrary to Defendants' argument, for several reasons, the duty to disclose this $66 billion exposure did not just arise once Citigroup already had suffered massive, multi-billion dollar losses on those securities.

First, Citigroup made numerous statements in the pre-November 2007 Public Offering Materials about its involvement with CDOs, all of which created the impression that Citigroup had no exposure to these highly risky securities.  For example, Citigroup stated that it had "limited continuing involvement" in its VIEs (¶¶165, 198); the "Company's mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchasers of securities issued by the trust" (¶315); and from July 20 up until November 4, 2007 it had less than $13 billion of exposure to subprime-backed CDOs (¶322).  Having made statements about its involvement and exposure to its subprime-related assets, Citigroup was obligated to disclose its direct exposure to tens of billions of dollars of toxic CDOs.  *See Caiola*, 295 F.3d at 331 ("[U]pon choosing to speak, one must speak truthfully about material issues.  Once Citibank chose to discuss its hedging strategy, it had a duty to be both accurate and complete."); *Nanopierce Techs., Inc. v. Southridge Capital Mgmt.*, 02-CV-0767, 2008 WL 250553 at *8 (S.D.N.Y. Jan. 29, 2008) ("Where a company chooses to make a disclosure, it has a duty to make it complete and accurate."); *Hall v. The Children's Place Retail Stores, Inc.*, No. 07 Civ. 8252, 2008 WL 2791526, at *5 (S.D.N.Y. Jul. 18, 2008) (same).

Defendants also contend that Citigroup's statements about its "limited continuing involvement" were accurate since Citigroup had "neither operational nor equity interest in the CDOs," and that its statements about its mortgage securitizations were accurate because those operations were "separate and distinct from its CDO-related activity and disclosures."  Citi Br. at

33.[26]  However, as the Complaint alleges, the statements about Citigroup's purportedly "limited" involvement were false because Citigroup was obliged to absorb losses on its CDOs, and the statements about mortgage securitizations did apply to CDOs because CDOs are a form of mortgage securitization, and the quoted statement does not imply otherwise.  Moreover, the crux of Bond Plaintiffs' claim is that these statements were rendered false by material <u>omission</u> – a fact amply demonstrated by the market's reaction once Citigroup began to disclose its CDO exposure.  *See, e.g.*, *WorldCom*, 352 F. Supp. 2d at 491 (statements must be analyzed in context to determine if they are materiality misleading).

<u>Second</u>, the highly material nature of this toxic exposure independently triggered a duty to disclose.  *See Globalstar*, 2003 WL 22953163, at *10 ("A prospectus will violate federal securities laws if it does not disclose 'material objective factual matters….'") (quoting *Demaria*, 318 F.3d at 180).  Defendants argue that Bond Plaintiffs are seeking "individual line item" financial statement disclosure of CDOs, and that this disclosure would not have been material to investors.  Indeed, Defendants go so far as to argue that the "disclosure suggested by plaintiffs would not only <u>be overly burdensome and time consuming to prepare</u>, but the resulting disclosure would be <u>too granular to be meaningful</u>" and would "<u>bury the shareholders in</u> an avalanche of <u>trivial information</u>."  Citi Br. at 25 n.17.  The notion that Citigroup's exposure to $66 billion of toxic subprime-backed CDOs was "trivial" or meaningless to investors is absurd.  Such fact-intensive arguments should be rejected.  At summary judgment or trial, Defendants can establish how burdensome and time-consuming it would have been to disclose their CDO exposure to investors – not here, where they have put forth no evidence as to how difficult that would have been.  As for their argument that this information was "trivial," the market's reaction

---

[26] Once again, Defendants' arguments in this regard rely upon their improper and contested version of the Complaint's well-pled facts.  As explained above, Defendants are not entitled to re-write the Complaint to suit their needs.

to this news establishes that it was anything but meaningless to investors in the Bond Class securities.

Indeed, the Complaint alleges numerous facts establishing that Citigroup's CDO exposure was highly material, including that (i) Citigroup's CDO exposure was more than 3.3 times larger than the capital cushion it held to preserve its well-capitalized status (¶155); (ii) a rising tide of defaults severely jeopardized the cash flows underlying those securities in late 2005 and early 2006 (¶¶158-65); and (iii) investors had recognized that these securities could become worthless as the housing market collapsed (*id.*).   Thus, Citigroup's November 4, 2007 disclosures led numerous analysts to report that the Company's "previously undisclosed" exposure was "surprisingly large and at risk" and materially altered Citigroup's risk profile. ¶182.  At the very least, these facts prevent any conclusion that this exposure was immaterial as a matter of law.[27]

Third, GAAP independently required Citigroup to disclose its massive concentration of CDO credit risk.   Specifically, SFAS 107 required Citigroup to disclose "all significant concentrations of credit risk from all financial instruments" (emphasis added).   ¶267. Throughout the Offerings Period, the Company's $66 billion of subprime mortgage-backed CDOs was a "significant" concentration of credit risk, and thus, Citigroup was bound to disclose it under the plain terms of SFAS 107.  ¶¶263-70.

Citigroup argues that it was not required to disclose this risk because SFAS 107 only requires disclosure of concentrations of counterparty "credit risks," while Citigroup's CDO portfolio was subject only to "market risks."  Citi Br. at 23-24.  However, Citigroup's CDOs were collateralized by subprime mortgages.  Accordingly, Citigroup's massive CDO exposure

---

[27] Moreover, Defendants misconstrue the relevant GAAP provisions.  SFAS No. 107 and Item 303 do not require mere "line item" disclosures – they require meaningful, descriptive disclosure of concentrations of risk.  ¶¶265-70.

was a <u>counterparty credit risk</u> – *i.e.*, the risk that the subprime borrowers upon whom the CDOs depended would be unable to pay off their loans.[28]   That is the very definition of concentrated credit risk.

In addition, Item 303 of Regulation S-K required Citigroup to disclose any "known trends" that either have impacted its business or could be reasonably expected to impact its business.  ¶265.  Once the trend of mortgage defaults threatened the Company's CDO exposure in late 2005 and early 2006 (¶¶160-65), Item 303 required disclosure of the Company's exposure to this trend by virtue of its interest in $66 billion of CDOs.  Defendants maintain that Citigroup was not required to disclose "known trends" regarding its subprime exposure under Item 303 because that provision does not separately confer a private right of action.  *See* Citi Br. at 33.  However, a violation of Item 303 is actionable <u>under the Securities Act</u>.  *See In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 211 (S.D.N.Y. 2004) ("An omission of fact 'required to be stated' under Item 303 will generally produce liability under section 11.").[29]

Defendants also argue that Citigroup's failure to disclose its CDO exposure pursuant to Item 303 was material only in "hindsight" because there did not exist any negative trends at the time of its statements.  Citi Br. at 34.  This argument ignores the relevant facts.  Indeed, the

---

[28] SFAS No. 107 ¶15A explains that "*Group concentrations* of credit risk exist if a number of counterparties are engaged in similar activities and have similar economic characteristics that would cause their ability to meet contractual obligations to be similarly affected by changes in economic or other conditions" (emphasis in original). This was exactly the case as to subprime borrowers.

Additionally, SOP 94-6 requires disclosure of concentrations of credit risks that make an enterprise vulnerable to a near-term (*i.e.*, within one year) severe impact.  Citigroup argues that this provision does not apply because SOP 94-6 contains an exclusion for "financial instruments." Citi Br. at 75 n.33.  In fact, FASB Staff Position SOP 94-6-1 – which was issued in December 2005 in response to the growing use of subprime and other non-traditional mortgages – makes it clear that, notwithstanding the exclusion of financial instruments from SOP 94-6, disclosure of concentrations of loan products, such as CDOs, is required where the terms or other features of the loan products give rise to a significant credit risk.  In any event, FAS No. 107 <u>in and of itself</u> required disclosure of Citigroup's concentration of credit risk.

[29] Defendants argue that the Complaint does not "identify which specific SEC filings allegedly violate Item 303." Citi Br. at 34.  The answer is that each of the Citigroup Form 10-Qs and Form 10-Ks, which were incorporated into the Public Offering Materials, violated Item 303.  *See* Appendix to Complaint at A-1-22.

Complaint alleges numerous <u>contemporaneous</u> facts showing an undisclosed deterioration in Citigroup's CDO collateral, including (i) the collapse in the housing market which impacted the loans that ultimately backed Citigroup's CDOs (¶¶161-66); (ii) the poor underwriting and risky nature of the loans that were packaged into CDOs (¶¶161-62, 187, 219-226); (iii) Citigroup's inability to sell its CDO assets at anything approaching their reported value (¶190); and (iv) the meltdown in the most analogous market-based index to Citigroup's CDO exposures (¶¶295-297).[30]

        2.      <u>Citigroup Failed to Properly Account for Its CDO Exposure</u>

The Complaint alleges that, even after Citigroup belatedly disclosed its CDO exposure in November 2007, it continued to materially misstate the value of these securities and their impact on its purported "well-capitalized" status.  ¶¶287-99.  Defendants argue that these allegations amount only to falsity by "hindsight" because GAAP is a matter of judgment, and Citigroup could not have anticipated the market collapse.  Citi Br. at 26-27.  However, as noted above, the Complaint alleges several facts existing <u>before and during</u> the Offerings Period which establish that Citigroup's CDO holdings were misstated at the time of each Offering in 2007 and 2008, including: (i) rising defaults in the risky loans collateralizing the CDOs had jeopardized the underlying cash flows (¶¶161-64, 219-26); (ii) Citigroup could not sell its CDOs (¶¶190, 293-94); (iii) the leading market index for valuing RMBS reflected that Citigroup's CDO securities were worth far less than reported (¶¶295-96); and (iv) Citigroup's valuation methodology

---

[30] Given these facts, Defendants' cited authorities are to no avail.  The plaintiff in *In Re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 202 F. Supp. 2d 8 (S.D.N.Y. 2001) alleged that Turkcell was required to disclose a first-time decline in sales that took place <u>after</u> the last quarterly financial statements in a prospectus.  The court held that the change was insufficiently material in size to justify deviating from quarterly reporting of financial information.  *Id.*  The plaintiff in *Panther Partners, Inc. v. Ikanos Communs., Inc.*, 538 F. Supp. 2d 662 (S.D.N.Y. 2008), alleged that defendants should have disclosed that increased orders by customers in 2003 and 2004 would lead to a decline in orders in 2006 – a classic forward-looking statement which the court held was backed only by pure speculation.  *Id.* at 669-70.

improperly relied on irrelevant valuations of corporate bonds, credit ratings, and interest rate risk (¶¶298-99).

Courts routinely hold that GAAP violations are actionable where, as here, the complaint's allegations show that those "judgments" were contradicted by then-existing facts. *See RAIT*, 2008 WL 5378164, at *7 (rejecting "fraud by hindsight" defense and sustaining Section 11 claims that company failed to properly value the assets collateralizing its CDOs); *New Century*, 588 F. Supp. 2d at 1210, 1215, 1226-27, 1239 (rejecting argument that misstatements of value of residual RMBS interests were judgmental and sustaining Section 11 claim for those misstatements); *Vivendi*, 381 F. Supp. 2d at 175 (sustaining Securities Act claim based on alleged failure to timely write-down goodwill); *WorldCom*, 352 F. Supp. 2d at 493-94 (denying summary judgment on Section 11 claim that WorldCom failed to properly account for goodwill); *White v. Heartland High-Yield Mun. Bond Fund*, 237 F. Supp. 2d 982, 984, 985-86 (E.D. Wis. 2002) (sustaining Section 11 claims based on misstatement of net asset value where plaintiffs' "primary contention is that the Funds' shareholders were never told that the value of their shares was so uncertain as to be essentially meaningless"); *Holmes v. Baker*, 166 F. Supp. 2d 1362, 1372 (S.D. Fla. 2001) ("Plaintiff amply establishes a prima facie claim under Section 11 by alleging various material misrepresentations and omissions in the Prospectus with respect to net income and inventory valuation.").

Moreover, Defendant Pandit's admissions that Citigroup could no longer "mark-to-market" $80 billion of its subprime holdings (including its CDOs), and the sheer size and scope of the U.S. Government's unprecedented $326 billion bailout, further support the inference that the Company misstated the value of its CDO securities.  As analysts and the financial press specifically noted, Pandit's statements were a concession that Citigroup could not withstand the

48

losses it would be forced to record if it accurately valued those holdings, and the Government's remarkable bailout is extraordinarily compelling evidence of that fact. ¶¶14, 255-56. *See, e.g.*, *Novak*, 216 F.3d at 312-13 ("[T]he complaint provides specific facts concerning the Company's significant write-off of inventory directly following the Class Period, which tends to support the plaintiffs' contention that inventory was seriously overvalued at the time the purportedly misleading statements were made."); *In re JDS Uniphase Corp. Sec. Litig.*, No. 02-1486, 2005 U.S. Dist. LEXIS 20831, at *28-29 (N.D. Cal. Jan. 6, 2005); *Vivendi*, 381 F. Supp. 2d at 175 ("The fact that plaintiff relies on evidence that post-date the Form F-4 does not vitiate the false or misleading nature of the registration statement…."). [31]

Defendants next claim that the Complaint fails to allege that Citigroup misstated the value of its CDO securities because it fails to plead the market prices for those securities or that Citigroup failed to consider such prices. *See* Citi Br. at 30-31. However, the Complaint specifically alleges that the quarterly value of the leading market index for RMBS valuation was collapsing, and that Citigroup failed to properly account for that data in valuing its CDO securities. ¶¶295-96. While Defendants argue that the TABX index is not a generally accepted indicator of CDO value and that Citigroup's methodology was otherwise appropriate (*see* Citi Br. at 31-32), these attempts to challenge the Complaint's allegations about what accounting practices are "generally accepted" or otherwise appropriate is precisely the type of fact-based argument that cannot be resolved on a motion to dismiss. *See RAIT*, 2008 WL 5378164, at *7 ("[I]t is a factual question whether [a company's] accounting practices were consistent with GAAP, and thus, we cannot determine this issue on a motion to dismiss." (quoting *In re*

---

[31] In addition, certain Public Offering Materials disseminated later in the Offerings Period specifically assured investors that Citigroup's valuation methodology had been "refined" to account for "ongoing unfavorable market developments," and, thus, that Citigroup had capital "sufficient to absorb unexpected market, credit, or operational losses." ¶9. Having inaccurately told investors that it accounted for even "unexpected" market events, Citigroup cannot now claim that those exact events somehow rendered its statements true when made.

*Burlington Coat Factory*, 114 F.3d 1410, 1421 (3d Cir. 1997)); *Refco*, 503 F. Supp. 2d at 656-57 ("Although the question of whether GAAP has been violated might appear to be a legal determination, the element of what is 'generally accepted' makes this difficult to decide as a matter of law.  At the motion to dismiss stage, the plaintiffs' assertion that certain practices were not generally accepted 'must be taken as true.'" (quoting *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 339 (S.D.N.Y. 2004)); *WorldCom*, 352 F. Supp. 2d at 493-94; *Nappier v. Pricewaterhouse Coopers, LLP*, 227 F. Supp. 2d 263, 276 (D.N.J. 2002).

3.    <u>The Complaint Adequately Alleges that Citigroup Violated FIN 46(R) by Failing to Consolidate Its Commercial Paper CDOs</u>

The Complaint also alleges that Citigroup violated FIN 46(R) by failing to consolidate (before the fourth quarter of 2007) the $25 billion of commercial paper CDOs for which it was obligated to absorb losses pursuant to the liquidity puts.  ¶¶273-76.  Defendants argue that Citigroup was not required to consolidate those securities until the fourth quarter of 2007 because, up to that point, it could not have "anticipat[ed] that it would absorb the majority of the losses associated with the commercial paper CDOs."  Citi Br. at 29.

This argument conflates the fact of actually <u>taking</u> losses with a <u>commitment</u> to absorb losses should they occur.  FIN 46(R) is not drafted in terms of Defendants' subjective intent, and it does not apply solely when losses occur; to the contrary, it provides that consolidation must occur if Citigroup "will absorb the majority of the entity's [*i.e.*, the CDOs'] expected losses." ¶273 (quoting FIN 46(R), ¶14).  In the case of the commercial paper CDOs, the liquidity puts guaranteed that if and <u>when losses occurred, Citigroup would absorb them</u>.  Thus, regardless of market conditions at any given moment, this guarantee rendered Citigroup liable for the majority of losses that would occur.

Further, the Complaint alleges that, long before the end of the fourth quarter of 2007,

numerous facts established that Citigroup's CDOs were in severe jeopardy.  ¶¶161-64, 190, 293-96.   Indeed, contrary to Citigroup's current version of events, it began to repurchase the commercial paper to avoid liquidity put exercises in the summer of 2007 – several months before Citigroup even disclosed this exposure, let alone consolidated these CDOs.  ¶179.  Based on these facts, there can be no doubt that Citigroup failed to consolidate these CDOs in a timely fashion.  Defendants may disagree with the Complaints' factual allegations, but that is not a matter to be resolved at the pleading stage.

**D.**     **The Public Offering Materials Contained Actionable Misstatements And Omissions Regarding Citigroup's SIVs**

Citigroup repeatedly misstated its exposure to its SIVs by claiming to have only "limited continuing involvement" with them, no obligation to absorb their losses, and no obligation to consolidate them.  *See, e.g.*, ¶¶197-206.  Further, once Citigroup admitted its direct exposure to its SIVs (and its obligation to consolidate them) on December 13, 2007, numerous analysts and market observers stated that its admission constituted "the second time that unwanted assets have suddenly appeared on the Citigroup balance sheet," and the price of the Bond Class Securities fell sharply.  ¶¶208-09.

In response to these facts, Defendants' principal argument is to again assert a truth-on-the-market defense, *i.e.*, that Citigroup stated the size of its SIVs' assets and its theoretical, or "notional," "maximum" exposure to all of its VIEs.  Citi Br. at 35-36.  Even putting aside that this "intensely fact-specific" defense is not appropriate to resolve on a motion to dismiss, numerous facts – including, most significantly, the market's reaction and the statements by analysts that the information had not been previously disclosed – preclude a finding that Citigroup had previously disclosed its true SIV exposure as a matter of law.[32]  ¶¶208-09.  Indeed,

---

[32] *See Ganino*, 228 F.3d at 167; *Lapin*, 506 F. Supp. 2d at 238; *see also* cases cited in footnote 23, *supra*.

far from disclosing its liabilities, Citigroup consistently asserted that it was <u>not</u> obligated to absorb its SIVs losses – even stating as late as November 2007 that it flatly "will not" consolidate those liabilities.  ¶¶203-06.

While Citigroup disclosed its maximum theoretical exposure to all of its VIEs as a whole, this figure failed to communicate in any way that Citigroup was obligated to absorb losses on its SIVs.  Indeed, this figure did not even specifically concern SIVs, but included instruments such as commercial paper conduits, mortgage-backed securities, CDOs, and literally "<u>hundreds</u> of separate entities with which the Company is involved."  *See* Citigroup's 2006 Form 10-K at 147 (emphasis added), Ex. 7 to the Singer Decl.  Moreover, Citigroup told investors to disregard this figure, stating that "[a]ctual losses [from VIEs] are not expected to be material."  ¶¶198, 318.

In addition, merely disclosing the amount of the SIVs' assets (*see* Citi Br. at 35), contained in a table along with at least 13 other types of VIEs, does not satisfy the Company's disclosure obligations.  *See* Citigroup's 2006 Form 10-K at 146, Ex. 7 to the Singer Decl. Notably, that table did not disclose either that (i) Citigroup had implicitly guaranteed the SIVs' losses, or (ii) the SIVs' assets had significantly deteriorated in value.  ¶¶194, 199, 201.[33]  Thus, neither of the vague and highly qualified disclosures to which Defendants point establishes the truth-on-the-market defense as a matter of law.[34]

---

[33] In addition, for the reasons set forth in Section III.C.1, *supra*, the Public Offering Materials also failed to comply with the requirements of SFAS 107 and SOP 94-6, as these provisions required Citigroup to disclose the concentration of risk relating to its billions of dollars of mortgage-related exposure in the SIVs.  ¶¶266-70.  Neither a "maximum exposure" figure nor a listing in a table sets forth this massive, undisclosed risk concentration, which would be of critical importance to investors in the Bond Class Securities.

[34] *See Demaria*, 318 F.3d at 180 (noting that central issue in determining falsity is "not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the [securities]" (citation omitted)).  Thus, read in context with Defendants' representation that actual VIE losses would be immaterial, the generic disclosure of Citigroup's maximum VIE loss is plainly insufficient.  *See also AXIS*, 456 F. Supp. 2d at 588 (noting that purported disclosures in a registration statement must be analyzed <u>in context</u> to determine whether they would have misled a reasonable investor).

As with its CDO exposure, after initially claiming that they disclosed this information, Defendants contend that Citigroup had no duty to disclose information about the SIVs in the first place.  *See* Citi Br. at 36.  At the very least, however, Citigroup's numerous statements about its purportedly "limited" involvement with its SIVs (¶197), the lack of a contractual obligation to support them (¶203), and the purported lack of obligation to consolidate them (¶206) unquestionably triggered a duty to disclose Citigroup's implicit guarantee to absorb these vehicles' losses.  *See, e.g.*, *Caiola*, 295 F.3d at 331; *Nanopierce*, 2008 WL 250553, at *8; *Globalstar*, 2003 WL 22953163, at *10.

Equally unpersuasive is Defendants' contention that Citigroup was not obligated to consolidate its SIV holdings because it had "no contractual obligation" to do so.  Citi Br. at 36-37.  The absence of a contractual guarantee does not absolve Citigroup of the duty to disclose its highly material *de facto* guarantee.  *See Globalstar*, 2003 WL 22953163, at *10; *Shaw*, 82 F.3d at 1208.  As explained in the Complaint, the plain language of FIN 46(R) requires consolidation where a company "will absorb the majority of the entity's expected losses" – regardless of whether the obligation to absorb those losses is "<u>explicit or implicit</u>."  ¶¶273, 279-80.[35]  Further, Citigroup admitted it was obligated to consolidate its SIVs on December 13, 2007, when it did precisely that.  Defendants' argument that Citigroup decided to assume crippling losses on almost <u>$50 billion</u> of these subprime-backed securities "at its discretion" (Citi Br. at 36), after months of denying that it would consolidate them, not only contradicts the allegations of the Complaint, but also is implausible.  Defendants can attempt to establish that they absorbed these

---

[35] Moreover, the Chairman and a member of the FASB have expressly stated that consolidation is required in situations where "rollover of commercial paper in a SIV" exposes a company to the SIVs' losses – exactly what occurred with Citigroup's SIVs.  ¶281.  In addition, numerous financial observers recognized that Citigroup had implicitly guaranteed that it would absorb the SIVs' losses, and Citigroup itself acknowledged as much when it attempted to avoid this obligation by transferring its SIVs to an even more remote "super-SIV."  ¶¶201-05.

losses out of the goodness of their hearts at summary judgment or trial – not now, where the inference sought by Defendants is implausible.

Defendants also insist – without citation to any authority – that these allegations are insufficient to establish the duty to consolidate at the pleading stage because they do not (i) cite to a law, regulation or judicial decision; and (ii) show that Citigroup inappropriately exercised its accounting judgment in electing not to consolidate its SIVs through the third quarter of 2007. *See* Citi Br. at 37.  Defendants again ignore the Complaint's allegations.  As noted above, the Complaint specifically cites to FIN 46(R), which requires consolidation of a VIE <u>when there is an implicit obligation to support it</u>.  ¶¶273, 279-86.  In addition, the Complaint cites to the interpretation of that provision by FASB members in the specific context of Citigroup's SIVs. ¶281.  Thus, it is difficult to understand Defendants' assertion that Bond Plaintiffs have failed to cite to any authority in this respect.  Further, the Complaint alleges that Citigroup improperly applied this accounting rule by repeatedly dismissing – and failing to even disclose – its implicit obligation for the purposes of consolidation under FIN 46(R), notwithstanding the plain language of that provision.  ¶¶196-206, 277-86.[36]

Defendants next claim that Citigroup's decision to stop marking-to-market its SIV assets in November 2008 does not mean that the value of these assets were misstated prior to that time. *See* Citi Br. at 37.  However, numerous alleged facts establish that Citigroup misstated the value of its SIV assets both before and after it consolidated them, including (i) the collapse of the housing market and the rising defaults on subprime and other loans backing the SIVs' assets (¶¶161-64); (ii) the precipitous decline of the TABX (¶296); (iii) the severe illiquidity of the

---

[36] To the extent that Defendants are challenging the Complaint's interpretation of FIN 46(R) as not generally accepted, they are wrong, as the plain language of that provision and the statements of FASB members establish.  In any event, such an argument merely raises fact issues that cannot be decided on a motion to dismiss, as noted above in Section III.C.2.  *See, e.g.*, *RAIT*, 2008 WL 5378164, at *7; *Refco*, 503 F. Supp. 2d at 656-57; *Global Crossing*, 322 F. Supp. 2d at 339; *WorldCom*, 352 F. Supp. 2d at 493-94.

market for SIV assets (¶¶201, 301); (iv) Citigroup's plan to create a "Super SIV," which financial observers stated was a way to avoid its mounting losses (¶¶202-05); and (v) the U.S. Government's $326 billion bailout of Citigroup, which analysts stated established "that Citi's toxic assets are worth much less than Citi has valued them at" (¶14). These facts adequately support the allegations that the SIVs' assets were worth far less than Citigroup reported. *See* cases cited in Section III.C.2, *supra* (concerning misstatements of CDO valuation).

**E.**      **Citigroup Misstated Its Loss Reserves**

Citigroup violated SFAS 5 in setting its reserves by: (i) reserving only for loans that had already defaulted and been charged off rather than those that exhibited a current probability of default (¶¶229-30); (ii) maintaining reserves substantially below the actual charge-offs for its North American portfolio from the third quarter of 2006 through the third quarter of 2007 (*id.*); and (iii) decreasing its reserves as a percentage of total loans by 50%, even though Citigroup had dramatically increased its volume of risky loans, the housing market had collapsed, and defaults were rising nationally (¶¶219-235).

Nevertheless, Defendants argue that "plaintiffs have not pled with particularity facts establishing that Citigroup should have known at the time that it needed larger loan loss reserves." Citi Br. at 38. This argument badly mischaracterizes both the law and the allegations summarized above. Because scienter is not an element of Bond Plaintiffs' claims, they need not show that Citigroup acted recklessly or knowingly in setting its reserves. *See* Section III.A, *supra*. As summarized directly above, the Complaint alleges contemporaneous facts reasonably available to Citigroup reflecting that Citigroup's reserves were understated <u>at the time of each</u> <u>Offering</u> – which is all that the Securities Act requires. ¶¶219-35. Courts routinely hold that

these allegations suffice, even under Rule 9(b)'s particularity requirement.[37]

Defendants advance the sweeping categorical argument that "GAAP violations do not suffice to plead a violation of the Securities Act of 1933." Citi Br. at 38. This argument – which again confuses the elements of fraud-based Exchange Act claims with those of negligence-based Securities Act claims – is nonsense. While GAAP violations by themselves may not suffice to plead scienter under the Exchange Act, scienter is not an element of a Securities Act claim. As noted above, the Securities Act requires only the existence of a materially untrue statement. Accordingly, courts routinely hold that well-pled GAAP violations are by definition sufficient to satisfy this element. *See, e.g.*, 17 C.F.R. § 210.4-01 ("Financial statements filed with the [SEC] which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate….") (emphasis added); *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 399 (S.D.N.Y. 2007) (holding that "[c]omplaint adequately alleges material misstatements under section 11 and section 12(a)(2)" where it principally alleged GAAP violations); *Refco*, 503 F. Supp. 2d at 633 (sustaining Section 11 claims based in part on GAAP violations); *SEC v. Caserta*, 75 F. Supp. 2d 79, 90 (E.D.N.Y. 1999) ("A statement made in violation of GAAP may be found to be misleading or inaccurate under the federal securities laws.").[38]

Defendants also contend that allegations of reserve misstatements "are classic claims of

---

[37] *See New Century*, 588 F. Supp. 2d at 1214, 1226, 1239 (Section 10(b) and Section 11 reserves claims sustained where company failed to set reserves according to contemporaneous mortgage loan repurchase data); *Accredited Home Lenders*, 556 F. Supp. 2d at 1150-52, 1154, 1159 (Section 10(b) and Section 11 reserves claims sustained where reserves "decreased as a percentage of the company's delinquent loans" even though size and risk of portfolio increased); *In re Dynex Inc. Sec. Litig.*, No. 05-1897, 2006 WL 314524, at *12 (S.D.N.Y. Feb. 10, 2006) (Section 10(b) reserves claim sustained where, as here, company "fail[ed] to include some provision for 'current' (not delinquent) loans"), *vacated in part on other grounds by* 531 F.3d 190 (2d Cir. 2008); *In re Reliance Sec. Litig.*, 91 F. Supp. 2d 706, 722 (D. Del. 2000) (reserves claim sustained where reserves "were declining as a percentage of net receivables during the time in which its loan loss rate was increasing").

[38] Defendants also claim that allegations of reserve misstatements "unquestionably sound[] in fraud." Citi Br. at 13. As explained above in Section III.A, this argument fails.

mismanagement" because they necessarily concern forward-looking estimates.  Citi Br. at 17;
*see also id.* at 28, 38.  This argument fails because, among other reasons (*see* Section III.G,
*infra*), reserves "are not projections, they are directed to the then-present state of the Company's
financial condition," and thus, a reserve misstatement is actionable under the securities laws.
*Schnall*, 2004 WL 367644, at *8 (internal quotation marks omitted); *see also New Century*, 588
F. Supp. 2d at 1226-27 (reserve misstatements were misrepresentations of "the present state of
historical facts"); *Accredited Home Lenders*, 556 F. Supp. 2d at 1150 (under SEC guidance,
reserves "must 'incorporate management's current judgments about the credit quality of the loan
portfolio'"); *Dynex*, 2006 WL 314524, at *12 ("the reserve provisions encompassed a
representation of present fact").[39]

## F.   The Complaint Alleges Materially False Statements And Omissions Regarding ARS

The Public Offering Materials altogether omitted that Citigroup had amassed an $11
billion portfolio of impaired ARS between August 2007 and February 2008.  ¶¶240-41.  After
Citigroup and other ARS market-makers stopped supporting the auctions in February 2008, the
Company carried these illiquid assets on its balance sheet at overstated values.  ¶¶246-47, 333.

Defendants' contention that the Company had no duty to disclose its ARS exposures is
unavailing.  *See* Citi Br. at 41-42.  As this Court has recognized, "[a] prospectus will violate
federal securities laws if it does not disclose '<u>material</u> objective factual matters'" that affect its
reported financial results.  *Globalstar*, 2003 WL 22953163, at *10 (emphasis added and quoting

---

[39] In each of the cases cited by Defendants relating to mismanagement with respect to loss reserves, unlike here, the
complaint alleged in conclusory fashion that the company's reserves were inadequate, without explaining the precise
manner in which the company violated GAAP and the amount of the misstatements.  *See CIT*, 349 F. Supp. 2d at
687 (complaint merely alleged that reserves were inadequate because company later increased them); *Ciresi v.
Citicorp*, 782 F. Supp. 819, 821 (S.D.N.Y. 1991) (complaint pled only "[u]nsupported conclusory allegations" that,
because reserves were later increased, they must have been misstated); *Hinerfeld v. United Auto Group*, No. 97 Civ.
3533(RPP), 1998 WL 397852, at *7 (S.D.N.Y. July 15, 1998) (allegation of "inadequacy of the reserves" was
"conclusory and unsupported by additional factual allegations").

*Demaria*, 318 F.3d at 180); *see also Shaw*, 82 F.3d at 1208.  As noted above, materiality is a factual question that typically cannot be resolved on a motion to dismiss.  *See Ganino*, 228 F.3d at 162.

Moreover, the omitted ARS information was unquestionably material to the Company's financial results and capital adequacy, and thus gave rise to a duty to disclose.  Between August 2007 and February 2008, Citigroup accumulated $11 billion of ARS.  ¶242.  It amassed this position by purchasing distressed and otherwise illiquid securities, and did so while its own capital adequacy was under severe pressure.  When Citigroup first disclosed this exposure, analysts specifically reported that this exposure was "worthy of note" because it was large, illiquid, and further threatened Citigroup's already-precarious capital adequacy.  ¶246.

In response, Defendants profess that this information was immaterial because (i) the ARS market did not become illiquid until February 2008, and (ii) Citigroup promptly disclosed this occurrence in its 2007 Form 10-K.  *See* Citi Br. at 41-42.  The Complaint, however, asserts that Citigroup was forced to purchase material amounts of ARS "[b]eginning in August 2007," and, consequently, it accumulated $11 billion of otherwise illiquid securities on its own balance sheet before February 2008.  ¶¶241-42.  Thus, the innocuous statement in Citigroup's 2007 Form 10-K, published on February 22, 2008, that the economic downturn "negatively affected a wide range of products including auction rate securities," was neither timely nor sufficient to disclose these material adverse facts.  To the contrary, that vague statement was misleading because it omitted the existence of $11 billion of these impaired securities on Citigroup's balance sheet.  *See, e.g.*, *Caiola*, 295 F.3d at 331; *Globalstar*, 2003 WL 22953163, at *11 (omission of "existing fact" not protected by general risk disclosure); *Nanopierce*, 2008 WL 250553, at *8.

Defendants' argument that "Citigroup's bidding practices in ARS auctions" have appeared "on Citigroup's public website since 2006" (Citi Br. at 41) ignores that generalized risk disclosures advising of <u>possible</u> problems are no proxy for disclosure of the <u>current</u> fact that a risk has <u>actually</u> materialized.  The language cited by Defendants – that Citigroup "may" support ARS auctions – failed to disclose the critical historical facts at issue: namely, that Citigroup had <u>in fact</u> accumulated $11 billion of <u>impaired</u> ARS between August 2007 and February 2008.  *See Globalstar*, 2003 WL 22953163, at *11; *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 579 (S.D.N.Y. 2007); *WorldCom*, 346 F. Supp. 2d at 687.[40]  Indeed, analysts specifically noted on April 18, 2008 that the Company's ARS exposure was both "newly disclosed" and "worthy of note."  ¶246.[41]

### G.    The Complaint Pleads Specific False Statements And Omissions Rather Than General Mismanagement

Defendants assert that the Complaint alleges only "mismanagement" because it merely pleads that "Citigroup took on too many risky assets."  Citi Br. at 15.  This argument fundamentally misconstrues the gravamen of the Complaint.  Indeed, Bond Plaintiffs do not allege that Citigroup should not have entered into the transactions at issue, or that entering into these transactions violated the federal securities laws.  To the contrary, Bond Plaintiffs allege that, having entered into such transactions, the Company failed to properly disclose and account for them.  *See* ¶¶155, 165-73, 188, 194, 198-99, 206, 210-13, 227-36, 244, 249-53, 269, 275-76, 282, 285, 293-99, 302, 310-42.  Those are classic allegations of a Securities Act claim.

For example, rather than alleging only that Citigroup "took on too many risky assets," the

---

[40] For the same reasons, the statement in Citigroup's 2007 Form 10-K also is woefully inadequate to disclose Citigroup's then-existing $11 billion portfolio, and that this exposure was severely impaired.

[41] Finally, Defendants do not (because they cannot) allege that their cited language appeared in the Public Offering Materials: the fact that they had to retrieve it from a website further establishes that this information was never disclosed anywhere in the Public Offering Materials.  In addition, it is unknown whether this information was available simultaneously with each of the Offerings, and Bond Plaintiffs do not conceded this point.

Complaint alleges that Citigroup <u>failed to disclose</u> its true exposure to CDOs, SIVs, and ARS (¶¶171-73, 199, 244, 269), <u>inaccurately stated</u> that it possessed only "limited" exposure to CDOs (¶¶165-66, 322), and <u>inaccurately stated</u> that it was not required to, and "will not," consolidate its SIVs (¶¶206, 327).  Further, the Complaint does not simply allege that Citigroup possessed poor asset valuation methods or "inadequate" reserves.  Citi Br. at 15, 17.  Rather, it alleges that Citigroup failed to account for specifically-identified, contemporaneous facts and thus <u>misstated</u> the value of its CDOs, SIVs, and its reserves.  ¶¶228-35, 292-99, 330, 332; *see also* Sections III.C-E, *supra*.  Finally, the Complaint does not merely claim that Citigroup "maintained insufficient capital ratios" (Citi Br. at 17) – it alleges that Citigroup <u>inaccurately stated</u> that it was "well-capitalized" in the Public Offering Materials.  *See, e.g.*, ¶319.  These allegations plainly plead a claim under the Securities Act.  *See, e.g.*, *Atlas*, 324 F. Supp. 2d at 494 n.11 ("[A] plaintiff has alleged more than mere corporate mismanagement when he has adequately alleged that the defendant made false statements concerning historical facts."); *In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 759 n.14 (S.D.N.Y. 2001) (same); *In re SureBeam Corp. Sec. Litig.*, No. 03 CV 1721JM(POR), 2005 WL 5036360, at *13 (S.D. Cal. Jan. 3, 2005) ("The fact that Lead Plaintiffs' allegations could potentially state claims for corporate mismanagement or a breach of fiduciary duty does not negate the applicability of federal securities laws, if the statements in the Prospectus were materially false or misleading at the time they were made.").

Defendants further attempt to distract the Court from the gravamen of the Complaint, and the governing law, by quoting at length from *In re Citigroup Inc. S'holder Deriv. Litig.*  *See* Citi Br. at 17.  Significantly, the complaint in that case <u>expressly alleged mismanagement</u> for the defendants' "<u>fail[ure] to properly</u> monitor and <u>manage</u> the risks the Company faced," and

asserted derivative, state law breach of fiduciary duty claims seeking to recover for the harm this management had caused to Citigroup.  964 A.2d 106, 111 (Del. Ch. 2009) (emphasis added).  In partially dismissing the complaint, the Delaware court held that the state law "business judgment rule" precluded recovery for derivative mismanagement claims.  *Id.* at 126.

By contrast, this Complaint does not assert a claim for mismanagement, as noted above, but rather alleges actionable misstatements and omissions under the Securities Act.  Further, the state law "business judgment rule" has absolutely no application to claims under the federal securities law.  *See Wolf v. Frank*, 477 F.2d 467, 477 (5th Cir. 1973) (holding that "[t]here could be no more effective way to emasculate the policies of the federal securities laws" than to apply the business judgment rule); *In re World Access, Inc. Sec. Litig.*, 119 F. Supp. 2d 1348, 1356-57 (N.D. Ga. 2000) (rejecting application of business judgment rule to both Exchange Act and Securities Act claims); *SEC v. Keating*, No. CV 91-6785 (SVW), 1992 WL 207918, at *4-5 (C.D. Cal. July 23, 1992) (imposing Rule 11 sanctions on litigant for, *inter alia*, advancing the "patently frivolous" argument that the "business judgment rule, a creation of state law, [could] supersede the requirements, prohibitions, and policies of the federal securities laws").[42]

### H.   Citigroup's Boilerplate Risk Disclosures Do Not Render Its Misstatements And Omissions Immaterial

Although Defendants never expressly make arguments based on Citigroup's general risk disclosures, they recite at length the vague risk factors set forth in Citigroup's SEC filings,

---

[42] The other authorities on which Defendants rely are inapposite.  *See Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996) (offering documents contained "prominent and specific" warning of the "exact[]" interest rate risk that plaintiffs alleged was omitted); *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 639 (3d Cir. 1989) ("emphasiz[ing]" that mismanagement defense does <u>not</u> apply where complaint "alleges the omission of specific material facts"); *Harrison v. Rubenstein*, No. 02 Civ. 9356(DAB), 2007 WL 582955, at *7-9 (S.D.N.Y. Feb. 26, 2007) (complaint failed to allege any particular misstatement, and company's SEC filings explicitly disclosed its operating losses); *Lerner*, 841 F. Supp. at 102 (complaint alleged only that registration statement "falsely portrayed the Company as [a] strong and stable institution," without identifying any materially false statements).  *See also* Section III.E, *supra* (further addressing Defendants' argument that reserves misstatements plead only mismanagement).

presumably to show how they supposedly warned investors that the nation's largest bank possessed hundreds of billions of dollars of toxic securities that could render it insolvent. These disclosures have no relevance to the alleged facts, and instead merely address "geopolitical uncertainty," "inflation," "indexed notes," "global and local economic conditions," and the possibility that an investment bank may suffer losses in its trading positions. Citi Br. at 3-5.

Tellingly, Defendants have <u>not</u> argued that these risk factors "bespeak caution" – and for good reason. Courts are unanimous that such boilerplate disclosures are meaningless. *See Globalstar*, 2003 WL 22953163, at *8, 11 (cautionary language must be "sufficiently specific"); *Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 729 (2d Cir. 1998) ("cautionary language … must relate directly to that by which plaintiffs claim to have been misled"); *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 618 (S.D.N.Y. 2008) (failure to disclose "undercapitalization" of fund not protected by bespeaks caution doctrine); *New Century*, 588 F. Supp. 2d at 1226 ("generalized cautionary language regarding the sub-prime industry" did not render misstatements immaterial); *RAIT*, 2008 WL 5378164, at *6; *In re VEECO Instr., Inc. Sec. Litig.*, 235 F.R.D. 220, 236 (S.D.N.Y. 2006) (bespeaks caution doctrine cannot render immaterial "accounting" misstatements, which are statements of present fact).

Moreover, it is universally recognized that the "bespeaks caution" doctrine applies only to forward-looking statements. *See, e.g.*, *Globalstar*, 2003 WL 22953163, at *11 (general risk disclosures cannot cure "the alleged misrepresentation of a currently existing fact"). Since the alleged misstatements and omissions at issue here concern matters of present and historical fact (such as Citigroup's then-existing CDO and SIV exposure), the bespeaks caution doctrine has no application.

## I.    The Challenges to Bond Plaintiffs' Standing Are Meritless And Premature

Even though Bond Plaintiffs purchased securities pursuant to <u>all three Shelf Registration Statements</u> at issue, Defendants contend that Bond Plaintiffs lack standing to assert Section 11 claims related to any particular <u>security</u> they did not purchase.  *See* UW Def. Br. at 17-19. Initially, Defendants' contention is premature.  Numerous courts have held that standing arguments are better addressed at the class certification stage.  *See In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 422-23 (S.D.N.Y. 2003); *Countrywide*, 588 F. Supp. 2d at 1167; *In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037, 1052 (N.D. Cal. 2008).

Moreover, as numerous courts have held, Bond Plaintiffs are not required to have purchased each security at issue to assert claims for all securities on behalf of the Class.  Indeed, Bond Plaintiffs' standing to assert these claims as putative Class representatives is established by the facts that (i) they purchased securities pursuant to <u>all</u> three Shelf Registration Statements under which each security was issued, (ii) the Complaint alleges that <u>all</u> of the financial statements comprising these Shelf Registration Statements at the time of <u>each</u> Offering were materially inaccurate for the <u>same</u> reasons (¶¶310-42), and (iii) Bond Plaintiffs have thus suffered a common injury shared by the purchasers of <u>all</u> of Citigroup's Bond Class Securities, whom Bond Plaintiffs represent (*see, e.g.*, ¶¶356-58).  *See Countrywide*, 588 F. Supp. 2d at 1166-67; *Juniper*, 542 F. Supp. 2d at 1052; *In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1372-73 (N.D. Ga. 2005); *Dreyfus*, 2000 WL 1357509, at *3.[43]  Although Defendants attempt to escape these well-established principles by claiming that each Offering results in a

---

[43] *See also In re DDi Corp. Sec. Litig.*, 2005 WL 3090882, *6 (C.D. Cal. 2005); *In re PMA Capital Corp. Sec. Litig.*, No. 03-6121, 2005 WL 1806503, at *18 (E.D. Pa. July 27, 2005); *Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 56 (S.D.N.Y. 1993) (certifying class representatives who invested in three out of five partnerships at issue); *Tedesco v. Mishkin*, 689 F. Supp. 1327, 1335 (S.D.N.Y. 1988) (on class certification, holding that "it is not necessary for the named plaintiffs to have invested in all of the investment vehicles").

"new" Registration Statement, their exact argument has already been rejected in the context of a subprime-related securities class action.  *See Countrywide*, 588 F. Supp. 2d at 1166-67.[44]

Defendants also claim that Bond Plaintiffs lack standing to assert Section 12 claims because the Complaint does not allege that they purchased securities "in" each Offering.  UW Br. at 9-10.  This argument ignores the Complaint's allegations, which specifically assert that Bond Plaintiffs purchased "in the Offerings" for the purposes of Section 12.  *See, e.g.*, ¶389.  Moreover, Defendants are wrong to suggest that they cannot determine whether any purchases were made "in" the Offerings from reviewing Bond Plaintiffs' certifications.  Seven of the eight Bond Plaintiffs list on their certifications at least one of their purchases at the exact Offering price, and identify their particular purchase date as occurring either <u>before or on</u> the respective Offering date.[45]  This same fact pattern applies to 19 separate transactions made by these seven Bond Plaintiffs in 11 separate Offerings, covering all three Shelf Registration Statements.  Thus,

---

[44] In another standing challenge, Defendants argue that Bond Plaintiffs cannot assert claims for the Offerings on August 25, 2006, August 15, 2007, and January 23, 2008 because the Bond Plaintiffs who purchased securities in those Offerings sold them at a profit.  *See* UW Br. at 17-18.  However, as explained above, Bond Plaintiffs have standing to assert claims for all Offerings at issue regardless of whether they purchased each security, so the issue of damages on <u>each</u> security is irrelevant.  Bond Plaintiffs listed their profitable trades in these three Offerings not for standing purposes, but merely to reflect all transactions in the Bond Class Securities undertaken during the Offerings Period.

Defendants also assert that even if Bond Plaintiffs' trades in these three Offerings had resulted in a loss, they still could not confer standing because Bond Plaintiffs sold their securities before the first corrective disclosure on November 4, 2007, and thus could not claim that any loss was the result of any corrective disclosure.  However, it is black-letter law that loss causation is not an element of a Securities Act claim, so Defendants' argument is misplaced.  *See* 15 U.S.C. § 77k; *Levine v. AtriCure, Inc.*, 508 F. Supp. 2d 268, 272 (S.D.N.Y. 2007) ("Loss causation … is not an element of a §11 claim under the Securities Act.").

[45] For example, Exhibit A to the Complaint provides that Minneapolis Firefighters' Relief Association purchased 30,000 units of CUSIP 172967ER8 at $100 on April 21, 2008, while the Offering for that security, at that same price, occurred on April 28, 2008 pursuant to the March 2, 2006 Shelf Registration Statement.  Exhibit B to the Complaint provides that Louisiana Sheriffs' Pension & Relief Fund acquired 350,000 units of CUSIP 172967EP2 at $99.332 per unit on February 27, 2008, while the Offering of that security at that price occurred on March 5, 2008.  Exhibit D to the Complaint shows that the City of Tallahassee Retirement System acquired 350,000 units of CUSIP 172967EQ0 at $99.492 per unit on April 4, 2008, while the Offering of that security, at that same price, occurred on April 11, 2008.  Numerous other examples, which Defendants have apparently ignored, exist.

it is clear that Defendants have sufficient information to determine that Bond Plaintiffs have purchased "in" the Offerings for the purposes of asserting Section 12 claims.[46]

**J.**      **Claims Based On The May 25, 2007 And June 28, 2007 Offerings Are Timely**

All of the Securities Act claims set forth in the Complaint are timely because it was not until November 2008 that the full truth about Citigroup's financial condition was revealed (¶¶1, 10-11, 252-262), allowing Bond Plaintiffs until November 2009 to bring their claims under the Securities Act's one-year statute of limitations.  *See* 15 U.S.C. § 77m.  Nevertheless, Defendants contend that claims based upon the May 25, 2007 and June 28, 2007 Offerings (collectively, the "Challenged Offerings") are time-barred because allegations of fraud leveled by <u>common stock</u> purchasers in the Securities Fraud Litigation, which was instituted on November 8, 2007, purportedly placed investors in Citigroup <u>debt and preferred securities</u> on inquiry notice of misstatements in the Public Offering Materials for the Challenged Offerings.  *See* UW Br. at 21.

Initially, the issue of inquiry notice is highly fact-specific and generally improper for resolution at this stage.  *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 169 (2d Cir. 2005) ("recent decisions reinforce the fact-specific nature of the limitations defense, particularly where the claim is foreclosed by inquiry notice"); *LC Capital Partners v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 154 (2d Cir. 2003).  This is especially true in the context of claims brought under the PSLRA, which Congress enacted specifically to curb frivolous litigation; too broad an interpretation of inquiry notice can precipitate premature and groundless suits.[47]

---

[46] Moreover, courts permit a plaintiff with standing under Section 11 to pursue Section 12(a)(2) claims for which he or she may not personally have standing on behalf of the class at the pleading stage.  *See Hicks v. Morgan Stanley & Co.*, No. 01-10071, 2003 U.S. Dist. LEXIS 11972, at *18-19 (S.D.N.Y. July 16, 2003) (Baer, J.) ("[b]ecause Nicholson is rightly in federal court for his Section 11 claim and because the Section 11 and Section 12 claims arise out of the same conduct and involve the same legal theories, the proper inquiry is typicality rather than standing").

[47] *See In re Merck & Co., Inc. Sec. Derivative & ERISA Litig.*, 543 F.3d 150, 162 (3d Cir. 2008) (stating that "courts should be mindful of the dangers in adopting too broad an interpretation of inquiry notice") (internal citations omitted).

Moreover, contrary to Defendants' claim, developments in the Securities Fraud Litigation support the fact that the full truth about Citigroup's financial condition was not revealed until November 2008.  ¶¶1, 10-11, 252-262.   Indeed, at the time that Bond Plaintiffs filed the Complaint, the complaint in the Securities Fraud Litigation had a class period that ended in January 2008.  After Bond Plaintiffs filed this Complaint, the complaint in the Securities Fraud Litigation was amended and its class period extended in order to assert allegations made for the first time in this Complaint concerning events that occurred after January 2008, and to include in the class investors who purchased common stock after January 2008.   Since this Complaint caused the complaint in the Securities Fraud Litigation to be substantially amended and extended, it is not credible for Defendants to claim that the filing of the initial complaint in the Securities Fraud Litigation triggered inquiry notice as a matter of law for investors in the Bond Class Securities.

In addition, the claims arising from the Challenged Offerings relate back to the filing of the initial complaints in this action, which respectively occurred on September 30, 2008 and October 28, 2008, and are therefore timely.  *See* Ex. A to Removal Petition at Docket No. 1 in 08-cv-9522; Ex. A to Removal Petition at Docket No. 1 in 08-cv-10353.  Indeed, these claims arise "out of the conduct, transaction, or occurrence set forth … in the original pleading," are asserted against existing defendants, and are based upon the same Shelf Registration Statements at issue in the earlier-filed complaints.  Fed. R. Civ. P. 15(c)(1)(B); *see In re Dynergy, Inc.*, 339 F. Supp. 2d 804, 841 (S.D. Tex. 2004); *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1543-44

(8th Cir. 1996).[48]

**K.    The Citigroup Defendants Are Statutory "Sellers" For Purposes Of Section 12(a)(2)**

The Citigroup Defendants argue that they are not liable under Section 12(a)(2) of the Securities Act because they do not qualify as "statutory sellers." Citi Br. at 53-55. As an initial matter, whether an issuer is a statutory seller under Section 12(a)(2) is a question of fact. *See Degulis v. LXR Biotechnology*, 09-CV-4204, 1997 U.S. Dist. LEXIS 381 at *17 (S.D.N.Y. Jan. 21, 1997); *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 370 (5th Cir. 2001).

In addition, because the Citigroup Defendants have conceded their seller status under Section 12(a)(2) in the Registration Statements, their argument is baseless. For example, in the March 10 Shelf Registration Statement, Item 17, Citigroup and Capital Funding, as signing "Registrants," affirmed that, "regardless of the underwriting method used to sell the securities to the purchaser, if the securities are offered or sold to such purchaser by means of [the prospectus], the undersigned Registrants will be a seller to the purchaser and will be considered to offer or sell such securities to such purchaser." Registration Statement dated Mar. 10, 2006 at p. II.5, Ex. 9 to the Singer Decl. The same declaration is made in the other two Registration Statements. *See* Registration Statement dated Mar. 2, 2006 at p. II.7 & Registration Statement dated June 20, 2006 at p. II.6, Exs. 10-11 to the Singer Decl. Indeed, SEC Rule 159A expressly provides that the issuer "shall be" considered a seller pursuant to Section 12(a)(2), "regardless of the underwriting method used" in a primary offering of securities. 17 C.F.R. § 230.159A(a)

---

[48] The lead underwriter for the June 28, 2007 Offering, Citigroup Global Markets Limited ("CGML"), which is a wholly-owned subsidiary of Citigroup, and whose CEO, William Mills, is himself an officer of Citigroup, cannot claim that it lacked notice of these claims even though it was not named as a defendant in the complaint filed on October 28, 2008. The October 28, 2008 complaint sued Citigroup for 44 separate offerings, including no less than 7 offerings made pursuant to the same June 20, 2006 Shelf Registration Statement used for the June 28, 2007 Offering. *See Minneapolis Firefighters' Relief Assoc. v. Rosen*, No. 08-cv-10353, at ¶133 (asserting Securities Act claims against Citigroup arising from multiple offerings based upon the June 20, 2006 Shelf Registration Statement), Ex. 8 to the Singer Decl. Citigroup Global Markets, Inc., the lead underwriter of the May 25, 2007 Offering, also cannot contend that it lacked notice of all claims in this litigation, as it was named as a defendant with respect to numerous other Offerings in the original complaints filed in September and October 2008.

(emphasis added); *see also In re APAC Teleservices, Inc. Sec. Litig.*, No. 97 Civ. 9145, 1999 U.S. Dist. LEXIS 17908, at *31-32 (Nov. 12, S.D.N.Y. 1999) ("as the issuer of the Registration Statement," company qualifies as seller).

Moreover, the Complaint adequately alleges the Citigroup Defendants' seller status because they were issuers of the Bond Class Securities, signed the Registration Statements (to which the prospectuses were attached), prepared the materially false and misleading financial statements incorporated into those Registration Statements, and "solicited the purchase of Bond Class Securities … motivated at least in part by the desire to serve their own gain." ¶387. These allegations suffice at the pleading stage. *See Scottish Re*, 524 F. Supp. 2d 370 at 399-400; *In re Am. Bank Note Holographics Secs. Litig.*, 93 F. Supp. 2d 424, 438 (S.D.N.Y. 2000); *Dorchester Investors v. Peak Trends Trust*, 99-CV-4696, 2003 U.S. Dist. LEXIS 1446, at *9 (S.D.N.Y. February 3, 2003); *In re OPUS360 Corp. Sec. Litig.*, 01-CV-2938, 2002 U.S. Dist. LEXIS 18558, at *30 (S.D.N.Y. Sept. 30, 2002).[49]  Citigroup's control of Citigroup Capital Funding and the Citigroup Trusts further establishes its seller status.  *See In re U.S.A. Classic Sec. Litig.*, No. 93 Civ. 6667, 1995 U.S. Dist. LEXIS 8327, at *10 (S.D.N.Y. June 16, 1995) (finding that because defendant "controlled" the offeror as its sole shareholder and would receive an

---

[49]  The allegation that Defendants were motivated by a desire to serve their own financial interests is not, as the Underwriter Defendants suggest, a fraud-based allegation.  *See* UW Br. at 15.  The Complaint alleges that the Underwriter Defendants were motivated to solicit the purchase of Citigroup securities; it does not state, or otherwise imply, that any Defendants were motivated to commit fraud.  ¶397.  Thus, the inclusion of this allegation, which satisfies a necessary element of a Section 12(a)(2) claim, does not transform any of Bond Plaintiffs' negligence-based causes of action into fraud-based claims.

offering's proceeds, defendant "caused" the offering and "conducted and controlled the solicitation") (citation omitted).[50]

## L.   Section 11 Claims Are Properly Alleged Against The Seven Objecting Directors

Liability attaches under Section 11 to every person who signs a registration statement <u>or</u> "was a director of … the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted."   15 U.S.C. § 77k(a)(1)-(2).   Contrary to Defendants' assertions, they are all properly named as Defendants under these provisions.

First, Defendants Jordan, Klienfeld, Mecum and Prince signed all three Shelf Registration Statements (¶¶52-53, 56, 60), and Citigroup's brief concedes that these Defendants are subject to Section 11 liability for each Offering before February 22, 2008, when it filed the 2007 Form 10-K.   *See* Citi Br. 57-58.   Citigroup asserts that the 2007 Form 10-K updated the earlier Registration Statements to exclude these persons as <u>directors</u> (Citi Br. 59), but this argument ignores their liability as <u>signers</u>.

While Citigroup relies on SEC Rule 412 to argue that "the registration statement is updated and superseded" each time the issuer files a new Form 10-K, there is nothing in Rule 412 that eliminates signer liability, as explicitly provided in Section 11.   All Rule 412 provides is that a later document incorporated by reference in a shelf registration supersedes earlier documents, but only to the extent that it "modif[ies] or replace[s] existing statements in the

---

[50] Defendants' citations do not help them. In *Steed Fin. LDC v. Nomura Sec. Int., Inc.*, No. 00 Civ. 8058, 2001 U.S. Dist. LEXIS 14761 (S.D.N.Y. Sept. 20, 2001), the court acknowledged that "[a] person who signs a registration statement [which the Citigroup Defendants did here] is deemed to have solicited the purchase of the offered securities." *Id.* at *23; *see also In re Deutsche Telekom AG Sec. Litig.*, No. 00 Civ. 9475, 2002 WL 244597, at *14 (S.D.N.Y. Feb. 20, 2002) (same).  The signature is a sufficient basis to infer that a plaintiff "purchased the securities as a result of [the signer's] solicitation." *Steed Fin.*, 2001 U.S. Dist LEXIS 14761, at *22.  In addition, *Credit Suisse First Boston Corp. v. Arm Fin. Group*, No. 99 Civ. 12046, 2001 U.S. Dist. LEXIS 3332 (S.D.N.Y. Mar. 27, 2001), is inapplicable because no issuer defendant was involved (the issuer was in bankruptcy) – as was also true in *Steed Fin.* and *Deutsche Telekom*.

registration statement or the prospectus…."   17 C.F.R. § 230.412(a).   Rule 412 therefore

concerns updated <u>disclosures</u> – not who are the <u>signers</u>.[51]

Second, Citigroup argues that Defendants Bischoff, Pandit and Ryan are not liable under

Section 11 because they were not directors of CMGI or the Citigroup Trusts, and "cannot be held

liable under Section 11(a)(1)" because they "did not sign[] the March 2, 2006, March 10, 2006 or

June 20, 2006 Shelf Registration Statements…."   Citi Br. 59.[52]   This ignores that all three of

these Defendants were <u>directors of Citigroup</u> at the times of at least nine Offerings for which

Citigroup indisputably was the issuer.   ¶309 at pp. 92-93.   As to these Offerings, Defendants

Bischoff, Pandit and Ryan clearly have liability.

## M.   The Complaint Adequately Alleges Claims for Control Person Liability Under Section 15

The prerequisites of a Section 15 claim are: "(a) a primary violation by a controlled

person, and (b) control by the defendant of the primary violator."   *Refco*, 503 F. Supp. 2d at

637.[53]   To plead control, a plaintiff need only allege that the defendant "possessed the power to

direct or cause the direction of the management and policies of a person, whether through the

ownership of voting securities, by contract or otherwise."   *Refco*, 503 F. Supp. 2d at 637 (internal

quotation marks omitted).   Control allegations are governed by Rule 8(a), and "[w]hether a

---

[51] Regulation S-K, Item 512 also does not help Defendants.  Rule 512 provides that, where a registration statement incorporates by reference a later annual report, the registrant is to state that the annual report "shall be deemed a new registration statement … and the offering of securities shall be deemed to be an initial bona fide offering thereof." There is nothing in this provision purporting to change signer liability.

[52] This statement inadvertently demonstrates the meritless nature of Citigroup's prior argument about Jordan, Klienfeld, Mecum and Prince, since Citigroup is now admitting that the signatures in the Shelf Registration statements were <u>not</u> replaced by the 2007 Form 10-K's signatures, which Bischoff, Pandit, and Ryan signed. Indeed, if the Registration Statement signatures were replaced by those in the 2007 Form 10-K, then Bischoff, Pandit and Ryan would be liable as signers under Section 11 for the subsequent CGMI and Citigroup Trust Offerings, all of which incorporated the 2007 Form 10-K by reference.

[53] A "plaintiff is not required to allege culpable participation by the controlling person in order to state a claim under section 15." *Scottish Re*, 524 F. Supp. 2d at 387. *See also In re WorldCom, Inc. Sec. Litig.*, No. 02-3288, 2005 U.S. Dist. LEXIS 4193, at *43 (S.D.N.Y. Mar. 21, 2005).

person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on motion to dismiss." *Scottish Re*, 524 F. Supp. 2d at 401 (internal quotation marks and citation omitted).

There can be no question that each of the Citigroup-owned entities was controlled by Citigroup. Specifically:

- Citigroup Funding is a wholly-owned subsidiary of Citigroup "whose business activities consist primarily of providing funds to Citigroup and its subsidiaries." ¶30. *See Dietrich v. Bauer*, 76 F. Supp. 2d 312, 335 (S.D.N.Y. 1999) ("owner" is a "position[] from which control can be directly inferred without more" (internal quotation marks omitted)). The Registration Statements for Citigroup Funding's offerings were issued by Citigroup Funding <u>and Citigroup</u>, and incorporated by reference <u>Citigroup's</u> Form 10-Ks, 10-Qs and 8-Ks. Clearly, Citigroup Funding did not unilaterally raise money for its parent. Nor did it unilaterally incorporate Citigroup's SEC filings in the Public Offering Materials for its Offerings. It did so only at Citigroup's direction and control. ¶413.

- The Citigroup Trusts – like Citigroup Funding – have their principal place of business at Citigroup's corporate headquarters at 399 Park Avenue in New York. ¶¶29-38. The Citigroup Trusts have no assets other than securities issued by Citigroup. *Id.* As with Citigroup Funding, the Registration Statements for the Citigroup Trust Offerings were issued both by <u>Citigroup</u> and the Citigroup Trusts, and incorporated by reference <u>Citigroup's</u> Form 10-Ks, 10-Qs and 8-Ks. Further, the Prospectuses stated that, except for certain limited exceptions, "<u>only Citigroup can elect or remove any of the Citigroup Capital trustees.</u>"[54]

- Citigroup Global Markets, Inc. ("CGMI") was an underwriter in all except one of the Offerings, of which Citigroup Global Markets Limited ("CGML") was an underwriter. ¶¶84-85 & Complaint Appendix. CGMI and CGML are both indirect wholly-owned subsidiaries of Citigroup. *See* Citigroup's 2006 Form 10-K at 88, 143, Ex. 7 to the Singer Decl.; *Dietrich*, 76 F. Supp. 2d at 335. As with Citigroup Funding, it defies belief that Citigroup lacked the power to direct or control its own subsidiaries' actions in raising monies for Citigroup. Moreover, CGMI and Citibank, N.A. publicly acknowledge on their website disclosures that "Citigroup Global Markets Inc. and Citibank are affiliated companies under the common control of Citigroup Inc." Website Disclosures, Ex. 13 to the Singer Decl.

As to the Individual Defendants, all except for two (Bischoff and Ryan) were Citigroup's principal executive officers or signed Registration Statements or SEC filings incorporated into

---

[54] *See e.g.*, Citigroup Capital XX Prospectus at 12, Ex. 12 to the Singer Decl.

the Public Offering Materials.  ¶¶41-68.  This alleges more than mere "status" (Citi Br. at 56) since these Defendants had the power to control and approve the disclosures made in the Offerings.  *See Refco*, 503 F. Supp. 2d at 638 (cited by Defendants) ("'It does comport with common sense to presume that a person who signs his name to a report has some measure of control over those who write the report.'") (citation omitted).[55]

---

[55] Defendants' cited cases are inapposite.  *In re WorldCom, Inc. Sec. Litig.*, No. 02-3288, 2004 WL 1097786, at *3 (S.D.N.Y. May 18, 2004) was an opinion issued after extensive discovery in which plaintiffs failed to adduce any facts other than a parent-subsidiary relationship showing control.  In *Deutsche Telekom*, 2002 WL 244597, at *5-6 the sole allegation was that the alleged control person owned 22% of Deutsche Telekom.  *See also Degulis v. LXR Biotech.*, 928 F. Supp. 1301, 1315 (S.D.N.Y. 1996) (finding that control was pled as to the individual defendants and that "[a]ny defense must be raised in their responsive pleadings"); *Wallace v. Buttar*, 239 F. Supp. 2d 388, 396 (S.D.N.Y. 2003), *rev'd on other grounds*, 378 F.3d 192 (2d Cir. 2004) (finding control was adequately pleaded in a broker-customer dispute but stating that mere "status" is insufficient); *Food & Allied Servs. Trades Dep't v. Millfeld Trading Co.*, 841 F. Supp. 1386, 1391 (S.D.N.Y. 1994) (holding that a "bare allegation of director status, without more, is insufficient").

## IV.   CONCLUSION

For the reasons set forth above, the Court should entirely deny Defendants' motions to

dismiss the Complaint.

Dated: April 24, 2009

**BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP**

By:   /s/ Steven B. Singer
Steven B. Singer
Mark Lebovitch
Kurt Hunciker
John Rizio-Hamilton
1285 Avenue of the Americas
New York, New York 10019
Tel: (212) 554-1400
Fax: (212) 554-1444

*Attorneys for Bond Plaintiffs, and
Court-Appointed Bond Counsel*

Ira M. Press
Peter S. Linden
**KIRBY McINERNEY LLP**
825 Third Avenue, 16th Floor
New York, NY 10022
Tel: (212) 371-6600
Fax: (212) 751-2540
*Interim Lead Counsel for Interim Lead
Plaintiffs The ATD Group*

Robert D. Klausner
**KLAUSNER & KAUFFMAN, P.A.**
10059 Northwest 1st Court
Plantation, FL 33324
Tel: (954) 916-1202
Fax: (954) 916-1232

*Additional Counsel for Minneapolis
Firefighters' Relief Association and
Louisiana Sheriffs' Pension and Relief Fund*

Brian F. Rice
**RICE, MICHAELS & WALTHER LLP**
206 East Bridge – Riverplace
10 Second Street, Northwest
Minneapolis, MN 55413
Tel:  (612) 676-2303
Fax:  (612) 676-2319

*Additional Counsel for Minneapolis
Firefighters' Relief Association*

David Kessler
Sharan Nirmul
Benjamin Sweet
**BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA  19087
Tel: (610) 667-7706
Fax: (610) 667-7056

*Additional Counsel for City of Tallahassee
Retirement System, Miami Beach
Employees' Retirement Plan, Southeastern
Pennsylvania Transit Authority and City of
Philadelphia Board of Pensions and
Retirement*

Marc I. Gross
Joshua B. Silverman
**POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS LLP**
100 Park Avenue
New York, NY 10017
Tel- 212-661-1100
Fax-212-661-8665

*Additional Counsel for American European
Insurance, Company*