UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE CITIGROUP INC.
BOND LITIGATION

MASTER FILE
08 Civ. 9522 (SHS)

---

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF CITIGROUP
DEFENDANTS' AND INDIVIDUAL DEFENDANTS' MOTION TO DISMISS
THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

PAUL, WEISS, RIFKIND, WHARTON &
  GARRISON LLP
Brad S. Karp
Richard A. Rosen
Susanna M. Buergel
Karen R. King

1285 Avenue of the Americas
New York, New York 10019-6064
Tel.  (212) 373-3000

*Attorneys for Defendants Citigroup Inc.,
Citigroup Funding Inc., Citigroup Capital
XIV, Citigroup Capital XV, Citigroup
Capital XVI, Citigroup Capital XVII,
Citigroup Capital XVIII, Citigroup Capital
XIX, Citigroup Capital XX, Citigroup
Capital XXI, C. Michael Armstrong, Alain
J.P. Belda, Sir Winfried Bischoff, Michael
Conway, Gary Crittenden, George David,
Kenneth T. Derr, John M. Deutch, Scott
Freidenrich, James Garnett, John C.
Gerspach, Ann Dibble Jordan, Klaus
Kleinfeld, Sallie L. Krawcheck, Andrew N.
Liveris, Dudley C. Mecum, Ann Mulcahy,
Vikram Pandit, Richard D. Parsons,
Charles Prince, Roberto Hernandez
Ramirez, Judith Rodin, Saul Rosen, Robert
E. Rubin, Robert L. Ryan, Franklin A.
Thomas, Eric L. Wentzel, and David Winkler*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................... 1

ARGUMENT............................................................................................................... 3

I.      PLAINTIFFS FAIL TO SATISFY RULE 9(b) ................................................. 3

II.     PLAINTIFFS FAIL TO PLEAD AN ACTIONABLE
MISSTATEMENT OR OMISSION ................................................................... 6

        A.     PLAINTIFFS FAIL TO PLEAD AN ACTIONABLE
MISSTATEMENT OR OMISSION WITH RESPECT TO CDOS ...................... 6

                1.     Plaintiffs Have Not Alleged Actionable
Misstatements or Omissions Prior to October 2007................................... 7

                2.     Plaintiffs Have Not Alleged Adequately that Citigroup's
October 1, 2007 Disclosure Was False or Misleading ............................. 14

                3.     Plaintiffs Have Not Alleged Adequately that Citigroup's
November 4, 2007 Disclosure Was False or Misleading ......................... 15

                4.     Plaintiffs Have Not Alleged Adequately that Citigroup
Misstated the Value of its CDO Holdings After November 4, 2007 ....... 16

        B.     PLAINTIFFS FAIL TO PLEAD ACTIONABLE
MISSTATEMENTS OR OMISSIONS RELATING TO SIVS .......................... 17

        C.     PLAINTIFFS FAIL TO PLEAD ACTIONABLE
MISSTATEMENTS OR OMISSIONS RELATING
TO MORTGAGE LOAN LOSS RESERVES .................................................. 19

        D.     PLAINTIFFS FAIL TO PLEAD ACTIONABLE
MISSTATEMENTS OR OMISSIONS RELATING
TO AUCTION RATE SECURITIES ............................................................... 20

III.    THE CITIGROUP DEFENDANTS ARE NOT STATUTORY SELLERS ................... 21

IV.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 15.............................. 22

V.     PLAINTIFFS IMPROPERLY ASSERT SECTION 11
CLAIMS AGAINST CERTAIN INDIVIDUAL DEFENDANTS................................. 23

CONCLUSION.......................................................................................................... 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*In re Aegon N.V. Securities Litigation,*
  03 Civ. 0603 (RWS), 2004 WL 1415973 (S.D.N.Y. June 23, 2004)..............................19

*In re Alliance Pharm. Corp. Securities Litigation,*
  279 F. Supp. 2d 171 (S.D.N.Y. 2003) ..........................................................................16

*In re Atlas Air Worldwide Holdings, Inc. Securities Litigation,*
  324 F. Supp. 2d 474 (S.D.N.Y. 2004) .............................................................................4

*Bell Atl. Corp.* v. *Twombly,*
  550 U.S. 544 (2007) .....................................................................................................3, 6

*Cal. Pub. Employees' Ret. Sys.* v. *Chubb Corp.,*
  394 F. 3d 126 (3d Cir. 2004).........................................................................................12

*Ciresi* v. *Citicorp,*
  782 F. Supp. 819 (S.D.N.Y. 1991)................................................................................20

*In re CIT Group, Inc. Securities Litigation,*
  349 F. Supp. 2d 685 (S.D.N.Y. 2004) .............................................................................4

*In re Citigroup, Inc. Securities Litigation,*
  330 F. Supp. 2d 367 (S.D.N.Y. 2004) ..........................................................................20

*In re Citigroup Inc. Securities Litigation,*
  07 Civ. 9901 (S.D.N.Y.)..................................................................................................5

*In re Corning Securities Litigation,*
  01 Civ. 6580 (CJS), 2004 WL 1056063 (W.D.N.Y. Apr. 9, 2004)  ................................5

*Coronel* v. *Quanta Capital Holdings, Ltd.,*
  07 Civ. 1405 (RPP), 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) ...........................*passim*

*Dietrich* v. *Bauer,*
  76 F. Supp. 2d 312 (S.D.N.Y. 1999)..............................................................................23

*In re Dynex Inc. Securities Litigation,*
  05 Civ. 1897 (HB), 2006 WL 314524 (S.D.N.Y. Feb. 10, 2006)...................................19

*Ernst & Ernst* v. *Hochfelder,*
  425 U.S. 185 (1976) .......................................................................................................22

*Freedman* v. *Value Health, Inc.*,
    135 F. Supp. 2d 317 (D. Conn. 2001) .................................................................. 11, 14

*Garber* v. *Legg Mason, Inc.*,
    537 F. Supp. 2d 597 (S.D.N.Y. 2008) ........................................................................ 4

*Good Hill Partners L.P. ex rel. Good Hill Master Fund, L.P.*
    v. *WM Asset Holdings Corp. CI 2007-WM2*,
    583 F. Supp. 2d 517 (S.D.N.Y. 2008) ...................................................................... 13

*In re Initial Public Offering Securities Litigation*,
    544 F. Supp. 2d 277 (S.D.N.Y. 2008) ........................................................................ 4

*In re JP Morgan Chase Securities Litigation*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005) .................................................................... 4, 5

*In re Marsh & McLennan Cos., Inc. Securities Litigation*,
    04 Civ. 8144 (SWK), 2006 WL 2057194 (S.D.N.Y. July 20, 2006) ............................ 9

*In re New Century*,
    588 F. Supp. 2d 1206 (C.D. Cal. 2008) .................................................................... 19

*Oran* v. *Stafford*,
    226 F.3d 275 (3d Cir. 2000).......................................................................................... 9

*Panther Partners, Inc.* v. *Ikanos Commc'ns, Inc.*,
    538 F. Supp. 2d 662 (S.D.N.Y. 2008) ...................................................................... 10

*In re Philip Servs. Corp. Securities Litigation*,
    383 F. Supp. 2d 463 (S.D.N.Y. 2004) ........................................................................ 5

*Pinter* v. *Dahl*,
    486 U.S. 622 (1988) .................................................................................................. 21

*In re Prestige Brands Holdings, Inc.*,
    05 Civ. 06924 (CLB), 2006 WL 2147719 (S.D.N.Y. July 10, 2006) ............................ 4

*In re Refco Inc. Securities Litigation*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007) ...................................................................... 23

*Rinehart* v. *Lehman Bros. Holdings, Inc.*,
    08 Civ. 5598 (LAK) (S.D.N.Y.)................................................................................... 4

*Rombach* v. *Chang*,
    355 F.3d 164 (2d Cir. 2004)......................................................................................... 4

*Rombach* v. *Chang*,
    00 Civ. 0958 (SJ), 2002 WL 1396986 (E.D.N.Y. June 7, 2002) ................................ 4

*In re Salomon Analyst Level 3 Litig.*,
    373 F. Supp. 2d 248 (S.D.N.Y. 2005) ...........................................................................13

*Schnall* v. *Annuity & Life Re (Holdings), Ltd.*,
    02 Civ. 2133 (GLG), 2004 WL 367644 (D. Conn. Feb 22, 2004)...................................20

*Scibelli* v. *Roth*,
    98 Civ. 7228 (HB), 2000 WL 122193 (S.D.N.Y. Jan. 31, 2000)....................................18

*Shapiro* v. *UJB Fin. Corp.*,
    964 F.2d 272 (3d Cir. 1992).............................................................................................4

*Shaw* v. *Digital Equip. Corp.*,
    82 F.3d 1194 (1st Cir. 1996) ............................................................................................4

*Stepak* v. *Aetna Life & Cas. Co.*,
    90 Civ. 886 (AVC), 1994 WL 858045 (D. Conn. Aug. 29, 1994)...................................19

*In re Supreme Specialties, Inc. Securities Litigation*,
    438 F.3d 256 (3d Cir. 2006)..............................................................................................4

*In re Ultrafem Inc. Securities Litigation*,
    91 F. Supp. 2d 678 (S.D.N.Y. 2000) ................................................................................3

*In re WorldSpace Securities Litigation*,
    07 Civ. 2252 (RMB), 2008 WL 2856519 (S.D.N.Y. July 21, 2008) ...............................4

*In re Xinhua Fin Media, Ltd. Securities Litigation*,
    07 Civ. 3994 (LTS)(AJP), 2009 WL 464934 (S.D.N.Y. Feb. 25, 2009) .........................9

*Zirkin* v. *Quanta Capital Holdings Ltd.*,
    07 Civ. 851 (RPP), 2009 WL 185940 (S.D.N.Y. Jan. 23, 2009).....................................5

## STATUTES AND RULES

Fed. R. Civ. P. 8(a) ..............................................................................................................3, 6

Fed. R. Civ. P. 9(b) ...........................................................................................................*passim*

Fed. R. Civ. P. 12(b)(6)...........................................................................................................1

SEC Regulation S-K, Item 512, 17 C.F.R. § 229.512 ............................................................21

# OTHER AUTHORITIES

Gary L. Gastineau & Mark P. Kritzman,
  *Dictionary of Financial Risk Management* (1996) .........................................................8

Jonathan Weil,
  *Citigroup SIV Accounting Looks Tough to Defend*, Bloomberg (Oct. 24, 2007) .............17

SEC Release No. 33-7386, 62 Fed. Reg. 6044 (Feb. 10, 1997)....................................................8

Securities Offering Reform, Exchange Act Release No. 8591,
  2005 WL 1692642, at 136–37 (Aug. 3, 2005)................................................................21

Citigroup Defendants[1] and the Individual Defendants[2] (collectively, "defendants") respectfully submit this reply memorandum in further support of their motion to dismiss the Consolidated Amended Class Action Complaint (the "complaint") in its entirety and with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).[3]

## PRELIMINARY STATEMENT

Against the backdrop of an unprecedented market crisis that began to unfold in late 2007, plaintiffs allege that the offering materials issued in connection with forty-eight separate offerings of Citigroup securities, over a twenty-seven month period from May 18, 2006 to August 19, 2008, were false and misleading because Citigroup did not disclose its specific holdings in CDO and certain other assets sooner, and did not properly value those assets in its financial statements. Although plaintiffs make sweeping, generalized allegations about Citigroup's disclosures during the entire time period, and lump all forty-eight offerings together, the Court must make an individualized determination regarding the sufficiency of the complaint as to each offering. In doing so, the Court must consider the facts as they existed at the time of each offering. *See Coronel* v. *Quanta Capital Holdings, Ltd.*, 07 Civ. 1405 (RPP), 2009 WL 174656, at *3 (S.D.N.Y. Jan. 26, 2009).

---

[1]   Citigroup, Inc., Citigroup Funding Inc., Citigroup Capital XIV, Citigroup Capital XV, Citigroup Capital XVI, Citigroup Capital XVII, Citigroup Capital XVIII, Citigroup Capital XIX, Citigroup Capital XX, and Citigroup Capital XXI.

[2]   C. Michael Armstrong, Alan J.P. Belda, Sir Winfried Bischoff, Michael Conway, Gary Crittenden, George David, Kenneth T. Derr, John M. Deutch, Scott Freidenrich, James Garnett, John C. Gerspach, Ann Dibble Jordan, Klaus Kleinfeld, Sallie L. Krawcheck, Andrew N. Liveris, Dudley C. Mecum, Ann Mulcahy, Vikram Pandit, Richard D. Parsons, Charles Prince, Roberto Hernandez Ramirez, Judith Rodin, Saul Rosen, Robert E. Rubin, Robert L. Ryan, Franklin A. Thomas, Eric L. Wentzel, and David Winkler.

[3]   Citigroup Defendants and the Individual Defendants also hereby adopt and incorporate the Underwriter Defendants' Reply Memorandum of Law in Further Support of Their Motion to Dismiss the Complaint.

1

With respect to the thirty-one offerings prior to October 1, 2007,[4] plaintiffs have not alleged facts sufficient to plead, under any standard, that there was a duty to detail Citigroup's holdings in super-senior tranches of CDOs, or any other asset.  Nor do plaintiffs plead facts sufficient to show that Citigroup's valuation of its assets was improper.  Indeed, no financial institution reported write-downs on super-senior CDO assets prior to October 2007.

It was not until early November 2007, after the credit markets froze and after ratings agencies announced unprecedented and severe downgrades of subprime RMBS and CDOs, that Citigroup (and other financial institutions) provided details regarding their holdings in super-senior CDO positions and took substantial write-downs on those assets.  Plaintiffs' hindsight critique of these disclosures, which were made when market conditions were volatile and rapidly evolving, are insufficient to show that the disclosures were inaccurate at the time they were made.  Between October 1, 2007 and November 4, 2007—when Citigroup disclosed net holdings of $43 billion of super-senior tranches of CDOs and anticipated fourth quarter subprime-related write-downs of $8 billion to $11 billion—there were two offerings.[5]

With respect to the fifteen challenged offerings *after* November 4, 2007,[6] plaintiffs take issue with Citigroup's valuation of CDOs, SIVs, auction rate securities ("ARS"),

---

[4]   These thirty-one offerings are dated: (i) pursuant to the March 2, 2006 Registration Statement – May 18, 2006, June 9, 2006, June 28, 2006, June 30, 2006, August 2, 2006, August 25, 2006 (6.125% Subordinated Notes), August 25, 2006 (Floating Subordinated Notes), September 29, 2006, November 7, 2006 (5.85% Notes), November 7, 2006 (5.10% Notes), December 7, 2006, December 28, 2006, January 16, 2007, February 12, 2007, February 16, 2007, February 27, 2007, March 7, 2007, May 29, 2007, May 31, 2007, August 13, 2007, August 15, 2007, August 27, 2007, September 14, 2007 (5.25% Notes), and September 14, 2007 (6.00% Notes); (ii) pursuant to the March 10, 2006 Registration Statement – May 25, 2007; (iii) pursuant to the June 20, 2006 Registration Statement – June 30, 2006, September 15, 2006, November 22, 2006, March 6, 2007, June 28, 2007, and August 15, 2007.

[5]   These two offerings are dated:  (i) pursuant to the March 2, 2006 Registration Statement – October 17, 2007; and (ii) pursuant to the March 10, 2006 Registration Statement – October 22, 2007.

[6]   These fifteen offerings are dated:  (i) pursuant to the March 2, 2006 Registration Statement – November 21, 2007, January 23, 2008, January 25, 2008,  March 5, 2008, April 11, 2008, April 28, 2008, May 12, 2008,  May 13, 2008 (Floating Rate Notes), May 13, 2008 (Depository Shares), and August 19, 2008; (ii) pursuant to the

2

and mortgage loans.  However, valuation of assets in a turbulent and illiquid market involves complex judgments, assumptions and future loss predictions by management.  Plaintiffs offer nothing but hindsight speculation and opinion as to how the Company should have valued these assets differently.

Because the complaint sounds in fraud, plaintiffs are required to meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b).  But even under the more permissive standards of Federal Rule of Civil Procedure 8(a), a complaint must allege facts that "raise a right to relief above the speculative level."  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007).  Because plaintiffs' allegations fail to satisfy this fundamental threshold, the complaint should be dismissed with prejudice.

## **ARGUMENT**

### **I.**
### **PLAINTIFFS FAIL TO SATISFY RULE 9(b)**

The fact that the complaint uses language from the Securities Act and disavows any fraud allegation (Pls. Mem. 27), does not immunize plaintiffs from satisfying the heightened pleading requirements of Rule 9(b).  (*See* Defs. Mem. 13 n.10);[7] *see also In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 690–91 (S.D.N.Y. 2000) (finding that a "boilerplate disclaimer" is not enough to evade the appropriate application of Rule 9(b)).  Here, there can be no reasonable dispute that the complaint repeatedly alleges that defendants *intentionally* misrepresented or concealed material information in Citigroup's disclosures.  For example, plaintiffs allege that:

---

March 10, 2006 Registration Statement – May 7, 2008, May 28, 2008, and June 26, 2008; (iii) pursuant to the June 20, 2006 Registration Statement – November 27, 2007, and December 21, 2007.

[7]   Citations in the form of "Defs. Mem. __" refer to the Memorandum of Law in Support of Citigroup Defendants' and Individual Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint, dated March 13, 2009.  Citations in the form of "Pls. Mem. __" refer to the Bond Plaintiffs' Opposition to Defendants' Motions to Dismiss the Complaint, dated April 24, 2009.

- Citigroup "understated" its CDO exposure "by tens of billions of dollars," "remained silent" about how its "massive exposure" to Alt-A RMBS was incurred, and "failed to disclose the existence of" its "$11 billion portfolio of impaired and illiquid" ARS.  (¶¶ 166, 187, 236.)[8]

- Citigroup's plan to create a "Super SIV" was evidence of its *awareness* that the SIVs were impaired in early October 2007.  (¶¶ 202–05.)

- Citigroup had begun purchasing material amounts of ARS beginning in August 2007, had accumulated $11 billion of these securities before February 2008, and *concealed* this fact in its 2007 Form 10-K.  (¶¶ 241–42, 244; Pls. Mem. 58.)

- Citigroup "inaccurately insisted" that it did not have to consolidate the SIVs on its balance sheet in order "to calm investor concern."  (¶ 203.)

*See Rombach* v. *Chang*, 355 F.3d 164, 172 (2d Cir. 2004) (claims that registration statement was misleading and contained untrue statements of material facts were "imputations … classically associated with fraud"); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005) (applying Rule 9(b) to complaint that contained "wording and imputations . . . classically associated with fraud" (citation omitted)).[9]

---

[8]   Citations in the form of "¶ __" refer to paragraphs in the complaint.  Citations in the form of "Ex. __" refer to exhibits attached to the Declaration of Richard A. Rosen, dated March 12, 2009 (Exhibits 1 through 32), or the Declaration of Richard A. Rosen, dated May 13, 2009 (Exhibits 33 through 38).

[9]   The nature of the complaint in this action is thus different from the complaints in cases cited by plaintiffs that were found to plead mere negligence.  (Pls. Mem. 28–29 & n.10); *see In re Supreme Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 272 (3d Cir. 2006) (distinguishing case from one where "'[i]t would be unreasonable to infer a negligence cause of action from [nothing more than a] fleeting and obscure reference [in the complaint] to gross negligence'" (quoting *Shapiro* v. *UJB Fin. Corp.*, 964 F.2d 272, 288 n.18 (3d Cir. 1992))); *In re WorldSpace Sec. Litig.*, 07 Civ. 2252 (RMB), 2008 WL 2856519, at *5 (S.D.N.Y. July 21, 2008) (characterizing allegations that defendants failed to undertake a reasonable and diligent investigation as a negligence claim); *Garber* v. *Legg Mason, Inc.*, 537 F. Supp. 2d 597, 612 (S.D.N.Y. 2008) (finding that plaintiffs' allegations did "not rely on fraudulent acts, and allege[d] no fraudulent intent"); *In re Initial Public Offering Sec. Litig.*, 544 F. Supp. 2d 277, 299 (S.D.N.Y. 2008) (finding that claims against issuer did not sound in fraud because claims did not rely on participation of the Issuer Defendants in the alleged fraud); *In re Prestige Brands Holdings, Inc.*, 05 Civ. 06924 (CLB), 2006 WL 2147719, at *8 (S.D.N.Y. July 10, 2006) (assuming that pleadings sounded in negligence because there was no "evidence to the contrary"); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 502 (S.D.N.Y. 2004) (refusing to apply Rule 9(b) to claim that issuer failed to conduct a reasonable investigation); *Rombach* v. *Chang*, 00 Civ. 0958 (SJ), 2002 WL 1396986, at *4 (E.D.N.Y. June 7, 2002) (characterizing allegations that defendants failed to undertake a reasonable and diligent investigation as a breach of duty claim).  Plaintiffs' citation to *Shaw* v. *Digital Equip. Corp.*, 82 F.3d 1194, 1223 (1st Cir. 1996), for the proposition that allegations that defendants possessed material information and knowingly withheld it do not sound in fraud is inconsistent with the law in this Circuit.  *See Coronel*, 2009 WL 174656, at *15; *In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690 n.4 (S.D.N.Y. 2004); *Rinehart* v. *Lehman Bros. Holdings, Inc.*, 08 Civ. 5598 (LAK), Tr. at 24:22–25:3 (S.D.N.Y. Jan. 8, 2009) (attached as Ex. 1 to the Declaration of Steven B. Singer, dated April 24, 2009).

4

Plaintiffs' attempt to distinguish cases applying Rule 9(b) to Securities Act claims, on the grounds that those cases involved claims under both the Securities Act and the Exchange Act, is unavailing.  The inclusion of an Exchange Act claim is not essential to a finding that a Securities Act claim sounds in fraud.  *See, e.g.*, *Zirkin* v. *Quanta Capital Holdings Ltd.*, 07 Civ. 851 (RPP), 2009 WL 185940, at *11–12 (S.D.N.Y. Jan. 23, 2009) (finding that complaint asserting claims only under the Securities Act sounded in fraud and was subject to Rule 9(b)).  The cases cited by plaintiffs do not hold otherwise.[10]  Moreover, although plaintiffs do not allege an Exchange Act claim in their complaint, the allegations in the complaint borrow heavily from the related Exchange Act complaint.[11]

As discussed in defendants' opening brief (Defs. Mem. 47–50), the complaint should be dismissed for failure to plead facts that give rise to a strong inference of fraudulent intent.  *See JP Morgan Chase*, 363 F. Supp. 2d at 635.[12]  Plaintiffs fail to allege that defendants either had motive or opportunity to commit fraud, and the suggestion that defendants *knew*, in

---

[10]    The court in *In re Corning Securities Litigation*, for example, merely held that Rule 9(b) will apply when a Securities Act claim is based on "[t]he same course of conduct that *would* support a Rule 10b-5 claim." 01 Civ. 6580 (CJS), 2004 WL 1056063, at *9 (W.D.N.Y. Apr. 9, 2004) (emphasis added).  In *JP Morgan Chase*, the court did not rely on the fact that plaintiffs also asserted Exchange Act claims.  *See* 363 F. Supp. 2d at 635.

[11]    Notably, plaintiffs could not have asserted a class action claim under the Exchange Act because lead plaintiff in *In re Citigroup Inc. Securities Litigation*, 07 Civ. 9901 (S.D.N.Y.) (the consolidated Exchange Act litigation), already had been selected a month before plaintiffs filed the first "bond litigation" (Securities Act) complaint. Docket 07 Civ. 9901, Entry # 59 (Aug. 19, 2008).

[12]    Plaintiffs' argument that, even if Rule 9(b) applies to their complaint, they need not plead fraudulent intent because it is not an element of the claim (Pls. Mem. 32–33), is contrary to the law in this Circuit.  (*See* Defs. Mem. 48–49); *see also Coronel*, 2009 WL 174656, at *16 (holding that where a Securities Act claim sounds in fraud, the complaint "must convey through factual allegations that the defendants made materially false statements, and that they did so with scienter" (citations omitted)); *Zirkin*, 2009 WL 185940, at *12 (Securities Act claims that sound in fraud must "convey by factual allegations that the defendants made materially false statements, and that they did so with scienter"); *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 481 (S.D.N.Y. 2004) (confirming that Rule 9(b) applies to Securities Act claims that sound in fraud and noting in this context that the Second Circuit has interpreted Rule 9(b) to require that a complaint allege "facts giving rise to 'a strong inference of fraudulent intent'").

2006 and early 2007, that Citigroup's CDO assets would be subject to substantial write-downs in late 2007 is flatly inconsistent with the views of most market participants, securities analysts, and regulators at that time.  (Defs. Mem. 43–47.)  The very fact that Citigroup retained and continued to accumulate billions of dollars worth of super-senior tranches of CDOs during the class period (¶ 155), directly contradicts the notion that defendants considered those positions toxic.

## II.
## PLAINTIFFS FAIL TO PLEAD AN ACTIONABLE MISSTATEMENT OR OMISSION

Whether the complaint is governed by Rule 9(b) or by Rule 8(a),[13] plaintiffs fail to state a claim under the Securities Act because they fail to identify any statement incorporated into the offering materials that was false or misleading at the time that it was made.  Hindsight pleading, generalized accusations that assets were valued incorrectly, and conclusory assertions that Citigroup was obligated to disclose details of its holdings do not suffice.

### A.   PLAINTIFFS FAIL TO PLEAD AN ACTIONABLE MISSTATEMENT OR OMISSION WITH RESPECT TO CDOS

In its SEC filings prior to the onset of the market crisis in late 2007, Citigroup discussed its involvement with CDOs, identified CDOs as a type of variable interest entity ("VIE"), and disclosed its aggregate exposure to VIEs.  (*See* Defs. Mem. 21–22.)  As the economic crisis began to unfold in late 2007, Citigroup provided additional information about its CDO exposure in response to developing market conditions.  On October 1, 2007, Citigroup "pre-announced" its expectation of estimated third quarter write-downs of $1.3 billion from subprime RMBS warehoused for future CDO securitizations, CDO positions, and leveraged

---

[13]   Even if plaintiffs need not satisfy the pleading requirements of Rule 9(b), they still must plead, under Rule 8(a), "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.  Plaintiffs must plead "[f]actual allegations … to raise a right to relief above the speculative level." *Id.*

loans warehoused for future CLO securitizations.  (*See id*. at 23.)  On November 4, 2007, after

the ratings agencies announced unprecedented and severe downgrades of subprime RMBS and

CDOs, Citigroup announced that it anticipated fourth quarter subprime-related write-downs of $8

to $11 billion, largely from Citigroup's net holdings of $43 billion of super-senior tranches of

CDOs.  (*See id*.)  After the economic crisis worsened in the fourth quarter of 2007, Citigroup

updated its disclosures and announced in its 2007 Form 10-K, filed on February 28, 2008, that its

actual fourth-quarter write-downs on its CDO exposure totaled approximately $18 billion.  (*See

id.*)  Notwithstanding the extensive nature of these disclosures, plaintiffs contend that all of them

were false or misleading when made.  Because plaintiffs fail to satisfy their pleading burden with

respect to each statement, however, plaintiffs' claims should be dismissed.

> **1.      Plaintiffs Have Not Alleged Actionable Misstatements
> or Omissions Prior to October 2007**

As explained below and in defendants' opening brief, plaintiffs fail to plead an

actionable misstatement or omission regarding CDOs prior to October 2007.  (Defs. Mem. 32–

34.)  Accordingly, the claims relating to thirty-one offerings should be dismissed.  (*See supra*

note 4.)

> **(a)      Citigroup Had No Duty to Make Additional Disclosures
> about Its CDO Holdings Any Earlier Than It Did**

Plaintiffs' complaint is based largely on the allegation that Citigroup failed to

provide line-item details regarding its exposure to CDOs in addition to the disclosures described

above.  However, an omission is not actionable unless there was a duty to disclose, and plaintiffs

fail to identify any such duty.  (*See* Defs. Mem. 18–19 n.14.)

Plaintiffs argue that Financial Accounting Standards Board, Statement of

Accounting Standards ("FAS") No. 107 required Citigroup to disclose its purported

"concentrated credit risk" to subprime borrowers that allegedly stemmed from its CDO holdings. (Pls. Mem. 45–46.)  This argument depends on a misapplication of FAS 107.  While FAS 107 requires disclosure of "significant concentrations of credit risk," *see* FAS 107 ¶ 15A, plaintiffs presume incorrectly that CDO securities are subject to "credit risk," as opposed to "market risk." "Credit risk" is "the possibility that a loss may occur from the failure of another party to perform according to the terms of a contract."  FAS 105 ¶ 7.[14]  CDOs do not have exposure to the credit risk of any counterparty.  Moreover, CDOs do not present a significant *concentration* of credit risk because they pool together securities backed by thousands of underlying loans with different counterparties.[15]

CDO securities are subject to risks in the *market at large* because their value depends on changes in the *market* price for those instruments.  *See id.* (defining "market risk" as "the possibility that future changes in market prices may make a financial instrument less valuable"); *see also* SEC Rel. No. 33-7386, 62 Fed. Reg. 6044, 6048 (Feb. 10, 1997) (noting that "market risk is inherent in derivative and non-derivative instruments, including … mortgage-backed securities … and other debt obligations").  Plaintiffs themselves acknowledge that there was a market for CDOs that fluctuated in price.  (*See* Pls. Mem. 9; *see also* ¶ 162.)  Plaintiffs

---

[14]  *See also* Gary L. Gastineau & Mark P. Kritzman, *Dictionary of Financial Risk Management* 78–79 (1996) (defining "credit risk" as "exposure to loss as a result of a default on a swap, debt or other counterparty instrument").

[15]  In any event, plaintiffs have not adequately alleged that Citigroup's CDO holdings constituted a *significant* concentration of credit risk.  As plaintiffs acknowledge, Citigroup's CDO holdings consisted largely of super-senior tranches of CDOs, which were structured to provide protection from defaults in the underlying collateral. (*See* ¶ 156.)  While these holdings were ultimately backed (in part) by mortgage-backed securities, which in turn were backed (in part) by subprime mortgages, plaintiffs do not allege that FAS 107 requires indirect exposures to such assets to be treated as significant credit risks.  *See, e.g.*, Int'l Monetary Fund, *Global Fin. Stability Report* 59 (Apr. 2008), http://www.imf.org/External/Pubs/FT/GFSR/2008/01/pdf/text.pdf (last visited May 13, 2009) ("Under normal circumstances, the most senior [RMBS] tranches should be very secure against credit risk.").  Ultimately, the decision whether there was a "concentration" of credit risk and whether this concentration of credit risk was "significant" enough to require disclosure is a judgment call for management.

also implicitly acknowledge that CDOs were subject to market risk by arguing that Citigroup should have measured the value of its CDOs by reference to the ABX and TABX—two market indices reflecting the price of a portfolio of RMBS.  (*See* ¶ 295.)

In fact, Citigroup—as discussed on the October 15, 2007 conference call—had assigned its "market risk" teams to these positions rather than its "credit risk" teams.  (Ex. 33 at 30.)  Certainly, plaintiffs have not suggested that it was industry practice to view CDOs as subject to "credit risk" and thus to disclose the details of CDO positions prior to late 2007. Because CDOs are subject to market risk, Citigroup was not required to disclose this exposure under FAS 107.  *See* FAS 107 ¶ 15C (an entity is "encouraged, *but not required*, to disclose quantitative information about the *market risks* of financial instruments" (emphasis added)).

Alternatively, plaintiffs argue that Citigroup had a duty to disclose its CDO exposure in more detail because of the "highly material nature of this toxic exposure," and because Regulation S-K, Item 303 required disclosure of a "known trend[]" impacting Citigroup's CDO exposure.  (Pls. Mem. 44–47.)  Both of these arguments fail.  There is no duty to disclose information simply because it is material.  *See In re Xinhua Fin Media, Ltd. Sec. Litig.*, 07 Civ. 3994 (LTS)(AJP), 2009 WL 464934, at *7 (S.D.N.Y. Feb. 25, 2009) (finding no duty to disclose all "material, non-public, adverse information" (internal quotation omitted)). Similarly, Item 303 does not establish a duty of disclosure.  *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 04 Civ. 8144 (SWK), 2006 WL 2057194, at *15 (S.D.N.Y. July 20, 2006) (no duty to disclose under Item 303); *see also Oran* v. *Stafford*, 226 F.3d 275, 287–88 (3d Cir. 2000) (same).

In any event, this is nothing more than hindsight pleading.  There is no basis for plaintiffs' assertion that defendants should have known about the impact of the developing market crisis on super-senior CDO positions prior to October 2007.  The public events to which

plaintiffs cite—"the collapse in the housing market," "the poor underwriting and risky nature of the loans," "Citigroup's inability to sell its CDO assets" and "the meltdown of the most analogous market-based index" (Pls. Mem. 47)—do not support the allegation that Citigroup's CDO instruments, which were primarily the super-senior tranches, were "toxic" prior to October 2007.  Indeed, it was a widely shared view among market participants, securities analysts, and regulators alike—including the Secretary of the Treasury and Chairman of the Federal Reserve— that the decline in the housing market was contained and, therefore, unlikely to impact the super-senior tranches of CDOs.  (*See* Defs. Mem. 43–45.)

Plaintiffs' reliance on two specific ABX and TABX sub-indices (Pls. Mem. 47) similarly is misplaced.  As explained in defendants' opening brief, those sub-indices track very small, discrete portfolios of subprime BBB and single-A rated RMBS and, thus, do not directly correlate with Citigroup's CDO holdings.  (*See* Defs. Mem. 31 n.22.)  Historically, the super-senior CDO tranches had virtually never suffered impairment prior to late 2007.  (*See* Ex. 34 at 17.)  Fundamentally, the use of an RMBS index to value super-senior CDO positions ignores the effect of subordination and the credit enhancements inherent to the CDO structure.  Even using plaintiffs' metric—indices tracking RMBS—plaintiffs ignore the fact that the AAA ABX sub-index traded at par prior to July 2007 and continued to trade near par until October 2007.  (Ex. 35.)

Plaintiffs' cannot employ "20/20 hindsight" to impose a duty to disclose losses or trends that were unknown to defendants prior to Citigroup's October 2007 disclosures.  *See Panther Partners, Inc.* v. *Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 669 (S.D.N.Y. 2008). Accordingly, plaintiffs fail to plead an actionable omission relating to CDOs prior to October 2007.

**(b)    Citigroup's Pre-October 2007 Disclosures
Were Accurate and Appropriate**

Contrary to plaintiffs' allegation that Citigroup did not disclose its exposure to

"CDO securities until the end of 2007" (*see* Pls. Mem. 39), the Company plainly disclosed in

each of its quarterly and annual filings between 2004 and 2007 its involvement with CDOs,

identified CDOs as a type of VIE, and disclosed its aggregate exposure to VIEs.  (*See* Defs.

Mem. 21–22; ¶¶ 272, 318.)  For example, in its second quarter Form 10-Q for 2007, Citigroup

disclosed that its "maximum exposure to loss as a result of its involvement with VIEs … was

$117 billion … at June 30, 2007."  (Ex. 12 at 67.)  Citigroup also disclosed that it (i) "may …

provide liquidity facilities, such as commercial paper backstop lines of credit to the VIEs"; and

(ii) "may also have an ownership interest in certain VIEs."  (*Id.*)  Plaintiffs try to dismiss these

disclosures as "vague and highly-qualified."  (¶¶ 165, 315.)  However, these disclosures were

consistent with the disclosure requirements of the governing accounting rule for VIEs (Financial

Accounting Standards Board Interpretation No. 46-R or "FIN 46-R") and plaintiffs have not

identified any duty for Citigroup to disaggregate its CDO exposure from the total VIE exposure.

(*See* Defs. Mem. 24–25.)

Plaintiffs focus on two particular statements, included in Citigroup's quarterly and

annual filings from 2006 through the second quarter of 2007, which plaintiffs allege are

misleading:  that (i) Citigroup had "limited continuing involvement" in VIEs (Pls. Mem. 44), and

(ii) the "Company's mortgage loan securitizations are primarily non-recourse, thereby effectively

transferring the risk of future credit loss to the purchasers."  (Pls. Mem. 33.)[16]  However, these

---

[16]    Plaintiffs also allege that Citigroup made a material misstatement on its July 20, 2007 earnings call.  (Pls. Mem. 11.)  However, alleged misstatements relating to this earnings call are not actionable under the Securities Act because they were not incorporated into any public offering material.  *See Freedman* v. *Value Health, Inc.*, 135 F. Supp. 2d 317, 335 (D. Conn. 2001) (holding that statement that was not incorporated by reference into offering materials was not actionable under Sections 11 or 12(a)(2) of the Securities Act).  In any event, the statements made on the July 20, 2007 earnings call were neither false nor misleading because Citigroup

allegations are not actionable because they constitute a distorted, out-of-context reading of the statements. *See Cal. Pub. Employees' Ret. Sys.* v. *Chubb Corp.*, 394 F. 3d 126, 156 (3d Cir. 2004) (rejecting plaintiffs claim that defendants' disclosures were misleading where plaintiffs took defendants' statements "out of context and dr[e]w unreasonable inferences").

*First*, plaintiffs assert that "statements about Citigroup's purportedly 'limited' involvement were false because Citigroup was obliged to absorb losses on its CDOs." (Pls. Mem. 44.) However, as explained in defendants' memorandum, the statement that Citigroup had "limited continuing involvement" with VIEs is true—the Company had neither operational control nor equity interest in the VIEs structured. (*See* Defs. Mem. 32–33.) Moreover, contrary to plaintiffs' assertions, "limited continuing involvement" could not have meant "limited exposure to loss" because Citigroup explicitly disclosed that it had a $117 billion "*maximum exposure to loss*" from unconsolidated VIEs in the second quarter of 2007. (Ex. 12 at 67.)

*Second*, plaintiffs argue that Citigroup's statement about its "mortgage loan securitization" activity was misleading because Citigroup retained CDO tranches from its CDO securitizations. (¶¶ 165, 315.) However, as explained in defendants' opening memorandum, Citigroup's disclosures about its mortgage loan securitization activities appeared in a section *unrelated to and entirely separate from* the discussion of CDO activity. (*See* Defs. Mem. 33.) Specifically, Citigroup's disclosures about its "mortgage loan securitization" activity clearly stated that it related to mortgages *originated* by Citigroup, which the Company would occasionally securitize in "primarily non-recourse" transactions. (Ex. 10 at 93.) By contrast, Citigroup's discussion of its CDO activity appeared in an entirely different portion of its

---

disclosed only its subprime secured lending exposure and made reference to having additional exposures. (Ex. 36 at 9.)

disclosures and discussed assets "*purchased* in the financial markets," with no characterization of CDO transactions as "non-recourse." (*Id.*)

### (c) Plaintiffs' Allegations of GAAP Violations Fail to Plead an Actionable Misstatement

Plaintiffs allege that Citigroup's financial disclosures violated GAAP in the pre-October 2007 period because Citigroup allegedly (i) misstated the fair value of its CDOs (Pls. Mem. 47; ¶ 287) and (ii) failed to consolidate its commercial paper CDOs onto its balance sheet (Pls. Mem. 50).

Plaintiffs allege that Citigroup "failed to properly account" for CDO market prices in its valuations of CDO assets because it did not consider certain ABX and TABX sub-indices. (Pls. Mem. 49; *see also id.* 47; ¶¶ 295–97.) However, plaintiffs do not allege that there was an absence of observable CDO transactions in the pre-October 2007 period or that Citigroup failed to mark its portfolio consistent with those observable CDO transactions. (*See* Defs. Mem. 30–31.) Moreover, as explained above and in defendants' opening brief, the sub-indices cited by plaintiffs are irrelevant: first, they were not comparable to Citigroup's CDO holdings; second, they were not designed to serve as a valuation tool; and, finally, they did not track actual CDO market transactions and thus properly were not viewed at the time as a valid reference point. (*See* Defs. Mem. 31–32.) In any event, the valuation of complex securities in a turbulent market inevitably involves judgment calls by management. *See Good Hill Partners L.P. ex rel. Good Hill Master Fund, L.P.* v. *WM Asset Holdings Corp. CI 2007-WM2*, 583 F. Supp. 2d 517, 520 (S.D.N.Y. 2008); *In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 251–52 (S.D.N.Y. 2005). Plaintiffs' hindsight critique of those judgment calls amounts to nothing more than a non-actionable claim of mismanagement. (*See* Defs. Mem. 32.)

Plaintiffs' assertion that Citigroup should have consolidated its commercial paper CDOs onto the balance sheet prior to late 2007, pursuant to FIN 46-R, also is unfounded. (*See* Pls. Mem. 50–51.) Consolidation of a CDO is appropriate under FIN 46-R only where the entity anticipates that it will suffer the majority of the losses of the CDO structure. (*See* Defs. Mem. 29.) As explained above, plaintiffs have not pleaded adequately that Citigroup anticipated that it would suffer the majority of losses from its exposure to super-senior tranches of commercial paper CDOs prior to late 2007, when it did, in fact, consolidate these CDOs after severe rating agency downgrades in October 2007. (*See id.*)

### 2. Plaintiffs Have Not Alleged Adequately that Citigroup's October 1, 2007 Disclosure Was False or Misleading

Plaintiffs also allege that Citigroup misled the market by disclosing on an October 1, 2007 earnings call that "Citigroup's total subprime exposure was $13 billion" when it had an additional $43 billion in super-senior CDO exposure.[17] (Pls. Mem. 11; *see also* ¶¶ 166–73; 322–24.) However, contrary to plaintiffs' allegations, Citigroup did not purport to disclose all of the Company's potential subprime exposure in its investment bank, as plaintiffs suggest, but only the approximately $13 billion of "secured subprime exposure in [its] lending and structuring business." (Ex. 13 at Ex. 99.2 p. 3.) Nor—as discussed more fully above—have plaintiffs identified a duty by Citigroup to disclose its super-senior CDO holdings at that time. Instead, plaintiffs merely point to a series of analyst reports that allegedly reflect "surpris[e]" at the size of the write-downs and the size of Citigroup's super-senior CDO exposure that was disclosed on

---

[17] Plaintiffs also allege that Citigroup made a similar misleading statement regarding its subprime exposure on Citigroup's October 15, 2007 earnings call. (¶ 168.) However, any purported misstatement made during the October 15, 2007 earnings call is not actionable under the Securities Act because statements made on this earnings call were not incorporated into any public offering material. *See Freedman*, 135 F. Supp. 2d at 335. In any event, the statements made on the October 15, 2007 earnings call were neither false nor misleading for the same reasons discussed with respect to the October 1, 2007 disclosure.

November 4, 2007.  (Pls. Mem. 12.)  However, analyst surprise in reaction to a new disclosure does not substitute for pleading (i) an affirmative statement that was rendered false or misleading by the omission of that position, or (ii) an independent duty to disclose a material fact.

> **3.     Plaintiffs Have Not Alleged Adequately that Citigroup's November 4, 2007 Disclosure Was False or Misleading**

On November 4, 2007, following a "series of rating agency downgrades" that "occurred after the end of the third quarter," Citigroup announced that it anticipated fourth-quarter subprime-related write-downs of approximately $8 billion to $11 billion arising from Citigroup's sub-prime exposures of (i) $11.7 billion in subprime-related "lending and structuring exposure" and (ii) $43 billion in "super-senior" CDO exposure.  (*See* Defs. Mem. 23.)

Plaintiffs assert that this disclosure understated Citigroup's super-senior exposure because it allegedly did not disclose an additional $10.5 billion of super-senior exposure that Citigroup had hedged with counterparties.  (Pls. Mem. 13 & n.3.)  However, as explained in defendants' opening brief, this allegation is flatly contradicted by the Company's contemporaneous disclosures.  On Citigroup's November 5, 2007 analyst call, Gary Crittenden expressly stated that the $43 billion represented Citigroup's "net" super-senior "exposure."  Gary Crittenden further stated that "I don't have off the top of my head exactly what the gross exposure is but there are hedges against that exposure that would add up to a larger number than the $43 billion."  (Ex. 37 at 13.)  Thus, contrary to plaintiffs' assertion, Citigroup plainly informed the market that it had additional hedged super-senior exposure.

Because plaintiffs fail to plead an actionable misstatement regarding CDOs between October 1, 2007 and November 4, 2007, the claims relating to the two offerings in that period should be dismissed.  (*See supra* note 5.)

4.      **Plaintiffs Have Not Alleged Adequately that Citigroup Misstated the Value of its CDO Holdings After November 4, 2007**

With respect to disclosures about CDO holdings after November 4, 2007, plaintiffs merely allege that Citigroup "continued to materially misstate" the value of its CDO securities in violation of GAAP.  (*See* Pls. Mem. 47.)  However, in its November 4, 2007 disclosure, Citigroup explained that, because there were no observable market transactions, the "fair value of these super senior exposures is based on estimates … [which] depend on market conditions and assumptions over time … As a result, the fair value of these exposures at the end of the fourth quarter will depend on future market developments."  (Ex. 1 at Ex. 99.1 p. 2.)  The valuation of complex securities in an illiquid market involves judgment calls by management.  Plaintiffs' *opinion* on how Citigroup should have valued its assets asserts, at best, a mismanagement claim that is not actionable under the securities laws.  (*See supra* Section II.A.1.c.)

Plaintiffs do not allege any fact suggesting that Citigroup did not calculate properly the "fair value" of its CDO assets after November 4, 2007.  The mere fact that Citigroup ultimately reported larger write-downs on its CDO exposure for the fourth quarter does not support the assertion that the earlier estimate on November 4, 2007 was wrong at the time that it was made.  After-the-fact market events during an unprecedented financial crisis do not suffice to render prior statements regarding Citigroup's assets false.  *See Coronel*, 2009 WL 174656, at *13–14; *In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 183–84 (S.D.N.Y. 2003).

Similarly, the suggestion that Citigroup's CDO assets were incorrectly valued in 2007 and early 2008 because, in **November 2008**, Citigroup reclassified its CDO assets (among other assets) from trading accounts to "held to maturity" accounts is argument by hindsight.  (*See* Pls. Mem. 48–49.)  In each of its quarterly filings in 2008, Citigroup disclosed its valuation

methodology for its CDO portfolio and resulting write-downs.  Plaintiffs have not alleged any

facts to suggest that this valuation methodology was inaccurate or otherwise improper.  The fact

that Citigroup reclassified these assets in late 2008 is entirely consistent with the stated belief

that the assets were affected by the severe financial crisis, but were fundamentally sound and

would regain value.[18]

> Because plaintiffs fail to plead an actionable misstatement or omission regarding
CDOs after November 4, 2007, the claims relating to the fifteen subsequent offerings must be
dismissed.  (*See supra* note 6.)

## B.   PLAINTIFFS FAIL TO PLEAD ACTIONABLE MISSTATEMENTS OR OMISSIONS RELATING TO SIVS

> Plaintiffs do not dispute that SIVs are a type of VIE, that Citigroup disclosed the
amount of its SIV assets as well as its exposure to all VIEs as a whole, and that Citigroup had no
contractual obligation to guarantee losses to the SIVs.  (Pls. Mem. 51–53.)  They nevertheless
argue that Citigroup did not satisfy its disclosure obligations because it did not disclose that
"(i) Citigroup had implicitly guaranteed the SIVs' losses, or (ii) the SIVs' assets had
significantly deteriorated in value."  (*Id.* 52.)  Plaintiffs' arguments have no basis in fact or law.

> Plaintiffs provide no support for their conclusory allegation that Citigroup had an
"implicit obligation" to support the SIVs.  Instead, they muddle the issue by arguing that FIN
46-R requires consolidation where a company has an explicit or implicit obligation to absorb the

---

[18]   Vikram Pandit, Presentation, Citigroup Financial Services Conference 2009 (Jan. 27, 2009), webcast available at http://www.citigroup.com/citi/fin/pres.htm (last visited May 12, 2009) ("These are distressed assets that have historically had 20% rates of return.  The goal is to extract value from this portfolio, as much value as possible consistent with the nature of the market.").

majority of an entity's losses.  (*Id.* at 53–54.)[19]  This argument does not address the question of whether Citigroup had "implicitly guaranteed" the SIVs' losses in the first place.

Even if Citigroup had guaranteed the SIVs' losses, FIN 46-R requires consolidation only if the company anticipates that it *will* in fact absorb a majority of losses.  (*Id.* at 53.)  Although Citigroup ultimately decided in December 2007—after Moody's and S&P identified the SIVs' outstanding senior debt for possible downgrade—to consolidate the SIVs' assets and liabilities onto its balance sheet, plaintiffs have not pleaded facts showing that Citigroup had any reason to believe, prior to December 2007, that it would absorb the majority of the SIVs' losses.  *See Scibelli* v. *Roth*, 98 Civ. 7228 (HB), 2000 WL 122193, at *3 (S.D.N.Y. Jan. 31, 2000) (rejecting as "not a reasonable inference" the suggestion that subsequent announcement meant defendants were in possession of the information in question months earlier).

Plaintiffs also fail to support their general assertion that Citigroup misstated the value of its SIV assets "both before and after it consolidated them." (Pls. Mem. 54.)  In particular, plaintiffs fail to allege facts showing that SIVs were impaired prior to December 2007.[20]  Citigroup's receipt of $326 billion in federal guarantees in November 2008 has no bearing on whether Citigroup's valuation of SIVs *in 2007* was inaccurate.  (Pls. Mem. 55.)  Moreover, as discussed above (*see supra* Section II.A.4), the valuation of complex assets such as

---

[19]   Plaintiffs also incorrectly state that the complaint cites an interpretation of  FIN 46(R) "in the specific context of Citigroup's SIVs."  (Pls. Mem 54.)  The officials in the article cited specifically "declined to comment on Citigroup."  Jonathan Weil, *Citigroup SIV Accounting Looks Tough to Defend*, Bloomberg (Oct. 24, 2007).

[20]   Contrary to plaintiffs' argument, the complaint does not cite the TABX index as an indication that Citigroup misstated its SIV assets.  (Pls. Mem. 54.)  The TABX index was referenced in the complaint only in connection with plaintiffs' CDO-related allegations.  (*See* ¶¶ 295–97.)

SIVs is a matter of judgment by management. Criticism of that judgment amounts to a claim of mismanagement, which is not actionable under the Securities Act.

Finally, because plaintiffs do not allege that Citigroup's disclosures prior to September 6, 2007 or after December 13, 2007 were inaccurate or misleading with respect to SIVs, any claims based on SIV disclosures outside this time frame should be dismissed.[21]

## C.   PLAINTIFFS FAIL TO PLEAD ACTIONABLE MISSTATEMENTS OR OMISSIONS RELATING TO MORTGAGE LOAN LOSS RESERVES

Plaintiffs' allegations about the inadequacy of Citigroup's loan loss reserves for residential mortgages do not state a claim because, in this Circuit, different opinions regarding the proper assumptions used to calculate loan loss reserves are insufficient grounds for claims under the federal securities laws; loan loss reserves will only be treated as false for this purpose if the plaintiffs "present evidence … that [defendants'] disclosures were inconsistent with current data." *Stepak* v. *Aetna Life & Cas. Co.*, 90 Civ. 886 (AVC), 1994 WL 858045, at *15 (D. Conn. Aug. 29, 1994); *see also In re Aegon N.V. Sec. Litig.*, 03 Civ. 0603 (RWS), 2004 WL 1415973, at *8 (S.D.N.Y. June 23, 2004). Plaintiffs' allegation that Citigroup did not adequately reserve against credit losses in light of the risks that the Company had undertaken does not show that the reserves were inconsistent with market data at the time, and therefore cannot serve as a basis for claims under the Securities Act. (¶¶ 227–35.)[22]  In any event, plaintiffs' allegation boils down to

---

[21]   Only six offerings were made between September 6, 2007 and December 13, 2007. These six offerings are dated:  (i) pursuant to the March 2, 2006 Registration Statement – September 14, 2007 (5.250% Notes), September 14, 2007 (6.00% Notes), October 17, 2007, November 21, 2007; (ii) pursuant to the March 10, 2006 Registration Statement – October 22, 2007; and (iii) pursuant to the June 20, 2006 Registration Statement – November 27, 2007. The other forty-two offerings were outside this time period.

[22]   Unlike the complaint here, the cases cited by plaintiffs involve misrepresentations about *existing* facts relevant to loan reserves. *See In re Dynex Inc. Sec. Litig.*, 05 Civ. 1897 (HB), 2006 WL 314524, at *12 (S.D.N.Y. Feb. 10, 2006) (plaintiffs alleged "that the reserve understatement concealed present facts concerning the impaired nature of the bond collateral"), *vacated in part on other grounds sub nom. Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190 (2d Cir. 2008); *In re New Century*, 588 F. Supp. 2d 1206, 1227 (C.D. Cal. 2008) (the complaint alleged misrepresentations "that did not turn on the outcome of future

claims of mismanagement and is therefore not actionable under the Securities Act.  *See, e.g.*, *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 376 (S.D.N.Y. 2004); *Ciresi* v. *Citicorp*, 782 F. Supp. 819, 821 (S.D.N.Y. 1991).

**D.    PLAINTIFFS FAIL TO PLEAD ACTIONABLE MISSTATEMENTS OR OMISSIONS RELATING TO AUCTION RATE SECURITIES**

There is no dispute that Citigroup disclosed its practice of "routinely" bidding for its own account in ARS auctions, that Citigroup promptly disclosed the occurrence of auction failures in February 2008, or that Citigroup disclosed on April 18, 2008 that it had written down $1.5 billion on its ARS inventory due to the failed auctions and deterioration in the credit market. (Defs. Mem. 39–42.)  Nevertheless, plaintiffs argue that Citigroup violated the Securities Act by failing to disclose the *amount* of its ARS portfolio between August 2007 and April 2008.  (Pls. Mem. 57–58.)  As discussed above (*supra* Section II.A.1.b), companies do not have a duty disclose line item details regarding their holdings of particular assets and defendants cannot be held liable for omitting facts they had no duty to disclose.

In addition, plaintiffs argue that Citigroup overstated the value of its ARS holdings after February 2008.  (Pls. Mem. 58.)  However, plaintiffs provide no basis for challenging the valuation of those holdings.  As explained in its first quarter 2008 10-Q, Citigroup valued ARS based on observable market prices prior to the failure of the first auctions in February 2008.  (Ex. 38 at 97.)[23]  Following the auction failures, Citigroup moved to valuing its ARS based on valuation models in the absence of market observables.  (Pls. Mem. 58.)

---

events"); *Schnall* v. *Annuity & Life Re (Holdings), Ltd.*, 02 Civ. 2133 (GLG), 2004 WL 367644, at *8 (D. Conn. Feb 22, 2004) (statements about future business conditions could be misleading because they were inconsistent with historical performance of bonds).

[23]    To the extent plaintiffs are challenging Citigroup's valuation of ARS prior to February 2008, they have not alleged that those market prices indicated a material deterioration to ARS before the auction failures.

Citigroup announced its write-downs on ARS inventory in the first quarter of 2008—the same quarter the first auctions failed. (*Id.* at 22–23; ¶ 246.) The valuation of assets in a turbulent and illiquid market is a matter of judgment by management. Criticism of that judgment amounts to a claim of mismanagement, which is not actionable under the Securities Act. (*See supra* Section II.A.1.c.)

Finally, because plaintiffs do not allege that Citigroup's disclosures prior to August 2007 or after April 2008 were inaccurate or misleading with respect to ARS, any claims based on ARS disclosures outside this time frame should be dismissed.[24]

### III.
### THE CITIGROUP DEFENDANTS ARE NOT STATUTORY SELLERS

Plaintiffs argue that the Citigroup Defendants—Citigroup, Citigroup Funding Inc. and the Citigroup Trusts—"conceded their seller status under Section 12(a)(2)" through affirmations made pursuant to Item 512 of SEC Regulation S-K[25] in connection with SEC Rule 159A. (Pls. Mem. 67.) However, SEC Rule 159A (and, in conjunction, the relevant undertaking required by Item 512) cannot expand the scope of liability under Section 12(a)(2). This is because the Securities Act does not authorize the SEC to expand the liability defined by Congress in crafting Section 12(a)(2), and articulated by the Supreme Court in *Pinter* v. *Dahl*, 486 U.S. 622, 641–42, 646–47 (1988), which states that only those in privity with plaintiffs, or

---

[24]   Only 15 offerings were made between August 2007 and April 18, 2008. These fifteen offerings are dated: (i) pursuant to the March 2, 2006 Registration Statement – August 13, 2007, August 15, 2007, August 27, 2007, September 14, 2007 (5.250% Notes), September 14, 2007 (6.00% Notes), October 17, 2007, November 21, 2007, January 23, 2008, January 25, 2008, March 5, 2008, April 11, 2008; (ii) pursuant to the March 10, 2006 Registration Statement – October 22, 2007; and (iii) pursuant to the June 20, 2006 Registration Statement – August 15, 2007, November 27, 2007, and December 21, 2007. The other thirty-three offerings were outside this time period.

[25]   Securities Offering Reform, Exchange Act Release No. 8591, 2005 WL 1692642, at 136–37 (Aug. 3, 2005); 17 C.F.R. § 229.512.

those who directly solicited them, can be held liable under Section 12(a)(2).  *See Ernst & Ernst*

v. *Hochfelder*, 425 U.S. 185, 213–14 (1976) (holding that the rulemaking power granted to the

SEC "is not the power to make law").  In any event, the cases cited by plaintiffs where

signatories of registration statements were found liable as statutory sellers all involve specific

allegations of active solicitations, such as participation by defendants in road shows to sell the

securities.  (Pls. Mem. 68–69.)  The complaint here includes no such allegation.

Finally, because plaintiffs have failed to plead facts showing that Citigroup

Capital Funding and the Citigroup Trusts are statutory sellers, plaintiffs' argument that

"Citigroup's control of Citigroup Capital Funding and the Citigroup Trusts further establishes its

seller status" must be rejected.  (Pls. Mem. 68.)  In any event, as explained below in Section IV,

plaintiffs have not pleaded facts showing that Citigroup controlled either Citigroup Funding or

the Citigroup Trusts.

## IV.
## PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 15

Even if plaintiffs had stated a legally sufficient claim under Section 11 of the

Securities Act—which they did not—their Section 15 claim should still be dismissed because

they fail to plead control by Citigroup or by the Individual Defendants over the alleged primary

violators.

With respect to Citigroup, plaintiffs ignore the extensive precedent cited by

defendants that establishes that the mere existence of a parent/subsidiary relationship is

insufficient to demonstrate control on the part of the parent entity.  (Defs. Mem. 53.)  While

plaintiffs allege that there is "no question" that Citigroup controlled Citigroup Funding Inc. and

the Citigroup Trusts, they offer little more than unsupported allegations and conclusory assumptions in support of their allegation.[26]  (Pls. Mem. 71.)

Moreover, with respect to the Individual Defendants, plaintiffs repeat their boilerplate allegations that these defendants were Citigroup officers, ignoring precedent cited by defendants showing that this status alone is insufficient to establish control person liability.  (*See* Pls. Mem. 71–72.)  Further, plaintiffs assert that many of the Individual Defendants are liable as signatories of Registration Statements or SEC filings.  However, the case plaintiffs cite for this proposition, *In re Refco Inc. Securities Litigation*, 503 F. Supp. 2d 611 (S.D.N.Y. 2007), does not establish that simply signing a registration statement establishes control person liability. *Refco* merely held that doing so was "suggestive" of power.  *Id.* at 638.  Unlike plaintiffs here, the *Refco* plaintiffs specifically alleged that the defendants had been involved in the "day-to-day operations" of the entity that they were alleged to have controlled, including its "financial reporting and accounting," and had "prepared and approved" the registration statement itself.  *Id.* at 638–39.

### V.
### PLAINTIFFS IMPROPERLY ASSERT SECTION 11
### CLAIMS AGAINST CERTAIN INDIVIDUAL DEFENDANTS

As noted in defendants' opening brief (Defs. Mem. 57–60), liability under Section 11 attaches both to signatories of a registration statement and to those who were directors of the issuer at the time that the portion of the statement alleged to contain misstatements or omissions was filed.  15 U.S.C. § 77k(a)(1)-(2).  In their response, plaintiffs do not dispute that Citigroup's 2007 Form 10-K updated earlier Registration Statements to exclude Defendants Jordan,

---

[26] Plaintiffs' citation to *Dietrich* v. *Bauer*, 76 F. Supp. 2d 312, 335 (S.D.N.Y. 1999) is inapposite, as the plaintiffs in that case did not allege control-person liability against a parent entity.

Kleinfeld, Mecum, and Prince as directors of the Company, thus precluding their liability as directors after the date the Form 10-K was filed.  17 C.F.R. § 230.412.  In addition, as Defendants Bischoff, Pandit, and Ryan never signed the Registration Statements, they can only be held liable under § 77k(a)(2) as Citigroup directors for those offerings issued after the 2007 Form 10-K was filed on February 22, 2008, effectively creating a new registration statement. Further, Bischoff, Pandit, and Ryan cannot be held liable for offerings issued by Citigroup Funding or any of the Citigroup Trusts, as they are not alleged to have been directors or trustees of those entities.  Plaintiffs appear to concede these points, but incorrectly assert that these defendants can nonetheless be liable for at least nine offerings—that is, they cannot be liable for thirty-nine offerings.  (Pls. Mem. 70.)  In fact, plaintiffs' concession means that Bischoff, Pandit, and Ryan cannot be held liable for *forty-one* offerings at issue in the complaint.[27]

---

[27] Only seven offerings were made by Citigroup Inc. after the 2007 Form 10-K was filed on February 22, 2008. These seven offerings, which were all made pursuant to the March 2, 2006 Shelf Registration Statement, are dated:  March 5, 2008, April 11, 2008, April 28, 2008, May 12, 2008, May 13, 2008 (Floating Rate Notes), May 13, 2008 (Depository Shares) and August 19, 2008.  (¶ 309.)

## CONCLUSION

For the reasons set forth above and in their opening brief, the Citigroup

Defendants and the Individual Defendants respectfully request that the Court dismiss the

complaint, in its entirety and with prejudice.

Dated: New York, New York
     May 13, 2009

                     Respectfully submitted,

                     PAUL, WEISS, RIFKIND, WHARTON &
                       GARRISON LLP

                         /s/  Richard A. Rosen

                     Brad S. Karp  (bkarp@paulweiss.com)
                     Richard A. Rosen  (rrosen@paulweiss.com)
                     Susanna M. Buergel  (sbuergel@paulweiss.com)
                     Karen R. King  (kking@paulweiss.com)
                     1285 Avenue of the Americas
                     New York, New York  10019-6064
                     Tel.  (212) 373-3000

                     *Attorneys for Defendants Citigroup Inc., Citigroup Funding Inc., Citigroup Capital XIV, Citigroup Capital XV, Citigroup Capital XVI, Citigroup Capital XVII, Citigroup Capital XVIII, Citigroup Capital XIX, Citigroup Capital XX, Citigroup Capital XXI, C. Michael Armstrong, Alain J.P. Belda, Sir Winfried Bischoff, Michael Conway, Gary Crittenden, George David, Kenneth T. Derr, John M. Deutch, Scott Freidenrich, James Garnett, John C. Gerspach, Ann Dibble Jordan, Klaus Kleinfeld, Sallie L. Krawcheck, Andrew N. Liveris, Dudley C. Mecum, Ann Mulcahy, Vikram Pandit, Richard D. Parsons,  Charles Prince, Roberto Hernandez Ramirez, Judith Rodin, Saul Rosen, Robert E. Rubin, Robert L. Ryan, Franklin A. Thomas, Eric L. Wentzel, and David Winkler*