UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
    :
    :
    :      08 Civ. 9522 (SHS)
IN RE CITIGROUP INC. BOND LITIGATION    :
    :      <u>OPINION & ORDER</u>
    :
    :
-----------------------------------------------------------------x

**I.    BACKGROUND** ........................................................................................ 3
   A.   The Parties ....................................................................................... 3
   B.   Citigroup's Bond Offerings ............................................................. 7
      i.   Citigroup's CDO Exposure ...................................................... 9
      ii.   Citigroup's SIV Exposure ..................................................... 12
      iii.   Citigroup's Stated Reserves .................................................. 14
      iv.   Citigroup's ARS Exposure ................................................... 15
      v.   Citigroup's Well-Capitalized Status ...................................... 16
      vi.   Citigroup's Compliance with GAAP ...................................... 18
   C.   The Financial Meltdown ............................................................... 19
   D.   This Action .................................................................................... 20
**II.    DISCUSSION** ..................................................................................... 23
   A.   The Motion To Dismiss Standard .................................................. 23
   B.   Statutory Provisions ...................................................................... 24
   C.   Standing ......................................................................................... 25
      i.   Section 11 Standing ............................................................... 26
      ii.   Section 12 Standing ............................................................... 28
   D.   Pleading Standard .......................................................................... 30
   E.   Section 11 Claims .......................................................................... 33
      i.   Actionable Misstatements or Omissions ............................... 34
         a.   Citigroup's CDO Exposure ............................................ 35
         b.   Citigroup's SIV Disclosure ............................................ 39
            *1.*   *Pre-Consolidation Statements* ..................................... 40
            *2.*   *Post-Consolidation Statements* .................................... 41
         c.   Citigroup's Stated Reserves ............................................ 42
         d.   Citigroup's ARS Exposure ............................................. 43
         e.   Citigroup's "Well-Capitalized" Status ........................... 45
         f.   Citigroup's Compliance with GAAP ............................... 46
   F.   Section 15 Claims .......................................................................... 48
**III.    CONCLUSION** .................................................................................... 49

SIDNEY H. STEIN, U.S. District Judge.

Plaintiffs, all purchasers of bonds issued by or on behalf of Citigroup, bring this putative class action against Citigroup, Inc. raising claims pursuant to Sections 11, 12 and 15 of the Securities Act of 1933.  15 U.S.C. § 77k, l, o.  Plaintiffs contend that Citigroup made materially untrue or misleading statements or omissions in public offering materials associated with forty-eight different bond issuances between May 2006 and August 2008.  Also named as defendants are a Citigroup subsidiary and eight Citigroup trusts, twenty eight current or former Citigroup officers or directors, and nearly eighty banks that served as underwriters on one or more of the offerings at issue.

All defendants now move to dismiss the consolidated amended class action complaint in its entirety contending, first, that plaintiffs lack standing to pursue many of their claims, second, that plaintiffs' remaining claims "sound in fraud" and should therefore be subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b) which the complaint does not satisfy, and third, that even if Rule 9(b) does not apply, plaintiffs fail to identify an actionable misstatement or omission and thus fail to plead a plausible claim to relief pursuant to any section of the Securities Act.  Plaintiffs oppose those motions.

Because the Court finds (1) that plaintiffs have standing to raise Section 11 and 15 claims and state plausible claims to relief pursuant to those sections, but (2) plaintiffs lack standing to raise claims pursuant to Section 12, defendants' motion to dismiss is granted in part and denied in part.

## I.    BACKGROUND

Unless otherwise noted, the following facts are taken from the consolidated amended class action complaint ("complaint") and are presumed to be true for purposes of this motion:

### A.    The Parties

Plaintiffs are a group of pension plans and an insurance company that purchased debt securities ("bonds") issued by defendants between May 2006 to August 2008. (Compl. ¶¶ 1, 21-28.)

Plaintiff Minneapolis Firefighters Relief Association ("MFRA") is a public pension plan fund operating for the benefit of current and former Minneapolis firefighters and their dependants.  MFRA traded units in five different bonds issued by defendants between March 2007 and December 2008.  (Id. ¶ 21; Ex. A to Compl.)

Plaintiff Louisiana Sheriffs Pension & Relief Fund ("LSPRF") is a defined-benefit pension plan operating for the benefit of sheriffs in the state of Louisiana.  LSPRF traded units in five different bonds issued by defendants between August 2006 and December 2008.  (Id. ¶ 22; Ex. B to Compl.)

Plaintiff Louisiana Municipal Police Employees' Retirement System ("LAMPERS") is a defined-benefit pension plan for police officers in the state of Louisiana.  LAMPERS purchased units in a bond issued by defendants in December 2007.  (Id. ¶ 23; Ex. C to Compl.)

Plaintiff the City of Tallahassee Retirement System is a public pension plan operating for the benefit of current and former City of Tallahassee employees.  The plan

traded units in five different bonds issued by defendants between January and October 2008.  (Id. ¶ 24; Ex. D to Compl.)

Plaintiff the City of Philadelphia Board of Pensions and Retirements is a public pension system that operates for the benefit of active and retired city police, fire, and municipal employees.  The city pension system traded units in six different bonds issued by defendants between June 2006 and September 2008.  (Id. ¶ 25; Ex. E to Compl.)

Plaintiff the Miami Beach Employees' Retirement Plan ("MBERP") is a public pension system that operates for the benefit of current and former city employees.  MBERP traded units of seven different bonds issued by defendants between August 2006 and August 2008.  (Id. ¶ 26; Ex. F to Compl.)

Plaintiff Southeastern Pennsylvania Transit Authority ("SEPTA") maintains a pension plan operating for the benefit of current or former SEPTA employees.  SEPTA's pension fund traded units in four different bonds issued by defendants between October 2007 and September 2008.  (Id. ¶ 27; Ex. G to Compl.)

Plaintiff American European Insurance Company ("AEIC") is a New Jersey based insurer.  AEIC purchased units in two different bonds issued by defendants between February and May 2008.  (Id. ¶ 28; Ex. H to Compl.)

Defendant Citigroup is a Delaware corporation with its principal place of business and corporate headquarters in New York City.  Defendant Citigroup Funding, Inc. is a wholly-owned subsidiary of Citigroup whose business activities, according to the complaint, "consist primarily of providing funds to Citigroup and its subsidiaries." (Compl. ¶¶ 29-30.)

Defendants Citigroup Capital XIV-XXI are all statutory trusts whose sole assets are securities issued by Citigroup.  (Id. ¶¶ 31-39.)  Citigroup, Citigroup Funding, and the Citigroup Capital XIV-XXI (collectively, the "Citigroup Defendants") are all alleged to be issuers of the bond securities at issue in this action.  (Id. ¶¶ 29-38.)

Defendants C. Michael Armstrong, Alan J.P. Belda, Sir Winfried Bischoff, George David, Kenneth T. Derr, John M. Deutch, Ann Dibble Jordan, Klaus Kleinfeld, Andrew N. Liveris, Dudley C. Mecum, Ann M. Mulcahy, Vikram Pandit, Richard D. Parsons, Charles Prince, Roberto Hernandez Ramirez, Judith Rodin, Robert E. Rubin, Robert L. Ryan, and Franklin A. Thomas are all current or former members of the Citigroup Board of Directors.  (Id. ¶¶ 41-43, 46-48, 52-53, 55-57, 59-62, 64-66.) Defendants Michael Conway, Gary Crittenden, Scott Freidenrich, James Garnett, John C. Gerspach, Sallie L. Krawcheck, Saul Rosen, Eric L. Wentzel, and David Winkler are all current and former officers of Citigroup or Citigroup Funding.  (Id. ¶¶ 44-45, 49-51, 54, 58, 63.)  The current and former Board members and Officers (collectively, the "Individual Defendants") all served in their respective capacities at the time of some or all of the offerings.  (Id. ¶¶ 41-63.)

Defendants A.G. Edwards & Sons, Inc.; ABN AMRO, Inc.; Apex Pryor Securities; B.C. Ziegler and Company; Banc of America Securities LLC; Barclays Bank PLC; Barclays Capital Inc.; BB&T Capital Markets; Blaylock Robert Van, LLC; BNP Paribas Securities Corp.; C.L. King & Associates, Inc.; Cabrera Capital Markets, LLC; CastleOak Securities, L.P.; Charles Schwab & Co.; Citigroup Global Markets; Citigroup Global Markets Limited; Comerica Securities Inc.; Credit Suisse Securities (Europe) Limited; Credit Suisse Securities (USA) LLC; Crowell, Weedon & Co.; D.A. Davidson

& Co.; Danske Bank; Davenport & Company LLC; Deutsche Bank Securities Inc.; Doley

Securities, LLC; Ferris, Baker, Watts, Inc.; Fidelity Capital Markets; Advisors Asset

Management, Inc.; Fortis Bank NV-SA; Goldman, Sachs & Co.; Greenwich Capital

Markets Inc.; Guzman & Co.; H&R Block Financial Advisors Inc.; HSBC Securities

(USA) Inc.; ING Belgium, SA; J.J.B. Hillard, W.L. Lyons, Inc.; J.P. Morgan Securities

Inc.; Jackson Securities LLC; Janney Montgomery Scott LLC; Jeffries & Company, Inc.;

JPMorgan Chase & Co.; Keefe, Bruyette & Woods, Inc.; KeyBanc Capital Markets;

Loop Capital Markets; Melvin Securities, LLC; Merrill Lynch, Pierre Fenner & Smith,

Inc.; Mesirow Financial, Inc.; Morgan Keegan & Company, Inc.; Morgan Stanley & Co.

Inc.; Muriel Siebert & Co.; nabCapital Securities, LLC; Oppenheimer & Co. Inc.;

Pershing LLC; Piper Jaffray & Co.; Raymond James & Associates, Inc.; RBC Capital

Markets Corporation; RBC Dain Rauscher Inc.; Robert W. Baird & Co., Inc.; Ryan Beck

& Co., Inc.; Samuel A. Ramirez & Co., Inc.; Sandler, O'Neill & Partners, L.P.; SBK-

Brooks Investment Corp.; Stifel, Nicolaus & Company, Inc.; Stone & Youngberg LLC;

SunTrust Capital Markets, Inc.; TD Ameritrade, Inc.; TD Securities (USA) LLC; The

Royal Bank of Scotland; The Williams Capital Group, L.P.; Toussaint Capital Markets,

LLC; UBS Securities LLC; UBS Limited; Utendahl Capital Partners, L.P.; Wachovia

Capital Securities, LLC; Wedbush Morgan Securities Inc.; Wells Fargo Investments,

LLC; and William Blair & Company LLC each served as underwriters of one or more of

the relevant offerings.  (Id. ¶¶ 70-147.)  As underwriters, each was responsible for

ensuring the truthfulness and accuracy of the various statements contained in the Public

Offering Materials related to those offerings.  (Id.)[1]

---

[1] While each of the above listed defendants is named in the complaint, on February 17, 2009 this Court
endorsed a stipulation between plaintiffs and sixty-one of the underwriter defendants dismissing this action

B.     Citigroup's Bond Offerings

This action centers on a series of 48 bond offerings between May 2006 and August 2008 from which Citigroup raised over $71 billion dollars.  According to the complaint, Citigroup did so while failing to truthfully and fully disclose critical information about its financial condition to investors, notably information pertaining to its "toxic mortgage-linked exposures."  (Compl. ¶¶ 1, 149.)   When that information was belatedly disclosed, Citigroup's bond securities plummeted in value.  (Id. ¶ 12.)

Specifically, the complaint alleges that defendants made material untrue statements and omissions in the public offering materials associated with each of the bond issuances in at least six different ways.  First, defendants failed to disclose Citigroup's exposure to $66 billion worth of collateralized debt obligations ("CDO's") backed by subprime mortgage assets.  (Id. ¶¶ 3, 169.)  Instead, Citigroup's public offering materials indicated that Citigroup had no direct exposure to subprime mortgage-backed CDOs.  (Id. ¶ 165.)  In fact, according to the complaint, Citigroup held nearly $30 billion in subprime backed CDOs and had guaranteed another $25 billion and had a total of nearly $66 billion in direct CDO exposure, facts Citigroup failed to disclose and which would have been material to investors considering Citigroup's bond offerings.  (Id. ¶¶ 170, 172-73, 192.)

Second, defendants failed to properly disclose Citigroup's exposure to $100 billion in structured investment vehicles ("SIVs") that were similarly backed primarily by subprime mortgage assets.  Specifically, while Citigroup maintained in its public statements that it had only "limited continuing involvement" with the SIVs it offered, in

without prejudice with respect to those defendants.

fact, Citigroup was "implicitly required" to absorb any losses from its SIVs and thus should have disclosed the SIVs as a potential liability to investors. (Id. ¶¶ 193, 197, 199.)

Third, defendants' offering materials "materially understated reserves" held for losses that might stem from Citigroup's Residential Mortgage Loan Portfolio. According to the complaint, while Citigroup was required to hold in reserve an amount necessary to protect it against all "likely" losses, in fact, Citigroup held only that necessary to cover losses that had already occurred. By disclosing a loss reserve consisting of that artificially reduced amount, the complaint alleges that defendants significantly mislead investors about the state of the company's financial health. (Id. ¶¶ 227-29, 233-35.)

Fourth, defendants' offering materials failed to disclose roughly $11 billion in auction-rate securities ("ARS") that Citigroup had acquired and which, plaintiffs contend, had become "illiquid." (Id. ¶¶ 236, 242, 244.) When defendants did reveal Citigroup's exposure to illiquid ARS in April 2008, the disclosure "shocked the market." (Id. ¶ 245.)

Fifth, defendants represented in all public offering materials that it was "well capitalized"—i.e., it had a Tier 1 capital ratio above 6%. In fact, that statement was false because it failed to account for the $66 billion in CDO exposure, $100 billion in SIV exposure, and $11 in ARS exposure described above. When those exposures were disclosed and properly accounted for, it became apparent that Citigroup was "insolvent" and would require a Government bailout, thereby decimating the value of Citigroup's bond securities. (Id. ¶¶ 248-65; 319.)

Sixth, each of defendants' SEC filings—all of which were incorporated by reference into the public offering materials—represented that the Company's financial statements complied with Generally Accepted Accounting Principles ("GAAP").

According to the complaint, that representation was untrue because Citigroup's accounting of its CDO, SIVs, and other "subprime exposures" all violated GAAP in various respects. (Id. ¶¶ 263-286, 320.)

The Court turns now to each of the six baskets of allegations.

i.    Citigroup's CDO Exposure

A CDO is a type of asset-backed or "structured" finance security. A CDO is formed by pooling together other assets, and holders of CDO certificates are then paid a fixed amount of principal and interest based on the performance of those underlying assets. (Id. ¶ 156.) While CDOs can be "backed" by various kinds of assets, the CDOs relevant to his action were all created by pooling together residential mortgage backed securities ("RMBS"). (Id.) RMBS are themselves collections of underlying assets—residential mortgages—and the quality of an RMBS depends on the quality of those underlying residential mortgages. (Id. ¶ 157.)

The performance of a CDO turns on the performance of the assets underlying it. Accordingly, where, as here, the CDO is backed by RMBS, the performance of the CDO turns on the performance of a collection of individual residential mortgages. According to the complaint, a "substantial amount" of those underlying residential mortgages were "subprime" mortgages. And because a subprime mortgage—which is generally defined as one issued to a borrower with a "FICO" score of 620 or below[2]—carries a higher risk of default than a traditional mortgage, a CDO backed by subprime mortgages poses a higher risk to those holding its certificates. (Id. ¶¶ 157-58, 221.)

---

[2] A "FICO score"—or a credit score—is a measure used by credit grantors to determine how much, if any, credit to grant to an applicant. JOHN DOWNES & JORDAN ELLIOT GOODMAN, DICTIONARY OF FINANCE AND INVESTMENT TERMS 153-4 (7th ed 2006).

There is no dispute that plaintiffs and the public were aware that Citigroup offered CDOs backed by subprime mortgages as investment options to its customers. Plaintiffs contend, however, that defendants repeatedly misled them about Citigroup's direct exposure to those subprime mortgages because it maintained that "it was principally a seller rather than a purchaser of [subprime-backed] CDOs" and thus "had no direct exposure to" those CDOs.  (Id. ¶ 165.)

Specifically, in its 2006 10-K, among other filings, Citigroup averred that it had only "limited continuing involvement" in its Variable Interest Entities ("VIEs")—a category of assets that included CDOs—because it was not the "primary beneficiary" but instead sold them to "institutional clients and retail customers."  (Id. ¶ 165.)  Similarly, the 2006 10-K told investors that the "Company's mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future credit losses" from Citigroup to those investors who purchased the CDO securities.  (Id.)

Those statements were false, plaintiffs contend, for two reasons.  First, despite averring that it had "limited continuing involvement" in its CDOs, Citigroup held for itself nearly $30 billion worth of subprime-backed CDO securities and was thus directly exposed to the risks those subprime mortgages posed.  (Id. ¶ 172.)  Second, despite averring that its CDOs were "primarily non-recourse," Citigroup had, in fact, retained the risk of loss with respect to an additional $25 billion in subprime-backed CDO securities because it had sold them to investors with a guarantee known as a "liquidity put."  (Id. ¶ 170.)  Pursuant to the terms of those liquidity puts, Citigroup was allegedly obligated to satisfy the obligations of the CDOs it issued if those CDOs could no longer generate

sufficient income through their underlying assets—i.e., the subprime RMBS—to meet its obligations to investors.  (Id. ¶ 171.)

According to the complaint, defendants never disclosed any direct exposure to subprime backed CDOs until a July 20, 2007 conference call when Citigroup announced that the company's "Securities and Banking" division had $13 billion in subprime exposure.  Citigroup subsequently announced on an October 13, 2007 conference call that the previously announced $13 billion figure had been reduced.  (Id. ¶¶ 166, 168, 174.)

Plaintiffs contend that those statements—both of which were incorporated into subsequent public offering materials—were untrue.  Indeed, on November 5, 2007 defendants announced that Citigroup actually had exposure to some $55 billion of subprime-backed CDOs.  (Id. ¶ 176.)  On January 15, 2008, Citigroup announced exposure to an additional $10.5 billion in subprime-backed CDO securities which defendants described as a "hedged exposure" since Citigroup had purchased insurance on those securities.  (Id. ¶ 185.)

Plaintiffs further contend that, even after announcing a total exposure of some $66 billion to subprime-backed CDO securities, defendants continued to misrepresent the true risk those securities posed.  For example, Citigroup's 2007 10-K which was issued on February 22, 2008 and incorporated into some of the public offering materials at issue here, represented that the "fair value" of Citigroup's subprime-backed CDO securities was $39.8 billion—and thus, Citigroup's exposure was limited to approximately $26 billion, i.e., the difference between Citigroup's total exposure and the claimed fair value of the securities.  (Id. ¶ 189.)  Those representations were false, plaintiffs contend,

because all of Citigroup's subprime-backed CDO securities were illiquid and thus Citigroup should have properly recorded the full $66 billion figure as a loss. (Id. ¶ 190.)

According to the complaint, when Citigroup announced the government bailout in November 2008, it conceded that its CDO assets had been "grossly overvalued." (Id. ¶ 192.)

### ii.     Citigroup's SIV Exposure

A structured investment vehicle ("SIV") is a special purpose corporate entity that invests in different kinds of assets including various securities and collectivized securities such as CDOs and RMBS. SIVs issue commercial paper—securities—to investors and then pay the holders of those securities with the income generated by the assets the SIV invests in. The performance of an SIV security, thus, just as with the performance of a CDO security, turns primarily on the performance of a pool of underlying assets. And much as with Citigroup's CDOs, Citigroup's seven SIVs were largely backed directly and indirectly by subprime and "low-quality" mortgages. (Id. ¶¶ 193, 196.)

Citigroup sold SIV securities to outside investors—it did not retain any significant holdings of its own. Accordingly, Citigroup represented in all of its Public Offering Materials during the relevant period that it had only "continuing limited involvement" in its SIVs and "as a result, would not consolidate their assets and liabilities in our financial statements." (Id. ¶ 316.) Should the assets underlying its SIV offerings suffer, in other words, Citigroup represented that only the holders of those securities—not Citigroup itself—would be harmed.

Those statements allegedly misrepresented Citigroup's actual exposure to the assets and liabilities of the SIVs it offered, plaintiffs contend, because Citigroup was

"implicitly required" to "absorb" any losses suffered by the holders of its SIV securities. (<u>Id.</u> ¶ 199.)  Plaintiffs allege that because Citigroup marketed the SIV securities it offered to its "coveted institutional and private wealth clients," should those securities fail—that is, should the assets those SIVs invested in stop performing—Citigroup's most important clients would "suffer massive losses" and therefore "stop purchasing the securities issued by those [SIVs]," which would in turn substantially harm Citigroup itself.  (<u>Id.</u> ¶ 199.) Thus, plaintiffs contend that Citigroup knew that it would be obligated to back its SIV securities even if it had no express contractual obligation to do so and therefore should have disclosed its SIV securities as potential liabilities.  (<u>Id.</u> ¶¶ 199-200.)

In December 2007, Citigroup did indeed announce that it would "support" its SIVs and therefore would "consolidate the SIVs assets and liabilities on its balance sheet under applicable accounting rules."  (<u>Id.</u> ¶ 207.)   As a result, plaintiffs contend Citigroup absorbed an additional $50 billion in "direct exposure" to the "risky" securities underlying its SIV offerings.  (<u>Id.</u>)

However, according to the complaint, Citigroup continued to misrepresent the nature of that risk.  In a December 13, 2007 press release, for example, defendants represented that "[g]iven the high credit quality of the SIV assets, Citi's credit exposure under its commitment is substantially limited."  (<u>Id.</u> ¶ 211.)  Defendants similarly stated that they expected to suffer "little or no" loss due to the SIV consolidation.  (<u>Id.</u>)

Citigroup's 2008 financial statements similarly allegedly misrepresented the risk its newly-consolidated SIV assets posed.  For example, in its first and second quarter Form 10-Qs, Citigroup represented that the value of its SIV assets remained essentially

static.  In fact, plaintiffs contend, those assets were "significantly impaired and worth dramatically less than Citigroup had reported."  (Id. ¶ 213.)

Finally, on November 19, 2008, Citigroup announced its intention to spend $17 billion to completely "unwind" its SIVs.  According to the complaint, it did so because although it "had been desperately trying to sell its toxic SIV assets," it was largely unable to do so.  (Id. ¶ 214.)

iii.    Citigroup's Stated Reserves

A "loan loss" reserve is a current reserve against likely credit losses in a company's portfolio.  Pursuant to GAAP, a company is expected to include an asset in its loss reserve where "it is probable the asset has been impaired . . . at the date of the financial statement" and "the amount of the loss can be reasonably calculated."  (Id. ¶ 228.)  To the investing public, a loan loss reserve represents an important gauge of the health of the company's holdings.  (Id. ¶¶ 227-28.)

According to the complaint, defendants' "loan loss" reserves—which Citigroup referred to in its financial documents as an "Allowance for Loan Losses"—materially misrepresented the state of Citigroup's portfolio and the risks it posed.  The reserves reported did so because they allegedly reflected only those mortgages which had already defaulted and assets that had already resulted in losses rather than also including those that were likely to default or result in losses in the future.  (Id. ¶¶ 228-29.)

Citigroup's failure to properly account for its likely future losses was particularly problematic, plaintiffs contend, given the nature of Citigroup's portfolio, which, as of 2006, had come to include massive amounts of risky mortgages and mortgage-backed

securities—i.e., the very types of assets that were most likely to fail and thus most deserving of being included in any loss reserve calculation.

The loss reserves defendants reported, therefore, "failed to reflect losses that were both probable and estimable given the housing market collapse." (Id. ¶ 235.) Indeed, plaintiffs contend that as of the first quarter of 2006, Citigroup's loan loss reserves were understated by as much as $2.6 billion, a figure that swelled to $4.5 billion as of the second quarter of 2007. (Id. ¶¶ 219-26, 232-33.)

iv.    Citigroup's ARS Exposure

Auction-rate securities, or "ARS," are long-term debt instruments that pay holders a fixed interest rate for a determinate period of time. That interest rate is regularly reset at a figure that is determined through a process known as a "Dutch auction." In a Dutch auction, interested investors bid the lowest interest rate at which they are willing to purchase the securities, and the auction "clears" at the lowest rate at which there are sufficient bidders to purchase all offered securities. If there are insufficient bidders to purchase all the offered securities, the auction "fails." (Id. ¶ 237); see generally In re Merrill Lynch Auction Rate Sec. Litig., No. 08 Civ. 3037, 2010 U.S. Dist. LEXIS 33532, at *8-10 (S.D.N.Y. Mar. 31, 2010); In re Citigroup Auction Rate Sec. Litig., No. 08 Civ. 3095, 2009 U.S. Dist. LEXIS, at *3 (S.D.N.Y. Sept. 11, 2009).

Because the auction process occurs on regular, frequent intervals—viz., every 7, 14, or 30 days—Citigroup marketed ARS to investors as highly liquid cash equivalents. However, in order for ARS to be "highly liquid" the auctions had to "clear." If an auction failed, holders of ARS would be unable to sell their holdings until the next auction. Accordingly, Citigroup and other ARS brokers "routinely supported ARS" by

bidding themselves when there were not enough interested bidders to allow an auction to clear.  (Id. ¶ 240.)

According to the complaint, the ARS market began to soften in late 2007.  As a result, Citigroup was forced to support its auctions—that is, bid on and purchase offered ARS—with increasing frequency, and, by February 2008, Citigroup had accumulated roughly $11 billion in ARS holdings.  (Id. ¶¶ 241-42.)  Plaintiffs further contend that these assets were increasingly illiquid because the market for ARS was rapidly evaporating.  (Id.)

Despite those "massive exposures," Citigroup did not disclose its own ARS holdings until April 2008 when it "shocked the market" by reporting that it held $8 billion worth of illiquid ARS, down from a high of $11 billion in February 2008.  At that time, Citigroup further "stunned" investors by reporting that $1.5 billion worth of those securities were already impaired.  (Id. ¶¶ 245-46.)  Plaintiffs further allege that even after Citigroup first disclosed its ARS holdings in spring 2008, it subsequently misrepresented the value of its ARS portfolio.  (Id. ¶¶ 245-47.)

v.    Citigroup's Well-Capitalized Status

A company that is "well capitalized" has a Tier 1 capital ratio of at least 6%—that is, it has capital on hand equal to at least 6% of its "risk-adjusted assets."  Risk-adjusted assets are those that are "potentially at risk of default."  Accordingly, as a company takes on a greater number of assets at risk of default, it needs more capital on hand to maintain its well-capitalized status.  (Id. ¶ 151.)

A company's capital adequacy is the basic measure of its financial viability and stability.  (Id.)  Accordingly, a company's status as "well-capitalized" is "highly

material" to potential creditors and investors and according to the complaint was "critical to Citigroup's financial condition." (Id.)

In each of its SEC filings during the relevant period, Citigroup represented that it "maintained a 'well-capitalized' position." (Id.) Those statements were false, plaintiffs contend, because they failed to account for Citigroup's various mortgage-related assets and liabilities, including its CDO and SIV exposure. (Id. ¶ 319.)

Moreover, Citigroup continued to represent that it maintained its "well capitalized" status even after disclosing its potential mortgage-related liabilities, stating, for example, in its 2007 Form 10-K that it had raised sufficient capital to withstand its then-recently disclosed potential liabilities and thus "maintained its 'well-capitalized' position with a Tier 1 capital ration of 7.12%." (Id. ¶ 191.) Similarly, in a July 18, 2008 earnings release, defendants represented that strategic write downs had "reduced legacy assets substantially" and that its "Tier 1 Capital ratio" had actually "increased to 8.7%" and was thus "substantially above the 6% benchmark for 'well-capitalized' status." (Id. ¶ 250.)

Those statements were also false, plaintiffs allege, because they failed to properly account for the true extent of, and risk posed by, the mortgage-related liabilities Citigroup carried. Thus, in November 2008, when defendants announced that Citigroup would no longer measure the fair value of those assets, it became apparent that Citigroup in fact lacked the capital to absorb its liabilities, necessitating an unprecedented decision by the U.S. government to guarantee $326 billion of Citigroup's assets against default. (Id. ¶ 192.)

vi.     Citigroup's Compliance with GAAP

Pursuant to SEC regulations, all interim financial statements such as Form 10-Qs must comply with Generally Accepted Accounting Principals, or GAAP.  (Id. ¶ 263.) According to the complaint, each relevant SEC filing therefore "stated that the Company's financial statements complied with GAAP."  (Id. ¶¶ 263, 320.)

Plaintiffs contend those statements of compliance were untrue because, in fact, defendants had failed to comply with GAAP in several respects.  First, defendants failed to disclose Citigroup's direct subprime exposure in violation of SFAS 107 which requires a company to disclose "all significant concentrations of credit risk" and in violation of SOP No. 94-6 which requires disclosure of any risks or uncertainties that might have a "severe impact" on its future operations.  (Id. ¶¶ 267-68.)

Moreover, plaintiffs contend that Citigroup's failure to "consolidate its . . . CDOs and SIVs onto its balance sheet"—that is, to account for them as direct liabilities on its books—violated a separate provision of GAAP, FIN 46(R), which requires a company to "consolidate a variable interest entity" where it has "guarantee[d] . . . the value of the assets or liabilities of a variable interest entity," has "written put options on the assets of the entity," or incurred "similar obligations such as some liquidity commitments or agreements (explicit or implicit)."  (Id. ¶ 273.)   Plaintiffs allege that because Citigroup had issued either explicit or implicit guarantees for material amounts of its CDO and SIV securities, it should have disclosed those as liabilities.

Second, Citigroup's loss reserves were understated and calculated in violation of SFAS 5 which required defendants to set aside reserves whenever it was "probable that

an asset had been impaired" and "the amount of the loss [could] be reasonably estimated."  (Id. ¶¶ 228, 271.)

Third, even after defendants began consolidating its CDO assets and liabilities, Citigroup calculated their value in violation of SFAS No. 157, which directs entities to calculate the "fair value" of assets "based on the assumptions that market participants would use in pricing the asset or liability."  (Id. ¶ 289.)  Plaintiffs allege that Citigroup's calculation of the fair value of its CDO assets and liabilities violated that provision in several respects.  Notably, Citigroup carried its CDO assets at values that "bore no relationship to the most applicable market index" and ignored "observable facts" about the value of those assets and liabilities that would have been critical to "market participants . . . in pricing the asset or liability."  (Id. ¶¶ 295, 298; 300-303.)

Plaintiffs thus allege that defendants failed to comply with GAAP in various significant respects.  As a result, they contend that Citigroup's representations in SEC filings—incorporated into the relevant public offering materials—that its financial statements were in compliance with GAAP were materially untrue.  (Id. ¶ 264.)

C.    The Financial Meltdown

On October 14, 2008 Citigroup received a $25 billion capital infusion from the U.S. Government pursuant to the Troubled Assets Relief Program ("TARP").  (Id. ¶ 251.) Citigroup nevertheless continued to represent that it had ample capital to withstand any mortgage-related losses, stating at a November 17, 2008 "Town Hall" meeting, for example, that it had "significantly reduced [its] risky assets while putting the company in a very strong capital position."  (Id. ¶ 252.)

Just five days later, however, "investors worst fears about the Company's true financial condition were confirmed" when Citigroup announced that it had agreed with the U.S. government to accept a $326 billion bailout package. According to the complaint, at the core of the bailout was the government's guarantee of some $306 billion of Citigroup's mortgage-related assets, including many of the CDO and SIV exposures discussed above. (Id. ¶¶ 259-60.)

According to the complaint, as investors belatedly realized that Citigroup was "close to insolvent," the value of its bond securities collapsed, with some of Citigroup's bond securities losing more than 50% of their value between November 17 and 21, 2008 alone. (Id. ¶¶ 12, 258.) Even after the government bailout, according to the complaint "significant uncertainty remain[ed] about Citigroup's financial condition" which continued to affect the price and value of its bond securities. (Id. ¶ 262.)

### D.    This Action

On September 30 and October 28, 2008 two putative class actions were filed in New York State Supreme Court, New York County, raising claims pursuant to the Securities Act of 1933. Defendants filed a timely notice of removal in both actions, and, on December 12, 2008, the cases were consolidated and accepted by this Court as related to other pending Citigroup litigation. On January 15, 2009, plaintiffs filed a consolidated amended class action complaint. The complaint raises seven causes of action pursuant to three different provisions of the Securities Act of 1933.

Counts I, II, and III raise claims against the Citigroup defendants (Count I), most of the individual defendants (Count II), and underwriter defendants (Count III) pursuant to Section 11 of the Securities Act. That section makes actionable any "untrue statement

of material fact" in a "registration statement" or any omission "of a material fact . . . necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a).

Specifically, count I alleges that the Citigroup defendants made materially false or misleading statements in registration statements for issuances offered between May 2006 and August 2008.  It further alleges that plaintiffs purchased bond securities pursuant to those registration statements and were damaged thereby.  (Id. ¶¶ 352-361.)

Count II raises identical claims against all but two of the individual defendants. Specifically, count two alleges that each named individual defendant was a director of Citigroup at the time the materially untrue or misleading statement was made, or signed the registration statement containing the materially untrue or misleading statement. According to the complaint, each individual defendant failed to "make a reasonable investigation or [to] possess reasonable grounds to believe that [the allegedly actionable] statements were true and that there were no omissions of any material fact."  (Id. ¶¶ 362-72.)

Count III raises Section 11 claims against the underwriter defendants, alleging that each served as an underwriter for one or more of the bond offerings during the relevant period.  Moreover, according to the complaint, each failed to "make reasonable investigation or [to] possess reasonable grounds to believe that [the allegedly actionable] statements were true and that there were no omissions of any material fact."  (Id. ¶¶ 373-383.)

Counts IV and IV raise claims against the Citigroup defendants and underwriter defendants, respectively, pursuant to Section 12(a)(2) of the Securities Act which makes liable any person who offers a security by means of a "prospectus which includes an

untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading."  15 U.S.C. 77l(a)(2).

Specifically, count IV alleges that the Citigroup defendants offered bond securities pursuant to prospectuses that contained untrue material statements, while Count V raises identical claims against that the underwriter defendants.  (Id. ¶¶ 384-93, 394-403.)

Finally, counts VI and VII raise claims against the Citigroup defendants and the individual defendants respectively pursuant to Section 15 of the Securities Act which makes "controlling persons" or entities jointly and severally liable for any violations of Sections 11 and 12 committed by those within their charge.  15 U.S.C. § 77o.

All defendants have moved to dismiss the complaint in its entirety and with prejudice.  Collectively,[3] the motions contend dismissal is appropriate because (1) plaintiffs lack standing to proceed with many of their Section 11 and all of their Section 12 claims, (2) plaintiffs' remaining claims "sound in fraud" and should thus be subjected to the heightened pleading requirements of Rule 9(b), which the complaint does not meet, (3) the complaint fails to identify any untrue or misleading statements or omissions that are actionable under Sections 11 or 12, and (4) the complaint fails to adequately allege control person liability pursuant to Section 15.

---

[3] Because all defendants join in all motions insofar as those motions are relevant to them, the two pending motions are considered collectively and arguments are deemed to be raised on behalf of all relevant defendants for purposes of this Opinion and Order.

## II.    DISCUSSION

### A.    The Motion To Dismiss Standard

On a defendant's Rule 12(b)(6) motion to dismiss for failure to state a claim, a court assumes the truth of all facts asserted in the complaint and draws all reasonable inferences from those facts in favor of the plaintiff.  See Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 154 (2d Cir. 2006); SEC v. Lyon, 529 F. Supp. 2d 444, 449 (S.D.N.Y. 2007).  In so doing, a court is limited to the complaint and the facts alleged in it.

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp v. Twombly, 550 U.S.  544, 570 (2007).  Thus, if a plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed."  Id.; see also  Ashcroft v. Iqbal, -- U.S. --, 129 S.Ct. 1937, 1950 (2009) ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss.")

 To state a plausible claim to relief, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555. As the U.S. Supreme Court most recently clarified, that Twombly standard "asks for more than a sheer possibility that a defendant acted unlawfully."  Iqbal, -- U.S. at --, 129 S.Ct. at 1949.  Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief," and the complaint must therefore be dismissed.  Id. at 1950 (quotations and citations omitted).

23

B.     Statutory Provisions

Plaintiffs' claims are brought pursuant to Sections 11, 12, and 15 of the Securities

Act.  Those provisions "impose liability on certain participants in a registered security

offering when the publicly filed documents used during the offering contain material

misstatements or omissions."  In re Morgan Stanley Info. Fund Sec. Litig., 592 F.2d 347,

358 (2d Cir. 2010).  Section 11 applies to "registration statement[s]," Section 12 covers

any "prospectus or oral communication," and Section 15 imposes liability on individuals

or entities that "control[ ] any person liable" under Sections 11 or 12.  15 U.S.C. § 77k(a),

l(a)(2), o.  Liability pursuant to Section 15 thus requires, as a preliminary matter, a

demonstration of liability under either Section 11 or Section 12.  In re Morgan Stanley

Info. Fund, 592 F.2d at 358.

Section 11 and 12(a)(2) are "Securities Act siblings" with "roughly parallel

elements."  Id. at 359.  Section 11 prohibits materially false or misleading statements or

omissions in registration statements, and requires a plaintiff to show (1) that it purchased

a registered security, (2) the defendant participated in the offering in a manner sufficient

to give rise to liability under Section 11, and (3) the registration statement "contained an

untrue statement of a material fact or omitted to state a material fact required to be stated

therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a);

In re Morgan Stanley Info. Fund, 592 F.2d at 358-59; In re Initial Public Offering Sec.

Litig., 471 F.3d 24, 43 (2d Cir. 2006).

Section 12(a)(2) prohibits materially untrue or misleading statements or omissions

in any prospectus or oral communication used to solicit the sale of a registered security

and requires a plaintiff to establish that (1) the defendant is a "seller" as defined by

Section 12, (2) the sale was effectuated "by means of a prospectus or oral communication," and (3) the prospectus or oral communication "include[d] an untrue statement of material fact or omit[ted] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading."  15 U.S.C. § 77l(a)(2); In re Morgan Stanley Info. Fund, 592 F.2d at 359.

C.    Standing

As a preliminary matter, defendants challenge plaintiffs' standing to raise certain of their Section 11 claims and all of their claims pursuant to Section 12.  With respect to the Section 11 claims, defendants contend the eight named plaintiffs only purchased bond class securities in nineteen of the 48 offerings listed in the complaint, and, accordingly, can only be heard to raise claims respecting the nineteen offerings they participated in. See In re Global Crossing, Ltd. Sec. Litig., 313 F. Supp. 2d 189, 207 (S.D.N.Y.  2003) (to raise a Section 11 claim, "a named plaintiff must have purchased shares traceable to the challenged offering").

With respect to the Section 12 claims, defendants contend the complaint fails to adequately allege that plaintiffs bought any of the securities at issue in this action directly from defendants—rather than through the secondary market—which is necessary to establish standing pursuant to that section.  See In re Ultrafem, Inc. Sec. Litig., 91 F. Supp. 2d 678, 693 (S.D.N.Y. 2000) ("Purchasers in private or secondary market offerings do not have standing to bring actions under Section 12(a)(2).")  The Court addresses each challenge in turn.

i.    Section 11 Standing

Section 11 provides a cause of action to "any person acquiring [a] security" pursuant to a "registration statement" if "any part of the registration statement contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k. Defendants contend that because the named plaintiffs only "acquir[ed] [a] security" in nineteen of those offerings, they lack standing to proceed with respect to the additional twenty-nine.

Plaintiffs do not dispute that they purchased securities in only some of the forty eight individual offerings. However, they contend that those offerings were all made pursuant to three "Shelf Registration Statements"; that they participated in at least one offering pursuant to each of the three shelf registration statements; and, accordingly, that they have standing to raise claims on behalf of all buyers who participated in all offerings made pursuant to those three shelf registration statements. The Court agrees.

A "shelf registration" is an indication of an issuer's intent to offer a specified number of securities in the future, frequently through a series of incremental offerings. A shelf registration—referred to colloquially as a "shelf"—is accompanied by a "shelf registration statement" which, like any registration statement, provides certain required information to the market about the issuer and the issuance and frequently incorporates, as was true here, the issuer's recent SEC filings, including 10-Q and 10-K forms. When an issuer is then ready to offer some or all of the securities authorized by the shelf to market, it "pulls down" the shelf registration statement from the shelf and updates it by filing a "supplemental" prospectus. The "registration statement" for that sale and

offering thus constitutes both the initial shelf registration statement and the supplement, along with any SEC filings incorporated by either document.  See In re Countrywide Fin. Corp. Sec. Litig., 588 F. Supp. 2d 1132, 1164 (C.D. Cal. 2009); see generally Finkel v. Stratton Corp., 962 F.2d 169, 174 (2d Cir. 1992).

 Each time an issuer makes an offering, it creates a new "registration statement." See Finkel, 962 F.2d at 174.  However, as noted, all registration statements made for offerings from the same "shelf" contains at least some common information—notably, anything included in or incorporated into the initial shelf registration statement. Accordingly, at least one court has found that where a plaintiff alleges untrue statements in the shelf registration statement or the documents incorporated therein—as opposed to an alleged untrue statement in a supplemental prospectus unique to a specific offering— then that plaintiff has standing to raise claims on behalf of all purchasers from the shelf. In re Countrywide Fin. Corp., 588 F. Supp. 2d at  1166.  As that court noted, "[i]f the initial shelf registration statement contained an actionable statement or omission that is common to more than one issuance under the shelf registration, then purchasers in those issuances may be able to trace the same injury to the same "registration statement."  Id.

 This Court agrees with that conclusion.  Pursuant to Section 11, if "any part of the registration statement . . . contained an untrue statement of a material fact or omitted to state  a material fact," then any person acquiring a security pursuant to that registration statement has standing to sue a variety of participants in the security's issuance.  15 U.S.C. § 77k(a).  Accordingly, where the actionable part of the registration statement is alleged to be common to all purchasers from the same shelf, then a plaintiff has standing to represent them because they have all suffered from the same alleged injury.

Here, plaintiffs allege actionably untrue or misleading statements or omissions in SEC filings incorporated into each of the three shelf registration statements from which all forty eight offerings identified in the complaint derive.  For example, the complaint can be read to allege that each shelf registration statement incorporated at least one SEC filing in which defendants made untrue statements regarding Citigroup's exposure to its CDO securities or falsely represented Citigroup's compliance with GAAP.   (Compl. ¶¶ 264, 316, 318.)  Moreover, the complaint alleges that at least one named plaintiff purchased securities pursuant to each of those allegedly actionable shelf registration statements.  That is sufficient, at this stage, to establish plaintiffs' standing to raise claims on behalf of all those who purchased pursuant to those shelf registration statements and thus to challenge all forty eight offerings.

> ii.    Section 12 Standing

Defendants separately challenge plaintiffs' standing to raise all of their Section 12 claims on the grounds that the complaint fails to allege that plaintiffs purchased any securities directly from defendants rather than through the secondary market.  The Court agrees.

As noted, while both Sections 11 and 12 require similar showings, unlike a Section 11 claim which may be brought by any purchaser of the relevant security who "can trace their shares to an allegedly misleading registration statement," DeMaria v. Andersen, 318 F.3d 170, 178 (2d Cir. 2003), a plaintiff seeking redress pursuant to Section 12(a)(2) must establish that it purchased the security directly from defendants through the public offering at issue.  In re Alcatel Sec. Litig., 382 F. Supp. 2d 513, 530 n.8 (S.D.N.Y. 2005) (citing Gustafson v. Alloyd Co., Inc., 513 U.S. 578 (1995)).

"Purchasers in private or secondary market offerings do not have standing to bring actions under Section 12(a)(2)." In re Ultrafem, 91 F. Supp. 2d at 693; see also In re Sterling Foster & Co. Sec. Litig., 222 F. Supp. 2d 216, 244-45 (E.D.N.Y. 2002) (collecting cases).

As a preliminary matter, the complaint and attached exhibits fail to clearly identify which plaintiffs bought which securities, let alone from whom plaintiffs bought those securities.   (Exs. A-H; Appx.)  Nor does the complaint expressly allege that plaintiffs purchased their securities directly from defendants.  Plaintiffs sole, cursory allegation—that plaintiffs "purchased or otherwise acquired bond class securities in the Offerings pursuant to the materially untrue and misleading Shelf Registration Statements" (compl. ¶ 389)—is, by its terms, insufficient because it concedes the possibility that some or all plaintiffs "otherwise acquired" bond securities.  Indeed, while, as noted, plaintiffs fail to expressly state which plaintiffs purchased securities in which offerings, even a cursory review of the information provided makes clear that many of the listed purchases must have been made in the secondary market because they were not made on dates on which any initial offering was being made.

In its opposition papers, plaintiffs contend at least some plaintiffs purchased some securities from defendants, and would have the Court scour the various documents provided to determine precisely which plaintiff purchased which security from which defendants.  This the Court declines to do.  For a complaint to plausibly plead standing to raise a claim pursuant to Section 12, it must identify a particular purchase from a particular defendant pursuant to a particular prospectus that it contends contained a particular false or misleading statement.  Failing to do so fails to meet even the lessened

pleading requirements of Rule 8, because it does not put the defendant on notice as to the claim plaintiffs seek to raise.  Cf. In re Sterling Foster & Co., 222 F. Supp. 2d at 246 (dismissing complaint where "[s]ome of the purchase dates listed in the complaint are close enough in time to suggest that the plaintiffs could have made their purchases in the offering" because "plaintiffs should specify at the pleading stage whether they made these purchases in the offering or in the secondary market").

Accordingly, plaintiffs fail to properly allege standing to proceed pursuant to Section 12, and all of its claims brought under that section must be dismissed.

D.     Pleading Standard

With respect to plaintiffs' surviving Section 11 claims, the parties dispute whether the heightened pleading standard imposed by Rule 9(b) for claims of fraud should apply. As a general rule, a plaintiff bringing claims pursuant to Section 11 need not plead scienter or otherwise comply with Rule 9 because "[f]raud is not an element or a requisite to a claim under Section 11 or Section 12(a)(2)."  Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004).  Instead, issuers are subject to "virtually absolute" liability under Section 11, while all other potential defendants may be held liable for "mere negligence."  In re Morgan Stanley Info. Fund, 592 F.3d at 359 (citing Herman & MacLean v. Huddleston, 459 U.S. 375, 381-82 (1983)).  And as such, Section 11 claims ordinarily need meet only the basic requirements of Rule 8.

However, the Second Circuit has made clear that because claims brought pursuant to Section 11 "may be—and often are—predicated on fraud," where Section 11 claims "are premised on allegations of fraud," the heightened pleading standard imposed by Rule 9(b) applies.  Rombach, 355 F.3d at 171.  Determining whether Section 11 claims

"sound in fraud . . . necessarily requires a case-by-case analysis," In re Refco, Inc.

Securities Litig., 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007), and only where "the

gravamen of the complaint is plainly fraud" should the heightened pleading requirements

of Rule 9 be applied.  Rombach, 355 F.3d at 172.

Defendants contend the complaint "sounds in fraud" because it is riddled with

allegations of "materially false and misleading" statements and "untrue statements of

material fact."  (Citigroup Defs.' Mem. of Law at 11.)  Cf. In re JP Morgan Chase Sec.

Litig., 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005) (quoting Rombach, 355 F.3d at 171)

(complaint "sound[s] in fraud" where it contains "wording and imputations . . . classically

associated with fraud").  Within the context of this complaint, the argument is unavailing.

The wording in the complaint identified by defendants merely tracks the language of the

statutes themselves which require a plaintiff to allege materially untrue statements or

omissions that render a document false or misleading in order to state a claim.  See, e.g.,

15 U.S.C. § 77k(a) (making actionable "an untrue statement of a material fact" or

"omi[ssion] [of] a material fact required to . . . to make the statements therein not

misleading").

Indeed, as other courts in this district have observed, mere use of the statutory

language is itself insufficient to render a complaint one that "sounds in fraud."  See, e.g.,

In re Refco, Inc., 503 F. Supp. 2d at 632; In re WRT Energy Sec. Litig., No. 96 Civ.

3611, 2005 U.S. Dist. LEXIS 1894, at *17-18 (S.D.N.Y. Feb. 9, 2005) (Use of "phrases

'materially incorrect,' 'untrue statements' and 'did not have reasonable ground to

believe'" insufficient because they "merely allude to language in Section 11 of the 1933

Act").

Instead, a court must "closely scrutinize the pleadings" in their entirety so as to determine whether the "claims sound in negligence or in fraud." Ladmen Partners, Inc. v. Globalstar, Inc., No. 07 Civ. 0976, 2008 U.S. Dist. LEXIS 76670, at *32 (S.D.N.Y. Sept. 30, 2008). Here, when considered as a whole, the "gravamen" of plaintiff's complaint is not fraud but is instead "carefully structured" so as to sound in negligence. In re Refco, Inc., 503 F. Supp. 2d at 632. Critically, the complaint does not allege that any of the statements were knowingly false or misleading but instead alleges that defendants "did not make a reasonable investigation or possess reasonable grounds to believe that those statements were true and that there were no omissions of any material fact." (Compl. ¶¶ 366, 377.) Those, of course, are allegations that sound in negligence, and where "plaintiffs claims as to defendants' intent . . . are carefully couched in the language of negligence," a complaint will not be found to sound in fraud. In re Worldspace Sec. Litig., No. 07 Civ. 2252, 2008 U.S. Dist. LEXIS 56224, at *15 (S.D.N.Y. July 21, 2008) (citations, quotations omitted).

Moreover, the complaint lacks any allegation—express or implied—of fraudulent intent or motive on the part of any defendant—i.e. the very sorts of allegations courts have found can provide a basis for deeming Section 11 claims to "sound in fraud." E.g., Ladman Partners, Inc. v. Globalstar, Inc., No. 07 Civ. 0976, 2008 U.S. Dist. LEXIS 76670, at *33 (S.D.N.Y. Sept. 30, 2008) (complaint "riddled with allegations" that defendant "had actual knowledge . . . [and] deliberately withheld" information sounds in fraud);

That plaintiffs here could have raised Section 10b-5 claims or alleged fraud is irrelevant. In this case, they carefully and specifically chose not to, and that is a choice

32

the statute leaves to them.  Cf. Rombach, 355 F.3d at 171 (While "[t]he same course of

conduct that would support a 10b-5 claim may as well support a Section 11 claim . . . a

plaintiff need allege no more than negligence to proceed" under Section 11 or Section

12(a)(2)).  Of course, having so chosen, plaintiffs will not be heard to allege or argue

fraud in this action.  But insofar as plaintiffs have chosen to proceed with a negligence

action, their complaint must meet only the pleading requirements of Rule 8(a).

      E.     Section 11 Claims

As noted, a claim under Section 11 has three elements: 1) a defendant is a signer

of a registration statement or a director of the issuer or an underwriter for the offering; 2)

the plaintiff purchased the registered securities; and 3) any part of the registration

statement for the offering contained an untrue statement of a material fact or omitted to

state a material fact necessary to make the statements not misleading.  Coronel v. Quanta

Capital Holdings Ltd., No. 07 Civ. 1405, 2009 U.S. Dist. LEXIS 6633, at *34 (S.D.N.Y.

Jan. 23, 2009) (citing In re Initial Public Offering Sec. Litig., 471 F.3d 24, 43 (2d Cir.

2006)).

Because Section 11 is "designed to assure compliance with the disclosure

provisions of the [Securities] Act by imposing a stringent standard of liability on the

parties who play a direct role in a registered offering," Huddleston, 459 U.S. at 382, it

"places a relatively minimal burden on a plaintiff," id.  Unlike a fraud claim, Section 11

does not require a plaintiff to plead scienter, reliance, or loss causation, and issuers are

subject to "virtually absolute" liability under Section 11, while other potential

defendants—including individual officers and directors or underwriters—may be held

liable for mere negligence.  In re Morgan Stanley Info. Fund,  359 F.3d at  359 (citations

omitted).

Here, there is no dispute that plaintiffs have adequately alleged the first element

with respect to all defendants,[4] and the Court has already determined that plaintiffs have

adequately plead the second element.[5]  With respect to the third, defendants argue that

plaintiffs have not adequately alleged the third element because the complaint does not

identify any actionable misstatement or omission.

  i.  Actionable Misstatements or Omissions

The third element requires a plaintiff to establish (1) the existence of either a

misstatement or an unlawful omission, and (2) materiality.  Id. at 360.  An "unlawful

omission" is one of "a material fact required to be stated therein" or one "necessary to

make" other statements contained within the registration statement "not misleading."  In

re Morgan Stanley and Van Kampen Mut. Fund Sec. Litig., 03 Civ. 8208, 2006 U.S. Dist.

LEXIS 20758, at *25 (S.D.N.Y. Apr. 14, 2006) (citations, quotations omitted); see also

DeMaria, 318 F.3d at 180 (an offering document "will violate federal securities laws if it

---

[4] Defendants challenge the sufficiency of the allegations with respect to seven of the individual defendants.
With respect to four of them—defendants Jordan, Klienfeld, Mecum, and Prince—the arguments all turn
either on facts not properly in the record at this time or fact-intensive inquiries that simply are not
appropriate at this stage.  With respect to the other three—Bischoff, Pandit, and Ryan—defendants
concede, in their reply papers, that each defendant can be properly named as a defendant with respect to at
least some of the actionable offerings, and thus, each can remain as a named defendant in this action.

[5] Defendants separately challenge inclusion of five offerings on the grounds that two are time-barred and
three resulted in no actual harm to plaintiffs.  With respect to the statute of limitations, it is well established
that such a challenge entails a fact-intensive inquiry that is generally inappropriate for a Court to engage in
at the motion to dismiss stage.  See Lentell v. Merrill Lynch & Co., 396 F.3d 161, 168-69 (2d Cir. 2005).
With respect to damages, defendants themselves concede that "[S]ections 11 and 12 do not require that a
plaintiff plead damages."  (Underwriter Defs.' Mem. of Law at 17); cf. In re Fuwei Films Sec. Litig., 634 F.
Supp. 2d 419, 444 (S.D.N.Y. 2009) ("Plaintiff is not required to demonstrate loss causation to plead
adequately claims under sections 11 and 12(a)(2)" and should defendants seek to raise "negative
causation," that "affirmative defense . . . is more properly considered on a motion for summary judgment").
Moreover, the Court need not address either challenge further because it has already determined that
plaintiffs may bring claims on behalf of all forty eight offerings by virtue of their valid claim with respect
to one offering from each "shelf."

does not disclose material objective factual matters or buries those matters beneath other information, or treats them cavalierly") (citations, quotations omitted).

A material fact is one a "reasonable investor would have viewed . . . as significantly altering the 'total mix' of information available." SEC v. Mayhew, 121 F.3d 44, 52 (2d Cir. 1997) (citing TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438 (1976)); In re Morgan Stanley & Van Kampen Mut. Fund, 2006 U.S. Dist. LEXIS 20758, at *29. In determining whether a fact is "material," courts ask "whether the defendants' representations, taken together and in context, would have misled a reasonable investor." In re Morgan Stanley Info. Fund, 592 F.3d at 360.

However, because materiality presents a mixed question of law and fact, "it will rarely be dispositive in a motion to dismiss" and "'a complaint may not be properly dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" Id. (quoting ECA v. JP Morgan Chase, 553 F.3d 187, 197 (2d Cir. 2009)); see also In re Worldspace Sec. Litig., No. 07 Civ. 2252, 2008 U.S. Dist. LEXIS 56224, at *24 (S.D.N.Y. July 21, 2008); In re Refco, Inc., 503 F. Supp. 2d at 636.

Here, as discussed above, plaintiffs contend Citigroup's registration statements violated Section 11 in six different ways.

a.    Citigroup's CDO Exposure

The complaint alleges that defendants' statements regarding Citigroup's exposure to subprime-backed CDOs were materially untrue or misleading because they failed to disclose the full extent of the risk Citigroup faced. Plaintiffs contend that insofar as those

statements were made or incorporated into registration statements, they are actionable pursuant to Section 11. The Court agrees.

Taken as true, as they must be at this stage, the allegations in the complaint can be read to identify at least three classes of statements in Citigroup's various registration statements that were materially untrue or misleading and thus actionable pursuant to Section 11. First, in offering statements prior to November 4, 2007, defendants repeatedly represented that Citigroup had "limited continuing involvement" in its variable interest entities ("VIEs")—a category of assets that includes CDOs—because the VIEs were "primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchasers of securities issued by the trust." (Id. ¶¶ 165, 198.) Plaintiffs allege that those statements were materially untrue or misleading because defendants omitted that (1) Citigroup held nearly $30 billion of its own subprime-backed CDO securities, (2) Citigroup had guaranteed—by way of liquidity puts—another $25 billion of its subprime-backed CDO exposure, and (3) Citigroup had, in total, nearly $66 billion in direct exposure to subprime-backed CDOs.

Second, in offering statements throughout the relevant period, while Citigroup reported a "maximum exposure to loss as a result of its involvement with VIEs that are not consolidated" it represented that "actual losses are not expected to be material." (Compl. ¶ 318.) Those statements were also materially misleading because they were made without also disclosing Citigroup's own substantial and direct exposure to the securities issued by those VIEs, and thus, the true nature of the risks Citigroup's VIE involvement posed.

Third, while defendants began disclosing some exposure to subprime-backed CDOs in July 2007, those disclosures materially misstated and underrepresented the full scope of risk. For example, on July 20, 2007, Citigroup reported that it had $13 billion worth of direct exposure to subprime assets. On November 4, 2007, defendants reported an additional $43 billion in direct exposure to subprime-backed CDOs. In fact, according to the complaint, at all relevant times, Citigroup's exposure to subprime-backed CDOs totaled nearly $66 billion, rendering the disclosures of smaller amounts of direct exposure materially untrue. (Compl. ¶¶ 322-35.)

Each of the above, in other words, amounts to an alleged "untrue statement of [ ] material fact" or an alleged omission of a "material fact . . . necessary to make" other statements within the registration statement "not misleading" and therefore states a claim pursuant to Section 11.

For purposes of this motion, Citigroup has not contended that its direct exposure to $66 billion in subprime-backed CDO securities was not a "material" fact. Instead, it argues, first, that Citigroup did disclose its exposure to subprime-backed CDOs, principally through its disclosure of a "maximum exposure to loss as a result of its involvement with VIEs that are not consolidated" in each of the relevant SEC filings. However, as noted above, those disclosures were all coupled with the representation that "actual losses are not expected to be material" and thus were allegedly misleading when not accompanied with accurate disclosure about Citigroup's direct exposure to nearly $66 billion in CDO securities.

Defendants contend they had no duty to provide further information regarding their VIE holdings, and, in particular, no duty to specify what exposure they had to CDO

securities in particular. <u>Cf.</u> <u>Resnik v. Swartz</u>, 303 F.3d 147, 154 (2d Cir. 2002) ("For an omission to be actionable, the securities laws must impose a duty to disclose the omitted information.") That argument overlooks both the statutory language and well-established case law which make clear that once an entity opts to include information in its registration statement—here, its maximum exposure to VIEs along with its prediction that "actual losses are not expected to be material"—it has a duty to disclose any additional material fact "necessary to make the statements [already contained] therein not misleading." 15 U.S.C. § 78k; <u>see also</u> <u>Caiola v. Citibank, N.A.</u>, 295 F.3d 312, 331 (2d Cir. 2002) ("[T]he lack of an independent duty is not . . . a defense to . . . liability because upon choosing to speak, one must speak truthfully and accurately.")

Alternatively, defendants contend they had no duty to disclose additional information about Citigroup's CDO holdings because "the magnitude of Citigroup's holdings was determinable from public information." (Citigroup Defs.' Mem. of Law at 25.) Specifically, Citigroup argues that because "[i]t was known throughout the industry that underwriters typically retain substantial portions of . . . the CDOs they underwrite and distribute" any "interested" investor could have independently determined from other sources that Citigroup had significant potential exposure to subprime-backed CDO securities.

The argument seemingly invokes the so-called "truth on the market" doctrine which provides that an otherwise actionable misstatement or omission may be deemed "immaterial" if the truth is already fully known to the investing public. <u>See</u> <u>Ganino v. Citizens Utilities Co.</u>, 228 F.3d 154, 167 (2d Cir. 2000). As a general rule, a truth-on-the-market defense "is intensely fact-specific" and thus "is rarely an appropriate basis for

dismissing a . . . complaint." Id. Here, defendants point to nothing that could allow the Court to find at this stage that sufficiently specific information about Citigroup's CDO holdings was already in the public domain so as to defeat plaintiff's claim as a matter of law. Cf. id. ("[T]he corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements.").[6]

Accordingly, plaintiffs' allegations that defendants' statements regarding Citigroup's CDO exposure states a claim pursuant to Section 11. Defendants' motion to dismiss those claims is denied.

### b.     Citigroup's SIV Disclosure

The complaint identifies two categories of statements defendants made respecting Citigroup's SIV exposure—(1) Citigroup's representations that it had "limited continuing involvement in its SIVs" and therefore would "not consolidate their assets and liabilities in [Citigroup's] financial statements," (the "pre-consolidation statements") and (2) that those SIVs, once ultimately consolidated, were of "high credit quality" (the "post-consolidation statements")—both of which the complaint alleges are actionable as materially untrue or misleading. (Compl. ¶¶ 316, 327, 330.) The Court addresses each category in turn.

---

[6] Additionally, Section 11 itself provides that no action will lie where it is "it is proved" that plaintiff knew of the untruth of the statement at the time he made the purchase. 15 U.S.C. § 77k(a) (emphasis added). Accordingly, while defendants may be able to ultimately defeat liability by establishing such proof, it is impossible to establish that defense at this stage of the proceedings. See In re Global Crossings Ltd. Litig. Sec., 313 F. Supp. 2d 189, 205 (S.D.N.Y. 2003) ("At this stage of the proceedings . . . it is presumed that the purchasing plaintiff did not know of the false or misleading statement.").

### 1.    Pre-Consolidation Statements

First, plaintiffs allege that Citigroup's statement that it had "limited continuing involvement in its SIVs" and specifically that it "has no contractual obligation to provide liquidity facilities or guarantees to any of the Citi-advised SIVs" were materially untrue or misleading because, in fact, Citigroup "made an implicit guarantee to protect its SIVs against losses." (Id. ¶¶ 316, 327.)

Defendants contend those statements were neither untrue nor misleading at the time they were made. The Court agrees. Plaintiff's contention that Citigroup was, from the outset, "implicitly" required to guarantee its SIV securities is supported by absolutely nothing but plaintiffs' bare assertion. As such, it is insufficient to state a plausible claim to relief. See Twombly, 550 U.S. at 556; Leber v. Citigroup, No. 07 Civ. 9329, 2010 U.S. Dist. LEXIS 25097, at *38-39 (S.D.N.Y. Mar. 16, 2010).

That Citigroup did ultimately decide to back its SIV securities in December 2007 and absorb at least some of the losses associated with them is an insufficient factual allegation to plausibly support the further, necessary inference plaintiffs would have the Court draw—i.e., that Citigroup intended to absorb those losses all along, and, in particular, intended to do so at the time it represented that it had "limited continuing involvement" in its SIVs and their assets. See Panther Partners, Inc. v. Ikanos Communications, Inc., 538 F. Supp. 2d 662, 669 (S.D.N.Y. 2008), rev'd on other grounds, 2009 U.S. App. LEXIS 20652, at *12-13 (2d Cir. Sept. 17, 2009) (plaintiffs cannot "reverse-engineer[]" Section 11 claims by alleging "that only became clear clue to subsequent events was somehow known to [defendant] far earlier in time"); Coronel, 2009 U.S. Dist. LEXIS 6633, at *39-40; In re Alliance Pharm. Corp. Sec. Litig., 279 F.

Supp. 2d 171, 183 (S.D.N.Y. 2003) ("[W]hen subsequent events make an effective

registration statement misleading, section 11 does not apply.") (citations, quotations

omitted). [7]

## 2.    Post-Consolidation Statements

Second, plaintiffs contend that defendants' statements made <u>after</u> announcing that

Citigroup would consolidate the assets backing its SIV offerings are actionable because

those statements misrepresented the nature of those assets.  According to the complaint,

Citigroup stated that its newly-consolidated SIVs had a "high credit quality" and thus that

Citigroup's "credit exposure" as a result of the consolidation "is substantially limited."

(Compl. ¶ 330.)  In fact, plaintiffs contend, those assets contained "toxic" RMBS

securities and other subprime mortgage-backed assets which were not of "high [credit]

quality."  (<u>Id.</u>)

Insofar as those allegations identify specific statements—i.e., that Citigroup's

SIVs were of "high credit quality"—and make specific factual allegations respecting why

those statements were untrue or misleading at the time they were made, plaintiffs state a

plausible claim pursuant to Section 11.  Defendants contend the allegations amount to

nothing more than the same sort of "reverse engineering" discussed above—that is,

plaintiffs seek to rely on subsequent meltdowns in the housing market to support the

inference that Citigroup's claims respecting its SIVs were untrue when made.  The

argument fails, however, because the complaint does not rely exclusively on hindsight

---

[7] Plaintiffs also allege that defendants' failure to consolidate its SIVs onto its books prior to December 2007 violated GAAP, specifically FIN 46(R) which, as interpreted by the Financial Accounting Standards Board ("FASB"), requires entities to consolidate VIEs when "an implicit agreement to replace impaired assets held by a variable interest entity" exists "that protects holders of other interests in the entity from suffering losses."  (Compl. ¶ 279.)  While plaintiffs' GAAP-related allegations are discussed collectively in section II(E)(i)(f) below, the allegation is insufficient to save plaintiffs' SIV allegations because it relies on the same bare assertion discussed above—i.e. that such an implicit agreement existed.

but instead alleges that the statements in question were misleading based on information readily available to defendants at the time the statements were made—i.e., that Citigroup's SIVs were largely backed by subprime mortgages and subprime RMBS and were therefore not of "high credit quality."  To the extent defendants seek to argue that those subprime mortgages and subprime RMBS were actually of "high credit quality," they cannot do so on this motion to dismiss where, of course, the Court is limited to the allegations, taken as true, as set forth in the complaint.

c.    Citigroup's Stated Reserves

Plaintiffs next contend that defendants' "loan loss" reserves—which Citigroup referred to in its financial documents as an "Allowance for Loan Losses"—are actionable as materially misleading.  Specifically, the complaint alleges that defendants' reserves were calculated based solely on assets that had already defaulted instead of also accounting for those assets reasonably likely to default in the future, as plaintiffs argue Citigroup was required to do by the relevant accounting rules.  Accordingly, plaintiffs contend that Citigroup's reported loss reserves painted a materially misleading picture of Citigroup's financial health and are thus actionable pursuant to Section 11.  The Court agrees—the allegations state a plausible claim to relief.

Taken as true, the allegations as set forth in the complaint identify material statements regarding Citigroup's financial health and allege with specificity why those statements were misleading when made.  Specifically, the complaint identifies a GAAP requirement that Citigroup account not solely for its current losses but also for those likely to occur in the future and sets forth specific factual allegations in support of a finding that Citigroup failed to do so.  For example, the complaint alleges that despite the

fact that loss reserves were meant to reflect not only losses already incurred but those likely to accrue in the future, Citigroup's reserve levels instead merely took into account its actual losses for much of the relevant period. Indeed, according to the complaint, for much of 2006 and 2007 in particular, Citigroup's actual losses greatly exceeded its stated reserves. (Compl. ¶¶ 229-32.)

Accordingly, the complaint plausibly alleges that Citigroup's loan loss reserves failed to accurately account for losses likely to incur, and, as such materially misled investors about the company's financial health.

Defendants argue in response that planning loss reserves raises a claim of mismanagement which is not actionable under the securities laws. See, e.g., Ciresi v. Citicorp, 782 F. Supp. 819, 821 (S.D.N.Y. 1991); see also City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC, 423 F. Supp. 2d 348, 355 (S.D.N.Y. 2006) (same). The argument is unavailing because the complaint does not allege that defendants should be liable simply for mismanaging their loss reserves but instead for materially misrepresenting the scope of the risk posed by Citigroup's holdings in its registration statements. It therefore states a claim pursuant to Section 11.

d.      Citigroup's ARS Exposure

Plaintiffs next contend that Citigroup failed to properly account for and disclose its ARS holdings. Specifically, the complaint alleges that while Citigroup began amassing some $11 billion in ARS holdings in late 2007 and early 2008, it did not disclose those holdings until April 2008 by which time they were "impaired" and "illiquid." Moreover, plaintiffs contend that when Citigroup did disclose its ARS

holdings in the spring of 2008, those disclosures materially misrepresented the value of the ARS holdings.

Defendants contend those allegations fail to state a claim pursuant to Section 11 because they neither set forth an untrue statement nor a material omission.  The Court agrees.  Plaintiffs' initial contention—that Citigroup's 2007 third-quarter Form 10-Q and its 2007 Form 10-K "failed to disclose" the "billions" in ARS the "Company had accumulated" in late 2007 and early 2008 (id. ¶ 244)—fails to state a claim because plaintiffs identify no basis for finding that to be an "unlawful omission."  In re Morgan Stanley Info. Fund, 592 F.3d at 360.  As the Second Circuit has explained, an omission— as opposed to a misrepresentation—can give rise to Section 11 liability only in two limited circumstances: first, where defendants had an affirmative duty to disclose the information, and second, where disclosure was necessary so as to prevent other information contained in the registration statements from being misleading.  Id. at 361-65.

Here, plaintiffs identify neither an independent duty on Citigroup's part to disclose specific information about its ARS holdings, nor any statement or statements that were "misleading" because Citigroup failed to disclose its ARS holdings.  Moreover, even assuming defendants had disclosed Citigroup's increasing ARS holdings in the fall of 2007 as they accumulated, the core of plaintiffs' allegation—i.e., that Citigroup failed to disclose its increasingly "illiquid" ARS holdings during that time (compl. ¶ 236)—fails because the complaint itself concedes that the ARS market did not actually become "completely illiquid" until late February 2008.  (Id. ¶ 243.)

With respect to plaintiffs' second ARS-related contention—that Citigroup's belated disclosures in spring 2008 misrepresented the value of its ARS holdings—as defendants correctly note, plaintiffs fail to allege any actual misrepresentation or to identify any untrue or misleading statement. Indeed, the only additional statement the complaint identifies is Citigroup's representation in the second quarter of 2008 that it recorded a $197 million gain on its ARS portfolio, and the complaint fails to allege in any respect how that statement was either untrue or misleading. (Compl. ¶ 247.)

Accordingly, plaintiffs' allegations with respect to Citigroup's ARS holdings fail to state a plausible claim to relief pursuant to Section 11.

### e. Citigroup's "Well-Capitalized" Status

Plaintiffs contend that Citigroup's representation in each of its SEC filings during the relevant period that it maintained a "well-capitalized" position was untrue or misleading and is actionable. The Court agrees.

Plaintiffs' allegation that defendants' statement that Citigroup was "well capitalized" was untrue is backed by specific factual allegations describing why it was untrue and why that untrue statement was material. Specifically, the complaint alleges that Citigroup's Tier 1 Capital Ratio—which was the basic measure of Citigroup's financial viability—was calculated without inclusion of billions of dollars of liabilities, including $66 billion in direct exposure to subprime-backed CDO securities, and thus the disclosed capital ratio was an untrue and misleading reflection of Citigroup's financial health. (Compl. ¶¶ 151, 191, 250, and 319.) Thus, the complaint states a plausible claim to relief pursuant to Section 11.

Defendants' response—that the complaint merely alleges "mismanagement" which is not actionable under the securities laws—ignores the core of plaintiffs allegations which turn not on Citigroup's management of its assets and liability but instead on the manner in which they disclosed those assets and liabilities. Accordingly, plaintiffs allege not simply mismanagement but an untrue or misleading statement of material fact and therefore states a claim pursuant to Section 11.

### f.   Citigroup's Compliance with GAAP

Finally, the complaint alleges that Citigroup's representations that each of its interim financial statements had been compiled in accordance with GAAP are actionable, material misstatements because those financial statements, which were incorporated into Citigroup's offering documents, did not comply with GAAP in critical respects.

According to the complaint, Citigroup's interim financial statements violated GAAP because they (1) failed to disclose Citigroup's direct subprime exposure in violation of SFAS 107 and SOP No. 94-6; (2) failed to consolidate its "CDOs . . . onto its balance sheet" in violation of FIN 46(R); (3) failed to properly calculate its loss reserves in accordance with SFAS 5; and (4) failed to properly value Citigroup's CDO assets in accordance with SFAS No. 157.[8]

Defendants contend none of the above supports a Section 11 claim because the allegations amount at most to plaintiffs' "subjective view" of how GAAP's flexible guidelines should be applied. (Citigroup Defs.' Mem. of Law at 26-27.) Defendants thus

---

[8] The complaint also alleges that defendants failed to properly account for its SIV assets in violation of SFAS 107 and SOP No. 94-6. However, because the Court has already determined that plaintiffs' allegations of GAAP violations in its SIV accounting fail to state a claim, see note 6, supra, those allegations are equally insufficient to raise a claim in this context.

argue that plaintiffs' allegations, even if credited, do not set forth violations of GAAP sufficient to render false defendants' representations of GAAP compliance.

Plaintiffs' allegation—that defendants represented that their financial statements had been compiled in compliance with GAAP when, in fact, defendants failed to comply with GAAP in several, significant respects—identifies an untrue statement of material fact in a document incorporated into a registration statement.  That allegation is then backed by specific factual allegations, identifying each GAAP provision allegedly violated, and in what manner those provisions were violated.  The complaint therefore plausibly alleges a material untrue statement and thus a claim pursuant to Section 11. Whether or not defendants' financial statements actually violated various provisions of GAAP—and thus whether the representation that the financial statements complied with GAAP was actually an "untrue" statement—are not issues for resolution at this stage. See, e.g., In re Global Crossing Ltd. Sec. Litig., 322 F. Supp. 2d 319, 338-39 (S.D.N.Y. 2004) (finding sufficiency of allegations of GAAP violations "cannot be determined in advance of development of the record"); see also In re AMBAC Fin. Group Sec. Litig., No. 08 Civ. 411, 2010 U.S. Dist. LEXIS 16701, at *81-82 (S.D.N.Y. Feb. 22, 2010) (same); cf. SEC v. Caserta, 75 F. Supp. 2d 79, 91 (E.D.N.Y. 1999) ("Whether GAAP has been violated is a fact-specific issue" which "[f]requently . . . turns on expert testimony.").

Alternatively, defendants argue that even if the complaint alleges violations of GAAP, those violations alone do not suffice to state a Section 11 claim.  The argument— which relies primarily on case law developed in the context of Section 10b-5 fraud claims, not Section 11 claims—is unavailing because the complaint does not assert that

GAAP violations "alone" raise claims but instead that defendants' non-compliance with GAAP rendered materially untrue its representation to the contrary in each of its relevant financial statements.

Accordingly, the complaint's GAAP allegations set forth a plausible claim to relief pursuant to Section 11.

F.    Section 15 Claims

Finally, counts VI and VII raise claims against the Citigroup and Individual defendants pursuant to Section 15 of the Securities Act which imposes liability on any individuals or entities that "control[] any person liable" under Sections 11 or 12. Plaintiffs contend Citigroup and each of the individual defendants are all "control" persons for purposes of Section 15, and that each is directly liable for any of the alleged Section 11 and 12 violations.

Defendants counter that the complaint fails to adequately allege that either Citigroup or any of the individual defendants was a control person because the complaint does not allege that Citigroup or any of the individual defendants actually had the authority to direct or influence those directly responsible for the alleged violations of Sections 11 and 12.

Section 15 requires only that a plaintiff plead that the relevant defendant controlled the primary violator, and control for purposes of Section 15 entails only "'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472-73 (2d Cir. 1996); In re Refco, Inc., 503 F. Supp. 2d at 637.

With respect to Citigroup, the complaint seeks to hold it liable primarily for the acts of Citigroup Funding, its "wholly-owned subsidiary" and The Citigroup Trusts, all of whose "sole assets" are alleged to be "securities issued by Citigroup." (Compl. ¶¶ 30-38.) With respect to the individual defendants, the complaint alleges that each was an officer or director of Citigroup during the time some or all of the allegedly actionable registration statements were issued. Those allegations are sufficient at this stage to state a claim against Citigroup and each of the Individual Defendants. See, e.g., In re Scottish Re Group, 524 F. Supp. 2d at 401; In re Worldcom, Inc. Sec. Litig., 02 Civ. 3288, 2004 WL 1097886, at *3 (S.D.N.Y. May 18, 2004).

And while defendants correctly argue that plaintiffs must establish "actual control, not merely control person status," In re Refco, Inc., 503 F. Supp. 2d at 637, in order to ultimately recover under Section 15, it is well settled that the issue of "[w]hether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." CompuDyne Corp. v. Shane, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006) (citing In re Oxford Health Plans, Inc. Sec. Litig., 187 F.R.D. 133, 143 (S.D.N.Y. 1999)); see also In re Scottish Re Group, 524 F. Supp. 2d at 401.

Accordingly, insofar as the complaint sets forth a plausible claim to relief pursuant to Section 11 as discussed above, it also sets forth a claim pursuant to Section 15 against Citigroup and the individual defendants.

## III.    CONCLUSION

Because the Court finds that plaintiffs have standing to raise Section 11 and 15 claims and state plausible claims to relief pursuant to those sections insofar as they allege misstatements respecting (1) Citigroup's CDO holdings, (2) the credit quality of

Citigroup's SIV holding once those holdings were consolidated in December 2007—i.e.,

the "post-consolidation statements," (3) Citigroup's loan loss reserves, (4) Citigroup's

"well capitalized" status, and (5) Citigroup's compliance with GAAP as set forth more

fully above, defendants' motions to dismiss are denied with respect to those claims as

raised in counts I, II, III, VI, and VII of the complaint. Defendants' motions to dismiss

are granted with respect to all of plaintiffs Section 12 claims as raised in counts IV and V

well as plaintiffs' Section 11 claims insofar as they allege misstatements respecting (1)

Citigroup's exposure to its SIV holdings before those holdings were consolidated in

December 2007—i.e., the "pre-consolidation" statements, and (2) Citigroup's ARS

exposure.

Dated: New York, New York
      July 12, 2010.

SO ORDERED:

Sidney H. Stein, U.S.D.J.