UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE CITIGROUP INC.<br>BOND LITIGATION | MASTER FILE<br>08 Civ. 9522 (SHS) |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

PAUL, WEISS, RIFKIND, WHARTON &
   GARRISON LLP
Brad S. Karp
Richard A. Rosen
Charles E. Davidow
Susanna M. Buergel

1285 Avenue of the Americas
New York, New York  10019-6064
Tel.  (212) 373-3000

*Attorneys for Defendants Citigroup Inc.,
Citigroup Funding Inc., Citigroup Capital XIV,
Citigroup Capital XV, Citigroup Capital XVI,
Citigroup Capital XVII, Citigroup Capital
XVIII, Citigroup Capital XIX, Citigroup
Capital XX, Citigroup Capital XXI, C. Michael
Armstrong, Alain J.P. Belda, Sir Winfried
Bischoff, Michael Conway, Gary Crittenden,
George David, Kenneth T. Derr, John M.
Deutch, Scott Freidenrich, James Garnett,
John C. Gerspach, Ann Dibble Jordan, Klaus
Kleinfeld, Sallie L. Krawcheck, Andrew N.
Liveris, Dudley C. Mecum, Anne Mulcahy,
Vikram Pandit, Richard D. Parsons, Charles
Prince, Roberto Hernández Ramirez, Judith
Rodin, Saul Rosen, Robert E. Rubin, Robert L.
Ryan, Franklin A. Thomas, Eric L. Wentzel,
and David Winkler*

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Jay B. Kasner
George A. Zimmerman

Four Times Square
New York, New York  10036
Tel. (212) 735-3000

*Attorneys for the Underwriter Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 8

    A.    The Financial Crisis, 2007–2008 ...................................................................... 8

        1.    Before the Credit Crisis:
              2006 Through Q2 2007 ................................................................... 8

        2.    Citigroup's Offerings and Disclosures:
              2006 Through Q2 2007 ................................................................... 9

        3.    The Financial Crisis:
              Q3 2007 Through Q4 2007 ............................................................. 11

        4.    Citigroup's Offerings and Disclosures:
              Q3 2007 Through Q4 2007 ............................................................. 13

        5.    The Financial Crisis:  2008 ........................................................... 17

        6.    Citigroup's Offerings and
              Disclosures:  2008 ......................................................................... 18

    B.    Plaintiffs' Claims ............................................................................................ 20

ARGUMENT ...................................................................................................................... 21

I.    PLAINTIFFS HAVE NOT ESTABLISHED
    THAT COMMONALITY IS MET ............................................................................ 22

II.   PLAINTIFFS' CLAIMS ARE NOT
    TYPICAL OF THOSE OF THE CLASS .................................................................. 27

    A.    The Class Representatives' Claims With
        Respect to the March 2 Shelf Do Not
        Satisfy the Typicality Requirement ................................................................ 28

        1.    Plaintiffs Do Not Satisfy Typicality
              as to Securities They Did Not Own .............................................. 28

        2.    Differences in the Timing of
              Purchases by Proposed Class Representatives
              Render Their Claims Atypical ....................................................... 30

        3.    Causation and Damages Issues
              Give Rise to Unique Defenses ...................................................... 32

B. The Class Representatives' Claims With Respect to the June 20 Shelf Do Not Satisfy the Typicality Requirement.........................................................33

    1. Mr. Brown's Claim Is Barred by the Statute of Repose ..........................................................34

III. INDIVIDUAL ISSUES PREDOMINATE OVER COMMON QUESTIONS .......................................................................34

A. Individual Issues of Knowledge Predominate over Common Questions ...................................................35

B. Causation and Damages Issues Will Require Individualized Proof..........................................................41

    1. Buy-and-Hold Claimants Have Suffered No Damages........................................................41

    2. Negative Causation Arguments Will Differ Across the Class ...................................................43

C. Reliance Issues Will Require Individualized Proof....................................................................43

D. Statute of Limitations.........................................................................44

IV. SEVERAL PROPOSED CLASS REPRESENTATIVES DO NOT MEET THE RULE 23(a)(4) ADEQUACY REQUIREMENT ...............................................................45

V. A CLASS ACTION IS NOT A SUPERIOR MEANS OF ADJUDICATION...................................................................46

CONCLUSION.......................................................................................50

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**CASES**

*In re Am. Int'l Group, Inc. Sec. Litig.*,
265 F.R.D. 157 (S.D.N.Y. 2010) ....................................................... 32, 35, 38

*Amchem Prods., Inc.* v. *Windsor*,
521 U.S. 591 (1997) ..................................................................................35

*Ansari* v. *N.Y. Univ.*,
179 F.R.D. 112 (S.D.N.Y. 1998) .................................................................47

*Baffa* v. *Donaldson, Lufkin & Jenrette Sec. Corp.*,
222 F.3d 52 (2d Cir. 2000) .................................................................27, 32

*In re Barclays Bank PLC*, *Sec.*, *Litig.*,
No. 09 Civ. 1989 (PAC), 2011 WL 31548 (S.D.N.Y. Jan. 5, 2011)................24

*Basic, Inc.* v. *Levinson*,
485 U.S. 224 (1988) ..................................................................................44

*Blackmoss Invs. Inc.* v. *ACA Capital Holdings, Inc.*,
No. 07 Civ. 10528, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010)....................43

*In re Blech Sec. Litig.*,
187 F.R.D. 97 (S.D.N.Y. 1999) .................................................................22

*In re Britannia Bulk Holdings Inc. Sec. Litig.*,
665 F. Supp. 2d 404 (S.D.N.Y. 2009) ..................................................32, 43

*CE Design Ltd.* v. *King Architectural Metals, Inc.*,
No. 10-8050, 2011 WL 938900 (7th Cir. Mar. 18, 2011) ..............................48

*In re Citigroup Inc. Bond Litig.*,
723 F. Supp. 2d 568, 583–85 (S.D.N.Y. 2010)............................................28

*City of Pontiac Gen. Employees' Ret. Sys.* v. *MBIA, Inc.*,
637 F.3d 169 (2d Cir. 2011)......................................................................45

*DeMaria* v. *Andersen*,
318 F.3d 170 (2d Cir. 2003)................................................................34, 35

*In re Deutsche Telekom AG Sec. Litig.*,
229 F. Supp. 2d 277 (S.D.N.Y. 2002) .........................................................26

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*,
  No. 98 Civ. 4318 (HB), 2000 WL 1357509 (S.D.N.Y. Sept. 20, 2000) .........................30

*Emps. Ret. Sys. of the Gov't of the Virgin Islands* v. *J.P. Morgan Chase Co.*,
  No. 09 Civ. 3701 (JGK), 2011 WL 1796426 (S.D.N.Y. May 10, 2011) .........................28

*Feit* v. *Leasco Data Processing Equip. Corp.*,
  332 F. Supp. 544 (E.D.N.Y. 1971).................................................................................36

*Finkel* v. *Stratton Corp.*,
  962 F.2d 169 (2d Cir. 1992)...........................................................................................34

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009) ..........................................................................22, 27, 33

*Fogarazzo* v. *Lehman Bros., Inc.*,
  232 F.R.D. 176 (S.D.N.Y. 2005) ...................................................................................26

*Footbridge Ltd. Trust & OHP Opportunity Ltd. Trust* v. *Countrywide Fin. Corp.*,
  No. 10 Civ. 367 (PKC), 2011 WL 907121 (S.D.N.Y. Mar. 16, 2011) ..........................34

*Gary Plastic Packaging Corp.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  903 F.2d 176 (2d Cir. 1990)...........................................................................................27

*Gen. Tel. Co. of the Sw.* v. *Falcon*,
  457 U.S. 147 (1982) .......................................................................................................30

*In re Globalstar Sec. Litig.*,
  No. 01 Civ. 1748 (PKC), 2004 WL 2754674 (S.D.N.Y. Dec. 1, 2004).........................26

*Hevesi* v. *Citigroup Inc.*,
  366 F.3d 70 (2d Cir. 2004) ............................................................................................48

*Hoxworth* v. *Blinder, Robinson & Co., Inc.*,
  980 F.2d 912 (3d Cir. 1992)...........................................................................................30

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008)..............................................................................22, 48, 49

*In re Indep. Energy Holdings PLC Sec. Litig.*,
  210 F.R.D. 476 (S.D.N.Y. 2002) ...................................................................................27

*In re Initial Public Offerings Sec. Litig.*,
  471 F.3d 24 (2d Cir. 2006) ....................................................................................*passim*

*Katz* v. *Image Innovations Holdings, Inc.*,
  No. 06 Civ. 3707 (JGK), 2010 WL 2926196 (S.D.N.Y. July 22, 2010).........................47

iv

*Kottler* v. *Deutsche Bank AG*,
    No. 05 Civ. 7773 (PAC), 2010 WL 1221809 (S.D.N.Y. Mar. 29, 2010)........................48

*Landry* v. *Price Waterhouse Chartered Accountants*,
    123 F.R.D. 474 (S.D.N.Y. 1989) ..................................................................................27

*In re Lehman Bros. Sec. & ERISA Litig.*,
    No. 09 Civ. 2017 (LAK), 2011 WL 1453790 (S.D.N.Y. Apr. 13, 2011)........................34

*Levitan* v. *McCoy*,
    No. 00 Civ. 5096, 2003 WL 1720047 (N.D. Ill. Mar. 31, 2003) ....................................26

*Lewis* v. *Casey*,
    518 U.S. 343 (1996) ......................................................................................................34

*In re Livent, Inc. Noteholders Sec. Litig.*
    151 F. Supp. 2d 371 (S.D.N.Y. 2011) ..........................................................................38

*In re Livent, Inc. Noteholders Sec. Litig.*,
    210 F.R.D. 512 (S.D.N.Y. 2002) ..................................................................................26

*Marisol A.* v. *Giuliani*,
    126 F.3d 372 (2d Cir.1997) ..........................................................................................22

*Maywalt* v. *Parker & Parsley Petroleum Co.*,
    147 F.R.D. 51 (S.D.N.Y. 1993) ....................................................................................30

*Maywalt* v. *Parker & Parsley Petroleum Co.*,
    67 F.3d 1072 (2d Cir.1995) ..........................................................................................46

*McMahan & Co.* v. *Wherehouse Entm't, Inc.*,
    65 F.3d 1044 (2d Cir. 1995)....................................................................................41, 43

*Merck & Co., Inc.* v. *Reynolds*,
    130 S. Ct. 1784 (2010)..................................................................................................45

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003) ..........................................................................28

*In re Monster Worldwide, Inc. Sec. Litig.*,
    251 F.R.D. 132 (S.D.N.Y. 2008) ..................................................................................46

*Morris* v. *Wachovia Sec., Inc.*,
    223 F.R.D. 284 (E.D. Va. 2004) ..................................................................................26

*N.J. Carpenters Heath Fund* v. *Residential Capital, LLC*,
    272 F.R.D. 160 (S.D.N.Y. 2010) ..........................................................26, 36, 38, 46, 47

*In re NASDAQ Market Makers Antitrust Litig.*,
    172 F.R.D 119 (S.D.N.Y. 1997) ...................................................................27

*In re Nortel Networks Corp. Sec. Litig.*,
    No. 01 Civ. 1855 (RMB), 2003 WL 22077464 (S.D.N.Y. Sep. 8, 2003) ........................26

*In re Novagold Res. Inc. Sec. Litig.*,
    629 F. Supp. 2d 272 (S.D.N.Y. 2009) ...........................................................45

*In re PaineWebber Ltd. P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y. 1997) ................................................................30

*Regents of Univ. of Cal.* v. *Credit Suisse First Boston (USA), Inc.*,
    482 F.3d 372 (5th Cir. 2007) ...................................................................48

*Robidoux* v. *Celani*,
    987 F.2d 931 (2d Cir. 1993)......................................................................32

*In re Salomon Analyst Metromedia Litig.*,
    544 F.3d 474 (2d Cir. 2008)..............................................................22, 35

*Savino* v. *Computer Credit, Inc.*,
    164 F.3d 81 (2d Cir. 1998) ....................................................................46

*In re State Street Bank & Trust Co. Fixed Income Funds Inv. Litig.*,
    No. 08 Civ. 8235 (RJH), 2011 WL 1206070 (S.D.N.Y. Mar. 31, 2011) ........................43

*Teamsters Lcl. 445 Freight Div. Pension Fund* v. *Bombardier Inc.*,
    546 F.3d 196 (2d Cir. 2008)......................................................................22

*Tedesco* v. *Mishkin*,
    689 F. Supp. 1327 (S.D.N.Y. 1988)............................................................30

*UFCW Local 1776* v. *Eli Lilly & Co.*,
    620 F.3d 121 (2d Cir. 2010)......................................................................35

*In re Vivendi Universal, S.A. Sec. Litig.*,
    242 F.R.D 76 (S.D.N.Y. 2007) ...........................................................22, 24

*In re Wachovia Equity Sec. Litig.*,
    No. 09 Civ. 6351 (RJS), 2011 WL 1344027 (S.D.N.Y. Mar. 31, 2011).........................28

*In re WorldCom, Inc. Sec. Litig.*,
    219 F.R.D. 267 (S.D.N.Y. 2003) ...............................................................26

## STATUTES

15 U.S.C. § 77k...........................................................................................27, 35, 43, 44

15 U.S.C. § 77m...............................................................................................34

28 U.S.C. § 2072(b)............................................................................................28

## OTHER AUTHORITIES

17 C.F.R. § 230.158(a)........................................................................................44

Fed. R. Civ. P. 23.......................................................................................*passim*

**INTRODUCTION**

Plaintiffs seek to certify a massive class of buyers and sellers of 34 different Citigroup securities issued in 43 distinct offerings over the period May 2006 through November 2008, during an economic crisis of historic dimension. At the time this suit was brought, virtually *every* security issued by *every* financial institution in the world was in precipitous decline. Plaintiffs' motion is an opportunistic attempt to transform the federal securities laws into an insurance policy against investment losses caused not by Citigroup but by the financial crisis generally, and to provide an unjust windfall to class members, many of whom *have not suffered any losses* because the Citigroup bonds at issue have never defaulted, have paid the required coupons, and trade today at or above par value. Plaintiffs should not be permitted to manufacture a Section 11 claim and certify a massive class in the hopes of coercing an unjustified settlement on these facts.

The fall of 2008 was a time of unprecedented crisis in the financial sector. In a span of several weeks, Fannie Mae and Freddie Mac were seized and placed into government conservatorship; Lehman Brothers filed for bankruptcy; Merrill Lynch was acquired by Bank of America; AIG, the nation's largest insurance provider, required an $85 billion bailout from the federal government; and the FDIC seized the assets of Washington Mutual in the largest bank failure in U.S. history.

This crisis threatened the entire financial sector. On October 3, 2008, in response to the dramatic events of September 2008, Congress passed the Emergency Economic Stabilization Act. Pursuant to that statute, the largest banking institutions in the U.S.—including JPMorgan, Goldman Sachs, Morgan Stanley, Wells Fargo, Bank of America, State Street, BoNY Mellon and Citigroup—each accepted $25 billion in government funds to stanch the spreading market panic. At the same time, another large bank, Wachovia, began to show signs of distress, but was saved by the last-minute intervention of Citigroup, which agreed to acquire Wachovia with the backing of the FDIC. Before Citigroup's deal closed, Wells Fargo presented a

competing bid for Wachovia that would not require FDIC support.  Although the FDIC had publicly endorsed Citigroup's deal, it withdrew its support and backed the Wells Fargo deal.

The FDIC's public withdrawal of support for the Citigroup offer shocked the markets, and was interpreted as a vote of no-confidence.  Citigroup quickly became the next target of opportunistic short selling, triggering a panicked market's misperception that Citigroup was under duress and precipitating an irrational but nonetheless enterprise-threatening run on the bank.  Consequently, Citigroup entered into an agreement in November 2008, pursuant to which the federal government provided a $306 billion asset guarantee and an additional $20 billion capital infusion to calm market fears.  The government's extension of financial support served its intended purpose, and quelled market concern about Citigroup's ability to survive the financial crisis.  The asset guarantee was never utilized, and the government's investment in Citigroup ultimately was repaid—with a *profit* to taxpayers of $12.3 billion.

The gravamen of plaintiffs' claims is that the fall 2008 liquidity crisis that decimated the financial sector generally and resulted in the significant decline in the market value of securities issued by Citigroup (and by every other major financial sector institution), somehow proves that Citigroup must have made misrepresentations over the prior several years in its regulatory filings about its exposure to mortgages and related instruments, and that Citigroup must have failed to comply with GAAP in valuing those assets and assessing its capital position.  Plaintiffs assume further that these assets must have been so overvalued by Citigroup that the Company was insolvent.  Based on these unfounded assumptions, plaintiffs seek to certify a massive class of purchasers who bought any of 34 different types of Citigroup debt and equity securities traceable to 43 different offerings from May 2006 through August 2008, and "who were damaged thereby."

In their zeal to seek certification of the broadest possible class, plaintiffs conspicuously have not demonstrated that the class of individuals they seek to represent has suffered actual or cognizable damages.  In point of fact, the vast majority of Citigroup securities

at issue are bonds as to which there have been no defaults and no missed or insufficient coupon payments.  While there is wide variation in the performance of the bonds within the putative class, virtually *all* of the bonds currently are trading at a premium to par and any class members who sold their securities today would realize a significant profit.

Equally crucial, the vast majority of Citigroup's disclosures about which plaintiffs complain were made in 2007 and had virtually no impact on the market value of plaintiffs' investments.  It was only a year *after* the purported Citigroup misstatements at issue, when the entire financial sector suffered an unprecedented collapse, that the price of these Citigroup securities dropped—*in lockstep with the prices of securities issued by every other financial institution in the world*.

Plaintiffs' motion for class certification fails for several independent reasons.

*First*, the claims asserted by the proposed class do not share common questions of law or fact, as required by Rule 23(a)(2).  In fact, the class claims are based on entirely *different* alleged misstatements or omissions.  The two shelf registration statements at issue contain *none* of the allegedly actionable statements; liability instead is predicated upon subsequent regulatory disclosures, which the shelf registration statements incorporate by reference, filed at various intervals over the 28-month offering period.

The differences in the regulatory disclosures are particularly pronounced.  This case fundamentally concerns Citigroup's alleged failure to disclose adequately its potential exposure to subprime mortgage assets and certain types of "variable interest entities" ("VIEs"), including collateralized debt obligations ("CDOs") and structured investment vehicles ("SIVs").  Contrary to plaintiffs' claims, Citigroup did in fact disclose its potential exposures to each category of assets.  Citigroup appropriately revised those disclosures over the class period as chaotic and unanticipated events roiled the financial markets beginning in the fall of 2007.

As a result, in the 28-month offering period, there are several fault lines along which commonality breaks down.  Investors who purchased securities at the beginning of the

class period—a time of record Wall Street profits (before the subprime crisis began), when Citigroup's regulatory filings stated accurately that the Company did not expect material losses from its $100 billion exposure to then highly-rated CDOs and other VIEs—have claims that are fundamentally different from those asserted by investors who bought Citigroup bonds two years later in the midst of the crisis.  Later in the class period, in response to the unanticipated market events that began in the fall of 2007, Citigroup specifically and repeatedly disclosed the amount of its CDO exposure in granular detail, wrote down over $30 billion associated with that exposure, and expressly warned investors that billions of dollars of additional losses might follow.  Moreover, by the end of the class period, Citigroup had consolidated $49 billion of SIVs onto its balance sheet, made numerous disclosures about those and other potential exposures, and increased its loan-loss reserves by over 100%.

Therefore, to establish liability at the beginning of the proposed class period, class members would be required to prove that Citigroup had a duty to disclose its CDO, SIV and subprime exposure beyond the disclosures already provided in its financial statements, and that such additional disclosures would have been material to investors.  At the end of the class period, at which point Citigroup was making granular disclosures about its CDO, SIV and subprime exposure, liability will turn on whether and to what extent those disclosures were false or misleading.  These questions plainly raise distinct (and in some cases inconsistent) factual and legal claims, and will require fundamentally different proof, thus defeating commonality.

*Second,* plaintiffs' claims are not typical of the claims of the proposed class in several crucial respects.  This action relates to 43 different offerings of securities issued by Citigroup from May 2006 through August 2008.  Thirty-five of those offerings were made pursuant to a March 2, 2006 Shelf Registration Statement (the "March 2 Shelf"), and eight were made pursuant to a June 20, 2006 Shelf Registration Statement (the "June 20 Shelf"), which was subject to three post-effective amendments ("PEAs").  As already indicated, none of the alleged misstatements or omissions that form the basis of plaintiffs' Section 11 claims is found in the

actual shelf registration statements themselves; all of the allegedly actionable statements and omissions are set forth in the various regulatory disclosures Citigroup filed subsequently and incorporated by reference into the shelf registration statements and PEAs, which differed over time.

In the 35 offerings under the March 2 Shelf, Citigroup issued 26 types of securities, each with very different characteristics and risk profiles. Those securities include fixed-rate bonds with maturities ranging from 2011 to 2038, floating-rate bonds with maturities ranging from 2009 to 2067, and depository shares, which are similar to preferred stock, and trade on the New York Stock Exchange. Twelve of the offerings were conducted in 2006, seven in the first half of 2007, seven in the second half of 2007, and nine in 2008—all under sharply different market conditions.

The putative class representatives collectively participated in only a fraction of these offerings, and they bought and sold their securities on many different dates; none of the class representatives bought and sold the securities at issue here throughout the entire class period. In addition, several of the class representatives continue to hold at least some of their securities, and—as to those holdings—have suffered no harm. These differences in plaintiffs' trading patterns negate typicality and render each claimant subject to unique defenses that threaten to become the focus of the litigation, to the detriment of absent class members.

In addition, the class representatives have a different typicality problem with respect to the eight Citigroup securities issued under the June 20 Shelf and its three PEAs. The proposed class representatives purchased shares on only five dates: November 17, 2006; December 17 and 18, 2007; January 24, 2008; and November 3, 2008. The first transaction by a proposed class representative therefore took place long *before* the subprime crisis began, *before* Citigroup began taking write-downs on its subprime exposure, and *before* Citigroup made granular disclosures about its potential exposure. None of the proposed class representatives transacted in any of these securities again until *after* nearly all of the key disclosures at issue

5

were made.  In fact, none of the proposed class representatives purchased any of the securities issued under the June 20 Shelf or its PEAs from the multiple March 2007, June 2007, August 2007, or November 2007 offerings—the critical period given Citigroup's disclosures during that time, and in light of plaintiffs' allegations regarding the purported inaccuracy of those disclosures.  Accordingly, these plaintiffs cannot properly represent this class.

*Third*, plaintiffs cannot satisfy the Rule 23(b)(3) predominance requirements under the Second Circuit's controlling decision in *In re Initial Public Offerings Securities Litigation*, 471 F.3d 24, 33 (2d Cir. 2006) (hereinafter "*IPO*"), because critical individual questions of knowledge, damages, reliance and causation predominate.  The proposed class period encompasses an extraordinarily dynamic timeframe with respect to investor knowledge about subprime and other mortgage-related exposures, both generally in the market and specifically as to Citigroup.  As in *IPO*, plaintiffs' own allegations underscore the need for individualized inquiries to determine investor knowledge at the time of each purchase.  Plaintiffs accuse Citigroup of repeatedly "shocking" the market over the course of the sprawling class period with new disclosures about subprime exposure and related losses.  Despite the fact that plaintiffs now allege that Citigroup's true "corrective disclosures" were made in November 2008, two of the named plaintiffs actually commenced Section 11 class actions relating to the securities and registration statements at issue here *before* those "corrective disclosures" were made.  Clearly plaintiffs' "knowledge" did not need to await those disclosures, which highlights the need for individualized inquiries into the knowledge of each individual class member, which cannot be achieved through generalized proof.

Nor are individual causation and damages issues amenable to generalized proof.  For many members of the proposed class, damages in this case are entirely theoretical.  Citigroup has not defaulted on any of its debt; all coupon payments have been made; and the matured bonds have been redeemed at par.  Therefore, every member of the putative class who bought and held Citigroup's bonds has received the benefit of her bargain and has not been harmed

6

because most of the Citigroup bonds at issue currently are trading at a premium to par, buy-and-hold class members stand to receive a windfall and cannot prove that anything Citigroup did caused them to suffer "losses."  By contrast, other putative class members who sold in the summer or fall of 2008—either out of panic or an urgent need for liquidity—suffered losses that were not caused by anything Citigroup did, but rather by the unprecedented financial crisis affecting the market.  As to each of those class members, Citigroup will present individualized "negative causation" evidence, which will predominate over common questions.

*Fourth*, several of the proposed class representatives fail to satisfy the adequacy requirement of Rule 23(a)(4), for a variety of reasons.  Three of the proposed class representatives—Phillip Ruffin, James Brown, and Arkansas Teacher—have not taken any steps formally to join this lawsuit as plaintiffs, and have not fulfilled the PSLRA's requirements for representative parties.  Several other proposed class representatives are manifestly unfamiliar with the claims of the class they purport to represent, and at least one—through the deposition testimony of an investment advisor—has expressly repudiated the complaint's allegations.  These are not appropriate stewards to represent the interests of absent class members, and the adequacy criteria as to these proposed class representatives have not been met.

*Fifth*, on the undisputed facts here, a class action is not a superior method of adjudication.  This case will present an unmanageable morass of mini-trials due to:

- the number and diversity of securities issued by Citigroup;

- the number of distinct offerings made by Citigroup over a multi-year period;

- the unprecedented and dynamic trauma affecting the financial markets in different ways at different times during the sprawling class period;

- Citigroup's continual revisions of its subprime and related disclosures during the broad class period to reflect shifting market conditions and updated views of its potential exposure; and,

- the individual defenses that defendants are entitled to present going to critical issues such as knowledge, damages, reliance and causation.

7

*Finally*, certifying sub-classes here will not be a workable solution inasmuch as scores of sub-classes would be required, making trial of this case unmanageable.  Nor is such a solution necessary.  The vast majority of the securities at issue here were purchased by large institutional investors, which have the financial wherewithal and economic incentive to pursue litigation in the event they suffered actual losses.  Indeed, several institutional investors already have opted out of this putative class action.

As amplified below, we respectfully submit that class certification should be denied.

## STATEMENT OF FACTS

### A.      The Financial Crisis, 2007–2008

Plaintiffs' claims in this case arise from the credit crisis that began in late 2007 and nearly caused the collapse of the financial sector in the fall of 2008.  The original class action complaint was filed on September 30, 2008, following an unprecedented month of market upheaval during which several major financial institutions failed or nearly failed, and the Dow lost over 1,000 points in less than three weeks of volatile trading.  Indeed, in *one single day* shortly before the complaint was filed, on September 29, 2008, the Dow dropped 778 points—the largest single-day drop in history.

#### 1.      Before the Credit Crisis:  2006 Through Q2 2007

The crisis is widely considered to have begun in August 2007.  (*See, e.g.*, Ex. 1 at 57.)  Its origins are now attributed, with the benefit of hindsight, to the collapse of the "subprime" mortgage market, which first showed signs of distress in February 2007.  (*Id.*)  That month, HSBC—then one of the largest subprime mortgage lenders in the U.S.—announced that it was setting aside $10 billion for loan impairments for 2006, a 20% increase over analyst expectations.  At the same time, another major subprime mortgage lender, New Century Financial ("New Century"), announced a fourth-quarter loss for 2006 and simultaneously

announced that its 2006 financials would be restated.  New Century filed for bankruptcy two months later in April 2007.

Over the course of 2007, losses continued to mount for subprime mortgage lenders, causing several to file for bankruptcy, including Alliance Bancorp (July 2007) and American Home Mortgage (August 2007).  Countrywide Financial, the largest mortgage originator in the U.S., announced enormous second-quarter losses in 2007, requiring it to seek a $2 billion equity investment from Bank of America.

Although the subprime housing market became increasingly distressed in the first half of 2007, the problems in that market, at the time, were thought to be contained.  The consensus among government regulators was that the surge in subprime mortgage defaults would not have a broader impact on the economy.  For instance:

- In March 2007, Federal Reserve Director of Banking Supervision and Regulation Roger T. Cole testified that, "at this time, we are not observing spillover effects from the problems in the subprime market to traditional mortgage portfolios or, more generally, to the safety and soundness of the banking system."  (Ex. 2 at 116–17.)

- In March 2007, Federal Reserve Chairman Ben Bernanke stated that "the impact on the broader economy and financial markets of the problems in the subprime market seems likely to be contained."  (Ex. 3 at 7.)

- In May 2007, Chairman Bernanke observed that "the effect of the troubles in the subprime sector on the broader housing market will likely be limited, and we do not expect significant spillovers from the subprime market to the rest of the economy or to the financial system." (Ex. 4 at 6.)

In hindsight, of course, these predictions were wrong.  As former SEC Chairman David Ruder later testified, at the time those statements were made, "none of the primary market participants predicted the collapse," nor did "[r]egulators . . . predict the collapse."  (Ex. 5 at 18.)

2.     Citigroup's Offerings and Disclosures:  2006 Through Q2 2007

During the first 14 months of plaintiffs' proposed class period—from May 2006 through the end of the second quarter of 2007—Citigroup conducted 24 of the 43 offerings at issue.  The offering documents were comprised of:  (i) the applicable shelf registration statement

or PEA; (ii) a supplemental prospectus or pricing supplement; and (iii) Citigroup's financial disclosures made as of the offering date, including those filed on Forms 10-K, 10-Q and 8-K.

Each of these offerings predates the widespread impact of the credit crisis. During this early period, mortgage-backed securities ("MBS") and CDOs—the primary subjects of plaintiffs' Section 11 claims—were widely perceived as desirable investments with high credit ratings that retained their value, and Citigroup's disclosures of its exposure to these products in the offering documents reflected their perceived high quality. Plaintiffs' assertion that, during this early period, Citigroup "stated" in its financials that it "had little or no direct exposure to subprime CDOs" (Mem. at 4), is false.

Citigroup's financials during this period consistently disclosed that the Company had involvement with, and exposure to, CDOs. Citigroup's CDO exposure was addressed as part of the Company's overall involvement with VIEs, of which CDOs were one type, as plaintiffs acknowledge. (*See* ¶¶ 272, 318.)[1] Citigroup's financials disclosed:

- "The Company may provide other financial services and/or products to the VIEs for market-rate fees. These may include: the provision of liquidity or contingent liquidity facilities; interest rate or foreign exchange hedges or credit derivative instruments; ***and the purchasing and warehousing of securities until they are sold*** to the SPE." (Ex. 6 at 90; *see also* Ex. 7 at 73; Ex. 8 at 79; Ex. 9 at 82; Ex. 10 at 93; Ex. 11 at 76 (emphasis added).)

- "The Company, along with other financial institutions, ***provides liquidity facilities, such as commercial paper backstop lines of credit to the conduits***." (Ex. 6 at 114; *see also* Ex. 7 at 90; Ex. 8 at 107; Ex. 9 at 112; Ex. 10 at 147; Ex. 11 at 101 (emphasis added).)

- Citigroup also disclosed that it "***may also have an ownership interest or other investment in certain VIEs***." (Ex. 6 at 132; *see also* Ex. 7 at 90; Ex. 8 at 108; Ex. 9 at 113; Ex. 10 at 147; Ex. 11 at 100–01 (emphasis added).)

Citigroup's exposure to VIEs also was disclosed in its financial statements as an aggregate "maximum exposure to loss." (*See* Ex. 7 at 90; *see also* Ex. 8 at 108; Ex. 9 at 113; Ex.

---

[1]  Citations in the form of "¶ __" refer to paragraphs in the Consolidated Amended Class Action Complaint (the "Amended Complaint"); citations in the form of "Ex. __" refer to exhibits annexed to the Declaration of Brad S. Karp in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification, dated May 13, 2011; citations in the form of "Mem. __" refer to pages in Plaintiffs' Memorandum of Law in Support of Their Motion for Class Certification.

10 at 147; Ex. 11 at 101.)  The maximum exposure ranged from $89 billion to $109 billion, depending on the reporting period, and was calculated by aggregating "the notional amounts of credit lines, guarantees, other credit support, and liquidity facilities, the notional amounts of credit default swaps and certain total return swaps, *and the amount invested where Citigroup has an ownership interest in the VIEs*." (*Id.* (emphasis added).)  Reflecting the high-credit quality of these assets, Citigroup's financials stated that the Company did not expect "actual losses [from VIEs] . . . to be material." (*Id.*)  During this early period, Citigroup was not obligated to make more specific, itemized disclosures about its subprime and CDO exposure, nor was there market interest in such additional disclosure.  As such, any additional disclosure would have been immaterial to investors.

Citigroup expressly and extensively disclosed that its exposure to VIEs was subject to market risk.  For instance, among many other risk disclosures, Citigroup's 10-Ks advised:  "[t]he profitability of Citigroup's businesses may be affected by global and local economic conditions, such as the liquidity of the global financial markets, the level and volatility of interest rates and equity prices, investor sentiment, inflation, and the availability and cost of credit." (Ex. 6 at 56; Ex. 10 at 58.)  The Company also disclosed risks specifically related to its mortgage and VIE exposures:  "[t]he credit quality of Citigroup's on-balance sheet assets and off-balance sheet exposures is also affected by economic conditions, as more loan delinquencies would likely result in a higher level of charge-offs and increased provisions for credit losses, adversely affecting the Company's earnings." (*Id.*)

### 3.    The Financial Crisis:  Q3 2007 Through Q4 2007

The subprime crisis spread in the third quarter of 2007.  Mounting subprime mortgage defaults eroded the value of MBS and related structured products.  In July 2007, the three major rating agencies—Moody's, Fitch Ratings, and Standard & Poor's ("S&P")— downgraded, or placed on downgrade-watch, billions of dollars of MBS and lower-rated CDO

tranches due to problems with collateral performance, which caused their prices to deteriorate and, in turn, led to losses and write-downs for market participants.

The impact from the rating agency downgrades was immediate and severe. On July 31, 2007, two Bear Stearns hedge funds filed for bankruptcy as a result of their subprime exposure, despite receiving a $3.2 billion capital infusion from their parent company just one month earlier. Other quantitative hedge funds experienced similar duress. In August 2007, the crisis spread beyond hedge funds, challenging more traditionally stable and diversified institutions. As one commentator explained:

> A complete chronology of the recent financial crisis might start in February 2007, when several large subprime mortgage lenders started to report losses. It might then describe how spreads between risky and risk-free bonds—"credit spreads"—began widening in July 2007. But the definitive trigger came on August 9, 2007, when the large French bank BNP Paribas temporarily halted redemptions from three of its funds because it could not reliably value the assets backed by U.S. subprime mortgage debt held in those funds. When one major institution took such a step, financial firms worldwide were encouraged to question the value of a variety of collateral they had been accepting in their lending operations—and to worry about their own finances. The result was a sudden hoarding of cash and cessation of interbank lending, which in turn led to severe liquidity constraints on many financial institutions.

(Ex. 1 at 57.) As a result, the interbank lending rate—the interest rate banks charge one another to borrow money on an overnight basis, an important economic measure of credit and liquidity— skyrocketed. (*Id.*) The credit bubble, which had long-fueled the economy, had burst.

During the fall of 2007, tightening credit markets significantly restricted financial institutions' access to liquidity, which—together with rating agency downgrades—exerted acute balance sheet pressure on virtually every financial sector participant. The asset-backed commercial paper market and leveraged lending markets were affected immediately. On October 18, 2007, the crisis accelerated when rating agencies broadly downgraded MBS, including several highly-rated AAA securities that previously had been considered safe.

In the third and fourth quarters of 2007, many financial institutions announced large write-downs and increased loan-loss provisions. For example, during the fourth quarter of

2007 alone, write-downs for mortgage-related products and similar assets totaled $16.7 billion at Merrill Lynch, $5.2 billion at Bank of America, and $10 billion at UBS.  JPMorgan and Barclays also reported losses of over $1 billion.

    4.    <u>Citigroup's Offerings and Disclosures:  Q3 2007 Through Q4 2007</u>

In the third and fourth quarters of 2007, as the credit crisis spread, Citigroup conducted ten new securities offerings.  During that time, Citigroup continually reviewed and adjusted its subprime and CDO disclosures to reflect unanticipated dislocations in the securitization markets, in response to the market's increased focus on subprime exposure.

Beginning in the third quarter of 2007, as the credit quality of assets underlying its subprime and CDO holdings deteriorated, Citigroup provided the market with more granular detail about these assets in its earnings calls.  On July 20, 2007—in the midst of the Bear Stearns hedge fund crisis and MBS credit downgrades by rating agencies—Citigroup's CFO, Gary Crittenden, stated on an earnings call that Citigroup's Markets and Banking division had exposure to subprime in "two categories, which together account for 2% of the Securities and Banking revenues in 2006."  (Ex. 12 at 9.)  In the first category, "secured lending," Crittenden explained that the Company held $13 billion of subprime exposure, down from $24 billion as of year-end 2006.  Crittenden did not quantify Citigroup's exposure in the second category of "trading."  (*Id.* at 9–10.)  On the call, Crittenden repeated warnings that the amount of Citigroup's subprime risk was subject to change because it was sensitive to unforeseeable market fluctuations.[2]

On October 1, 2007, Citigroup pre-released its third quarter earnings and announced that, due to continued dislocations in the housing market, the Company expected to write down $1.3 billion "on the value of sub-prime mortgage-backed securities warehoused for

---

[2]    *See* Ex. 12 at 20 ("Q:  Do you think that getting from the $13 billion to wherever you are going, you will have losses of a similar amount?  Or might they be lower ahead?  Or how should we think about that?  A:  Impossible again for me to say.  As I mentioned, this is an uncertain market right now and it is very difficult to forecast exactly where the market is going to go.  If we knew that, we would be making bets on it, obviously.  But we don't know exactly where that is going to go.").

future [CDO] . . . securitizations, CDO positions, and leveraged loans warehoused for future collateralized loan obligation ('CLO') securitizations." (Ex. 13 at Exhibit 99.1 at 1.) This announcement and the transcript of the earnings call held the same day were filed with the SEC on Form 8-K. (*Id.*) On October 15, 2007, Citigroup made its quarter-end earnings announcement, which increased the $1.3 billion write-down figure to $1.56 billion. (Ex. 14 at Exhibit 99.1 at 2.)[3]

Throughout October 2007, the MBS market and related CDO market continued to deteriorate—in mid- and late-October, Moody's and S&P downgraded over $50 billion in MBS. The downgrades on MBS precipitated downgrades on more highly-rated tranches of CDOs and caused Citigroup to reassess its exposure, because positions that previously had been considered to have an extremely low risk of default—and therefore were not viewed as "subprime"—now faced potential risk of mark-to-market accounting losses.

On November 4, 2007, Citigroup announced that its $13 billion in subprime exposure in its lending and structuring businesses (previously discussed on July 20, 2007, *see* p. 13, *supra*) had been reduced further to $11.7 billion, and detailed the exposures that comprised this figure. (Ex. 15 at Exhibit 99.1 at 1.) Citigroup also disclosed approximately $43 billion in ABS CDO super-senior exposures as of September 30, 2007, which were backed primarily by subprime MBS collateral. (*Id.* at 2.) As a result of further rating agency downgrades in late October, Citigroup announced that it anticipated a write-down of approximately $8 to $11 billion for the fourth quarter on its ABS CDO super-senior exposure. (*Id.* at 1.) As Crittenden explained on a conference call with investors on November 5, 2007:

> Following the downgrades on these mortgage-backed securities, the rating agencies then turned their attention to the CDOs which of course have mortgage-backed securities as an important part of their collateral. And during October alone there were approximately 1000 negative actions taken against CDOs by S&P and Moody's. Moody's now has more than $30 billion of CDO securities on negative watch and Fitch also followed by

---

[3]  The 8-K disclosures in October 2007 were incorporated by reference in subsequent securities offerings under the shelf registration statements. Disclosures appearing in earnings calls only—such as the July 20, 2007 call— are not incorporated by reference into the offerings, and therefore are not actionable under Section 11.

putting on negative watch about $37 billion of ABS CDO tranches.  Now once the October downgrades occurred, the value of the junior tranches were driven down to very low levels. . . .  [T]his increased the riskiness of the senior tranches as the subordination below them eroded.  And this drove down the value then of the super senior tranches as well, something that had not occurred during the course of the first nine months of the year.

(Ex. 16 at 3.)

Citigroup's third-quarter Form 10-Q was filed on November 5, 2007.  Due to unforeseen changes in market conditions, the filing contained a series of detailed disclosures about Citigroup's subprime exposure, CDO exposure, third-quarter write-downs and anticipated fourth-quarter write-downs on that exposure, in contrast to the prior 10-Ks and 10-Qs issued during the class period, which had provided an aggregate exposure to VIEs—which included the super-senior tranches of CDOs, believed to be safe from loss—and stated that actual losses were not expected to be material.  For instance:

- The new 10-Q contained a section "Exposure to U.S. Residential Real Estate – Sub-prime Related Exposure in Securities and Banking," in which Citigroup disclosed that it had "approximately $55 billion in U.S. sub-prime related direct exposures in its Securities and Banking (S&B) business.  The $55 billion in U.S. sub-prime related direct exposures in S&B . . . consisted of (a) approximately $11.7 billion of sub-prime related exposures in its lending and structuring business, and (b) approximately $43 billion of exposures in the most senior tranches (super senior tranches) of [CDOs] . . . ."  (Ex. 17 at 29.)

- The disclosures relating to the $43 billion in CDO exposure indicated that "[t]hese exposures include approximately $25 billion in commercial paper principally secured by super senior tranches of high grade ABS CDOs and approximately $18 billion of super senior tranches of ABS CDOs, consisting of approximately $10 billion of high grade ABS CDOs, approximately $8 billion of mezzanine ABS CDOs and approximately $0.2 billion of ABS CDO-squared transactions."  (*Id.* at 9.)

- The 10-Q explained that, in light of market conditions, fair value accounting for the assets posed difficulties:  "These super senior tranches are not subject to valuation based on observable market transactions.  Accordingly, fair value of these super senior exposures is based on estimates about, among other things, future housing prices to predict estimated cash flows, which are then discounted to a present value.  The rating agency downgrades and market developments referred to above have led to changes in the appropriate discount rates applicable to these super senior tranches, which have resulted in significant declines in the estimates of the fair value of S&B super senior tranches."  (*Id.*)

Citigroup's third-quarter 10-Q also disclosed a significant increase in loan-loss reserves to account for the unanticipated rise in borrower defaults. The 10-Q explained that, "[p]rovisions for loan-losses and for benefits and claims increased substantially primarily reflecting weakening credit indicators, including increased delinquencies in first and second mortgages and unsecured personal loans, as well as trends in the U.S. macro-economic environment and the change in estimate of loan-losses." (*Id.* at 16.) From the beginning of the class period through the end of the second quarter of 2007, loan-loss reserves ranged from $8.9 billion to $10.3 billion. In the third quarter of 2007, reserves increased to $12.7 billion—a 23% increase in the span of three months.

In addition, between May 2006 and December 2007—a period covering the first 19 months of the proposed class period—Citigroup consistently disclosed its involvement with seven SIVs, which were operating companies that issued securities and invested the proceeds in a portfolio of assets. The securities issued by SIVs were mostly in the form of short-term debt, such as asset-backed commercial paper, which allowed the SIVs to borrow money cheaply—to pay low interest rates to senior debt investors—and then to use that money to invest in higher-yielding assets. Citigroup advised the seven SIVs, but had no contractual obligation to support them.

The unfolding credit crisis in late 2007 caused sudden and unprecedented dislocations in the asset-backed commercial paper market, which resulted in the seven SIVs being unable to find buyers for the short-term securities they issued to finance their operations. On December 13, 2007, Citigroup took the extraordinary step of providing the SIVs that it advised with a liquidity support facility and consolidated $49 billion of SIVs onto its balance sheet. As explained in its contemporaneously filed 8-K, the consolidation was "a response to the recently announced ratings review for possible downgrade by Moody's and S&P of the outstanding senior debt of the SIVs, and the continued reduction of liquidity in the SIV related asset-backed commercial paper and medium-term note markets." (Ex. 18 at Exhibit 99.1 at 1.)

While the consolidation of the SIVs brought new exposure onto Citigroup's balance sheet, the SIVs' assets were diversified and concentrated in investment-grade corporate securities with an A credit rating or better—not in MBS.  As a result, Citigroup disclosed that "Citi's credit exposure under its commitment is substantially limited."  (*Id.* at 1.)

5.    The Financial Crisis:  2008

From the first quarter of 2008 through the end of the year, the financial crisis deepened, culminating in the collapse of several major financial institutions and the near-collapse of several others.  In January 2008, Moody's and S&P downgraded monoline insurers Ambac and MBIA, two leading insurers of bonds in the U.S., due to their MBS exposure. Questions about the monolines' financial health greatly increased the subprime exposure of financial institutions, which relied on monoline insurance to hedge against subprime exposure. In March 2008, Bear Stearns—the fifth largest securities brokerage firm in the U.S.—faced a "run on the bank" in which its customers withdrew $17 billion in just two days.  Unable to survive, Bear Stearns was saved by a government-sponsored deal to sell it to JPM.

By September 2008, virtually all of the major U.S. financial institutions had experienced significant losses and had written down billions of dollars of subprime and other mortgage-related exposures.  In a three-week span, a series of events brought about the near collapse of the U.S. banking system:

- On September 7, Fannie Mae and Freddie Mac were seized and placed into government conservatorship due to their mortgage exposure.

- On September 15, Lehman filed for bankruptcy—the largest bankruptcy in U.S. history—and Merrill Lynch was sold to Bank of America.  That day, the Dow dropped 499 points.

- On September 16, the government announced an $85 billion bailout to save AIG, the country's largest insurance provider.

- On September 16, as a result of market shocks from the credit crisis, money market funds "broke the buck"—traded below par—for the first time since 1994.

- On September 20, the Department of the Treasury unveiled its $700 billion Troubled Asset Relief Program ("TARP") to provide balance-sheet relief to banks for their now-illiquid holdings.  As later enacted by Congress, the program provided that each of the largest

banking institutions in the U.S.—including JPM, Goldman Sachs, Morgan Stanley, Wells Fargo, Bank of America, State Street, BoNY Mellon and Citigroup—accept $25 billion in government funds to help allay the spreading market panic.

- On September 21, Goldman Sachs and Morgan Stanley became bank holding companies, making them eligible for TARP funds and providing them access to the FED window.

- On September 24, Washington Mutual failed—the largest bank failure in U.S. history.  The FDIC seized Washington Mutual's assets and sold them to JPM.

- On September 29, Wachovia nearly failed and the FDIC arranged for its sale to Citigroup for $2.2 billion.  The same day, the Dow dropped 778 points, the largest one-day drop in history.

On October 3, 2008, it was announced that Wachovia would be sold to Wells Fargo, instead of Citigroup.  The FDIC's participation in this transaction was interpreted by the market as a vote of no-confidence in Citigroup.  As a consequence, Citigroup became the target of short sellers, which fueled market misperception that Citigroup was in distress and made government regulators concerned about a bank run on Citigroup and the systemic risk such a run would pose to the economy.  The government therefore orchestrated a deal with Citigroup to provide a $20 billion equity infusion and $306 billion asset guarantee.  The government's deal with Citigroup was announced on November 23, 2008.  It had the intended effect, and a bank run was avoided.  The government's financial support of Citigroup conferred a benefit by reversing an irrational, but still dangerous, fear in the market regarding Citigroup's ability to survive the credit crisis.  Significantly, Citigroup never utilized the asset guarantee, and taxpayers received a $12.3 billion profit on their Citigroup investment.

6.     Citigroup's Offerings and Disclosures:  2008

The nine remaining Citigroup securities offerings at issue took place between January 2008 and August 2008.  These offerings incorporated by reference the previous disclosures made by Citigroup in the third and fourth quarters of 2007, as well as additional disclosures made during 2008 as the crisis continued to expand and decimate the financial sector.

On January 15, 2008, Citigroup made several specific disclosures in connection with its fourth-quarter earnings release, filed in a Form 8-K.  (Ex. 19.)  Following ratings

downgrades of monoline insurers in January 2008, Citigroup treated its monoline protection as ineffective for accounting purposes and included $10.5 billion of insured CDOs as part of its overall subprime exposure.  (*Id.* at Exhibit 99.1 at 12.)  On the same day, Citigroup also announced an $18.1 billion write-down on its subprime-related exposures, including super-senior tranches of CDOs (*id.*), and increased its loan-loss reserves by 27% to $16.1 billion from $12.7 billion in the third quarter of 2007 (*id.* at Exhibit 99.2 at 35).  On February 22, 2008, Citigroup filed its Form 10-K for fiscal year ending December 31, 2007, which included the disclosures about its subprime-related MBS and CDO exposures, write-downs, and increased reserves.

Over the next several months, while the credit markets continued to experience unprecedented and unforeseen trauma, Citigroup continued to disclose its subprime, CDO and SIV exposures at each reporting period.  On April 18, 2008, Citigroup announced its first-quarter results, which included further losses resulting from continued downward market trends.  In the first quarter of 2008, Citigroup suffered a $6 billion loss on its subprime-related CDO exposure (Ex. 20 at Exhibit 99.1 at 2, 11), a $1 billion dollar loss on Alt-A mortgage assets (*id.* at 6), and a $212 million loss in connection with the SIVs (*id.* at 8).  In addition, Citigroup increased its loan-loss reserves to $18.3 billion (*id.* at Exhibit 99.2 at 35), a 14% increase from the previous quarter and 44% more than just six months earlier.  Citigroup's write-downs and increases in loan-loss reserves were disclosed in its Form 10-Q, filed on May 2, 2008.  (Ex. 21.)

Throughout the spring and early summer of 2008, Citigroup's disclosures reflected the ongoing decline in asset values in the markets for structured finance and mortgage products.  On July 18, 2008, in its second-quarter earnings release filed on Form 8-K, Citigroup detailed the further deterioration in its remaining subprime and mortgage assets by announcing an additional $3.5 billion mark-to-market loss on its CDO exposure, reducing the fair value of its CDO holdings to $22.5 billion.  (Ex. 22 at Exhibit 99.1 at 9.)  Again, in its 10-Q filing on August 1, 2008, Citigroup reiterated the financial results summarized above.  (Ex. 23.)

In the third quarter, Citigroup disclosed significant additional write-downs.  In its earnings release filed on Form 8-K, Citigroup announced a $2 billion write-down on the SIVs and a $1.2 billion write-down on Alt-A assets.  (Ex. 24 at Exhibit 99.1 at 2, 3.)  Citigroup also wrote down an additional $800 million on its CDO exposure.  (*Id.* at 11.)  Finally, Citigroup increased its loan-loss reserves by $3.2 billion, to $24 billion.  (*Id.* at Exhibit 99.2 at 3.)

Cumulatively, between the third quarter of 2007 and October 2008, Citigroup wrote down $29.6 billion of its CDO portfolio, $2.5 billion of Alt-A exposure, and $2.2 billion of SIV assets.  Citigroup also increased its loan-loss reserves by $14.5 billion, or 152%, reflecting the sharp decline in loan performance due to the financial crisis.  In November 2008, the market for CDOs and other subprime assets remained illiquid and—seeing no prospect to sell the assets at a reasonable valuation—Citigroup decided to hold certain assets to maturity, announcing on November 17, 2008 that it would no longer consider these assets saleable from an accounting perspective.

### B.    Plaintiffs' Claims

Plaintiffs assert claims under Sections 11 and 15 of the Securities Act, relating to 43 different offerings of Citigroup debt and equity securities from May 2006 through August 2008.[4]  Thirty-five of the offerings were conducted pursuant to the March 2 Shelf.  Eight were conducted pursuant to the June 20 Shelf, which was subject to three post-effective amendments, dated September 5, 2006 ("PEA 1"), May 4, 2007 ("PEA 2"), and November 23, 2007 ("PEA 3").  The securities registered under the March 2 Shelf were issued by Citigroup and consisted of 15 series of fixed-rate bonds with maturities ranging from 2011 to 2038, seven series of floating-rate bonds with maturities ranging from 2009 to 2067, and four series of

---

[4]    This putative class action was originally commenced on September 30, 2008, in New York State Court. Defendants removed the case to federal court, where it was consolidated with a second putative class action relating to the same securities that had been filed on October 28, 2008.  The Amended Complaint was filed on January 15, 2009.

depository shares.[5]  The securities registered under the June 20 Shelf and its PEAs were

enhanced trust preferred securities issued by various trusts affiliated with Citigroup.

Plaintiffs allege that defendants made material misrepresentations or omissions in

connection with each of these offerings regarding Citigroup's CDO exposure, the value of the

SIVs (once they were brought onto Citigroup's balance sheet), Citigroup's loan-loss reserves,

Citigroup's compliance with GAAP, and statements about Citigroup's "well capitalized" status.

Although plaintiffs' purported Section 11 claims are based on two shelf registration statements,

none of the alleged misstatements or omissions is actually contained in those documents.  All of

the allegedly actionable statements or omissions are in some or all of 24 different 10-K, 10-Q,

and 8-K disclosures filed over the course of the putative class period, and incorporated by

reference into the registration statements used in connection with each offering.  (*See* Am.

Compl. App'x.)  The class definition proposed by plaintiffs includes after-market purchasers in

each of the offerings, thus extending the class beyond the end of the offering period in August

2008.

## ARGUMENT

Class certification requires plaintiffs to establish:  "(1) the class is so numerous

that joinder of all members is impracticable; (2) there are questions of law or fact common to the

class; (3) the claims or defenses of the representative parties are typical of the claims or defenses

of the class; and (4) the representative parties will fairly and adequately protect the interests of

the class."  Fed. R. Civ. P. 23(a).  Plaintiffs seek certification under Rule 23(b)(3), which

requires that "the questions of law or fact common to the class members predominate over any

questions affecting only individual members, and that a class action is superior to other available

methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

Motions for class certification require "rigorous analysis."  *See IPO*, 471 F.3d at

33 (quoting *Gen. Tel. Co. of the Sw.* v. *Falcon*, 457 U.S. 147 (1982)).  "A district judge may

---

[5]    Certain of the 26 securities were the subject of more than one offering.

certify a class only after making determinations that each of the Rule 23 requirements has been met."  *Id.*  "[T]he preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements."  *Teamsters Lcl. 445 Freight Div. Pension Fund* v. *Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).  "Lower courts have an 'obligation' to resolve factual disputes relevant to the Rule 23 requirements . . . , an obligation 'not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement.'"  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 38 (2d Cir. 2009) (quoting *IPO*, 471 F.3d at 41).  If the court "is not satisfied that the requirements of Rule 23 have been met," then the court "should refuse certification until they have been met." *IPO*, 471 F.3d at 23.[6]

Under *IPO* and its progeny, a "definitive assessment" of the Rule 23 requirements is required on a motion for class certification.  *See In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 484 (2d Cir. 2008) (quoting *IPO*, 471 F.3d at 41).  This careful application of the Rule 23 analysis "accords with the pivotal status of class certification in large-scale litigation, because 'denying or granting class certification is often the defining moment in class actions.'"  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir. 2008).  Therefore, "[t]he potential for unwarranted settlement pressure" is a factor to weigh in the "certification calculus."  *Id.*

## I.   PLAINTIFFS HAVE NOT ESTABLISHED THAT COMMONALITY IS MET

Rule 23(a)(2) requires that plaintiffs establish commonality.  "The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact."  *Marisol A.* v. *Giuliani*, 126 F.3d 372, 376 (2d Cir.1997) (*per curiam*).  "Not every 'issue[] must be identical as to each [class] member, but . . . plaintiff [must] identify some unifying thread among the members' claims that warrants class treatment.'"  *In re Vivendi Universal, S.A. Sec. Litig.*,

---

[6]   Plaintiffs' reliance on *In re Blech Securities Litigation*, 187 F.R.D. 97, 102 (S.D.N.Y. 1999), for the proposition that "when a court is in doubt as to whether or not to certify a class action, the court should err in favor of allowing the class to go forward" (Mem. at 15), is misplaced.  *Blech* is contrary to prevailing law in this Circuit. The court in *Blech*, in fact, *conditionally certified* the class—a result no longer authorized by Rule 23.

242 F.R.D 76, 84 (S.D.N.Y. 2007) (quoting *Cutler* v. *Perales*, 128 F.R.D. 39, 44 (S.D.N.Y. 1989)) (alterations in original).  As with each of the Rule 23 requirements, it is plaintiffs' burden to establish commonality by a preponderance of the evidence.

Plaintiffs' own allegations negate commonality.  Plaintiffs' core claim is that Citigroup failed to disclose its potential exposure to $66 billion of subprime MBS and CDOs, and $49 billion of SIVs.  (*See* Mem. at 4–7.)  As set forth above, the disclosures relating to these subjects changed dramatically over time:  prior to July 20, 2007, Citigroup did not provide (nor was it required to provide) any itemized disclosures about its "subprime" exposure either in its regulatory disclosures or in its earnings calls; on October 1 and 15, 2007, Citigroup filed 8-Ks disclosing $11.6 billion of subprime exposure, and announcing over $1 billion in write-downs on that exposure; on November 5, 2007, Citigroup disclosed and provided granular detail about its $55 billion in CDO and subprime exposure and predicted $8 to $11 billion in fourth-quarter losses; on December 13, 2007, Citigroup consolidated the SIVs onto its balance sheet and detailed the resulting new exposure; and on January 15, 2008, in response to the monoline downgrades, Citigroup disclosed $10.5 billion in additional subprime exposure, and wrote down $18 billion of its overall subprime exposure for the fourth quarter of 2007.

As the facts changed over the proposed class period, plaintiffs' theory of liability and defendants' defenses to liability likewise change as a result.  For instance:

- At the beginning of the class period, to establish liability, plaintiffs will be required to establish that Citigroup had a duty to disclose itemized information about subprime and CDO exposures, and that additional disclosures would have been material to investors at a time *prior* to the subprime and credit crisis, when the securities at issue were highly rated and thought to be of high credit quality.

- After Citigroup began making specific disclosures about its subprime exposure in October 2007, to establish liability, plaintiffs must establish that Citigroup's disclosures were materially misleading.  The same is true with respect to the Company's CDO and subprime disclosures made in November 2007 and January 2008, and Citigroup's disclosures about SIV consolidation on December 13, 2007.

- Plaintiffs do not dispute that Citigroup had disclosed its CDO and SIV exposures by January 15, 2008; plaintiffs' claims after that date relate solely to the valuations of those products. Significantly, all of Citigroup's 10-Ks and 10-Qs during that time recited that its CDO

exposure valuations were not based on observable prices (because of market illiquidity), but reflected subjective estimates.  Plaintiffs must demonstrate that Citigroup "did not truly believe its own valuation[s]," *see In re Barclays Bank PLC, Sec., Litig.*, No. 09 Civ. 1989 (PAC), 2011 WL 31548, at *8 & n.21 (S.D.N.Y. Jan. 5, 2011), a significant burden that plaintiffs will be unable to meet on the facts of this case.

Consequently, class members who purchased Citigroup securities at different times have fundamentally different claims that depend on fundamentally different legal arguments and fundamentally different facts.  Such claims lack a "unifying thread" sufficient to establish commonality.  *See In re Vivendi Universal*, 242 F.R.D at 84.

Plaintiffs also fail to meet their burden to prove commonality with respect to Citigroup's loan-loss reserves over the class period.  In support of their allegation that Citigroup was under-reserved for mortgage losses and that its financials were materially false or misleading, plaintiffs' Amended Complaint directs the Court to a chart allegedly showing, from the third quarter of 2006 through the third quarter of 2007, that Citigroup's actual credit losses for consumer loans in North America exceeded its reserves.  (¶ 230.)  After the third quarter of 2007, however, the same chart appears to reflect that Citigroup was *over*-reserved in each quarter in North America.  (*Id.*)  This chart undermines plaintiffs' efforts to establish commonality and instead underscores the significant differences throughout the proposed class period, in particular with respect to disclosures pre-dating and post-dating the third quarter of 2007.[7]

Commonality is further negated by the fact that Citigroup's loan-loss reserves increased dramatically over the class period, particularly after the credit crisis began in the third quarter of 2007.  From the beginning of the class period through the end of the second quarter of 2007, loan-loss reserves ranged from $8.9 billion to $10.3 billion.  In the third quarter of 2007, reserves increased to $12.7 billion, and increased further to $16.1 billion in the fourth quarter.  Loan-loss reserves increased to $18.3 billion in the first quarter of 2008, and, by the time the

---

[7]   Notably, the chart on which plaintiffs rely for their claim that Citigroup was under-reserved for loan defaults does not appear in any registration statement or SEC filing.  Nor do plaintiffs proffer any expert analysis relating to the chart.  Citigroup's financials show that Citigroup, as an enterprise, was over-reserved against credit losses in every quarter during the offering period by margins ranging from $1.6 billion (fourth quarter 2006) to $19 billion (third quarter 2008).

original class action complaint was filed on September 30, 2008, loan-loss reserves had increased to $24 billion, more than twice the level pre-dating the credit crisis.[8]

Nor do plaintiffs' allegations of GAAP violations or misrepresentations concerning Citigroup's "well-capitalized" status satisfy commonality. These claims, by their nature, are derivative of plaintiffs' allegations regarding Citigroup's disclosures about subprime mortgages, CDOs, and SIVs, discussed above. Any claim that Citigroup failed to make necessary disclosures about "subprime" or CDO exposure under the accounting rules applies only to the offerings prior to the third quarter of 2007; claims relating to the sufficiency of the detailed disclosures that were made apply only after that period; claims relating to accounting for SIVs apply only after their consolidation on December 13, 2007; and the impact of these exposures on Citigroup's capitalization consequently differ before and after the fourth quarter of 2007. Moreover, plaintiffs' Amended Complaint describes significant changes in applicable accounting rules and Citigroup's accounting methodologies during the class period that relate specifically to these issues. (*See, e.g.*, ¶ 289 ("Fair Value Accounting" rule SFAS No. 157 applied only after January 1, 2007); ¶ 298 (alleging that "Citigroup's methodology to value its CDO holdings was fundamentally flawed . . . *[p]rior to the first quarter of 2008*" (emphasis added)).)

Plaintiffs have not met their burden under *IPO* to prove that commonality exists across the class. *All* of plaintiffs' evidence in support of their motion relates to the fall and winter of 2007, at the start of the credit crisis, when Citigroup made a series of disclosures about its CDO, subprime and SIV exposure.[9] The conspicuous concentration of evidence around that

---

[8]   The only new "evidence" plaintiffs put into the record to establish commonality with respect to Citigroup's loan-loss reserves is the testimony of Richard Bowen before the FCIC, which plaintiffs allege shows "Citigroup's loss reserves were understated by billions of dollars throughout the Offerings Period." (Mem. at 8.) Bowen's testimony—addressed to Citigroup's mortgage underwriting standards in *2006 and 2007* (Singer Decl., Ex. 6)—does not support plaintiffs' assertion.

[9]   *See* Singer Decl., Ex. 1 (presentation dated April 2007 regarding CDO exposure); Ex. 2 (email chain from September 2007 regarding CDO exposure); Ex. 3 (SEC Complaint relating to fall 2007 subprime disclosures); Ex. 4 (cease and desist order regarding same); Ex. 5 (judgment regarding same); Ex. 6 (Bowen's FCIC testimony discussed *supra*, n.8);

period mirrors the allegations in the Amended Complaint, which focus heavily on these disclosures to claim that Citigroup repeatedly "shocked" the market with each successive announcement. (*See* ¶¶ 174–87.) But plaintiffs seek certification of a far broader class—one that extends more than one year before and one year after those disclosures. Plaintiffs have made no showing that the investors who were "shocked" by those disclosures share any common questions with investors who purchased much later, *after* all the key interim disclosures were made, in a radically different economic environment. *See Morris* v. *Wachovia Sec., Inc.*, 223 F.R.D. 284, 293–94 (E.D. Va. 2004) (commonality defeated by interim disclosures); *cf. N.J. Carpenters Heath Fund* v. *Residential Capital, LLC*, 272 F.R.D. 160, 169 (S.D.N.Y. 2010) ("[D]ifferences in purchase dates may work against a finding of commonality."). By the summer of 2008, many of Citigroup's bonds were already in decline.

Instead of evidence, plaintiffs rely on general observations by courts that the commonality requirement is often a low bar to Section 11 claimants. (Mem. at 16–17.) *None* of the cases relied upon by plaintiffs, however, actually involved a circumstance where a defendant contested commonality.[10] Here, commonality is defeated by the fact that plaintiffs' Section 11 claims relate to 24 separate 10-Q, 10-K, and 8-K disclosures filed over the most turbulent 28-month period in the financial markets in generations, during which the Company's disclosures changed materially over time, reflecting changing market conditions. Class members

---

████████ Ex. 9 (analysis by Comptroller of the Currency relating to "substantial financial losses realized in the third and fourth quarter of 2007"). Notably, the only document proffered by plaintiffs that relates to any time period *other* than the fall of 2007 is a report by the TARP Inspector General, dated January 13, 2011, regarding financial assistance provided to Citigroup in November 2008. (*Id.* at Ex. 10.) Contrary to plaintiffs' allegation in this action that government assistance was needed due to Citigroup's subprime-related exposures, the report states unequivocally that the government provided assistance to Citigroup to stop a run on the bank—not out of any concern that subprime assets rendered Citigroup insolvent.

[10] *See Fogarazzo* v. *Lehman Bros., Inc.*, 232 F.R.D. 176, 182 (S.D.N.Y. 2005); *In re Globalstar Sec. Litig.*, No. 01 Civ. 1748 (PKC), 2004 WL 2754674, at *4 (S.D.N.Y. Dec. 1, 2004); *In re Nortel Networks Corp. Sec. Litig.*, No. 01 Civ. 1855 (RMB), 2003 WL 22077464, at *3 (S.D.N.Y. Sep. 8, 2003); *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 280 (S.D.N.Y. 2003); *In re Deutsche Telekom AG Sec. Litig.*, 229 F. Supp. 2d 277, 281 (S.D.N.Y. 2002); *In re Livent, Inc. Noteholders Sec. Litig.*, 210 F.R.D. 512, 515–16 (S.D.N.Y. 2002); *Levitan* v. *McCoy*, No. 00 Civ. 5096, 2003 WL 1720047, at *4 (N.D. Ill. Mar. 31, 2003).

who bought securities in different offerings and at different time periods have fundamentally different claims.  In these circumstances, commonality is not met.[11]

## II.    PLAINTIFFS' CLAIMS ARE NOT TYPICAL OF THOSE OF THE CLASS

To satisfy the typicality requirement, "the party seeking certification must show that 'each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.'"  *Flag*, 574 F.3d at 35 (quoting *Robidoux* v. *Celani*, 987 F.2d 931, 936 (2d Cir. 1993)).  Class representatives must "have the incentive to prove all of the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions."  *In re NASDAQ Market Makers Antitrust Litig.*, 172 F.R.D 119, 126 (S.D.N.Y. 1997) (internal quotations omitted).  "[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation."  *Baffa* v. *Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000).

The "unique defenses" doctrine protects against the "danger that absent class members will suffer if their representative is preoccupied with defenses unique to it."  *Gary Plastic Packaging Corp.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990).  "[A] unique defense need not be proven in order to defeat class certification."  *In re Indep. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 481 (S.D.N.Y. 2002).  The question at the class certification stage is only whether the class representative "would be required to devote considerable time" to rebutting the defenses to the potential prejudice of absent class members.  *Landry* v. *Price Waterhouse Chartered Accountants*, 123 F.R.D. 474, 476 (S.D.N.Y. 1989).

---

[11]    Plaintiffs also cannot establish commonality with respect to the individual defendants or underwriter defendants, because each of those defendants is not potentially liable for the same offerings.  For example, the underwriter defendants have no liability for offerings in which they did not participate.  Likewise, defendants Bischoff, Pandit, Crittenden, and Ryan have no liability for any offerings prior to February 22, 2008, and defendants Jordan, Kleinfeld, Mecum, and Prince cannot be held liable for any offerings after February 22, 2008.  Moreover, each individual and underwriter defendant is entitled to present defenses to liability that are not available to the issuers, including the "due diligence" defense, as to which commonality cannot be met across the class period.  *See* 15 U.S.C. § 77k(b).

### A.    The Class Representatives' Claims With Respect to the March 2 Shelf Do Not Satisfy the Typicality Requirement

The March 2 Shelf was used in connection with 35 offerings of 26 different securities from May 2006 through August 2008:  twelve in 2006, seven in the first half of 2007, seven in the second half of 2007, and nine in 2008.  The securities differed substantially:  fifteen were fixed-rate bonds issued between June 2006 and August 2008, paying different coupon rates with maturities ranging from 2011 to 2038; seven were floating-rate bonds issued between May 2006 and May 2008, paying different coupon rates with maturities ranging from 2009 to 2067; and four were depository shares (which are similar to preferred stock) offered between January 2008 and May 2008, with long-term maturities, paying different coupons.

#### 1.    Plaintiffs Do Not Satisfy Typicality as to Securities They Did Not Own

The class representatives' claims are not typical of those belonging to class members holding securities that the class representatives did not own.[12]  Publicly available information indicates that differences among the securities affected their value in different ways, and their pricing exhibited significant inconsistencies as a result.  For instance, of the seven floating-rate bonds issued under the March 2 Shelf, the class representatives owned only one— the ET4 Security, purchased by Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriffs") in May 2008, which pays a coupon of LIBOR + 170 basis points and matures in 2018. (Declaration of Steven B. Singer in Support of Plaintiffs' Motion for Class Certification, dated Mar. 11, 2011 ("Singer Decl."), Ex. 12 at 2).[13]  An analysis performed by the defendants'

---

[12]  Although we acknowledge this Court's contrary ruling, *see In re Citigroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 583–85 (S.D.N.Y. 2010), defendants maintain that plaintiffs lack statutory and constitutional standing to pursue claims on behalf of purchasers of securities from offerings in which the proposed representatives did not participate.  Two recent decisions in the Southern District of New York have declined to follow this Court's Section 11 standing ruling.  *See Emps. Ret. Sys. of the Gov't of the Virgin Islands* v. *J.P. Morgan Chase Co.*, No. 09 Civ. 3701 (JGK), 2011 WL 1796426 (S.D.N.Y. May 10, 2011); *In re Wachovia Equity Sec. Litig.*, No. 09 Civ. 6351 (RJS), 2011 WL 1344027, at *25–*27 (S.D.N.Y. Mar. 31, 2011).  To the extent the class representatives lack standing to pursue all of the proposed class members' claims, the class representatives are not typical of the class they seek to represent.  *See In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 255 (S.D.N.Y. 2003) ("It is axiomatic that a putative class representative must be able to individually state a claim . . . even though he or she purports to act on behalf of a class."); 28 U.S.C. § 2072(b) ("[R]ules [of Procedure] shall not abridge, enlarge or modify any substantive right.").

[13]  Each security is identified by an alphanumeric CUSIP.  (*See* Ex. 41 at Exhibit B.)  For ease of reference, each security is referenced by the last three characters of its CUSIP.

valuation expert, Dr. Petersen, found that the ET4 Security first showed price impairment below par in July 2008. (*See* Ex. 41 at Exhibit C.) Other floating-rate bonds, which were not owned by the class representatives, exhibited different trends. For example, the DL2 Security, offered in May 2006 with a coupon of LIBOR + 9 basis points, and maturing in 2011, frst consistently traded below par in August 2007, and the DM0 Security, offered in June 2006 with a coupon of LIBOR + 27 basis points and maturing in 2016, first consistently traded below par in May 2007. (*Id.*)[14]

The securities also demonstrated different sensitivities to market-wide events not directly related to Citigroup. The Lehman bankruptcy filing on September 15, 2008, for instance, had an observable negative price impact on virtually all of the Citigroup securities, but the extent of its impact varied. For instance, the 572 Security—a depository share issued in January 2008 (owned by American European Insurance Co. ("AEIC"))—experienced a price decline of over 20% on September 15, 2008. (*Id.* at Exhibit D.) The EP2 Security—a fixed-rate bond paying a 6.9% coupon and maturing in 2038 (owned by Louisiana Sheriffs and City of Philadelphia Board of Pensions & Retirement ("City of Philadelphia"))—declined 5.6% on the same date. (*Id.*) The DU2 Security (which no proposed class representatives owned) declined 2.26%. (*Id.*)

These observed differences in the price sensitivities of the different securities at issue have legal significance in at least three ways. First, the price reaction of the different securities to various market events and Citigroup's disclosures corresponds to different arguments about materiality. Second, the different price and value characteristics of the bonds will directly impact class members' damages claims. Third, these differences will alter

---

[14]   The fixed-rate bonds show similar discrepancies. For example, the DY4 Security, issued in February 2007, paying a 5.5% coupon and maturing in 2017, began trading persistently below par in March 2008. The EC1 Security was offered in May 2007, matures in 2037 and pays a 5.9% coupon; this security began trading persistently below par in June 2007. The DU2 Security, initially offered on September 29, 2006, matures in 2011 and pays a 5.1% coupon. That security experienced persistent price deterioration below par in July 2008. (*See* Ex. 41 at Exhibit C.)

defendants' affirmative negative causation defenses. These variations will lead to different and often conflicting proof on matters relating to liability for these different securities.[15]

2.      Differences in the Timing of Purchases by Proposed
        Class Representatives Render Their Claims Atypical

As set forth above, *see* pp. 22–27, *supra*, plaintiffs have failed to meet their burden of demonstrating commonality because plaintiffs' legal and factual arguments to establish liability will necessarily be different at different time periods. The requirements of typicality and commonality "tend to merge." *Falcon*, 457 U.S. at 158 n.13. In this case, none of the proposed class representatives satisfies typicality because none bought securities in all of the relevant periods, and different legal theories will be required to establish liability for each period.

Several of the putative class representatives did not purchase Citigroup securities during 2007, when the credit crisis began and when many of Citigroup's critical disclosures about subprime and CDO exposure were made. The Company's disclosures in the fall and winter of 2007 are the subject of extensive allegations in the Amended Complaint and the evidence submitted in support of plaintiffs' motion, yet five of the nine putative class representatives that bought securities registered under the March 2 Shelf—City of Tallahassee Retirement System ("City of Tallahassee"), Southeastern Pennsylvania Transportation Authority ("SEPTA"), AEIC, Phillip Ruffin and City of Philadelphia—did not buy *any* securities in calendar year 2007.[16] (Singer Decl., Exs. 14, 15, 17–19.) ███████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████

---

[15]   Plaintiffs' authority that they need not have invested in all the offerings or securities to satisfy typicality is inapposite. Those cases did not involve offerings as numerous and diverse as those present here. *See In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 Civ. 4318 (HB), 2000 WL 1357509, at *1 (S.D.N.Y. Sept. 20, 2000); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 106 (S.D.N.Y. 1997); *Maywalt* v. *Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 56 (S.D.N.Y. 1993); *Tedesco* v. *Mishkin*, 689 F. Supp. 1327, 1330 (S.D.N.Y. 1988); *Hoxworth* v. *Blinder, Robinson & Co., Inc.*, 980 F.2d 912, 914 (3d Cir. 1992).

[16]   Four of these class representatives only bought securities in February 2008 or later. City of Philadelphia bought securities in June and July of 2006—long before the subprime and credit crisis began—but not again until February 27, 2008, long after Citigroup made the critical disclosures at issue here.



None of the four putative class representatives that purchased securities issued under the March 2 Shelf in 2007—Minneapolis Firefighters' Relief Association ("Minneapolis Firefighters"), Louisiana Sheriffs, Arkansas Teacher Retirement System ("Arkansas Teacher"), and Miami Beach Employees' Retirement Plan ("Miami Beach")—has a claim relating to any purchase of securities prior to August 20, 2007.[17] (Singer Decl., Exs. 11–13, 16.) By that date, Citigroup had made its first significant public subprime exposure disclosure on a July 20, 2007 earnings call, at which point the credit crisis had begun. The relevant 2007 transactions are as follows:

- Miami Beach purchased securities only on August 20, 2007. Therefore, Miami Beach purchased after the July 20, 2007 disclosure, but before further disclosures beginning in October 2007 were made. (*Id.*, Ex. 16.)

- Minneapolis Firefighters purchased securities on November 14 and December 19, 2007. These purchases post-date Citigroup's July 20, October 1, October 15, and November 5, 2007 disclosures about subprime and CDO exposure. The December purchase also post-dates the SIV consolidation disclosure. (*Id.*, Ex. 11 at 1.)

- Louisiana Sheriffs bought securities on November 14 and December 6, 2007. Both of these purchases were made after the 8-K and 10-Q disclosures in the fall of 2007 relating to subprime exposures and CDOs. (*Id.*, Ex. 12 at 1.)

- Arkansas Teacher purchased securities on two dates: October 10 and December 17, 2007. It purchased these securities after Citigroup's first 8-K disclosure about subprime exposure, and then again after the November subprime, CDO and SIV disclosures. (*Id.*, Ex. 13 at 1–2.)

Because none of the class representatives transacted during all of the relevant time periods, none is capable of establishing liability across the class, an infirmity that cannot be cured with plaintiffs' conclusory and simplistic suggestion that the class claims all arise from the "same

---

[17] Some of these class representatives bought securities as early as March 2007, but sold their positions shortly thereafter. For instance, Minneapolis Firefighters purchased the DY4 Security on March 14 and June 7, 2007, but sold those positions by September 2007. (Singer Decl., Ex. 11 at 1.) Arkansas Teacher bought shares of the EC1 Security in May 2007, but sold that position in January 2008. (*Id.*, Ex. 13 at 1.) Louisiana Sheriffs bought shares of the EC1 Security in August 2007, but sold its position in December 2007. (*Id.*, Ex. 12 at 1.) These short-term "in and out" trades are not properly part of any class alleging corrective disclosures in November 2008, as plaintiffs do here. *See also* p. 33, *infra*.

course of events." (Mem. at 18.) Even if it somehow could be said that the "same course of events" gave rise to all of the purported claims at issue, that is not remotely sufficient under settled law to establish *liability* for the entire period. The fact that the claims arose from a vaguely related historical sequence is not the test for typicality. Both the class representatives and the class as a whole must be able to make "similar *legal arguments* to *prove* the defendant's *liability*," for typicality to be met. *Robidoux*, 987 F.2d at 936 (emphases added). Plaintiffs here do not come close to meeting this standard.

Differences in the timing of the class representatives' purchases not only will give rise to different liability arguments, but they also will subject the class representatives to unique defenses regarding their knowledge of the alleged misstatements or omissions. *See In re Am. Int'l Group, Inc. Sec. Litig.*, 265 F.R.D. 157, 166 (S.D.N.Y. 2010) ("knowledge of a misstatement or omission is sufficient to defeat a [Section] 11 . . . claim; defendants need not demonstrate plaintiffs' actual knowledge of the truth" (internal quotations omitted)). Depending on when the class representatives purchased securities relative to different disclosures and market-wide events, the proposed representatives will be subject to a unique knowledge defense "which threatens to become the focus of the litigation." *Baffa*, 222 F.3d at 59 (internal quotations omitted). This, too, negates typicality.

### 3. Causation and Damages Issues Give Rise to Unique Defenses

Virtually all of the proposed class representatives sold some of their March 2 Shelf securities at modest losses prior to the commencement of this lawsuit, particularly in the summer and fall of 2008. Plaintiffs allege that defendants did not make corrective disclosures until November 23, 2008. Sales by class representatives *prior* to the date of those alleged disclosures will be subject to unique causation defenses: defendants will prove that those modest losses resulted from market forces entirely unrelated to defendants' alleged conduct. *See In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 418 (S.D.N.Y. 2009). The proof will vary day by day.

Negative causation arguments relating to the class representatives' in-and-out sales will be particularly compelling in light of the fact that plaintiffs' own trading activity shows that prices for many of the securities that the class representatives owned actually *increased* during the class period, including in the fall and winter of 2007 through 2008, when many of the critical disclosures were made.  For example:

- Minneapolis Firefighters bought shares of the DY4 Security on June 7, 2007 (at 96.695% of par) at a price *lower* than the price it sold those shares for on September 19, 2007 (at 97.943% of par); it also bought shares of the EM9 Security at a price on November 14, 2007 (99.572% of par) lower than the price it paid on December 19, 2007 (at 102.872% of par), and both of those purchases were at prices *lower* than the price it sold those shares for on January 9, 2008 (at 103.833% of par).  (Singer Decl., Ex. 11.)

- Arkansas Teacher bought shares of the 598 Security on January 17, 2008 at $50 per share, and then sold them for a profit the very next day.  (*Id.*, Ex. 13.)

- City of Philadelphia bought shares of the ER8 Security on April 21, 2008 (at 100% of par), and sold shares of the same security for a profit on April 22, 2008 (at 100.5% of par) and April 30, 2008 (at 101% of par).  (*Id.*, Ex. 15.)

Plaintiffs' own evidence, therefore, belies any claim that losses from in-and-out sales during the putative class period would have been attributable to interim disclosures correcting any prior material misstatements or omissions.  As a result, such in-and-out trades are not properly included in the class and the putative class representatives are not competent to represent the class with respect to such transactions.  *See, e.g.*, *Flag*, 574 F.3d at 38–40 (reversing certification of class to the extent it included in-and-out traders who could not establish loss causation).

### B. The Class Representatives' Claims With Respect to the June 20 Shelf Do Not Satisfy the Typicality Requirement

Plaintiffs' claims also are atypical of the class of purchasers who bought securities registered under the June 20 Shelf or its three PEAs.  The June 20 Shelf was used to issue one security.  Three additional securities were offered under PEA 1, two under PEA 2, and two under PEA 3.  The original plaintiffs here purchased securities registered under PEA 3 only, and purchased those securities on only four dates:  December 17 and 18, 2007; and January 24 and November 3, 2008.  New purported class representative James Brown—who has not formally

joined the litigation as a plaintiff, and has appeared for the first time in connection with Plaintiffs' Motion for Class Certification—interposed a claim for his purchase of securities registered under PEA 1, which he bought on November 17, 2006.

      1.      <u>Mr. Brown's Claim Is Barred by the Statute of Repose</u>

Section 13 of the Securities Act establishes a three-year statute of repose that runs from the date the security is bona fide offered to the public. *See* 15 U.S.C. § 77m. A security is "bona fide offered to the public" on the date the original shelf registration statement is filed, unless the security is registered pursuant to a PEA, in which case the period runs from the effective date of the PEA. *See Finkel* v. *Stratton Corp.*, 962 F.2d 169, 175–76 (2d Cir. 1992). Statutes of repose, unlike statutes of limitation, are absolute and not subject to equitable tolling.[18] Since Mr. Brown's securities were registered under PEA 1, which was effective on September 5, 2006, Mr. Brown's claim thus became untimely in September 2009, more than one year before he interposed his claim in this case.

The original plaintiffs lacked standing to sue on behalf of Mr. Brown because they purchased securities registered only under PEA 3, filed on November 23, 2007. Because PEA 3 registered new securities, and did not offer previously registered securities to the public, the original plaintiffs' claims are not traceable to the previous PEAs or to the original June 20 Shelf and plaintiffs therefore lack standing to sue with respect to the previously registered securities. *See DeMaria* v. *Andersen*, 318 F.3d 170, 175–78 (2d Cir. 2003).[19]

## III.   INDIVIDUAL ISSUES PREDOMINATE OVER COMMON QUESTIONS

The commonality and typicality problems infecting plaintiffs' motion are incurable because—no matter how the class is limited temporally—individual issues will

---

[18] *See In re Lehman Bros. Sec. & ERISA Litig.*, No. 09 Civ. 2017 (LAK), 2011 WL 1453790, at *2–*3 (S.D.N.Y. Apr. 13, 2011); *Footbridge Ltd. Trust & OHP Opportunity Ltd. Trust* v. *Countrywide Fin. Corp.*, No. 10 Civ. 367 (PKC), 2011 WL 907121, at *4–*7 (S.D.N.Y. Mar. 16, 2011).

[19] The Court's previous consideration of the standing issue addressed the question of plaintiffs' standing to sue with respect to different offerings of securities registered under a shelf registration statement to which plaintiffs could trace their shares. The Court was not presented with arguments, and thus did not decide, the effect on standing of PEAs that register new securities. The Court may properly consider that issue now, as standing is jurisdictional and not subject to waiver. *Lewis* v. *Casey*, 518 U.S. 343, 349 n.1 (1996).

predominate over common questions.  Rule 23(b)(3) requires that, to obtain class certification, "questions of law or fact common to class members predominate over any questions affecting only individual members."  To establish predominance in this Circuit, plaintiffs must show—by a preponderance of the evidence—that "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and . . . these particular issues are more substantial than the issues subject only to individualized proof."  *UFCW Local 1776* v. *Eli Lilly & Co.*, 620 F.3d 121, 131 (2d Cir. 2010) (internal quotations omitted).  The Rule 23(b)(3) predominance requirement is "far more demanding" than the Rule 23(a)(2) commonality requirement, *Amchem Prods., Inc.* v. *Windsor*, 521 U.S. 591, 623–24 (1997), and tests whether "a proposed class is sufficiently cohesive to warrant adjudication by representation."  *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 480 (2d Cir. 2008) (internal citations omitted).

Several critical issues in this case will require extensive individualized proof, including plaintiffs' knowledge of any alleged misstatements or omissions, causation, damages, reliance, and the timeliness of claims.  Plaintiffs ignore the numerous individual issues this litigation will entail.

## A.  Individual Issues of Knowledge Predominate Over Common Questions

To recover under Section 11, "[p]laintiffs must show lack of knowledge" of the alleged misstatements or omissions at the time of their purchase.  *IPO*, 471 F.3d at 43; *see also DeMaria* v. *Andersen*, 318 F.3d 170, 175 (2d Cir. 2003) ("[Section] 11 provides a cause of action for 'any person acquiring' a security issued pursuant to a materially false registration statement *unless the purchaser knew about the false statement at the time of acquisition*." (emphasis added)); 15 U.S.C. § 77k(a) (negating liability if "it is proved that at the time of such acquisition [the purchaser] knew of such untruth or omission").  "[K]nowledge of a misstatement or omission is 'sufficient to defeat a [Section] 11 . . . claim; defendants need not demonstrate plaintiffs' actual knowledge of the truth.'"  *In re Am. Int'l Group, Inc. Sec. Litig.*, 265 F.R.D.

157, 166 (S.D.N.Y. 2010) (quoting *In re Livent, Inc. Noteholders Sec. Litig.* 151 F. Supp. 2d 371, at 441 (S.D.N.Y. 2011)).  Constructive knowledge is sufficient.  *See Feit* v. *Leasco Data Processing Equip. Corp.*, 332 F. Supp. 544, 575 (E.D.N.Y. 1971) (recovery not allowed under Section 11 if plaintiff "knew *or had available*" information that would have revealed the defect in the registration statement (emphasis added)).

        The Second Circuit's *IPO* decision is dispositive and compels denial of plaintiffs' motion for class certification.  In *IPO*, plaintiffs alleged that the registration statements for numerous IPOs failed to disclose material compensation and share allocation arrangements between issuers and their underwriters, in violation of Section 11.  *See IPO*, 471 F.3d at 28.  The Second Circuit held individual issues predominated over common questions as a matter of law:

> The Plaintiffs' allegations, evidence, and discovery responses demonstrate that the predominance requirement is defeated because common questions of knowledge do not predominate over individual questions.  The claim that lack of knowledge is common to the class is thoroughly undermined by the Plaintiffs' own allegations as to how widespread was knowledge of the alleged scheme. . . .  Moreover, [even] the exclusion of full participants from the class does nothing to lessen the broad extent of knowledge of the scheme throughout the community of market participants and watchers, and it is this widespread knowledge that would precipitate individual inquiries as to the knowledge of each member of the class . . . .

*Id.* at 43–44.  In a recent decision applying *IPO*, Judge Baer denied class certification based on plaintiffs' failure to establish predominance in a Section 11 case where "defendant show[ed] that broad knowledge of the alleged wrongful conduct existed 'throughout the community of market participants.'"  *N.J. Carpenters Heath Fund* v. *Residential Capital, LLC*, 272 F.R.D. 160, 168 (S.D.N.Y. 2010), *lv. to appeal granted*, No. 11-382-mv (2d Cir. Apr. 28, 2011) (quoting *IPO*, 471 F.3d at 44).  In *N.J. Carpenters*, Judge Baer found that:

> putative class members [had] different levels of knowledge because they purchased the . . . [securities] at different times, and thus had the benefit of different levels of information about the lending practices relevant to investment in mortgage backed securities. . . .  [D]ifferent levels of knowledge can be imputed to investors who purchased at different times because throughout the relevant period more and more information became publicly available, including reports from government actions or investigations, analysts reports, news items and raw data.  This information cast increasing levels of doubt on, whether the loans comprising mortgage backed securities were originated in conformity with appropriate guidelines and risk analyses.

*Id.* at 169–70.  The court concluded that "[t]he fact that putative class members purchased securities at different dates relative to different disclosure events . . . demonstrates that the proposed class would include investors with different levels of knowledge, and that such individual issues predominate."  *Id.* at 170.

      In this case, as in *IPO*, plaintiffs' own allegations conclusively establish that individual issues of knowledge predominate over common questions.  Section IV.A.3 of the Amended Complaint, entitled "Citigroup Shocks the Market by Disclosing Its Exposure to Subprime-Backed CDOs," is rife with allegations that Citigroup's fall 2007 disclosures about its subprime and CDO exposures gave rise to Section 11 liability with respect to those securities purchased prior to those disclosures, raising questions of individual knowledge with respect to any plaintiffs who purchased *after* these disclosures.[20]  The Amended Complaint also alleges that regulatory actions were initiated in the fall of 2007 and that several top executives resigned or were removed as a result.[21]

      Moreover, although plaintiffs have alleged in the Amended Complaint that Citigroup did not make true "corrective disclosures" until November 2008, two of the plaintiffs commenced putative class actions relating to these securities on September 30 and October 28, 2008, respectively—*before* the alleged corrective disclosures were made.  (*See Louisiana Sheriffs Pension & Relief Fund* v. *Citigroup Inc.*, No. 08 Civ. 9522 (SHS) (S.D.N.Y.); *Minneapolis Firefighters' Relief Ass'n* v. *Rosen*, No. 08 Civ. 10353 (SHS) (S.D.N.Y.).)  The fact that these actions were commenced prior to the alleged corrective disclosures necessarily

---

[20]  *See, e.g.*, ¶ 174 ("[O]n October 15, 2007, during the Company's conference call to discuss its third quarter results, Defendant Crittenden stated that the Company had *reduced* its direct exposure to subprime securities . . . . Just three weeks later, investors learned that Citigroup's CDO exposure was multiples higher.") (emphasis added); ¶ 185 ("On January 15, 2008, the Company announced that its CDO exposure was actually materially higher than had been disclosed in November 2007.  On that day, Citigroup issued a press release announcing its results for the fourth quarter of 2007, which were among the worst in the Company's history, disclosing that the Company possessed an additional $10.5 billion in exposure to subprime-backed CDOs.").

[21]  *See* ¶ 175 ("On November 1, 2007, Citigroup fired two of its senior-most CDO executives: Michael Raynes, Citigroup's head of structured credit, and Nestor Dominguez, Citigroup's co-head of CDOs.  On November 2, 2007 it was reported that: (1) the SEC was investigating Citigroup's accounting; Citigroup's Board of Directors would hold an 'emergency' meeting during November 3–4, 2007 weekend; and (2) Defendant Prince would resign.").

"precipitate[s] individual inquiries as to the knowledge of each member of the class." *See IPO*, 471 F.3d at 44. Neither of the original complaints specifies when plaintiffs (or any putative class member) became aware of the purported misstatements or omissions, and neither complaint was immediately preceded by any alleged "corrective disclosure." That plaintiffs now allege they did not learn the *truth* until late November 2008 is immaterial to the knowledge defense, since defendants need only prove knowledge—or constructive knowledge—of an alleged misstatement or omission to negate liability, not actual knowledge of the truth. *See In re AIG*, 265 F.R.D. at 166; *In re Livent*, 151 F. Supp. 2d at 441.

Underscoring the need for individualized proof of knowledge, as in *N.J. Carpenters*, plaintiffs' own pleadings demonstrate that this case involves many interim disclosures over time, both specifically relating to Citigroup and to subprime and CDO risks more generally. (*See, e.g.*, ¶¶ 174–87; *see also* ¶ 202 (alleging that news reports regarding Citigroup's plans to participate in the creation of a 'super SIV' to alleviate balance sheet pressures "raised questions about Citigroup's financial condition and accounting").) It is significant, in this regard, that "many putative class members are sophisticated investors with significant experience in asset-backed securities markets." *N.J. Carpenters*, 272 F.R.D. at 169. Each of the proposed class representatives is either an institutional investor or a high-net worth individual. The institutional investors are each represented by at least one, and, in some cases, several, sophisticated investment advisors, including Wellington Management Company ("Wellington"), FAF Advisors, Columbia Management Investment Advisors, and Mairs & Powers, among others.





The focus on analyst reports is particularly significant.  Analysts during the fall of 2007 were intensely interested in subprime and related exposures, both for Citigroup and other financial sector institutions.  As Citigroup was disclosing subprime and CDO exposures in the fall of 2007, many analysts forecasted larger future write-downs than the Company itself expected.  For instance:

- Morgan Stanley released research reports on November 5 and November 26, 2007, which predicted "further potential CDO write-downs" for Citigroup in the "near term."  (Exs. 32 at 2; 33 at 1.)

- Deutsche Bank wrote on November 4, 2007 that, "[f]or Citi, there is a period of 'CDO watch,' whereby investors must monitor CDO activity and prices to see if new billion-plus charges might be forthcoming, esp. given likely new CDO downgrades that caused the new write-down."  (Ex. 34 at 1.)

- Deutsche Bank again wrote on November 27, 2007 that "[w]e also expect additional CDO write-downs above that forecast for 4Q07."  (Ex. 35 at 1.)

- On November 27, 2007, CIBC reiterated an underperformance rating on Citigroup and wrote: "We continue to believe we are only in the early stages of [Citigroup's] capital pressures. CDO write-downs are 'first inning' issues, but we believe losses associated with [Citigroup's] high LTV mortgage exposures will mount at an alarming rate over the next several quarters."  (Ex. 36 at 1.)

In addition to these analyst reports, Moody's downgraded a variety of Citigroup's securities on November 5, 2007, and again on December 13, 2007, in response to subprime-related disclosures by the Company.  On November 5, 2007, Moody's explained that the downgrades were caused by "the additional uncertainties that Citigroup faces, beyond those of

the CDO portfolio, includ[ing] (A) a sizable leveraged-loan exposure, [and] (B) a meaningful direct exposure to non-prime US mortgage loans . . . ."  (Ex. 37 at 1.)  Similarly, on December 13, 2007, Moody's wrote that "[t]he downgrade was prompted by Moody's view that Citigroup's capital ratios will remain low . . . management will need to take sizable write-downs against its sub-prime RMBS and CDO portfolio.  The bank is also expected to make significant sustained provisions against its residential mortgage book."  (Ex. 38 at 1.)

Even purchases by class members prior to Citigroup's fall 2007 disclosures will require individualized proof of knowledge.  Before the subprime crisis, it was generally known—as plaintiffs themselves allege—that Citigroup "was one of the country's largest originators and sellers of CDO securities."  (¶ 155.)  It was known throughout the industry that underwriters typically retained substantial portions of "super senior" tranches of the CDOs they underwrite.  (Ex. 39 at 1.)  This, too, precipitates a need for individualized inquiries into investor knowledge that is not amenable to generalized proof, defeating class certification.

### B.    Causation and Damages Issues Will Require Individualized Proof

Damages and causation issues will predominate over individual issues, rendering class certification inappropriate, in two respects.

#### 1.    Buy-and-Hold Claimants Have Suffered No Damages

The damages formula under Section 11 permits plaintiffs

to recover . . . difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages [as calculated under subsection (1)] above.

*McMahan & Co.* v. *Wherehouse Entm't, Inc.*, 65 F.3d 1044, 1047–48 (2d Cir. 1995) (quoting 15 U.S.C. § 77k(e)).  The "value" of the security at the time suit was brought may differ from the "price" of the security, because "under certain circumstances, the market price may not adequately reflect the security's value."  *Id.* at 1048–49.  Although "instances where the market

price of a security will be different from its value are unusual and rare situations" *id.* at 1049 (internal quotations omitted), this is one such instance: at the time this lawsuit was brought, the markets were stricken by a financial crisis of historic dimension, negatively and irrationally impacting the market price not just of the Citigroup securities at issue here, but of all securities issued by financial institutions generally. Moreover, there is no evidence that any of the securities at issue here traded in efficient markets at that time, casting further doubt on the correlation between "price" and "value" during 2008.

This action relates primarily to Citigroup debt securities. Although the bonds at issue have very different characteristics and risk profiles, they share in common the fact that *none* has defaulted and *all* coupon payments have been made in full.



This argument negating damages applies to those class members who, having purchased their bonds with the intention of holding them for lengthy periods of time, did not

abandon that strategy during the market panic of 2008 and 2009, and consequently continue to hold them. This issue is not amenable to generalized proof.

2.    <u>Negative Causation Arguments Will Differ Across the Class</u>

Although Section 11 plaintiffs are not required to prove loss causation as part of their *prima facie* case, defendants in a Section 11 case "may assert the absence of loss causation as an affirmative defense . . . by proving the allegedly misleading representations did not cause the depreciation in the [security's] value." *In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 418 (S.D.N.Y. 2009). This "negative causation" defense allows proof that losses suffered by plaintiffs are due to, among other things, general market decline, rather than defendants' conduct, *see McMahan*, 65 F.3d at 1048; *see also* 15 U.S.C. § 77k(e) ("[I]f the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from [the] part of the registration statement . . . [that contains the material misstatement or omission], such portion of or all such damages shall not be recoverable"), and "precludes recovery for price declines that are not the result of an alleged misrepresentation." *Blackmoss Invs. Inc.* v. *ACA Capital Holdings, Inc.*, No. 07 Civ. 10528, 2010 WL 148617, at *11 (S.D.N.Y. Jan. 14, 2010). The negative causation defense goes directly to liability, and not merely damages. *See In re State Street Bank & Trust Co. Fixed Income Funds Inv. Litig.*, No. 08 Civ. 8235 (RJH), 2011 WL 1206070, at *3 (S.D.N.Y. Mar. 31, 2011).

Virtually all of the securities at issue began trading below par over the summer of 2008, and continued trending downward through the fall of 2008. That was a time of extraordinary volatility in the market—particularly the market for financial institution securities. Any putative class member who sold at a loss during that period thus will be subject to a unique negative causation defense that cannot be litigated on a class-wide basis.

## C.  Reliance Issues Will Require Individualized Proof

Because plaintiffs seek to certify a broad, temporally unlimited class, issues of reliance also will need to be litigated on an individualized basis. Although Section 11 plaintiffs

43

generally are presumed to have relied on an allegedly faulty registration statement, an exception to this presumption exists where the purchaser "acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement . . . ." 15 U.S.C. 77k(a).  If a qualifying earning statement has been made available, then the purchaser must prove that she relied upon the earlier, allegedly defective registration statement.  *Id.*

   Here, for example, Citigroup filed its second quarter 10-Q for 2007 on August 3, 2007.  Cumulatively, this 10-Q and Citigroup's three previous quarterly filings contained a statement of income for more than 12 months following the March 2 Shelf.  *See* 17 C.F.R. § 230.158(a) (noting that certain information required in a company's 10-Q and 10-K is an "earning statement" within the meaning of the statute, and that such information may be contained in any combination of these filings).  Thus, any purchasers of Citigroup securities registered pursuant to the March 2 Shelf who bought after August 3, 2007 would be required to demonstrate reliance.[22]  Such purchasers cannot satisfy their burden with generalized proof, as there are no allegations (much less proof) that the securities traded in an efficient market.  Thus, plaintiffs here will not be entitled to any generalized presumption of reliance.  *See Basic, Inc.* v. *Levinson*, 485 U.S. 224 (1988).

   **D.**  **Statute of Limitations**

   Section 11 claims are subject to a one-year statute of limitations period that "begins to run upon the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  The Second Circuit recently clarified the quantum of information that would constitute discovery:  a "reasonably diligent plaintiff" is deemed to have "'discovered' one of the facts constituting a securities fraud violation" when "he can plead that fact with sufficient detail and particularity to survive a

---

[22] Whether the "effective date of the registration statement," for these purposes, is considered the shelf registration or the particular offering, individual issues nevertheless will predominate over common issues, because Citigroup made available a number of qualifying earning statements more than a year into the class period.

12(b)(6) motion to dismiss." *City of Pontiac Gen. Employees' Ret. Sys.* v. *MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011). Because Securities Act plaintiffs are not required to establish scienter, "[d]etermining when the plaintiff should have uncovered an untrue assertion in a registration statement or prospectus is *much simpler* than assessing when a plaintiff should have learned that the defendant deliberately misled him using a deceptive device covered by [Section] 10(b)." *Merck & Co., Inc.* v. *Reynolds*, 130 S. Ct. 1784, 1801 (2010) (Scalia, J., concurring) (emphasis added). All a court needs to find is that a putative class member had discovered or should have discovered facts sufficient to satisfy notice pleading standards, *i.e.*, facts suggesting "the probability of an earlier 'untrue statement' or 'omission.'" *In re Novagold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 288 (S.D.N.Y. 2009).

Plaintiffs' allegations in this case give rise to potential statute of limitations defenses as to any purchasers of securities prior to September 30, 2007. The Amended Complaint alleges: "Despite the market's focus on the risks of subprime-backed CDOs, [Citigroup] did not disclose that it had retained *any* direct subprime CDO exposure at all until July 20, 2007. . . . Specifically, on a July 20, 2007 conference call, Defendant Crittenden, the Company's CFO, stated that the Company's total on-balance sheet subprime exposure in its Securities and Banking division was $13 billion as of the second quarter of 2007, which had been materially *reduced* from $24 billion at the end of 2006 (*a figure never before disclosed*)." (¶ 166 (emphases added).) In light of these allegations, individualized inquiries regarding the timeliness of certain class members' claims and notice will be required.

## IV.   SEVERAL PROPOSED CLASS REPRESENTATIVES DO NOT MEET THE RULE 23(a)(4) ADEQUACY REQUIREMENT

Rule 23 requires that the proposed class representatives "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "[C]lass certification may properly be denied where the class representatives ha[ve] so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the

possibly competing interests of the attorneys." *Maywalt* v. *Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077–78 (2d Cir.1995) (internal quotations omitted).



- Three of the proposed class representatives—James Brown, Phillip Ruffin, and Arkansas Teacher—have been "put forward" by plaintiffs' counsel as new proposed representatives. These three individuals have not filed their own actions, have not sought to join formally this lawsuit by amending the complaint or by motion to intervene, and have not satisfied the certification requirement for representative parties under the PSLRA.

For these reasons, Arkansas Teacher, Miami Beach, Phillip Ruffin, James Brown, and City of Philadelphia are not adequate class representatives of any putative class.

## V.    A CLASS ACTION IS NOT A SUPERIOR MEANS OF ADJUDICATION

To obtain class certification under Rule 23(b)(3), plaintiffs must establish that a class action is a superior method for adjudicating the controversy.  Courts typically consider the following nonexclusive factors:  "(1) the interest of the class members in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation already commenced by or against class members; (3) the desirability of concentrating the litigation in a particular forum; and (4) difficulties likely to be encountered in the management of a class action." *N.J. Carpenters*, 272 F.R.D. at 170; Fed. R. Civ. P. 23(b)(3).

For all of the reasons that individual issues predominate, and that commonality and typicality are not satisfied, the class proposed by plaintiffs is unmanageable and would result in a morass of mini-trials.  Plaintiffs have put forward no trial plan to address these complexities in a manner consistent with Rule 23 and defendants' right to due process.  *See* 2003 Advisory Comm. Notes to Rule 23 (courts increasingly "require a party requesting class certification to present a 'trial plan' that describes the issues likely to be presented at trial and tests whether they are susceptible of class-wide proof.").  Plaintiffs' motion entirely ignores these issues.

A class action also is not a superior method for adjudicating this controversy because plaintiffs have made no showing that they seek to represent a class of people who have suffered any actual harm.  The paradigmatic case in which a securities class action is a superior method of adjudication is where a large number of claimants each have suffered small damages, such that none has an individual incentive to sue.  *E.g.*, *Katz* v. *Image Innovations Holdings, Inc.*, No. 06 Civ. 3707 (JGK), 2010 WL 2926196 (S.D.N.Y. July 22, 2010).  This case hardly fits that paradigm because the securities at issue, for the most part, are bonds on which there have been no defaults, and all coupons have been paid.  Citigroup is indisputably solvent, and virtually all of the bonds now trade at a premium to par.

The only class members who have actual losses are those who sold amid the market turbulence and dramatic decline in the prices of securities issued by financial institutions in late 2008 through early 2009.  Given the depressed market conditions at that time, and the manifest risk that the U.S. banking system would collapse, those class members may have sold at considerable losses.  (As to those class members, Citigroup has compelling negative causation defenses, *see* p. 43, *supra*.)  Thus, plaintiffs with actual losses would be highly motivated to pursue individual claims, whereas all other class members stand only to reap a windfall.  *See N.J. Carpenters*, 272 F.R.D. at 170 (superiority not met where "the proposed class consists of large, institutional and sophisticated investors with the financial resources and incentive to pursue their own claims"); *see also Ansari* v. *N.Y. Univ.*, 179 F.R.D. 112, 116 (S.D.N.Y. 1998) (class action

not superior because potential recovery of $90,000 is sufficient incentive for individual class members to file individual suits).  Indeed, several institutional investors already have commenced separate individual lawsuits relating to the securities at issue in this case.[23]  *Kottler* v. *Deutsche Bank AG*, No. 05 Civ. 7773 (PAC), 2010 WL 1221809, at *5 (S.D.N.Y. Mar. 29, 2010) (class action not superior where class included high net-worth individuals, many of whom had "already brought individual lawsuits").

Accordingly, this is not a case where a class action is superior to other forms of adjudication.  To the contrary, it would be grossly unfair to threaten Citigroup with the spectre of a gigantic exposure by certifying a massive class of investors, the vast majority of whom have no damages.  Courts in this Circuit (and elsewhere) have noted the coercive power of class certification, because of the hydraulic settlement pressure that can result irrespective of the actual merits of a case.  *See Hevesi* v. *Citigroup Inc.*, 366 F.3d 70, 80 (2d Cir. 2004) ("Moreover, numerous courts and scholars have warned that settlements in large class actions can be divorced from the parties' underlying legal positions."); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir. 2008) ("[D]enying or granting class certification is often the defining moment in class actions (for it may sound the 'death knell' of the litigation on the part of plaintiffs, or create unwarranted pressure to settle nonmeritorious claims on the part of defendants).").[24]

---

[23]   *See Pa. Pub. Sch. Employees' Ret. Sys., et al.* v. *Citigroup Inc., et al.*, No. 11 Civ. 2583 (E.D. Pa. 2011); *Universal-Investment Gesellschaft MBH, et al.* v. *Citigroup Inc., et al.*, No. 11 Civ. 0314 (SHS) (S.D.N.Y. 2011); *Swiss & Global Asset Mgmt. AG, et al.* v. *Citigroup Inc., et al.*, No. 10 Civ. 9325 (SHS) (S.D.N.Y. 2010); *Norges Bank* v. *Citigroup Inc., et al.*, No. 10 Civ. 7202 (SHS) (S.D.N.Y. 2010); *Int'l Fund Mgmt S.A., et al.* v. *Citigroup Inc., et al.*, No. 09 Civ. 8755 (SHS) (S.D.N.Y. 2009).

[24]   *CE Design Ltd.* v. *King Architectural Metals, Inc.*, No. 10-8050, 2011 WL 938900, at *1 (7th Cir. Mar. 18, 2011) ("Certification as a class action can coerce a defendant into settling on highly disadvantageous terms regardless of the merits of the suit."); *Regents of Univ. of Cal.* v. *Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 379 (5th Cir. 2007) ("As we have recognized, class certification may be the backbreaking decision that places 'insurmountable pressure' on a defendant to settle, even where the defendant has a good chance of succeeding on the merits.").

48

The "potential for unwarranted settlement pressure" is a factor to weigh in the "certification calculus." *In re Hydrogen Peroxide*, 552 F.3d at 310. Because plaintiffs have made no showing that the class of would-be claimants has suffered widespread losses, that factor weighs heavily against certification here.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that plaintiffs' motion for class certification be denied.

Date:   New York, New York
        May 13, 2011

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

Brad S. Karp (bkarp@paulweiss.com)
Richard A. Rosen (rrosen@paulweiss.com)
Charles E. Davidow (cdavidow@paulweiss.com)
Susanna M. Buergel (sbuergel@paulweiss.com)

1285 Avenue of the Americas
New York, New York 10019-6064
Tel. (212) 373-3000

*Attorneys for Defendants Citigroup Inc., Citigroup Funding Inc., Citigroup Capital XIV, Citigroup Capital XV, Citigroup Capital XVI, Citigroup Capital XVII, Citigroup Capital XVIII, Citigroup Capital XIX, Citigroup Capital XX, Citigroup Capital XXI, C. Michael Armstrong, Alain J.P. Belda, Sir Winfried Bischoff, Michael Conway, Gary Crittenden, George David, Kenneth T. Derr, John M. Deutch, Scott Freidenrich, James Garnett, John C. Gerspach, Ann Dibble Jordan, Klaus Kleinfeld, Sallie L. Krawcheck, Andrew N. Liveris, Dudley C. Mecum, Anne Mulcahy, Vikram Pandit, Richard D. Parsons, Charles Prince, Roberto Hernández Ramirez, Judith Rodin, Saul Rosen, Robert E. Rubin, Robert L. Ryan, Franklin A. Thomas, Eric L. Wentzel, and David Winkler*

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

Jay B. Kasner
(jay.kasner@skadden.com)
George A. Zimmerman
(george.zimmerman@skadden.com)

Four Times Square
New York, New York  10036
Tel. (212) 735-3000

*Attorneys for the Underwriter Defendants*

50