**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE CITIGROUP INC. BOND LITIGATION

Master File No. 08 Civ. 9522 (SHS)

ECF Case

---

### MEMORANDUM OF LAW IN SUPPORT OF BOND COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**
Max W. Berger
Steven B. Singer
John C. Browne
John Rizio-Hamilton
1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 554-1400
Fax: (212) 554-1444

*Attorneys for Bond Plaintiffs and*
*Court-appointed Bond Counsel*

Additional counsel listed on signature block

Dated:  June 7, 2013

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES……………………………………………………………..iii

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT ...............................................................................................................7

I.  PLAINTIFFS' COUNSEL ARE ENTITLED TO AN AWARD OF
    ATTORNEYS' FEES FROM THE COMMON FUND.......................................7

II. THE REQUESTED ATTORNEYS' FEES ARE REASONABLE UNDER
    EITHER THE PERCENTAGE-OF-THE-FUND METHOD OR THE
    LODESTAR METHOD.......................................................................................8

    A.  The Requested Attorneys' Fees Are Reasonable Under the Percentage-of-
        the-Fund Method.......................................................................................8

    B.  The Requested Attorneys' Fees Are Reasonable Under the Lodestar
        Method ...................................................................................................10

III. OTHER FACTORS CONSIDERED BY COURTS IN THE SECOND CIRCUIT
     CONFIRM THAT THE REQUESTED FEE IS FAIR AND REASONABLE................13

    A.  The Time and Labor Expended By Counsel Support the Requested Fee.............13

    B.  The Risks of Litigation Support the Requested Fee ...............................17

    C.  The Magnitude and Complexity of the Action Support the Requested Fee .........22

    D.  The Quality of Bond Counsel's  Representation Supports the Requested
        Fee.........................................................................................................22

    E.  The Requested Fee in Relation to the Settlement ...................................24

    F.  Public Policy Considerations Support the Requested Fee ......................24

    G.  The Requested Fee Has Been Approved by Bond Plaintiffs ...............................25

    H.  The Reaction of the Bond Class to Date Supports the Requested Fee .................25

IV. THE EXPENSES INCURRED ARE REASONABLE AND WERE
    NECESSARY TO ACHIEVE THE BENEFIT OBTAINED...........................................26

V.  BOND PLAINTIFFS SHOULD BE AWARDED THEIR REASONABLE
    COSTS AND EXPENSES UNDER 15 U.S.C. § 78u-4(a)(4).........................................27

CONCLUSION.................................................................................28

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
    No. 03 MDL 1529 LMM, 2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006) (McKenna,
    J.), *aff'd*, 272 Fed. Appx. 9 (2d Cir. 2008) ...................................................9, 12, 23

*In re Am. Bank Note Holographics Inc. Sec. Litig.*,
    127 F. Supp. 2d 418 (S.D.N.Y. 2001) ........................................................17, 18, 19

*In re Bank of America Corp. Sec., Derivatives & ERISA Litig.*,
    Master File No. 09 MDL 2058 (PKC), slip op. (S.D.N.Y. Apr. 8, 2013) ..............................27

*In re BankAmerica Corp. Sec. Litig.*,
    228 F. Supp. 2d 1061 (E.D. Mo. 2002) ................................................................10, 12

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ....................................................................................................24

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
    472 U.S. 299 (1985) ...............................................................................................8, 24

*Blum v. Stenson*,
    465 U.S. 886 (1984) ........................................................................................................8

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980) ........................................................................................................7

*In re Cardinal Health, Inc. Sec. Litig.*,
    528 F. Supp. 2d 752 (S.D. Ohio 2007) .............................................................9, 12

*Carlson v. Xerox Corp.*,
    596 F. Supp. 2d 400 (D. Conn. 2009) .........................................................................12

*In re Citigroup, Inc., Sec. Litig.*,
    No. 07 Civ. 9901 (SHS) (S.D.N.Y.) ...................................................................4, 11

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974) ........................................................................................17

*In re Comverse Tech., Inc. Sec. Litig.*,
    No. 06-CV-1825 (NGG), 2010 WL 2653354 (E.D.N.Y. June 24, 2010) ..................................9

*In re Countrywide Fin. Corp. Sec. Litig.*,
No-07-0529, slip op. (C.D. Cal. Mar. 4, 2011)......................................................12

*In re DaimlerChrysler AG Sec. Litig.*,
Master File No. 00-0993 (KAJ), slip op. (D. Del. Feb. 5, 2004).......................10, 12

*In re Deutsche Telekom AG Sec. Litig.*,
Civil Action No. 00-CV-9475 (NRB), 2005 U.S. Dist. LEXIS 45798 (S.D.N.Y. June
9, 2005) ....................................................................................................................11

*Fait v. Regions Financial Corp.*,
655 F.3d 105 (2d Cir. 2011) ...........................................................................5, 16, 19

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.*,
No. 02-CV-3400 (CM) (PED), 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010).........7, 11, 24, 26

*Fogarazzo v. Lehman Bros., Inc.*,
No. 03-cv-5194 (SAS), 2011 WL 671745 (S.D.N.Y. Feb. 23, 2011) ........................9

*In re Gen. Elec. Co. Sec. Litig.*,
856 F. Supp. 2d 645 (S.D.N.Y. 2012).......................................................................5

*In re Gilat Satellite Networks, Ltd.*,
No. CV-02-1510 (CPS)(SMG), 2007 WL 2743675
(E.D.N.Y. Sept. 18, 2007)........................................................................................28

*In re Global Crossing Sec. & ERISA Litig.*,
225 F.R.D. 436 (S.D.N.Y. 2004) ........................................................................10, 25

*In re Global Crossing Sec. & ERISA Litig.*,
No. 02 Civ. 910 (GEL), 2005 WL 1668532 (S.D.N.Y. July 12, 2005) ...................10

*In re Global Crossing Sec. & ERISA Litig.*,
No. 02 Civ. 910 (GEL), slip op (S.D.N.Y. Nov. 4, 2005) .......................................10

*In re Global Crossing Sec. & ERISA Litig.*,
No. 02 Civ. 910 (GEL), slip op (S.D.N.Y. Oct. 1, 2007) ........................................10

*In re Global Crossing Sec. & ERISA Litig.*,
No. 02 Civ. 910 (GEL), slip op (S.D.N.Y. Oct. 30, 2006) ......................................10

*Goldberger v. Integrated Res., Inc.*,
209 F.3d 43 (2d Cir. 2000)............................................................................... passim

*In re HealthSouth Corp. Stockholder Litig.*,
No. 03-cv-1500, slip op. at 2 (N.D. Ala. Feb. 12, 2008) ...........................................9

iv

*In re HealthSouth Corp. Stockholder Litig.*,
   No. 03-cv-1500, slip op. at 2 (N.D. Ala. July 26, 2010)......................................................9

*In re HealthSouth Corp. Stockholder Litig.*,
   No. 03-cv-1500 (N.D. Ala.)......................................................................................9

*Hicks v. Morgan Stanley*,
   No. 01 Civ. 10071 (RJH), 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005)......................8, 24, 27

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*,02
   Civ. 5575 (SWK), 2006 U.S. Dist. LEXIS 17588 (S.D.N.Y. Apr. 6, 2006) ..........................22

*In re Rite Aid Corp. Sec. Litig.*,
   146 F. Supp. 2d 706 (E.D. Pa. 2001) ......................................................................10, 12

*In re Initial Pub. Offering Sec. Litig.*,
   671 F. Supp. 2d 467 (S.D.N.Y. 2009) ........................................................................9, 12

*Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.*,
   540 F.2d 102 (3d Cir. 1976).......................................................................................11

*Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.*,
   487 F.2d 161 (3d Cir. 1973).......................................................................................11

*In re Lucent Tech., Inc., Sec. Litig.*,
   327 F. Supp. 2d 426 (D.N.J. 2004) ..............................................................................10

*Maley v. Del Global Techs. Corp.*,
   186 F. Supp. 2d 358 (S.D.N.Y. 2002).......................................................................11, 24

*In re Marsh & McLennan Cos. Sec. Litig.*,
   No. 04 Civ. 8144 (CM), 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009)..........................22, 28

*In re Marsh ERISA Litig.*,
   265 F.R.D. 128 (S.D.N.Y. 2010) ................................................................................22

*Missouri v. Jenkins*,
   491 U.S. 274 (1989)................................................................................................11

*In re NASDAQ Market-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) ................................................................................12

*Ohio Pub. Employees Ret. Sys. v. Freddie Mac*,
   No. 03-CV-4261, 2006 U.S. Dist. LEXIS 98380 (S.D.N.Y. Oct. 26, 2006) ..........................9

*In re Oxford Health Plans, Inc. Sec. Litig.*,
   MDL No. 1222, 2003 U.S. Dist. LEXIS 26795 (S.D.N.Y. June 12, 2003)............................10

*In re Rite Aid Corp. Sec. Litig.*,
   362 F. Supp. 2d 587 (E.D. Pa. 2005) .......................................................................10, 12

*Savoie v. Merchs. Bank*,
   166 F.3d 456 (2d Cir. 1999) ..........................................................................................8

*Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*,
   No. 01-CV-11814 (MP), 2004 WL 1087261 (S.D.N.Y. May 14, 2004) ..........................17, 24

*In re Telik, Inc. Sec. Litig.*,
   576 F. Supp. 2d 570 (S.D.N.Y. 2008) ...........................................................................11, 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ....................................................................................................8, 24

*In re UnitedHealth Group Inc. PSLRA Litig.*,
   643 F. Supp. 2d 1094 (D. Minn. 2009) .........................................................................12

*In re Veeco Instruments Inc. Sec. Litig.*,
   No. 05 MDL 01695 (CM), 2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) ....................8, 11, 23

*In re Wachovia Preferred Sec. & Bond/Notes Litig.*,
   No. 09 Civ. 6351 (RJS), 2012 WL 2589230 (S.D.N.Y. Jan. 3, 2012) ..............................12

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005) ...........................................................................................8, 9, 11

*In re Williams Sec. Litig.*,
   No. 02-cv-72-SPF, slip op. (N.D. Okla. Feb. 12, 2007) ...................................................10

*In re WorldCom, Inc. Sec. Litig.*,
   388 F. Supp. 2d 319 (S.D.N.Y. 2005) ...........................................................................23, 25

**STATUTES**

15 U.S.C. § 77k(e) ...........................................................................................................20, 21

15 U.S.C. § 77Z-1(A)(4) ...................................................................................................27

**RULES**

Fed. R. Civ. P. 12(c) .........................................................................................................16

Fed. R. Civ. P. 23 .............................................................................................................15

Fed. R. Civ. P. 23(h) .........................................................................................................1, 4

vi

Court-appointed Bond Counsel, Bernstein Litowitz Berger & Grossmann LLP ("BLBG" or "Bond Counsel"), having achieved a Settlement providing for a recovery of $730 million in cash for the benefit of the Bond Class, respectfully submits this memorandum of law in support of its motion pursuant to Fed. R. Civ. P. 23(h), on behalf of Bond Plaintiffs' Counsel, for an award of attorneys' fees in the amount of 20% of the Settlement Fund, or $146,000,000, plus interest.[1]  Bond Counsel also seeks reimbursement of: (i) $7,286,868.15 in litigation expenses incurred in prosecuting the Bond Action, and (ii) awards in the amount of $39,946.95 pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") for costs and expenses incurred by certain Bond Plaintiffs directly related to their representation of the Bond Class.

## PRELIMINARY STATEMENT

The settlement of the Bond Action for $730 million in cash is an outstanding result for the Bond Class.  If approved, the Settlement would be the second largest recovery in a securities class action brought on behalf of purchasers of debt securities, one of the three largest recoveries in a case that does not involve a financial restatement, and among the fifteen largest securities class action recoveries in history.  In addition, as discussed in more detail below, the Settlement Amount represents a substantial percentage of the Bond Class's likely recoverable damages, as calculated by Bond Plaintiffs' damages expert.  Bond Counsel respectfully submits that this exceptional result was achieved through the skill, tenacity and effective advocacy of Bond Plaintiffs' Counsel, who

---

[1] Bond Plaintiffs are simultaneously submitting the Declaration of Steven B. Singer in Support of: (I) Bond Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation and (II) Bond Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Singer Declaration" or "Singer Decl.").  The designation "¶" or "¶¶" refers to paragraphs in the Singer Declaration. The Court is respectfully referred to the Singer Declaration for a detailed description of the history of the Bond Action; the nature of the claims asserted; the negotiations leading to the Settlement; the risks and uncertainties of continued litigation; and a description of the services Bond Plaintiffs' Counsel provided for the benefit of the Bond Class.  Unless otherwise noted, capitalized terms have the meanings set out in the Singer Declaration and in the Stipulation and Agreement of Settlement dated March 18, 2013 (the "Stipulation" (ECF No. 153-1).  As used herein, "Bond Plaintiffs' Counsel" refers to Bond Counsel and all attorneys who did work at Bond Counsel's direction.

litigated this case for more than four-and-one-half years on an entirely contingent basis against some of the most well-respected law firms in the country.

As set forth more fully in the Singer Declaration, the Bond Action was an extremely large, complex, and challenging case. ¶¶35-102; *see also* Section III.C, *infra*. It involved alleged misstatements made in connection with 48 separate Offerings and 39 distinct securities issued over a two-and-one-half year period, from May 2006 through the end of 2008, which is considered one of the most volatile periods in the history of the financial markets. ¶¶4, 16, 100, 111, 132-134. Bond Plaintiffs alleged that Defendants made misrepresentations and omissions concerning a multitude of topics, including: (i) Citigroup's exposure to subprime-related collateralized debt obligations ("CDOs"); (ii) the value of Citigroup's CDO assets; (iii) the value and credit quality of special purpose entities known as structured investment vehicles ("SIVs"); (iv) understatements of Citigroup's loan loss reserves for its $200 billion mortgage portfolio; (v) violations of Generally Accepted Accounting Principles ("GAAP"); and (vi) misstatements of Citigroup's capital adequacy. *E.g.,* ¶¶16-26. In essence, Bond Plaintiffs alleged that Citigroup misstated the value of its CDOs and SIVs, and understated its loan loss reserves, by tens of billions of dollars at each reporting period from year-end 2006 through November 23, 2008, and that these massive losses had so decimated the capital of one of the world's largest banks that it was no longer "well capitalized" under federal regulations.

Significantly, the vast majority of the claims asserted in the Bond Action, including claims relating to loan loss reserves, capital adequacy, violations of GAAP, SIV valuation, and CDO valuation for much of the Offerings Period, were not the subject of any other private or regulatory action against Citigroup. Accordingly, Bond Counsel was required to independently develop the evidence necessary to support these claims and to overcome Defendants' asserted defenses. ¶¶39, 42-47. This was an enormous undertaking given the many complicated issues involved. As set

forth more fully in the Singer Declaration, Bond Counsel's efforts on behalf of the Bond Class began in September and October 2008, when Bond Counsel filed two separate class action complaints in New York State Court asserting Securities Act claims on behalf of investors in Citigroup's bonds and preferred stock. These complaints were filed shortly before the statute of limitations on certain of these claims was set to expire, and thus Bond Counsel's actions preserved these claims for the benefit of all Bond Class members. ¶¶4, 9-11. Following the removal of these actions to federal court and their consolidation into this Action, Bond Plaintiffs' Counsel drafted and filed a detailed consolidated amended complaint and successfully opposed Defendants' motions to dismiss and related motion for reconsideration, which collectively involved hundreds of pages of briefing and several hundred pages of supporting exhibits. ¶¶27-33.

Bond Plaintiffs' Counsel then embarked on an enormous fact discovery effort. As explained in the Singer Declaration, Bond Counsel served detailed document requests and subpoenas on all 38 Defendants and 13 separate non-parties, and obtained more than 42.5 million pages of documents relating to the claims asserted in the Bond Action. ¶¶35-64. Bond Counsel also filed a motion to compel production of documents that Citigroup was withholding on the basis of a bank examination privilege, which was opposed by Citigroup, the Federal Reserve, the Office of the Comptroller of the Currency ("OCC") and the Federal Deposit Insurance Corporation ("FDIC"). ¶¶65-74. While merits discovery was ongoing, the parties were simultaneously engaged in exhaustive class certification discovery. Bond Plaintiffs produced tens of thousands of pages of documents to Defendants, and Bond Plaintiffs' Counsel defended a total of twenty-three depositions of representatives from Bond Plaintiffs and their outside investment managers. ¶¶61-64. These efforts culminated in Bond Plaintiffs filing a vigorously-contested class certification motion that was fully briefed on June 10, 2011, and involved approximately 400 pages of briefing, exhibits and supplemental letters submitted to the Court. ¶¶75-80.

Bond Plaintiffs' Counsel then began extensive deposition discovery.  From July 2011 through August 2012, counsel deposed 53 fact witnesses, including some of Citigroup's most senior current and former officers.  ¶¶87-91.  In light of the extremely complex nature of the claims asserted by Bond Plaintiffs and the complicated structure of the CDOs, SIVs and other financial instruments at issue, Bond Plaintiffs' Counsel also retained six experienced experts on subjects ranging from loan loss reserves and GAAP compliance to CDO and SIV valuation and damages. ¶¶92-102.  Bond Counsel worked closely with these experts to develop, analyze and synthesize the evidence adduced throughout the litigation, culminating in the preparation of detailed draft expert reports on numerous issues pertaining to Bond Plaintiffs' claims – an extensive effort that included drafting and serving multiple interrogatories and requests for admission on Defendants in order to obtain the detailed information necessary to support the opinions of these experts.  *Id.*  Finally, Bond Counsel engaged in protracted, arm's-length settlement discussions, including negotiations facilitated by Judge Layn Phillips, a former federal district judge in the United States District Court for the Western District of Oklahoma and an experienced and highly respected mediator, who was fully familiar with the facts relating to this case and who served as the mediator in *In re Citigroup, Inc., Securities Litigation*, No. 07 Civ. 9901 (SHS) (the "Stock Action").  ¶¶103-110.

Bond Counsel undertook these substantial efforts and achieved this outstanding result in the face of extremely significant litigation risks.  *See* ¶¶111-140; *see also* Section III.B, *infra*. Defendants asserted powerful defenses to Bond Plaintiffs' claims and there was considerable uncertainty as to whether Bond Plaintiffs would be able to establish either liability or damages.  For example, Bond Plaintiffs faced substantial challenges in establishing that Defendants made any material misstatements or omissions in the Registration Statements at issue.  As discussed below, the vast majority of Bond Plaintiffs' claims were based on alleged misstatements of opinions, and Citigroup specifically disclosed in its SEC filings that CDO and SIV valuation, loan loss reserves,

and capital adequacy concerned inherently subjective judgments that were subject to change. ¶¶116, 119, 122, 126; *see also* Section III.B., *infra*. Moreover, Citigroup did not restate its financial statements, and at all times valued its mortgage-related assets using extremely sophisticated financial models that were reviewed by numerous federal regulators such as the Federal Reserve and the OCC, and by Citigroup's independent outside auditors at KPMG, who repeatedly certified the accuracy of Citigroup's publicly reported financial statements. ¶¶45, 115, 118, 121, 123, 177, 179. Defendants further argued that when the need arose to adjust reserves or alter valuations, they readily did so, as evidenced by the fact that Citigroup increased its loan loss reserves by more than $18 billion from November 2007 through the end of 2008, and took more than $28 billion in writedowns on its CDOs during the same time period. ¶118.

The already significant risks to establishing liability present at the outset of this case were dramatically increased by the Second Circuit's opinion in *Fait v. Regions Financial Corp.*, 655 F.3d 105 (2d Cir. 2011), which was issued while discovery was proceeding. In *Fait*, the Second Circuit held that, in order to establish Section 11 liability for misstatements of "opinion," a plaintiff must prove that the defendant "misstated [its] truly held belief" – which requires proof that the defendant "engaged in a form of knowing misconduct." *In re Gen. Elec. Co. Sec. Litig.*, 856 F. Supp. 2d 645, 653 (S.D.N.Y. 2012) (Cote, J.). The Second Circuit expressly held that this standard applies to claims based on allegedly misstated loan loss reserves, and subsequent decisions in this District have held that *Fait* also applies to any statement involving a "judgment," including estimated asset valuations. Thus, in order to prevail on the overwhelming majority of their claims, Bond Plaintiffs would have had to prove at summary judgment and at trial that Defendants acted with a level of intent akin to scienter. As set forth in the Singer Declaration, Bond Plaintiffs faced significant risks that they would be unable to establish that Defendants acted with the heightened level of intent required to satisfy *Fait*. *E.g.*, ¶¶112-113, 116, 119, 122, 126.

Finally, even if Bond Plaintiffs were successful in establishing liability, they faced material risks in establishing damages in this Action. The Bond Class Securities did not suffer material declines in value until September and October 2008, when several high-profile financial institutions, including Lehman Brothers, Fannie Mae, Freddie Mac, and American International Group, Inc., either filed for bankruptcy or received large Government bailouts, and the securities prices of numerous large financial institutions declined sharply. Accordingly, Defendants had strong arguments that the declines in the prices of the Bond Class Securities were caused by market-wide issues rather than any alleged misrepresentations or omissions in the Registration Statements. Defendants would have also contended that the Bond Class Securities quickly rebounded in value to trade at or above par, which, at a minimum, meant that any Bond Class Members who retained their securities suffered no damages. ¶¶131-138.

In light of these risks, the $730 million cash recovery obtained by the Settlement is truly exceptional and demonstrates the outstanding quality of Bond Counsel's representation of the Bond Class. ¶¶155-210. As compensation for their efforts and achievements on behalf of the Bond Class, Bond Counsel, on behalf of all plaintiffs' counsel, requests a fee award in the amount of 20% of the Settlement Amount, plus interest incurred at the same rate as the Settlement Fund, and reimbursement of litigation expenses in the amount of $7,286,868.15. ¶159. The requested fee is within the range of fees awarded in comparable settlements, whether considered as a percentage of the Settlement or on a multiplier basis. Indeed, the requested fee represents a multiplier of just 1.67 on Bond Plaintiffs' Counsel's total lodestar, which is far below the range of multipliers routinely awarded in complex class actions with substantial contingency risks such as this one. ¶160; *see also* Section II.B, *infra.* In addition, Bond Plaintiffs have approved Bond Counsel's application for fees and expenses. *See* Declarations of Bond Plaintiffs, Exhibits 2 to 9; *see also* ¶¶161, 191-193.

The reaction of the Bond Class to date further supports Bond Counsel's fee request. Pursuant to the Court's Preliminary Approval Order (ECF No. 155), more than 417,000 copies of the Notice have been mailed, and the Summary Notice was published in *The Wall Street Journal* and transmitted over the *PR Newswire*.[2]  The Notice advised potential Bond Class Members that Bond Counsel would seek fees up to 20% of the Settlement Fund and reimbursement of litigation expenses and PSLRA awards in an amount not to exceed $10.5 million.  *See* Singer Decl. ¶142 and Ex. 1 (Cirami Aff.) at Exhibit A, at ¶¶5, 69.  While the deadline set by the Court for Bond Class Members to object to the requested attorneys' fees and expenses has not yet passed, to date, no objections to the amount of attorneys' fees and expenses set forth in the Notice have been received. ¶146.

## ARGUMENT

I.   **PLAINTIFFS' COUNSEL ARE ENTITLED TO AN AWARD OF ATTORNEYS' FEES FROM THE COMMON FUND**

The Supreme Court has long recognized that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000).  Courts recognize that awards of fair attorneys' fees from a common fund "serve to encourage skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons, and to discourage future misconduct of a similar nature."  *In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, No. 02-CV-3400 (CM) (PED), 2010 WL 4537550, at *23 (S.D.N.Y. Nov. 8, 2010) (internal quotation marks

---

[2] *See* Affidavit of Stephen J. Cirami Regarding (A) Mailing of the Notice and Proof of Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date, ("Cirami Aff."), attached as Exhibit 1 to the Singer Declaration, at ¶¶7-8.

omitted); *see In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695 (CM), 2007 WL 4115808, at *2 (S.D.N.Y. Nov. 7, 2007) (same).

The Supreme Court has also emphasized that private securities actions are "an essential supplement to criminal prosecutions and civil enforcement actions" brought by the SEC. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007); *accord Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (private securities actions are "'a most effective weapon in the enforcement' of the securities laws and . . . 'a necessary supplement to [SEC] action'") (citation omitted)).  Compensating plaintiffs' counsel for the risks they take in bringing these actions is essential, because "[s]uch actions could not be sustained if plaintiffs' counsel were not to receive remuneration from the settlement fund for their efforts on behalf of the class." *Hicks v. Morgan Stanley*, No. 01 Civ. 10071 (RJH), 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005).

## II.   THE REQUESTED ATTORNEYS' FEES ARE REASONABLE UNDER EITHER THE PERCENTAGE-OF-THE-FUND METHOD OR THE LODESTAR METHOD

As the Court is aware, there are two methods for determining the reasonableness of the requested fee: the percentage-of-the-fund method, and the lodestar method.  Under either method, the requested fee in this Action is fair and reasonable.

### A.   The Requested Attorneys' Fees Are Reasonable Under the Percentage-of-the-Fund Method

The Supreme Court has endorsed the percentage-of-the-fund method, stating that "under the 'common fund doctrine'. . . a reasonable fee is based on a percentage of the fund bestowed on the class." *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984).  The Second Circuit has also expressly approved the percentage method, recognizing that it "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) ("*Visa*"); *see also Savoie v. Merchs. Bank*, 166 F.3d 456, 460 (2d Cir. 1999) (the "percentage-of-the-fund method has been deemed a solution to certain problems that may arise when the lodestar method is used in

8

common fund cases"). District Courts, in turn, have repeatedly recognized the benefits of the percentage method in common fund cases. As the Second Circuit has noted, the "trend [among District Courts] in this Circuit is toward the percentage method." *Visa*, 396 F.3d at 121; *see Fogarazzo v. Lehman Bros., Inc.*, No. 03-cv-5194 (SAS), 2011 WL 671745, at *2 (S.D.N.Y. Feb. 23, 2011); *In re Comverse Tech., Inc. Sec. Litig.*, No. 06-CV-1825 (NGG), 2010 WL 2653354, at *2 (E.D.N.Y. June 24, 2010).

Here, the requested fee is in line with fee awards that are commonly granted in cases involving significant recoveries, such as this one. Indeed, in such cases, courts in this District and across the country have often awarded fees representing between 17% and 33% of the settlement fund, with multipliers substantially above the 1.67 multiplier requested here. *See, e.g.*, *Comverse*, 2010 WL 2653354, at *3 (Garaufis, J.) (on settlement of $225 million, "Lead Counsel's request for 25% of the Settlement Amount is consistent with, or lower than, the fee awards in other 'megafund' securities fraud actions in this Circuit."); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 516 (S.D.N.Y. 2009) (Scheindlin, J.) (awarding 33% of $586 million settlement fund); *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03 MDL 1529 LMM, 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16, 2006) (McKenna, J.), *aff'd*, 272 Fed. Appx. 9 (2d Cir. 2008) (awarding 21.4% of $455 million settlement fund, representing a 2.89 multiplier); *In re Cardinal Health, Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 767, 770 (S.D. Ohio 2007) (awarding 18% of $600 million settlement fund, representing a 5.9 multiplier); *In re HealthSouth Corp. Stockholder Litig.*, No. 03-cv-1500 (N.D. Ala.) (awarding 18.1% of $537.5 total settlement fund);[3] *Ohio Pub. Employees Ret. Sys. v. Freddie Mac.*, No. 03-CV-4261, 2006 U.S. Dist. LEXIS 98380, at *4 (S.D.N.Y. Oct. 26, 2006) (Sprizzo, J.) (awarding 20% of $410 million settlement, representing a 2.33 multiplier); *In re*

---

[3] This is the aggregate fee awarded in three fee awards in the *In re HealthSouth Corp. Stockholder Litig.* *See* No. 03-cv-1500, ECF No. 1112, at 2 (N.D. Ala. Feb. 12, 2008); ECF No. 1617, at 1 (N.D. Ala. June 12, 2009); and ECF No. 1721, at 2 (N.D. Ala. July 26, 2010) (attached hereto as Exhibit 1).

*Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 469 (S.D.N.Y. 2004) (Lynch, J.) (awarding 18% of combined $408 settlement, with a 2.19 multiplier on the principal award);[4] *In re Lucent Tech., Inc., Sec. Litig.,* 327 F. Supp. 2d 426, 442-43 (D.N.J. 2004) (awarding 17% of $517 million settlement, with a 2.13 multiplier); *In re Oxford Health Plans, Inc. Sec. Litig.*, MDL No. 1222, 2003 U.S. Dist. LEXIS 26795, at *13 (S.D.N.Y. June 12, 2003) (Brieant, J.) (awarding 28% of $300 million settlement).[5]

In sum, when considered on a percentage basis, the requested fee is in line with the fees commonly awarded in securities class actions involving settlements of significant magnitude. The percentage method thus demonstrates the reasonableness of the requested fee.

## B.   The Requested Attorneys' Fees Are Reasonable Under the Lodestar Method

The Second Circuit also encourages district courts to determine the reasonableness of a requested fee pursuant to the lodestar method. *See Goldberger*, 209 F.3d at 50. In this case, the lodestar method strongly demonstrates the reasonableness of the requested fee.

As the Court is aware, under the lodestar method, the Court: (i) determines counsel's lodestar by multiplying the number of hours each attorney spent on the case by each attorney's reasonable hourly rate; and (ii) adjusts that lodestar figure by applying a multiplier "to reflect litigation risk, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors." *FLAG Telecom*, 2010 WL 4537550, at *23; *see generally Lindy Bros.*

---

[4] This is the aggregate fee awarded in several settlements in this Action. The fee orders include the decision cited above, as well as: (i) No. 02 Civ. 910 (GEL), 2005 WL 1668532, at *5 (S.D.N.Y. July 12, 2005); (ii) No. 02 Civ. 910 (GEL), ECF No. 655 (S.D.N.Y. Nov. 4, 2005); (iii) No. 02 Civ. 910 (GEL), ECF No. 722 (S.D.N.Y. Oct. 30, 2006); and (iv) No. 02 Civ. 910 (GEL), ECF No. 773 (S.D.N.Y. Oct. 1, 2007).

[5] *See also In re BankAmerica Corp. Sec. Litig.*, 228 F. Supp. 2d 1061, 1066 (E.D. Mo. 2002) (awarding 18% of $490 million settlement, with a 3 multiplier); *In re Williams Sec. Litig.*, No. 02-cv-72-SPF, slip op. at 2 (N.D. Okla. Feb. 12, 2007), ECF No. 1638 (attached hereto as Exhibit 2) (awarding 25% of a $311 million settlement); *In re DaimlerChrysler AG Sec. Litig.*, Master File No. 00-0993 (KAJ), slip op. at 1 (D. Del. Feb. 5, 2004), ECF No. 971, and fee brief at 32 (D. Del. Nov. 14, 2003), ECF No. 864 (order and fee brief excerpt attached hereto as Exhibit 3) (awarding 22.5% of $300 million settlement, with a 4.2 multiplier); *In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587 (E.D. Pa. 2005) & 146 F. Supp. 2d 706, 736 (E.D. Pa. 2001) (awarding 25% of combined $320 million settlement, with a 6.67 multiplier).

*Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167-69 (3d Cir. 1973), *subsequently refined in Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 116-18 (3d Cir. 1976) (*en banc*).   In securities class actions, fees representing multiples above the lodestar are regularly awarded to reflect the contingency fee risk and other relevant factors.

Here, Bond Plaintiffs' Counsel have spent a total of 213,507 hours of attorney and other professional support time prosecuting the Action.[6]   ¶164.   Plaintiffs' Counsel's lodestar is $87,229,248.75.[7]   *See id*.   The requested 20% fee, which amounts to $146,000,000 (without interest), represents a multiplier of 1.67.  *Id*.

Significantly, the requested multiplier in this Action is well below the range of multipliers commonly awarded in securities class actions.   In complex class actions with significant contingency risks, lodestar multipliers between 3 and 4.5 are commonly awarded.  *See Visa*, 396 F.3d at 123 (upholding multiplier of 3.5 as reasonable and explaining that "multipliers of between 3 and 4.5 have become common" in common fund class actions); *In re Deutsche Telekom AG Sec. Litig.*, Civil Action No. 00-CV-9475 (NRB), 2005 U.S. Dist. LEXIS 45798, at *13-*14 (S.D.N.Y. June 9, 2005) (awarding fee representing a 3.96 multiplier); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 369, 371 (S.D.N.Y. 2002) (awarding fee representing a 4.65 multiplier, which was "well within the range awarded by courts in this Circuit and courts throughout the country"); *In re*

---

[6] As set forth in detail in the Singer Declaration, Bond Plaintiffs' Counsel have excluded from their lodestar all time spent working on the fee application, including work on this brief, and all work after April 30, 2013. ¶¶176-177. Further, the submitted lodestar does not include any time spent on lead plaintiff motions submitted in the Stock Action or any time spent on issues relating to the leadership structure of the Bond Action. ¶166; *see also* ¶¶169-176.

[7] While the Supreme Court and courts in this Circuit have approved the use of current hourly rates to calculate the base lodestar figure as a means of compensating for the delay in receiving payment, instead of using 2013 rates, Bond Plaintiffs' Counsel have submitted their lodestar based on rates charged during 2012. *See Missouri v. Jenkins*, 491 U.S. 274, 284 (1989); *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 589 n.10 (S.D.N.Y. 2008); *Veeco*, 2007 WL 4115808 at *9.

*NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 487-89 (S.D.N.Y. 1998) (awarding fee representing a 3.97 multiplier).

Moreover, the requested 1.67 multiplier is substantially lower than multipliers that are commonly awarded by courts in this District and across the country in cases involving settlements of significant magnitude. *See, e.g.*, *In re UnitedHealth Group Inc. PSLRA Litig.*, 643 F. Supp. 2d 1094, 1106 (D. Minn. 2009) ($925.5 million settlement; 6.5 multiplier); *Cardinal Health*, 528 F. Supp. 2d at 770 ($600 million settlement; 6 multiplier); *Adelphia*, 2006 WL 3378705, at *3 ($455 million settlement; 2.89 multiplier); *BankAmerica*, 228 F. Supp. 2d at 1066 ($490 million settlement; 3 multiplier); *DaimlerChrysler*, Master File No. 00-00993 (KAJ), slip op. at 1, ECF No. 971 and fee brief at 32, ECF No. 864 (attached hereto as Exhibit 3) ($300 million settlement; 4.2 multiplier); *Rite Aid*, 362 F. Supp. 2d 587 & 146 F. Supp. 2d at 736 ($320 million combined settlement; 6.67 multiplier).

As further confirmation of the reasonableness of the requested fee, the 1.67 multiplier is significantly below the average multiplier awarded in the six securities class action cases that have settled between $550 million and $925 million since the passage of the PSLRA.  In those cases, courts have awarded an average multiplier of approximately 2.89 times lodestar, or nearly 73 percent higher than the lodestar multiplier requested here.[8]  Accordingly, the reasonableness of the requested fee is strongly demonstrated by the lodestar method.

In sum, whether calculated as a percentage of the fund or under the lodestar method, the requested fee is within the range of fees regularly awarded by courts in securities class actions.

---

[8] These cases include: *Initial Pub. Offering*, 671 F. Supp. 2d at 514 ($586 settlement; 0.7 multiplier); *Cardinal Health*, 528 F. Supp. 2d at 767 ($600 million settlement; 5.9 multiplier); (iii) *In re Countrywide Fin. Corp. Sec. Litig.*, No-07-0529, slip op. at 5 (C.D. Cal. Mar. 4, 2011), ECF No. 1062 ($601.6 million settlement; 0.67 multiplier); *In re Wachovia Preferred Sec. & Bond/Notes Litig.*, No. 09 Civ. 6351 (RJS), 2012 WL 2589230, at *3 (S.D.N.Y. Jan. 3, 2012) ($627 million settlement; 2.3 multiplier); *Carlson v. Xerox Corp.*, 596 F. Supp. 2d 400, 413 (D. Conn. 2009) ($750 million settlement; 1.25 multiplier); *United Health*, 643 F. Supp. 2d at 1106 ($925.5 million settlement; 6.5 multiplier).

Additionally, as set forth below, the factors established by the Second Circuit in *Goldberger* further demonstrate that the requested fee is fair and reasonable, and should be approved.

## III.  OTHER FACTORS CONSIDERED BY COURTS IN THE SECOND CIRCUIT CONFIRM THAT THE REQUESTED FEE IS FAIR AND REASONABLE

The Second Circuit has set forth the following criteria that courts should consider when reviewing a request for attorneys' fees in a common fund case:

> (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Goldberger*, 209 F.3d at 50.  Consideration of these factors provides further confirmation that the fee requested here is reasonable.

### A.     The Time and Labor Expended By Counsel Support the Requested Fee

As noted above, the claims in this Action were extremely broad and complex.  They involved 48 separate Offerings conducted over two-and-one-half years and involving 39 separate securities. ¶¶4, 16, 36, 132-134.  To prevail, Bond Plaintiffs had to prove that one of the largest financial institutions in the world overstated the value of complex mortgage-related assets by tens of billions of dollars, and that massive unreported losses in these assets had decimated the bank's capital base.  This would be a colossal undertaking in any circumstance.  Moreover, the vast majority of claims asserted in the Bond Action were unique to this case – they were not asserted in any other private or regulatory action – which meant that Bond Plaintiffs had to independently develop the evidence to support their claims.  ¶¶42-47.  As set forth in the Singer Declaration, prosecuting these claims and developing this evidence was a monumental task that required herculean efforts.  *See* ¶¶35-102.

Bond Counsel's efforts on behalf of the Bond Class began even before the Bond Action was filed.  In late 2008, Bond Counsel and certain Bond Plaintiffs recognized that investors in Citigroup's bonds and preferred stock possessed potentially valuable Securities Act claims that had

not been asserted in any action, and further recognized that the statute of limitations on certain of these claims was about to expire.  ¶¶4, 9-11.  Bond Counsel promptly investigated these claims and filed two separate class action complaints in New York State Court (one for purchasers of Citigroup's bonds and one for purchasers of its preferred securities) in order to preserve these claims on behalf of members of the Bond Class.  *Id.*

Following the removal of these actions to federal court and their consolidation into this Action, Bond Plaintiffs' Counsel conducted an extensive investigation and drafted the detailed consolidated Complaint, which was filed on January 15, 2009.  ¶¶13-26.  Bond Plaintiffs' Counsel then successfully opposed Defendants' motions to dismiss and motion for reconsideration, which involved hundreds of pages of briefing and several hundred pages of supporting exhibits.  ¶¶27-33.

Bond Plaintiffs' Counsel then began an enormous fact discovery effort.  ¶¶35-64.  As explained in detail in the Singer Declaration, Bond Counsel promptly served detailed document requests on Defendants and issued approximately thirteen subpoenas to non-parties, including KPMG and former senior Citigroup employees.  ¶37.  The Parties engaged in an extensive meet-and-confer process regarding the scope of Bond Plaintiffs' requests and the adequacy of the responses.  ¶38.  Through these efforts, Bond Plaintiffs ultimately obtained 42.5 million pages of documents relating to the claims asserted in the Bond Action.  ¶42.  To develop the evidence necessary to support Bond Plaintiffs' claims, Bond Plaintiffs' Counsel created a detailed and efficient process to review and analyze these documents for use in motion practice and depositions.  ¶¶47-58.

While merits discovery was ongoing, counsel also engaged in substantial class certification discovery, including producing tens of thousands of pages of documents on behalf of Bond Plaintiffs and defending 23 depositions of Bond Plaintiffs' representatives and their outside investment advisors.  ¶¶61-64.  Bond Counsel then drafted and filed a vigorously-contested class

certification motion, in which Defendants raised arguments with respect to all the elements of Rule 23, as well as additional arguments directed to the merits of the litigation.  ¶¶75-80.

Meanwhile, Bond Plaintiffs' Counsel were engaging in very significant deposition discovery.  From July 2011 through August 2012, Bond Plaintiffs' Counsel deposed 53 fact witnesses.  These included numerous current and former senior Citigroup employees, such as: (i) Citigroup's former CEO Charles Prince; (ii) senior risk managers with responsibility for  CDO and SIV operations; (iii) senior executives with responsibility for Citigroup's SIVs and determining the value of the SIVs, including the Co-Heads of Global Credit Structures (which was Citigroup's SIV division); (iv) senior executives with responsibility for Citigroup's CDOs and determining their value, including the Co-Heads of Global Credit Markets (which was Citigroup's CDO division); (v) senior Treasury department officials with responsibility for Citigroup's capital and capital ratios, including Citigroup's former Treasurer; (vi) senior executives with responsibility for Citigroup's mortgage portfolio and loan loss reserves, including the CFO of the Global Consumer Group; (vii) senior executives with responsibility for Citigroup's financial reporting, including its former Head of Corporate Financial Reporting; and (viii) senior executives with responsibility for investor relations, including the former Head of Investor Relations.  ¶¶87-91.

Bond Plaintiffs also filed a motion to compel the production of documents that Citigroup was withholding on the basis of a bank examination privilege.  As the Court is aware, this motion was opposed by Citigroup, the Federal Reserve, the OCC, and the FDIC, and entailed extensive briefing and correspondence with each of the agencies noted above.  ¶¶65-74.  In addition, following the Second Circuit's decision in *Fait,* Defendants filed a Rule 12(c) motion for judgment on the pleadings.  ¶82.  Bond Counsel opposed this motion on numerous grounds and after receiving several letter briefs from the Parties, the Court ultimately denied Defendants' motion without prejudice to renewal at summary judgment.  ¶¶81-86.

Bond Counsel also undertook significant efforts to develop expert evidence in support of Bond Plaintiffs' claims. From the outset of this case, Bond Counsel understood that given the complicated nature of the claims asserted by Bond Plaintiffs, it would be necessary to develop expert evidence on such topics as Citigroup's valuation of its CDO and SIV assets, the calculation of its loan loss reserves, its capital adequacy, and damages. Accordingly, Bond Plaintiffs' Counsel retained six experienced and well-regarded experts on these subjects and worked closely with them to obtain and analyze the evidence needed to develop the case and to prepare their detailed expert reports opining on these issues. ¶¶99-102. As part of this effort, Bond Counsel drafted and served multiple interrogatories and requests for admission on Defendants. ¶¶58-60, 102. Finally, substantial time and effort were also required to negotiate the Settlement. As set forth in the Singer Declaration, during 2012 and early 2013, the Parties engaged in significant negotiations and mediation efforts, including exchanging information regarding liability and damages, retaining Judge Layn Phillips to act as the mediator in facilitating settlement discussions, and preparing and exchanging multiple detailed submissions regarding the strengths and weaknesses of Bond Plaintiffs' claims and Defendants' defenses. ¶¶103-110.

As noted above, Bond Plaintiffs' Counsel have expended more than 213,500 hours investigating, prosecuting and resolving this Action with a total lodestar value of over $87.2 million. ¶164. The enormous amount of time and effort necessarily devoted to this case by Bond Plaintiffs' Counsel, and the efficient and effective management of the litigation, was critical in obtaining the outstanding result achieved by the Settlement. ¶¶155-210. This significant effort and the excellent result confirm that the fee request here is eminently reasonable.

**B.      The Risks of Litigation Support the Requested Fee**

The risk of litigation is one of the most important *Goldberger* factors.  *See Goldberger*, 209

F.3d at 54; *Telik*, 576 F. Supp. 2d at 592 ("'the risk of the litigation' is a pivotal factor in assessing

the appropriate attorneys' fees").  As the Second Circuit has recognized:

> No one expects a lawyer whose compensation is contingent upon his success to
> charge, when successful, as little as he would charge a client who in advance had
> agreed to pay for his services, regardless of success. Nor, particularly in complicated
> cases producing large recoveries, is it just to make a fee depend solely on the
> reasonable amount of time expended.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974) (citation omitted).  "Little about

litigation is risk-free, and class actions confront even more substantial risks than other forms of

litigation."  *Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.,* No. 01-CV-11814 (MP), 2004 WL

1087261, at *3 (S.D.N.Y. May 14, 2004); *see also In re Am. Bank Note Holographics Inc. Sec.*

*Litig.*, 127 F. Supp. 2d 418, 433 (S.D.N.Y. 2001) (it is "appropriate to take this [contingent-fee] risk

into account in determining the appropriate fee to award").

As noted, Bond Plaintiffs' Counsel faced very significant challenges to establishing liability

and damages in this action.  ¶¶111-140.  As an initial matter, Bond Plaintiffs faced significant

hurdles in establishing that Defendants had made any material false statements or omissions.  For

example, with respect to Citigroup's alleged misstatements regarding its CDO and SIV valuations,

loan loss reserves, and capital adequacy, Citigroup's SEC filings repeatedly stated that its

statements on these subjects reflected matters of judgment and were subject to change.  ¶¶115, 118,

121, 123.  Moreover, Citigroup employed sophisticated financial models to determine the value of

its mortgage-related assets, set its loss reserves, and calculate its regulatory capital ratios.  These

models involved hundreds of inputs, were vetted at many levels within Citigroup, and were

repeatedly recalibrated to take account of changing market conditions.  ¶¶43-45, 115, 118, 121, 123.

These models were routinely reviewed by Citigroup's independent auditors at KPMG, who never

concluded that they were materially flawed or resulted in inaccurate valuation of Citigroup's

mortgage assets.  *Id.*  To the contrary, Citigroup's auditors expressly certified the accuracy of Citigroup's publicly reported financial statements multiple times during the relevant time period.  ¶¶45, 115, 118, 121, 123, 177, 179.  Similarly, as one of the most regulated financial institutions in the world, Citigroup was subject to near-constant regulatory scrutiny during the Offerings Period, and numerous federal regulators, including the OCC and the Federal Reserve, closely examined the value of Citigroup's mortgage-related assets, loan loss reserves and its capital adequacy, and never concluded that Citigroup made any misstatements about its financial condition.

Moreover, when the market began to deteriorate in the third quarter of 2007, Citigroup promptly disclosed tens of billions of dollars in losses.  From November 2007 through the third quarter of 2008, Citigroup recorded $28 billion in writedowns on its CDO assets.  Similarly, during the same period, Citigroup increased its loan loss reserves by between $2 billion and $4 billion for each quarter (a total of $18 billion during the relevant time period) in order to account for a rapidly declining real estate market.  ¶118.  These facts, all of which were publicly disclosed, created a significant risk that the Court or a jury could conclude that Citigroup was accurately reporting the value of its mortgage-related assets throughout the Offerings Period or, at a minimum, that investors who purchased Citigroup securities after November of 2007 were well aware of the fact that Citigroup was suffering billions of dollars in losses on its mortgage-related assets.  This posed a particularly severe risk to Bond Plaintiffs' claims because the vast majority of Bond Plaintiffs' damages were attributable to offerings conducted after November 2007.  ¶¶131-138.

Bond Plaintiffs also faced substantial hurdles in demonstrating that Citigroup misrepresented its subprime CDO exposure prior to November 4, 2007.  *See* ¶¶127-128.  Defendants argued that they had no duty to disclose Citigroup's subprime CDO exposure earlier than they did because these assets were not considered risky until late in 2007.  Indeed, these assets were given triple-A ratings by all of the ratings agencies until mid-October 2007, when the agencies unexpectedly downgraded

some of them.  *Id*.  Defendants argued vigorously that this downgrade was unexpected and they acted promptly after the downgrade to disclose Citigroup's exposure to these assets.  ¶128.  In short, there was considerable risk that the Court or a jury may have concluded that Defendants did not make any false statements or omissions on any of the topics alleged by Bond Plaintiffs.

The already significant risks to establishing liability that were present at the outset of the case were dramatically increased by the Second Circuit's opinion in *Fait*.  ¶¶81, 112-113.  As the Court is aware, in *Fait,* the Second Circuit heightened the standard of liability applicable to Securities Act claims premised on misstatements of "opinion," holding that for such claims a plaintiff must show not only that a misstatement was made but that in making the misstatement, defendants "misstated [their] truly held belief."  655 F.3d at 112 n.5.  Accordingly, the *Fait* standard for establishing liability – which is akin to showing scienter or intentional deception – would have applied to the vast majority of Bond Plaintiffs' claims.

Based on many of the facts noted above, Defendants had strong arguments that even if there were material misstatements in the Offering Materials, Bond Plaintiffs could not prove they were intentional.  Defendants would have argued that they disclosed in the Offering Materials that their CDO and SIV valuations, loan loss reserves, and statements regarding capital adequacy concerned inherently subjective judgments and were matters of opinion that were subject to change.  ¶¶112-113, 116, 119, 122, 126.  Defendants again would have contended that KPMG and federal regulators repeatedly reviewed Citigroup's financial models and never suggested that Citigroup's publicly-filed financial statements were incorrect in any way – facts that Defendants argued were flatly inconsistent with the notion that Defendants were intentionally misrepresenting the value of these assets.  Defendants also would have argued that the fact they began to publicly report tens of

billions of dollars of writedowns in these assets beginning in the third quarter of 2007 demonstrates that they were not intentionally misleading investors.[9]   ¶¶45, 115, 118, 121, 123, 177, 179.

Finally, even if Bond Plaintiffs were successful in overcoming the many hurdles to establishing liability, they continued to face substantial challenges to establishing damages on behalf of the Bond Class.  As discussed in the Singer Declaration at paragraphs 131 to 138, the Securities Act provides defendants with a "negative causation" defense that can reduce or eliminate damages if Defendants can show that the price declines in a security were not caused by the alleged inaccuracies in the Offering Materials.  *See* 15 U.S.C. § 77k(e).[10]

Here, as noted, the key declines in the prices of the Bond Class Securities occurred in September and October 2008, and Defendants had extremely strong negative causation arguments with respect to those declines.  *See* ¶¶48, 131-138.  Defendants argued that these declines were not caused by Citigroup's alleged misstatements, but rather by the disclosure of significant negative news about companies other than Citigroup.  Specifically, because the declines occurred at the same time that a raft of negative information about several other high-profile financial institutions was disclosed – such as Lehman's bankruptcy, the Government bailouts of Fannie Mae and Freddie Mac, and AIG's massive losses and resulting Government bailout – Defendants contended that the

---

[9]   The only claim asserted by Bond Plaintiffs not premised on alleged misstatements of opinion is that Citigroup failed to disclose its true exposure to subprime-related CDOs prior to November 4, 2007. However, as explained in the Singer Declaration at paragraphs 48 and 131 to 138, Citigroup's Bond Class Securities did not experience significant price declines in response to Citigroup's November 2007 disclosure of its subprime exposure.  Rather, the key declines in the Bond Class Securities occurred nearly a year later, in September and October 2008.  ¶¶48, 113, n.3, 131-138.  Accordingly, recoverable damages associated with Bond Plaintiffs' CDO exposure claim were minimal – while the vast majority of damages stemmed from the CDO and SIV valuation, loan loss reserve, and capital adequacy claims premised on alleged misstatements of opinion.  *Id.*

[10]   Specifically, the Securities Act provides that, "if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable."  15 U.S.C. § 77k(e)

declines in the Bond Class Securities were caused by market-wide factors rather than being directly related to the alleged misrepresentations and omissions in the Registration Statements at issue. *Id*.

Defendants also would have contended that the September and October 2008 declines in Citigroup's securities were caused by investor overreaction during an historic and sudden market collapse. ¶¶131-138. In support of this argument, Defendants would have asserted that this market panic caused the securities of numerous other financial institutions to precipitously decline in value at the same time that Citigroup's securities declined. Defendants also would have argued that Citigroup needed the bailout not because of undisclosed losses in its mortgage-related assets, but because it was targeted by short sellers and suffered a liquidity crisis in the midst of the global market meltdown. These arguments presented a meaningful risk that Bond Plaintiffs would not be able to recover for the major declines at issue in this case. *Id*.

In addition, Defendants would have argued that any potentially recoverable damages had to be greatly reduced given that the Bond Class Securities quickly rebounded in price. ¶¶111, 136. Specifically, Defendants would have pointed out that the Bond Class Securities fully recovered in price to trade at or above par, where they continue to trade today. Based on the rebound in the price of the Bond Class Securities, Defendants would have argued that Bond Class Members who did not sell their securities had suffered little if any harm, and could not recover damages. Defendants also argued that the price rebound demonstrated that the decline that occurred in 2008 was not due to any real concerns about financial problems at Citigroup, but instead was the result of a market overreaction that impacted all financial institutions. ¶136.

In the face of these uncertainties regarding the outcome of the case, Bond Counsel prosecuted this Action on a wholly contingent basis, knowing that the litigation could last for years and would require the devotion of a substantial amount of attorney time and a significant advance of litigation expenses with no guarantee of compensation. ¶¶155-210. "In numerous class actions,

including complex securities cases, plaintiffs' counsel have expended thousands of hours and advanced significant out-of-pocket expenses and received no remuneration whatsoever." *In re Marsh & McLennan Cos. Sec. Litig.*, No. 04 Civ. 8144 (CM), 2009 WL 5178546, at *18 (S.D.N.Y. Dec. 23, 2009). Bond Plaintiffs' Counsel's assumption of this contingency fee risk, and their extensive litigation of the Action in the face of these risks, further support the reasonableness of the requested fee. In short, "[t]here was significant risk of non-payment in this case, and Plaintiffs' Counsel should be rewarded for having borne and successfully overcome that risk." *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 148 (S.D.N.Y. 2010).

C.       **The Magnitude and Complexity of the Action Support the Requested Fee**

The magnitude and complexity of the Action support the requested fee. Courts have long recognized that securities class action litigation is "notably difficult and notoriously uncertain." *FLAG Telecom*, 2010 WL 4537550, at *27 (quoting *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999)). The Bond Action was extraordinarily complex. As noted above and described in detail in the Singer Declaration, the Bond Action asserted claims in connection with 48 separate Offerings of dozens of different securities that were conducted over a two-and-one-half year period when market conditions dramatically changed. *See* ¶¶4, 16, 100, 11, 132-134. These claims raised a host of difficult questions about the nature and value of numerous different kinds of Citigroup's mortgage-related assets and their impact on its capital adequacy. In short, the Bond Action raised a plethora of complex questions, and required an enormous undertaking over an extended period of time. ¶¶35-102.

D.       **The Quality of Bond Plaintiffs' Counsel's Representation Supports the Requested Fee**

The quality of the representation by Bond Plaintiffs' Counsel is another important factor that supports the reasonableness of the requested fee. Bond Counsel submits that the quality of the representation in this Action is best evidenced by the quality of the result achieved. *See*

22

*Goldberger*, 209 F.3d at 55; *Veeco*, 2007 WL 4115808, at *7. The cash settlement of $730 million, if approved, would be the second largest recovery ever on behalf of purchasers of debt securities and represents an outstanding result for the Bond Class.

Moreover, this result was obtained through Bond Plaintiffs' Counsel's hard work and skill in a highly complex case that presented very significant litigation risks. This result was obtained without the benefit of a financial restatement – indeed, the proposed Settlement would be one of the three largest securities class action recoveries that did not involve a financial restatement – and where there were no criminal proceedings related to the alleged misconduct. Further, the vast majority of the claims in the Bond Action were unique to this case, and Bond Plaintiffs' Counsel had to independently develop evidence in support of those claims to convince Defendants to settle. The fact that Bond Plaintiffs' Counsel achieved this result through their independent efforts confirms that the quality of representation was excellent.

Bond Plaintiffs' Counsel submit that the quality of their efforts in the litigation, their substantial experience in securities class actions, and their commitment to the litigation were key elements in enabling them to negotiate this Settlement. *See In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005) ("If the Lead Plaintiff had been represented by less tenacious and competent counsel, it is by no means clear that it would have achieved the success it did here on behalf of the Class. . . . While some significant recovery in a case of this magnitude may seem a foregone conclusion now, the recovery achieved here was never certain. . . . it is likely that less able plaintiffs' counsel would have achieved far less").

Courts also recognize that the quality of the opposition faced by plaintiffs' counsel should be considered in assessing counsel's performance. *See, e.g., In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.,* No. 03 MDL 1529 LMM, 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16, 2006) ("The fact that the settlements were obtained from defendants represented by 'formidable opposing

counsel from some of the best defense firms in the country' also evidences the high quality of lead counsels' work") (citation omitted); *Teachers' Ret. Sys.*, 2004 WL 1087261, at *7 (same).  Here, Defendants were represented by some of the nation's most elite defense firms.  *See* Singer Decl. ¶182.  Notwithstanding this formidable opposition, Bond Plaintiffs' Counsel's ability to present a strong case enabled them to achieve the very favorable settlement for the benefit of the Bond Class.

### E.    The Requested Fee in Relation to the Settlement

Courts have interpreted this factor as requiring the review of the fee requested in terms of the percentage it represents of the total recovery.  As explained above, the requested fee award is within the range of fees that courts in the Second Circuit and around the country have awarded in comparable cases, and is fully justified by the work performed and the result obtained.

### F.    Public Policy Considerations Support the Requested Fee

A strong public policy concern exists for rewarding firms for bringing successful securities litigation.  *See FLAG Telecom*, 2010 WL 4537550, at *29 (if the "important public policy [of enforcing the securities laws] is to be carried out, the courts should award fees which will adequately compensate Lead Counsel for the value of their efforts, taking into account the enormous risks they undertook"); *Maley*, 186 F. Supp. 2d at 373 ("In considering an award of attorney's fees, the public policy of vigorously enforcing the federal securities laws must be considered."); *Hicks*, 2005 WL 2757792, at *9 (same); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 230-31 (1988) (the federal securities laws are remedial in nature, and the courts must encourage private lawsuits to effectuate their purpose of protecting investors).  The Supreme Court has emphasized that private securities actions such as this provide "'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action.'" *Bateman*, 472 U.S. at 310 (citation omitted); *see also Tellabs*, 551 U.S. at 313.  Accordingly, public policy favors granting Bond Counsel's fee and expense application here.

### G.     The Requested Fee Has Been Approved by Bond Plaintiffs

Bond Plaintiffs include 7 sophisticated institutional investors, 6 of which are public pension funds.   As set forth in Bond Plaintiffs' respective declarations, Bond Plaintiffs oversaw the prosecution and resolution of this Action, and had a basis for assessing the reasonableness of the fee request.   *See* Singer Decl., Exs. 2-9.   Each of the Bond Plaintiffs approves the fee request.   Further, the requested 20% fee is expressly permitted under the terms of the retainer agreements Bond Counsel negotiated and entered into with the institutional plaintiffs that initiated the litigation. While a district court is not required to adhere to such retainer agreements, courts have found that it should be given great weight.   Indeed, as Judge Cote observed in *WorldCom*, "when class counsel in a securities lawsuit have negotiated an arm's-length agreement with a sophisticated lead plaintiff possessing a large stake in the litigation, and when that lead plaintiff endorses the application following close supervision of the litigation, the court should give the terms of that agreement great weight." *WorldCom*, 388 F. Supp. 2d at 356; *see also Global Crossing*, 225 F.R.D. at 466 (same).

### H.     The Reaction of the Bond Class to Date Supports the Requested Fee

The reaction of the Bond Class to date also supports the requested fee.   As of June 6, 2013, the Claims Administrator has disseminated the Notice to more than 417,000 potential Bond Class Members and nominees informing them of Bond Counsel's intent to apply for an award of attorneys' fees up to 20% of the Settlement Fund and reimbursement of up to $10,500,000 in expenses and PSLRA awards.   ¶194.   While the time to object to these applications does not expire until June 27, 2013, to date, no objections to the amount of attorneys' fees and expenses set forth in the Notice have been received.   *Id*.   Bond Counsel will address any objections received in their reply papers to be filed with the Court on July 15, 2013.

IV.   **THE EXPENSES INCURRED ARE REASONABLE AND
       WERE NECESSARY TO ACHIEVE THE BENEFIT OBTAINED**

Bond Counsel's fee application includes a request for reimbursement of litigation expenses that were reasonably incurred and necessary to the prosecution of this Action.  *See* Singer Decl. ¶¶158-194.  These expenses are properly recovered by counsel.  *See FLAG Telecom*, 2010 WL 4537550, at *30 ("It is well accepted that counsel who create a common fund are entitled to the reimbursement of expenses that they advanced to a class.").  As set forth in detail in the Singer Declaration, Bond Plaintiffs' Counsel incurred $7,286,868.15 in litigation expenses on behalf of the Bond Class in the prosecution of the Bond Action.  ¶195-198.  Reimbursement of these expenses is fair and reasonable.

Of the total expenses, the vast majority was related to experts.  Specifically, $4,618,592, or 63%, was expended on experts and consultants.  ¶198.  Bond Counsel retained 6 experts and consultants in multiple disciplines whose work was critical to the development of the case.  ¶¶15, 92-102.

Another large component of the expenses, $1,702,875, or 23%, was for outside vendors to provide the necessary services for electronic database document review that enabled our discovery team to efficiently and effectively search and review the more than 42.5 million pages of documents produced to Bond Plaintiffs.  ¶200.

The other expenses for which Bond Counsel seeks reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These expenses include, among others, court fees, court reporters, out-of-town travel, and copying costs. ¶201-203.  The foregoing expense items are billed separately by Bond Plaintiffs' Counsel, and such charges are not duplicated in the firm's hourly billing rates.

The Notice informed potential Bond Class Members that Bond Counsel would apply for reimbursement of litigation expenses and PSLRA awards in an amount not to exceed $10,500,000.

26

The total amount of expenses requested is below the amount listed in the Notice and, to date, there has been no objection to the request for expenses.

## V.     BOND PLAINTIFFS SHOULD BE AWARDED THEIR REASONABLE COSTS AND EXPENSES UNDER 15 U.S.C. § 77z-1(a)(4)

In connection with their request for reimbursement of litigation expenses, certain Bond Plaintiffs also seek $39,946.95 in PSLRA awards to reimburse some of the costs and expenses incurred by them directly relating to their representation of the Bond Class.  *See* Singer Decl. ¶206 and Exs. 2 to 9.  The PSLRA specifically provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class."  15 U.S.C. § 77z-1(a)(4).  Moreover, "Courts in [the Second] Circuit routinely award such costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place."  *Hicks*, 2005 WL 2757792, at *10; *see also In re Bank of America Corp. Sec., Derivatives & ERISA Litig.*, Master File No. 09 MDL 2058 (PKC), slip op. at 2-3 (S.D.N.Y. Apr. 8, 2013) (awarding PSLRA expense awards totaling $453,000 to five lead plaintiffs).

As set forth in the declarations of the respective Bond Plaintiffs, Bond Plaintiffs have pursued their claims against the Defendants for several years.  They have actively and effectively fulfilled their obligations as representatives of the Bond Class, complying with the many demands placed upon them, and providing valuable assistance to Bond Plaintiffs' Counsel.  In devoting substantial effort to the commencement of, oversight of, and participation in this Action on behalf of the Bond Class, as detailed in the Singer Declaration and Bond Plaintiffs' declarations, Bond Plaintiffs, among other things: (i) participated in discussions with Bond Counsel concerning significant developments in the litigation; (ii) reviewed significant pleadings and briefs; (iii)

27

participated in the production of discovery, including gathering and reviewing documents in response to discovery requests; (iv) prepared and sat for depositions in furtherance of their motion for class certification; and (v) oversaw settlement negotiations on behalf of the Bond Class. *See* Singer Decl. Exs. 2 to 9, and ¶¶191, 208.

The foregoing efforts by Bond Plaintiffs are precisely the types of activities Courts have found to support reimbursement to class representatives. *See, e.g.*, *Marsh & McLennan*, 2009 WL 5178546, at \*21 (noting that these efforts were "precisely the types of activities that support awarding reimbursement of expenses to class representatives"); *In re Gilat Satellite Networks*, *Ltd*., No. CV-02-1510 (CPS)(SMG), 2007 WL 2743675, at \*19 (E.D.N.Y. Sept. 18, 2007) (granting PSLRA awards where, as here, "the tasks undertaken by employees of Lead Plaintiffs reduced the amount of time those employees would have spent on other work and these tasks and rates appear reasonable to the furtherance of the litigation").

The Notice to Bond Class Members stated that the Litigation Expenses requested by Bond Counsel may include the reasonable costs and expenses of Bond Plaintiffs.  To date, there have been no objections to this request.  Bond Counsel respectfully request that the Court award Bond Plaintiffs $39,946.95 as compensation for their reasonable costs and expenses incurred in representing the Bond Class.

## CONCLUSION

For the foregoing reasons, Bond Counsel respectfully requests that the Court award: (i) attorneys' fees in the amount of 20% of the Settlement Fund, or $146,000,000, plus interest incurred at the same rate as the Settlement Fund; (ii) reimbursement of $7,286,868.15 of Bond Plaintiffs' Counsel's litigation expenses; and (iii) $39,946.95 in PSLRA awards representing Bond Plaintiffs' costs and expenses.

Dated:  June 7, 2013

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

By:     /s/ Steven B. Singer
        Max W. Berger
        Steven B. Singer
        John C. Browne
        John Rizio-Hamilton
        1285 Avenue of the Americas
        New York, NY  10019
        Tel:  (212) 554-1400
        Fax:  (212) 554-1444

        *Attorneys for Bond Plaintiffs and
        Court-appointed Bond Counsel*

**KESSLER TOPAZ MELTZER &
CHECK, LLP**
David Kessler
Darren J. Check
Matthew L. Mustokoff

280 King of Prussia Road
Radnor, PA  19087
Tel: (610) 667-7706
Fax: (610) 667-7056

*Additional Counsel for City of Tallahassee
Retirement System, Miami Beach Employees'
Retirement Plan, Southeastern Pennsylvania
Transit Authority, City of Philadelphia Board
of Pensions and Retirement, and James M.
Brown*

**POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP**
Marc I. Gross
Jeremy Lieberman

600 Third Avenue
New York, NY 10016
Tel- 212-661-1100
Fax-212-661-8665

*Additional Counsel for American European
Insurance Company*

#726823