**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE CITIGROUP INC. BOND LITIGATION | Master File No. 08 Civ. 9522 (SHS) |
| | ECF Case |

**DECLARATION OF STEVEN B. SINGER IN SUPPORT OF: (I) BOND PLAINTIFFS'
MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN
OF ALLOCATION, AND (II) BOND COUNSEL'S MOTION FOR AN AWARD OF
<u>ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES</u>**

## **TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................. 1

II.     PROSECUTION OF THE ACTION ............................................................... 4

        A.      Bond Counsel's Efforts to Identify and Preserve the Claims of Investors in
                Citigroup's Bonds and Preferred Stock ................................................. 4

        B.      Preparation of the Consolidated Amended Class Action Complaint, and
                Summary of the Claims Asserted ........................................................... 6

        C.      The Citigroup Defendants' and the Underwriter Defendants' Extensive
                Motions to Dismiss ............................................................................... 12

        D.      The Court's Opinions Largely Denying Defendants' Motions to Dismiss,
                and Denying Defendants' Motion for Reconsideration ......................... 15

        E.      Bond Plaintiffs Conduct Extensive Discovery and Motion Practice ................... 17

                1.      Bond Plaintiffs' Efforts in Document Discovery ...................................... 17

                2.      Bond Plaintiffs' Motion to Compel ......................................... 29

                3.      Bond Plaintiffs' Motion for Class Certification ........................................ 33

                4.      Defendants' Rule 12(c) Motion ............................................ 35

                5.      Bond Plaintiffs' Efforts in Deposition Discovery ...................................... 37

                6.      Bond Plaintiffs' Efforts in Expert Discovery ............................................ 39

        F.      The Settlement Negotiation Process and the Proposed Settlement ...................... 43

III.    RISKS OF CONTINUED LITIGATION ....................................................... 46

        A.      Risks Relating to Bond Plaintiffs' Claim Concerning Citigroup's Loan
                Loss Reserves .......................................................................................... 48

        B.      Risks Relating to Bond Plaintiffs' Claim Concerning Citigroup's CDO
                Valuations ............................................................................................... 50

        C.      Risks Relating to Bond Plaintiffs' Claim Concerning Citigroup's SIV
                Valuations ............................................................................................... 51

        D.      Risks Relating to Bond Plaintiffs' Claim Concerning Citigroup's Capital
                Adequacy ................................................................................................ 52

E.   Risks Relating to Bond Plaintiffs' Claim Concerning Citigroup's Failure to Adequately Disclose Its CDO Exposure ............................................................ 54

F.   Risks Relating to Damages ................................................................................ 57

G.   Risk of Appeal ................................................................................................... 61

IV.   BOND PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE ................................... 61

V.   ALLOCATION OF THE PROCEEDS OF THE SETTLEMENTS ............................... 63

VI.   THE FEE AND LITIGATION EXPENSE APPLICATION .......................................... 66

A.   The Fee Application ........................................................................................... 67

1.   The Requested Fee Is Fair and Reasonable ............................................. 67

2.   Additional Information Concerning Plaintiffs' Counsel's Lodestar ......... 70

3.   The Quality of Bond Counsel's Representation ....................................... 73

4.   The Risks of the Litigation ...................................................................... 75

5.   The Significant Amount of Time and Labor Devoted to the Action by Plaintiffs' Counsel .............................................................................. 76

6.   Bond Plaintiffs' Endorsement of the Fee Application ............................. 77

7.   The Reaction of the Settlement Class to the Fee Application .................. 78

B.   The Litigation Expense Application ................................................................... 78

VII.   CONCLUSION .......................................................................................................... 83

TABLE OF EXHIBITS ........................................................................................................... 85

I, STEVEN B. SINGER, declare as follows:

## I.   INTRODUCTION

1.     I am a partner in the law firm of Bernstein Litowitz Berger & Grossmann LLP ("BLBG"), the Court-appointed Bond Counsel.[1]  BLBG, along with Kessler Topaz Meltzer & Check, LLP and Pomerantz Grossman Hufford Dahlstrom & Gross LLP (collectively "Bond Plaintiffs' Counsel") represents Plaintiffs Louisiana Sheriffs' Pension and Relief Fund, City of Tallahassee Retirement System, City of Philadelphia Board of Pensions and Retirement, Miami Beach Employees' Retirement Plan, Southeastern Pennsylvania Transportation Authority, American European Insurance Company, Arkansas Teacher Retirement System, Phillip G. Ruffin, and James M. Brown (collectively, "Bond Plaintiffs").  I have personal knowledge of the matters set forth herein based on my active participation in the prosecution and settlement of this Action.

2.     I respectfully submit this Declaration in support of: (a) Bond Plaintiffs' Motion for Final Approval of the Settlement and Plan of Allocation (the "Final Approval Motion"); and (b) Bond Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Fee and Expense Motion").

3.     The proposed Settlement now before the Court provides for the resolution of all claims in the Bond Action in exchange for a cash payment of $730 million (the "Settlement Amount") from Citigroup Inc. ("Citigroup").   As further detailed herein, Bond Plaintiffs respectfully submit that the Settlement represents an outstanding result for the Bond Class.  If approved, the Settlement would be the second largest recovery ever in a securities class action

---

[1] Unless otherwise defined herein, all capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement dated March 18, 2013 (the "Stipulation") previously filed with the Court. *See* Dkt. No. 153-1.

brought on behalf of purchasers of debt securities, and one of the three largest securities class action recoveries in a case that does not involve a financial restatement.  The Settlement would also rank among the fifteen largest securities class action settlements in history.  As explained further below, the Settlement greatly benefits the Bond Class by conferring an immediate and substantial recovery while avoiding the significant risks and expense of continued litigation, including the risk of recovering less than the Settlement Amount, or perhaps nothing, after years of protracted continued litigation.

4.      The proposed Settlement is the result of nearly four-and-a-half years of extensive efforts by Bond Plaintiffs' Counsel in an extremely challenging and complex case involving alleged misstatements on multiple subjects in connection with 48 separate Offerings and 39 distinct securities issued over a two-and-one-half year period from May 2006 through the end of 2008.  Bond Plaintiffs' Counsel's extensive efforts included, among other things detailed herein: (a) aggressive action to identify, investigate and preserve the Bond Class's claims before the statute of limitations expired; (b) preparation of a detailed consolidated amended complaint; (c) successful opposition of Defendants' motions to dismiss; (d) filing of detailed papers in support of a vigorously-contested class certification motion, which included voluminous document production and 23 depositions of representatives from all of the Bond Plaintiffs and many of their investment advisors; (e) conducting extensive discovery, including taking or defending 76 depositions and reviewing more than 42.5 million pages of documents produced by Defendants and third parties; (f) successfully opposing Defendants' Rule 12(c) motion; and (g) engaging in an arduous settlement negotiation process with Defendants, including conducting settlement negotiations under the auspices of a highly respected mediator, retired District Court Judge Layn Phillips, which involved the exchange of multiple submissions concerning liability and damages.

5.      In addition to seeking final approval of the Settlement, Bond Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable.  Bond Plaintiffs prepared the Plan of Allocation in consultation with an experienced expert in the fields of damages and economics, Chad Coffman, CFA, the Founder and President of the Global Economics Group. Pursuant to the Plan of Allocation, the Settlement Amount plus interest accrued (less Court-approved attorneys' fees and expenses, Notice and Administration Costs and Taxes (the "Net Settlement Fund")) will be distributed on a *pro rata* basis to Bond Class Members who submit Claim Forms that are approved for payment by the Court.

6.      For their extensive efforts achieving the Settlement in the face of significant risk, Bond Counsel, on behalf of all Plaintiffs' Counsel, are applying for an award of attorneys' fees and reimbursement of Litigation Expenses.  Specifically, Bond Counsel are applying for: (a) attorneys' fees in the amount of 20% of the Settlement Amount, or $146,000,000, plus interest accrued at the same rate as the Settlement Amount; (b) reimbursement of expenses incurred in the amount of $7,286,868.15; and (c) awards pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA") in the total amount of $39,946.95 for costs and expenses reasonably incurred by the Bond Plaintiffs in connection with their representation of the Bond Class.  As detailed herein, the requested fee is within the range of percentage awards granted by courts in this Circuit and across the country in securities class actions, including cases involving large recoveries.  Significantly, the requested fee results in a modest multiplier of 1.67 on Plaintiffs' Counsel's lodestar[2] – which is well below the range of multipliers routinely awarded by courts in this Circuit and across the country.  As detailed further herein, the requested fee is amply supported by the factors set forth in *Goldberger v. Integrated Resources, Inc.*, 209 F. 3d 43 (2d

---

[2]  All the firms comprising Plaintiffs' Counsel are listed in paragraph 161 below.

Cir. 2000), and the lodestar calculation has been performed by taking into account the direction given by the Court in the Stock Action.

7.      For all of the reasons set forth herein, including the excellent result obtained and the numerous significant litigation risks, we respectfully submit that the Settlement and Plan of Allocation are "fair, reasonable and adequate" in all respects, and that the Court should approve them pursuant to Federal Rule of Civil Procedure Rule 23(e).  For similar reasons, and for the additional reasons set forth in Section VI below, we respectfully submit that Bond Counsel's requests for attorneys' fees and reimbursement of Litigation Expenses, including the requested PSLRA awards to the Bond Plaintiffs, are also fair and reasonable, and should be approved.

## II.      PROSECUTION OF THE ACTION

### A.      Bond Counsel's Efforts to Identify and Preserve the Claims of Investors in Citigroup's Bonds and Preferred Stock

8.      Even before the Bond Action was filed, Bond Counsel recognized that investors in Citigroup bonds and preferred stock possessed potentially valuable claims that had not been brought and took significant actions to investigate and preserve these claims.  On August 19, 2008, the Court consolidated numerous securities class actions seeking recovery on behalf of Citigroup investors into the Stock Action.  The Stock Action asserted claims arising under the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of investors in Citigroup common stock.  Neither the Stock Action nor any other related action filed against Citigroup asserted any claims on behalf of investors in Citigroup bonds or preferred stock.

9.      Bond Counsel recognized that investors in Citigroup's bonds and preferred stock possessed claims under the Securities Act of 1933 (the "Securities Act"), the statute that provides for liability for material misstatements and omissions made in connection with a public securities offering.  Bond Counsel further recognized that the Securities Act's statute of limitations on

certain of these claims would likely soon expire unless these claims were promptly asserted. Indeed, as this Court held in a later-filed related action asserting Securities Act claims similar to those alleged in this Action, the Securities Act's statute of limitations expired on November 4, 2008 for claims relating to Citigroup's alleged failure to disclose its exposure to subprime collateralized debt obligations ("CDOs").  *See Brecher v. Citigroup, Inc.*, 797 F. Supp. 2d 354, 367 (S.D.N.Y. 2011).  Thus, as of the time the Court entered its August 18, 2008 consolidation order in the Stock Action, the statute of limitations on Securities Act claims related to Citigroup's CDO exposure was set to expire within approximately 11 weeks.

10.    The expiration of these claims would have negatively impacted a significant number of investors.  Citigroup conducted 33 Offerings prior to November 4, 2007 (the day that Citigroup first disclosed its subprime CDO exposure), in which it sold $32 billion worth of bonds and preferred securities to investors.  As of mid-August 2008, all investors who purchased bonds or preferred stock in or traceable to those Offerings were at significant risk of having any claims based on Citigroup's misrepresentations concerning its CDO exposure expire.

11.    To preserve these investors' claims, in September and October 2008, Bond Counsel, on behalf of certain Bond Plaintiffs, prepared and filed two class action complaints in New York State Supreme Court asserting Securities Act claims against Defendants, including claims related to Citigroup's failure to disclose its CDO exposure (collectively, the "State Court Actions").  Specifically, on September 30, 2008, Bond Counsel filed a class action complaint asserting claims under Sections 11, 12(a)(2), and 15 of the Securities Act against Defendants in connection with 26 Offerings of debt securities conducted between May 18, 2006 and November 21, 2007.  On October 28, 2008 – 7 days before the statute of limitations expired – Bond Counsel filed a second class action complaint asserting the same Securities Act claims against Defendants

in connection with 44 Offerings of debt and preferred securities conducted between May 18, 2006 and August 19, 2008.  Accordingly, Bond Counsel's efforts preserved for the benefit of Bond Class Members the Securities Act claims related to Citigroup's failure to disclose its CDO exposure.

12.     On November 5, 2008, Defendants removed the first-filed State Court Action to this Court, and on November 26, 2008, Defendants removed the second-filed State Court Action to this Court.  By Order dated December 10, 2008, the Court consolidated the State Court Actions into the instant Bond Action.  *See* Dkt. No. 10 at 6.  The Court named BLBG as Bond Counsel, and made Bond Counsel and Bond Plaintiffs "responsible for prosecuting all claims on behalf of investors" in Citigroup bonds and preferred stock.  *Id*.  In addition, the Court coordinated the Bond Action with the Stock Action for all pre-trial purposes.  The Court further directed Bond Counsel to file a consolidated complaint in the Bond Action, and later set January 15, 2009 as the date for the filing of that complaint.  *Id*. at 6-7; *see also* Dkt. No. 11.

   **B.     Preparation of the Consolidated Amended Class Action Complaint, and Summary of the Claims Asserted**

13.     In connection with preparing the Consolidated Amended Class Action Complaint (the "Complaint"), Bond Plaintiffs' Counsel conducted a comprehensive investigation and analysis of the potential Securities Act claims that could be asserted on behalf of investors in Citigroup's bonds and preferred stock.

14.     This investigation included, among other things, a detailed review and analysis of a large volume of publicly available information concerning Citigroup that was issued during the three-year period between January 2006 and January 2009.  For example, Bond Plaintiffs' Counsel reviewed the Registration Statements, Prospectuses, and other Offering Materials for each of the 48 Offerings; all of Citigroup's filings with the U.S. Securities and Exchange

Commission ("SEC"); earnings announcements and press releases; transcripts of analyst conference calls; and investor presentations.   Further, Bond Plaintiffs' Counsel reviewed a similarly large volume of news articles and all publicly available analysts' reports about Citigroup, including those relating to the November 23, 2008 announcement that the U.S. Government had provided a $328 billion bailout to Citigroup as a result of its impaired financial condition, the largest bailout in history.   Given that Citigroup is one of the largest and most widely-covered financial institutions in the world, and was at the epicenter of the financial crisis, this volume of material was substantial.

15.    In addition to this factual research, Bond Plaintiffs' Counsel thoroughly researched the law applicable to the claims asserted and Defendants' potential defenses thereto. Bond Counsel also retained and consulted with multiple experts to assist in their analysis of the claims.   For example, Bond Counsel consulted with an accounting expert concerning Citigroup's alleged accounting violations.   Bond Counsel also consulted with a damages expert to determine potentially recoverable damages.

16.    On January 15, 2009, Bond Plaintiffs filed the detailed Complaint.   Based on Bond Counsel's investigation, the Complaint asserted claims under Sections 11, 12(a)(2), and 15 of the Securities Act, on behalf of all persons and entities that purchased or otherwise acquired any of 39 different Citigroup bonds, preferred stock, or depository shares representing interests in preferred stock in or traceable to 48 Offerings conducted between May 18, 2006 and August 19, 2008.   The Complaint named as Defendants: (a) the Citigroup Defendants; (b) the Individual Defendants, including former senior Citigroup executives and members of its Board of Directors; (c) and the Underwriter Defendants.

17.     The Complaint alleges that, before and during the period from May 18, 2006 through November 30, 2008 (the "Offerings Period"), the housing market was declining, and home borrowers were defaulting in record numbers.  Citigroup therefore faced the prospect of significant losses on its undisclosed subprime mortgage-related assets.  Further, since Citigroup held hundreds of billions of dollars of such assets, and since the bank operated with an extremely high degree of leverage, losses in even a small portion of its assets were sufficient to pose a serious risk to Citigroup's Tier 1 capital adequacy, the basic measure of a bank's financial stability under federal banking regulations.  Accordingly, it was material to investors in the Offerings that Citigroup accurately disclose and account for its mortgage-related exposures.

18.     The Complaint further alleges that, in connection with the Offerings of bonds and preferred stock through which Citigroup raised $67 billion from investors, Defendants made a series of material misstatements and omissions concerning Citigroup's exposure to massive amounts of subprime mortgage-related assets, their true value, and their impact on Citigroup's financial condition.  First, for Offerings conducted between May 18, 2006 and November 4, 2007, Citigroup allegedly misrepresented its exposure to as much as $66 billion worth of risky CDOs backed by subprime mortgages.  As detailed in the Complaint, this exposure consisted of: (a) $25 billion of "liquidity puts," or guarantees that obligated Citigroup to absorb any losses on these CDOs; and (b) $41 billion of "super senior" subprime CDOs and related assets that Citigroup was unable to sell.  Rather than disclose this CDO exposure, the Offering Materials for Offerings conducted prior to November 4, 2007 contained a series of misleading statements which represented that Citigroup had minimal, if any, exposure to subprime CDOs.

19.     Second, the Complaint alleges that, even after Citigroup belatedly disclosed its subprime CDO exposure on November 4, 2007, Citigroup continued to inaccurately report the

value of these securities and their impact on its financial condition in Offerings conducted after that date.  For example, while Citigroup reported that the value of its CDOs was as high as $40 billion as of February 2008, in reality, these securities were worth tens of billions of dollars less than reported.  As support for the allegations that Citigroup overstated the value of its CDOs, the Complaint alleges that: (a) Citigroup was unable to find any buyer for its CDOs at their recorded value; (b) the leading market indices for measuring the value of the CDOs reflected that Citigroup's CDOs were worth a fraction of their reported value; and (c) Citigroup's valuation methodology improperly relied on valuations of far less risky corporate bonds and failed to analyze the market value of the underling CDO collateral.

20.     Third, the Complaint alleges that, for all Offerings conducted prior to December 13, 2007, Citigroup misrepresented its exposure to, and its obligation to consolidate, $100 billion worth of risky, subprime-backed securities known as structured investments vehicles ("SIVs"). Specifically, while Citigroup represented that it had only "limited" involvement with its SIVs, and was not required to consolidate them or absorb their losses, in reality, Citigroup was obligated to absorb their losses and consolidate them on its balance sheet – facts to which Citigroup admitted on December 13, 2007, when it announced that it would consolidate its SIVs.

21.     Fourth, the Complaint alleges that, even after Citigroup was forced to consolidate its SIVs, it continued to misrepresent the SIVs' credit quality and value in Offerings conducted after December 13, 2007.  Specifically, while Citigroup claimed that its SIVs were of "high credit quality," and that the SIVs' assets were worth tens of billions of dollars, the SIVs' assets consisted largely of toxic subprime-backed securities that were worth far less than reported.  In support of the allegation that Citigroup overvalued its SIVs, the Complaint alleges that: (a) the collateral supporting certain SIV assets had recently suffered sharply rising defaults, which

impaired their cash flows; (b) Citigroup could find no buyer for its SIVs at their reported value; and (c) since at least the fourth quarter of 2006, relevant market indices showed that the SIVs' mortgage-backed assets had severely deteriorated in value.

22.     Fifth, the Complaint alleges that, Citigroup understated its loan loss reserves by billions of dollars at each quarter throughout the Offerings Period.  As the Complaint alleges, by the time the Offerings Period began, Citigroup had accumulated a $200 billion portfolio of high-risk mortgage loans, including tens of billions of dollars of subprime loans.  Generally Accepted Accounting Principles ("GAAP") required that each quarter Citigroup establish a reserve against "probable" losses in its mortgage portfolio, and that it charge any increase against its income.  In particular, under SFAS 5, Citigroup was required to establish a reserve that reflected: (a) all loans that had already defaulted and been charged off each quarter; and (b) an additional amount of loans whose existing credit risk established a probability of default, but which had not yet defaulted.  In violation of these requirements, Citigroup's loan loss reserves for its North American portfolio included only the loans that had already defaulted and been charged off each quarter, with no provision for the additional loans that posed a likelihood of default.  Consequently, Citigroup's loan loss reserves were understated by between $1.6 billion and $7.2 billion each quarter during the Offerings Period.

23.     Sixth, that Complaint alleges that, for Offerings conducted between August 2007 and April 18, 2008, Citigroup failed to disclose its exposure to $11 billion worth of illiquid and impaired mortgage-related securities known as "auction rate securities" ("ARS").  Further, even after Citigroup disclosed its exposure to ARS on April 18, 2008, it continued to overstate the value of these securities on its balance sheet by billions of dollars – balance sheets that were

included in the Offering Materials for the Offerings conducted through the end of the Offerings Period.

24.    Seventh, the Complaint alleges that, in making the material misstatements and omissions summarized above, Citigroup violated GAAP in several ways.  Specifically, Citigroup violated: (i) SFAS 107, FIN 46(R), and SOP No. 94-6 in failing to disclose its CDO exposure; (ii) SFAS 115 and SFAS 157 in failing to properly value its CDOs and SIVs; and (ii) as noted above, SFAS 5 in failing to report adequate loan loss reserves.

25.    Finally, the Complaint alleges that Citigroup misrepresented its "well capitalized" status.  Specifically, at each quarter during the Offerings Period, Citigroup reported that it was "well capitalized" under federal regulations, *i.e.*, that it possessed ample capital to absorb any losses in its assets.  However, in reality, by no later than mid-2007, tens of billions of dollars of unreported losses in the Company's subprime-related assets had seriously jeopardized its capital adequacy.  Moreover, the problems with Citigroup's capital adequacy intensified throughout 2007, and ultimately brought Citigroup to the precipice of insolvency by 2008.  Nevertheless, the Offering Materials for Offerings conducted in 2008 inaccurately assured investors that the quality of Citigroup's mortgage-related assets was improving, the risk of any adverse impact on its financial condition was decreasing, and the bank remained well-capitalized.

26.    The Complaint alleges that investors in the Offerings did not learn the full truth about Citigroup's financial condition until months after the last Offering was conducted.  In November 2008, a series of disclosures concerning Citigroup's financial condition culminated in the November 23, 2008 announcement that the U.S. Government had been forced to extend Citigroup a $326 billion bailout to prevent it from collapsing as a result of its toxic mortgage-related assets.  As investors realized that Citigroup was close to insolvent as a result of massive

undisclosed losses in its mortgage-backed assets, the price of the Bond Class Securities fell precipitously.

### C. The Citigroup Defendants' and the Underwriter Defendants' Extensive Motions to Dismiss

27. On March 13, 2009, the Citigroup Defendants and the Underwriter Defendants filed separate motions to dismiss the Complaint. Their motions to dismiss consisted of 82 pages of briefs and over 320 pages of exhibits. *See* Dkt. Nos. 41, 42, 44, 45. Defendants argued that the Complaint should be dismissed on numerous grounds, including those described below.

(a)  Defendants argued that Bond Plaintiffs lacked standing to bring Section 11 claims for all Offerings in which they did not purchase securities, or 29 of the 48 Offerings at issue.

(b)  Defendants contended that the Complaint pled "falsity by hindsight." Cataloguing a wide array of materials concerning the sudden onset of the financial crisis and its severe impact on virtually every other major financial institution, Defendants contended that all of Citigroup's statements concerning its exposure to mortgage-related assets, as well as its loan loss reserves and asset valuations, were accurate and complete when issued.

(c)  Similarly, Defendants argued that the Complaint pled only inactionable mismanagement by alleging that Citigroup made poor business decisions in the midst of an unanticipated market meltdown.

(d)  Citing extensive disclosures in the Offering Materials concerning Citigroup's CDO and SIV operations, Defendants argued that Citigroup adequately disclosed Citigroup's exposure to CDOs and SIVs.

(e)  Defendants also contended that, in light of the disclosures made, Citigroup had no duty to disclose any additional information concerning the precise extent of its CDO exposure before November 4, 2007.

(f)  Defendants further contended that, under accounting rules, Citigroup had no duty to consolidate its SIVs before December 13, 2007.

(g)  Defendants asserted that all the Complaint's allegations concerning GAAP violations – including those related to Citigroup's overvalued CDO and SIV holdings, and inadequate loss reserves – failed to state a claim because they concerned matters of judgment, which were not actionable unless the Complaint alleged either that the Defendants believed that their valuations were inaccurate or that the valuations lacked a reasonable basis. Defendants

contended that the Complaint contained no such allegations.

(h)     Defendants further argued that their CDO and SIV asset valuations and loan loss reserves were accurately stated throughout the Offerings Period.

(i)     Defendants argued that Citigroup made extensive public disclosures concerning its involvement in the ARS market, and thus adequately disclosed Citigroup's ARS exposure.  Defendants further argued that Citigroup had no duty to disclose the specific amount of its ARS exposure earlier than it did, and that it accurately valued its ARS at all relevant times.

(j)     Defendants further argued that the claims based on misstatements of capital adequacy were derivative of the Complaint's other claims, and should be dismissed for the same reasons as those other claims.

(k)     Defendants contended that the Complaint "sounded in fraud" and was thus subject to heightened pleading standards of Fed. R. Civ. P. 9(b), which they asserted it failed to satisfy.  Defendants further contended that, because the Complaint sounded in fraud, Bond Plaintiffs were required to plead scienter, which they had failed to do.

(l)     Defendants also argued that Bond Plaintiffs lacked standing to bring Section 12(a)(2) claims, and that Citigroup could not be liable under that statute because it was not a "statutory seller."

28.     On April 24, 2009, Bond Plaintiffs filed a 75-page brief in opposition to Defendants' motions to dismiss in which they vigorously disputed Defendants' arguments.  *See* Dkt. No. 47.  Among other things, in their opposition brief, Bond Plaintiffs:

(a)     Demonstrated that they had standing to assert Section 11 claims for all 48 Offerings.  As Bond Plaintiffs explained, all Offerings were conducted pursuant to three allegedly misleading Registration Statements, and Bond Plaintiffs purchased securities issued under each of those Registration Statements.  Thus, unlike the cases on which Defendants relied, Bond Plaintiffs and all members of the proposed class could trace their injury to a common, misleading set of registration statements.

(b)     Rebutted Defendants' "fraud by hindsight" and "mismanagement" arguments by demonstrating that the Complaint alleged numerous contemporaneous facts showing that Defendants' statements in the Offering Materials were false or misleading when made.

(c)     Refuted Defendants' arguments that Citigroup had no duty to disclose its subprime CDO exposure before November 4, 2007, as well as Defendants' arguments that Citigroup had adequately disclosed its CDO exposure prior to that date.

(d)     Argued that, under applicable accounting rules, Citigroup was implicitly obligated to consolidate its SIVs prior to December 13, 2007.

(e)     Argued extensively that Citigroup's CDO and SIV valuations and loan loss reserves were not inactionable matters of "judgment," and that the Complaint alleged specific, contemporaneous facts showing that Citigroup overstated the value of its CDOs and SIVs, and understated its loss reserves.

(f)     Argued that Citigroup had a duty to disclose its ARS exposure prior to April 18, 2008, and that even after Citigroup disclosed its exposure to ARS, it continued to misstate their value.

(g)     Demonstrated that the Complaint adequately alleged that, in light of massive unreported losses in its mortgage-related assets, Citigroup misrepresented its capital adequacy during the Offerings Period.

(h)     Established that, under applicable law, the Complaint did not sound in fraud.

(i)     Argued that Bond Plaintiffs had standing to bring Section 12(a)(2) claims.

29.     On May 13, 2009, Defendants filed their respective reply papers, which consisted of a combined 35 pages of additional briefs, plus additional exhibits.  *See* Dkt. Nos. 51, 52, 53, 54.

30.     After briefing was complete, Bond Plaintiffs monitored any factual and legal developments that were pertinent to the motions to dismiss and kept the Court informed of these developments.  In particular, in April 2010, Bond Plaintiffs wrote a detailed letter to the Court informing it of facts made public in connection with hearings conducted by the Financial Crisis Inquiry Commission ("FCIC"), which corroborated certain of the claims that Bond Plaintiffs had originally alleged in the Complaint.   During April and May 2010, Bond Plaintiffs and Defendants each submitted additional letters addressing these facts and their relevance to Defendants' pending motions to dismiss.  Bond Plaintiffs also responded to a letter submitted by Defendants concerning certain newly-issued decisions that Defendants contended supported their arguments for dismissal.

14

**D.     The Court's Opinions Largely Denying Defendants' Motions to Dismiss, and Denying Defendants' Motion for Reconsideration**

31.     On July 12, 2010, the Court entered a 50-page Opinion & Order in which it agreed with many of the arguments advanced by Bond Plaintiffs and largely denied Defendants' motions to dismiss.  *See In re Citigroup Inc. Bond Litig.*, 723 F. Supp. 2d 568 (S.D.N.Y. 2010) (the "July 12 Opinion").  In the July 12 Opinion, the Court held that Bond Plaintiffs had standing to bring Section 11 claims on all 48 Offerings because Bond Plaintiffs had purchased securities issued under all three Registration Statements pursuant to which all the Offerings were conducted.  The Court further held that the Complaint did not sound in fraud, and sustained the majority of Bond Plaintiffs' claims, including the claims alleging that Citigroup: (a) made material misstatements and omissions concerning its subprime CDO exposure prior to November 4, 2007; (b) even after disclosing its CDO exposure, continued to misrepresent the value of its CDOs on its balance sheet; (c) misrepresented the credit quality and value of its SIVs after consolidating them on December 13, 2007; (d) understated its loan loss reserves throughout the Offerings Period; (e) violated GAAP in failing to disclose its CDOs, reporting inaccurate CDO and SIV values, and reporting inadequate loan loss reserves; and (f) made misstatements concerning its capital adequacy.  The Court dismissed Bond Plaintiffs' claims concerning Citigroup's obligation to consolidate its SIVs prior to December 13, 2007, and Citigroup's alleged misstatements and omissions related to its ARS exposure.  The Court also dismissed Bond Plaintiffs' claims under Section 12(a)(2) solely for lack of standing.

32.     On July 26, 2010, Defendants filed a motion for reconsideration of the Court's July 12 Opinion with respect to its holding that Bond Plaintiffs had standing to bring Section 11 claims in connection with Offerings in which they did not purchase.  Defendants contended that the Court overlooked controlling Second Circuit law in *DeMaria v. Andersen*, 318 F.3d 170 (2d

Cir. 2003), which Defendants argued demonstrated that Bond Plaintiffs lacked statutory standing to bring Section 11 claims in connection with the 29 Offerings in which they did not purchase securities.  Defendants further contended that the Court's ruling on standing contradicted the weight of district court authority.  Finally, Defendants asserted that supposed differences between the types of securities issued in the Offerings undermined the Court's conclusion that Bond Plaintiffs had standing to bring claims in connection with securities they did not purchase.

33.    Bond Plaintiffs filed their opposition brief on August 9, 2010.  Bond Plaintiffs demonstrated that the Court had undertaken a thorough and correct analysis of statutory standing in its July 12 Opinion.  Noting that Defendants did not cite *DeMaria* in their voluminous motion to dismiss briefs, Bond Plaintiffs explained that *DeMaria* did not address the standing issue before the Court and, in any event, the Court did not overlook this decision, but rather cited it in its July 12 Opinion.  Bond Plaintiffs further demonstrated that the Court was well aware of, and properly rejected and/or distinguished, the district court decisions cited by Defendants.  Finally, Bond Plaintiffs explained that the supposed differences between the types of securities issued in the Offerings had no impact on the Court's standing analysis.  Defendants filed their reply brief on August 16, 2010.  On March 29, 2011, the Court entered an Order denying Defendants' motion for reconsideration for substantially the reasons set forth in Bond Plaintiffs' opposition brief.

34.    On October 8, 2010, Defendants filed their Answers to the Complaint.  In their Answers, Defendants denied Bond Plaintiffs' claims in their entirety, and asserted a combined 38 affirmative defenses, including, among others, that the Offering Materials were accurate in all material respects; Citigroup had no duty to disclose any allegedly omitted information; many of the allegedly false statements concerned opinions and forward looking matters that were not

actionable under the securities laws; Bond Plaintiffs were aware of any facts that they claimed were omitted or misrepresented; any loss suffered by Bond Plaintiffs was not caused by Defendants' alleged misrepresentations and omissions; Defendants conducted a reasonable investigation of the Offering Materials' accuracy and had reasonable grounds to believe that the Offering Materials were accurate and materially complete; and the Bond Action did not meet the requirements for class certification under Rule 23.

### E.   Bond Plaintiffs Conduct Extensive Discovery and Motion Practice

#### 1.   Bond Plaintiffs' Efforts in Document Discovery

35.    In August 2010, the Bond Action moved into active discovery.  Specifically, on August 27, 2010, Bond Plaintiffs submitted a Stipulation and Proposed Scheduling Order (the "Scheduling Order") setting forth the Parties' joint discovery plan pursuant to Fed. R. Civ. P. 26(f), which provided that fact discovery was to begin that day.  The Scheduling Order was entered by the Court on September 30, 2010.

36.    Given the scope of Bond Plaintiffs' claims, discovery in the Bond Action was an enormous undertaking.  As noted above, the Bond Action asserted that Citigroup made materially false statements in connection with 48 different Offerings conducted over a two and half year period concerning its CDO exposure, CDO valuation, SIV valuation and credit quality, loan loss reserves, GAAP compliance, and capital adequacy.  To prove these claims, Bond Plaintiffs needed to obtain and develop evidence on a multitude of complex issues concerning the value of numerous types of Citigroup's mortgage-related assets, and their impact on Citigroup's capital position.

37.    Thus, on August 30, 2010, Bond Plaintiffs served their first set of document requests on Defendants.  These requests sought 49 separate categories of documents related to, among other things, the composition and value of Citigroup's CDOs and SIVs, the composition

of Citigroup's mortgage portfolio, the adequacy of its loan loss reserves, its compliance with GAAP, and its capital adequacy for the three-year period from January 1, 2006 to January 1, 2009.

38.     On October 8, 2010, Defendants served their responses and objections, in which they raised numerous objections to Bond Plaintiffs' requests, refused to produce documents on certain subjects, and agreed to produce only some documents on certain other subjects.  Bond Plaintiffs then engaged in extensive meet-and-confers with Defendants, and exchanged numerous detailed letters, through which the Parties negotiated the scope of Bond Plaintiffs' document requests, Defendants' objections thereto, and proposed custodians whose files would be searched and the search terms that would be used.  Defendants began producing documents in November 2010.

39.     While document discovery was beginning in the Bond Action, on November 9, 2010, the Court issued its opinion resolving the motions to dismiss in the Stock Action.  *See In re Citigroup, Inc. Sec. Litig.*, 753 F. Supp. 2d 206 (S.D.N.Y. 2010).  In that Opinion, the Court sustained claims alleging that Citigroup and certain former senior officers: (a) made misstatements and omissions concerning Citigroup's CDO exposure from February 2007 through November 3, 2007; and (b) misstated the value of Citigroup's CDOs from November 4, 2007 to April 2008.  *Id.* at 249.  The Court dismissed the remaining claims in the Stock Action. Following the Court's decision on the motions to dismiss in the Stock Action, Bond Plaintiffs coordinated discovery with the Stock Action plaintiffs in order to streamline the litigation, as explained further below in paragraph 90.

40.     Defendants continued to produce documents in the Bond Action in increasingly larger quantities during the remainder of 2010 and 2011.  As disputes arose over the scope and

adequacy of Defendants' ongoing document production, Bond Plaintiffs and Defendants continued to meet and confer, and were able to resolve the majority of the Parties' disagreements without the need for judicial intervention.  As a result of these efforts, Defendants produced approximately 38 million pages of documents to Bond Plaintiffs, including documents concerning all the subjects at issue in the Bond Action.

41.     Bond Plaintiffs also conducted extensive third-party document discovery.  Bond Plaintiffs subpoenaed documents from 13 non-parties, including Citigroup's auditor, KPMG, and former senior Citigroup employees.  Bond Plaintiffs engaged in numerous meet-and-confers with these third parties concerning the scope of Bond Plaintiffs' requests and the sufficiency of the third parties' responses.  Through these efforts, Bond Plaintiffs obtained more than 4.5 million additional pages of documents relevant to the Bond Action from non-parties.

42.     In total, Bond Plaintiffs obtained more than 42.5 million pages of documents from Defendants and non-parties that were relevant to the Bond Action.  Bond Plaintiffs' review and analysis of these documents was essential to their prosecution of the Bond Action.  The vast majority of the claims in the Bond Action were not the subject of any other action, and raised complex issues about the value of mortgage-backed securities and their impact on Citigroup's capital adequacy on which Bond Plaintiffs had the burden of proof.  To carry their burden to prove these challenging claims, Bond Plaintiffs had to independently develop a very substantial amount of evidence.

43.     For example, Bond Plaintiffs were required to develop evidence to prove that Citigroup understated its loss reserves by billions of dollars every quarter from the first quarter of 2006 through the third quarter of 2008.  It is very difficult to prove that a bank as large as Citigroup materially misstated its loss reserves for nearly three years.  Citigroup maintained a

$200 billion mortgage portfolio, and calculated the loss reserves on this portfolio by using sophisticated, proprietary financial models that had hundreds of variables, changed several times during the Offerings Period, and were reviewed by its auditor.  Bond Plaintiffs had to prove that these detailed financial models understated Citigroup's loss reserves by billions of dollars at each quarter during the Offerings Period.  To develop this proof, Bond Plaintiffs had to carefully analyze documents produced by Citigroup and KPMG concerning Citigroup's mortgage portfolio and loan loss reserves, including documents and communications from dozens of Citigroup and KPMG employees who were involved with determining Citigroup's loss reserves; auditing its loss reserves; creating, reviewing, and analyzing its models for setting its loss reserves; and analyzing and managing the risk in Citigroup's massive mortgage portfolio.

44.     Similarly, Bond Plaintiffs were required to prove that Citigroup materially overstated the value of its $66 billion CDO portfolio by billions of dollars at each quarter from year-end 2006 through the third quarter of 2008.  Proving that Citigroup overstated the value of its $66 billion CDO portfolio was also very difficult and required Bond Plaintiffs to conduct extensive document review and analysis.  CDOs were highly complex securities whose value depended on cashflows generated by thousands of underlying securities that were, in turn, backed by hundreds of thousands of mortgage loans.  Again, Citigroup determined the value of its CDOs by using financial models that had hundreds of variables, changed multiple times during the Offerings Period, and were reviewed by its auditor.  Bond Plaintiffs had to develop evidence establishing that Citigroup's sophisticated CDO valuation models overestimated the value of Citigroup's CDOs by billions of dollars at each quarter for nearly two years.  To develop this evidence, Bond Plaintiffs had to conduct a detailed review of all documents produced by Citigroup and KPMG concerning the value and credit risk of Citigroup's CDOs,

including documents and communications from scores of Citigroup and KPMG employees who were involved with determining the value of the CDOs; creating, analyzing, and auditing Citigroup's CDO valuation models; assessing and managing the risk in the CDO portfolio; and buying and selling CDO securities through Citigroup's trading desks.

45.    Similarly, Bond Plaintiffs were required to prove their claim that Citigroup overstated the value of its $49 billion SIV portfolio by billions of dollars from year-end 2007 through the third quarter of 2008.  This claim, too, was extremely difficult, and required Bond Plaintiffs to develop extensive evidentiary support.  Like CDOs, SIVs were highly complex securities whose value depended on cashflows received from thousands of underlying asset-backed securities, which in turn were backed by hundreds of thousands of mortgages, car loans, student loans, and bank debt, among other things.  Citigroup also used sophisticated financial models to estimate the value of the SIVS – models which again had hundreds of independent variables, and were reviewed by its auditor.  To prove that Citigroup materially overstated the value of its SIVs, Bond Plaintiffs needed to develop evidence showing that these valuation models overestimated the value of the SIVs by billions of dollars each quarter for approximately a year.  Developing this evidence required Bond Plaintiffs to review all documents produced by Citigroup and KPMG concerning the value and credit risk of the SIVs, including documents and communications from a host of employees who were involved with determining the value of the SIVs; creating, analyzing, and auditing Citigroup's SIV valuation models; assessing and managing the risk in the SIV portfolio; and buying and selling SIV securities through Citigroup's trading desks.

46.    Bond Plaintiffs also alleged that Citigroup misrepresented its capital adequacy from mid-2007 through the third quarter of 2008.  Proving that one of the world's largest banks,

with a balance sheet as large as Citigroup's, was not "well capitalized" is an exceptionally complex and difficult task.  Throughout the Offerings Period, Citigroup reported capital ratios that were significantly above the levels required by federal regulations.  To prove that Citigroup was not well capitalized, Bond Plaintiffs had to develop evidence showing that Citigroup had suffered tens of billions of dollars in unreported losses in its mortgage-related assets at each quarter from mid-2007 through the third quarter of 2008.  To develop this evidence, Bond Plaintiffs had to carefully analyze all documents that Citigroup produced concerning the value of its mortgage-related assets, its capital levels and capital adequacy, and the impact of any losses on its capital position, including the documents and communications of numerous Citigroup employees who were involved with valuing Citigroup's mortgage-related assets, running and auditing Citigroup's capital models, and negotiating the bailout.

47.    Because these claims were unique to the Bond Action, in developing the evidence necessary to prove these claims, Bond Plaintiffs could not rely on the evidence developed in related actions against Citigroup.  For example, the SEC's action against Citigroup alleged only that Citigroup misrepresented its CDO exposure for the approximately 4-month period between July 20, 2007 and November 4, 2007.  While the Bond Action also asserted claims related to Citigroup's failure to disclose its CDO exposure, the claims asserted in the Bond Action went far beyond those at issue in the SEC's action.

48.    Moreover, many of the largest Offerings in this case, which also had the largest damages, occurred after Citigroup disclosed its CDO exposure in November 2007, including 12 Offerings of more than $33 billion worth of securities that accounted for the vast majority of Bond Plaintiffs' damages.  Thus, Bond Plaintiffs' ability to recover the large majority of the Bond Class's damages depended on proving their claims related to Citigroup's misstated CDO

and SIV valuations, loan loss reserves, and capital adequacy – claims for which Bond Plaintiffs

had to independently develop evidence to carry their burden of proof.

49.     Developing this evidence from the 42.5 million pages of documents produced by

Defendants and third parties was a massive undertaking.  Bond Plaintiffs implemented a detailed

process by which teams of attorneys reviewed the documents, and the evidence they discovered

was shared among Plaintiffs' Counsel and Bond Plaintiffs' experts.   At the beginning of this

process, Bond Counsel assembled and trained a team of attorneys from Plaintiffs' Counsel to

review and analyze the document productions.  Bond Counsel prepared a manual explaining the

issues in the case, summarizing the responsibilities of key Defendants and Citigroup executives,

setting forth a chronology of events, and describing the electronic database that the attorneys

from Plaintiffs' Counsel would use to review the documents.   Bond Counsel provided this

manual to the attorneys along with additional background materials, including the Complaint, the

motion to dismiss briefing, and the Court's July 12 Opinion.   Thereafter, Bond Plaintiffs'

Counsel conducted multiple training sessions with attorneys from Plaintiffs' Counsel concerning

the substantive issues in the case and the electronic document database that the attorneys would

be using to review the documentary evidence in the Bond Action.

50.     Teams of attorneys from Plaintiffs' Counsel then began to review, analyze, and

categorize the documents on the electronic database.   In reviewing these documents, the

attorneys were required to make several determinations as to their importance and relevance.

Specifically, they determined whether the documents were "hot," "relevant," or "not relevant."

They also determined which specific issues the documents related to, including issues for CDO

exposure, CDO valuation and credit quality, SIV consolidation, SIV valuation and credit quality,

reclassification of SIV assets, mortgage underwriting and credit quality, loan loss reserves,

residential mortgage-backed securities exposure and valuation, capital adequacy, the bailout, the Offerings and Offering Materials, and underwriter due diligence.  In addition, the attorneys were required to determine which Citigroup executives the document related to, so that the documents could be easily retrieved when preparing for the depositions of those executives.

51.     For documents identified as "hot," the attorneys were typically required to explain their substantive analysis of the document's importance.   Specifically, the attorneys made electronic notations on the document review system explaining what portions of the documents were hot, how they related to the issues in the case, and why the attorney believed that information to be significant.

52.     The attorneys also analyzed the documents for several other issues related to the adequacy and scope of Citigroup's document production.  For example, the attorneys reviewed any privilege redactions, as well as Citigroup's privilege logs, to determine whether Citigroup was redacting or withholding potentially non-privileged information.   This was a significant undertaking because Citigroup's privilege log spanned more than 1,400 pages and contained more than 9,700 entries.   The attorneys also reviewed the productions to determine whether Citigroup was producing the documents it had agreed to produce in response to Bond Plaintiffs' document requests.   Moreover, as the attorneys analyzed the documents, they made note of whether the documents referenced additional subjects or custodians for which Bond Plaintiffs should consider requesting additional documents.  Based on this analysis of these issues, Bond Plaintiffs were kept apprised of any deficiencies in Citigroup's document production, and repeatedly sought and obtained additional documents from Defendants to remedy these deficiencies.

53.     During the document review process, Plaintiffs' Counsel held regular weekly meetings with the attorneys conducting the document review.  In advance of these meetings, the most significant documents that had been discovered and analyzed during the prior week were compiled and circulated to all Plaintiffs' Counsel.  At the meetings, the attorneys who analyzed these documents discussed their importance, and other counsel present asked questions and discussed additional, similar documents that had been discovered.  Through these meetings, Bond Counsel ensured that attorneys from Plaintiffs' Counsel were all aware of the important documentary evidence being developed in the case, and focused the document review teams on developing similar evidence in support of Bond Plaintiffs' claims.

54.     The magnitude of Citigroup's document productions continued to grow through 2011, and Bond Plaintiffs began to receive tens of millions of pages of documents.  Bond Counsel determined that the most efficient process for analyzing this large volume of documents was to divide the attorney team into smaller teams with responsibility for reviewing documents related to specific issues.  Thus, in 2011, Bond Counsel divided the attorneys into teams with responsibility for CDO exposure, CDO valuation and credit quality, SIV valuation and credit quality, loan loss reserves, and capital adequacy.  Creating specialized teams allowed the attorneys on each team to develop close familiarity with the subject to which they were assigned, as well as detailed knowledge of the most important facts related to that subject.  This enabled them to review and analyze documents more quickly, efficiently, and effectively.

55.     As the document review process was ongoing, Bond Counsel created a central repository of key documents organized by issue.  Important documents related to each of Bond Plaintiffs' claims were arranged chronologically and placed in binders dedicated to each issue. These binders were updated regularly as additional key documents were discovered.  The binders

were located in a central repository, and electronic versions of the binders were maintained on the document database.  Creating this repository of key documents allowed attorneys from Plaintiffs' Counsel to easily access and analyze the key documents related to any claim in the case without having to independently compile them, which allowed the attorneys to efficiently prepare for depositions and locate evidence for fact-based submissions to the Court.

56.     In addition, for each claim in the Bond Action, Bond Counsel created an extensive, detailed memorandum that served as a blueprint for the evidence that Bond Counsel was developing in support of that claim.  These memoranda set forth the facts Bond Plaintiffs were required to prove to prevail on that claim, cited the important documentary and deposition evidence relating to those facts, and explained how that evidence tended to prove or disprove those facts.  These memos were continually updated as additional relevant documentary evidence or deposition testimony was obtained.

57.     These memoranda guided and streamlined Bond Plaintiffs' discovery efforts.  For example, the memoranda explained what additional documentary evidence Bond Plaintiffs needed to develop to support their claims, which the attorney teams were then tasked with identifying.  Similarly, these memoranda described deposition testimony that Bond Plaintiffs should attempt to elicit to further support their claims.  Attorneys conducting depositions could then structure their depositions to elicit the desired testimony from relevant witnesses.

58.     In addition to conducting the extensive document discovery summarized above, Bond Plaintiffs served numerous interrogatories and requests for admissions on Defendants. Specifically, on March 6, 2012, Bond Plaintiffs served their first set of interrogatories on Citigroup, requesting detailed information about Citigroup's SIVs for the three-year period between 2006 and 2009, including identification of the assets held by the SIVs at each quarter;

identification of all sales of SIV assets and the prices at which the sales were made; and any models used to value SIV assets.  On July 3, 2012, Defendants served their responses and objections, in which they provided the requested information.  This information assisted Bond Plaintiffs in developing additional evidence in support of their claims that Citigroup misstated the value of its SIVs.

59.    On August 10, 2012, Bond Plaintiffs issued their second set of interrogatories to Citigroup seeking a wide variety of information generated between 2006 through 2009 that was relevant to their claims, including information concerning Citigroup's capital calculations and ratios, the risk-weighting assigned to CDOs and SIVs when calculating capital adequacy under federal regulations, projected defaults in Citigroup's mortgage portfolio, and calculation of loan loss reserves.  On August 15, 2012, Bond Plaintiffs issued their third set of interrogatories to Citigroup seeking all information that Citigroup believed supported the 21 affirmative defenses it asserted in its Answer to the Complaint.  Also on August 15, 2012, Bond Plaintiffs issued their first set of interrogatories to the Underwriter Defendants seeking all information that they believed supported the 17 affirmative defenses they asserted in their Answer to the Complaint.

60.    On August 15, 2012, Bond Plaintiffs issued their requests for admissions to Citigroup.  These requests contained 54 requests for admissions related to all the claims in the Bond Action, including, among other things, requests for admission concerning: (a) Citigroup's CDO exposure and the risk profile of its CDOs; (b) CDO valuation; (c) Citigroup's public disclosures; (d) the adequacy of Citigroup's loan loss reserves; (e) the assets held by, and the value of, Citigroup's SIVs; (f) the impact of impairments in Citigroup's SIVs and CDOs on its capital adequacy; and (g) Citigroup's need for the bailout.

27

61.     While Bond Plaintiffs' Counsel was engaging in the discovery summarized above, Bond Plaintiffs' Counsel were also responding to numerous discovery requests by Defendants.   For example, on September 30, 2010, Defendants served 34 wide-ranging document requests on Bond Plaintiffs seeking, among other things, all documents from January 1, 2006 through the date of Bond Plaintiffs' responses concerning Bond Plaintiffs' transactions in the Bond Class Securities, Bond Plaintiffs' investment managers, or Citigroup.   In response to these requests, Bond Plaintiffs diligently gathered, reviewed, and produced over 70,000 pages of documents, including, among other things, all documents concerning their transactions in the Bond Class Securities and documents regarding Citigroup.

62.     Also on September 30, 2010, Defendants served their first set of interrogatories on Bond Plaintiffs, requesting that Bond Plaintiffs provide, among other things, the names of all individuals with knowledge relevant to the action.   On November 8, 2010, Bond Plaintiffs served their responses and objections in which they identified their investment advisors for transactions in the Bond Class Securities during the Offerings Period.

63.     Defendants thereafter served document subpoenas on 17 of Bond Plaintiffs' outside investment managers.   Bond Plaintiffs' Counsel coordinated and conferred with each of these investment managers regarding the subpoenas and, in several instances, assisted the investment managers in providing documents and responding to the subpoenas.

64.     In addition, Defendants issued approximately 40 deposition notices and/or subpoenas for representatives of each of the Bond Plaintiffs and their investment advisors pursuant to Fed. R. Civ. P. 30(b)(6).   Bond Plaintiffs coordinated with these investment advisors regarding the subpoenas and the permissible scope of discovery.   Between February 15, 2011

and July 29, 2011, Defendants conducted 23 depositions of representatives of Bond Plaintiffs and their investment advisors.  Bond Plaintiffs' Counsel defended each of these depositions.

### 2.      Bond Plaintiffs' Motion to Compel

65.      Although Bond Plaintiffs were able to resolve the vast majority of their discovery disputes with Defendants through the meet and confer process, they were not able to resolve their dispute over documents that Citigroup was withholding pursuant to the "bank examination privilege."  Based on a review of Citigroup's privilege logs, Bond Plaintiffs concluded that these documents were relevant to the core claims in the Bond Action, namely, that Citigroup overvalued its mortgage-related assets by billions of dollars during the Offerings Period, and that undisclosed losses in these assets caused Citigroup to fall below threshold for "well capitalized" status under federal regulations, requiring the Federal Government to rescue Citigroup with the bailout.  Indeed, many of the documents being withheld were created during the Fall of 2008 when Citigroup received the bailout, and concerned analyses of the value of Citigroup's mortgage-related assets, assessments of its capital adequacy, and communications with regulators relating to the bailout.

66.      As noted above, Bond Plaintiffs engaged in numerous meet and confers with Defendants in an effort to negotiate a resolution to the Parties' disputes over documents.  In this instance, the Parties were not successful.  Because proving the core claims in the Bond Action was extremely difficult, and because these documents directly related to disputed issues of fact central to those claims, Bond Plaintiffs moved to compel production of these key documents on May 13, 2011.  Bond Plaintiffs served their motion to compel on the three federal banking agencies whose communications with Citigroup were at issue, namely, the Board of Governors of the Federal Reserve System (the "Federal Reserve"); the Federal Deposit Insurance Corporation (the "FDIC"); and the Office of the Comptroller of the Currency (the "OCC").

67.     Between May 20, 2011 and May 27, 2011, Bond Plaintiffs received correspondence from each of the Federal Reserve, the FDIC and the OCC asserting that the documents at issue were privileged, and that Bond Plaintiffs were required to exhaust their administrative remedies before moving to compel by requesting that the agencies agree to waive the privilege and release the documents pursuant to their respective regulations.  Between May 24, 2011 and May 31, 2011, Bond Plaintiffs submitted letters to each agency explaining that, based on several court decisions, Bond Plaintiffs were not required to exhaust their administrative remedies before moving to compel.  Nevertheless, in an effort to resolve the dispute and avoid further motion practice, Bond Plaintiffs addressed the criteria for waiver under each agency's regulations.  Bond Plaintiffs provided each agency with detailed letter-briefs explaining why, under each set of regulations, the criteria for waiver were satisfied, and the documents should be released.

68.     On June 6, 2011, Citigroup filed its opposition brief, contending that Bond Plaintiffs had failed to exhaust their administrative remedies, the documents were privileged, and the privilege should not be overridden.  On June 9, 2011, *amicus curiae* The Clearinghouse Association LLC filed an opposition brief principally arguing that Bond Plaintiffs had failed to exhaust their administrative remedies.  On June 17, 2011, the Federal Reserve filed a motion to intervene in which it similarly argued that Bond Plaintiffs had failed to exhaust their administrative remedies.

69.     On June 20, 2011, Bond Plaintiffs filed their reply brief, in which they explained that: (a) they were not required to exhaust their administrative remedies before moving to compel, but had nevertheless voluntarily submitted detailed letters to each agency explaining why the documents relevant to them should be released; (b) the agencies had already received a

full opportunity to be heard on this motion, but if the Court was inclined to allow the agencies additional time to respond, it should require them to assert the privilege over any documents by July 8, 2011; and (c) Citigroup had failed to establish that the documents were privileged and that any applicable privilege should not be overridden.

70.    On July 1, 2011, Bond Plaintiffs filed a response to the Federal Reserve's motion to intervene.   Bond Plaintiffs again explained that they were not required to exhaust administrative remedies, the agencies had received a full opportunity to respond to Bond Plaintiffs' motion, and if the Court was inclined to allow the agencies additional time to respond, it should require them to assert the privilege over any documents by July 8, 2011.  On July 8, 2011, the Federal Reserve filed its reply brief in further support of its motion to intervene.

71.    On July 29, 2011, the Court issued an Order in which it agreed that Bond Plaintiffs were not required to exhaust administrative remedies, and provided a specific timeframe for the agencies to assert the privilege over any documents they believed were privileged.  Specifically, the Court: (a) granted the Federal Reserve's motion to intervene, and permitted any other relevant federal agency to move to intervene by August 15, 2011; (b) ordered any agency asserting the bank examination privilege to submit a memorandum of law explaining why the documents were privileged and why any such privilege should not be overridden on or before August 15, 2011; (c) ordered any agency submitting such a memorandum to provide the documents at issue to the Court for *in camera* review; and (d) permitted Bond Plaintiffs to submit any response to the agencies' memoranda by August 26, 2011.

72.    By letter dated August 1, 2011, the Federal Reserve informed Bond Plaintiffs that, in response to Bond Plaintiffs' letter explaining why the privilege should be waived under

agency regulations, the Federal Reserve had agreed to authorize Citigroup to produce to Bond Plaintiffs 80 documents at issue in Bond Plaintiffs' motion to compel.  Similarly, on August 3, 2011, the OCC issued a decision in response to Bond Plaintiffs' letter explaining why the privilege should be waived under the OCC's regulations, in which the OCC authorized Citigroup to produce to Bond Plaintiffs 60 documents at issue.   On August 5, 2011, the FDIC sent Bond Counsel a letter stating that, in response to Bond Counsel's letter to the FDIC explaining that any privilege should be waived over the documents at issue, the FDIC had agreed to release 3 of the 7 documents that related solely to the FDIC.

73.     On August 12, 2011, the Federal Reserve filed a memorandum of law in which it asserted that the remaining documents relevant to it were protected by the bank examination privilege, and that the privilege should not be overridden.  On August 15, 2011, the OCC and the FDIC moved to intervene, and submitted memoranda of law asserting the same arguments with respect to the remaining documents relevant to each respective agency.  Citigroup submitted all the remaining documents at issue to the Court for *in camera* review.  On August 26, 2011, Bond Plaintiffs filed their supplemental reply to the agencies' submissions, asserting that the agencies had failed to establish that the remaining documents were protected by the bank examination privilege, and that even if the privilege applied, it should be overridden.

74.     On December 5, 2011, the Court issued an Order granting in part and denying in part Bond Plaintiffs' motion to compel. After conducting a detailed *in camera* review of the documents at issue, the Court ordered Citigroup to produce 37 of the remaining documents that were being withheld, and to produce portions of an additional 17 documents.  The documents that Bond Plaintiffs obtained though their motion to compel, including the documents released by the federal regulators in response to Bond Plaintiffs' letters and ordered by the Court to be

produced, assisted Bond Plaintiffs in developing evidence to support their claims relating to the overvaluation of Citigroup's mortgage-related assets and their impact on its capital adequacy.

### 3.    Bond Plaintiffs' Motion for Class Certification

75.    On March 11, 2011, while discovery in the Bond Action was ongoing, Bond Plaintiffs filed their class certification motion.  In their motion, Bond Plaintiffs explained that the Bond Action, while large and complex, readily met all the elements for class certification under Rule 23.  In connection with that motion, Bond Plaintiffs put forward as additional class representatives one public pension fund and two individuals who were not named in the Complaint: Arkansas Teacher Retirement System, Phillip G. Ruffin, and James M. Brown.

76.    On May 13, 2011, Defendants filed a 50-page brief in opposition to Bond Plaintiffs' class certification motion and over 440 pages of supporting exhibits.  In their brief, Defendants contested every aspect of Bond Plaintiffs' motion under Rule 23, contending, among other things, that the Bond Action could not be certified because of the unique magnitude and complexity of the Action.  For example, Defendants argued that:

(a)    The Bond Action could not be certified as a class action because it involved 48 Offerings of different securities conducted over a two-and-a-half year period during which conditions in the market, and the information available to investors, changed dramatically.

(b)    Commonality was not satisfied because Citigroup's alleged misstatements concerning its CDOs, loss reserves and other mortgage-related assets supposedly changed significantly during the Offerings Period.

(c)    Renewing their standing argument, Defendants contended that Bond Plaintiffs' claims were not typical of claims possessed by class members holding securities that the Bond Plaintiffs did not purchase, principally because of differences in the characteristics of these securities.

(d)    Typicality also could not be shown because (i) the Bond Class Securities traded differently in response to Citigroup's disclosures; (ii) Bond Plaintiffs did not purchase securities in all supposedly "relevant periods" throughout the Offerings Period; and (iii) depending on when class members bought and sold their securities, they would be subject to a variety of "unique negative

33

causation" affirmative defenses.

(e)     Predominance was not satisfied because Citigroup's disclosures changed substantially throughout the Offerings Period, and because individual questions of knowledge, damages, and causation predominated.

(f)     Five of the class representatives were not adequate.

77.     Defendants also raised numerous additional arguments directed to the merits of the litigation.  For example, Defendants argued that Citigroup required the bailout not because of the impact of its mortgage-related assets, but rather because it was targeted by short sellers who created a market misperception concerning its financial condition and thereby triggered a liquidity crisis at the bank.  They also renewed their prior arguments that Citigroup adequately disclosed its subprime exposure, and that Bond Plaintiffs were alleging falsity by "hindsight."

78.     On June 10, 2011, Bond Plaintiffs filed a 35-page reply brief in further support of their motion for class certification.   Bond Plaintiffs explained that each of Defendants' arguments related to the elements of Rule 23 was incorrect.   In summary, Bond Plaintiffs explained that:

(a)     While the Bond Action was large and complex, it was nevertheless focused on a nucleus of common questions concerning Citigroup's misrepresentations and omissions in the Offering Materials, and thus, was appropriate for certification under Rule 23.  As Bond Plaintiffs noted, numerous courts had certified class actions involving multi-year class periods, several categories of different false statements, and multiple securities.

(b)     Commonality was met because Citigroup made several allegedly false statements during the Offerings Period, some of which continued throughout the entire Offerings Period.   Although Citigroup made certain partial disclosures during the Offerings Period, these partial disclosures did not destroy commonality.   Indeed, courts regularly certified class actions involving partial disclosures.

(c)     Defendants' arguments concerning typicality had been repeatedly rejected by courts, were unsupported by any authority in many instances, and were factually incorrect.

(d)     Predominance was satisfied because the central issues in the Bond Action –

34

whether the Offering Materials contained material misstatements and omissions, and whether Defendants could establish their negative causation defense – would be proved on a common, class-wide basis.

(e)     The class representatives, which included seven institutional investors, had diligently fulfilled their duties to the Bond Class and were more than adequate.

79.     Bond Plaintiffs further explained that Defendants' merits-based arguments were irrelevant to class certification, premature, and contradicted by the evidence uncovered by Bond Plaintiffs thus far in discovery.

80.     Bond Plaintiffs' motion for class certification was pending at the time the Parties reached the Settlement.

### 4.     Defendants' Rule 12(c) Motion

81.     On August 23, 2011, the Second Circuit issued its decision in *Fait v. Regions Financial Corporation*, 655 F.3d 105 (2d Cir. 2011), which set forth a heightened pleading standard for Section 11 claims based on statements of "opinion."   Specifically, the Second Circuit held that statements of opinion were not actionable unless the plaintiff could allege facts demonstrating that the defendants "misstated [their] truly held belief."   As set forth below at paragraphs 112 to 113, the *Fait* decision materially increased the risks that Bond Plaintiffs faced in the Bond Action.

82.     On August 26, 2011, Defendants submitted a letter to the Court contending that *Fait* required dismissal of certain core claims in the Bond Action, including claims related to Citigroup's inadequate loss reserves, and CDO and SIV valuations.   Defendants thus requested permission to file a Rule 12(c) motion seeking dismissal of Bond Plaintiffs' claims on the ground that, under *Fait*, these claims concerned opinions, and the Complaint did not allege that Defendants misstated their truly held beliefs.

83.     On September 7, 2011, Bond Plaintiffs submitted a detailed letter in which they

argued that allowing Defendants to make a Rule 12(c) motion at the current stage of the litigation

would be highly impracticable and a waste of judicial resources, and that Defendants should be

instructed to make any arguments based on *Fait* at the summary judgment stage, when they

could be decided on a full record.  Specifically, Bond Plaintiffs argued that:

(a)     Defendants conceded that *Fait* had no bearing on Bond Plaintiffs' claims
        regarding Citigroup's failure to disclose its CDO exposure and misrepresentations
        concerning its well-capitalized status.  Because those claims encompassed the
        entire Offerings Period, the proposed Rule 12(c) motion would have no impact on
        the scope of the Bond Action or discovery.

(b)     Under Second Circuit law, if the Court permitted Defendants to make their Rule
        12(c) motion, it would have to allow Bond Plaintiffs to present all evidence
        developed in discovery that supported their claims – which would have forced the
        Court to entertain multiple evidentiary submissions based on the discovery that
        had already occurred and that which was ongoing.

(c)     Even if Defendants' motion were successful, Bond Plaintiffs would be entitled to
        amend the Complaint to cure any potential pleading deficiencies.

84.     Bond Plaintiffs also argued that the allegations of the Complaint regarding

Citigroup's loan loss reserves, and CDO and SIV valuations, satisfied *Fait's* requirements.

Finally, Bond Plaintiffs cited substantial evidence they had developed during discovery which

demonstrated that Defendants "did not believe the statements" regarding these subjects "at the

time they made them."  *Fait*, 655 F.3d at 112.

85.     On October 27, 2011, Defendants filed their Rule 12(c) motion.   Although

Defendants had previously argued that *Fait* required dismissal of certain of Bond Plaintiffs'

claims, in their motion, Defendants contended that *Fait* required dismissal of all of Bond

Plaintiffs' claims.   On October 28, 2011, Bond Plaintiffs submitted a letter to the Court

requesting that the Rule 12(c) motion be denied largely for the reasons set forth in their

September 7, 2011 letter, or alternatively, that Bond Plaintiffs' response be delayed until the time

that they were required to amend the Complaint under the then-existing schedule, which was April 13, 2012.   On November 4, 2011, Defendants filed a letter in further support of their motion, and on November 7, 2011, Bond Plaintiffs responded with their own letter.

86.     On November 23, 2011, the Court entered an Order dismissing Defendants' Rule 12(c) motion largely for reasons set forth in Bond Plaintiffs' submissions.   The Court held that, if Defendants were permitted to make their Rule 12(c) motion, it would have to be converted into a motion for summary judgment and Bond Plaintiffs would be permitted to present all evidence that supported their claims.   ECF No. 141 at 1.   Noting that such a procedure would be "extremely inefficient at this time," the Court held that it would address any arguments based on *Fait* "as part of a single motion for summary judgment made at the end of discovery."   ECF No. 141 at 2.

### 5.     Bond Plaintiffs' Efforts in Deposition Discovery

87.     Merits depositions in the Bond Action began in July 2011.   Given the breadth and complexity of the claims in the Bond Action, Bond Plaintiffs took an extensive number of depositions.   Specifically, from July 2011 through August 2012, Bond Plaintiffs deposed 53 fact witnesses.

88.     These fact witnesses included current and former senior Citigroup employees with knowledge pertinent to all of the claims in the Bond Action, such as: (a) Citigroup's most senior executives, including former CEO Charles Prince; (b) senior risk managers with responsibility for Citigroup's CDO and SIV operations, including Citigroup's former Chief Risk Officer; (c) senior executives with responsibility for Citigroup's SIVs and determining the value of the SIVs, including the Co-Heads of Global Credit Structures (which was Citigroup's SIV division); (d) senior executives with responsibility for Citigroup's CDOs and determining their value, including the Co-Heads of Global Credit Markets (which was Citigroup's CDO division); (e)

senior Treasury department officials with responsibility for Citigroup's capital and capital ratios, including Citigroup's former Treasurer; (f) senior executives with responsibility for Citigroup's mortgage portfolio and loan loss reserves, including the CFO of the Global Consumer Group; (g) senior executives with responsibility for Citigroup's financial reporting, including its former Head of Corporate Financial Reporting; and (h) senior executives with responsibility for investor relations, including the former Head of Investor Relations.

89.     Including the depositions that Bond Plaintiffs defended at the class certification stage, Bond Plaintiffs took or defended a total of 76 depositions in the Bond Action.  Attached as Exhibit 10 is a chart setting forth all the depositions that Bond Plaintiffs took or defended, the number of attorneys who attended each deposition, their level of experience, and how many hours they spent preparing for and attending each deposition.

90.     Bond Plaintiffs coordinated with the Stock Action plaintiffs during deposition discovery to ensure that depositions were conducted as efficiently as possible.  Specifically, Bond Plaintiffs worked with the Stock Action plaintiffs to identify witnesses with knowledge relevant to both actions and coordinate deposition dates so that those witnesses were deposed only once.  As a result of these efforts, Bond Plaintiffs deposed 33 Citigroup witnesses on a coordinated basis with the Stock Action plaintiffs.

91.     As the Court is aware, discovery in the Stock Action was stayed on May 8, 2012, when the parties accepted a mediator's recommendation to settle that action.  After discovery was stayed in the Stock Action, Bond Plaintiffs conducted 14 additional depositions, including depositions of some of Citigroup's most senior officers and other key witnesses.  For instance, in August 2012, Bond Plaintiffs took the deposition of Citigroup's former CEO, Charles Prince. Other depositions taken by Bond Plaintiffs after the Stock Action was stayed include: (a)

Citigroup's Treasurer; (b) the former Co-Head of Global Credit Markets; and (c) the head of Global Consumer Capital & Reserves.

### 6.    Bond Plaintiffs' Efforts in Expert Discovery

92.    Bond Plaintiffs also undertook extremely substantial efforts to develop expert evidence in support of their claims.  These efforts were essential to their ability to support their claims and overcome Defendants' anticipated defenses.  Bond Plaintiffs asserted numerous claims concerning Citigroup's exposure to and valuation of complex mortgage-backed securities, each of which required extensive expert proof, including the claims concerning Citigroup's valuations of its SIVs and CDOs, the adequacy of Citigroup's loss reserves for its $200 billion mortgage portfolio, Citigroup's GAAP violations, and the impact of alleged losses in Citigroup's mortgage-related assets on its capital adequacy.

93.    Further, Bond Plaintiffs understood that the core claims in the Bond Action would involve a hotly contested "battle of the experts."  Defendants would have vigorously disputed Bond Plaintiffs' expert evidence, and offered a host of their own competing sophisticated expert opinions in support of their defenses, each of which Bond Plaintiffs would be required to counter.  For example, if this litigation continued, Defendants would have offered testimony from several experts contending that Citigroup's CDOs were not risky or impaired prior to the fall of 2007 (and therefore Citigroup had no duty to disclose them before November 2007); Citigroup's CDO and SIV valuations were accurate at all relevant times; Citigroup's loan loss reserves were adequate; Citigroup's accounting complied with GAAP; Citigroup was well-capitalized throughout the Offerings Period; and Citigroup's officers, directors, and underwriters performed adequate due diligence.  As described further below in Section III.F, Defendants also would have asserted extensive expert evidence in support of a vigorous "negative causation" defense to damages, in which they would have contended that, even if Bond Plaintiffs could

establish liability, Bond Plaintiffs could not recover damages because their losses were not caused by Citigroup's alleged misstatements or omissions.

94.     To prove their claims and rebut Defendants' expected defenses, Bond Plaintiffs vetted and retained 6 experts, including: (i) Chad Coffman, CFA, Founder and President of Global Economics Group, who served as their damages expert; (ii) Harris Devor, CPA, their expert as to the adequacy of Citigroup's loan loss reserves, and GAAP compliance; (iii) Professor Joseph Mason, Ph.D., their expert on CDO and SIV composition, risk, credit quality and valuation; (iv) James Miller, their expert on due diligence in connection with public offerings; (v) Bernard Katz, their expert on Citigroup's capitalization and capital ratios, solvency and liquidity; and (vi) Timothy Koch, their expert with respect to federal banking regulations.

95.     Developing expert evidence to prove Bond Plaintiffs' claims required substantial efforts by Bond Plaintiffs' Counsel and the experts listed above.  Bond Counsel created teams of attorneys to work with each expert.  These attorneys consulted with each expert as to what types of evidence they needed to review to form their opinion, and then designed searches to retrieve the millions of pages of relevant documents that the experts requested.  The documents were compiled and sent to the expert, along with any relevant deposition testimony.

96.     Each expert then conducted a detailed review of the evidence relevant to his opinion.  For example, as noted above, Bond Plaintiffs were required to develop expert evidence demonstrating that Citigroup misrepresented the value of its SIVs by billions of dollars from December 13, 2007 to November 23, 2008.  To develop his opinion on the value of Citigroup's SIVs, Bond Plaintiffs' expert, Dr. Mason, and those working under his supervision, analyzed tens of thousands of pages of documents and testimony concerning the SIVs, including the structure of the SIVs, the thousands of securities that the SIVs owned, Citigroup's detailed

financial models for valuing the SIVs, KPMG's workpapers concerning its audit and reviews of Citigroup's SIV valuations, and internal Citigroup memoranda and emails concerning the SIVs. Based on this data, Dr. Mason analyzed how Citigroup erred in valuing its SIVs, and what the SIVs' valuations should have been valued at each reporting period.

97.     Bond Plaintiffs also were required to develop expert evidence supporting their claims that Citigroup misstated the value of its CDOs by billions of dollars at each reporting period from year-end 2006 through November 23, 2008.   In order to develop his opinion on Citigroup's CDO valuations, Dr. Mason undertook the same type of analysis as he conducted for Citigroup's SIV valuations, although for a time period that was twice as long.

98.     As noted above, Bond Plaintiffs also alleged that Citigroup misstated its loan loss reserves by billions of dollars at each quarter during the Offerings Period.   In order to develop his opinion on the inadequacy of Citigroup's loan loss reserves, Bond Plaintiffs' accounting expert, Mr. Devor, and those working under his supervision, analyzed thousands of pages of documents concerning the composition and default rates of Citigroup's $200 billion mortgage portfolio throughout the two-and-a-half year Offerings Period, Citigroup's financial models for calculating its reserves, and KPMG's workpapers.   Based on this information, Mr. Devor analyzed how Citigroup erred in calculating its reserves, and what Citigroup's loan loss reserves should have been at each reporting period during the Offerings Period.

99.     Bond Plaintiffs' expert on Citigroup's capital adequacy, Mr. Katz, also undertook extensive efforts to develop and support his opinions.   Among other things, Mr. Katz and those working under his supervision, analyzed hundreds of thousands of pages of documents and testimony concerning Citigroup's capital adequacy and financial condition throughout the Offerings Period, including Citigroup's internal capital models, documents concerning the value

of Citigroup's mortgage-related assets, internal Citigroup memoranda and emails, and KPMG's workpapers.  Based on this data, among other things, Mr. Katz analyzed the extent to which unreported losses in Citigroup's mortgage-related assets impacted its capital adequacy.  Bond Plaintiffs' expert Mr. Miller, a former investment banker, analyzed the due diligence efforts of the Underwriter Defendants and also reviewed information concerning Citigroup's loan loss reserves and CDO valuations.  Mr. Koch, a professor of finance at the University of South Carolina and a former research scholar at the Federal Reserve Bank of Atlanta, reviewed information obtained in discovery regarding Citigroup's capital ratios, and provided analyses regarding the calculation of those metrics as well as the impact that failing to meet certain capital thresholds would likely have on a bank's ability to continue operations.

100.    In addition to developing this expert evidence with respect to liability, Bond Plaintiffs were also required to develop expert evidence on damages.  Developing this evidence was also an extensive undertaking.  Whereas plaintiffs in a typical securities action are required to calculate damages for one or a handful of securities, Bond Plaintiffs were required to prove damages separately for each of the 48 Offerings.  Calculating damages for each Offering was further complicated by several facts unique to the Bond Action, including that (a) the dozens of different securities for which Bond Plaintiffs had to calculate damages reacted differently to many of the same alleged corrective disclosures depending mainly on their time to maturity or other characteristics; (b) the Offerings involved different alleged false statements and different partial corrective disclosures; and (c) trading volume data for many of the Bond Class Securities was incomplete or not readily available, which required Bond Plaintiffs' expert to develop a trading model to estimate damages for the bonds and preferred securities at issue in this case.

101.    As Bond Plaintiffs' experts developed their opinions based on their review of the evidence, Bond Plaintiffs' Counsel consulted extensively with them through multiple in-person and telephonic meetings wherein the experts discussed the evidence supporting their opinions and their conclusions based on that evidence.  Throughout this process, Bond Plaintiffs' Counsel continued to search for and provide their experts with significant amounts of additional documents that they requested.

102.    Further, Bond Plaintiffs' Counsel consulted with their experts on numerous other topics relevant to the discovery process.  For example, Bond Counsel worked closely with their experts to determine whether to request any additional documents from Citigroup on subjects relevant to their opinions.  Bond Counsel also worked with their experts to create interrogatories and requests for admissions designed to elicit evidence relevant to the experts' opinions.  In addition, Bond Counsel consulted with their experts in connection with numerous depositions to develop lines of questioning concerning the subjects on which the experts were opining.  As a result of these efforts, Bond Counsel sought and obtained a significant amount of additional documentary and testimonial evidence that supported Bond Plaintiffs' claims.

### F.    The Settlement Negotiation Process and the Proposed Settlement

103.    The Settlement was achieved through an arduous, arm's-length negotiation process, including negotiations conducted under the auspices of a highly experienced mediator and former federal district court judge.  In early 2012, while the Parties were engaged in full-scale fact and expert discovery, they began discussing a potential resolution of the Bond Action.  Over the next several months, the Parties engaged in numerous discussions and exchanged information regarding damages and liability.  For example, among other things, in April 2012, Bond Plaintiffs' damages expert, Chad Coffman, prepared a preliminary damages analysis that was shared with Citigroup and its damages expert.  Mr. Coffman also discussed his damages

analysis directly with Citigroup's damages expert on a conference call.  However, no resolution was achieved.

104.    The Parties ultimately agreed to engage the Honorable Layn R. Phillips, a former federal district court judge in the Western District of Oklahoma who mediated the Stock Action, to facilitate further settlement negotiations.  On September 6, 2012, the Parties jointly contacted the Court to seek a 90-day stay of all proceedings while they continued to explore the possibility of a negotiated resolution.  The Court granted this request, and directed the Parties to report back on the progress of settlement negotiations on December 11, 2012.

105.    The Parties continued their settlement negotiations under the auspices of Judge Phillips.  Although Judge Phillips was closely familiar with many of the issues in the Bond Action because of his experience as the mediator in the Stock Action, in December 2012 and early January 2013, the Parties provided to Judge Phillips and exchanged among themselves multiple, detailed submissions.  The Parties' submissions addressed the history of the Bond Action, set forth extensive arguments on liability and damages, and provided damages calculations prepared by their respective experts.  The Parties also provided Judge Phillips with a significant amount of additional material relevant to the Bond Action, including, among other things, the Complaint, the Parties' briefing on the motions to dismiss, the Court's July 12 Opinion, the Parties' class certification briefing, Defendants' August 26, 2011 letter to the Court concerning *Fait*, Bond Plaintiffs' September 7, 2011 responsive letter, and select evidence uncovered in discovery.

106.    Based on their ongoing negotiations, on December 11, 2012, the Parties contacted the Court and reported that they were making progress, and requested that the Court extend the stay.  The Court agreed to extend the stay and directed the Parties to report back on January 3,

44

2013.   On January 3, 2013, the Parties contacted the Court and reported that they were continuing to make progress, and requested that the stay be continued until the end of January 2013.  The Court agreed to do so.

107.    Judge Phillips engaged in multiple consultations with the Parties in January 2013. On January 17, 2013, Judge Phillips held a telephonic mediation session, during which the Parties presented further arguments and responded to questions from Judge Phillips.  At the end of that mediation session, Judge Phillips made a mediator's recommendation that the Bond Action be settled for a payment of $730 million by Citigroup, and gave the Parties until noon on January 25, 2013 to accept his recommendation.  On January 25, 2013, the Parties accepted the mediators' recommendation.

108.    Following the execution of a settlement Term Sheet, the Parties negotiated the terms of the Stipulation, which they executed on March 18, 2013.  Pursuant to the terms of the Stipulation, in full and complete settlement of the Released Bond Plaintiffs' Claims (as defined in paragraph 1(xx) of the Stipulation) against the Defendants, Citigroup has paid into escrow $730 million in cash.

109.    The Bond Class is for settlement purposes only, and is defined as follows:

All persons and entities who purchased or otherwise acquired, from May 11, 2006 through and including November 28, 2008 (the "Settlement Class Period"), the debt securities (including certain medium term notes), series of preferred stock and certain series of depository shares representing interests in preferred stock, in or traceable to the offerings of the Bond Class Securities, and were damaged thereby.  Excluded from the Bond Class are Defendants, the Tolled Underwriter Defendants, the respective affiliates of the Defendants and the Tolled Underwriter Defendants, persons who served as Officers or Directors of any of the Defendants or the Tolled Underwriter Defendants at any time during the Settlement Class Period, members of their Immediate Families and their legal representatives, heirs, successors or assigns, trustees of the Citigroup Trusts, and any entity in which any Defendant or Tolled Underwriter Defendant has or had a controlling interest, *provided, however*, that any Investment Vehicle (as defined in the Stipulation) shall not be excluded from the Bond Class.  Also excluded from the

Bond Class are any Persons who submit an Exclusion Request.

110.    On March 18, 2013, Bond Plaintiffs filed a motion for preliminary approval of the Settlement and certification of the Bond Class for settlement purposes only.  On March 26, 2012, the Court entered its Preliminary Approval Order, thereby preliminarily approving the Settlement, certifying the Bond Class for settlement purposes, appointing Bond Plaintiffs as class representatives, and appointing Bond Counsel as class counsel.

## III.    RISKS OF CONTINUED LITIGATION

111.    As explained in detail below, Defendants had substantial defenses to both liability and damages.  Among other things, Defendants would have vigorously argued that they did not make any material misstatements, and that the market was well aware of any information that Bond Plaintiffs alleged was misstated in or omitted from the Offering Materials.  Defendants also would have asserted numerous arguments contending that, even if Bond Plaintiffs could establish liability for certain of their claims, Bond Plaintiffs could not recover damages. Defendants would have contended, *inter alia*, that the price declines at issue in this Action were not related to Citigroup's alleged misrepresentations, and were instead caused by market hysteria that occurred as the global financial crisis swept through the markets in late 2008.  Defendants also would have argued that Citigroup's securities quickly rebounded in price to trade at or above par, and some of the securities matured, thus at a minimum eliminating damages for any investors who retained their securities.  These arguments created a significant risk that, after years of protracted litigation, Bond Plaintiffs could achieve no recovery, or a lesser recovery than the Settlement Amount.

112.    Moreover, the Second Circuit's decision in *Fait v. Regions Fin. Corp.*, 655 F.3d 105 (2d Cir. 2011), significantly heightened the risks that Bond Plaintiffs faced in prosecuting this Action.  In *Fait*, the Second Circuit held that, for Section 11 claims based on misstatements

of "opinion," a plaintiff must show not only that the statement was untrue, but that in making the statement, defendants "misstated their truly held belief." *Id.* at 108. The Second Circuit specifically held that this heightened standard applied to Section 11 claims based on allegedly misstated loan loss reserves, and subsequent decisions in this District have held that *Fait* applies to any statement involving a subjective "judgment," including estimated asset valuations. *See, e.g., In re Gen. Elec. Co. Sec. Litig.*, 856 F. Supp. 2d 645, 653 (S.D.N.Y. 2012) (Cote, J.) ("Statements estimating the fair market value of assets are opinions, not matters of objective fact.").

113.    Thus, Defendants had a strong argument that *Fait* applied to the vast majority of Bond Plaintiffs' claims, including the claims relating to Citigroup's allegedly misstated loan loss reserves, CDO valuations, SIV valuations, and capital adequacy. Accordingly, in order to prevail on the overwhelming majority of their claims, Defendants contended that Bond Plaintiffs would have had to prove, both at summary judgment and at trial, that Defendants "misstated their truly held belief" on these subjects. This was an extremely difficult burden that is akin to proving scienter or intentional deception. *See id.* at 657 (holding that, in order to satisfy *Fait's* requirement that the defendant "disbelieved this statement of opinion at the time he made it," the plaintiff had to establish that the defendant "lied" and "engaged in a form of knowing misconduct").[3]

114.    Defendants' additional arguments with respect to each of Bond Plaintiffs' claims are summarized below.

---

[3] The only claim that was not likely subject to *Fait* was Bond Plaintiffs' claim that Citigroup failed to adequately disclose its true CDO exposure. However, as noted above, that claim accounted for an extremely small percentage of the damages sought, as the vast majority of Bond Plaintiffs' damages were attributable to Offerings that took place after that exposure was disclosed.

A. **Risks Relating to Bond Plaintiffs' Claim Concerning Citigroup's Loan Loss Reserves**

115.     Defendants would have asserted numerous defenses to Bond Plaintiffs' claim that Citigroup misstated its loan loss reserves.  To start, Defendants would have argued that the evidence did not establish that Citigroup's loan loss reserves were inaccurate.  Defendants would have argued that Citigroup specifically disclosed in the Offering Materials that its loss reserves represented inherently subjective judgments about potential future losses in its loan portfolio that were uncertain and subject to change.  Defendants also would have argued that Citigroup never restated its loan loss reserves, and that Citigroup's auditor, KPMG, reviewed the reserves as part of its audits and reviews, never questioned their accuracy and, indeed, certified the accuracy of Citigroup's loss reserves multiple times during the Offerings Period.  In addition, Defendants would have asserted that Citigroup was one of the most regulated financial institutions in the world, and numerous regulators, including the OCC and the Federal Reserve, closely examined Citigroup's reported loss reserves and never concluded that they were misstated.  Defendants also would have contended that Citigroup calculated its loss reserves using highly sophisticated financial models that accounted for hundreds of variables, were repeatedly recalibrated to account for changing market conditions, were vetted at multiple levels within Citigroup, and were reviewed by Citigroup's auditors and regulators.  Defendants would have further argued that, when market conditions began to rapidly deteriorate in the third quarter of 2007, they promptly disclosed the problems in Citigroup's mortgage portfolio by increasing Citigroup's loan loss reserves by between $2 billion and $4 billion at each quarter through the end of 2008, for a total of more than $18 billion during that time period.  These arguments created a significant risk that the Court or a jury could conclude that Citigroup did not misstate its loss reserves.

116.    Further, Defendants would have contended that, even if Citigroup's loan loss reserves were inaccurate, loss reserves were unquestionably opinions under *Fait*, and there was no basis to conclude that Defendants "misstated their truly held beliefs" on this subject.  Again, Defendants would have relied on the fact that Citigroup's independent auditor reviewed its loan loss reserves and certified their accuracy, and numerous federal regulators examined Citigroup's loss reserves and never found that they were inaccurate.  Defendants also would have contended that the fact that they increased loss reserves by billions of dollars each quarter beginning in the third quarter of 2007 demonstrated that they did not intend to mislead investors about the problems in Citigroup's mortgage portfolio.  Defendants also would have argued that the fact that Citigroup disclosed to investors that its loan loss reserves were opinions that were uncertain and subject to change further demonstrated that they did not intend to mislead investors about the potential for error in their calculations.  Based on all these facts, there was a significant risk that the Court or a jury would conclude that Defendants did not misstate their truly held belief with respect to Citigroup's loan loss reserves.

117.    Defendants also would have argued that, by no later than the third quarter of 2007, when Citigroup began dramatically increasing its reserves, investors were well aware of the fact that Citigroup's mortgage portfolio was severely impaired, and that Citigroup had to increase its reserves by billions of dollars as a result.  While Bond Plaintiffs would have argued that Citigroup continued to conceal the full extent of the impairment in its mortgage portfolio throughout the Offerings Period, there was a substantial risk that the Court or a jury could determine that investors in all Offerings conducted after the third quarter of 2007 knew that Citigroup was significantly increasing its reserves, and thus, knew or should have known that Citigroup faced the risk of material losses in its mortgage portfolio.

**B.**     **Risks Relating to Bond Plaintiffs' Claim Concerning Citigroup's CDO Valuations**

118.     Bond Plaintiffs also faced very significant risks with respect to their claim that Citigroup overstated the value of its CDOs.  To start, Defendants would have argued that the evidence did not establish that Citigroup's CDO valuations were inaccurate.  In support of this argument, they would have asserted that Citigroup disclosed that its reported CDO valuations were uncertain opinions that were subject to change.  They also would have contended that Citigroup never restated its reported CDO valuations, and that KPMG reviewed and audited the CDO valuations, did not question their accuracy, and certified those valuations twice during the Offerings Period.  Defendants would have further asserted that numerous federal regulators closely examined the value of Citigroup's mortgage-related assets, but no regulator found that Citigroup misstated the value of its CDOs.  Defendants also would have argued that they calculated the value of the CDOs through detailed and comprehensive financial models, which were reviewed by KPMG and Citigroup's regulators.  In addition, Defendants would have argued that, when market conditions swiftly turned for the worse in late 2007, they fully disclosed the impairments in Citigroup's CDO portfolio, publicly reporting in November 2007 that Citigroup's CDOs were impaired by as much as $11 billion, and reporting a total of $28 billion in writedowns on Citigroup's CDOs through the third quarter of 2008.  Based on these arguments, there was a significant risk that the Court or a jury could determine that Citigroup's CDO valuations were not misstated.

119.     In addition, Defendants would have argued that, even if Citigroup's CDO valuations were inaccurate, the CDO valuations were opinions, and the evidence did not establish that Defendants misstated their truly held beliefs as to this subject.  Again, Defendants would have argued that Citigroup's independent auditor reviewed and certified its reported CDO

valuations, and several regulators reviewed Citigroup's CDO valuations and did not determine that they were misstated.  Defendants also would have argued that Citigroup began taking tens of billions of dollars in writedowns on its CDOs as early as November 2007, which demonstrated that they did not attempt to mislead the market about the fact that Citigroup's CDOs were suffering massive losses.  Defendants also would have asserted that they fully disclosed in the Offering Materials that Citigroup's CDO valuations were uncertain opinions that could materially change.  These arguments created a substantial risk that the Court or a jury would conclude that Defendants did not intentionally misstate their belief as to Citigroup's CDO valuations.

120.    Defendants also would have argued that, by no later than November 4, 2007, the market was well aware of the fact that Citigroup's CDOs were severely impaired.  Based on the extremely large writedowns Citigroup took beginning in November 2007, Defendants would have argued that, at a minimum, anyone who purchased in the Offerings after November 4, 2007 knew that Citigroup's CDOs were suffering huge losses.  While Bond Plaintiffs would have argued that even these significant writedowns were inadequate, there was a serious risk that the Court or a jury could conclude that investors in Offerings after November 4, 2007 knew or should have known that Citigroup's CDOs were rapidly declining in value.

## C.    Risks Relating to Bond Plaintiffs' Claim Concerning Citigroup's SIV Valuations

121.    Defendants also would have asserted substantial defenses to Bond Plaintiffs' claim that Citigroup overstated the value of its SIVs.  Again, Defendants would have contended that the evidence did not establish that their SIV valuations were inaccurate.  Defendants would have asserted that Citigroup specifically disclosed to investors that its SIV valuations were uncertain opinions that were subject to change.  Defendants also would have argued that

Citigroup employed detailed models to value its SIVs, never restated its reported SIV valuations, and that KPMG reviewed the SIV valuations, and certified the accuracy of Citigroup's financial statements during the Offerings Period.  Defendants would have further contended that numerous regulators closely examined the value of Citigroup's SIVs, and no regulator asserted that Citigroup misstated its SIV values.  These arguments posed a significant risk that the Court or a jury could conclude that Citigroup's reported SIV values were not misstated.

122.     Moreover, Defendants would have argued that, even if Citigroup's SIVs valuations were inaccurate, the SIV valuations were opinions, and the evidence did not establish that Defendants intentionally misrepresented the value of the SIVs.  Defendants would have again contended that Citigroup's auditors reviewed and certified the accuracy of its reported SIV values, and that federal regulators scrutinized Citigroup's SIV valuations and never found that they were misstated.  Defendants also would have asserted that they disclosed the fact that Citigroup's SIV valuations were merely uncertain opinions in the Offering Materials, thus informing investors that the SIV valuations could be lower than reported.  Accordingly, there was a substantial risk that the Court or a jury could conclude that Defendants did not misstate their truly held beliefs with respect to Citigroup's SIV valuations.

**D.     Risks Relating to Bond Plaintiffs' Claim Concerning Citigroup's Capital Adequacy**

123.     Defendants also would have asserted significant defenses to Bond Plaintiffs' claims that Citigroup misstated its capital adequacy.  To begin with, Defendants would have vigorously argued that the evidence did not establish that Citigroup's reported capital ratios were inaccurate.  Defendants would have again argued that they informed investors that the capital ratios were based on Citigroup's uncertain and subjective asset valuations, and thus, were also subject to change.  Defendants would have further argued that Citigroup never restated its

reported capital ratios, and that KPMG reviewed and audited Citigroup's asset values and capital levels, and never questioned their accuracy.  Further, Defendants would have relied on the fact that federal regulators carefully examined Citigroup's capital ratios throughout the Offerings Period, yet no regulator determined that Citigroup misstated its capital adequacy.  These arguments posed a significant risk that the Court or a jury would conclude that Citigroup's reported capital ratios were not misstated.

124.    Defendants would have further contended that, even if Citigroup's capital ratios were inaccurate, any inaccuracies were immaterial because Citigroup never fell below the standard for well-capitalized status under federal regulations.  Defendants would have asserted that, throughout the Offerings Period, including the quarter before Citigroup received the bailout, Citigroup reported capital ratios that were well above the minimum required for "well capitalized" status under federal regulations.  Given these high ratios, Defendants would have contended that, in order to establish that Citigroup was not well-capitalized, Bond Plaintiffs had to prove that Citigroup's mortgage-related assets were impaired by tens of billions of dollars more than Citigroup disclosed at each quarter.  While Bond Plaintiffs would have argued that Citigroup's mortgage related assets were indeed impaired by these amounts during the Offerings Period, there was a serious risk that the Court or a jury would conclude that Citigroup never fell below the standard for well-capitalized status, and thus, any inaccuracies in its capital ratios were immaterial.

125.    Defendants would have further argued that Citigroup did not need the bailout because of unreported losses in its mortgage-related assets, but rather because it was targeted by short sellers and suffered a liquidity crisis during a market-wide panic in the fall of 2008 – the precise time when several other large financial institutions experienced similar distress.  While

Bond Plaintiffs would have argued that Citigroup required the bailout because massive unreported losses in its mortgage-related assets had rendered it undercapitalized, there was no assurance that they would have prevailed on this complex issue.

126.    Finally, Defendants would have contended that, even if Citigroup's statements concerning its capital adequacy were materially inaccurate, these statements were opinions because Citigroup's capital adequacy depended on the value of its CDOs, SIVs, and reported loan loss reserves.   Thus, once again, Defendants would have argued that the evidence did not show that they misstated their truly held belief on this subject.   Specifically, Defendants would have again argued that KPMG reviewed and certified the accuracy of Citigroup's reported asset values and capital levels.   Similarly, Defendants would have contended that federal regulators conducted regular, detailed reviews of Citigroup's capital adequacy during the Offerings Period. Defendants also would have contended that they disclosed that their assessments of Citigroup's capital adequacy were based on uncertain asset valuations that were subject to change.   Based on these facts, there was a significant risk that a jury could conclude that Defendants did not intentionally misstate Citigroup's capital adequacy.

### E.    Risks Relating to Bond Plaintiffs' Claim Concerning Citigroup's Failure to Adequately Disclose Its CDO Exposure

127.    Bond Plaintiffs also faced significant risks with respect to their claims that Citigroup misrepresented its exposure to subprime CDOs.   Defendants would have argued that Citigroup made extensive disclosures in its SEC filings about the fact that it had significant involvement with CDOs.    Specifically, Defendants would have contended that Citigroup disclosed the fact that it created tens of billions of dollars' worth of CDOs, and potentially retained an ownership interest in these CDOs totaling tens of billions of dollars.   Thus, there was a risk that a jury could determine that, regardless of whether Citigroup precisely quantified its

exposure to CDOs prior to November 4, 2007, it adequately disclosed the fact that it had significant exposure to these securities.

128.   Defendants also would have argued that they had no duty to disclose their CDO exposure earlier than November 4, 2007 because these securities did not become risky until mid-October 2007.  Specifically, Defendants would have contended that, until mid-October 2007, all of Citigroup's CDOs were rated AAA.  Defendants would have further argued that market conditions suddenly worsened in mid-October 2007, causing rating agencies to unexpectedly downgrade certain of Citigroup's CDOs and leading to a sudden decline in their value.  While Bond Plaintiffs would have contended that Citigroup's CDOs were risky long before they were downgraded, Defendants' arguments posed the risk that a jury could conclude that Defendants had no duty to disclose Citigroup's CDO exposure earlier than they did.

129.   In addition to the numerous risks to establishing liability that apply to all Defendants, Section 11 provides the Individual Defendants and the Underwriter Defendants with an additional affirmative defense to liability known as the due diligence defense.  The due diligence defense allows non-issuer defendants such as the Individual Defendants and Underwriter Defendants to escape liability under the Securities Act by showing that they did not have reasonable grounds to suspect that a registration statement contained a materially misleading statement or omission.  Specifically, under Section 11(b)(3)(A) of the Securities Act, a non-issuer defendant is not liable for any material misstatement or omission in a registration statement if that defendant can show that "he had, after reasonable investigation, reasonable ground to believe, and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements not misleading."  15 U.S.C.

§ 77k(b)(3)(A).  Moreover, for portions of a registration statement that have been reviewed and certified by an "expert" – such as Citigroup's year-end audited financial statements – Section 11(b)(3)(C) provides that a non-issuer defendant is not liable if he can show that "he had no reasonable ground to believe and did not believe, that at the time such part of the registration statement became effective, that the statements therein were untrue or that there was an omission to state a material fact required to stated therein or necessary to make the statements not mislead."  15 U.S.C. § 77k(b)(3)(A).

130.    Here, the Underwriter Defendants argued that they engaged in extensive due diligence relating to each of the Offerings and nothing came to their attention that should have alerted them to the alleged misstatements in the offering documents at issue.  Among other things, the Underwriter Defendants argued that they submitted detailed information request lists to Citigroup, reviewed and analyzed the information provided in response to those requests, hired experienced outside counsel to assist them in reviewing the registration statements for completeness and accuracy, and asked numerous questions of Citigroup's management regarding key disclosures in the registration statements.  In addition, the Underwriter Defendants argued that they asked for detailed information from KPMG regarding that firm's audits and reviews of Citigroup's year-end and quarterly financial statements, and at no point did KPMG raise any concerns regarding the accuracy of any of Citigroup's SEC filings.  Similarly, the Individual Defendants argued that they satisfied their due diligence obligations and had no basis to doubt the accuracy of the registration statements.  Among other things, the Individual Defendants claimed that for each Offering they received and reviewed credit authorization memoranda prepared by the individuals at Citigroup who had direct knowledge regarding the statements made in the offering documents, asked questions at board meetings and elsewhere regarding the

offerings, relied on KPMG to review and certify the accuracy of Citigroup's financial statements, and ensured that Citigroup hired outside attorneys to review the registration statements for accuracy and completeness.  In short, there was a substantial risk that even if Bond Plaintiffs could establish that Citigroup made a material misstatement or omission, the Individual Defendants and the Underwriter Defendants would not be liable because of the due diligence defense afforded them under Section 11.

### F.    Risks Relating to Damages

131.    Even if Bond Plaintiffs overcame Defendants' defenses to liability, Defendants had very substantial arguments with respect to damages.  If these arguments were accepted by the Court at summary judgment or by a jury at trial, they would have greatly reduced or potentially eliminated the recoverable damages in this case.

132.    Section 11(e) of the Securities Act sets forth a formula for calculating damages in Section 11 cases.  This formula provides that, where a plaintiff has sold the securities at issue, damages are calculated as the difference between (a) the price it paid for the security, capped at the offering price, and either (b) the price at which it sold the security, or (c) the price of the security on the date that suit was filed, whichever is higher.  *See* 15 U.S.C. § 77k(e).  Where a plaintiff has not sold its securities, damages are calculated as the difference between (a) the price it paid for the security, capped at the offering price, and (b) the price of the security on the date that suit was filed.  *See id.*  Section 11(e) also provides defendants with an affirmative defense of "negative causation" through which defendants can reduce or eliminate damages to the extent that defendants can show that the stock price declines were not caused by the alleged inaccuracies in the offering materials.  *See id*.

133.    Here, Defendants had very strong negative causation arguments.  The vast majority of the Bond Class Securities did not decline in value until September and October 2008.

57

These declines occurred at the same time that a raft of negative information about several financial institutions other than Citigroup was being disclosed – such as negative information concerning Lehman's bankruptcy, the Government bailouts of Fannie Mae and Freddie Mac, and AIG's massive losses and resulting Government bailout. Defendants would have argued that this information, which was unrelated to Citigroup's alleged misstatements and omissions, caused the declines in the prices of the Bond Class Securities. Accordingly, they would argue that the declines in the Bond Class Securities that occurred during this time were not recoverable as damages. While Bond Plaintiffs would have argued that the declines that occurred during this time period were related to Citigroup's alleged misstatements and omissions, there was a significant risk that the Court at summary judgment or a jury would conclude that the key declines in the Bond Class Securities were not caused by the alleged misrepresentations and omissions in this case. If Defendants' argument were accepted, it would have eliminated the vast majority of Bond Plaintiffs' recoverable damages.

134.    Defendants also would have argued that the declines that occurred in September and October 2008 were merely the product of an unprecedented market collapse, and were not caused by any undisclosed, material impairment in Citigroup's financial condition. Defendants would have asserted that this market panic caused the securities of numerous other financial institutions to decline in value at the same time that Citigroup's securities declined, and that the prices of Citigroup's securities fully recovered within months to trade at or above par. Defendants also would have argued that Citigroup needed the bailout not because of undisclosed losses in its mortgage-related assets, but because it was targeted by short sellers and suffered a liquidity crisis in the midst of this global market meltdown. While Bond Plaintiffs would have contended that the declines that occurred in September and October 2008 were caused by

Citigroup's own alleged misstatements and omissions, there was a risk that a jury would agree with Defendants.

135.    Defendants also would have contended that the September and October 2008 declines were not recoverable because Citigroup corrected any arguably false statements long before the key declines occurred in the fall of 2008.   In particular, Defendants would have asserted that, throughout late 2007 and August 2008, Citigroup fully disclosed its impaired financial condition to the market by increasing its loan loss reserves by billions of dollars each quarter, and writing down its CDOs and SIVs by tens of billions of dollars – yet the Bond Class Securities continued to trade at or near par during this time period.   While Bond Plaintiffs would have argued that Citigroup's misrepresentations continued through the time of the September and October 2008 declines, there was a risk that a jury would conclude that the central declines in this case were not recoverable because the market was well aware of Citigroup's dire financial condition months before those declines occurred.

136.    Defendants also would have contended that any potentially recoverable damages had to be significantly reduced because, as noted above, the Bond Class Securities rebounded in price to trade at or above par, where they continue to trade today.   Defendants would have argued that the price rebound demonstrated that the declines in the Bond Class Securities in the fall of 2008 were not caused by any true concerns regarding Citigroup's financial condition, but were the result of a market-wide overreaction that impacted all financial institutions.   Defendants would also have contended that, at a minimum, the swift and lasting rebound in the price of the Bond Class Securities meant that Bond Class Members who did not sell their securities had suffered little if any harm, and, therefore, could not recover significant damages.   While Bond Plaintiffs would have argued that the recovery in the price of the Bond Class Securities was

irrelevant to calculating damages under the Securities Act, there was a significant risk that the Court or a jury would have concluded that Bond Class Members who retained their securities could not recover damages.  This is particularly true for Bond Class Securities which matured at par while the litigation was pending.

137.    As noted above, Bond Plaintiffs retained a well-regarded and highly experienced damages expert to calculate damages for the 48 Offerings in this case, Chad Coffman CFA, the Founder and President of the Global Economics Group.   Because the trading data that Mr. Coffman required to calculate damages for each Offering was not always publicly reported, Bond Plaintiffs subpoenaed and obtained trading data for the Bond Class Securities from the Financial Industry Regulatory Authority ("FINRA"), which maintains a database known as the Trade Reporting and Compliance Engine ("TRACE").   The FINRA TRACE database includes all over-the-counter market activity in eligible preferred securities and bonds, such as those at issue here.

138.    Mr. Coffman analyzed this trading data and Defendants' negative causation arguments, and considered what a reasonable juror would likely conclude as to which price declines were recoverable as damages in this case.  After conducting this analysis, Mr. Coffman excluded from his damages calculation certain price declines that he determined were likely not recoverable, namely: (a) price declines on days that had no identifiable Citigroup-specific news arguably tied to the allegations; (b) price declines observed concurrent with events concerning financial institutions other than Citigroup, namely, the failure of Lehman Brothers, Fannie Mae, or Freddie Mac; and (c) the portion of any price declines on days with Citigroup-specific news that could reasonably be attributed to declines in market and industry indices.  After factoring out

these declines, Mr. Coffman concluded that the likely maximum recoverable damages in this case were no more than $3 billion.

### G.      Risk of Appeal

139.    Finally, even if Bond Plaintiffs prevailed at summary judgment and at trial, Citigroup would have invariably appealed the judgment – leading to many additional months, if not years, of further litigation.  On appeal, Citigroup would have renewed its host of arguments as to why Bond Plaintiffs had failed to establish liability and damages, thereby exposing Bond Plaintiffs to the risk of having any favorable judgment reversed or reduced below the Settlement Amount.

140.    Based on all the factors summarized above, Bond Plaintiffs and Bond Counsel respectfully submit that it was in the best of interest of the Bond Class to accept the immediate and extremely substantial benefit conferred by the Settlement, instead of incurring the significant risk that the Bond Class could recover a lesser amount, or nothing at all, after several additional years of arduous litigation.

## IV.    BOND PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE

141.    The Court's March 25, 2013 Order Preliminarily Approving Proposed Settlement and Providing for Notice (ECF No. 155) ("the "Preliminary Approval Order") directed that the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Notice") and Proof of Claim Form ("Claim Form") be disseminated to the Bond Class.  The Preliminary Approval Order also set a June 27, 2013 deadline for Bond Class Members to submit objections to the Settlement, the Plan of Allocation and/or the Fee and

Expense Application or to request exclusion from the Bond Class, and set a final approval hearing date of July 23, 2013.

142.     Pursuant to the Preliminary Approval Order, Bond Counsel instructed The Garden City Group, Inc. ("GCG"), the Court-approved Claims Administrator, to begin disseminating copies of the Notice and the Claim Form by mail and to publish the Summary Notice.  The Notice contains, among other things, a description of the Bond Action, the Settlement, the proposed Plan of Allocation and Bond Class Members' rights to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the Fee and Expense Application, or exclude themselves from the Bond Class.  The Notice also informs Bond Class Members of Bond Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 20% of the Settlement Fund, and for reimbursement of Litigation Expenses in an amount not to exceed $10.5 million.  To disseminate the Notice, GCG obtained information from Citigroup and from banks, brokers and other nominees regarding the names and addresses of potential Bond Class Members.  *See* Affidavit of Stephen J. Cirami Regarding (A) Mailing of the Notice and Proof of Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date ("Cirami Aff."), attached hereto as Exhibit 1, at ¶¶3-5.

143.     On April 23, 2013, GCG disseminated 111,657 copies of the Notice and Claim Form (together, the "Notice Packet") to potential Bond Class Members and nominees by first-class mail. Ex. 1, ¶¶3-4.   As of June 6, 2013, GCG had disseminated over 417,000 Notice Packets. *Id.* ¶7.

144.     On May 2, 2013, in accordance with the Preliminary Approval Order, GCG caused the Summary Notice to be published in *The Wall Street Journal* and to be transmitted over *PR Newswire.  Id.* ¶8.

145.    Bond Counsel also caused GCG to establish a dedicated settlement website, www.citigroupbondactionsettlement.com, to provide potential Bond Class Members with information concerning the Settlement and access to downloadable copies of the Notice and Claim Form, as well as copies of the Stipulation and Preliminary Approval Order.  *Id.* ¶10. Copies of the Notice and Claim Form are also available on Bond Counsel's website, www.blbglaw.com.

146.    As set forth above, the deadline for Bond Class Members to file objections to the Settlement, the Plan of Allocation and/or the Fee and Expense Application or to request exclusion from the Bond Class is June 27, 2013.  To date, only 8 requests for exclusion have been received (*see id.* ¶11); and no objections to the Settlement, the Plan of Allocation or Bond Counsel's Fee and Expense Application have been received.  Bond Counsel will file reply papers on July 15, 2013 that will address the requests for exclusion and any objections that may be received.

## V.    ALLOCATION OF THE PROCEEDS OF THE SETTLEMENTS

147.    Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Bond Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the Settlement Fund less (a) any Taxes, (b) any Notice and Administrative Costs, (c) any Litigation Expenses awarded by the Court, and (d) any attorneys' fees awarded by the Court) must submit a valid Claim Form with all required information postmarked no later than August 21, 2013.  As set forth in the Notice, the Net Settlement Fund will be distributed among Bond Class Members according to a plan of allocation approved by the Court.

148.    Bond Plaintiffs' Counsel developed the proposed plan of allocation (the "Plan of Allocation") in consultation with Bond Plaintiffs' damages expert, Mr. Coffman.  Bond Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate

the Net Settlement Fund among Bond Class Members who suffered losses as result of the conduct alleged in the Complaint.

149.    The Plan of Allocation is set forth at pages 8 to 11 of the Notice.  As described in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Bond Class Members might have been able to recover at trial. Instead, the calculations under the Plan of allocation are only a method to weigh the claims of Bond Class Members against one another for the purposes of making *pro rata* allocations of the Net Settlement Fund.

150.    Under the Plan of Allocation, a "Recognized Loss Amount" or "Recognized Gain Amount" will be calculated for each purchase or other acquisition of the Bond Class Securities during the Settlement Class Period (*i.e.,* from May 11, 2006 through and including November 28, 2008) that is listed in the Claim Form and for which adequate documentation is provided. The calculation of Recognized Loss or Gain Amounts will depend upon several factors, including (a) which Bond Class Securities were purchased or otherwise acquired, and in what amounts; (b) when the Bond Class Securities were purchased or otherwise acquired; and (c) whether the Bond Class Securities were sold, converted or held to maturity and, if so, when the securities were sold or converted and for what amounts.

151.    The formula for calculating Recognized Loss Amounts under the Plan of Allocation is generally based on the formula for calculating damages under Section 11(e) of the Securities Act of 1933, 15 U.S.C. § 77k(e).  However, because Bond Plaintiffs alleged that additional misrepresentations had not been fully revealed as of the date the initial complaints were filed on September 30 and October 28, 2008, the closing price of the securities on November 28, 2008 (the last day of the Settlement Class Period) is used as the "value" of the

Bond Class Securities as of the date the suit was filed.  *See* Notice ¶52.  In addition, because the overwhelming majority of Bond Class Securities have subsequently recovered in price, in consultation with Bond Plaintiffs' damages expert, the Recognized Loss Amounts applicable to Bond Class Securities that were still held as of March 18, 2013 – the date the Stipulation was executed – will be discounted by 90%.  Notice ¶54.

152.    Under the Plan of Allocation, Recognized Gain Amounts will be calculated for Bond Class Securities that were purchased or acquired during the Settlement Class Period and sold, converted or held for a gain.  Recognized Gain Amounts will be used to offset Recognized Loss Amounts calculated for the same Bond Class Security, but will not be used to offset Recognized Loss Amounts for different securities.  Notice ¶58.   The sum of a Claimant's Net Recognized Losses for all of the Bond Class Securities will be the Claimant's "Recognized Claim" and the Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims.  Notice ¶¶59-60.

153.    In sum, the Plan of Allocation, which was developed in consultation with Bond Plaintiffs' damages expert, was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Bond Class Members based on the losses they suffered on transactions in the Bond Class Securities that were attributable to the conduct alleged in the Complaint. Accordingly, Bond Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

154.    As noted above, as of June 6, 2013, more than 417,000 copies of the Notice, which contains the Plan of Allocation, and advises Bond Class Members of their right to object to the proposed Plan of Allocation, have been sent to potential Bond Class Members. S*ee* Ex. 1

(Cirami Aff.), ¶¶2-7.   To date, no objections to the proposed Plan of Allocation have been received.

## VI.   THE FEE AND LITIGATION EXPENSE APPLICATION

155.   In addition to seeking final approval of the Settlement and Plan of Allocation, Bond Counsel is applying to the Court for: (a) an award of attorneys' fees and reimbursement of litigation expenses on behalf of all Plaintiffs' Counsel; and (b) PSLRA awards for certain of the Bond Plaintiffs for the costs and expenses they incurred in connection with their representation of the Bond Class.  *See* Singer Decl., Ex. 2 through Ex. 9 (Declarations from Bond Plaintiffs).

156.   Specifically, for Plaintiffs' Counsel's extensive efforts on behalf of the Bond Class, Bond Counsel is applying for a fee award of 20% of the Settlement Fund, or $146,000,000, plus interest earned at the same rate as the Settlement Fund, and for reimbursement of $7,286,868.15 in Plaintiffs' Counsel's litigation expenses.   Pursuant to 15 U.S.C. § 77z-1(a)(4), Bond Counsel also requests reimbursement of $39,946.95 in costs and expenses incurred by certain of the Bond Plaintiffs directly related to their representation of the Bond Class.   The total amount of Plaintiffs' Counsel's out-of-pocket litigation expenses and the costs and expenses of Bond Plaintiffs (*i.e.*, $7,326,815.10) for which Bond Counsel is seeking reimbursement is below the maximum expense amount of $10.5 million set forth in the Notice.

157.   In determining whether a requested award of attorneys' fee is fair and reasonable, district courts are guided by the factors first articulated by the Second Circuit in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974).   As summarized more recently in *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000), these factors include:

> (1) The time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation…; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Goldberger*, 209 F.3d at 50.  Based on consideration of these factors as further discussed below, and on the additional legal authorities set forth in the accompanying Memorandum of Law in Support of Bond Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Fee Memorandum") being filed contemporaneously herewith, we respectfully submit that Bond Counsel's requested fee should be granted.

### A.    The Fee Application

#### 1.    The Requested Fee Is Fair and Reasonable

158.    For Plaintiffs' Counsel's extensive efforts on behalf of the Bond Class, Bond Counsel is applying for a fee award from the Settlement Fund on a percentage basis.  As set forth in the accompanying Fee Memorandum, the percentage method is the appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the interest of the Bond Class in achieving the maximum recovery in the shortest amount of time required under the circumstances, is supported by public policy, and has been recognized as appropriate by the United States Supreme Court and the Second Circuit for cases of this nature.

159.    Based on the extraordinary result achieved for the Bond Class, the extent and quality of work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Bond Counsel respectfully submits that a 20% fee award is reasonable and should be approved.  As discussed in the Fee Memorandum, a 20% fee award is fair and reasonable for attorneys' fees in common fund cases such as this, is within the range of percentages typically awarded in securities class actions in this Circuit, and is within the range of percentages often awarded by courts in this Circuit and across the country in securities class actions with substantial settlements.

160.    Significantly, consideration of Plaintiffs' Counsel's lodestar confirms the reasonableness of the requested fee.  As this Court noted in the April 8, 2013 fee hearing in the

Stock Action, as the size of a settlement increases, "the percentage aspect [of the fee request] goes down, and indeed the lodestar may be becoming, and I think is, becoming more important." *See* Tr. of Apr. 8, 2013 Hearing at 15.   In this case, the lodestar strongly demonstrates the reasonableness of the fee request.

161.   Attached hereto as Exhibits 12A-12G are declarations from all Plaintiffs' Counsel in support of an award of attorneys' fees and reimbursement of litigation expenses.   The first page of Exhibit 12 contains a summary chart of the hours expended and lodestar amounts for each Plaintiffs' Counsel firm, as well as a summary of each firm's total litigation expenses. Included within each supporting declaration is a schedule summarizing the lodestar of each firm, a description of the work performed by each firm, and a summary of expenses by category.   The supporting daily time records of each firm are being submitted to the Court *in camera*.   These Plaintiffs' Counsel include: (a) BLBG, the Court-appointed Bond Counsel; (b) Kessler Topaz Meltzer & Check, LLP ("KTMC"), counsel for Bond Plaintiffs City of Tallahassee Retirement System, Miami Beach Employees' Retirement Plan, Southeastern Pennsylvania Transit Authority, City of Philadelphia Board of Pensions and Retirement, and James M. Brown; (c) Pomerantz Grossman Hufford Dahlstrom & Gross LLP ("Pomerantz"), counsel for Bond Plaintiff American European Insurance Company; (d) Klausner & Kaufman, P.A., additional counsel for Bond Plaintiff Louisiana Sheriffs' Pension and Relief Fund and Minneapolis Firefighters' Relief Association; (e) Rice, Michaels & Walther LLP, additional counsel for Minneapolis Firefighters' Relief Association; (f) Ann D. White Law Offices, P.C.; and (g) Murray Frank LLP.   The vast majority of the total lodestar in this action – or 98% – was incurred by Bond Counsel, KTMC, and Pomerantz.

162.     As detailed above, each of these additional Plaintiffs' Counsel performed work at the direction of, and under the supervision of, Bond Counsel.  As explained in the Declarations of other Bond Plaintiffs' Counsel and Plaintiffs' Counsel, these counsel performed work that assisted in the prosecution of this Action and provided a benefit to the Bond Class by, among other things, assisting in the drafting and review of pleadings and motion papers, assisting in the production of documents by Bond Plaintiffs, assisting in the deposition preparation of Bond Plaintiffs' 30(b)(6) representatives, assisting with document review, taking certain depositions on behalf of Bond Plaintiffs, and conferring with their respective clients and Bond Counsel about the status of the litigation and settlement negotiations.

163.     The significant amount of work undertaken by Bond Plaintiffs' Counsel has been time-consuming, challenging, and fraught with risk.  I maintained control of and monitored the work performed by lawyers on this case.  While I personally devoted substantial time to this case, other experienced attorneys at my firm and the other Plaintiffs' Counsel's firms undertook particular tasks appropriate to their levels of expertise, skill, and experience, and more junior attorneys and paralegals worked on matters appropriate to their experience levels.  Throughout the litigation, Bond Counsel allocated work assignments among its many attorneys and other Plaintiffs' Counsel to avoid unnecessary duplication of effort.

164.     As set forth on Exhibit 12, Plaintiffs' Counsel have collectively expended a total of 213,507 hours in the prosecution and investigation of this Action.  The resulting total lodestar is $87,229,248.75.  The requested fee, therefore, yields a multiplier of 1.67.  This multiplier is fair and reasonable based on the risks of the litigation, the quality of Bond Plaintiffs' Counsel's representation, and the outstanding result obtained on behalf of the Bond Class.  Indeed, as discussed in further detail in the Fee Memorandum, the requested multiplier is well below the

multipliers commonly awarded in securities cases, and well below the multipliers commonly awarded by courts in this Circuit and nationwide in cases involving settlements of significant magnitude, such as this one.

165.    Bond Counsel and other Plaintiffs' Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it for over four years without any compensation or guarantee of success.  Based on the excellent result obtained, the quality of the work performed, the risks of the Bond Action, and the contingent nature of the representation, Bond Counsel respectfully submits that a fee award of 20%, resulting in a multiplier of 1.67 is fair and reasonable, and is amply supported by the fee awards courts have granted in other large cases.

### 2.    Additional Information Concerning Plaintiffs' Counsel's Lodestar

166.    Bond Plaintiffs' Counsel have excluded from their lodestar calculation all time spent working on their application for reimbursement of attorneys' fees and litigation expenses, and further excluded all time for any work incurred after April 30, 2012.  Moreover, the submitted lodestar does not include any time spent on lead plaintiff motions submitted in the Stock Action or any time spent on issues relating to the leadership structure of the Bond Action. At a February 28, 2013 hearing concerning the fee application in the Stock Action, and in an order that the Court issued in the Stock Action on April 1, 2013, the Court requested certain information concerning the Stock Action plaintiffs' counsel's lodestar.  Given that the Court requested this information in the Stock Action, and in anticipation that the Court may also desire to have that information with respect to the Bond Action, Bond Counsel has set forth below information responsive to the Court's requests where those requests apply to the Bond Action.

167.    In certain of its requests, the Court sought information concerning work performed by contract attorneys in the Stock Action.  That request does not apply here as Plaintiffs' Counsel did not employ contract attorneys in the Bond Action.

168.    With respect to the Court's requests in the Stock Action that do apply to the Bond Action, set forth below is the information responsive to those requests.

(i)     Time Records for All Plaintiffs' Counsel

169.    As noted above, the detailed time records for each Plaintiffs' Counsel's firm are being submitted to the Court *in camera*.

(ii)    Breakdown of All Time Spent Pre- and Post- Appointment of Lead Plaintiff

170.    Plaintiffs' Counsel's lodestar does not include any time spent on lead plaintiff issues in the Stock Action or any time spent on issues concerning the leadership structure of the Bond Action.  The only time included prior to Bond Counsel's appointment on December 10, 2008 relates solely to Plaintiffs' Counsel's efforts to litigate the Bond Action for the benefit of the Bond Class, including their efforts to investigate Bond Plaintiffs' claims, to preserve those claims by drafting and filing the State Court Complaints, to negotiate with Defendants over remand, and to investigate and draft the consolidated Complaint.

(iii)   Estimated Breakdown of Time Spent On Depositions, Briefs, and Court Conferences

171.    As requested by the Court at the February 28, 2013 conference in the Stock Action, attached as Exhibit 10 is a chart which sets forth: (a) the number of Bond Plaintiffs' attorneys attending each deposition; (b) their level of experience; (c) their billing rate; and (d) an estimate of how many hours they spent preparing for and attending each deposition.

172.    Further, attached as Exhibit 11 is a chart which sets forth: (a) the number of Bond Plaintiffs' attorneys who principally worked on each set of briefs; (b) their level of experience; (c) their billing rate; and (d) an estimate of how many hours they spent on each set of briefs.

173.    At the February 28, 2013 hearing, the Court also requested Lead Counsel in the Stock Action to provide a breakdown of time spent attending Court conferences.  There were no Court conferences in the Bond Action, and thus, Plaintiffs' Counsel's lodestar does not include any time spent preparing for or attending Court conferences.

(iv)    Work Performed After a Settlement in Principle Was Reached

174.    In its April 1, 2013 Order in the Stock Action, the Court requested the total lodestar amount for contract attorneys' work performed and all firm attorneys' work performed after a settlement in principle was reached but before a settlement was finalized, excluding work on finalizing the settlement and preparing the motions for preliminary and final approval of the Settlement.

175.    In the Bond Action, there is no such time for any attorneys.  As noted above, the Parties in the Bond Action reached a settlement in principle on January 25, 2013, when they agreed to accept the mediator's recommendation.  After that date, all attorney work in the Bond Action related to finalizing the Settlement and preparing the motion for preliminary approval.

176.    Moreover, Bond Counsel significantly decreased its discovery efforts after the Court stayed the Bond Action on September 6, 2012 in order to streamline the litigation.  For example, Bond Counsel did not take any depositions after September 6, 2012 (with the last deposition occurring on August 28, 2012).  Further, once the Court granted the stay on September 6, 2012, Bond Counsel directed all attorneys to expeditiously complete certain important outstanding projects in the event that litigation resumed, which included completing deposition kits for key potential witnesses (such as former Citigroup CEO Vikram Pandit) and

finishing memoranda setting forth key evidence on the central issues in the Action.  Within two weeks, or by September 20, 2012 – more than four months before the Settlement was reached – nearly all non-settlement related work was suspended pending settlement discussions.

### 3.     The Quality of Bond Counsel's Representation

177.    A critical factor for evaluating the quality of counsel's representation is the quality of the results achieved on behalf of the class.  Bond Counsel respectfully submits that the quality of the Settlement is extraordinary.  As noted above, if approved, the $730 million Settlement would be the second largest recovery ever in a securities class action brought on behalf of purchasers of debt securities, and one of the three largest securities class action recoveries in a case that does not involve a financial restatement.  The Settlement would also rank among the fifteen largest securities class action settlements in history.  The outstanding quality of this result is evidence of the quality of Bond Counsel's representation.

178.    The quality of Bond Counsel's representation is further demonstrated by the fact that it recognized that investors in Citigroup's bonds and preferred stock had valuable claims that were not being asserted, and took steps to preserve those claims, as described above in paragraphs 8 to 11.  The fact that Bond Counsel was the only firm to recognize the value of these claims, to agree to take on the risk of prosecuting them, and to take significant action to preserve them, confirms that Bond Counsel provided high quality representation to the Bond Class.

179.    Moreover, this result was obtained through Bond Plaintiffs' Counsel's hard work, persistence and skill in a highly complex case that presented very significant litigation risks.  Bond Plaintiffs' Counsel achieved the Settlement without the benefit of an accounting restatement by Citigroup.  Further, as explained above, the vast majority of the claims here were unique to the Bond Action, and Bond Counsel had to independently develop substantial evidence to support those claims and convince Defendants to settle.  The fact that Bond Counsel achieved

this result through its independent efforts further demonstrates that the quality of representation here was outstanding.

180.     Of course, the Court may also take into account its own observations of the quality of Bond Counsel's representation during the course of this litigation.  Here, the Court has personally reviewed the Complaint and Bond Plaintiffs' papers submitted in connection with numerous motions, including Defendants' motions to dismiss, Bond Plaintiffs' motion for class certification, Bond Plaintiffs' motion to compel, and Defendants' Rule 12(c) motion.   Although this work represents a small portion of the total work that Bond Counsel has performed, we respectfully submit that the quality of that work reflects the quality of Bond Counsel's work on all aspects of the Bond Action.

181.     The standing and expertise of Bond Counsel is another relevant factor in assessing the quality of its work.  Bond Counsel has extensive experience in successfully prosecuting some of the largest and most complex securities class actions in history, and is consistently ranked among the top plaintiffs' firms in the country.  Bond Counsel has taken complex securities fraud cases to trial, and is among the few firms that have done so.  Bond Counsel believes that this willingness and ability to prosecute cases through trial added valuable leverage in the settlement negotiations.  All other Plaintiffs' Counsel are highly experienced in prosecuting securities class actions, and worked diligently and efficiently in prosecuting the Bond Action.   Plaintiffs' Counsel's experience and track record in complex securities class action litigation are summarized in the firm resumes attached to their respective declarations.

182.     Finally, the quality of the work performed by Bond Counsel in obtaining the Settlement should also be evaluated in light of the quality of the opposition.  Here, Defendants were represented by some of the country's most prestigious and experienced securities defense

firms, which vigorously and ably defended the Bond Action for more than four years. Specifically, the Citigroup Defendants were represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP, and the Underwriter Defendants were represented by Skadden, Arps, Slate Meagher & Flom LLP.  Against this formidable opposition, Bond Counsel presented a case that was sufficiently strong that it was able to negotiate the outstanding recovery reflected in the proposed Settlement.

183.    In sum, the exceptional quality of representation here supports the requested fee.

### 4.    The Risks of the Litigation

184.    This prosecution was undertaken by Bond Counsel on an entirely contingent-fee basis.  The extensive risks assumed by Bond Counsel in bringing these claims have been detailed above and those same risks are equally relevant to an award of attorneys' fees.

185.    From the outset, Bond Counsel understood that it was embarking on a complex, expensive and likely lengthy litigation with no guarantee of compensation for the substantial investment of time, money and effort that the case would require.  Bond Counsel understood that Defendants would raise myriad challenges to liability, damages, and class certification, and that there was no assurance of success.

186.    In undertaking the responsibility of prosecuting this Action, Bond Counsel ensured that ample resources were dedicated to it, and that funds were available to compensate staff and to advance the significant expenses that a case of this magnitude and complexity requires.  Indeed, for over four years, Bond Plaintiffs' Counsel vigorously prosecuted this Action for the benefit of the Bond Class and received no compensation, while incurring more than $7.28 million in expenses.

187.    Bond Counsel bore the risk that no recovery would be achieved.  Indeed, this case presented numerous risks that could have prevented any recovery whatsoever.   Despite the

vigorous efforts of Bond Counsel, success in contingent litigation such as this is never assured. Bond Counsel firmly believes that the commencement of a securities class action, or the survival of a class action after a motion to dismiss, does not guarantee settlement.  To the contrary, it takes hard work and diligence by skilled counsel to develop facts and theories that are needed to induce sophisticated defendants to engage in serious settlement negotiations involving significant sums of money.

188.    Moreover, the United States Supreme Court and numerous other courts have repeatedly recognized that the public has a strong interest in having experienced and able counsel enforce the federal securities laws through private actions.  *See, e.g.*, *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (private securities actions provide "'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action.'") (citation omitted).  Further, as Congress recognized through the passage of the PSLRA, vigorous private enforcement of the securities laws can only occur if private plaintiffs, particularly institutional investors, take an active role in prosecuting securities class actions.  If this important public policy is to be carried out, it is essential that plaintiffs' counsel be adequately compensated for undertaking actions with significant risk and achieving remarkable results, as Bond Counsel did here.

### 5.    The Significant Amount of Time and Labor Devoted to the Action by Plaintiffs' Counsel

189.    The work undertaken by Bond Counsel and all Plaintiffs' Counsel in investigating and prosecuting this Action and achieving the Settlement in the face of substantial risks has been time-consuming and challenging.  As explained in detail above, among other things, Plaintiffs' Counsel: (a) investigated the Bond Class's claims and filed the two State Court Complaints to preserve those claims; (b) filed the detailed consolidated Complaint; (c) successfully opposed

76

Defendants' motions to dismiss; (d) filed detailed papers in support of their vigorously contested class certification motion; (e) extensively briefed their motion to compel, which was hotly contested by Defendants and multiple federal regulators; (f) successfully opposed Defendants' Rule 12(c) motion; (g) conducted two years of extensive discovery, including reviewing over 42.5 million pages of documents and taking or defending 76 depositions; (h) developed significant exert evidence in support of their claims, and nearly completed their opening expert reports, the deadline for which was weeks away when the Court entered the stay of discovery; and (i) engaged in a hard-fought negotiation process with experienced defense counsel.

190.    At all times, Plaintiffs' Counsel's efforts advanced the litigation, and these efforts conferred a substantial benefit on the Bond Class in the form of the Settlement.  Accordingly, the substantial time and expense incurred by Plaintiffs' Counsel weighs strongly in favor of the requested fee.

### 6.    Bond Plaintiffs' Endorsement of the Fee Application

191.    Bond Plaintiffs include 7 sophisticated institutional investors, 6 of which are public pension funds.  All Bond Plaintiffs have approved the Fee Application and believe it to be fair and reasonable.  As set forth in the declarations submitted by each of the Bond Plaintiffs, each of the Bond Plaintiffs supervised and monitored both the prosecution and the settlement of the Action and has concluded that Bond Counsel have earned the requested fee based on the outstanding recovery obtained for the Bond Class in a case that involved serious risks.  *See* Exhibits 2 to 9 hereto.  In addition to their responsibilities as Bond Plaintiffs, the 6 public pension fund Bond Plaintiffs have independent duties to their respective constituents to ensure that they are acting in their best interests and that they are appropriately reviewing Bond Counsel's request.  Accordingly, Bond Plaintiffs' endorsement of Bond Counsel's fee request further demonstrates its reasonableness.

192.    In addition, the requested 20% fee is expressly permitted under the terms of the fee retainer agreements that Bond Counsel negotiated and entered into with the institutional Bond Plaintiffs which initiated the litigation.  The fact that the requested fee is authorized by an agreement that was negotiated with and agreed to by sophisticated institutions is further confirmation of its reasonableness.  The fee request also has the support of those Bond Plaintiffs who negotiated their own retainer agreements with Plaintiffs' Counsel and have participated extensively in this Action.

193.    Accordingly, Bond Plaintiffs' unqualified endorsement of the fee request should be given meaningful weight in the Court's consideration of the fee award.

### 7.    The Reaction of the Settlement Class to the Fee Application

194.    As noted above, as of June 6, 2013, over 417,000 Notice Packets had been mailed to potential Bond Class Members advising them that Bond Counsel would apply for an award of attorneys' fees in an amount not to exceed 20% of the Settlement Fund.  *See* Ex. 1, ¶7 and Ex. A thereto, at ¶¶5, 69.  In addition, the Court-approved Summary Notice has been published in the national edition of *The Wall Street Journal* and transmitted over the *PR Newswire*.  Ex. 1 at ¶ 8. To date, no objections to the attorneys' fees set forth in the Notice have been received.  Should any objections be received, they will be addressed in Bond Counsel's reply papers.

### B.    The Litigation Expense Application

195.    As noted above, Bond Counsel, on behalf of themselves and the other Plaintiffs' Counsel firms, seek reimbursement from the Settlement Fund in the total aggregate amount of $7,286,868.15 for litigation expenses that were reasonably incurred by Plaintiffs' Counsel in connection with commencing, litigating and settling the claims asserted in this Action.  Bond Counsel also seeks reimbursement of $39,946.95 for the costs and expenses incurred by certain of the Bond Plaintiffs directly related to their representation of the Bond Class.

196.    From the beginning of the case, Plaintiffs' Counsel were aware that they might not recover any of their expenses, and, even in the event of a recovery, would not recover any of their out-of-pocket expenditures until such time as the Action might be successfully resolved. Plaintiffs' Counsel also understood that, even assuming that the case was ultimately successful, reimbursement for expenses would not compensate them for the lost use of the funds advanced by them to prosecute the Action.  Accordingly, Plaintiffs' Counsel were motivated to and did take appropriate steps to avoid incurring unnecessary expenses and to minimize costs without compromising the vigorous and efficient prosecution of the case.

197.    As set forth in the Fee and Expense Declarations from Plaintiffs' Counsel (provided in Exhibit 12 hereto, and as summarized on the first page of Exhibit 12), the respective Plaintiffs' Counsel law firms have incurred a total of $7,286,868.15 in unreimbursed litigation expenses in connection with the prosecution of the Bond Action.  These expenses, as attested to in the respective firm Declarations, are reflected on the books and records maintained by each Plaintiffs' Counsel law firm. These books and records are prepared from expense vouchers, check records and other source materials, and provide an accurate accounting of the litigation expenses incurred in this matter.  Plaintiffs' Counsel's expenses are set forth in detail in each firm's declaration, each of which identifies the specific category of expense, *e.g.*, on-line research, experts' fees, out-of-town travel costs, the costs of electronic discovery, photocopying, telephone, fax and postage expenses, and other costs actually incurred for which Plaintiffs' Counsel seek reimbursement.  These expense items are billed separately by Plaintiffs' Counsel, and such charges are not duplicated in the respective firms' billing rates.  A summary chart of Plaintiffs' Counsel's expenses is attached hereto as Exhibit 13.

198.    Bond Counsel maintained control over the litigation expenses.   Of the total amount of expenses, $4,618,592, or 63% was expended on Bond Plaintiffs' experts.   As noted above, Bond Counsel retained multiple experts to assist in the prosecution and resolution of the Action.   Many of these experts were closely involved in the prosecution of this case from the outset.   For example, the damages expert retained by Bond Counsel assisted in the preparation of the Complaint, Bond Plaintiffs' class certification motion, the expert discovery phase, during settlement negotiations with the Defendants, and in preparing the plan of allocation of the settlement proceeds.

199.    As noted, the other 5 experts retained by Bond Plaintiffs included experts in the fields of CDO and SIV valuation, accounting, bank capital and solvency, federal banking regulations, and underwriter due diligence.   Bond Plaintiffs consulted extensively with these experts during the litigation, and their opinions would have been critical to Bond Plaintiffs' ability to establish their claims.

200.    Another significant part of the litigation expenses, $1,702,875, or approximately 23%, was necessary to conduct document discovery.   Defendants and third parties produced 42.5 million pages of documents in this Action in electronic format.   Thus, it was necessary for Bond Counsel to retain the services of a specialist firm to host a secure, Internet-based electronic document database that could be used to search, review, code and organize the relevant documents.

201.    Another component of the litigation expenses was for online legal and factual research, which was necessary to prepare the Complaint and research the law pertaining to the claims asserted in the Action.   The charges for on-line research amounted to approximately $211,108.

202.    Additionally, Bond Counsel paid $125,000 for mediation fees charged by the mediator in this matter, Judge Phillips.

203.    The other expenses for which Plaintiffs' Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These expenses include, among others, court fees, costs of out-of-town travel, support staff overtime, miscellaneous copying costs, long distance telephone and facsimile charges, and postage and delivery expenses.

204.    During the February 28, 2013 hearing in the Stock Action, the Court requested information concerning plaintiffs' counsel's policies on expenses related to travel, hotel rooms, and per-page copying rates.  Bond Counsel's policy for seeking reimbursement of these items is described in detail at paragraph 8 of the Declaration of Steven B. Singer In Support of Bond Counsel's Motion For An Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Bernstein Litowitz Berger & Grossmann LLP ("BLBG Declaration"), which is attached hereto as Tab A to Exhibit 12.  Bond Counsel instructed all Plaintiffs' Counsel doing work in this matter to apply Bond Counsel's policies related to reimbursement requests. Specifically, consistent with Bond Counsel's policy, Plaintiffs' Counsel are seeking reimbursement for coach rate airfare only, and a cap is placed on nightly hotel rates and out of town meals.  *See* Ex. 12, Tab A (BLBG Declaration) at ¶8(a).  Moreover, also consistent with Bond Counsel's policy on such matters, Plaintiffs' Counsel placed caps on reimbursement for in office working meals and internal copying, while reimbursement for on-line legal research is sought at the cost charged to Plaintiffs' Counsel.  *Id.* at ¶¶8(b)-(e).

205.    All of the litigation expenses incurred by Plaintiffs' Counsel were reasonably necessary to the successful litigation of this Action, and have been approved by the Bond Plaintiffs.

206.    Additionally, pursuant to 15 U.S.C. § 77z-1(a)(4), certain of the Bond Plaintiffs seek reimbursement of their reasonable costs and expenses incurred directly in connection with their representation of the Class.  Specifically: (a) Louisiana Sheriffs' Pension and Relief Fund is seeking reimbursement of $3,842.96 in expenses; (b) City of Tallahassee Retirement System is seeking reimbursement of $3,680.00 in expenses; (c) City of Philadelphia Board of Pensions and Retirement is seeking reimbursement of $1,815.00 in expenses; (d) Miami Beach Employees' Retirement Plan is seeking reimbursement of $3,510.65 in expenses; (e) Southeastern Pennsylvania Transportation Authority is seeking reimbursement of $1,698.34 in expenses; (f) American European Insurance Company is seeking reimbursement of $5,000 in expenses; (g) Arkansas Teacher Retirement System is seeking reimbursement of $2,400 in expenses; and (h) Phillip G. Ruffin is seeking reimbursement of $18,000 in expenses.[4]

207.    The amount of time and effort devoted to this Action by the Bond Plaintiffs is detailed in the accompanying declarations of their respective representatives, annexed hereto as Exhibits 2 through 8.  Bond Counsel respectfully submits that these requested amounts are fully consistent with Congress's intent, as expressed in the PSLRA, of encouraging institutional and other plaintiffs to take an active role in bringing and supervising actions of this type.

208.    As set forth in the Fee Memorandum and in the supporting declarations submitted on behalf of the Bond Plaintiffs attached hereto, Bond Plaintiffs have been committed to

---

[4] In light of the fact that Bond Plaintiff James M. Brown is a retiree who has no current hourly rate for which to utilize as a basis for seeking reimbursement for the hours he has spent on behalf of the Bond Class in this Action, Mr. Brown is not seeking a reimbursement award.  I have been advised by KTMC that he fully supports all aspects of the Settlement and fee request.

pursuing the Bond Class's claims against the Defendants for years.  These large institutions and individuals have actively and effectively fulfilled their obligations as representatives of the Bond Class, complying with all of the many demands placed upon them during the litigation and settlement of this Action, and providing valuable assistance to Bond Plaintiffs' Counsel.  The efforts expended by the representatives for the Bond Plaintiffs during the course of this Action are precisely the types of activities courts have found to support reimbursement to class representatives, and fully support Bond Plaintiffs' requests for reimbursement of costs and expenses.

209.    The Notice informed potential Bond Class Members that Bond Counsel would be seeking reimbursement of expenses in an amount not to exceed $10.5 million and that the costs and expenses of the Bond Plaintiffs could be sought as part of the request for reimbursement of Litigation Expenses.  The total amount sought by the Bond Plaintiffs (*i.e.*, $39,946.95), when added to the request of Plaintiffs' Counsel (*i.e.*, $7,326,815.10), is below the $10.5 million that Bond Class Members were advised could be sought.  To date, no objection has been raised as to the maximum amount of Litigation Expenses set forth in the Notice, including the amount sought to be reimbursed to the Bond Plaintiffs.

210.    In view of the complex nature of the Action, as well as the fact that this Action was vigorously prosecuted for over four years, the expenses incurred by Plaintiffs' Counsel were reasonable and necessary to represent the Bond Class and achieve the Settlement.  Accordingly, Bond Counsel respectfully submit that the expenses incurred by Plaintiffs' Counsel and Bond Plaintiffs are fair and reasonable and should be reimbursed in full from the Settlement Fund.

## VII.    CONCLUSION

211.    For all the reasons set forth above, Bond Plaintiffs and Bond Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable and

adequate.   Bond Counsel further submits that the requested fee in the amount of 20% of the

Settlement Fund should be approved as fair and reasonable, and the request for reimbursement of

total litigation costs and expenses in the amount of $7,326,815.10 should also be approved.

I declare, under penalty of perjury under the laws of the United States, that the foregoing

facts are true and correct.

Date:   June 7, 2013
        New York, New York


                                                    _____/s/ Steven B. Singer_____
                                                    STEVEN B. SINGER

84

## TABLE OF EXHIBITS

**Exhibit 1**    Affidavit of Stephen J. Cirami Regarding (A) Mailing of the Notice and Proof of Claim; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date

**Exhibit 2**    Declaration of Osey "Skip" McGee, Jr., Executive Director of Louisiana Sheriffs' Pension and Relief Fund

**Exhibit 3**    Declaration of James O. Cooke, IV, City Treasurer-Clerk for the City of Tallahassee Retirement System

**Exhibit 4**    Declaration of James P. Leonard, Chief Deputy of the Economic Development and Investments Unit for the Law Department of the City of Philadelphia on Behalf of the City of Philadelphia Board of Pensions and Retirement

**Exhibit 5**    Declaration of Rick Rivera, Pension Administrator for the Miami Beach Employees' Retirement Plan

**Exhibit 6**    Declaration of James B. Jordan, Esquire, General Counsel of Southeastern Pennsylvania Transportation Authority

**Exhibit 7**    Declaration of Steve Klein, Treasurer of American European Insurance Company

**Exhibit 8**    Declaration of Laura Gilson, General Counsel of Arkansas Teacher Retirement System

**Exhibit 9**    Declaration of Phillip G. Ruffin

**Exhibit 10**   Depositions Taken or Defended by Bond Plaintiffs' Counsel

**Exhibit 11**   Breakdown of Bond Plaintiffs' Counsel's Work on Briefs

**Exhibit 12**   Summary of Plaintiffs' Counsel's Lodestar and Expenses

  **Tab A**    Declaration of Steven B. Singer in Support of Bond Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Bernstein Litowitz Berger & Grossmann LLP

  **Tab B**    Declaration of David Kessler in Support of Bond Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Kessler Topaz Meltzer & Check, LLP

| **Tab C** | Declaration of Jeremy A. Lieberman in Support of Bond Counsel's Motion for an Award of Attorneys' Fees And Reimbursement of Litigation Expenses Filed on Behalf of Pomerantz Grossman Hufford Dahlstrom & Gross LLP |
|---|---|
| **Tab D** | Declaration of Robert D. Klausner in Support of Bond Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Klausner & Kaufman, P.A. |
| **Tab E** | Declaration of Brian F. Rice in Support of Bond Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Rice, Michels & Walther LLP |
| **Tab F** | Declaration of Ann D. White in Support of Bond Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Ann D. White Law Offices, P.C. |
| **Tab G** | Declaration of Marvin L. Frank in Support Of Bond Counsel's Motion for an Award Of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Murray Frank LLP |
| **Exhibit 13** | Summary of Plaintiffs' Counsel's Expenses |