D7NBCITC                    Settlement Conference

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    IN RE CITIGROUP BOND
     LITIGATION,
4
                                        08 CV 9522 (SHS)
5    ------------------------------x

6

7                                       New York, N.Y.
                                        July 23, 2013
8                                       10:03 a.m.

9    Before:

10                      HON. SIDNEY H. STEIN,

11                                      District Judge

12                      APPEARANCES

13   BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
          Attorneys for Bond Plaintiffs
14   STEVEN SINGER, ESQ.
     MAX BERGER, ESQ.
15   JOHN RIZZO-HAMILTON, ESQ.
     JOHN BROWNE, ESQ.
16
     PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
17        Attorneys for Citigroup
     RICHARD ROSEN, ESQ.
18   JANE O'BRIEN, ESQ.
     BRAD KARP, ESQ.
19   SUSANNA BUERGEL, ESQ.

20   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
          Attorneys for Underwriter Defendants
21   GARY HACKER

22

23

24

25

D7NBCITC                        Settlement Conference

1              (In open court)

2              (Case called)

3              THE COURT:  Please be seated.

4              We're here for the hearing on the proposed settlement,

5      plan of allocation, and motion for attorneys' fees.

6              Who's going to be making the presentation on behalf of

7      plaintiffs?

8              MR. SINGER:  I will be, your Honor.

9              THE COURT:  Sure.  Tell me whatever it is you'd like

10     to tell me.

11             MR. SINGER:  Certainly.  Again, your Honor, may it

12     please the Court, Steven Singer from Bernstein Litowitz on

13     behalf of the bond plaintiffs.  Your Honor, with the Court's

14     permission, I'll first address the proposed settlement and the

15     plan of allocation and then, after that, the fee and expense

16     application.

17             THE COURT:  Sure.

18             MR. SINGER:  With respect to the settlement, as set

19     forth in our papers, it's our position that the proposed

20     settlement is fair, adequate and reasonable and merits approval

21     pursuant to the standards set forth by the Second Circuit in

22     the *Grinnell* case.  The proposed settlement is for $730 million

23     in cash, which has been deposited in escrow and is currently

24     earning interest to the benefit of the class.

25             We respectfully submit that that settlement is an

1    outstanding result.  It's the second largest recovery in a

2    securities class action brought on behalf of purchasers of debt

3    securities.  It is one of the three largest securities class

4    action recoveries in a case that does not involve a financial

5    restatement, and it is one of the 15 largest recoveries in any

6    securities class action, in securities class action history.

7            And as I'll discuss in greater detail in a few

8    minutes, the settlement was achieved only after counsel

9    expended tremendous effort litigating this case for more than

10   four and a half years in the face of substantial risks.  And

11   this result was achieved without significant assistance from

12   any related government action.

13           And in fact, as set forth in our papers, bond

14   plaintiffs were the only parties to litigate the vast majority

15   of the claims that were at issue in our case.

16           THE COURT:  I'm sorry, say that again.

17           MR. SINGER:  We were the only parties to litigate the

18   vast majority of the claims at issue in our case.  Meaning that

19   many of our claims related to, for instance, valuation of SIV

20   assets, valuations of CDOs, loss reserves, allocations --

21           THE COURT:  Well, certainly the CDO valuation was at

22   issue in the securities class action.

23           MR. SINGER:  Part of it.  For part of that.

24           THE COURT:  Your class period was somewhat larger.  Is

25   that what you're--

D7NBCITC                    Settlement Conference

            MR. SINGER:  Correct, for the CDOs and other subjects

that was unique to us, as was the allegations regarding

Citigroup's well-capitalized status.  So those were unique to

us.

            The settlement was also achieved through an extensive

negotiation process, including negotiations conducted under the

auspices of the Honorable Layn Phillips, a former federal

district court judge and extremely well-regarded mediator.

            And while all of the *Grinnell* factors strongly support

settlement -- and they're addressed in detail in our papers --

I would like to focus on three of those factors now:  The

reaction of the class, the inherent risks of the case, and the

advanced stage of the proceedings before settlement was

reached.

            With respect to the reaction of the class, the

reaction of the bond class has been extremely positive.  The

claims administrator has disseminated almost half a million

notices to bond class members and their nominees.  We also

published notice nationally in the Wall Street Journal and over

the PR Newswire.

            With respect to the settlement, we received virtually

no objections and not a single bond class member has objected

to the adequacy of the settlement.  The lack of objections is

particularly notable here, given both the size of the class and

the fact that the class consists of bondholders which are owned

1    largely by sophisticated financial institutions.  And these

2    institutions typically have their own counsel, or access to

3    their own counsel.  They're very familiar with securities class

4    actions.  They have large financial interests in both the

5    corporation and in this litigation.  And if they have an issue

6    with the settlement, or a fee request for that matter, they are

7    not hesitant to address.  And the fact that we didn't get any

8    objections from institutions I think is quite notable.

9           With respect to requests for exclusion, we also got an

10   extraordinarily small number of exclusion requests for a class

11   of this size.  In total, we received 31 requests for exclusion.

12   The majority of those, 18 of those 31, were submitted by

13   investors that either made a profit on their purchase of their

14   bond class securities, or aren't class members or did not

15   provide sufficient information to determine whether they are

16   class members.

17          Of the remaining 13, one request was filed by an

18   institution.  One opted out and filed an individual case years

19   ago.  And excluding that request, the remaining 12 investors

20   who purchased exclusion purchased just .0018 percent of the

21   bond class securities issued during the offerings period.

22          So to get so few objections and opt-outs in a case of

23   this size is extraordinary and it speaks volumes as to how the

24   class believes this settlement is an excellent result.

25          One final point on the reaction of the class, your

1    Honor.  Although the deadline for the submission of claim forms

2    is not until August 21st, the claims administrator has already

3    received more than 27,000 claim forms.  Typically in these

4    cases, the vast majority of claim forms come in at the end of

5    the deadline.  So I think this is a case where we are going to

6    get tens of-- obviously we're going to get tens and tens of

7    thousands of claim forms from class members.

8              With respect to the litigation risks as set forth in

9    our papers, this was an extremely complex and risky case.  The

10   magnitude of the case itself was enormous.  It involved 39

11   separate securities, 48 separate offerings, conducted over two

12   and a half years during rapidly changing market conditions.

13   The alleged misrepresentations included a host of false

14   statements on complex subjects, including Citigroup's loan loss

15   reserves, value of its CDOs, value of its SIVs, capital

16   adequacy and its exposure to subprime CDOs.

17             Significantly the Court claims in this case, the

18   claims which accounted for roughly 90 percent of our damages,

19   concerned estimates or matters of opinion or subjective

20   judgment about the value of assets such as the value of CDOs,

21   the values of the SIVs, the capital adequacy, and obviously the

22   loan loss reserves.

23             And to prove that Citigroup's valuation of these

24   assets were materially false and misleading was a difficult

25   task.  We've set forth the risks in our papers.  I won't detail

1    all of them, but in sum Citigroup used very complex financial

2    models to set its loan loss reserves as well as to determine

3    the value of its CDOs and SIVs and calculate its capital

4    adequacy.  These models were reviewed not only by Citigroup's

5    independent auditor, but also by regulators such as the OCC and

6    the Federal Reserve, none of which ever concluded that

7    Citigroup misrepresented the value of its mortgage-related

8    assets.  And, in fact, Citigroup's outside auditor actually

9    certified the accuracy of the company's financial statements

10   twice during our class period.

11           To prevail on these claims, this wasn't what I'll call

12   almost a traditional Section 11 claim, where you just have to

13   show falsity; to the contrary.  We also had to overcome the

14   heightened standards of the Second Circuit's decision in the

15   *Fait v. Regions Financial* case, which came down literally in

16   the midst of discovery, as your Honor knows.  And that was a

17   difficult case from a plaintiff's perspective.  *Fait* held that

18   to establish liability for a misstatement of opinion, the

19   plaintiff must prove that defendants misstated their truly held

20   belief.  The courts have held that's essentially equivalent to

21   scienter.  And here, the vast majority of our claims would

22   have fallen under the rubric of opinions under the Second

23   Circuit's test.  The valuation claims, loan loss reserves, all

24   of those.

25           And thus to prevail on the Court claims in this case,

1    we would have had to prove that defendants not only misstated

2    the value of their mortgage-related assets, not only were those

3    inaccurate, but that defendants did so deliberately or, at a

4    minimum, recklessly.  And that's extremely difficult to do,

5    especially when it concerns matters of judgment, and

6    particularly where you have auditors who review valuations and

7    reserves and sign off on financial statements.

8            So, again, Judge, I think on liability there were very

9    substantial risks.

10           There are also substantial risks with respect to

11   establishing damages in this case.  Proving damages would have

12   been complicated given that there were 39 different securities

13   at issue in this case sold over more than 40 separate offerings

14   over two and a half years.  These securities did not all trade

15   alike.  They reacted in many instances differently to different

16   disclosures.  They were issued during different periods of

17   time.

18           And defendants had a number of significant arguments.

19   I think it's notable that in our case, the bond securities did

20   not drop significantly in price in 2007, when Citigroup first

21   disclosed its subprime exposure, allegedly first disclosed it,

22   and took some large write-downs.  The major declines in the

23   price of the bond class securities occurred in the fall of

24   2008 -- September/October/August, that period of time -- when

25   there was sort of what we'll call the apex of the financial

crisis.

And defendants had strong arguments that the major

declines in the price of these securities were caused by

marketwide factors rather than any alleged misstatements and

omissions.  In fact, defendants would point to many times the

bonds dropped because of disclosures concerning financial

institutions other than Citigroup.

So, for example, when Lehman filed for bankruptcy,

that caused a drop in the bond class securities.  The issues

relating to Fannie Mae, Freddie Mac, AIG, again those also had

an impact on Citigroup's securities.  So defendants would have

argued that these were really marketwide factors, not issues

pertaining directly to Citigroup.

Defendants also would have argued that the declines in

the fall of 2008 were caused by investor overreaction rather

than any misstatements.  And, again, defendants would have

contended that the securities of numerous major financial

institutions declined in value at this time, and that Citigroup

actually required the government bailout not because of the

quality of its mortgage-related assets, but just because it was

suffering a liquidity crisis as a result of a market panic.

And to that end, Judge, and one final point, is that

the prices of many of the bond class securities quickly

rebounded in this case to trade at or above par where they

continue to trade today.  And I think that defendants would

1   have argued that this confirmed that any declines were not due

2   to real financial problems at Citigroup, but to a market panic,

3   so to speak.  And also under the statute establishes that any

4   investors who retain their securities had not suffered any

5   damages and could not recover.

6            So those are some of the issues with respect to

7   damages.

8            The stage of the proceedings at which the settlement

9   was reached was extremely advanced.  Bond plaintiffs had a

10  thorough understanding of the strengths and weaknesses of their

11  claims at the time they agreed to a settlement.  This

12  settlement was only obtained after more than four and a half

13  years of litigation, which included, among other things,

14  overcoming defendants' motions to dismiss, related motion for

15  reconsideration, an extensive class certification process,

16  which entailed nearly two dozen depositions of all of the bond

17  plaintiffs, many of their investment advisors, as well as

18  extremely extensive class certification briefing.

19           Successfully opposing defendants' effort to bring a

20  Rule 12(c) motion for judgment on the pleadings after the

21  Second Circuit issued its decision in *Fait*, conducting an

22  enormous amount of fact discovery, and, in fact, really getting

23  to virtually the end of fact discovery, which included

24  reviewing more than 42.5 million pages of documents and taking

25  or defending a total of 76 depositions, including taking the

D7NBCITC                    Settlement Conference

1    depositions of some of Citigroup's most senior executive

2    officers, such as the corporation's former treasurer, former

3    chief risk officer, and former CEO chuck prince.  And also

4    conducting significant work with numerous experts on subjects

5    such as damages, CDO and SIV valuation, loan loss reserves and

6    issues of that nature.

7              One final point, your Honor, just as I mentioned

8    earlier, in terms of the settlement discussions themselves.

9    The settlement discussions here were at all times arm's length

10   and adversarial.  We had preliminary discussions in 2012.  As

11   your Honor knows, in late summer/early fall of 2012, the

12   parties concluded that it made sense to see if they could

13   mediate the case.  At that point we contacted the Court and

14   asked your Honor to stay the case for a period of time while we

15   engaged in those settlement discussions and we shut down our

16   litigation efforts at that time.  All discovery within a week

17   or so shut down.

18             And we then went and mediated with Judge Phillips, who

19   was also the mediator in the stock action and obviously

20   familiar with the case.  Mediated with Judge Phillips.  And the

21   case actually settled in January, after Judge Phillips issued a

22   mediator's recommendation and both parties accepted it.

23             So, your Honor, that's just a summary of the reasons

24   why we say the settlement is fair and reasonable and should be

25   approved as set forth in our papers.  If your Honor has any

1    questions, I can answer them or I could also-- I know we

2    received a couple of objections to certain aspects of the

3    settlement.  We dealt with those in our papers, but if your

4    Honor wants me to address those briefly, I can.

5            THE COURT:  No, not in terms of the settlement itself.

6    No need.

7            MR. SINGER:  Okay.

8            THE COURT:  I fully understand the settlement.

9            MR. SINGER:  Okay.  Just briefly, Judge, on the plan

10   of allocation, also, that plan of allocation is fair, adequate

11   and reasonable.  We developed a plan in consultation with our

12   damages expert.  It basically allocates the settlement based on

13   the statutory measure of damages set forth in Section 11(e) and

14   there are no objections to the plan of allocation.  So we also

15   submit that that should be approved as well.

16           THE COURT:  I guess in terms of the settlement itself,

17   the only question I have is the same that I had in securities.

18   Corporations only act through individuals.  You certainly have

19   a number of individuals who are the defendants here survive the

20   motion practice.

21           The issue is why didn't you try to get some of the

22   settlement amount from the individuals as a deterrent?

23           MR. SINGER:  Well, I think there's-- I think this case

24   is actually different than the stock case in that regard, your

25   Honor.  I think the questions that your Honor raised in the

1    stock action, they're not as prevalent here principally because

2    the bond class consists of purchasers of debt, not stock.

3    We're not stockholders.  And the settlement -- I know your

4    Honor raised a question about the transfer of money potentially

5    from current shareholders to a class consisting of current

6    shareholders and former shareholders.

7            Bond class members are creditors of the corporation.

8    We're not owners.  So the payment in this case isn't a transfer

9    of money from current shareholders at all.  It's a payment-- or

10   it isn't anything to current shareholders.  It's a payment to

11   creditors of the corporation.

12           I do think with respect to deterrents, Judge, that a

13   settlement of this size is a deterrent to any future misconduct

14   by a corporation.  I don't think you need to get individual

15   contributions in order for there to be a deterrent effect.  We

16   settled a Bank of America case earlier this year.  It was

17   approved by Judge Castel for $2.4 billion.  That did not

18   involve individual contributions, but I think the size of that

19   settlement is still a deterrent in effect to corporations, and

20   I think the same is true here.

21           And I think here, getting contributions from

22   individuals would have been extremely-- would have been --

23   short of going to trial would have been impossible, frankly.

24   No individuals profited from the offerings.  This is not a case

25   where they were selling stock in an offering and were

1    profiting.  None of them profited.  And they had very

2    significant defenses, not just before *Fait* but certainly after

3    *Fait* came down.  Now we basically have to prove their scienter,

4    which was extraordinarily difficult, and they also had a due

5    diligence defense.

6         So I think it was very difficult to even-- it would

7    have been very difficult-- if we got a jury verdict, that's one

8    thing, but short of that, to get a recovery from individuals.

9         And I think also, Judge, this was a point I know was

10   made in the stock case, and we made it in our papers, too, but

11   the law is clear that the adequacy of the settlement should be

12   determined by looking at the overall compensation that the

13   class gets and not necessarily which defendants are paying and

14   where it's coming from.

15        And obviously, also, one final point that we made.

16   The individual defendants were indemnified by the corporation

17   here.  So obviously to the extent an individual paid, Citigroup

18   would have been required to pay them back, again short of

19   trial.

20        So I think all of those, Judge, are reasons why we did

21   not obtain individual contributions.

22        THE COURT:  Why don't you move on to the fees unless

23   there's another point you wanted to make on either settlement

24   or allocation.

25        MR. SINGER:  No, your Honor, I can move on to the

1    fees.

2           Bond counsel is applying for an award of 20 percent of

3    the settlement fund plus reimbursement of litigation expenses

4    of $7,286,868.15.  The bonds plaintiffs are also collectively

5    seeking reimbursement of their litigation expenses in the

6    amount of $39,946.95.  We respectfully submit that the fee

7    request is fair and reasonable under the factors set out by

8    Second Circuit in *Goldberger*, particularly in light of the

9    outstanding result obtained here.  And here looking at --

10          THE COURT:  Well, as a percentage you're seeking 20

11   percent.

12          MR. SINGER:  Yes, Judge.

13          THE COURT:  Everybody picks and chooses their own

14   comparative risk, but how do you come to the conclusion that 20

15   percent is appropriate?

16          MR. SINGER:  Well, I think, Judge --

17          THE COURT:  And your multiplier is 1.67.

18          MR. SINGER:  Correct, Judge.  And I think that's-- for

19   one thing-- multiple ways, your Honor.  But, first, the

20   requested percentage is within the range of percentages awarded

21   by courts in this district and elsewhere in large settlements.

22   We've cited some of those to your Honor:  The initial public

23   offerings case before Judge Scheindlin, where the Court granted

24   a 33 percent fee on settlement of $586 million; there was

25   Adelphia before Judge McKenna, a 21.4 percent fee on a $455

D7NBCITC                    Settlement Conference

1    million settlement; Freddie Mac before Judge Sprizzo, a 20

2    percent fee on $410 million settlement; Oxford Health before

3    Judge Brian.  And there are others that we cited.

4           But I think -- and your Honor alluded to it in your

5    comment about the multiplier -- courts in the Second Circuit

6    and elsewhere do not award percentage fees in a vacuum.

7           Also, Judge, the 20 percent fee, so your Honor is

8    aware, that's our retainer agreement with our plaintiffs.  The

9    20 percent, when your Honor talks about the percentage, that's

10   within the range of percentages, but it was also the amount

11   that we set forth in our retainer agreements with our

12   plaintiffs and which they agreed was a reasonable fee here.

13          But courts in the Second Circuit, as I said, do not

14   award percentage fees in a vacuum.  To the contrary, they look

15   at a number of factors.  Chief among them, the quality of

16   result, the complexity of the case, the amount of work done.

17   And one of the things that they do -- and your Honor has noted

18   this, I know, in the stock action -- is that they look at the

19   lodestar to ensure that the fee is reasonable.  And courts

20   recognize that, whereas, here counsel have expended

21   significant effort to obtain an outstanding result in a

22   difficult case, they are entitled to a reasonable multiplier on

23   their lodestar.

24          THE COURT:  I think this is an outstanding result and

25   you are entitled to a reasonable multiplier.  Both of those

D7NBCITC                    Settlement Conference

statements are true.  I guess the issue is the validity of the

lodestar.  And that issue goes to another issue that you know

I'm interested in, which is the "staff attorneys" usage.  About

more than 80 percent of the hours were by staff attorneys.

So talk to me about that.  That is, I asked for

documentation of contract attorneys and the answer that came

back, I think moderately disingenuously, was that we don't use

contract attorneys.  I think it just may be a nomenclature

issue, but I may be wrong.  If there's a significant

difference between contract attorneys and staff attorneys, I

want to know.

But I guess I need to know more about your staff

attorneys; the type of work they do, how they're brought on, if

they stay on after this project.  As I say, the work they do,

they are far and away the workhorses of the case.

And, again, I don't think it's so easy just to say we

don't hire contract attorneys.  So talk to me about who's

really doing the work here and the type of work they do.  I

need to get a better sense of that, how they differ from

associate attorneys.  Talk to me.

MR. SINGER:  Yes, your Honor.  I think the figure

actually for the staff attorneys -- and I think your Honor said

more than 80 percent.  I think it's around 70 percent of the

overall lodestar.  But that clarification aside, staff

attorneys --

1    THE COURT:  I show for you-- I may be wrong-- 166,000

2    hours for your firm, of which 134,000 were by staff attorneys.

3            MR. SINGER:  I think it's roughly three-quarters for

4    our firm, but overall, for all of the firms, the overall

5    lodestar.

6            THE COURT:  Okay.

7            MR. SINGER:  But I think --

8            THE COURT:  Give or take a couple of percentages, I

9    think the issue is still the same.

10           MR. SINGER:  I agree.  But what I said to your Honor

11   was 100 percent correct.  And we do not hire contract-- these

12   are not contract attorneys.  We do not use contract attorneys.

13   Our staff attorneys are employees of our firm.  They are firm

14   employees.  They receive W-2 forms, not form 1099s which are

15   the forms that --

16           THE COURT:  Do they show up on the-- actually some of

17   these questions I know the answer to, but this one I don't.  Do

18   they show up on your firm website?

19           MR. SINGER:  They do not, Judge.

20           THE COURT:  Do your associates show up on your firm

21   website?

22           MR. SINGER:  Yes, Judge, they do.

23           THE COURT:  All right.

24           MR. SINGER:  But the reason for that is simply because

25   we put people on our website who communicate with opposing

19

1   counsel and clients and we want to provide those-- and other

2   plaintiffs firms.  We want to provide lawyers and our clients

3   with contact information and biographical information about the

4   people who they most deal with.  And staff attorneys don't

5   typically have that function so we don't list them.  But they

6   are firm employees under the law.

7          THE COURT:  All right.  Let's just take this a little

8   bit slowly.  Again, because it really is, by far and away, the

9   bulk of your lodestar, and for the six other firms as well,

10  which is why I think the past cases of lodestar calculations

11  may not reflect current law firm economics is, but I may be

12  wrong.

13          Your associates communicate with the opposing side and

14  I take it with experts and so forth?

15          MR. SINGER:  Yes.

16          THE COURT:  And staff attorneys don't communicate with

17  the opposing side experts?

18          MR. SINGER:  Not typically-- well, not to the same

19  extent that regular associates do.  I mean, actually our staff

20  attorneys here second seated a number of depositions.  I

21  believe, I think, seven depositions they second-seated or

22  second-chaired, so they had interactions there.

23          THE COURT:  Just a moment.

24          MR. SINGER:  Okay.

25          THE COURT:  So they second-seated seven depositions--

D7NBCITC                              Settlement Conference

1          MR. SINGER:  Yes, Judge.

2          THE COURT:  -- out of 50?  70?

3          MR. SINGER:  Out of 50, right.

4          THE COURT:  And the other 43 were second-seated by

5    associates?

6          MR. SINGER:  Or they were not second-seated.

7    Sometimes they were second-seated by a partner.  But it would

8    be one of those, yes.

9          THE COURT:  All right.  Going with one lawyer would be

10   a good thing, but I don't think it's ever been done.

11         MR. SINGER:  But they do interact with experts.  They

12   do work on legal memoranda for us.  In this case --

13         THE COURT:  Did they do research for briefing?  Let me

14   just say that it appears -- and I don't think you can contest

15   this -- essentially what they do is document review.  That's

16   what they're hired for; that's what they do.  A few of them may

17   do second seating at a deposition, but they're document review

18   people.  Fair?

19         MR. SINGER:  The majority of their work is spent on

20   document review.

21         THE COURT:  Okay.  Is the majority-- that may also be

22   true of associates.  Is the majority of the associates' work

23   document review?

24         MR. SINGER:  I don't know that the majority of the

25   work done by associates is document review.

D7NBCITC                    Settlement Conference

1          THE COURT:  All right.

2          MR. SINGER:  I do know that associates do document

3    review.

4          THE COURT:  Yes, of course.  So the work is different.

5    The staff attorneys essentially do document review and the

6    associates, who presumably are at a higher billing rate, do

7    more substantive work.  Document review can be very important,

8    but it certainly is repetitive.  You're talking 42 million

9    documents, I think.

10         MR. SINGER:  Yes, Judge.

11         THE COURT:  I think you beat the securities people by

12   two million.  Huge amounts of documents and somebody has to go

13   through it with the aid of computers, and that's the staff

14   attorneys.  Agreed?

15         MR. SINGER:  Yes, your Honor.

16         THE COURT:  Okay.

17         MR. SINGER:  But --

18         THE COURT:  Okay.  You say they're employees.  They

19   get W-2s?

20         MR. SINGER:  Yes.

21         THE COURT:  All right.  Talk to me more.

22         MR. SINGER:  They are firm employees.

23         THE COURT:  They get full benefits?

24         MR. SINGER:  They have access to benefits, yes.  They

25   get the benefits offered through the firm, provides for

1   workers' comp, health insurance, and a 401(k) plan.

2          THE COURT:  Now you say "access to benefits."  Is that

3   the same as associate attorneys' access to benefits?

4          MR. SINGER:  I don't know if they get the exact same

5   level of benefits provided as to associates.  I'm not that

6   familiar with the particular health insurance plans, for

7   instance, that an associate gets as opposed to a staff

8   attorney, but I know they are allowed to participate in the

9   firm's health insurance plan.

10         THE COURT:  No, no, I understand that.  I just don't

11  know if your phrasing of "they have access to" is different

12  than the associates.  That is it may be, for all I know, that

13  when an associate comes on, his or her employment package

14  includes health benefits, but it's not the same for staff

15  attorneys.  I don't know.  I'm asking.

16         MR. SINGER:  There's a period of time, I know, when an

17  associate comes on board before they get health insurance,

18  before they can get a 401(k).  You have to be at our firm for a

19  certain amount of time.  I think that might be true for most

20  firms.  I'm not 100 percent sure.  That's also true for our

21  staff attorneys.  I'm not sure of the exact amount of time

22  and I'm not sure of the exact benefit of the health plans,

23  but --

24         THE COURT:  The question here is, are the benefits

25  given to staff attorneys different than the associate

1  attorneys?  And you can submit something to me after this so we

2  get a better sense of that.

3          MR. SINGER:  Okay.

4          THE COURT:  They work in your offices.  Is that

5  correct?

6          MR. SINGER:  Yes, Judge, they do.  They work in our

7  offices in midtown Manhattan.  That's where our offices are

8  located, 1285 --

9          THE COURT:  And I take it there's not a separate floor

10  for them.  I remember, I think it was in your affidavit,

11  actually, maybe the second one, that said some are even right

12  down the hall.

13          MR. SINGER:  There's no separate floor for them,

14  Judge.  They are.  They are right down the hall.  They share

15  offices with our partners and associates.

16          THE COURT:  And we know they differ from associates in

17  what they do and we know they differ from associates in being

18  on the firm website.  And we know the reason why; you've told

19  me.

20          Their billing rates are the same as associates.

21  Right?

22          MR. SINGER:  No, I don't think that's right.

23          THE COURT:  All right.

24          MR. SINGER:  I think their hourly rates-- and that's

25  the key distinction.  Their hourly rates reflect the difference

1    in the work that's done by staff attorneys and by senior

2    associates.

3              THE COURT:  The hourly rates for the staff attorneys,

4    you're proposing rates of $340 an hour to $425 an hour for

5    essentially document review.  That's how I read your papers.

6    Is that right?

7              MR. SINGER:  I think, Judge, we had -- for the most

8    part, the rates we charged for staff attorneys are $340 to $395

9    an hour.  There were two exceptions, a very small amount of

10   time by two very senior staff attorneys, that were charged at

11   $425 an hour, but that was a very small amount of time.

12             THE COURT:  Right.

13             MR. SINGER:  I think the true time was in the range of

14   $340 an hour to $395 an hour.  The blended rate is somewhere in

15   the middle of that number.  Those rates, Judge, are the rates

16   that we charge for the most junior associates at the firm.  So

17   that's a rate that's equivalent to the rate charged for a

18   first-year associate, someone who is just out--

19             THE COURT:  $395?

20             MR. SINGER:  Roughly $350.  The higher rate might be a

21   second-year associate.  But those are the rates charged for

22   very junior associates, people just out of law school.  And

23   many of our staff attorneys obviously have more experience than

24   that, but we charge them out at the rate that we charge for the

25   most junior associate that we have, mostly first- or

1    second-year associates.

2            And if you look, your Honor, the rates we charge for

3    associates, they can vary, but they're generally, I mean if you

4    look in our papers, $440 an hour --

5            THE COURT:  Where are they in your papers?  This is

6    the attachment to your first declaration?

7            MR. SINGER:  Yes, to my first declaration.  It's

8    Exhibit 12A.

9            THE COURT:  And where are you?

10           MR. SINGER:  The first page of Exhibit 12A to my

11   declaration.  And it's a chart "Bernstein Litowitz Berger &

12   Grossmann Time Report."

13           THE COURT:  No, I'm sorry.  Let me just see what I

14   have here.  I have your first declaration, 12A, declaration of

15   yourself.

16           MR. SINGER:  Right.  The declaration of myself.  And

17   then Exhibit 12 is a --

18           THE COURT:  Oh, Exhibit 12 to that?

19           MR. SINGER:  Right, Exhibit 12 to the first

20   declaration I submitted.  It's a lengthy document.

21           THE COURT:  Yes, that's what I'm looking at.

22           MR. SINGER:  Right.

23           THE COURT:  In your first declaration, I'm looking at

24   12A.

25           MR. SINGER:  Yes.

1          THE COURT:  But the 12A that I have -- I can pass it

2    down to you.

3          MR. SINGER:  Okay.

4          THE COURT:  -- is a declaration of you.

5          MR. SINGER:  I'll find it.  I apologize, Judge.  Keep

6    flipping the pages to that.  12A is a declaration of me.

7    Exhibit 1 to that, if you go a few pages-- I apologize.

8          THE COURT:  Yes, sir, I have it.  Thank you.

9          MR. SINGER:  I apologize, Judge, for the difficulty in

10   finding it.  Many of these -- if you look down that list,

11   Judge, you'll see--

12         THE COURT:  They go from $390 to $515.

13         MR. SINGER:  Correct.  So the rates we charge for

14   associates are higher.  Mr. Doreste, who was $390, I believe he

15   was either a first- or second-year associate at the time.  He's

16   no longer with our firm, but that's who -- that was the rate we

17   charged, that he was charged at.  The others are all higher.

18   So our staff attorney rates are generally-- well, not

19   generally.  They are lower than the rates we charge for our

20   associates other than the most junior associates.

21         THE COURT:  And I take it your practice is essentially

22   entirely contingency work; that is, people don't actually pay

23   the hourly rate.

24         MR. SINGER:  That's correct.  Our work is contingency

25   work.  I will say, Judge, in terms of those rates, that those

D7NBCITC                    Settlement Conference

1   rates-- we have submitted those rates to numerous judges in

2   this district in recent years in large cases similar to this.

3   That includes the Bank of America case before Judge Castel; the

4   Lehman Brothers case before Judge Kaplan; the Wachovia bond

5   litigation before Judge Sullivan; and the Merrill Lynch

6   mortgage-backed securities litigation before Judge Rakoff.

7           In all of those cases, staff attorney time was

8   submitted at these rates.  These rates have remained constant

9   since 2010.  We have not raised them.  They're the same as they

10  were three, four years ago.  And in each of those cases that I

11  just mentioned, staff attorney time accounted for a substantial

12  percentage, if not a majority of our time, in those cases.

13          So just for example --

14          THE COURT:  Well, my working assumption is it was far

15  more than a majority, but go ahead.

16          MR. SINGER:  Well, in Wachovia, for example, the

17  Wachovia bond case, staff attorneys accounted for almost

18  two-thirds of our time, 63 percent.  That was a case we didn't

19  take depositions in.

20          THE COURT:  Are staff attorneys brought on to work on

21  a particular project?

22          MR. SINGER:  Some are and some aren't.  Many are with

23  us for periods of time.  Your Honor asked about this particular

24  case.  I think we still have somewhere between-- almost two

25  dozen staff attorneys who were working on this case when it

1    concluded are still with our firm working on other matters.  It

2    depends.  Sometimes people leave on their own; sometimes there

3    might not be work for them.  But for the most part, what we

4    like to do -- and I think this is reflected in the information

5    we gave your Honor -- is to the extent we have staff attorneys

6    who we like and who we believe are doing good work, we endeavor

7    to keep them on.

8              THE COURT:  I take it -- and tell me if I'm wrong.  I

9    take it your associates have a career path.  That is, if

10   they're very good, they go into the partnership itself.  I take

11   it that career path is not part of staff attorneys.

12             MR. SINGER:  It is not entirely that, but not-- there

13   are-- I don't know if I would say it with such a blanket.  I

14   can give an example sitting in this courtroom today, Judge.

15   Mr. Duncan, who is an attorney with our firm, he's an associate

16   with our firm, he started as a staff attorney with us.  We

17   liked his work.  We thought he did excellent work --

18             THE COURT:  I take it he's the exception.

19             MR. SINGER:  Yes, he is an exception, but it's not --

20             THE COURT:  All right.  Let me go back to the start.

21   When you hire associates, it's with the expectation or hope

22   that they, on their part and your part, that they will become

23   partners.  That's not true of staff attorneys.  Correct?

24             MR. SINGER:  I think that's logical, Judge, yes.

25             THE COURT:  All right.  For example, in Kessler Topaz,

1    almost all of the contract attorneys that they retained to work

2    with you have left, or at least 14 of the 22 have left.  They

3    appear to be more based for a particular case.  In other words,

4    the case is over and they've gone.  There may be other factors.

5            Are there other differences between your staff

6    attorneys and your associates?

7            MR. SINGER:  No, I think the principal difference in

8    them is that staff attorneys, in terms of the work that they

9    do, we do hire staff attorneys.  Their principal job is to do

10   document review and analysis for us.

11           THE COURT:  And they're full-time employees?

12           MR. SINGER:  They are employees of the firm, yes.

13   They are employees.

14           THE COURT:  They're full-time employees?

15           MR. SINGER:  Yes.

16           THE COURT:  And I take it they're paid on salary and

17   there may be some bonus aspect?

18           MR. SINGER:  They are, I believe, paid by the hour,

19   but there is a bonus aspect that they can get.

20           THE COURT:  And are regular associates paid by the

21   hour?

22           MR. SINGER:  No.  They receive a salary and they are

23   also eligible to receive bonuses.

24           THE COURT:  And, again, when I say "full time," do

25   they have a number of hours that they have to work or are

1   expected to work?

2            MR. SINGER:  I don't think so, Judge.  I don't think

3   it's that formal.  It's sort of-- I guess the expectation would

4   be 40 hours.  I think the expectation is 40 hours a week.  I'm

5   not 100 percent sure, but that's what I believe the expectation

6   is.  That might be, yes, we expect 40 hours a week.

7            THE COURT:  All right.  Now, you went out of your way

8   to tell me that these are not contract attorneys.

9            In your view, what is a contract attorney?

10           MR. SINGER:  A contract attorney is someone who's not

11  an employee of your firm.  They're an independent contractor

12  who you hire --

13           THE COURT:  In other words, they get a 1099?

14           MR. SINGER:  Correct.  You hire them and-- you hire

15  them through a temp agency.  You bring them on for a specific

16  project.  At the end of that project, they leave.  That is a

17  contract attorney.  A staff attorney is different, different in

18  terms of who we hire.  We hire them.  As I say, they have an

19  opportunity to get --

20           THE COURT:  Well, I take it you use headhunting firms.

21  I assume you go through employment agencies of some type.

22           MR. SINGER:  Yes, sometimes.  Sometimes people come to

23  us through word of mouth.  Just the typical form of hiring.

24  The same is true for associates.  Sometimes we go through

25  headhunters; other times we don't.  So I think it's a similar

1    method of hiring them.

2            We do train them.  They are entitled to participate in

3    firm-sponsored CLEs, which is another issue that an objector

4    raised.  They have access to --

5            THE COURT:  Again, is that the same as with your

6    associates?  That is, would you use the same phrasing, they're

7    "entitled" to participate?

8            MR. SINGER:  Yes.

9            THE COURT:  It's not that the-- or is it that your

10   associates must do CLE?

11           MR. SINGER:  No.  Well, everybody has their CLE

12   requirements.  But, no, the phrase-- the words are the same.

13           THE COURT:  Okay.  To your knowledge, do contract

14   attorneys and staff attorneys do the same work?  I take it the

15   answer is yes:  Document review.  That's what these people are

16   hired for.

17           MR. SINGER:  I think they do similar work.  I think

18   staff attorneys do more substantive work.  I think our staff

19   attorneys do more substantive work.  I don't know any contract

20   attorneys who would second seat a deposition normally.

21           THE COURT:  Well, but it looks the same way in your

22   firm if you're talking about seven out of 50-something.

23           MR. SINGER:  But I think--

24           THE COURT:  There's nothing wrong with having

25   employees who do document work.  I'm just trying-- I mean, the

1    document work is what's critical to these cases in many

2    circumstances.  I'm just trying to compare and contrast what

3    these people do with what your associates do.

4         What comparators can you give me or what facts can you

5    give me that say these people -- that is, the staff

6    attorneys -- are doing important work for the case, and in fact

7    are the workhorses of these case, both I think from the

8    standpoint of defendants as well as from the standpoint of

9    plaintiffs, what can you give me as facts or comparators for

10   the fact that the document review attorneys, who you call staff

11   attorneys, are that the market, that is a reasonable client,

12   will pay $340 to $395?  Now, I think you told me that-- you

13   said that $395 is an outlier.  Except for the $395 people,

14   what's the real range we're talking about for staff attorneys

15   at your firm?

16        MR. SINGER:  The range is, I believe, $340 an hour to

17   $395 an hour.

18        THE COURT:  No, I'm sorry.  I thought you told me that

19   the $395s were just a couple and they were outliers.

20        MR. SINGER:  No, $425 an hour were a couple of

21   outliers.

22        THE COURT:  Oh, I see.

23        MR. SINGER:  There are a couple of staff attorneys who

24   have been with us truly for years and years.

25        THE COURT:  I understand.

1          MR. SINGER:  Those are the only ones.  But the vast

2     majority were in the range of $340 to $395 per hour.

3          THE COURT:  Okay.  So let me get back to my question.

4     What comparators can you give me, what facts can you give me,

5     to say a reasonable client would pay $340 to $395 an hour for

6     people to do document review apart from what you've already

7     told me?  That is, other judges in this district have said it's

8     okay.  I don't know that that by itself tells me what a

9     reasonable client would pay.  And you've told me -- because

10    you've been very forthcoming and honest and I appreciate it --

11    that you don't have clients who you send out monthly billings

12    to, so we can't use that.

13          The fact that other judges have accepted your figures

14    is interesting and has some weight, but I don't think it either

15    is a fact or a comparator.  So that's what I'm leaving you

16    with.

17          The one thing in your papers that I can see is a

18    comparison of bankruptcy cases.  I don't think that's a valid

19    comparison because I don't think that bankruptcy issue is what

20    a reasonable client would pay.  But that certainly is something

21    that you showed.

22          Is there anything else you could tell me that would

23    show a reasonable paying client would pay these sums for

24    document review?

25          MR. SINGER:  Let me address it this way.  First, I do

D7NBCITC                          Settlement Conference

1    think that study is important.  The American Lawyers did a

2    study.  That was the work done and it showed the billing rates

3    for 18 large --

4              THE COURT:  Yes, but the bankruptcy court is its own

5    world.  It's highly criticized for the rates being far too

6    high.  It's a selected group.  The survey, which doesn't

7    purport to be scientific -- actually it only has the firms

8    which I think are the highest-billing firms, including Paul

9    Weiss, on it.  I'm not sure that that's an accurate reflection

10   of the marketplace.

11             MR. SINGER:  I think, Judge, again, the rates we

12   charged are the rates that are in line with rates we charge for

13   the most junior associates at our firm.  And I believe that's

14   true for defense firms, too, from studies we've seen and

15   anecdotal evidence.

16             Do those rates compare favorably with defense firms?

17   I'm confident that defense firms charge for first- and

18   second-year associates fees or rates in the range of rates that

19   we are charging for our staff attorneys.  That is a very

20   appropriate, completely appropriate rate to charge for staff

21   attorneys who are doing document review.

22             And the work that they do, Judge, is -- in terms of

23   what a client would pay, the work that they would do, that they

24   do for us, is invaluable.  It's invaluable.  When your Honor

25   says, What would a client pay? a client is getting a bargain,

D7NBCITC                        Settlement Conference

1    frankly, to pay $350 an hour for the work done by staff

2    attorneys because their work can be the difference between

3    winning or losing a case.  And it was actually here.

4            It was, for example -- when defendants made their Rule

5    12(c) motion on *Fait*, that was potentially a very problematic

6    motion for us.  If we had lost it, it would have arguably taken

7    out the vast majority of our claims; certainly the claims that

8    were most valuable.  It was very important that we win that

9    motion.  Very important.

10           When we opposed it, we submitted a letter brief to

11   your Honor which said, Judge, this case, it's premature to

12   consider now.  We shouldn't consider it.  It should be kicked

13   down the road.  And one of the things we did is we gave your

14   Honor evidence, certain e-mails and other documents, that we

15   believed supported our allegations.  And we attached that

16   evidence to the brief.  And I think ultimately we were

17   successful in opposing that motion.  We convinced the Court,

18   the Court agreed to consider this down the road.

19           THE COURT:  Well, that's right.  I didn't decide it.

20   I said it's for summary judgment.

21           MR. SINGER:  Exactly.  But the reason we did it and

22   the reason we said it, was we said, hey, Judge if you're going

23   to consider this now, we're going to amend our complaint and

24   we're going to put in documents like this and you're going to

25   have to convert it to a motion for summary judgment.  So if

D7NBCITC                    Settlement Conference

1    you're going to do that, Judge, don't do it now and let's

2    engage in this process now.  Do it in accordance with the

3    schedule at the end of the case, when we have all of our

4    evidence.

5            That was a good argument to make.  That won.  That

6    prevailed.

7            THE COURT:  That was a good argument to me, also.

8            MR. SINGER:  I know.  And the point I want to make is

9    that if you look at that letter, it cites a number of e-mails.

10   Come out of the blue, perhaps, and we discussed their

11   importance to us.  This shows X; that shows Y.

12           The point I wanted to make is that those documents

13   that help us defeat a motion like that, which comes at a

14   critical time in a case, they're found by staff attorneys.

15   That's who finds them.  And they go-- in order to find them,

16   they go through 43 million pages of documents to help us find

17   the relatively few that can help us win a case.  These e-mails

18   can be a single line --

19           THE COURT:  I don't think the issue is their

20   importance to you.  I concede that.  Or it's not for me to

21   concede.  I agree with you that the issue is what a reasonable

22   client would pay.

23           MR. SINGER:  And that's what I'm getting to, Judge,

24   because a reasonable client for that sort of work to win that

25   motion would be happy to pay the rate that we charged for a

1   first- or second-year associate.

2          THE COURT:  And what do you cite to me?

3          MR. SINGER:  Well, I've cited to your Honor the fact

4   that we've submitted the-- I don't have the-- I mean, we've

5   cited-- I don't know how to get --

6          THE COURT:  It may not be a question you can answer,

7   but the cases say that's the test.  So that's what I'm looking

8   for, that's all.

9          MR. SINGER:  I appreciate that.  I'm trying to explain

10  to you though why --

11         THE COURT:  And, again, simply because other judges

12  have said-- I won't use the word "rubber-stamp," that's not

13  what they're doing, but other judges have signed off on these

14  rates.  I don't think that by itself gets you over the finish

15  line.

16         MR. SINGER:  I think it's a factor, Judge.

17         THE COURT:  Sure.

18         MR. SINGER:  I think it's a significant factor --

19         THE COURT:  I agree.

20         MR. SINGER:  -- that numerous other judges -- we've

21  submitted these rates.  They haven't raised any issue.  I don't

22  think any judge that we've been before on those fee cases, and

23  just recently Judge Castel, rubber-stamped our fee application.

24         THE COURT:  No, that's why -- I used that statement

25  but it's wrong.  They weren't doing that.  I'm just trying to

 1    see what you can give me apart from the fact that others have

 2    done.  That's all.

 3            MR. SINGER:  I think that's -- we have that.  We have

 4    the American Lawyers study.  We have the fact that we haven't

 5    raised our rates in years, and the fact that-- and the fact

 6    that when you-- that these are-- I guess my overall point is

 7    that the work that they do is incredibly important to us and it

 8    has to be done by trained, quality attorneys.

 9            That's why we hire them as staff attorneys.  That's

10    why we make them employees of the firm rather than contract

11    attorneys, and why they work on site rather than off site.  We

12    believe that's better for the way we handle cases.  We believe

13    it's better for our classes; it's better for our clients.  That

14    way they're in our offices.  They're employees of the firm.  We

15    have better quality control over them.  We can monitor them

16    more easily.  We can interact with them.  Many of them do stay

17    on or have experience with us.  And I think, Judge, that all of

18    that is reflected in the results we obtain for investors,

19    including this one.

20            So I think, Judge, where you have a situation where

21    you have a-- where, again, you have attorneys, many with years

22    of experience, and they are doing work that from our

23    perspective-- I don't know that defense firms, that they have

24    to review documents the same way we do.  They don't have the

25    burden of proof on it.  I don't know that a defense firm has to

1   conduct the same document review we do.  They don't have the

2   burden of proof on issues.

3           If a staff attorney misses one of those documents,

4   Judge, if they miss a key document, it's gone forever.  It's

5   gone.  We will never find it again.  It literally goes, boom,

6   see you.  That's a problem for us.  That could be the

7   difference between winning or losing.  That's why we have the

8   system we have in place and it's why we do hire quality

9   attorneys and why those rates that we charge for them are

10  entirely appropriate.

11          I mean, it would be-- that's what -- that's what they

12  are.  I mean, your Honor, I've given you some information about

13  what we charge for associates.  We can always give your Honor a

14  chart of that if your Honor wants, but that is the information

15  for our hourly rates.

16          THE COURT:  All right.  I'm sorry.  I didn't mean

17  to --

18          MR. SINGER:  No, that is the information for hourly

19  rates.  And the only point I would add, and I don't -- even--

20  this is a separate point.  It goes to the rates.  Even if your

21  Honor were to reduce the rates that we charged for staff

22  attorneys in this particular case, the multiplier we're seeking

23  under this fee would still be extremely reasonable.

24          So just, for example, if your Honor were to reduce the

25  rate for staff attorneys by 20 percent, it's a substantial

D7NBCITC                    Settlement Conference

1   reduction.  Twenty percent is at $350, $360, $90 dollars an

2   hour you would take that down to.  The adjusted multiplier is

3   about 1.95.  If you cut it by 25 percent, it's 2.04.  If you

4   were to cut it by 35 percent, more than a third, which is --

5   respectfully, Judge, I don't think any reduction is entitled,

6   but that would be massive.  It would be a multiplier of 2.2.

7           So, again, I don't think it's going to dramatically

8   impact the Court's analysis or the multiplier awarded.  We have

9   staff attorneys --

10          THE COURT:  Well, I haven't done those numbers quite

11  that way, but I'm not quite sure that would be so given the

12  fact that the hours are 75 to 80 percent of the hours you're

13  talking about.

14          MR. SINGER:  This is the math I was handed, Judge.

15          THE COURT:  Okay.

16          MR. SINGER:  So I'm assuming it's --

17          THE COURT:  Mr. Berger knows how to add.

18          MR. SINGER:  But I believe that those are right and we

19  could always calculate them again.  But I think that is what--

20  those are the numbers that we've come up with.

21          THE COURT:  All right.  I think I understand your

22  answer.

23          Let me just ask, is there anything else you wanted to

24  tell me, sir?

25          MR. SINGER:  No, Judge.  I think that's it for now.

D7NBCITC                    Settlement Conference

```
 1              THE COURT:  Okay.

 2              MR. SINGER:  I appreciate it.

 3              THE COURT:  Take a few moments, because I know people

 4    on your side want to add in something.  So why don't you talk

 5    to your colleagues and if there's anything else you want to

 6    add, I'll be glad to hear it.  There's no problem with that at

 7    all.

 8              MR. SINGER:  Thank you, Judge.

 9              THE COURT:  People should work as a team.

10              (Pause)

11              THE COURT:  Mr. Singer, there's no question but that

12    in my mind-- let me rephrase it.  I think this is a wonderful

13    settlement for the class.  They're receiving $730 million.

14    You're seeking $146 million; obviously a significant sum.  The

15    issue is not whether that's a lot or a little.  The issue is,

16    would a reasonable client pay $146 million in today's

17    marketplace?  That's what I'm focusing on.

18              Is there anything anyone wanted to add on our

19    discussion?  Yes, sir.

20              MR. BERGER:  Good morning, your Honor.  Max Berger,

21    Bernstein Litowitz.  You know, certainly to the extent your

22    Honor wishes to have any further submissions from us, we're

23    certainly happy to provide them.  The best we can do-- there

24    are limited examples at our firm where we do charge by the hour

25    and two significant clients.  However, I don't think it's
```

D7NBCITC                    Settlement Conference

1    really reflective of the vast majority of our work.  I mean,

2    probably at least 90 percent of the work that we do is on a

3    fully contingent basis, so I don't think we could really use

4    that as really an appropriate comparison.

5        I think what is an appropriate comparison for us is,

6    as your Honor knows, we litigate against the biggest and the

7    best law firms in the country and we have to compete

8    head-to-head with them.  And the burden is on us to prove our

9    case, so we need to hire the very best, best people to

10    prosecute our litigation.

11        So I do believe it is an appropriate comparison to

12    say, well, do our rates compare favorably, just in general for

13    lawyers, with defense firms?

14        THE COURT:  Well, yes, let's talk about that.  I take

15    it you've read the transcript or were present, you had

16    colleagues present I take it, at the fairness hearing on the

17    securities class action.  And I take it you believe-- I mean,

18    you've just said that defense firms obviously have qualified

19    people doing their work.

20        And in that transcript I'm sure you read what Citicorp

21    pays for the contract attorneys it hires.  And if we're going

22    to assume analyzing documents, reviewing documents, is as

23    important to the defense as it is to the plaintiffs, that's a

24    figure that suggests no reasonable client would pay $340 to

25    $395 for document review.

1        MR. BERGER:  I don't think that's a fair comparison,

2    your Honor.

3            THE COURT:  Because?

4        MR. BERGER:  I'll tell you why.  The defense firms,

5    for example, Citigroup, I mean, Lord knows how many hundreds of

6    attorneys Citigroup has in their in-house legal department.

7    Lord knows how many employees they have.  I would venture to

8    guess there's probably --

9            THE COURT:  Well, we're not talking about their

10   in-house.  We're talking about their contract attorneys.

11       MR. BERGER:  No, no.  What I mean, your Honor, is that

12   our clients in our case are, generally speaking, pension

13   systems.

14           THE COURT:  Huge, billion-dollar pension systems.

15       MR. BERGER:  Not billion dollar.  Huge --

16           THE COURT:  Hundreds of millions.

17       MR. BERGER:  Huge only in the sense of the beneficiary

18   money that they are required to manage, but they're not managed

19   by --

20           THE COURT:  Only two at a time.

21       MR. BERGER:  I believe that most defense firms-- if

22   your Honor is talking about a reasonable marketplace, I totally

23   get, you know, what you're driving at.  From my perspective,

24   not that I believe it matters particularly, I believe it's very

25   legitimate.  But I think that defense --

1          THE COURT:  It does matter.

2          MR. BERGER:  Defendants in our cases-- okay.

3   Defendants in our cases are very varied.  When you take a huge

4   bank that has law firms representing them all over the world

5   basically, they have the ability to drive market rates down.

6   They can either-- they can either have their law firm provide

7   lawyers at their typical hourly rates or some rate that is a

8   discounted rate to represent them, or they can bring in their

9   own people because that's what they do.

10          But most defendants in these cases will hire a law

11   firm to litigate a case, defend it or prosecute a case, will

12   hire that law firm and that law firm will charge them their

13   hourly rates.  So what constitutes a reasonable hourly rate?

14          From our perspective we believe that you really-- we

15   are talking about experienced lawyers who represent our staff

16   attorneys in our cases.  And we thought it would be very

17   appropriate for the hourly rates that we charge for them to be

18   representative of first- and second-year lawyers.  Some of them

19   are 10- and 15- and 20-year lawyers.

20          THE COURT:  I understand that.  I think we both

21   understand what each other is saying.  Document review is

22   document review.  It's important.  It's also mechanical and

23   routine, but it's important.  It's important for the defense;

24   it's important for the prosecution.  You want the very best

25   document reviewers and the defense wants the very best document

D7NBCITC                         Settlement Conference

1   reviewers.

2          You've heard what the market rate is for document

3   reviewers in the securities action for document reviewers hired

4   by the client.  It's not the junior associate rate.  So the

5   question is, what is the appropriate rate for document

6   reviewers?  And I'm having trouble getting that figure.

7          The reason I'm asking you is I think the Second

8   Circuit requires me to decide what a hypothetical reasonable

9   client would pay for these services.  In the case of defense

10  firms, they don't have a hypothetical reasonable client; they

11  have the actual client.  That's less so for contingency firms.

12  That's where my trouble is, that's all.

13         MR. BERGER:  But, your Honor, isn't the appropriate

14  question:  What would a defense firm charge for a staff

15  attorney who was going to primarily review documents if they

16  were basically paying those staff attorneys and then billing it

17  to the client?  Not every defendant has the market power of a

18  Citigroup to basically drive down rates.

19         THE COURT:  Let's assume--

20         MR. BERGER:  It's fortuitous.

21         THE COURT:  Let's assume--

22         MR. BERGER:  It's fortuitous that Citigroup-- I'm

23  sorry, I didn't mean to interrupt your Honor.

24         THE COURT:  No, it's all right.  First of all, I think

25  you are not being fair to your massive pension fund clients.

D7NBCITC                    Settlement Conference

```
 1   But the issue is still there because they don't actually pay an
 2   hourly rate.  Let me assume that you are correct for this
 3   moment, for this issue, that the question is what would an
 4   hourly paying client-- what would a law firm charge an hourly
 5   paying client for document review?  Forget for the moment
 6   whether we call it a staff attorney or a contract attorney.
 7   Let's simply say for document review, because that's what staff
 8   attorneys do and that's what contract attorneys do.
 9           So what's the answer to that question:  What would an
10   hourly person pay for that rate?  I'm sorry, what would--
11           MR. BERGER:  What would a law firm.
12           THE COURT:  What would a defense client pay on an
13   hourly basis for somebody doing document review?  How do I find
14   out that information?
15           MR. BERGER:  Well, what would be the billing rate,
16   your Honor?
17           THE COURT:  No.  How do you phrase the question?
18           MR. BERGER:  Well, I would say the billing rate just
19   because it's not the client-- it's not the client --
20           THE COURT:  Fair enough.
21           MR. BERGER:  It's not the client that's paying it.
22   It's the billing rate.  What would a large defense firm bill
23   document reviewers out to a client when the client is not
24   supplying the contract attorney?
25           THE COURT:  What information can you give me?  Do you
```

D7NBCITC                    Settlement Conference

 1  have anything like that in your papers?  If so, I'd love to see

 2  it.  And you can submit it to me afterwards.  That's okay.

 3          MR. BERGER:  I don't believe we do.  I think we just

 4  have first- and second-year associates.

 5          THE COURT:  If you have it, sir, you certainly can

 6  send it to me.  Okay?  Because I think that's relevant.  I

 7  think you're focusing in or you're phrasing it in an

 8  appropriate way.  I'll take any information you can find on

 9  that.

10          Okay.  Thank you.  I appreciate the discussion.  And,

11  Mr. Singer, I appreciate it, also.

12          I believe I received notification that one of the

13  objectors wanted to speak.  That is, Mr. Pentz for the Hopson

14  objection.  To the extent this was one of your areas of

15  concern, I think we've been addressing it, is Mr. Pentz here?

16  Let me put it this way:  Is there anyone here who wants to

17  speak on behalf of an objector?

18          All right.  Does the defense want to add anything?

19          MR. ROSEN:  Your Honor, I think Mr. Singer has

20  admirably covered all of the issues.  We did submit a written

21  response in mid-July to certain of the objections, specifically

22  on the question of individual contributions.  You and

23  Mr. Singer had a dialogue on that subject.  I'm happy to answer

24  any questions the Court has, but otherwise I'm content to rely

25  on our written submission.

D7NBCITC                    Settlement Conference

1            THE COURT:  Well, thank you very much.  If there's

2     nothing else, I appreciate everybody coming in and you'll have

3     an opinion in due course.  Thank you very much.

4            MR. SINGER:  Thank you, Judge.

5            (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25