UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE CITIGROUP INC. BOND
LITIGATION

08 Civ. 9522 (SHS)

OPINION & ORDER

SIDNEY H. STEIN, U.S. District Judge.

In August, this Court approved the settlement of this securities class action, which was brought on behalf of a class of purchasers of bonds issued by or on behalf of Citigroup, Inc. and raised claims pursuant to the Securities Act of 1933. Plaintiffs agreed to settle all claims in exchange for a payment of $730 million—an agreement that the Court found to be fair, reasonable, and adequate. *See generally In re Citigroup Inc. Bond Litig.*, No. 08 Civ. 9522 (SHS), 2013 WL 4427195 (S.D.N.Y. Aug. 20, 2013). Plaintiffs' attorneys, Bernstein Litowitz Berger & Grossman LLP, seek an award of attorneys' fees and reimbursement of litigation expenses pursuant to Federal Rule of Civil Procedure 23(h), as well as reimbursement of costs and expenses incurred by class representatives pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4. The Court has reviewed Bernstein Litowitz's request and finds that it is entitled to both an award of reasonable attorneys' fees and reimbursement of litigation expenses. The Court also awards reasonable costs and expenses for services rendered to the class by the lead plaintiffs.

I.  **FEE AWARD**

Rule 23(h) permits the Court to award reasonable attorneys' fees in a certified class action. Indeed, the U.S. Supreme Court has long recognized that "a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see also, e.g., In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 430 (S.D.N.Y. 2001) ("[A]ttorneys who create a common fund to be shared by a class are entitled to an award of fees and expenses from that fund as compensation for their work."). Class counsel Bernstein Litowitz has moved for such an award here, seeking 20% of the common fund, or $146 million, plus interest.

Although the firm is certainly deserving of an award for its efforts in this litigation—for which it has yet to receive compensation—the Court finds the

requested percentage too high given the significant size of the fund. *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 123 (2d Cir. 2005) (noting that the "sheer size" of a fund made "a smaller percentage" award appropriate because it nonetheless produced a "generous fee"). For the reasons explained below, the Court instead finds reasonable an award of attorneys' fees of 16% of the settlement amount, or $116.8 million. To ensure the fairness of this percentage, the Court performs a "cross-check," comparing the amount of the award to the approximate market value of plaintiffs' attorneys' work—known as the lodestar figure—to ensure that the percentage of the fund method yields appropriate compensation without resulting in a windfall for plaintiffs' attorneys. *See id.* Finally, the Court confirms the reasonableness of the fee determined by the percentage of the fund method and bolstered by the cross-check by examining the factors set forth by the U.S. Court of Appeals for the Second Circuit in *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000).

In performing this analysis, the Court takes into account an objection submitted by class members Lexie and Michelle Hopson.[1] (*See* Objection of Lexie and Michelle Hopson dated June 24, 2013, Dkt. No. 165.) The Hopson Objection argues in salient part that the requested percentage of the common fund is too high for a settlement of this magnitude and that the proposed billing rates for staff attorneys exceed what a reasonable client would pay. The Court has the same concerns.

### A. The Percentage of the Fund Method

As this Court recently observed, "using the percentage of the fund method to compensate plaintiffs' counsel in major securities fraud class actions is now firmly entrenched in the jurisprudence of this Circuit." *In re Citigroup Inc. Sec. Litig.*, Nos. 09 MD 2070 (SHS), 07 Civ. 9901 (SHS), 2013 WL 3942951, at *15 (S.D.N.Y. Aug. 1, 2013). Use of this method is supported by the language of the PSLRA, which mandates that "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages . . . actually paid to the class." 15 U.S.C. § 78u–4(a)(6). The Court therefore allocates fees to plaintiffs' counsel by determining an award that constitutes a reasonable percentage of the common fund.

---

[1] As noted in the Opinion approving the settlement, only five objections were received. *In re Citigroup Inc. Bond Litig.*, 2013 WL 4427195, at *4. To the extent the others address the request for attorneys' fees or expenses, the Court has considered their arguments and finds them to be without merit.

2

Plaintiffs' counsel, as noted, contend that an award of 20% of the common fund represents such a reasonable percentage. In support of this request, they point to a number of cases with significant recoveries in which courts awarded attorneys' fees of between 17% and 33% of the common fund. *See, e.g., In re Comverse Tech. Inc. Sec. Litig.*, No. 06 Civ. 1825 (NGG) (RER), 2010 WL 2653354, at *6 (S.D.N.Y. June 24, 2010) (awarding attorneys' fees of 25% of $225 million settlement); *In re Initial Public Offering Sec. Litig.*, 671 F. Supp. 2d 467, 513-16 (S.D.N.Y. 2009) (awarding attorneys' fees of 33% of $586 million settlement); *In re Adelphia Commc'ns Corp. Sec. and Derivative Litig.*, No. 03 MD 1526 (LMM), 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16, 2006), *aff'd* 272 F. App'x 9 (2d Cir. 2008) (awarding attorneys' fees of 21.4% of $455 million settlement); *In re Cardinal Health, Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 754-55 (S.D. Ohio 2007) (awarding attorneys' fees of 18% of $600 million settlement); *In re Lucent Tech., Inc. Sec. Litig.*, 327 F. Supp. 2d 426, 433, 442 (D.N.J. 2004) (awarding attorneys' fees of 17% of $517 million settlement). They also note that all lead plaintiffs[2]—seven of which are institutional investors—approved the fee application and that a fee of 20% of the common fund is expressly permitted under the terms of the retainer agreements counsel negotiated with the institutional plaintiffs that initiated this suit. (Singer Decl. ¶¶ 191-92.) Further, the notice distributed to nearly 500,000 potential class members advised that plaintiffs' counsel would seek a fee not to exceed 20% of the settlement fund. (Singer Decl. ¶ 194.) Only thirty-one opt-outs—thirteen of which were from class members who suffered losses—and five objections were received. *In re Citigroup Inc. Bond Litig.*, 2013 WL 4427195, at *4.

Certain considerations must be balanced against these points in favor of the requested fee, however. First is the Court's responsibility to avoid awarding plaintiffs' counsel a "windfall" at the expense of the class—a special concern when "the recovered fund runs into the multi-millions," as does this fund of $730 million. *See Goldberger*, 209 F.3d at 52. In cases with exceptionally large common funds, courts often "account[] for these economies of scale by awarding fees in the lower range." *Id.*

Second is that, although counsel's case citations are accurate, there are many others where the percentage fee awarded in settlements as large as this one is typically lower—often substantially lower—than 20%. *See, e.g., In re*

---

[2] The class representatives are Louisiana Sheriffs' Pension & Relief Fund, the City of Tallahassee Retirement System, the City of Philadelphia Board of Pensions and Retirements, the Miami Beach Employees' Retirement Plan, Southeastern Pennsylvania Transit Authority, American European Insurance Company, Arkansas Teacher Retirement System, Phillip G. Ruffin, and James M. Brown. *In re Citigroup Inc. Bond Litig.*, 2013 WL 4427195, at *2 n.2.

3

*Citigroup Sec. Litig.*, 2013 WL 3942951, at *28 (awarding attorneys' fees of 12% of $590 million); *In re Wachovia Preferred Sec. and Bond/Notes Litig.*, No. 09 Civ. 6351 (RJS), 2012 WL 2589230, at *1, *3 (S.D.N.Y. Jan. 3, 2012) (awarding attorneys' fees of 12% of $627 million); *Carlson v. Xerox Corp.*, 596 F. Supp. 2d 400, 403, 414 (D. Conn. 2009) (awarding attorneys' fees of 16% of $750 million). Indeed, as recognized by Professor Geoffery P. Miller in a report submitted in support of the attorneys' fee request in connection with the settlement in *In re Citigroup Inc. Securities Litigation* (the "*Securities* Action")—another consolidated class action in this multidistrict litigation—the average percentage fee award of post-PSLRA settlements in the $550 to $800 million range is 17.3%, with a median of 16.5%. 2013 WL 3942951, at *27. Moreover, in *Carlson v. Xerox Corp.*, which involved a common fund of $750 million—comparable in size to the one here—the court considered the top twenty-six post-PLSRA settlements that had occurred before early 2009 and found that "in only 6 of the 26 cases were the fees awarded 20% or more of the amount of the common fund." 596 F. Supp. 2d at 405. The *Carlson* court ultimately approved a fee award of 16% of the settlement fund, rather than the 20% award requested by plaintiffs' counsel. *Id.* at 411-14.

Finally, the Court considers the objection of the Hopsons, who advocate for a fee award of 15% or less. In support, they reference an empirical study of class action settlements reached during the years of 2006 and 2007 concluding that the median percentage awarded in settlements between $500 million and $1 billion was 12.9%. Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Stud. 811, 839 (2010). The objection also points to the 16% fee award in *Carlson*. The Hopsons' examples are of limited utility because of the narrow scope of their sample size, but the Court takes seriously the concern that the requested 20% fee award is too high for such a large settlement fund.

Ultimately, the Court finds the median of close to 16% in post-PLSRA cases of similar size, as well as the 16% of the settlement fund awarded in *Carlson*, informative in determining a reasonable percentage fee that balances the need to provide plaintiffs' counsel with adequate compensation and the desire to prevent attorneys from recovering windfalls in megafund cases. Informed by these data, the Court finds a fee award of 16% of the settlement fund to be reasonable, subject to confirmation by the lodestar cross-check and an examination of the *Goldberger* factors.

### B. The Lodestar Cross-Check

The lodestar is "the product of a reasonable hourly rate and the reasonable number of hours required by the case"; it "creates a

4

presumptively reasonable fee." *Millea v. Metro-N. R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011) (internal quotation marks omitted). The reasonable fee is an estimation of "what a reasonable, paying client would be willing to pay, given that such a party wishes to spend the minimum necessary to litigate the case effectively." *Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009) (internal quotation marks and citation omitted). A multiplier is typically applied to the lodestar figure to represent "the risk of litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors." *In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 468 (S.D.N.Y. 2004).

Here, Bernstein Litowitz submitted a lodestar figure of $87,229,248. This figure represents 213,507 hours of work—the total performed by all seven firms that rowed oars on behalf of the class in this litigation[3]—multiplied by the proposed reasonable hourly rate for each attorney according to how many hours are attributable to her. (Ex. 12 to Singer Decl.) Overall, 166,213 hours and $67,134,135 of lodestar is attributed to Bernstein Litowitz; the next-highest-billing firm, Kessler Topaz, contributed 34,251 hours and $14,001,494 of lodestar.

Plaintiffs' counsel contend that this lodestar figure supports their request for 20% of the settlement fee, or $146 million. Using the $87,229,248 figure, counsel's requested fee represents a 1.67 multiplier, which they contend is significantly below the typical multiplier utilized in litigation involving large common funds. As this Court has noted, however, "[c]ourts in this Circuit have trended toward awarding lower percentages and lower multipliers for awards from extremely large common funds." *In re Citigroup Inc. Sec. Litig.*, 2013 WL 3942951, at *27. The multiplier of 1.34 that results from using the Court's preferred award of 16% of the settlement fee, or $116.8 million, is therefore still well within the appropriate range. Awards recently approved by courts in this Circuit confirm this. *See, e.g., In re Citigroup, Inc. Sec. Litig.*, 2013 WL 3942951, at *28 (applying multiplier of 2.8); *In re Wachovia Preferred Sec. & Bond/Notes Litig.*, 2012 WL 2589230, at *3 (applying multiplier of 2.3); *Carlson*, 596 F. Supp. 2d at 413 (applying multiplier of 1.25); *In re Initial Public Offering Sec. Litig.*, 671 F. Supp. 2d at 514 (applying "negative multiplier" of 0.7). The Court nevertheless examines the reasonableness of both the number

---

[3] In addition to Bernstein Litowitz, these firms are Kessler Topaz Meltzer & Check, LLP; Pomerantz Grossman Hufford Dahlstrom & Gross LLP; Klausner & Kaufman PA; Rice, Michels & Walther LLP; Ann D. White Law Offices, PC; and Murray Frank LLP. The work of Bernstein Litowitz, Kessler Topaz, and Pomerantz accounts for the vast majority of the lodestar. (Singer Decl. ¶ 161.)

of hours and the hourly billing rates submitted by counsel to ensure the lodestar amount is accurate.

### 1. Hours Reasonably Expended

Although the overall number of hours spent on this litigation is high, the Court does not find it unreasonably so in comparison to the amount of work done. This litigation lasted four-and-one-half years. Plaintiffs' counsel were responsible for investigating claims spanning a time period of over two years—far longer than the class period in the *Securities* Action—and covering forty-eight separate debt instruments. Plaintiffs' counsel filed two complaints in state court, followed by a consolidated class action complaint in this Court, fully briefed four significant motions—an opposition to a motion to dismiss, a motion to compel, a motion for class certification, and an opposition to a motion for judgment on the pleadings—reviewed in excess of 42.5 million pages of documents, took or defended seventy-six depositions, and engaged six experts. Moreover, counsel negotiated the terms of the settlement—a process that included a lengthy engagement with a third-party mediator. *In re Citigroup Inc. Bond Litig.*, 2013 WL 4427195, at *2-4, *7.

Bernstein Litowitz submitted evidence of the hours spent by each attorney at each firm in support of its fee application, as well as detailed time entries explaining what each attorney spent his or her time on. The Court has reviewed these time records and finds no significant instances of inflation or waste. And "[b]ecause the lodestar is being used merely as a cross-check, it is unnecessary for the Court to delve into each hour of work that was performed by counsel to ascertain whether the number of hours reportedly expended was reasonable." *In re Initial Public Offering Sec. Litig.*, 671 F. Supp. 2d at 506. Nonetheless, the Court has conducted an independent review of these records because "the lodestar serves little purpose as a cross-check if it is accepted at face value." *In re Citigroup Inc. Sec. Litig.*, 2013 WL 3942951, at *16. Subjected to the appropriate level of scrutiny, counsel's commitment of 213,507 hours to this litigation appears reasonable.

### 2. Reasonable Hourly Rates

Despite its determination that the reported number of hours is justified, the Court questions whether the lodestar amount is too high because of the proffered hourly billing rates for "staff attorneys." These are attorneys whose work the Court finds would be valued by the market somewhere in between that of project-specific or "contract" attorneys and traditional law firm associates. *See In re Citigroup Inc. Sec. Litig.*, 2013 WL 3942951, at *21 (characterizing contract attorneys as those "who are not permanent employees of the law firm, are hired largely from outside staffing agencies,

are not listed on counsel's law firm website or resume, are paid by the hour, and are hired on a temporary basis to complete specific projects related to a particular action"). Unlike associates, staff attorneys—at least those utilized by plaintiffs' attorneys in this litigation—are employed essentially to review documents, are paid on an hourly basis, and are not listed on the firm's website. Unlike contract attorneys, however, they are full-time employees of the law firm, work onsite, and are provided benefits and ongoing legal education. (Supplemental Decl. of Steven B. Singer, Esq. dated July 15, 2013 ("Supp. Singer Decl.") ¶¶ 3-4.) In its opinion approving the attorneys' fee award in the *Securities* Action, the Court determined that $200 per hour was a fair approximation of the rate a reasonable paying client with bargaining power would pay for the work of a contract attorney. *In re Citigroup Inc. Sec. Litig.*, 2013 WL 3942951, at *25.

    Here, the firms that worked on this litigation have submitted a range of hourly rates for staff attorneys—as distinct from contract attorneys—that results in a total blended hourly rate of $385. (Ex. 12 to Singer Decl.) The question of whether this rate is too high, as the Hopsons suggest, is important because of the significant percentage of the lodestar attributable to staff attorney work. Approximately 78% of the total hours spent by plaintiffs' attorneys litigating this action were logged by staff attorneys.[4] And roughly $63.5 million—approximately 73%—of the lodestar represents compensation for staff attorneys.

    There is, of course, nothing wrong on its face with plaintiffs' counsel's extensive use of staff attorneys; it appears to be a cost-effective manner of conducting document review and similar routine tasks, which were undoubtedly important to the development of plaintiffs' claims and evidence. Nor does the Court intend to call into question the quality of these attorneys' work. The Court does question, however, whether the proposed blended hourly rate for staff attorneys actually reflects what a reasonable client would pay, and this inquiry is material to the accuracy of the lodestar writ large because of the firm's high utilization of staff attorneys.

    The Court raised its concerns about the proposed blended hourly rate for staff attorneys at the fairness hearing. In response, Bernstein Litowitz submitted bankruptcy applications from six major firms—including defense counsel Paul, Weiss, Rifkind, Wharton & Garrison LLP—in an attempt to defend the reasonableness of its proposed rates. (Ltr. from Max W. Berger, Esq. dated July 29, 2013 ("Berger Ltr.").) The total blended hourly rate

---

[4] 165,569 of the 213,507 total hours expended by plaintiffs' attorneys was spent by staff attorneys. (Ex. 12 to Singer Decl.)

7

proposed for the work of staff attorneys in these applications works out to approximately $333 per hour. The Court notes that this rate is not only lower than that proposed by plaintiffs' counsel here, but also that its source is bankruptcy fee applications, in which there is no indication that the appropriateness of individual rates was analyzed independently. *See In re Citigroup Inc. Sec. Litig.*, 2013 WL 3942951, at *24 n.8.

The Court also recognizes, however, that the firms submitting these applications to the bankruptcy courts affirmed these rates were reflective of those typically charged. (Exs. A-G to Berger Ltr.)  The Court has no way of knowing, however, whether the typical rates charged in bankruptcy actions are the same as the typical rates charged in traditional litigation, or if clients with substantial market power, such as the institutional investors who comprise the majority of lead plaintiffs here, could have negotiated better rates. *See In re Citigroup Inc. Sec. Litig.*, 2013 WL 3942951, at *23-25. This information leads the Court to observe, as it did in the *Securities* Action, that there is "no simple answer[]" and "no one number flows inexorably from the record." *Id.* at *25.

The available evidence, however, leads the Court to believe that the proffered rate for staff attorneys—and therefore the lodestar figure itself—is too high. It need not decide the exact rate at which a hypothetical paying client would compensate a firm for the services of staff attorneys, however, to conclude that the lodestar cross-check supports its finding that an award of $116.8 million is appropriate. If the Court reduces the blended hourly rate for staff attorneys to $300—a rate that appears to be either appropriate or slightly high—the modified lodestar is approximately $73.5 million. Such a reduction would make the multiplier closer to 1.59. Assuming even a blended hourly rate for staff attorneys of $250—perhaps somewhat on the low end—the result is a modified lodestar of approximately $65 million and a multiplier of nearly 1.8.  All of these figures are within the range of reasonableness.

The lodestar cross-check has therefore performed its function, satisfying the Court that an award of 16%—which it has already determined represents a reasonable percentage of the settlement fund—adequately compensates plaintiffs' counsel for their time and effort based on estimations of reasonable market rates and factoring in an appropriate multiplier.

### C. Assessing Reasonableness Pursuant to *Goldberger*

Regardless of whether the percentage of the fund method or the lodestar method is used to calculate attorneys' fees, courts within this Circuit consider the following six factors to confirm that a fee award is reasonable in common fund cases:  "(1) the time and labor expended by counsel; (2) the magnitude

8

and complexities of the litigation; (3) the risk of the litigation . . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Wal-Mart Stores, Inc.*, 396 F.3d at 121 (quoting *Goldberger*, 209 F.3d at 50). The Court examines each factor in turn, concluding that all six support the substantial award given here.

### 1. Time and Labor Expended By Counsel

As explained in detail in the Court's Opinion approving the settlement, counsel spent considerable time and labor for the benefit of the class during the four-and-one-half year duration of this case. *In re Citigroup Inc. Bond Litig.*, 2013 WL 4427195, at *2-4, *7. The 213,507 hours plaintiffs' counsel spent pursuing this action on behalf of the class were, as stated, reasonable and are not the product of waste. This significant expenditure of time and effort weighs in favor of a large award.

### 2. The Magnitude and Complexities of the Litigation

As is typical in securities class action suits, this litigation was both broad in scope and complex. *In re Citigroup Inc. Bond Litig.*, 2013 WL 4427195, at *7. First, the class period was relatively lengthy and encompassed a significant number of securities issuances. Specifically, plaintiffs' claims were based on numerous alleged material misstatements or omissions made in connection with forty-eight separate issuances of Citigroup debt securities or preferred stock that occurred over a period of more than two years. *See In re Citigroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 574-75 (S.D.N.Y. 2010). Second, these misstatements involved an alphabet soup of complex financial instruments that have become synonymous with the financial meltdown of 2008—principally residential mortgage backed securities ("RMBS") collateralized debt obligations ("CDOs"), structured investment vehicles ("SIVs"), and auction-rate securities ("ARS")—as well as Citigroup's statements about its capital ratio and its compliance with Generally Accepted Accounting Principles ("GAAP"). *Id.* Moreover, in addition to the complexity of the facts, the applicable law is far from simple. In particular, plaintiffs' standing to bring claims pursuant to the Securities Act of 1933 for each issuance was by no means assured. *Id.* at 583-85. Further, they had to contend with significant case law developments that occurred during the pendency of this action concerning the standard of proof required to demonstrate that certain types of misstatements are actionable pursuant to the Securities Act. *In re Citigroup Inc. Bond Litig.*, 2013 WL 4427195, at *8. The upshot is that the magnitude and complexity of the litigation also weigh in favor of a significant award.

### 3. *The Risk of the Litigation*

As other courts in this district have recognized, the risk of achieving no recovery at all in a securities class action suit has become quite small. *See, e.g., In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 139 (S.D.N.Y. 2008). The vast majority of such cases that survive motions to dismiss resolve themselves via agreed-upon settlements. *In re Citigroup Sec. Litig.*, 2013 WL 3942951, at *26. That said, this suit did not involve certain factors that traditionally signal the virtual inevitability of a settlement—such as a successful government investigation—and did involve the risk of an unfavorable outcome brought on by changes in applicable case law. *In re Citigroup Inc. Bond Litig.*, 2013 WL 4427195, at *8. The Court finds that this factor also tips in favor of a substantial fee.

### 4. *The Quality of Representation*

The U.S. Court of Appeals for the Second Circuit has observed that "the quality of representation is best measured by results, and . . . such results may be calculated by comparing 'the extent of possible recovery with the amount of actual verdict or settlement.'" *Goldberger*, 209 F.3d at 55 (quoting *Lindy Bros. Builders, Inc. of Philadelphia v. Am. Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 118 (3d Cir. 1976)). Though the recovery here—$730 million—represents only a fraction of the possible recovery estimated by plaintiffs' damages experts—$3 billion—that fraction is still an impressive result. This observation is particularly meaningful when the percentage of the highest possible recovery here is compared to the percentage of the highest possible recovery in comparable cases. *In re Citigroup Inc. Bond Litig.*, 2013 WL 4427195, at *9. In short, it is a favorable comparison.

From a qualitative standpoint, the Court is satisfied with Bernstein Litowitz's representation. It has been recognized by other courts, *see, e.g., In re Lucent Techs. Inc. Sec. Litig.*, 327 F. Supp. 2d at 433, 436, and is reflected in the work observed by the Court during the course of this action. This factor therefore also suggests that counsel is deserving of a substantial award.

### 5. *The Requested Fee in Relation to the Settlement*

As the Court has explained, the requested fee of 20% of the settlement fund is too high when compared to fees awarded in similar cases. *See In re Citigroup Inc. Sec. Litig.*, 2013 WL 3942951, at *27. For the reasons set forth above, the Court's chosen percentage award of 16% is more appropriate in relation to comparators. The Court has therefore considered this factor and determined that it "weighs in favor of a substantial fee award, albeit lower than Lead Counsel has requested." *Id.*

10

### 6. *Public Policy Considerations*

Finally, the Court addresses the public policy considerations involved in awarding significant attorneys' fees when counsel has succeeded in creating a large common fund on behalf of a class. Competing concerns cut both ways. Weighing in favor of a large award are the importance of private actions to ensuring the effectiveness of federal securities laws and the need to encourage quality attorneys to take on such difficult, expensive, complex, and time-consuming actions on a contingency basis. *See Hicks v. Stanley*, No. 01 Civ. 10071 (RJH), 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005) ("In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives."). Weighing against such large awards is the need to protect the interests of the class, who often have no representative in the fee request debate, and guarding against an award of fees "in excess of that required to encourage class litigation." *See In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. at 142. Every dollar that goes to the lawyers is a dollar less that goes to the class members.

The Court has carefully considered the public policy effects of significant awards of attorneys' fees—such as the one contemplated here—and it finds that, although no solution is perfect, its preferred award achieves a balance between encouraging skilled counsel to undertake securities class action litigation on a contingency basis in the future, rewarding plaintiffs' counsel now for having done so successfully, and avoiding providing a windfall to plaintiffs' attorneys at the expense of the class.

\*\*\*

In sum, the Court finds that the percentage of the fund method, the lodestar cross-check, and the *Goldberger* factors all support awarding plaintiffs' counsel substantial attorneys' fees of 16% of the settlement fund, or $116.8 million.

## II. REIMBURSEMENT OF LITIGATION EXPENSES

Bernstein Litowitz also seeks reimbursement of litigation expenses on behalf of itself and the other firms that spent significant time on this action. The Court has reviewed the affidavits submitted in support of this request and finds the requested fees to be reasonable. Plaintiffs' counsel is therefore awarded $7,286,868 in reimbursable expenses.

### III. REIMBURSEMENT OF EXPENSES INCURRED BY LEAD PLAINTIFFS

Finally, plaintiffs' counsel seek reasonable costs and expenses on behalf of certain lead plaintiffs pursuant to the PSLRA. *See* 15 U.S.C. § 78u–4(a)(4). The Court has reviewed the affidavits submitted in support of this request; it also notes that it received no objections to this request. The Court finds these costs and expenses reimbursable and therefore awards $39,946 to lead plaintiffs.

### IV. CONCLUSION

For the foregoing reasons, the Court grants plaintiffs' counsel's motion for an award of attorneys' fees and reimbursement of litigation expenses. (Dkt. No. 158.) Specifically, the Court awards attorneys' fees in the amount of 16% of the settlement fund, or $116.8 million; reimbursement of litigation expenses in the amount of $7,286,868; and reimbursement of reasonable costs and expenses to lead plaintiffs in the amount of $39,946.

Dated: New York, New York
December 19, 2013

SO ORDERED:

_____
Sidney H. Stein, U.S.D.J.

12